ARGUMENT SCHEDULED FOR SEPTEMBER 8, 2026

---

Case No. 26-7050

---

IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA

---

National Association of Home Builders of the United States et al.,

*Plaintiffs-Appellants*

v.

District of Columbia,

*Defendant-Appellee*

---

On Appeal from the United States District Court for the
District of Columbia

---

**Brief of *Amicus Curiae* Public Health Law Center Supporting Defendant-Appellee and Affirmance**

---

Daniel Carpenter-Gold
Jamie Long

Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
daniel.carpentergold@mitchellhamline.edu
(651) 290-6329

**Certificate as to Parties, Rulings under Review, and Related Cases**

Parties and *Amici*: Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Opening Brief for Appellants. In addition, the Public Health Law Center is aware of the following *amici* appearing in this Court:

American Gas Association supporting Appellants.

The United States supporting Appellants.

The States of New York, Colorado, Connecticut, Hawai'i, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Oregon, and Vermont as well as the County of Montgomery, Maryland, and the City of New York supporting Appellee.

William Boyd, Lincoln Davies, Daniel A. Farber, Sharon Jacobs, Alexandra Klass, Joshua C. Macey, Heather Payne, Melissa Powers, Jim Rossi, David B. Spence, and Shelley H. Welton supporting Appellee.

The Public Health Law Center supporting Appellee. The Public Health Law Center has no parent corporation and no publicly held corporation owns 10% more of its stock.

Rulings under Review: References to the rulings at issue appear in the Opening Brief of Appellants.

ii

Related Cases: The case on review was not previously before this or any other Court. Counsel are aware of the following cases before other U.S. Courts of Appeal with at least one party in common with this case and a similar question of law: *Md. Bldg. Ind. Assoc., Inc. v. McIlwain*, No. 26-1552 (4th Cir.), and *Nat'l Assoc. of Home Builders v. Montgomery County*, *Maryland*, No. 26-1449 (4th Cir.) are in briefing; *Mulhern Gas Co., Inc. v. Mosley*, No. 25-2041 (2d Cir. decided June 30, 2026), and *Rinnai Am. Corp. v. S. Coast Air Qual. Mgmt. Dist.*, No. 25-5129 (9th Cir. decided July 2, 2026) were recently decided and the time for a petition for rehearing has not yet lapsed. In addition, *Assoc. of Contracting Plumbers v. City of New York*, No. 25-977 (2d Cir. decided June 30, 2026), was consolidated with *Mulhern Gas* and addresses a similar question of law but shares no parties in common with this case.

iii

# Table of Contents

Certificate as to Parties, Rulings under Review, and Related Cases ........................ ii

Table of Authorities ................................................................................................. v

Glossary .................................................................................................................. vii

Statutes and Regulations ....................................................................................... vii

Statement of Identity, Interest in Case, and Source of Authority ............................ 1

Statement of Authorship and Financial Contributions ............................................ 1

Summary of Argument .......................................................................................... 1

Argument ................................................................................................................ 3

    I.    The Clean Buildings Act Will Not Create the "Patchwork" of Conflicting Standards with Which EPCA's Preemption Provision is Concerned ................... 3

        A.    EPCA's Preemption Provision Exists to Protect Against Specific Economic Harms ......................................................................................... 4

        B.    The Clean Buildings Act Does Not Implicate Any of the Economic Harms Congress Sought to Prevent ................................................................. 8

    II.    The Code Exemptions Confirm that EPCA Does Not Preempt the Clean Buildings Act ...................................................................................................... 12

        A.    The Code Exemptions Do Not Indicate Congressional Intent to Preempt Appliance Prohibitions ............................................................................... 13

        B.    If EPCA Preemption Applied to the Clean Buildings Act, It Would be Protected by the Code Exemptions .............................................................. 20

Conclusion ............................................................................................................. 31

Certificate of Compliance ..................................................................................... 32

## Table of Authorities

### Cases

*Assoc. of Contracting Plumbers v. City of New York*, 2026 WL 1871692 (2d Cir. June 30, 2026)..................................................................................... 3, 8, 25

*Bread Pol. Action Comm. v. F.E.C.*, 455 U.S. 577 (1982)......................................29

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) ..............................................16

*Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122 (D.C. Cir. 1995).................3

*Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355 (D.C. Cir. 1985)..........15

### Statutes

42 U.S.C. § 6295(f) ...................................................................................................29

42 U.S.C. § 6297(c) .....................................................................................................2

42 U.S.C. § 6297(f)............................... 2, 12, 14, 17, 20, 23, 24, 25, 26, 27, 28, 29

42 U.S.C. § 6316(b) ......................................... 2, 14, 17, 20, 21, 22, 28, 29

42 U.S.C. § 6833(b) ...................................................................................................30

D.C. Code § 6-1451.01 ..............................................................................................29

D.C. Code § 6-1453.01 ................................................................................ 20, 21, 28

D.C. Energy Conservation Code (2017).................................................... 19, 24, 26

D.C. Existing Building Code (2017) .........................................................................30

### Session Laws and Legislative Materials

133 Cong. Rec. 4501 (Mar. 3, 1987) ..........................................................................6

133 Cong. Rec. 802 (Jan. 6, 1987)...............................................................................7

*Appliance Standards: Hearing on H.R. 5465 Before the Subcomm. on Energy Cons. & Power of the Comm. on Energy & Commerce*, 99th Cong. (Sept. 10, 1986) ........................................................................................................ 5, 6, 7, 9

H.R. Rep. No. 100-11 (1987) .......................................................... 3, 7, 9, 23, 25, 26

National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101
    Stat. 103 ............................................................................................................3

*National Appliance Energy Conservation Act: Hearing on S.2781 Before the*
    *Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat.*
    *Res.*, 99th Cong. (Sept. 16, 1986) .............................................................. 5, 7, 18

S. Rep. No. 100-6 (1987) ........................................................... 3, 13, 15, 17, 19, 24

**Administrative Materials**

*State Petitions for Exemption from Federal Preemption of State Standards for*
    *Refrigerators and Refrigerator-Freezers, Freezers, Water Heaters, Room Air*
    *Conditioners, Central Air Conditioners, Furnaces and Kitchen Ranges and*
    *Ovens*, 49 Fed. Reg. 32,944 (Aug. 17, 1984) .........................................................16

**Other Authorities**

Am. Soc'y of Heating, Refrigerating and Air-Conditioning Eng'rs, *Energy*
    *Conservation in New Building Design*, Standard 90-1975 (1975) ................ 15, 17

Am. Soc'y of Heating, Refrigerating and Air-Conditioning Eng'rs, *Energy*
    *Conservation in New Building Design*, Standard 90A,B,C-1980 (1980) ............18

Am. Soc'y of Heating, Refrigerating and Air-Conditioning Eng'rs, *Energy*
    *Standard for Buildings Except Low-Rise Residential Buildings*, Standard 90.1-
    2025 (2026) ........................................................................................................30

Int'l Code Council, *2015 International Fire Code* ..................................................22

Int'l Code Council, *2015 International Fuel Gas Code* ..........................................22

Int'l Code Council, *2015 International Residential Code* ......................................22

Pac. Nw. Lab., *Issues in Federal Preemption of State Appliance Energy Efficiency*
    *Regulations* (1982) .................................................................................. 16, 18

U.S. Dept. of Energy, *Status of State Energy Code Adoption* (June 30, 2026) .......30

U.S. Energy Info. Admin., *Residential Energy Consumption Survey* (2023) ..........9

**Glossary**

ASHRAE...................................American Society of Heating, Refrigerating and Air-Conditioning Engineers

Center .......................................Public Health Law Center

Clean Buildings Act..................Clean Energy D.C. Building Code Amendment Act of 2022, D.C. Act 24-528 (July 27, 2022)

Code Exemptions ......................42 U.S.C. §§ 6297(f), 6316(b)(2)

Consumer Code Exemption ......42 U.S.C. § 6297(f)

District......................................District of Columbia

DOE...........................................U.S. Department of Energy

EPCA.........................................Energy Policy and Conservation Act

Industrial Code Exemption .......42 U.S.C. § 6316(b)(2)

NAECA ......................................National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103


**Statutes and Regulations**

Except for the following, all applicable statutes and regulations are contained in the Opening Brief for Appellants and the Brief for Appellee the District of Columbia: 42 U.S.C. § 6833; D.C. Energy Conservation Code Appx. G, § 1.2; D.C. Existing Building Code § 505. These materials are reprinted in an addendum to this brief.

**Statement of Identity, Interest in Case, and Source of Authority**

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations, such as the law challenged in this case, that reduce indoor and outdoor pollution caused by the combustion of certain fuels. The Center is also concerned with preserving the power of state and local governments to protect their constituents through regulations that protect public health.

The Center files this brief with the consent of all parties. Counsel hereby certify that a separate brief from the Center is necessary because the Center has expertise and perspective on the operation of preemption under the Energy Policy and Conservation Act not shared by other *amici*.

**Statement of Authorship and Financial Contributions**

No party's counsel authored this brief in whole or in part. No party's counsel, or any person other than the Center, contributed money intended to fund the preparation or submission of this brief.

**Summary of Argument**

The Energy Policy and Conservation Act (EPCA) does not preempt laws like the Clean Buildings Act. As the District of Columbia (District) explains, the Clean Buildings Act does not "concern[] the energy use[ or] energy efficiency," 42

1

U.S.C. §§ 6297(c), 6316(b)(2), of any EPCA-covered product. *See generally* Br. for Appellee the District of Columbia (District's Br.) at 17-25.

The Center offers this *amicus curiae* brief to provide the Court with further background on two flawed assertions in Appellants' argument. First, as the District notes, the legislative record's reference to "patchwork" state and local regulations does not implicate laws like the Clean Buildings Act. District's Br. 42-43; *contra* Op. Br. of Appellants' (Appellants' Br.) at 32. A full understanding of the record demonstrates that Congress used EPCA preemption to prevent the growth of a large number of conflicting standards that were subject to arbitrary change, a scenario that regulations like the Clean Buildings Act will not and cannot bring about.

Second, Appellants badly misconstrue the exemptions from preemption in EPCA for regulations contained in building codes, 42 U.S.C. §§ 6297(f), 6316(b)(2) (Code Exemptions). The Code Exemptions do not indicate congressional intent to preempt regulations other than appliance efficiency standards. *Contra* Appellants' Br. 23-27, 47-48. Instead, the Code Exemptions specifically protect appliance efficiency standards, when those standards are located in a building code and certain other requirements are met. If, on the other hand, Appellants were correct that the Clean Buildings Act's standards were "regulations concerning the energy use[ or] energy efficiency" of an EPCA-

covered product, the Code Exemptions would protect them from preemption. The Code Exemptions therefore prevent EPCA preemption of the Clean Buildings Act.

## Argument

### I. The Clean Buildings Act Will Not Create the "Patchwork" of Conflicting Standards with Which EPCA's Preemption Provision is Concerned

The preemption language at issue in this case originated in amendments made to EPCA in the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103 (NAECA). *See* District's Br. 6-8. The legislative record behind NAECA's drafting illuminates Congress's intent in enacting EPCA's preemption provisions. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("[P]ertinent legislative history may often shed new light on congressional intent."). Congress intended NAECA's preemption provision "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24 (1987). But Congress did not seek "to ensure access to all covered products." *Assoc. of Contracting Plumbers v. City of New York*, 2026 WL 1871692, at *7 n.5 (2d Cir. June 30, 2026). Rather, "Congress was concerned with a patchwork of conservation standards specifically, not a patchwork of any kind of regulation, because they could 'complicate [manufacturers'] design, production and marketing plans.'" *Id.* at *8 n.8 (quoting S. Rep. No. 100-6, at 4 (1987)).

3

Indeed, as the District explains, Congress solved the historical patchwork problem by nationalizing appliance conservation standards and restricting state waivers—not by expanding the scope of EPCA's preemption provision to reach every state regulation affecting covered appliances. District's Br. 43-44. This concern does not "cover all regulations which might impact the choices of manufacturers" and certainly does not implicate the Clean Buildings Act's binary distinction between electric and fossil-fuel appliances. *Assoc. of Contracting Plumbers*, 2026 WL 1871692, at *8 n.8.

### A. EPCA's Preemption Provision Exists to Protect Against Specific Economic Harms

Congress's concern with a patchwork of appliance conservation standards reflected three related economic threats. First, Congress sought to prevent inconsistent state appliance efficiency standards from fragmenting the national appliance market. Second, Congress sought to avoid continual changes to those standards that would make long-term investment and product development unpredictable. Third, Congress sought to address uneven enforcement of varying state standards that would disadvantage manufacturers complying with more stringent requirements.

Congress was principally concerned with preventing market fragmentation. Senator Wendell Ford, a cosponsor of NAECA, warned that, without national standards, manufacturers would effectively "have to produce 50 separate pieces of

equipment, separate stoves, separate refrigerators, whatever it might be." *National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. 256 (Sept. 16, 1986) (*Senate Subcomm. Hearing*). Industry representatives echoed this concern, explaining that differing state efficiency standards would fragment the national appliance market, eliminate economies of scale, and substantially increase manufacturing and distribution costs. *See, e.g.*, *Appliance Standards: Hearing on H.R. 5465 Before the Subcomm. on Energy Cons. & Power of the Comm. on Energy & Commerce*, 99th Cong. 67 (Sept. 10, 1986) (*House Subcomm. Hearing*) (statement of John Norris, Jr., Chairman, Air Conditioning and Refrigeration Institute) ("Eventually we could see every state with its own mandatory efficiency standard…. The result of that will be a total fragmentation of an efficient national market into 50 individual markets, each with its own rules….").[1]

The argument drew on two different concerns. First, manufacturers would lose economies of scale if they were forced to break existing product lines into

---

[1] Statements by participants in the drafting of a bill are relevant to statutory interpretation, even when the drafters are not legislators. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 202-03 & n.24 (1976) (finding an "explanation of [a bill provision] by a spokesman for its drafters…significant," despite the fact that the speaker was not a member of Congress).

5

many smaller lines, each conforming to a single jurisdiction's conservation standards. As a representative of the Gas Appliance Manufacturers Association explained, "Instead of making a run of a thousand products, I may now have to take that product and make it into 50 of these and 25 of those, and so forth, and my production efficiencies go down tremendously in my plant." *Id.* at 142 (statement of Robert J. Bauer, Chairman, Gas Appliance Manufacturers Association). Second, distribution costs would increase because each of these new product lines would need to be directed to the appropriate state. *Id.* (explaining that if a single Sears distribution center serving Illinois, Indiana, Iowa, Michigan, Missouri, Ohio, and Wisconsin "had to have a different product for each one of those states…distribution costs would be horrendous").

Congress also recognized that continually changing state efficiency standards created regulatory instability. As Representative Moorhead explained, state appliance standards were marked by "volatility," and one city—Austin, Texas—had adopted one air-conditioner efficiency standard in 1986, increased it in 1987, and planned to increase it again in 1988. 133 Cong. Rec. 4501 (Mar. 3, 1987). Industry representatives similarly warned that state regulations "create[d] great unpredictability in the marketplace, not just because they are inconsistent, but because they are unevenly enforced and subject to change at any time." *House Subcomm. Hearing* at 104 (statement of Robert Bauer, Chairman, Gas Appliance

6

Manufacturers Association). Congress responded by establishing lengthy "lock-in periods" between revisions to federal standards so that "manufacturers can obtain returns on their capital investments before being required to make further investments and other expenditures in order to meet more stringent requirements." H.R. Rep. No. 100-11, at 20.

Finally, Congress was concerned that differing appliance conservation standards would be difficult to enforce. Legislators and industry representatives warned that varying state standards would encourage the sale and distribution of noncompliant appliances across state lines, undermining manufacturers that invested in meeting stricter requirements. Senator Lowell Weicker warned of a growing trade in "smuggled" appliances because consumers crossed state lines to purchase cheaper, less efficient products. 133 Cong. Rec. 802 (Jan. 6, 1987). Industry representatives echoed these concerns, explaining that "[e]nforcement [of state standards] will be difficult and expensive," *House Subcomm. Hearing* at 74 (statement of John Norris, Chairman, Air Conditioning and Refrigeration Institute), and that state efficiency regulations were "unevenly enforced." *Id.* at 104 (statement of Robert Bauer, Chairman, Gas Appliance Manufacturers Association). Likewise, the President of the American Supply Association described wholesalers losing business to competitors selling below-standard appliances. *Senate Subcomm. Hearing* at 219 (statement of David A. Corcoran).

Taken together, these concerns reveal that Congress's objective was not to eliminate every state regulation affecting EPCA-covered products, but to prevent inconsistent appliance performance standards from disrupting the national manufacturing and distribution system.

### B. The Clean Buildings Act Does Not Implicate Any of the Economic Harms Congress Sought to Prevent

The Clean Buildings Act does not create the patchwork Congress sought to avoid. There cannot be fifty conflicting prohibitions governing the same appliance: an appliance is either prohibited, or it is not. *Assoc. of Contracting Plumbers*, 2026 WL 1871692, at *8 n.8 (a prohibition "does not represent the same risk of complication of the market as the potential for fifty different conservation standards"). None of the concerns identified by Congress applies to fossil-fuel prohibitions.

First, the Clean Buildings Act does not require manufacturers to divide existing product lines or create jurisdiction-specific appliance models. Nor does it require the design of new products, since electric appliances already exist to replace fossil-fuel appliances. At most, the Act divides the market into places where fossil-fuel combustion equipment may be installed and places where it may not. This is no different from the status quo, where, for practical or regulatory reasons, some fuels are available in some areas and structures and unavailable in others. For example, approximately 34 million homes in the United States have no

access to natural gas and therefore are not part of the market for gas appliances. U.S. Energy Info. Admin., *Residential Energy Consumption Survey* tbl. HC2.1, at 5 (2023).[2] The Clean Buildings Act may reduce demand for fossil-fuel appliances in newly covered buildings, but it cannot "fragment[] the national market into 50 individual markets, each with its own rules." *House Subcomm. Hearing* at 67 (statement of John Norris, Jr., Chairman, Air-Conditioning and Refrigeration Institute). Simply put, the Clean Buildings Act does not create the "patchwork of numerous conflicting State requirements" that NAECA was enacted to eliminate. H.R. Rep. No. 100-11, at 24.[3]

Second, the Clean Buildings Act does not create the regulatory instability that concerned Congress. For the same reason that the Act will not cause market fragmentation, it also will not create regulatory uncertainty. Appliance prohibitions are not subject to increasing stringency in the way that numeric efficiency standards are. A manufacturer supplying air conditioners to Austin in 1986 did not

---

[2] *Available at* https://www.eia.gov/consumption/residential/data/2020/hc/pdf/HC%202.1.pdf.

[3] Appellants likewise overread Congress's references to the "unavailability…of a product type." Appellants' Br. 31. This language in the legislative record refers to the standard governing federal authority to grant an individualized waiver from preemption, not the scope of EPCA's express preemption clause. S. Rep. No. 100-6, at 2. As the District explains, the two are different in intent and effect. District's Br. 39-40.

know whether it would need to create more efficient products for 1987, or how much more efficient to make them. No such instability results from fossil fuel prohibitions. Because they are binary, fossil fuel prohibitions cannot become more stringent and cannot require continual redesign of existing appliances. Future amendments may expand or contract the buildings to which the Act applies, but they would not require manufacturers to develop new product lines or redesign existing appliances—only to supply appliances already in widespread commercial production. Moreover, buildings constructed under the Clean Buildings Act will generally have the infrastructure necessary to use only electric appliances while lacking the infrastructure required for fossil-fuel combustion equipment, creating a stable market for electric appliances in the future.

Third, the Clean Buildings Act does not present the enforcement concerns that motivated NAECA. These issues arose only where variations in appliance conservation standards were small enough that compliant and noncompliant products remained interchangeable, allowing manufacturers selling below-standard products to undercut those complying with more stringent requirements. Those concerns do not arise where regulations instead require different types of appliances connected to different energy infrastructure. In that circumstance, noncompliant appliances simply cannot be used. Such is the case here: a gas appliance ordinarily cannot be installed in a building designed not to use such

10

appliances. Consequently, the Clean Buildings Act does not create the widespread possibility that manufacturers distributing compliant products will be undercut by manufacturers selling noncompliant appliances in neighboring jurisdictions. Nor does it create the kind of inconsistent appliance standards that Congress believed would frustrate enforcement and undermine a uniform national market.

Ultimately, the legislative history confirms the limits reflected in EPCA's text and structure. Congress was not attempting to eliminate all state and local regulation affecting EPCA-covered appliances. Rather, it sought to reduce the unpredictability, market fragmentation, and enforcement difficulties caused by conflicting state and local appliance conservation standards. As the District explains, Congress addressed the pre-1987 patchwork by adopting national appliance conservation standards and narrowing the circumstances in which states could obtain waivers—not by broadening EPCA's substantive preemptive reach to encompass every regulation affecting appliance markets. District's Br. 42-43. The Clean Buildings Act does not recreate that historical patchwork. It does not establish conflicting appliance efficiency standards, require manufacturers to redesign products, or threaten a proliferation of jurisdiction-specific product lines. Instead, it merely shifts demand from one existing category of products—fossil-fuel appliances—to another—electric appliances.

Congress did not enact NAECA to preserve the market share of fossil-fuel appliance manufacturers or to guarantee access to every covered product in every jurisdiction. It enacted NAECA to protect manufacturers from conflicting appliance conservation standards. Because the Clean Buildings Act does not recreate the very patchwork Congress sought to eliminate, EPCA should not be construed to invalidate the Clean Buildings Act on that basis.

## II.     The Code Exemptions Confirm that EPCA Does Not Preempt the Clean Buildings Act

The Clean Buildings Act does not "concern[] the energy efficiency or energy use" of any EPCA-covered product and therefore the Code Exemptions do not apply to it. 42 U.S.C. § 6297(f)(3); *see generally* District's Br. 17-25. The Code Exemptions do not detract from this reading; they confirm that Congress anticipated preempting appliance efficiency standards through EPCA. *Contra* Appellants' Br. 23-27. Certainly, the Code Exemptions do not demonstrate that Congress expected to preempt performance-based building codes themselves—exactly the opposite. If, however, the Clean Buildings Act did "concern[]…energy use" in the manner alleged by Appellants, the Code Exemptions would protect it from preemption.

*A. The Code Exemptions Do Not Indicate Congressional Intent to Preempt Appliance Prohibitions*

Appellants mischaracterize the nature and purpose of the Code Exemptions. The Code Exemptions do not indicate Congress's intent to preempt "some flexible, performance-based building codes"; in fact, EPCA does not preempt "codes" at all. *Contra* Appellants' Br. 26, 48. Rather, the Code Exemptions indicate Congress's awareness that some appliance efficiency standards—the same type of standards that EPCA preempts otherwise—are located in building codes. Congress wanted to protect building codes' use of those standards, so long as specific requirements were met. Among those requirements, for standards applicable to consumer products, is that the code in which the standard was located must be to be "performance-based." S. Rep. No. 100-6, at 10. But that does not mean that the "code" itself would be preempted, or that performance-based codes are disfavored under EPCA. Quite the opposite: the exemption privileges performance-based codes by permitting them to include standards for EPCA-covered appliances that would be preempted elsewhere.

1. Congress Intended the Code Exemptions to Protect Appliance Efficiency Standards

Congress, in passing the Code Exemptions, was specifically concerned with appliance efficiency standards contained in building codes. This is immediately clear from the text of the Code Exemption applicable to industrial appliances,

13

which protects "standard[s]" on the basis of their "energy efficiency" requirements. 42 U.S.C. § 6316(b)(2)(B). This Code Exemption neither refers to "energy use" nor anticipates the possibility of a regulation other than an appliance efficiency standard could be preempted. Therefore, it does not imply that Congress intended EPCA to preempt other types of regulations, such as appliance or fuel prohibitions, or "codes" in their entirety. *Contra* Appellants' Br. 24 n.8, 34.

The consistent focus on appliance efficiency standards is also clear in the structure and history of the relevant language. First, 42 U.S.C. § 6297(f)(2), which applies to regulations in codes enacted between NAECA's passage and a corresponding federal standard, clearly anticipates numeric efficiency standards. Specifically, that subsection protects building-code "standards" that do not "require that the energy efficiency of a covered product exceed" either the standard in a "national voluntary consensus standard" or one of the standards carved out by NAECA when it was passed, "whichever is higher." *Id.* This provision assumes that both the standard itself and the state or consensus standards to which it would be compared are numeric; otherwise, one could not be "higher" or "exceed" the other.

The legislative record supports this reading. While "national voluntary consensus standard" is not defined in the statute, the Senate Report on the bill indicates that the term "include[s] those adopted by the Association of Air

14

Conditioning, Heating and Refrigerating Engineers (ASHRAE)." S. Rep. No. 100-6, at 10. ASHRAE building codes at the time, like today, specified a variety of numeric efficiency standards for specific appliances. *E.g.*, ASHRAE, *Energy Conservation in New Building Design*, Standard 90-1975, §§ 6.3-6.8 (1975) (ASHRAE 90-1975).[4] And the legislative record recognizes this: the building-code standards that Congress intended to protect needed protection because they "typically regulate the energy efficiency of central heating and cooling equipment and water heaters." S. Rep. No. 100-6, at 10. In other words, the "national voluntary consensus standard[s]" to which new standards were to be compared were also appliance-specific, numeric efficiency standards.

In fact, the ASHRAE model building codes were closely connected with the concerns that led Congress to enact NAECA. The impetus for the law began with "no-standard standards" promulgated by the Department of Energy (DOE), which would have preempted state and local appliance efficiency standards without replacing them with federal efficiency standards. *See generally Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1367-69 (D.C. Cir. 1985); S. Rep. No. 100-6, at 3-4. When DOE first endeavored to issue the "no-standard standards" for room air conditioners, furnaces, and water heaters, nearly all states were already

---

[4] *Available at* https://www.ashrae.org/technical-resources/standards-and-guidelines/read-only-versions-of-ashrae-standards.

15

regulating these appliances pursuant to one of two ASHRAE model building codes: ASHRAE 90-1975 and 90A-1980. Pac. Nw. Lab., *Issues in Federal Preemption of State Appliance Energy Efficiency Regulations* 2.4 (1982) (*Issues in Federal Preemption*).[5] And when DOE issued those "no-standard standards," at least 17 states petitioned for waivers of preemption for standards contained in their building codes or in local building codes within their borders—based on the ASHRAE model codes. *State Petitions for Exemption from Federal Preemption of State Standards for Refrigerators and Refrigerator-Freezers, Freezers, Water Heaters, Room Air Conditioners, Central Air Conditioners, Furnaces and Kitchen Ranges and Ovens*, 49 Fed. Reg. 32,944 (Aug. 17, 1984).

Appellants argue that the Code Exemptions provide information about the "domain expressly pre-empted" by EPCA. Appellants' Br. 23 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)). If so, that "domain" is not building codes, but rather appliance efficiency standards—which the Clean Buildings Act does not create. Therefore, the Code Exemptions cement the conclusion that EPCA does not preempt the Clean Buildings Act.

---

[5] *Available at* https://www.osti.gov/servlets/purl/6604664.

2. EPCA Does Not Preempt, but Rather Favors, Code Pathways Like Appendix Z

In exchange for allowing building codes to impose appliance efficiency standards, Congress imposed certain requirements on them. 42 U.S.C. § 6297(f). Initially, the only requirement was that the building-code standard could not require a higher level of efficiency for the equivalent ASHRAE standard. 42 U.S.C. § 6297(f)(2). For standards on industrial appliances, this continues to be the sole requirement. *See infra* § II.B.1 (analyzing 42 U.S.C. § 6316(b)(2)(B)). But for standards on consumer appliances, once a federal standard was promulgated for the relevant appliance, additional requirements kicked in. 42 U.S.C. § 6297(f)(3). Generally, these requirements ensure that the code is "performance-based," meaning that is "authorize[s] builders to adjust or trade off the efficiencies of various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10-11; *see also infra* § II.B.2 (discussing these requirements in detail).

This model of applying high efficiency standards to specific appliances, while allowing builders to trade off the use of lower-efficiency appliances for efficiency gains elsewhere, was prominent in the standards referenced in the legislative record. ASHRAE 90-1975 included such a performance-based tradeoff option. ASHRAE 90-1975 § 10 (allowing "deviat[ions] from the specific design criteria" if "such deviations will result in an annual energy consumption equal to or less than that resulting from compliance with these criteria"). This section was then

17

republished to accompany ASHRAE 90A-1980 as ASHRAE 90B-1975. ASHRAE, *Energy Conservation in New Building Design*, Standard 90A,B,C-1980 (1980).[6] The Air-Conditioning and Refrigeration Institute proposed a similar performance-based approach—a "point index" that assigned points to efficiency measures and required builders to select measures adding up to a certain number of points—as a way of avoiding preemption of state and local building codes under the "no-standard standards." *Issues in Federal Preemption* 3.3-3.4. This "point index" approach was in fact adopted by Florida in its 1982 building code, which was part of DOE's consideration of the state's waiver program after issuance of those standards. 49 Fed. Reg. at 32,949. And, ultimately, Florida's building code, including its "point index" compliance option, was considered by Congress in the process of drafting the Code Exemptions. *Senate Subcomm. Hearing* at 483-87.

This is the deal that Congress made on behalf of state and local building codes: A building code may regulate consumer appliance efficiency in ways that other types of regulation cannot. If it does so, however, it must also provide builders with an alternative, "performance-based" option that allows builders to use appliances at the federal minimum efficiency level and achieve the energy-conservation goals of the code in some other way. This ensures that builders can

---

[6] *Available at* https://www.ashrae.org/technical-resources/standards-and-guidelines/read-only-versions-of-ashrae-standards.

18

always use minimum-efficiency appliances, if they are willing to make up for the efficiency loss elsewhere, while state and local governments can still use appliance-specific building standards in their building codes

For this reason, Appellants' attack on Appendix Z of the D.C. Energy Conservation Code, Appellants' Br. 32-34, is nonsensical. Appendix Z is a performance-based compliance pathway: it measures compliance in part based on a building's total energy consumption. D.C. Energy Conservation Code, Appx. Z § Z2 (2017).[7] In that sense, it is no different from the code's Appendix G, which likewise measures compliance based on a building's energy consumption, and is drawn from ASHRAE 90.1, the model code which replaced ASHRAE 90-75 and 90A-80. *Id.* v-vi, Appx. G § G1.2.2. These compliance options are what make the D.C.'s building code "performance-based": by measuring whole-building energy consumption rather than regulating individual appliances, they "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10-11. In other words, options like Appendix Z are what protect other regulations in D.C.'s building code from preemption; they do not make the code vulnerable to preemption.

---

[7] *Available at* https://dob.dc.gov/sites/default/files/dc/sites/dob/publication/attachments/2017%20DC%20Energy%20Code.pdf.

To the extent that Appellants argue that the Clean Buildings Act is preempted because it "requires compliance with the Appendix Z provisions," Appellants' Br. 33, they are likewise mistaken. As the District notes, the mandatory applicability of Appendix Z has not yet been established. District's Br. 9-11 & n.2, 47-48 & n.5. In any case, the Act merely requires the District to come up with code amendments that achieve the same level of energy savings as Appendix Z, not to copy Appendix Z. D.C. Code § 6-1453.01(a)(3), (b)(1) (requiring the District to develop a "net-zero-energy standard," defined in part as "a standard under which…[a] building conserves an amount of energy…equal to or greater than the amount that would be required by…Appendix Z").

### B. If EPCA Preemption Applied to the Clean Buildings Act, It Would be Protected by the Code Exemptions

At the outset, the Code Exemptions do not apply to the Clean Buildings Act, because the Law does not "concern" the "energy efficiency" or "energy use" of a covered product. 42 U.S.C. §§ 6297(f) (3) & 6316(b)(2); *see* District's Br. 17-25, 38.  But even if the exemptions did apply, the Clean Buildings Act would be protected under EPCA's two building code exemptions: 42 U.S.C. § 6316(b)(2) (the Industrial Code Exemption) and § 6297(f)(3) (the Consumer Code Exemption).

It is uncontested that the Clean Buildings Act's fossil fuel prohibition will be contained in the District's Energy Conservation Code. *See* D.C. Code § 6-

20

1453.01(b). It is also uncontested that the Energy Conservation Code itself qualifies for the Code Exemptions. Appellants argue only that the fossil fuel prohibition, independent of the Energy Conservation Code, is ineligible for the Code Exemptions. Appellants' Br. 51-52.[8] This argument misunderstands how the Code Exemptions operate, as explained below.

1. The Industrial Code Exemption Would Protect Any Industrial Appliance Prohibitions Created Pursuant to the Clean Buildings Act

First, the Clean Buildings Act would qualify under the Industrial Code Exemption. Under this Exemption, a regulation of industrial appliances "contained in a State or local building code for new construction" is protected from EPCA preemption so long as it meets two requirements. 42 U.S.C. § 6316(b)(2)(B). First, the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i). Second, it must "not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(ii). Taken together,

---

[8] If Appellants suggest amici are bringing a new issue before the Court by arguing that the Industrial Code Exemption and Commercial Code Exemption cover the Clean Buildings Act, this is not so. Appellants themselves bring the issue before the Court in arguing that "no waiver or exception can save the Clean Buildings Act from preemption." Appellants' Br. 52.

these two requirements prevent codes from requiring an EPCA-covered industrial appliance to be more efficient than the relevant ASHRAE code would require.

The Clean Buildings Act meets these requirements because it does not set any minimum efficiency standard for any appliance. Appellants argue that the Clean Buildings Act "does not meet this requirement because its ban on EPCA-covered gas industrial appliances that use any gas energy whatsoever effectively requires them to have an impossible level of energy efficiency." Appellants' Br. 51 n. 14. But this argument conflates the prohibition of an appliance with a requirement for that appliance to have a certain efficiency level. The Industrial Code Exemption is concerned with regulations that "require" a higher efficiency standard. 42 U.S.C. § 6316(b)(2)(B)(i). It says nothing of regulations that prevent the use of an appliance, with good reason: building codes place many restrictions on where appliances may be installed in order to promote health and safety.[9]

---

[9] *E.g.*, Int'l Code Council (ICC), *2015 International Fire Code* § 603.4.2.1.1, https://codes.iccsafe.org/content/IFC2015/ (prohibiting outdoor portable gas heaters in occupied buildings); ICC, *2015 International Fuel Gas Code* § 303.3, https://codes.iccsafe.org/content/IFGC2015 (prohibiting fuel-fired appliances in various areas); ICC, *2015 International Residential Code* § 621.4, https://codes.iccsafe.org/content/IRC2015 (prohibiting unvented room heaters in certain buildings).

2. The Consumer Code Exemption Would Continue to Protect the D.C. Code if the Clean Buildings Act Added Consumer Appliance Prohibitions

The Consumer Code Exemption, if it applied, would likewise protect the Clean Buildings Act. The requirements of the Consumer Code Exemption apply to the code in which a regulation is located, not to the regulation itself. 42 U.S.C. § 6297(f)(3) ("[A] regulation or other requirement contained in a State or local building code for new construction…is not superseded by this part if *the code* complies with all of the following requirements…." (emphasis added)). The code must meet seven specific requirements, which, although detailed, are aimed at a simple concept: the code must not "expressly or effectively require the installation of covered products whose efficiencies exceed…the applicable Federal standard." H.R. Rep. No. 100-11, at 26. The exemption is not concerned with appliance prohibitions such as the Clean Buildings Act.

Appellants' arguments are based on the incorrect assumption that the Clean Buildings Act itself—rather than the code as a whole—must comply with the requirements of the Consumer Code Exemption. Appellants' Br. at 51 ("The *Clean Buildings Act* also does not qualify for the building code exception" (emphasis added)). But when taking the code in its entirety as EPCA requires, the D.C. building code continues to meet the Consumer Code Exemption.

23

Appellants claim that the Clean Buildings Act fails to satisfy two of the Consumer Code Exemption's requirements. First, they argue that the "*Clean Buildings Act* does not…'permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.'" Appellants' Br. 51 (quoting 42 U.S.C. § 6297(f)(3)(A)) (emphasis added). But this provision refers to "the code" as a whole. 42 U.S.C. § 6297(f)(3)(A). The appropriate question is whether the Energy Conservation Code as a whole sets an "energy…objective" and allows builders to select items to meet that objective, which it does. For example, the Code's "Performance Rating Method" compliance path allows builders to select whichever efficiency measures they wish to meet a "Performance Cost Index Target" set for each building. D.C. Energy Conservation Code, Appx. G §§ G1.1-2.[10]

This is the type of approach Congress wanted to ensure was permitted under EPCA. It was not concerned with appliance prohibitions, but rather with allowing codes like the IECC that use performance-based efficiency measures but do not require EPCA-covered appliances to exceed federal standards. *See, e.g.,* S. Rep. No. 100-6, at 11 ("The limited requirements of [§ 6297(f)(3)] are designed to ensure the performance-based building codes cannot circumvent the federal

---

[10] *Available at* https://dob.dc.gov/sites/default/files/dc/sites/dob/publication/attachments/2017%20DC%20Energy%20Code.pdf.

standard for a given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards….").

To the extent that Appellants argue that this requirement mandates that builders be able to use any item to achieve energy efficiency, their position is not supported by the text. Codes are required to "permit[] a builder to…select[] items," not to select *any possible* energy conservation item. 42 U.S.C. § 6297(f)(3)(A). Reading this as requiring codes to permit any item the builder wishes to use would be absurd, since there are many items that building codes need to restrict in order to protect building occupants.[11] Indeed, Congress specifically intended to avoid preempting such regulations. H.R. Rep. No. 100-11, at 23-24 ("[NAECA] does not affect a State's authority to adopt provisions in building codes that do not affect the energy efficiency or energy use of covered products, such as insulation, structure, fire, heating or safety standards.").

Appellants also argue that the "*Clean Buildings Act* does not establish an 'energy consumption or conservation objective [that] is specified in terms of an estimated total consumption of energy.'" Appellants' Br. 51 (quoting 42 U.S.C. §

---

[11] *See supra* n.9; *see also Assoc. of Contracting Plumbers*, 2026 WL 1871692, at *13 (addressing a similar reading of EPCA to preempt health and safety measures and concluding that it is "far-fetched to conclude that Congress imagined such consequences, let alone intended such consequences, when it drafted a preemption provision in a statute that by-and-large imposes energy conservation standards").

6297(f)(3)(F)) (emphasis added). This is, again, the wrong test. The correct question is whether D.C.'s Energy Conservation Code as a whole satisfies this requirement, which it does. For example, the objective specified for buildings using the Performance Rating Method is specified in terms of energy cost. *See* D.C. Energy Conservation Code Appx. G, § G1.2.2.

Adding the Clean Buildings Act to the code does not remove these objectives, and again, there is no requirement in the Consumer Code Exemption that specific appliances be allowed as an option to meet the code's conservation objectives.

Appellants do not address the other requirements of the Consumer Code Exemption, but they are no more help to their argument. 42 U.S.C. § 6297(f)(3)(B) prevents a code from "requir[ing] that [any consumer] covered product have an energy efficiency exceeding the applicable energy conservation standard established" for that product under EPCA. This requirement serves the overall purpose of "ensur[ing] that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed…the Federal standard." H.R. Rep. No. 100-11, at 26 (emphasis added). Prohibiting the use of an appliance is the opposite of "requir[ing its] installation" and does not require any particular "energy efficiency"; therefore, a prohibition on an appliance of fuel does not violate this requirement.

26

42 U.S.C. § 6297(f)(3)(C) provides that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the applicable federal] energy conservation standard…[must be] on a one-for-one equivalent energy use or equivalent cost basis." A prohibition on an appliance does not change the credit calculations for using higher efficiency appliances, it only prevents the use of that appliance. In other words, this requirement does not give builders free rein to use any appliance they wish, it only ensures that they receive adequate credit when they use a higher efficiency version of an appliance that they are otherwise permitted to use.

42 U.S.C. § 6297(f)(3)(D) provides that, if a code uses "baseline building designs" as a point of comparison for proposed buildings, and those baseline designs include an EPCA-covered appliance, the designs must assume that the appliance has the minimum efficiency that would comply with EPCA. A fossil fuel prohibition could not violate this requirement because any baseline design affected by the prohibition would, by definition, not include fossil-fuel appliances.

42 U.S.C. § 6297(f)(3)(E) applies "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective." For each "optional combination" that uses a version of an appliance with a higher efficiency than the relevant federal standard requires, the

27

code must also include "at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard." *Id.* The D.C. Energy Conservation Code does not use "optional combinations," and the Clean Buildings Act does not create any, so this requirement does not apply.

Finally, 42 U.S.C. § 6297(f)(3)(G) mandates that a code must use the same test procedures as federal standards do. The Clean Buildings Act will not change the test procedures used for any appliance and therefore does not violate this requirement.

Appellants also argue that even if the Clean Buildings Act met those seven requirements, it would still be preempted "because EPCA's building code exception applies only to building codes 'for new construction'" and the Clean Buildings Act also covers substantial improvements. Appellants' Br. 52 (citing 42 U.S.C. §§ 6297(f)(3), 6316(b)(2)(B) and D.C. Code § 6-1453.01(b)(1)). Again, this mischaracterizes the scope of analysis. The Clean Buildings Act is not a "building code" at all, nor does it need to be in order to be protected by the Code Exemptions. Both of the Code Exemptions apply to regulations "*contained in* a building code for new construction"; thus, the regulations themselves do not need

28

to be "for new construction" alone. 42 U.S.C. §§ 6297(f)(3), 6316(b)(2)(B) (emphasis added).

Appellants are also incorrect in asserting that the Code Exemptions apply "only" to building codes for new construction. Appellants' Br. 52. The phrase "for new construction" cannot be read as equivalent to the phrase "*only* for new construction." The enacting Congress used such exclusive language elsewhere in EPCA. *E.g.*, 42 U.S.C. § 6295(f)(2) (standard for "[f]urnaces which are designed *solely for* installation in mobile homes" (emphasis added)). Its choice not to use it in this case should be respected. *Cf., e.g.*, *Bread Pol. Action Comm. v. F.E.C.*, 455 U.S. 577, 583 (1982) (rejecting statutory interpretation in part because "the structure of the Act suggests that Congress knew how to specify" the proposed reading "[b]ut Congress did not do so"). The phrase therefore does not exclude regulations that also concern subjects other than new construction.

Lastly, the coverage of "substantial improvements" can reasonably be read within the phrase "for new construction." "Substantial improvement" covers only those activities "the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started." D.C. Code § 6-1451.01(a)(40).[12] The term "for new construction" then neatly fits the Clean

---

[12] The D.C. Council recently approved amendments to the Clean Buildings Act to substitute "Level 3 alterations" for "substantial improvements" and to add

Buildings Act, which applies to both "new construction" and to a category of "substantial improvements" that are similar in scope to other "new construction."

Finally, reading the Code Exemptions to never apply to building codes that include renovations or improvements could have alarming consequences. For example, ASHRAE 90.1—the updated version of ASHRAE 90-75 and 90A-80—includes requirements that apply to building alterations. *E.g.*, ASHRAE, *Energy Standard for Buildings Except Low-Rise Residential Buildings*, Standard 90.1-2025, § 6.1.3 (2026).[13] Continuing to allow for standards like ASHRAE 90.1 was an important consideration in drafting EPCA's preemption provision, *see supra* § II.A.1, and is currently enshrined in the Industrial Code Exemption, *see supra* § II.B.1, as well as related statutes, *e.g.*, 42 U.S.C. § 6833(b). Today, nearly every state that adopts a code for commercial buildings uses a version of ASHRAE 90.1. DOE, *Status of State Energy Code Adoption* (June 30, 2026).[14] Congress did not intend to preempt these widely used standards.

---

requirements for additions over 10,000 square feet. District's Br. 11-12 n.2. "Level 3 alterations" are modifications exceeding 50% of the aggregate building area. D.C. Existing Building Code § 505.1 (2017). This analysis is substantially the same for each of these thresholds.

[13] *Available at* https://www.ashrae.org/technical-resources/standards-and-guidelines/read-only-versions-of-ashrae-standards.

[14] *Available at* https://www.energycodes.gov/state-portal.

## Conclusion

The Center urges the Court to affirm the decision below.

Dated: July 24, 2026

Respectfully submitted,

/s/ Daniel Carpenter-Gold
Daniel Carpenter-Gold
daniel.carpentergold@mitchellhamline.edu
(651) 290-6329

Jamie Long
Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105

*Counsel for* Amicus Curiae *Public Health Law Center*

## Certificate of Compliance

Pursuant to Fed. R. App. Pr. 29(a)(4)(G), I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. Pr. 29(a)(5) because it is 6,483 words in length, excluding exempted portions.

/s/ Daniel Carpenter-Gold
Daniel Carpenter-Gold

## Statutory and Regulatory Addendum

42 U.S.C. § 6833 ..............................................................................Add. 1

D.C. Energy Conservation Code, Appx. G § G1 ...............................Add. 5

D.C. Existing Building Code, § 505 ..................................................Add. 7

**42 U.S.C. § 6833. Updating State building energy efficiency codes**

**(a) Consideration and determination respecting residential building energy codes**

**(1)** Not later than 2 years after October 24, 1992, each State shall certify to the Secretary that it has reviewed the provisions of its residential building code regarding energy efficiency and made a determination as to whether it is appropriate for such State to revise such residential building code provisions to meet or exceed CABO Model Energy Code, 1992.

**(2)** The determination referred to in paragraph (1) shall be--

**(A)** made after public notice and hearing;

**(B)** in writing;

**(C)** based upon findings included in such determination and upon the evidence presented at the hearing; and

**(D)** available to the public.

**(3)** Each State may, to the extent consistent with otherwise applicable State law, revise the provisions of its residential building code regarding energy efficiency to meet or exceed CABO Model Energy Code, 1992, or may decline to make such revisions.

**(4)** If a State makes a determination under paragraph (1) that it is not appropriate for such State to revise its residential building code, such State shall submit to the Secretary, in writing, the reasons for such determination, and such statement shall be available to the public.

**(5)(A)** Whenever CABO Model Energy Code, 1992,[1] (or any successor of such code) is revised, the Secretary shall, not later than 12 months after such revision, determine whether such revision would improve energy efficiency in residential buildings. The Secretary shall publish notice of such determination in the Federal Register.

**(B)** If the Secretary makes an affirmative determination under subparagraph (A), each State shall, not later than 2 years after the date of the publication of such determination, certify that it has reviewed the provisions of its residential building code regarding energy efficiency and made a determination as to whether it is

Add. 1

appropriate for such State to revise such residential building code provisions to meet or exceed the revised code for which the Secretary made such determination.

**(C)** Paragraphs (2), (3), and (4) shall apply to any determination made under subparagraph (B).

### (b) Certification of commercial building energy code updates

**(1)** Not later than 2 years after October 24, 1992, each State shall certify to the Secretary that it has reviewed and updated the provisions of its commercial building code regarding energy efficiency.

Such certification shall include a demonstration that such State's code provisions meet or exceed the requirements of ASHRAE Standard 90.1-1989.

**(2)(A)** Whenever the provisions of ASHRAE Standard 90.1-1989 (or any successor standard) regarding energy efficiency in commercial buildings are revised, the Secretary shall, not later than 12 months after the date of such revision, determine whether such revision will improve energy efficiency in commercial buildings. The Secretary shall publish a notice of such determination in the Federal Register.

**(B)(i)** If the Secretary makes an affirmative determination under subparagraph (A), each State shall, not later than 2 years after the date of the publication of such determination, certify that it has reviewed and updated the provisions of its commercial building code regarding energy efficiency in accordance with the revised standard for which such determination was made. Such certification shall include a demonstration that the provisions of such State's commercial building code regarding energy efficiency meet or exceed such revised standard.

**(ii)** If the Secretary makes a determination under subparagraph (A) that such revised standard will not improve energy efficiency in commercial buildings, State commercial building code provisions regarding energy efficiency shall meet or exceed ASHRAE Standard 90.1-1989, or if such standard has been revised, the last revised standard for which the Secretary has made an affirmative determination under subparagraph (A).

### (c) Extensions

The Secretary shall permit extensions of the deadlines for the certification requirements under subsections (a) and (b) if a State can demonstrate that it has

Add. 2

made a good faith effort to comply with such requirements and that it has made significant progress in doing so.

**(d) Technical assistance**

The Secretary shall provide technical assistance to States to implement the requirements of this section, and to improve and implement State residential and commercial building energy efficiency codes or to otherwise promote the design and construction of energy efficient buildings.

**(e) Availability of incentive funding**

**(1)** The Secretary shall provide incentive funding to States to implement the requirements of this section, and to improve and implement State residential and commercial building energy efficiency codes, including increasing and verifying compliance with such codes. In determining whether, and in what amount, to provide incentive funding under this subsection, the Secretary shall consider the actions proposed by the State to implement the requirements of this section, to improve and implement residential and commercial building energy efficiency codes, and to promote building energy efficiency through the use of such codes.

**(2)** Additional funding shall be provided under this subsection for implementation of a plan to achieve and document at least a 90 percent rate of compliance with residential and commercial building energy efficiency codes, based on energy performance--

**(A)** to a State that has adopted and is implementing, on a statewide basis--

**(i)** a residential building energy efficiency code that meets or exceeds the requirements of the 2004 International Energy Conservation Code, or any succeeding version of that code that has received an affirmative determination from the Secretary under subsection (a)(5)(A); and

**(ii)** a commercial building energy efficiency code that meets or exceeds the requirements of the ASHRAE Standard 90.1-2004, or any succeeding version of that standard that has received an affirmative determination from the Secretary under subsection (b)(2)(A); or

**(B)** in a State in which there is no statewide energy code either for residential buildings or for commercial buildings, to a local government that has adopted and is implementing residential and commercial building energy efficiency codes, as described in subparagraph (A).

**(3)** Of the amounts made available under this subsection, the Secretary may use $500,000 for each fiscal year to train State and local officials to implement codes described in paragraph (2).

**(4)(A)** There are authorized to be appropriated to carry out this subsection--

**(i)** $25,000,000 for each of fiscal years 2006 through 2010; and

**(ii)** such sums as are necessary for fiscal year 2011 and each fiscal year thereafter.

**(B)** Funding provided to States under paragraph (2) for each fiscal year shall not exceed one-half of the excess of funding under this subsection over $5,000,000 for the fiscal year.

**(Normative Appendix G is adopted in the District of Columbia.)**

## NORMATIVE APPENDIX G
## PERFORMANCE RATING METHOD

### G1. GENERAL

**G1.1 Performance Rating Method Scope.** This building performance rating method is a modification of the Energy Cost Budget (ECB) Method in Section 11 and is intended for use in rating the energy efficiency of building designs that exceed the requirements of this standard. This appendix offers an alternative compliance path for minimum standard compliance per Chapter 1, Section 101.10.6 of Title 12-A DCMR and is provided for those wishing to use the methodology developed for this standard to quantify performance that substantially exceeds the requirements of Standard 90.1. It shall be used for evaluating the performance of all such *proposed designs,* including *alterations* and *additions* to *existing buildings,* except designs with no mechanical systems.

**G1.2 Performance Rating.**

**G1.2.1 Mandatory Provisions.** This performance rating method requires conformance with the following provisions:

a. All requirements of Sections 5.4, 6.4, 7.4, 8.4, 9.4, 10.4, and 11 shall be met. These sections contain the mandatory provisions of the standard and are prerequisites for this rating method.

b. The interior lighting power shall not exceed the interior lighting power allowance determined using either Tables G3.7 or G3.8 and the methodology described in Section 9.5.1 and 9.6.1.

**G1.2.2 Performance Rating Calculation.** The performance of the proposed design is calculated in accordance with provisions of this appendix using the following formula:

Performance Cost Index =
Proposed building performance/Baseline building performance

*Informative Note:*

1. Neither the *proposed building performance* nor the *baseline building performance* predictions of actual *energy* consumption or costs for the *proposed design* after *construction.* Actual experience will differ from these calculations due to variations such as occupancy, *building* operation and maintenance, weather, *energy* use not covered by this procedure, changes in energy rates between design of the *building* and occupancy, and the precision of the calculation tool.

2. When using Appendix G, the Performance Cost Index (PCI) shall be less than or equal to the Performance Cost Index Target ($PC_{It}$) when calculated in accordance with the following:

$$PC_{It} = (BBUEC + (BPF \times BBREC))/BBP$$

Where:

PCI = Performance Cost Index calculated in accordance with Section G1.2.

BBUEC = Baseline Building Unregulated Energy Cost. The portion of the annual energy cost of a baseline building design that is due to unregulated energy use.

BBREC = Baseline Building Regulated Energy Cost. The portion of the annual energy cost of a baseline building design that is due to regulated energy use.

BPF = Building Performance Factor from Table G1.2.2. For building area types not listed in Table G1.2.2 use "All others." Where a building has multiple building area types, the required BPF shall be equal to the area-weighted average of the building area types.

BBP = *Baseline Building Performance.*

Regulated energy cost shall be calculated by multiplying the total energy cost by the ratio of regulated energy use to total energy use for each fuel type. Unregulated energy cost shall be calculated by subtracting regulated energy cost from total energy cost.

3. Neither the proposed building performance nor the baseline building performance are predictions of actual energy consumption or costs for the proposed design after construction. Actual experience will differ from these calculations due to variations such as occupancy, building operation and maintenance, weather, energy use not covered by this procedure, changes in energy rates between design of the building and occupancy, and the precision of the calculation tool.

**TABLE G1.2.2   BUILDING PERFORMANCE FACTOR (BPF)**

| Building Area Types[a] | Climate Zone 4A |
|---|---|
| Multifamily | 0.58 |
| Healthcare/ hospital | 0.47 |
| Hotel/motel | 0.52 |
| Office | 0.48 |
| Restaurant | 0.48 |
| Retail | 0.45 |
| School | 0.39 |
| Warehouse | 0.48 |
| All others | 0.48 |

a. In cases where both a general building area type and a specific building area type are listed, the specific building area type shall apply.

Add. 5

**G1.2.3 Additions to Existing Buildings.** When an addition to an existing building cannot comply by itself, trade-offs will be allowed by modification to one or more of the existing components of the existing building. Modeling of the modified components of the existing building and addition shall employ the procedures of Appendix G; the addition shall not increase the energy consumption of the existing building plus the addition beyond the energy that would be consumed by the existing building plus the addition if the addition alone did comply.

**G1.2.4 Alterations of Existing Buildings.** Alterations of existing buildings shall comply with the provisions of Section 5, 6, 7, 8, 9, 10, 11, 13 or Appendix G.

**G1.3 Documentation Requirements.** Simulated performance shall be documented, and documentation shall be submitted to the rating authority. The information shall be submitted in a report and shall include the following:

a. A brief description of the project, the key energy efficiency improvements compared with the requirements in Sections 5 through 11, the simulation program used, the version of the simulation program, and the results of the energy analysis. This summary shall contain the calculated values for the baseline building performance, the proposed building performance, and the percentage improvement

b. An overview of the project that includes: the number of stories (above and below grade), the typical floor size, the uses in the building (e.g., office, cafeteria, retail, parking, etc.), the gross area of each use, and whether each use is conditioned space.

c. A list of the energy-related features that are included in the design and on which the performance rating is based. This list shall document all energy features that differ between the models used in the baseline building performance and proposed building performance calculations.

d. A list showing compliance for the proposed design with all the requirements of Sections 5.4, 6.4, 7.4, 8.4, 9.4, 10.4 and 11 (mandatory provisions).

e. A list identifying those aspects of the proposed design that are less stringent than the requirements of 5.5, 6.5, 7.5, 9.5, and 9.6 (prescriptive provisions).

f. A table with a summary by end use of the energy cost savings in the proposed building performance.

g. A site plan showing all adjacent buildings and topography that may shade the proposed building (with estimated height or number of stories).

h. Building elevations and floor plans (schematic is acceptable).

i. A diagram showing the thermal blocks used in the computer simulation.

j. An explanation of any significant modeling assumptions.

k. Backup calculations and material to support data inputs (*e.g.,* U-factors for building envelope assemblies, NFRC ratings for fenestration, end-uses identified in Table G3.1, "1. Design Model," paragraph [a]).

l. Input and output reports from the simulation program or compliance software including a breakdown of energy use by at least the following components: lights, internal equipment loads, service water heating equipment, space heating equipment, space cooling and heat rejection equipment, fans, and other HVAC equipment (such as pumps). The output reports shall also show the amount of unmet load hours for both the proposed design and baseline building design.

m. Purchased energy rates used in the simulations.

n. An explanation of any error messages noted in the simulation program output.

o. For any exceptional calculation methods employed, document the predicted energy savings by energy type, the energy cost savings, a narrative explaining the exceptional calculation method performed, and theoretical or empirical information supporting the accuracy of the method.

p. The reduction in proposed building performance associated with on-site renewable energy.

## G2. SIMULATION GENERAL REQUIREMENTS

**G2.1 Performance Calculations.** The proposed building performance and baseline building performance shall be calculated using the following:

a. The same simulation program.

b. The same weather data.

c. The same energy rates.

**G2.2 Simulation Program.** The simulation program shall be a computer-based program for the analysis of energy consumption in buildings (a program such as, but not limited to, DOE-2, BLAST, or EnergyPlus). The simulation program shall include calculation methodologies for the building components being modeled. For components that cannot be modeled by the simulation program, the exceptional calculation methods requirements in Section G2.5 shall be used.

**G2.2.1** The simulation program shall be approved by the rating authority and shall, at a minimum, have the ability to explicitly model all of the following:

a. 8760 hours per year.

b. Hourly variations in occupancy, lighting power, miscellaneous equipment power, thermostat set points, and

**D.C. Existing Building Code § 505. Alteration—Level 3**

**505.1 Scope.**

Level 3 *alterations* apply where the work area exceeds 50 percent of the *building area*.

**505.2 Application.**

Level 3 *alterations* shall comply with the provisions of Chapters 7 and 8 for Level 1 and 2 *alterations*, respectively, as well as the provisions of Chapter 9.