# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,
*Appellants*

v.

DISTRICT OF COLUMBIA,
*Appellee*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:24-CV-02942-ACR, District Judge Ana C. Reyes

**Appellants' Opposed Motion to Expedite**

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1489
mark.little@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

*Additional counsel and parties listed on next page*

Abigail V. Carter
BREDHOFF & KAISER, P.L.L.C.
805 15th St. NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

Lauren McDermott
MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.
1920 L St. NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

Pursuant to Federal Rule of Appellate Procedure 27 and D.C. Circuit Rule 27, Appellants National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 respectfully move the Court to expedite their appeal in the above-captioned matter, adopt their proposed briefing schedule, set the case for oral argument on a priority basis once the briefing has been completed, and enter the case into the Court's stand-by pool for oral argument. Appellants have consulted with Appellee District of Columbia regarding this motion, and the District advised that it opposes this motion.[1]

## INTRODUCTION

The case concerns a District of Columbia law that prohibits the use of federally regulated gas appliances. In 2022, the District enacted the so-called Clean Energy DC Building Code Amendment Act. That law, which Appellants will refer to as the "D.C. Gas Ban," prohibits the use of gas appliances in a broad swath of new and substantially improved existing buildings in the District and requires the Mayor to issue regulations implementing that prohibition no later than December 31 of this

---

[1] Specifically, the District does not oppose Appellants' proposed deadline for their opening brief and joint appendix or an oral-argument setting in October or November of 2026. But the District opposes all other relief requested in this motion—including any formal designation of this case as "expedited"—and intends to file a response.

year. Appellants—a broad coalition of trade organizations, companies, and unions—rely on the availability of gas appliances, systems, and infrastructure for their livelihoods. They challenged the D.C. Gas Ban as preempted under the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.*, and are now appealing the district court's adverse summary judgment ruling to this Court.

As Appellants have detailed in their pleadings and declarations, the D.C. Gas Ban is inflicting ongoing and escalating harm in the form of lost customers, lost revenue, increased costs, higher gas prices, and the loss of access to their preferred and cheaper form of energy. These harms, immediate and concrete as they are now, will only worsen once the Mayor issues the mandated implementing regulations by the end of this year, if not sooner. The worst of these harms, however, can be avoided through swift appellate action. To that end, Appellants move to expedite this appeal to provide the Court an opportunity to consider the legality of the D.C. Gas Ban before it can cause more irreversible damage. Appellants accordingly request that the Court grant this motion and order (1) the adoption of Appellants' proposed briefing schedule, (2) priority treatment for oral argument, and (3) entry of the case into the Court's stand-by pool for oral argument.

## BACKGROUND

The D.C. Gas Ban prohibits the use of gas appliances in newly constructed or substantially improved commercial buildings, including mixed-use buildings with

restaurants, apartment buildings, hotels, condos, or houses. *See* D.C. Code § 6-1453.01(a)(2). It does so by directing the Mayor to issue, no later than December 31, 2026, "final regulations requiring all new construction or Level 3 alterations of covered buildings to be constructed to a net-zero energy standard." *Id.* § 6-1453.01(b)(1). Critically, "net-zero energy standard" means, *inter alia*, that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building." *Id.* § 6-1453.01(a)(3)(B)(iii). Accordingly, the Mayor's regulations necessarily will prohibit the use of gas appliances because those appliances require fuel combustion to function.

If the Mayor does not act by the December 31 deadline, the D.C. Gas Ban imposes an automatic fallback. In the absence of mayoral regulations, the D.C. Gas Ban provides that "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z" of the D.C. Energy Conservation Code. *Id.* § 6-1453.01(b)(2). Appendix Z, in turn, provides that "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building except as specified by the *code official*." D.C. Energy Conservation Code, Appendix Z, § Z3.1. Thus, whether or not the Mayor acts by December 31, the D.C. Gas Ban will prohibit the use of federally regulated gas appliances in a broad swath of buildings in the District by the end of this year.

Appellants filed the underlying suit in October 2024, challenging the D.C. Gas Ban as preempted under EPCA, a federal law that preempts any state or local law "concerning the energy efficiency [or] energy use" of covered gas appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). Appellants detailed their harms from the D.C. Gas Ban in their pleadings and declarations. Gas appliance manufacturers face significant declines in revenue; businesses as diverse as restaurants, apartment-building owners, and builders will be saddled with higher capital expenditures and operational costs, as well as burdensome constraints on their energy choice; gas utilities will lose customers; union workers who work on gas-distribution lines and infrastructure will lose work and potentially even their employment; and everyone in the District will be forced to pay higher rates for gas, as the D.C. Gas Ban will inevitably limit the pool of gas customers and thereby force existing customers to shoulder higher rates. *See* Exhibit 2, Compl., Dkt. 1, at ¶¶ 11-17; Exhibit 3, Perry McGuire Decl., Dkt. 1-1, at ¶ 5; Exhibit 4, Angelo Amador Decl., Dkt. 1-2, at ¶¶ 7-9; Exhibit 5, Nicole Upano Decl., Dkt. 1-3, at ¶¶ 6-7; Exhibit 6, Lori Graf Decl., Dkt. 1-4, at ¶¶ 6-8; Exhibit 7, Donald "Blue" Jenkins Decl., Dkt. 1-5, at ¶¶ 6-8, 10; Exhibit 8, Ryan Boyer Decl., Dkt. 1-6, ¶¶ 6-7; Exhibit 9, Wilder Reed Decl., Dkt. 1-7, at ¶ 6.

Based on those harms, among others, Appellants requested a permanent injunction enjoining the District from enforcing the D.C. Gas Ban and for a

declaratory judgment declaring it preempted under federal law. Both sides moved for summary judgment. *See* Exhibit 1, Mem. Op., Dkt. 48, at 8. The district court ultimately agreed with the District's interpretation, granted the District summary judgment, and denied Appellants their requested declaratory and injunctive relief. *Id.* at 22. This appeal followed.

## ARGUMENT

This Court's Handbook provides that motions to expedite "must demonstrate that the delay will cause irreparable injury and that the decision under review is subject to substantial challenge." D.C. Circuit Handbook § VIII.B. Both requirements are met here. "[D]elay will cause irreparable injury" because the D.C. Gas Ban, with its end-of-the-year deadline for implementing regulations, poses an imminent threat of irreparable harm to Appellants and their livelihoods. And "the decision under review is subject to substantial challenge," as demonstrated by the Ninth Circuit's decision adopting Appellants' broader view of EPCA preemption in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Accordingly, the Court should expedite this appeal.

While the D.C. Gas Ban is already causing harm to Appellants, the magnitude of that harm will grow exponentially come December 31. By that time, when the Mayor issues regulations further implementing the D.C. Gas Ban or when Appendix Z takes effect, the virulent economic effects of the D.C. Gas Ban will be fully

unleashed. Appellants and many others in the District will lose customers, sales, revenue, and employment; they will incur significantly increased building and development costs; they will lose their preferred and cheaper form of energy that allows them to maintain their profitable enterprises; and they will be forced to pay higher rates for gas as a result of a shrunken pool of gas consumers. *See* Exhibit 2, Compl., Dkt. 1, at ¶¶ 11-17; Exhibit 3, Perry McGuire Decl., Dkt. 1-1, at ¶ 5; Exhibit 4, Angelo Amador Decl., Dkt. 1-2, at ¶¶ 7-9; Exhibit 5, Nicole Upano Decl., Dkt. 1-3, at ¶¶ 6-7; Exhibit 6, Lori Graf Decl., Dkt. 1-4, at ¶¶ 6-8; Exhibit 7, Donald "Blue" Jenkins Decl., Dkt. 1-5, at ¶¶ 6-8, 10; Exhibit 8, Ryan Boyer Decl., Dkt. 1-6, ¶¶ 6-7; Exhibit 9, Wilder Reed Decl., Dkt. 1-7, at ¶ 6.

That constitutes irreparable harm. Indeed, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring); *see also Ohio v. EPA*, 603 U.S. 279, 291-92 (2024) (holding that incurring significant "nonrecoverable" compliance costs "during the pendency of th[e] litigation" constitutes a "strong argument[]" on "[irreparable] harm[]"); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) (recognizing a "risk of irreparable harm by depriving [landlords] of rent payments with no guarantee of eventual recovery"); *Phillip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (observing that economic harm is irreparable "[i]f expenditures

6

cannot be recouped"). This case is no exception, as Appellants' injuries are incalculable and/or unrecoverable from the District. *Simpson v. Colbert*, No. 1:21-cv-00479, 2024 WL 3887393, at *2 (D.D.C. 2024) ("A plaintiff cannot pursue damages from the District of Columbia without an express waiver of sovereign immunity from Congress.").

Despite this Court's admirable record of resolving appeals quickly and efficiently, the ordinary appellate process likely will push resolution of this appeal past the District's end-of-year deadline. That means that the usual pace of appellate litigation would subject Appellants to significant additional harm. Expediting the Court's consideration of this appeal, however, would result in a faster resolution of this case—potentially even before the District's end-of-year deadline—that would minimize the duration and magnitude of Appellants' harm. That is why expedition is warranted here.

The district court's decision below is also subject to substantial challenge. Its disagreement with Appellants' interpretation of EPCA deepened what it acknowledged as "a split among federal courts" on the scope of EPCA preemption. Exhibit 1, Mem. Op., Dkt. 48, at 8; *cf. Berkeley*, 89 F.4th at 1107 (holding that EPCA preempted a city's similar gas ban). Appellants will explain at length in their merits briefing why their view of EPCA is the correct one, but it suffices for present purposes to point out that the district court admittedly departed from "the lone circuit

decision on point" for the issue presented in this preemption challenge. Mem. Op., Dkt. 48, at 13 (citing *Berkeley*); *cf. United States v. Phillips Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005) ("[W]e avoid creating circuit splits when possible . . . .").

With the requisites of expedition established, Appellants request that the Court grant this motion and set the following schedule for this case, which aligns with the deadlines provided in Rule 31(a)(1) in the Federal Rule of Appellate Procedure:

- Appellants' Opening Brief and Joint Appendix due June 8, 2026 (40 days after the filing of this motion), with no extensions.

- Appellee's Response Brief due July 8, 2026 (30 days after the Opening Brief's due date), with no extensions.

- Appellants' Reply Brief due July 29, 2026 (21 days after the Response Brief's due date), with no extensions; and

- Case set for oral argument on a priority basis once the briefing has been completed and entry of the case into the Court's stand-by pool for oral argument.

Lastly, Appellants note that they are not seeking the more extraordinary relief of an injunction pending appeal at this time.[2] While such an injunction would shield Appellants from further harm, Appellants have opted to exercise restraint and instead propose expedition as a more modest means of minimizing their irreparable harm during the pendency of this challenge.

---

[2] Appellants reserve the right to later seek an injunction pending appeal if circumstances develop in a manner that makes that relief necessary.

**CONCLUSION**

For these reasons, Appellants respectfully request that the Court grant this motion, expedite its consideration of this appeal, and set the following schedule for this case:

- Appellants' Opening Brief and Joint Appendix due June 8, 2026 (40 days after the filing of this motion), with no extensions.

- Appellee's Response Brief due July 8, 2026 (30 days after the Opening Brief's due date), with no extensions.

- Appellants' Reply Brief due July 29, 2026 (21 days after the Response Brief's due date), with no extensions; and

- Case set for oral argument on a priority basis once the briefing has been completed and entry of the case into the Court's stand-by pool for oral argument.

Appellants additionally request such further relief to which they may be entitled.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. Mark Little
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

BREDHOFF & KAISER, P.L.L.C.

/s/ *Abigail V. Carter*
Abigail V. Carter [474454]
805 15th St. NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.

/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**CERTIFICATE OF COMPLIANCE**

1.      This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,058 words.

2.      This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

*/s/ J. Mark Little*
J. Mark Little

**CERTIFICATE OF SERVICE**

I certify that on April 29, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES, et al.,

    *Plaintiffs*,

v.

DISTRICT OF COLUMBIA,

    *Defendant*.

Case No. 24-cv-02942 (ACR)

## MEMORANDUM OPINION AND ORDER

The Energy Policy and Conservation Act of 1975 (EPCA) prohibits state and local regulations "concerning the energy efficiency [or] energy use" of certain products, including gas appliances. *See* 42 U.S.C. § 6297(c). The Clean Energy D.C. Building Code Amendment Act of 2022 (Clean Buildings Act) requires that by 2027, certain newly constructed or improved buildings in Washington, D.C., operate as zero-energy—essentially, they must produce as much energy as they consume. To achieve this, it bans the use of gas appliances in those buildings.

The question: does the former preempt the latter? Plaintiffs—an assortment of trade associations, companies, and unions—say yes. The ban, they argue, de facto sets gas appliances' energy efficiency or use standard to zero, which conflicts with EPCA's preemption provision. The District of Columbia responds that the ban does not address such standards at all. Yes, it mandates that gas appliances cannot be used in certain buildings. But it says nothing about the performance standards the appliances must meet when used elsewhere.

The District has the better interpretation.  The Court therefore GRANTS the District's

Cross-Motion for Summary Judgment, Dkt. 30, and DENIES Plaintiffs' Motion for Summary

Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26.

## I.    BACKGROUND

### A.  The Oil Embargo of 1973[1]

While it is difficult to pinpoint the origin story of any litigation, we might as well start

ours on October 17, 1973.  That day, President Richard M. Nixon expressed concern that the

Arab–Israeli War might cause gas prices to rise.  Given our country's dependence on foreign oil

then, he feared this would cause economic upheaval at home.[2]  And he was right to worry.  On

that same day, halfway across the world, Arab oil ministers decided to impose a total oil embargo

on the United States and other countries aiding Israel.[3]  As intended, this ban "sent shock

radiating through the social fabric of . . . industrial nations."[4]  In the United States, gas prices

skyrocketed, supplies plummeted, unemployment increased, and the economy teetered.[5]

Oil was not the President's only problem.  Throughout 1973, the Watergate scandal was

splashed daily in newspaper headlines across the Nation.[6]  And it seemed that "the President was

---

[1] For those interested in a "panoramic history of the world's most important resource: oil," including the 1973 oil crisis, the Court commends Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* (1990).

[2] *Id.* at 588–91.

[3] *Id.*

[4] *Id*. at 597.  Coincidentally, as the Court publishes this Memorandum Opinion, the world economy is facing potentially its largest oil shock.  Due to a conflict in the Middle East.  *See* Emmett Lindner, *Echoes of the '70s in What's Now the Largest Oil Shock Ever*, N.Y. Times (Mar. 13, 2026).

[5] H.R. Rep. No. 94-340, at 20–22 (1975).

[6] Yergin at 601.  For more on that scandal and recommended readings, see *Storch v. Hegseth*, 804 F. Supp. 3d 216, 219–21 & n.1 (D.D.C. 2025).

always searching for some political 'spectacular' involving oil and the Middle East to try to divert the country from its obsession with Watergate."[7]  Because of the embargo, Watergate, or both, on November 7, 1973, President Nixon announced Project Independence: "in the spirit of Apollo, with the determination of the Manhattan Project, . . . by the end of this decade we will have developed the potential to meet our own energy needs without depending on any foreign energy source."[8]  And afterward, his administration continued to announce various energy actions.

But neither the announcements nor the energy actions succeeded.  President Nixon was forced to resign in August 1974.  And our dependence on products that used petroleum *increased* from 33 percent in September 1973 to 36 percent in December 1974.[9]

### B.  The Energy Policy and Conservation Act of 1975

The oil embargo ended on March 18, 1974.  But the crisis had awakened the United States to the "serious long-term economic and national security problems" of continued dependence on foreign oil.  *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985).  So in January 1975, President Gerald R. Ford called for "the strongest and most far-reaching energy conservation program we have ever had."  *Id*.  Congress answered him by passing EPCA that same year.  *See* EPCA, Pub. L. No. 94-163, 89 Stat. 871 (1975).  Relevant here, EPCA aimed to "reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  *Herrington*, 768 F.2d at 1364 (citing S. Rep. No. 94–516, at 116–17 (1975)).

---

[7] Yergin at 601.

[8] *Id*. at 599.

[9] H.R. Rep. No. 94-340, at 20.

At enactment, EPCA required the Department of Energy "to mandate energy efficiency labeling of major residential appliances and to prescribe voluntary industry appliance efficiency improvements." S. Rep. No. 100-6, at 3 (1987); *see* EPCA §§ 324–326. It also "authorized, but did not require, DOE to establish mandatory efficiency standards if necessary." S. Rep. No. 100-6, at 3.

But DOE was slow on the uptake. It did not set standards expeditiously or, in some cases, at all. *See* H.R. Rep. No. 95-496, at 43–46 (1977). So three years later, Congress amended EPCA to mandate minimum energy efficiency standards for appliances that consume substantial energy, such as kitchen ranges, ovens, refrigerators, and dishwashers. *See* National Energy Conservation Policy Act (NECPA), Pub. L. No. 95-619, § 422, 92 Stat. 3206, 3259–62 (1978); *Herrington*, 768 F.2d at 1362 & n.1. Congress sought product designs that "achieve the maximum improvement in energy efficiency which the [DOE] Secretary determines is technologically feasible and economically justified." S. Rep. No. 100-6, at 3. It added, however, a waiver provision that DOE began granting as a matter of course. *See infra* pp. 9–10.

In 1987, again attempting to ensure uniformity, Congress amended EPCA to clamp down on the waivers and bolster EPCA's preemption provision. S. Rep. No. 100-6, at 4–5; National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. No. 100-12 § 5, 101 Stat. 103, 107–17 (codified as amended at 42 U.S.C. § 6295). If an energy conservation standard exists for a covered product,[10] EPCA preemption now provides that "no State regulation concerning the

---

[10] The statute identifies specific covered products and provides that the Secretary "may classify" certain other consumer products as covered products if the Secretary makes certain findings. *See* 42 U.S.C. § 6292(a), (b)(1).

energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product."  42 U.S.C. § 6297(c).[11]

In the decades since, DOE has promulgated energy conservation standards for various gas appliances, including stoves,[12] ovens, water heaters, and dryers.  *See* 42 U.S.C. § 6295(a); 10 C.F.R. § 430.32.

### C. The Clean Energy D.C. Building Code Amendment Act of 2022

Fast-forward about half a century.  In 2021, six D.C. Councilmembers introduced the Clean Buildings Act "to arrest climate change" in response to "record-breaking extreme weather, higher tides caused by rising sea levels, heavy rains and flooding, and a sharp increase in the number of dangerously hot days."[13]  The Clean Buildings Act codifies a component of the 2018 Clean Energy D.C. Plan, the District's strategy to achieving carbon neutrality by 2050.[14]

In 2022, the D.C. Council passed the Clean Buildings Act.  *See* D.C. Act 24-528 (July 27, 2022).  The Act requires that by 2027 certain newly constructed or improved buildings operate as zero-energy.  That is, they must produce as much energy as they consume.  An arguably laudable goal, though one that imposes numerous conditions on commercial buildings and residential buildings over three stories.  D.C. Code § 6-1453.01(a)(2); 12A D.C. Mun. Regs. § 101.10.5; D.C. Energy Conservation Code R202.

---

[11] This preemption provision is subject to several exception and waiver provisions, *id.* § 6297(c)–(f), which the Court discusses *infra* pp. 15–19.

[12] *Stove*, coincidentally, is the title of Lana Del Rey's forthcoming album.  *See* Lindsay Zoladz, *6 (More) Albums I'm Looking Forward to in 2026*, N.Y. Times (Feb. 24, 2026).  Alas, though, it is unlikely to address EPCA or preemption.

[13] Letter from Mary M. Cheh, Councilmember, Ward 3, Council of the District of Columbia, to Nyasha Smith, Secretary, Council of the District of Columbia, at 1 (Oct. 1, 2021).

[14] *Id*.

The Act directs the D.C. Mayor, by December 31, 2026, to "issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard."  D.C. Code § 6-1453.01(b)(1).[15]  To meet a "[n]et-zero-energy standard," a building must (1) "conserve[] an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z"; and (2) "obtain[] energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z" and meet additional "restrictions."  *Id*. § 6-1453.01(a)(3)(A)–(B).  If the Mayor does not timely issue the required regulations, however, a fallback provision kicks in: "no building permit application submitted after" 2026 "shall be approved unless the building design complies with the most recent version of Appendix Z."  *Id*. § 6-1453.01(b)(2).[16]

Appendix Z of the D.C. Energy Conservation Code provides for "the design of a net-zero energy building" through, among other criteria, prohibition of "[o]n-site combustion of fossil fuels . . . for the provision of thermal energy to the building."  Dkt. 29-7 at 4, 6.[17]  In lay terms, it

---

[15] The Net Zero Modification and Preservation Emergency Amendment Act of 2026, D.C. Act 26-275 (Mar. 6, 2026), temporarily alters the text of the statute until June 4, 2026.  The amendment replaces "substantial improvements" with "Level 3 alterations," for example, and clarifies the definition of "[n]et-zero-energy standard."  *Id*. § 3(a)(3), (b).  These temporary changes do not affect the Court's analysis.

[16] The Act excepts from this provision "the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety."  D.C. Code § 6-1453.01(b)(2).

[17] The D.C. Construction Codes Coordinating Board approved a new version of Appendix Z in 2023, which provides that "[a]ll buildings shall be all-electric buildings."  Dkt. 29-8 at 6; Dkt. 29-6; Dkt. 38-1 ¶ 8.  As of the filing of this Memorandum Opinion, that version has not yet gone into effect, because it has not yet undergone notice-and-comment rulemaking and gained the approval of the D.C. Council.  D.C. Mun. Regs. tit. I, §§ 600–603; D.C. Code § 6-1409; *see* Dkt. 29 at 6–7.  The Court's analysis does not depend on which version of Appendix Z is in effect, because both effectively prohibit the use of natural-gas appliances in covered buildings.

bans the use of natural-gas appliances in applicable buildings. So, for example, rather than installing gas stoves in apartments, builders must install electric stoves.

### D. Procedural Background

Plaintiffs, "a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems," here sued the District to enjoin the Clean Buildings Act. Dkt. 1 ¶ 6. They assert that if allowed to go into effect, the Act "will inflict serious harm on Plaintiffs in the form of lost customers, sales, and revenue; loss of employment; increased expenses, including as a result of higher gas prices; and the inability of restaurants to cook with their preferred form of energy." Dkt. 26 at 15–16.

Plaintiff National Association of Home Builders of the United States is an organization that represents approximately 140,000 U.S. residential building construction industry members. Dkt. 1 ¶ 11. Plaintiff Restaurant Law Center is a public-policy organization whose membership includes all members in good standing with the National Restaurant Association and State Restaurant Associations. *Id*. ¶ 12. Plaintiff National Apartment Association is a federation of 141 affiliated apartment associations. *Id*. ¶ 13. Plaintiff Maryland Building Industry Association represents home builders, remodelers, developers, and affiliate professional and service providers in D.C. and Maryland. *Id*. ¶ 14. Plaintiff Washington Gas Light Company is a regulated public utility that provides natural gas services to 1.2 million customers in D.C., Maryland, and Virginia. *Id*. ¶ 15. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council is an affiliate of the Laborers International Union of North America, AFL-CIO. *Id*. ¶ 16. Finally, Plaintiff Teamster Local 96 is a union whose members work for Plaintiff Washington Gas Light Company. *Id*. ¶ 17.

Collectively, Plaintiffs contend that EPCA preempts the Clean Buildings Act. They moved for summary judgment and requested a declaration and a permanent injunction. Dkt. 26 at 35. The District disagrees that the Act is unlawful and therefore cross-moved for summary judgment. Dkt. 29. The Court heard argument on these Motions on September 25, 2025.[18]

## II.    LEGAL STANDARD

Because the parties present a purely legal question of statutory interpretation and "there is no genuine dispute as to any material fact," summary judgment is appropriate. Fed. R. Civ. P. 56(a). And because Plaintiffs challenge the Clean Buildings Act facially, *see* Dkt. 1 ¶ 20, the Court may award summary judgment in their favor only if "no set of circumstances exists under which the [District's regulation] would be valid." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 213 (D.C. Cir. 2010).

## III.    ANALYSIS

The Constitution's Supremacy Clause makes federal law "supreme." U.S. Const. art. VI, cl. 2. And so Congress may decide that federal law should "preempt," rather than "operate alongside state law." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018). The question here is whether EPCA "announces its displacement" of the Clean Buildings Act "through [its] express preemption provision." *Id*. (cleaned up).

---

[18] Application of EPCA's preemption provision to regulations like the Clean Buildings Act has generated a split among federal courts. *Compare Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (local regulation preempted), *with Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (local regulation not preempted), *and Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (same), *and Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) (same). The Southern District of New York and Northern District of New York decisions are on appeal before the Second Circuit. *See* Dkt. 85, *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 25-977 (2d Cir. Jan. 30, 2026); Dkt. 71, *Mulhern Gas Co. v. Mosley*, No. 25-2041 (2d Cir. Jan. 30, 2026).

The traditional tools of statutory interpretation, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024), favor the District.  Plaintiffs' preferred reading strains the statutory text, context, and history beyond what they can bear.  The District's reading, on the other hand, fits comfortably within EPCA's statutory history, plain language, and structure.  Energy efficiency or use in EPCA refers to a fixed measure of an appliance's performance capacity.[19]  It does not concern whether the appliance can be used in a particular context.  The Clean Buildings Act only regulates the latter.

### A.  EPCA's Statutory History

Congress amended and refined EPCA over time to increase federal control over product design and strengthen its preemption provision.  This statutory history, which "form[s] part of the context of the statute," Antonin Scalia & Bryan A. Garner, *Reading Law* 256 (2012) (Scalia & Garner), informs the Court's central task of interpreting the text of the preemption provision.[20]  So the Court backs up to explain EPCA's evolution.

The federal government did not act alone in addressing the energy crisis.  Throughout the 1970s, "some States began enacting appliance efficiency standards on their own."  S. Rep. No. 100-6, at 4.  And, while NECPA contained a limited preemption provision, it allowed a state to petition DOE for a waiver.  *Id*.  Moreover, the agency adopted "a general policy" of granting

---

[19] The Court will follow the parties' lead in discussing EPCA's provisions concerning consumer products.  However, its analysis applies equally to industrial equipment for which parallel language applies.  *See* 42 U.S.C. § 6316(a) (incorporating by reference 42 U.S.C. § 6297 for certain industrial equipment); *id*. ch. 77, subch. III, pt. A-1.

[20] Statutory history includes "the statutes repealed or amended by the statute under consideration."  Scalia & Garner at 256.  It "(unlike with legislative history) can properly be presumed to have been before all the members of the legislature when they voted."  *Id.*  "So a change in the language of a prior statute presumably connotes a change in meaning."  *Id*.  For a critique of this approach, however, see Anita S. Krishnakumar, *Statutory History*, 108 Va. L. Rev. 263 (2022).

them. *Id*. The exception became the rule, and, predictably, a "growing patchwork of differing State regulations" emerged. *Id*. Equally predictably, this created conflicting standards to which manufacturers had to cater. *Id.* One state could require that a gas stove not consume greater than 1,200 kBtu per year, while another could up the limit to 1,770 kBtu per year. Soon, manufacturers confronted the Hobbesian choice of designing appliances to meet the strictest state standard or designing appliances differently for different states.

To address this performance standard free-for-all and promote uniformity, Congress amended EPCA in 1987 to tighten the waiver provision and include a new preemption provision. S. Rep. No. 100-6 at 2, 9; NAECA § 7. The main goal was to allow "industry [to] avoid the burdens of a patchwork of conflicting and unpredictable State regulations." S. Rep. No. 100-6 at 12–13. This goal is key. It was not to ensure the use of all covered appliances in all buildings. *Cf*. Dkt. 26 at 25–28; Dkt. 38 at 13–15. And so the preemption provision's language focuses laser-like on "energy efficiency [or] energy use" of "covered product[s]." 42 U.S.C. § 6297(c).

The Court considers this text in depth next.

## B. Statutory Definitions of "Energy Efficiency" and "Energy Use"

### 1. "Energy Efficiency" and "Energy Use" Standards Govern Product Design

The text of EPCA's preemption provision reads:

> [E]ffective on the effective date of an energy conservation standard [that DOE] established . . . for any covered product, no State regulation concerning the energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product.

42 U.S.C. § 6297(c). To interpret this language, the Court looks first to the relevant statutory definitions. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021).

To start, EPCA preempts regulations only where there is a DOE-established "energy conservation standard" for a covered product. 42 U.S.C. § 6297(c). It defines "energy

conservation standard" as a "performance standard" that measures either the "minimum level of *energy efficiency* or a maximum quantity of *energy use*" of an appliance. *Id*. § 6291(6)(A) (emphases added).[21]  And so, by design, "energy conservation standard" is synonymous with "energy efficiency" and "energy use." *Id*.; *see Rawat v. Comm'r of Internal Revenue*, 108 F.4th 891, 896 (D.C. Cir. 2024).

EPCA defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product." 42 U.S.C. § 6291(5).  "Energy use" in turn is "the quantity of energy directly consumed by a consumer product at point of use." *Id*. § 6291(4).  So energy efficiency is a ratio of an appliance's useful output to its energy use, while energy use is total consumption.  As defined, each term—energy conservation standard, energy efficiency, and energy use—refers to and protects federal primacy over product design.  And each metric is determined in accordance with test procedures performed under 42 U.S.C. § 6293. *See id*. § 6291(4)–(6).

Let's consider gas cooking tops, *i.e.,* gas stoves, to show how these performance standards work in practice.  Gas cooking tops manufactured after April 9, 2012, cannot come equipped with a constant burning pilot light. *See* 10 C.F.R. § 430.32(j)(1)(i).  For those manufactured on or after January 31, 2028, their "[m]aximum integrated annual energy consumption" must be 1,770 kBtu/year. *Id*. § 430.32(j)(1)(iii)(C).  And to ensure a gas cooking top meets these requirements, a manufacturer must test it under specified "[t]esting [c]onditions." *See generally* 10 C.F.R. ch. II subch. D, pt. 430, subpt. B.  DOE instructs, for example, that the test gas cooking top must meet certain installation, gas supply, and instrument-configuration

---

[21] That the statute itself establishes this equivalency punctures Plaintiffs' assertion that the Court should resist "conflat[ing] the terms 'regulation[s] concerning . . . energy use' and 'energy conservation standard.'"  Dkt. 38 at 18.

requirements, among other specifications.  *See id*. ch. II, subch. D, pt. 430, subpt. B, app. I1 § 2. The test aims to "simulat[e] actual use."  *Herrington*, 768 F.2d at 1404.

Putting all the pieces together, and widening our lens again, EPCA preempts regulations that govern the design, manufacture, and production of an appliance—*i.e.*, colloquially, how it "perform[s]."  *See* 42 U.S.C. § 6291(6)(A).  And a state or local regulation only conflicts with a federal energy efficiency or use standard where it affects the appliance's performance under "simulat[ed]" test conditions, not in other settings.  *Herrington*, 768 F.2d at 1404.

This all matters because Plaintiffs' interpretation of EPCA is instead based on a hypothetical measurement of the appliance's energy consumption *not* under testing conditions, but at the "point of use"—a phrase they take from the statutory definition of "energy use" and define in a particular way.  Which takes us next to answering, what is a point of use?

## 2. That "Energy Use" Is Measured at an Appliance's "Point of Use" Does Not Alter the Analysis

Avoiding that the text refers to product design and testing conditions, Plaintiffs instead latch on to a different aspect of EPCA's definition of "energy use."  The statute provides that "energy use" means the "quantity of energy" a product consumes at its "point of use."  42 U.S.C. § 6291(4).  And the dictionary definition of "point of use," Plaintiffs note, is "the place where or time when a product or service is used."  Dkt. 26 at 18 (quoting *Point of Use*, Cambridge English Dictionary Online (2025)).  So, they say, the statute preempts any regulation of the "quantity of energy" that a gas appliance consumes where it is used.  *Id*. at 17–18.  And if a regulation entirely precludes the use of gas appliances, then their "energy use" at the "point of use" is zero—which is a standard different from the federal energy conservation standard and thus preempted.  *Id.*

In making this argument, Plaintiffs rely on *California Restaurant Association*, a Ninth Circuit opinion holding that EPCA preempts a similar regulation enacted by the City of Berkeley. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  And the Court considers this decision in detail, as it is currently the lone circuit decision on point.  *See supra* note 18. The panel began by referencing the Oxford English Dictionary to define "point of use" (similarly to Plaintiffs) as the "place where something is used."  *Id.* at 1101 (quoting *Point of Use*, Oxford English Dictionary Online (2022)).  It used this definition to rewrite EPCA to "preempt[] regulations, including 'building code requirements,' § 6287(f), that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used."  *Id*.

"Right off the bat," the panel next stated, "we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants."  *Id*. at 1101–02.  And the Berkeley building code in question "necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'"  *Id*. at 1102.  "So, by its plain language, EPCA preempts Berkeley's regulation . . . because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used."  *Id*.

The Court does not dismiss the panel's reasoning, which three circuit court judges signed and which the Ninth Circuit voted not to take up en banc.  That said, in the Court's view, if this was the at-bat, the batter struck out.  To start, EPCA addresses *technical* subjects.  And so, naturally, "point of use" in EPCA "has a well-established technical meaning."  *Cal. Rest. Ass'n*, 89 F.4th at 1123 (on denial of rehearing en banc) (Friedland, J., dissenting).  The Ninth Circuit majority ignored that when a statute "'address[es] a technical subject, a specialized meaning

is expected'" to work better than a phrase's ordinary meaning. *Van Buren*, 593 U.S. at 388 n.7 (cleaned up) (quoting Scalia & Garner at 73). The Oxford English Dictionary definition the panel consulted thus sheds no light.

Rather than refer to a lay-use dictionary, the dissent from the denial of rehearing en banc exhaustively canvassed a range of industry, regulatory, and legislative sources. *See Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting). That survey shows that Congress included the phrase "point of use" to "convey that the 'energy use' of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain," such as "energy consumed in extracting that natural gas, removing its impurities, and transporting it to the location of the stove." *Id*. at 1123 (Friedland, J., dissenting). So "point of use," properly defined in the EPCA context, has nothing to do with an appliance's use at the place it is used.

Second, the panel's analysis contends that banning the use of appliances effectively sets the appliance's consumption to zero. *Id*. at 1102. But recall that DOE assesses energy efficiency and use according to *simulated-use test procedures*. If a test had shown our hypothetical gas stove's energy use to be 1,770 kBtu (according to the maximum integrated annual energy consumption metric the DOE prescribes), its energy use would be 1,770 kBtu wherever used. And even if not used at all. "[A] gas stove of a particular model that sits uninstalled and unused has the same 'energy use' under EPCA as one that is installed and running." *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting).

Third, even accepting the lay-use dictionary definition for "point of use" does not require accepting the inference that EPCA demands that the appliance must be permitted in *all* places. Consider a hypothetical federal law that defines the point of use as restaurants, sets a national tortilla chips-to-salsa ratio of 2 grams for every 3 grams, and preempts states from regulating that

14

ratio.  No one would say that because Congress set a chips-to-salsa ratio, it intended to ensure that every restaurant has a right to sell chips and salsa.  And a state regulation prohibiting French restaurants from serving chips and salsa would not be preempted because it would operate in an entirely different regulatory space, preserving French cuisine—one that happens also to affect chips and salsa availability.  But replace "chips and salsa" with "covered products" and "ratio" with "energy efficiency," and the situation is the same this litigation presents.

The District has the better reading of "point of use."

## C.  Statutory Context

### 1.  The Court's Interpretation Creates a Coherent Statutory Scheme

The statutory definitions do not end the Court's analysis.  It must also interpret EPCA with an eye toward "harmony among [its] provisions."  Scalia & Garner at 180.

Here, the statutory scheme confirms that Congress intended the preemption provision to cover only state and local regulations that alter a product's design.  Consider that the statute contemplates that the Secretary may require "each manufacturer of a covered product to submit information or reports to the Secretary with respect to energy efficiency [or] energy use."  42 U.S.C. § 6296(d)(1).  That is, manufacturers report a static energy efficiency or use figure as a property of a particular product.  This data does not vacillate depending on where a product is used.  EPCA also contains labeling requirements pertaining to "energy use" of certain products.  *Id*. § 6294(a)(2)(I), (a)(3).  Those labels, too, must necessarily report a static figure.  And manufacturers and distributors may not "make any representation . . . with respect to the energy use or efficiency . . . of a covered product to which a test procedure is applicable . . . unless such product has been tested in accordance with [the relevant] test procedure and such representation

fairly discloses the results of such testing." *Id*. § 6293(c)(1).  Again, these representations concern a static figure.

In addition, DOE may in some cases waive preemption for states.  *See id*. § 6297(d). This waiver provision, too, reflects congressional concern for how a state or local law might affect an appliance's design and production.[22]  For example, DOE must consider "the extent to which the State regulation would cause a burden to manufacturers to *redesign and produce* the covered product type (or class)."  *Id*. § 6297(d)(3)(C) (emphasis added).  The DOE cannot grant a waiver if a state or local regulation would remove certain "*performance characteristics* (including reliability), features, sizes, capacities, and volumes" from the market.  *Id*. § 6297(d)(4) (emphasis added).  And if DOE waives federal preemption of a state regulation governing a covered product's energy efficiency or use, DOE may still delay the state regulation's effective date if it finds such delay "necessary due to the substantial burdens of *retooling, redesign, or distribution need* to comply with the State regulation."  *Id*. § 6297(d)(5) (emphasis added).

### 2.  Plaintiffs' Contrary Interpretation Disrupts the Statutory Scheme

Plaintiffs take a different view.  They assert that (1) the word "concerning" in the preemption provision, 42 U.S.C. § 6297(c); (2) the explicit exclusion of certain building codes from preemption, *id*. § 6297(f); (3) the statute's waiver provision, *id*. § 6297(d); and (4) the appearance of "energy use" in other portions of EPCA enlarge EPCA's preemptive scope.  They do not.

---

[22] As the Court discusses *infra* pp. 18–19, a waiver provision attached to a more general provision (here, the preemption provision) cannot, by itself, control the interpretation of the more general provision.  Here, however, the Court uses the language of the waiver provision alongside other contextual cues to confirm a reading of the statutory definitions of "energy efficiency" and "energy use" it has already established.

First, "concerning."  True, that term "generally has a broadening effect."  *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 716–17 (2018).  But that does not tell the Court *how* broadly to read the preemption provision.  "[A]s many a curbstone philosopher has observed, everything is related to everything else."  *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring).  And words like "concerning" are especially sensitive to surrounding context.  *See United States v. Miller*, 604 U.S. 518, 533 (2025).  Courts must therefore take "particular" care, when "construing [words and] phrases that govern conceptual relationships," to read these terms "in their context and with a view to their place in the overall statutory scheme."  *Id*.

The District contends that "concerning" limits preemption to building codes that smuggle in design-related restrictions.  *See* Dkt. 29 at 47–49.  For example, a building code could provide that all gas appliances consume only a certain amount of energy while switched on in certain buildings.  The inclusion of the term "concerning" likely closes such a loophole.[23]  On the other hand, stretching "concerning" to cover *any* state or local prohibition of appliance use would preclude a host of critical regulations—such as fire codes that prevent placement of gas appliances where they could increase the risk of poisoning from harmful pollutants or more easily ignite.  *See Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025).  Plaintiffs read "concerning" with "uncritical literalism" that risks "mak[ing] pre-emption turn on infinite connections."  *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (cleaned up).

---

[23] The legislative history confirms this view.  Congress added § 6297(f) to "prevent[] State building codes from being used as a means of setting mandatory State appliance standards in excess of the Federal standards."  H.R. Rep. No. 100-11, at 26 (1987).

Second, the exception for certain building codes.  EPCA excludes from federal preemption "State or local building code[s]" that meet certain criteria.  42 U.S.C. § 6297(f).  The parties agree that § 6297(f) is inapplicable here because the Clean Buildings Act does not meet those criteria.  *See* Dkt. 26 at 28–31; Dkt. 29 at 50–51.  But § 6297(f) remains relevant, Plaintiffs assert, because it allows the Court to infer that by exempting certain building codes, Congress meant to apply the preemption provision to all other building codes.  *See* Dkt. 26 at 19–20.

That argument is a too-long stretch.  "[E]xceptions to preemption," like § 6297(f), "while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the [preemptive] rule."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013); *see also Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 127 (2016) (explaining the no-elephants-in-mouseholes interpretive canon).  That is because statutes often provide multiple routes for escaping a particular proscription.  *See Dan's City Used Cars*, 569 U.S. at 264.  Here, the Clean Buildings Act is not preempted because that Act does not "concern[] . . . energy efficiency [or] energy use" under the main preemption provision.  42 U.S.C. § 6297(c).  But even building codes that *do* concern energy efficiency or use could still be excepted from preemption if they meet one of the tests that § 6297(f) prescribes.

Third, the waiver provision.  DOE may grant state and local governments waivers that permit their regulations of a product's energy efficiency or use to go into effect under certain conditions.  *See id*. § 6297(d).  But EPCA prohibits waiver if the "state regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  *Id*. § 6297(d)(3).  Plaintiffs claim that if DOE cannot waive preemption of laws that affect an appliance's "sale" or "servicing," *id*. § 6297(d)(3), the

18

preemption provision must cover all laws affecting an appliance's post-manufacturing life cycle. Dkt. 26 at 20–21 (quoting 42 U.S.C. § 6297(d)(3)) (citing *Cal. Rest. Ass'n*, 89 F.4th at 1104).

But like an exception provision, a waiver provision cannot by itself establish the scope of a preemption provision. *See Dan's City Used Cars*, 569 U.S. at 264. And Plaintiffs' read too much into the words "sale" and "servicing." That "the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition," *California Rest. Ass'n*, 89 F.4th at 1104, does not mean that the corresponding preemption provision covers *all* laws governing an appliance's entire life cycle in all contexts.

Fourth, "energy use" in other portions of EPCA. Notwithstanding the definition of "energy use" that the statute explicitly supplies, *see supra* pp. 10–15, Plaintiffs assert that other sections of EPCA refer to "energy use" as the quantity of energy a household consumes. *See* Dkt. 26 at 23. But those other sections do not refer to the "performance standard," 42 U.S.C. § 6291(6)(A), associated with "a covered product," *id*. § 6297(c), as the preemption provision and its associated statutory definitions do. Instead, they reference "*average annual per-household* energy use," *id*. § 6292(b)(1) (emphasis added), and similarly "*average per household* energy use," *id*. § 6295(*l*)(1) (emphasis added), of products. Different sections of EPCA, different types of energy use referenced.

If anything, the different usages support the District's take: the preemption provision's omission of any reference to total household consumption suggests that it covers regulations of product design, *not* actual energy consumption in a particular location. Between § 6297(c) on the one hand and § 6292(b)(1) and § 6295(*l*)(1) on the other, the phrase "energy use" "take[s] on distinct characters from association with distinct statutory objects." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (cleaned up).

19

In sum, EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones.  This is the only reading that preserves "a symmetrical and coherent regulatory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).[24]

### D. Federalism

Finally, the Court addresses federalism concerns.  The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015).  Lead Plaintiff National Association of Home Builders agrees.  It has endorsed this principle before the D.C. Circuit—as to building codes, no less.  In 2020, it explained that "[s]tate and local governments, which are closer to the needs and realities of their economies and constituents, have primary authority to adopt and enforce building energy codes."  *See* Br. Amicus Curiae Nat'l Ass'n of Home Builders in Supp. of Resp'ts at 18, *Am. Lung Ass'n v. EPA*, No. 19-1173 (D.C. Cir. June 23, 2020).  Well said.

Still, here, the parties present dueling theories regarding the applicability of a presumption against preemption in areas that states and municipalities traditionally regulate.  *See* Dkt. 26 at 17; Dkt. 29 at 25–27.  The Court does not fault them for raising this issue, as the relevant Supreme Court jurisprudence is evolving.  The Supreme Court has previously instructed

---

[24] On summary judgment, Plaintiffs for the first time raise the question of whether EPCA also preempts certain provisions of Appendix Z.  *Compare* Dkt. 26 at 24–26, *with* Dkt. 1 at 22–23. The Court agrees with the District that Plaintiffs have forfeited this challenge.  *See Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019); Dkt. 29 at 59.  Even if they have not, and assuming without deciding that they have standing on a ripe claim, *cf.* Dkt. 29 at 59–60, Plaintiffs' argument is unpersuasive.  Appendix Z (in either its current or proposed form, *see supra* note 17) provides for reduced energy consumption in certain buildings without setting any product-design standard.  So EPCA does not preempt Appendix Z for the same reasons it does not preempt the Clean Buildings Act.

that "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (cleaned up). More recently, however, the Supreme Court refused to "invoke any presumption against pre-emption" where (as here) the "statute contains an express pre-emption clause." *Franklin Cal. Tax-free Tr.*, 579 U.S. at 125 (cleaned up). Some judges have noted difficulty in reconciling these approaches, because *Franklin California Tax-free Trust* did not "mention—much less expressly overrule—the decades of cases where the presumption had . . . been applied." *See Cal. Rest. Ass'n*, 89 F.4th at 1107–08 (O'Scannlain, J., concurring); *see Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (discussing a circuit split).

Fortunately, the presumption, applicable or not, is a wash here. Whatever else the Supreme Court cases state, both emphasize that the text of the statute must bear the weight of the chosen interpretation. *See Medtronic,* 518 U.S. at 485; *Franklin California Tax-free Tr.*, 579 U.S. at 125. Here, the text is clear. EPCA establishes certain national programs for conservation. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986). Plaintiffs provide no persuasive evidence that Congress meant, through the same statute, to trample on the District's ability to pursue its own environmental goals where they do not contradict federal standards. With or without federalism principles to aid its analysis, the Court's conclusions remain the same.

21

## IV.   CONCLUSION AND ORDER

In sum, the Clean Buildings Act is not facially invalid under EPCA.  Accordingly, the Court:

**GRANTS** Defendant's Cross-Motion for Summary Judgment, Dkt. 30;

**DENIES** Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).

Date: March 26, 2026

_____
ANA C. REYES
United States District Judge

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES<br>1201 15th St NW, Suite 400<br>Washington, DC 20005<br><br>RESTAURANT LAW CENTER<br>2055 L St NW, Suite 700<br>Washington, DC 20036<br><br>NATIONAL APARTMENT ASSOCIATION<br>4300 Wilson Blvd, Suite 800<br>Arlington, VA 22203<br><br>MARYLAND BUILDING INDUSTRY ASSOCIATION<br>11825 West Market Place<br>Fulton, MD 20759<br><br>WASHINGTON GAS LIGHT COMPANY<br>1000 Maine Ave, SW<br>Washington, DC 20024<br><br>PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL<br>665 N. Broad Street<br>Philadelphia, PA 19123<br><br>TEAMSTERS LOCAL 96<br>5627 Allentown Rd, Suite 202<br>Camp Springs, MD 20746<br><br>                *Plaintiffs,*<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>                *Defendant.* | CASE NO. 24-2492<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

1. Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 seek declaratory and injunctive relief under federal law against enforcement of the Clean Energy DC Building Code Amendment Act of 2022 ("D.C. Appliance Ban"), codified at D.C. Code § 6-1453.01. The D.C. Appliance Ban prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings, including buildings used as residences over three stories (such as apartment buildings), in the District of Columbia after December 31, 2026, at latest. D.C. Code § 6-1453.01(b)(1). But the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly and broadly preempts state and local laws on that subject. The D.C. Appliance Ban falls within the heartland of EPCA's express preemption provision because it too purports to regulate the energy use of gas appliances—by preventing such use entirely. As such, the D.C. Appliance Ban is preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets

energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this same kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the D.C. Appliance Ban does exactly that, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and abandoned their efforts to enact similar bans. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. Because the District did not do so on its own, the Court must order it to do the same.

5. The D.C. Appliance Ban inflicts serious and irreparable harm. Banning the use of gas appliances in new construction and renovations is at odds with the needs of District residents, workers, and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the District's housing crisis, and aims to shift the District's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. Due to the D.C. Appliance Ban artificially limiting the pool of gas customers, homes, apartments, restaurants, and other businesses that rely upon gas services will be forced to pay higher gas prices than they would

otherwise have to pay. Thus, the D.C. Appliance Ban will negatively impact existing buildings as well, even those that do not undergo substantial improvements.

6. Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—stand to lose much if the D.C. Appliance Ban is not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, apartment owners, retail, and delivery related to gas and gas infrastructure. Even though the D.C. Appliance Ban does not go into effect until the end of 2026 at latest, its chilling effect is already undermining their livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing maintenance of existing and development of new desperately needed multifamily homes. Ultimately, the D.C. Appliance Ban will compel Plaintiffs to exit some or all of their businesses and trades and substantially increase the cost in the District for apartment homes, lodging, energy, and food service—all despite federal law's express preemption of it.

7. In sum, the D.C. Appliance Ban is plainly preempted by EPCA, is already inflicting substantial irreparable harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the D.C. Appliance Ban is preempted by EPCA and an injunction preventing its enforcement.

## JURISDICTION AND VENUE

8. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. 42 U.S.C. § 6202(4) defines the term "State" to encompass the District of Columbia under EPCA, and as such, references to states throughout this Complaint should be read to encompass the District of Columbia as well. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

4

9.   This Court has personal jurisdiction over the District of Columbia and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the District of Columbia, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

## PARTIES

11. Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. The National Association of Home Builders' mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. The National Association of Homebuilders has one or more members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of NAHB's members is an appliance manufacturer that sells gas appliances, "including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers," in the District of Columbia. Ex. 1, Perry McGuire Decl., ¶ 2. The D.C. Appliance Ban will harm this member, as the company "will face significant sales losses if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances we manufacture and sell due to the D.C. Appliance Ban." *Id.* at ¶ 5.

12. The Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including businesses in the District of Columbia. RLC's members will be harmed by D.C. Law 24-177 by restricting energy choice, by losing the ability to cook with gas, which is necessary for many of their restaurants' menus, and by increasing the costs of building and maintaining their restaurants. Ex. 2, Angelo Amador Decl., ¶ 7. Furthermore, many RLC members run on thin margins, making any increase in business operations significant. *Id.* at ¶ 8. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay. *Id.* Notably, many RLC members in the District of Columbia are already struggling due to a variety of unfavorable economic conditions. *Id.* at ¶ 9. D.C. restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. *Id.* The D.C. Appliance Ban will further exacerbate these unfavorable economic conditions. *Id.*

13. The National Apartment Association ("NAA") is the leading voice and preeminent resource for the rental housing industry across the country. As a federation of 141 affiliated apartment associations, NAA encompasses over 97,000 members, representing more than 12 million apartment

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in the District of Columbia).

homes globally. NAA emphasizes integrity, accountability, collaboration, inclusivity, and innovation, and believes that rental housing is a valuable partner in every community. In addition to providing professional development, education, and credentialing, NAA and its network of affiliated apartment associations work to ensure that public policy does not impede but promotes the businesses of apartment owners and operators to run their businesses and provide housing to more than 30 million American households. D.C. Law 24-177 harms NAA's members by restricting energy choice and increasing the costs of building and maintaining apartment buildings. Ex. 3, Nicole Upano Decl., ¶ 6. Having access to affordable gas services is important to NAA members. *Id.* at ¶ 7. Many NAA members run on thin margins, making any increase in business operations significant. *Id.* For example, based on data from the operating statements of federally mortgaged properties, each dollar of rent results in a profit of only seven cents to the owners, a slim margin that underscores the challenging financial pressures that the rental housing industry faces.[2] *Id.* The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are NAA members to pay higher rates for gas service than they otherwise would pay. *Id.* Furthermore, research has shown that more than 40% of multifamily development costs derive from regulations imposed by all levels of government.[3] *Id.* at ¶ 8. The D.C. Appliance Ban is another regulation which will further drive up the costs of multifamily rental housing in the District of Columbia. *Id.*

14. Plaintiff Maryland Building Industry Association ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience; the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-

---

[2] National Apartment Association, *Breaking Down One Dollar of Rent: 2023*, https://www.naahq.org/breaking-down-one-dollar-rent-2023 (last visited Oct. 3, 2024).

[3] National Association of Home Builders and National Multifamily Housing Council, *Regulation: 40.6 Percent fo the Cost of Multifamily Development*, (2022), https://www.nmhc.org/globalassets/research--insight/research-reports/cost-of-regulations/2022-nahb-nmhc-cost-of-regulations-report.pdf.

Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the NAHB. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's, as well as Baltimore City, the Eastern Shore, the District of Columbia. MBIA has members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. Ex. 4, Lori Graf Decl., at ¶¶ 6–8. The D.C. Appliance Ban will restrict MBIA members from using gas in new commercial buildings, and they will be forced to conduct expensive electric retrofits in existing commercial buildings they make substantial modifications to that currently have gas service. *Id.* at ¶ 6. Additionally, the D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are MBIA members to pay higher rates for gas service than they otherwise would pay. *Id.* at ¶ 7. By contributing to rising construction and energy costs, the D.C. Appliance Ban will also further exacerbate the affordable housing crisis in the District.[4] *Id.* at ¶ 8.

15. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 160,000 customers in the District of Columbia, which make up nearly 13% of WGL's customers overall. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. "The D.C. Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers

---

[4] *See, e.g.,* Aaron Wiener, *A 'perfect storm' of problems pushes D.C. toward full-blown housing crisis*, WASHINGTON POST (Sept. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/25/dc-affordable-housing-crisis/.

and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had." Ex. 5, Donald "Blue" Jenkins Decl., ¶ 6. Additionally, "[b]y capping a portion of WGL's customer growth, the D.C. Appliance Ban impedes [the company's] ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system." *Id.* at ¶ 8. The result will be financial harm to and lower profits for WGL. Furthermore, the D.C. Public Service Commission has already relied on the D.C. Appliance Ban to deny WGL's requests regarding pipeline replacement. *Id.* at ¶ 10.

16. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council ("District Council") is an affiliate of the Laborers International Union of North America ("LIUNA"), AFL-CIO, a 120-year-old labor organization with over 500,00 members throughout the United States and Canada. Ex. 6, Ryan Boyer Decl., ¶ 2. The District Council has approximately 13,000 members, and nationally, one-third of construction work performed by LIUNA members is in the energy sector. *Id.* Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by WGL, such as Miller Pipeline, Infrasource, Skoda Contracting Company, and Vector Services, 70 of whom regularly work in the District. *Id.* at ¶ 3. Notably, District Council members who work on gas distribution lines are required to hold an operator qualification under Subpart G in 49 C.F.R. Part 195. *Id.* at ¶ 4. This valuable employment credential is applicable only to work on gas lines. *Id.* The D.C. Appliance Ban will reduce the work performed by District Council members, leading to layoffs and the permanent loss of employment. *Id.* at ¶ 6. Furthermore, it will cause the gas industry in the local area to shrink, restricting District Council members' ability to find employment in the industry for which they have non-transferrable training and credentials. *Id.*

Loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans. *Id.* Many District Council local members are also WGL customers. *Id.* at ¶ 7. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers like these local members to pay higher rates for gas service than they otherwise would pay. *Id.*

17. Plaintiff Teamsters Local 96 ("Local 96") is a union. Local 96 has approximately 600 members, all of whom are employed by Plaintiff WGL. Ex. 7, Wilder Reed Decl., ¶ 3. As WGL employees, Local 96 members service the more than 160,000 WGL customers in the District of Columbia. *Id.* Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses. *Id.* at ¶ 4. The D.C. Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. *Id.* at ¶ 6. The D.C. Appliance Ban will therefore harm Local 96's members. *Id.* Additionally, the D.C. Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade. *Id.*

18. Defendant District of Columbia is a municipal corporation that adopted D.C. Law 24-177.

19. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of D.C. Law 24-177. Plaintiffs contend that the D.C. Appliance Ban is preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and assert that the appliance ban is lawful and enforceable. Enforcement of the appliance ban will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

20. The claims asserted herein are ripe for review because Plaintiffs challenge the facial validity of D.C. Law 24-177, thereby raising a legal question. When a question is "predominantly legal,"

10

there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which D.C. Law 24-177 would be valid under federal law.

## ALLEGATIONS

**D.C. Law 24-177's Ban on Federally Regulated Appliances**

21. D.C. Law 24-177 bans the use of gas appliances in newly constructed or substantially improved existing commercial buildings (which encompasses residences over three stories), including mixed-use buildings with restaurants, apartment buildings, hotels, condos, or houses, located in the District of Columbia.

22. D.C. Law 24-177 applies to "covered buildings," which means "all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions." D.C. Code § 6-1453.01(a)(2). The District of Columbia Energy Conservation Code defines commercial buildings to encompass "all buildings that are not included in the definition of 'Residential building.'" D.C. Energy Conservation Code, R202 (2017) The Code defines residential buildings to include "detached one- and two-family dwellings and multiple single-family dwellings (townhouses) as well as Group R-2, R-3 and R-4 buildings three stories or less in height above grade plane." *Id.* Accordingly, the D.C. Appliance Ban applies to all such buildings that are more that than three stories.

23. For covered buildings, D.C. Law 24-177 requires the Mayor of the District of Columbia to issue, by December 31, 2026, at latest, "final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1).

24. "New construction" includes "new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building." *Id.* § 6-1451.01(33); *id.* § 6-1453.01(a)(4).

25. "Substantial improvement" means "any repair, alteration, addition, or improvement of a building or structure, the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started." *Id.* § 6-1451.01(40); *Id.* § 6-1453.01(a)(5).

26. The definition of "net-zero-energy standard" states that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building." *Id.* § 6-1453.01(a)(3)(B)(iii). This prohibits the use of gas appliances, which necessarily rely upon fuel combustion in their energy use.

27. If the Mayor does not adopt the aforementioned net-zero-energy standard regulations by December 31, 2026, "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z [of the District of Columbia Energy Conservation Code – Commercial Provisions] . . . ." *Id.* § 6-1453.01.

28. Under Appendix Z, "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building . . . ." D.C. Energy Conservation Code, Appendix Z, Section Z3.1 (2017). This prohibits the use of gas appliances, which necessarily rely upon fossil fuel combustion in their energy use.

29. As a result, use of federally regulated gas appliances will be banned in covered buildings in the District after December 31, 2026, at latest, regardless of whether the Mayor promulgates net-zero-energy standard regulations.

30. The Council of the District of Columbia adopted Bill 24-420, which eventually became D.C. Law 24-177, on First Reading and Final Reading, on June 28, 2022, and July 12, 2022, respectively.

31. Following execution by the Mayor on July 27, 2022, the bill became Act 24-528 and was published in the August 5, 2022 edition of the D.C. Register (Vol. 69, page 009924).

32. Act 24-528 was then transmitted to the U.S. Congress on August 9, 2022 for a 30-day review period. The 30-day review period ended on September 21, 2022, at which point Act 24-528 became D.C. Law 24-177 and took effect the same day.

33. On October 7, 2022, D.C. Law 24-177 was published in the D.C. Register (Vol. 69, page 011947).

**EPCA Establishes National Binding Appliance Energy Regulations**

34. D.C. Law 24-177 impermissibly regulates the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

35. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

36. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

37. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

38. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

39. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

40. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

41. One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations

that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

42. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

43. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

44. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

45. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

46. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states can seek permission to establish their own standards, "achieving the

waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

47. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

48.  In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state

building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

49. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts State Regulation of Consumer and Industrial Appliances**

50. EPCA expressly preempts state regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

51. EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters," "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

52. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the

products are used in a commercial building or a residential building. Some of the appliances regulated under D.C. Law 24-177 are considered "consumer products."

53. The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

54. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

55. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters and furnaces and gas stoves) which are regularly sold to individuals.

56. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

57. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

58. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

59. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if

they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

60.  Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning the energy use or energy efficiency of heating equipment, water heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use.

**EPCA Preempts the D.C. Appliance Ban**

61. EPCA preempts D.C. Law 24-177 because D.C. Law 24-177 expressly concerns the energy use of EPCA-covered gas appliances which are regularly sold for residential, commercial, or industrial use, as it bans the use of entire classes of such appliances in newly constructed and substantially improved existing buildings over three stories in the District of Columbia.

62. D.C. Law 24-177 concerns the quantity of natural gas consumed by appliances in the buildings it regulates because it prohibits the installation of EPCA-covered products. As a result, D.C. Law 24-177 requires that *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts D. C. Law 24-177.

63. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation must meet *all seven* of these requirements to avoid preemption.

64. The EPCA provisions providing the possibility of an exemption from preemption for consumer appliances only apply to codes governing new construction. For the provisions of D.C. Law 24-177 that impose requirements concerning the energy use or energy efficiency of EPCA-

covered appliances in existing buildings that undergo substantial modifications, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

65. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

66. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives in new construction, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

67. When it comes to new construction, D.C. Law 24-177 does not meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted. For example, the first requirement to avoid preemption is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). D.C. Law 24-177 does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* EPCA-covered gas appliance, no matter the energy use or efficiency of the appliance.

68. The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). D.C. Law 24-177 does not meet this requirement, because it prohibits the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

69. The third requirement is that "[t]he credit to the energy consumption or conservation

objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). D.C. Law 24-177 does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require. Instead, D.C. Law 24-177 bans the use of EPCA-covered consumer products.

70.  The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, *except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard*." *Id.* § 6297(f)(3)(E) (emphasis added). Here, D.C. Law 24-177 does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

71. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a state building code regulation for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

72. D.C. Law 24-177 does not meet this requirement, because it bans EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

73. Like the EPCA preemption exemption for consumer appliances, the preemption exemption

21

for industrial appliances only applies to codes governing new construction. To the extent that D.C. Law 24-177 attempts to impose requirements concerning the energy use or energy efficiency of EPCA-covered appliances in the context of substantial modifications to existing buildings, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

74. On information and belief, the District of Columbia has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an exemption under 42 U.S.C. § 6297(d). Even if the District of Columbia did make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

## CAUSES OF ACTION

### COUNT ONE: FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

75. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

76. D.C. Law 24-177 concerns the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in newly constructed or substantially improved existing buildings—including but not limited to certain apartment buildings, condos, and homes—that are more than three stories tall.

77. On information and belief, the District of Columbia has not applied for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption, and it could not lawfully obtain such a waiver even if it had applied for one.

78. D.C. Law 24-177's requirements for new construction do not meet EPCA's requirements to be exempt from preemption, including because, inter alia:

    a.  It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather bans EPCA-covered gas appliances;

    b.  It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency; and

    c.  It bans EPCA-covered gas appliances, even when they meet the federal efficiency standards.

79. D.C. Law 24-177's requirements for substantial modifications of existing construction are not eligible for an exemption from preemption, as any applicable exemptions only apply to new construction.

80. D.C. Law 24-177 is therefore preempted by the federal EPCA.

81. There is no set of circumstances under which D.C. Law 24-177 would be valid.

82. Plaintiffs accordingly request that the Court declare that D.C. Law 24-177 is preempted by EPCA and enjoin Defendant from enforcing D.C. Law 24-177.

**PRAYER FOR RELIEF**

83. WHEREFORE, Plaintiffs pray for relief as follows:

84. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce D.C. Law 24-177;

85. For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that D.C. Law 24-177 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

23

86. For costs of this suit, including reasonable attorney's fees; and

87. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BAKER BOTTS L.L.P.

__/s/ Megan H. Berge_____
Megan H. Berge (Bar ID: 983714)
Scott Novak (DC Bar No. 1736274) (*admission pending*)
700 K St NW
Washington, DC
202-639-1308
megan.berge@bakerbotts.com
scott.novak@bakerbotts.com
*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

RESTAURANT LAW CENTER

__/s/ Angelo Amador_____
Angelo Amador (Bar ID: 480031)
2055 L St NW
Washington, DC 20036
202-331-5913
AAmador@restaurant.org
*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

__/s/ Brian Petruska_____
Brian Petruska (Bar ID: 498321)
1875 Explorer Dr, Ste. 920
Reston, VA 20190
703-860-4194
bpetruska@mailliuna.org
*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C

   /s/ Lauren McDermott
Lauren McDermott (Bar ID: 1008301)
1920 L St NW
Washington, DC 20036
202-783-0010
lmcdermott@mooneygreen.com
*Counsel for Teamsters Local 96*

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant*. | **Case No.** |

**<u>DECLARATION OF PERRY MCGUIRE</u>**

1. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Vice President and General Counsel of Rinnai America Corporation. Rinnai America Corporation manufactures gas appliances, including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers. We sell these gas appliances throughout the United States, including in the District of Columbia.

3. Rinnai America Corporation is a member of the National Association of Home Builders of the United States.

4. D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

1

5. Rinnai America Corporation will face significant sales losses if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances we manufacture and sell due to the D.C. Appliance Ban.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: <u>October 14, 2024</u>

_____
Perry McGuire
Vice President and General Counsel
Rinnai America Corporation

2

# Exhibit 4

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, | **Case No.** |
| *Plaintiffs*, | |
| v. | |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**<u>DECLARATION OF ANGELO AMADOR</u>**

1.  My name is Angelo Amador. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.  I am the Executive Director of the Restaurant Law Center ("RLC"), a business association supporting the restaurant and food-service industry across the United States. While the RLC is an independent organization with its own Board of Directors, all members in good standing with its affiliate, the National Restaurant Association, are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.5 million employees, or approximately 10% of the workforce of the United States. Our members are predominantly small businesses. Even restaurants with well-established brand names are often franchisees who own only one or several locations.

1

3.  The RLC's main purpose is to support the growth and development of the restaurant industry, which is the second largest private sector employer. RLC does so through numerous channels, including by conducting direct outreach efforts for our members, by hosting educational and informational meetings, seminars, and webinars, by submitting regulatory comments at the federal, state, and local level advocating for restaurant-friendly policies, and by helping our members navigate their legal and regulatory obligations.

4.  The RLC is the only independent public policy organization created specifically to represent the interests of the American foodservice industry in the judicial system and before quasi-judicial bodies like the National Labor Relations Board. The RLC regularly provides courts and agencies with the industry's perspective on legal issues that significantly impact its members and the health of the foodservice industry.

5.  As Executive Director of the RLC, I am responsible for managing and leading the RLC's efforts to advocate for restaurant-friendly policies and regulations at the federal level and in numerous state and local jurisdictions. I have been the Executive Director since the RLC was launched in 2016.

6.  I am providing this declaration to discuss the negative impacts upon RLC members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

7.  I have held multiple calls with RLC members to address their concerns arising from the D.C. Appliance Ban. Our RLC members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on restaurant employers who are subject to the D.C. Appliance Ban. Specifically, RLC members have informed me that the D.C.

Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. The D.C. Appliance Ban is especially concerning to RLC members because many restaurant owners rely on gas for cooking, as well as for space and water heating, in their restaurants, and RLC members want to have the choice to use gas in the future to meet their energy needs.

8. Furthermore, RLC members have told me that having access to affordable energy, including gas services, is important to them. Many RLC members run on thin margins, making any increase in business operations significant and potentially devastating. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay.

9. Notably, many RLC members in the District of Columbia are already struggling due to a variety unfavorable economic conditions. D.C. restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. The D.C. Appliance Ban will further exacerbate these unfavorable economic conditions.

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in the District of Columbia).

3

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: <u>October 16, 2024</u>

Angelo I. Amador, Esq.
Executive Director
Restaurant Law Center

4

# Exhibit 5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96,<br><br>                    *Plaintiffs*,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>                    *Defendant*. | **Case No.** |

<u>**DECLARATION OF NICOLE UPANO**</u>

1.  My name is Nicole Upano. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.  I am the Assistant Vice President of Housing Policy & Regulatory Affairs for the National Apartment Association ("NAA").

3.  The NAA serves as the leading voice and preeminent resource through advocacy, education, and collaboration on behalf of the rental housing industry. As a federation of 141 state, local, and global affiliates, NAA encompasses over 97,000 members representing more than 12 million apartment homes globally. NAA has members in all 50 states and the District of Columbia.

4.  I am providing this declaration to discuss the negative impacts upon NAA members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the

construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

5.  NAA's members include apartment developers and owners and operators of rental housing whose buildings use gas appliances and intend to continue to use gas appliances in new and substantially modified commercial building construction in the District of Columbia. Notably, commercial buildings in the District of Columbia include buildings more than three stories in height, thereby encompassing many apartment buildings that our members either develop or own and operate.

6.  Our NAA members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on them. Specifically, NAA members have informed me that the D.C. Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service.

7.  Furthermore, NAA members have told me that having access to affordable energy, including gas services, is important to them. Many NAA members run on thin margins, making any increase in business operations significant and potentially devastating. For example, based on data from the operating statements of federally mortgaged properties, each dollar of rent results in a profit of only seven cents to the owners, a slim margin that underscores the challenging financial pressures that the rental housing industry faces.[1] The D.C. Appliance Ban will limit the pool of gas customers and force existing gas customers who are NAA members to pay higher rates for gas service than they otherwise would pay.

---

[1] National Apartment Association, *Breaking Down One Dollar of Rent: 2023*, https://www.naahq.org/breaking-down-one-dollar-rent-2023 (last visited Oct. 3, 2024).

8.  Research has shown that more than 40% of multifamily development costs derive from regulations imposed by all levels of government.[2] The D.C. Appliance Ban is another regulation which will further drive up the costs of multifamily rental housing in the District of Columbia.

9.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: October 15, 2024

*Nicole Upano*

Nicole Upano
AVP, Housing Policy & Regulatory Affairs
National Apartment Association

---

[2] National Association of Home Builders and National Multifamily Housing Council, *Regulation: 40.6 Percent fo the Cost of Multifamily Development*, (2022), https://www.nmhc.org/globalassets/research--insight/research-reports/cost-of-regulations/2022-nahb-nmhc-cost-of-regulations-report.pdf.

# Exhibit 6

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES,
RESTAURANT LAW CENTER,
NATIONAL APARTMENT
ASSOCIATION, MARYLAND BUILDING
INDUSTRY ASSOCIATION,
WASHINGTON GAS LIGHT COMPANY,
PHILADELPHIA-BALTIMORE-
WASHINGTON LABORERS' DISTRICT
COUNCIL, and TEAMSTERS LOCAL 96,

                        *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA,

                        *Defendant*.

**Case No.**

## DECLARATION OF LORI GRAF

1. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Chief Executive Officer for the Maryland Building Industry Association ("MBIA").

3. MBIA formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience; the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-Capital Building Industry Association that covered DC and Southern Maryland. MBIA is a local chapter of the National Association of Home Builders of the United States. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's as well as Baltimore City, the Eastern Shore and Washington, DC.

1

4.  I am providing this declaration to discuss the negative impacts upon MBIA members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

5.  MBIA's members include home builders and developers whose buildings use gas appliances. These home builders and developers intend to continue to use gas appliances in new and substantially modified commercial buildings they construct in the District of Columbia.

6.  MBIA members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on them. Specifically, MBIA members have informed me that the D.C. Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service.

7.  Furthermore, MBIA members have told me that having access to affordable energy, including gas services, is important to them. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are MBIA members to pay higher rates for gas service than they otherwise would pay.

8.  By contributing to rising construction and energy costs, the D.C. Appliance Ban will also further exacerbate the affordable housing crisis in the District of Columbia.[1]

---

[1] *See, e.g.,* Aaron Wiener, *A 'perfect storm' of problems pushes D.C. toward full-blown housing crisis*, WASHINGTON POST (Sept. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/25/dc-affordable-housing-crisis/.

9.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: October 14, 2024

*Lori Graf*

Lori Graf
Chief Executive Officer
Maryland Building Industry Association

3

Exhibit 7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, | **Case No.** |
| *Plaintiffs*, | |
| v. | |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**DECLARATION OF DONALD "BLUE" JENKINS**

1. My name is Donald "Blue" Jenkins. I am Executive Vice President & President, Utilities, AltaGas and President, Washington Gas Light Company ("WGL").

2. I have personal knowledge of the facts set out below, and I am competent to testify herein.

3. WGL is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 163,000 customers in the District of Columbia, which make up nearly 13% of WGL's customers overall.

4. As President, I am responsible for delivering on the company's commitment to customer satisfaction and operational excellence. This includes WGL's customer-facing functions, including the customer contact center, billing, and account management.

1

5. D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6. The D.C. Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had.

7. The D.C. Appliance Ban limits a portion of WGL's customer growth. Customer growth is a crucial component of the utility business model. Each year, we make significant and necessary investments in our system to ensure safety, reliability, and resiliency. Customer growth helps to ensure that those costs can be spread over a growing customer base and helps to keep costs for all of our customers at an affordable level.

8. By capping a portion of WGL's customer growth, the D.C. Appliance Ban impedes our ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system.

9. Notably, S&P Global's Regulatory Research Associates has ranked the District of Columbia as a restrictive regulatory environment for gas utilities from an investor viewpoint.

10. Recently, the D.C. Public Service Commission ("PSC") has relied on the D.C. Appliance Ban to deny WGL's requests. For instance, in denying WGL's PIPES 3 Plan (see attached Order No. 22003), the PSC stated that it "must take in account" "the District's new aggressive climate

initiatives."[1] One such initiative the PSC specifically noted was the D.C. Appliance Ban, which it observed "established standards for new buildings and major renovations to be built to net zero standards starting after 2026, requiring no on-site combustion, with an exception for buildings essential to public health and safety."[2] The PSC went on to conclude: "It is within this context that it is clear that our pipeline replacement program needs to be revised to better align with both Federal and District climate initiatives. Therefore, we believe that it is necessary for WGL to file a new restructured PIPES plan to ensure safe and reliable operation of the natural gas system that appropriately aligns with the District's Climate goals."[3]

11. I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on October 15, 2024

Blue Jenkins (Oct 15, 2024 12:08 PDT)

Donald "Blue" Jenkins
Executive Vice President & President, Utilities, AltaGas and President, Washington Gas Light Company

---

[1] Public Service Commission of the District of Columbia, Formal Case No. 1154, 1775, and 1179, Order No. 22003, ¶ 9 (June 12, 2024).
[2] *Id.* at ¶ 11.
[3] *Id.* at ¶ 48.

**Attachment – D.C. Public Service Commission Order No. 22003**

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA**
**1325 G STREET, N.W., SUITE 800**
**WASHINGTON, D.C. 20005**

**ORDER**

**June 12, 2024**

**FORMAL CASE NO. 1154, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECT*PIPES* 2 PLAN:**

**FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN;**

**and**

**FORMAL CASE NO. 1179, IN THE MATTER OF THE INVESTIGATION INTO WASHINGON GAS LIGHT COMPANY'S STRATEGICALLY TARGETED PIPE REPLACEMENT PLAN, Order No. 22003**

## I.    INTRODUCTION

1.    By this Order, the Public Service Commission of the District of Columbia ("Commission") accepts Continuum Capital's Audit Report on Washington Gas Light Company's ("WGL" or the "Company") PROJECT*pipes* 2 ("PIPES 2") Plan.  The Commission dismisses WGL's PROJECT*pipes* 3 Application ("PIPES 3").  Finally, the Commission opens *Formal Case No. 1179*, and within 45 days of the date of this Order, WGL shall submit a restructured pipes plan that ensures the safe and reliable operation of the natural gas infrastructure to meet the energy needs of all District consumers in the District as well as aligns with the District's climate goals.

## II.    BACKGROUND

2.    More than a decade ago, the Commission approved the first five (5) year phase of WGL's 40-year Revised Accelerated Pipe Replacement Plan ("PIPES 1").[1]  The PIPES 1 plan included proposals for the replacement of aging leak-prone pipeline infrastructure with the highest risk and leak rates (*i.e.*, cast iron main lines and bare and unprotected steel mains) at an estimated cost of $110 million.[2]  The Commission's approval required an audit of the PIPES 1 Program.[3]

---

[1]    *Formal Case No. 1093, In the Matter of the Investigation Into the Reasonableness of Washington Gas Light Company's Existing Rates and Charges for Gas Service, and Formal Case No. 1115, Application of Washington Gas Light Company for Approval of a Revised Accelerated Pipe Replacement Program*, Order No. 17431, ¶ 1, rel. March 31, 2014 ("Order No. 17431").  The Accelerated Pipes Replacement Plan was renamed and is currently known as PROJECT*pipes.*

[2]    *Formal Case No. 1093*, Washington Gas Light Company's Request for Approval of a Revised Accelerated Pipe Replacement Plan (Public Version and Confidential Version), at 2-3, and 6, filed August 15, 2013.

[3]    *Formal Case No. 1115,* Liberty Consultant's Management Review of PROJECT*pipes*, filed April 19, 2019 ("LMA Audit Report").

The PIPES 1 Audit Report found mixed performance for the PIPES 1 Program, specifically finding that WGL's management of the program was deficient in years one and two, but concluded years three and four showed significant improvement.[4]   The PIPES 1 Audit Report offered 24 recommendations encompassing WGL's nine (9) program areas, including risk ranking and project prioritization, program management, program planning, cost estimating, cost management, scheduling, resource planning, oversight, and field execution.[5]

3.      WGL filed its PIPES 2 plan on December 7, 2018, requesting approval for five years (*i.e.,* October 1, 2019, through December 31, 2024).[6]  The PIPES 2 plan included proposals for eight distribution replacement programs and five transmission replacement programs at an estimated cost of $305.3 million.[7]  Instead of a five-year approval, the Commission approved a three-year Plan requiring WGL to address distribution system safety and reliability, including more restrictive performance targets for replaced pipe and the District's climate goals.[8]   The Commission established a spending cap at $150 million and directed another audit of WGL's PIPES 2 performance for Calendar Years 2021 and 2022.[9]  Through Order No. 21620, the Company selected Continuum Capital to perform an Audit of the first two years of PIPES 2 program using a scope of work that we previously approved.[10]

4.      WGL filed its PIPES 3 Application on December 22, 2022.[11]  The Commission invited stakeholder comments on the Application.[12]  Initial comments were received from the District Department of Energy and Environment ("DOEE"),[13] the District Department of

---

[4]        LMA Audit Report at 4-14.

[5]        LMA Audit Report at 14-16.

[6]        *Formal Case No. 1154, Washington Gas Light Company's Application for Approval of PROJECTpipes 2 Plan ("Formal Case No. 1154")*, filed December 7, 2018 ("WGL's PIPES 2 Plan").

[7]        WGL's PIPES 2 Plan at 5.

[8]        *Formal Case No. 1154,* Order No. 20671, ¶¶ 35-36, rel. December 11, 2020 ("Order No. 20671").

[9]        *Formal Case No. 1154*, Order No. 20671, rel. December 11, 2020.

[10]        *Formal Case No. 1154,* Order No.  21620, rel. May 17, 2023 ("Order No. 20620").

[11]        *Formal Case No. 1175, In the Matter of Washington Gas Light Company's Application for Approval of* PROJECT*pipes 3 Plan ("Formal Case No. 1175").* Washington Gas Light Company's Application for Approval of PROJECT*pipes* 3 Plan, filed December 22, 2022 ("PIPES 3 Application").

[12]        70 *D.C. Reg.* 000777-000779, January 20, 2023.  *See also*, *Formal Case No. 1175,* Public Notice, filed January 20, 2023.

[13]        *Formal Case No. 1175,* Department of Energy and Environment's Initial Comments on Washington Gas Light Company's PROJECT*pipes* 3 Application, filed May 2, 2023 ("DOEE Comments").

**Order No. 22003**                                                                                       **Page 3**

Transportation ("DDOT"),[14] D.C. Climate Action ("DCCA"),[15] Rewiring America,[16] Office of the People's Counsel for the District of Columbia ("OPC"),[17] Sierra Club,[18] the Apartment and Office Building Association of Metropolitan Washington ("AOBA"),[19] Advisory Neighborhood Commission ("ANC") 3B,[20] Interfaith Center on Corporate Responsibility ("ICCR"),[21] ANC 3C,[22] ANC 3A,[23] ANC 6A,[24] and 10 Councilmembers of the Council of the District of Columbia.[25] Reply comments were filed by WGL on July 17, 2023.[26]

5.        On December 13, 2023, the PIPES 2 Continuum Audit Report was filed.[27]  On January 22, 2024, WGL, OPC, the District of Columbia Government ("DCG"), and Philadelphia-Baltimore-Washington Construction Laborers' District Council ("PBWCLDC") each filed

[14]        *Formal Case No. 1175,* Comments of the District Department of Transportation on Washington Gas Light Company's PROJECT*pipes* 3 Plan Application, filed May 2, 2023 ("DDOT Comments").

[15]        *Formal Case No. 1175,* DC Climate Action's Initial Comments, filed June 16, 2023 ("DCCA Comments").

[16]        *Formal Case No. 1175,* Comments of Rewiring America, filed June 16, 2023 ("Rewiring America Comments").

[17]        *Formal Case No. 1175*, Office of the People's Counsel for the District of Columbia's Comments on Washington Gas Light's PROJECT*pipes* 3 Plan, filed June 16, 2023 ("OPC Comments").

[18]        *Formal Case No. 1175,* Sierra Club's Initial Comments, filed June 16, 2023 ("Sierra Club Comments").

[19]        *Formal Case No. 1175,* Comments of the Apartment and Office Building Association of Metropolitan Washington on Washington Gas Light Company's PROJECT*pipes* 3 Plan, filed June 16, 2023 ("AOBA Comments").

[20]        *Formal Case No. 1175,* Resolution in Opposition to Washington Gas PROJECT*pipes,* filed November 13, 2023 ("ANC 3B Resolution").

[21]        *Formal Case No. 1175,* Comments of the Interfaith Center on Corporate Responsibility, filed December 4, 2023 ("ICCR Comments").

[22]        *Formal Case No. 1175,* ANC3C Resolution 2023-CONSENT Resolution in Opposition to Washington Gas' Application to the DC Public Service Commission for Approval of the PROJECT*pipes* 3 Plan, filed December 18, 2023 ("ANC 3C Resolution").

[23]        *Formal Case No. 1175,* ANC 3A Resolution Regarding Washington Gas Light (WGL) PROJECT*pipes,* filed December 18, 2023 ("ANC 3A Resolution").

[24]        *Formal Case No. 1175,* ANC 6A Resolution 3-2023 Opposition to Washington Gas' Application to the DC Public Service Commission for Approval of the PROJECT*pipes* 3 Plan, filed January 22, 2024 ("ANC 6A Resolution").

[25]        *Formal Case No. 1175*, Council of the District of Columbia Letter on the Future of the District's Gas Distribution Network, filed February 8, 2024 ("Council Letter").

[26]        *Formal Case No. 1175,* Reply Comments of Washington Gas Light Company, filed July 17, 2023 ("WGL Reply").  More than 400 community comments were also received in opposition to the PIPES 3 Application, in addition to letters of opposition from District political parties and civic organizations.

[27]        *Formal Case No. 1154*, Continuum Capital's Independent Management Audit of PROJECT*pipes* 2, filed December 13, 2023 ("Continuum Audit Report").

comments on the Audit Report. [28]  On February 5, 2024, WGL filed reply comments.[29]

6.        On February 23, 2024, by Order No. 21960, the Commission granted WGL a 12-month extension of the PIPES 2 Program until February 28, 2025.[30]  The Order capped the surcharge eligible target spend not to exceed $50 million for previously approved PIPES 2 Programs 1, 2, 3, 4, 5, and 10.[31]  The Commission stated that "[t]his extension period will allow the Commission to evaluate how we appropriately move forward with WGL's request to continue replacing high-risk leak-prone aging infrastructure subject to increased risk of leaks and/or failure."[32]  On April 24, 2024, by Order No. 21892, the Commission denied the District of Columbia Government's ("DCG") motion to reconsider Order No. 21960.[33]

7.        On May 6, 2024, OPC filed a Motion for Status requesting that the Commission issue an Order setting forth a procedural schedule, policy framework, and evaluation process to be utilized for any project adopted to replace PROJECT*pipes*.[34]  On May 10, 2024, WGL filed a response opposing OPC's motion, asserting that the policy considerations associated with the alignment of the PIPES program with the District's climate goals are being addressed in *Formal Case No. 1175* and that any evaluation of a cohesive strategy and integrated plan to address climate goals should be addressed in *Formal Case No. 1167*.[35]  On June 11, 2024, DCG filed a letter in support of OPC's request to set a procedural schedule and critical policy framework for interested parties to address as the Commission considers potential adjustments or alternatives to PROJECT*pipes*.[36]

---

[28]        *Formal Case No. 1154*, Washington Gas Light Company's Comments on PROJECT*pipes* 2 Management Audit Report, filed January 22, 2024 (WGL Audit Comments"); *Formal Case No. 1154*, the Office of the People's Counsels Comments on Continuum Capital's Audit Report of Washington Gas Light Company's PROJECT*pipes* 2 Program, filed January 22, 2024 ("OPC Audit Comments"); *Formal Case No. 1154*, the District of Columbia Government's Comments, filed January 22, 2024 ("DCG Audit Comments"); *Formal Case No. 1154*, Philadelphia-Baltimore-Washington Construction Laborers' District Council's Comments on Continuum Capital's Independent Management Audit Report of WGL's PIPES 2 Plan, filed January 22, 2024 ("PBWCLDC Audit Comments").

[29]        *Formal Case No. 1154*, Washington Gas Light Company's Reply Comments on PROJECT*pipes* 2 Management Audit Report, filed February 5, 2024 ("WGL's Audit Reply").

[30]        *Formal Case No. 1154*, Order No. 21960, ¶ 13, rel. February 23, 2024 (Order No. 21960").

[31]        *Formal Case No. 1154*, Order No. 21960, ¶ 14.

[32]        *Formal Case No. 1154*, Order No. 21960, ¶ 13.

[33]        *Formal Case No. 1154*, Order No. 21982, rel. April 24, 2024 ("Order No. 21982").

[34]        *Formal Case No. 1154*, Office of the People's Counsels for the District of Columbia's Motion for Status, filed May 6, 2024, at 2-4 ("OPC's Motion").

[35]        *Formal Case No. 1154*, Washington Gas Light Company's Response to Office of People's Counsel for the District of Columbia's Motion for Status,  at 2-3, filed May 10, 2024 ("WGL Response").  OPC's Motion is denied as moot since this Order sets forth a procedural schedule and policy framework for addressing pipeline infrastructure and repair in the future.

[36]        *Formal Case No. 1154*, District of Columbia Government's Letter in Support of the Office of the People's Counsel, filed June 11, 2024 ("DCG Letter").

### III.   **DISCUSSION**

8.       We begin our review by briefly identifying the statutes, rulemaking efforts, and activities in other cases that have, or will, impact the restructured PIPES plan we are directing WGL to develop.  Thereafter we address the PIPES 2 Continuum Audit Report and make recommendations that WGL should consider in developing its new PIPES plan.  Finally, we review WGL's PIPES 3 Application.

### A.       **Statutes and Proposed Federal Rules**

9.       The Commission must ensure the continued safety and reliability of the gas distribution system in the District while also supporting the District's climate goals.  In addition, our review requires the Commission and WGL to consider the federal regulations on eliminating hazardous leaks and reducing fugitive gas emissions in the United States.  These considerations are in addition to addressing the District's new aggressive climate initiatives that the Commission must take in account all matters that come before us.[37]

10.       The Federal PIPES Act of 2020 ("PIPES Act") was signed into law on December 27, 2020.[38]   Under the PIPES Act, WGL must update its inspection and maintenance plans to address eliminating hazardous leaks and minimizing fugitive methane emissions.  The Pipeline and Hazardous Materials Safety Administration ("PHMSA") under the United States Department of Transportation ("USDOT") is in the process of updating its rules in compliance with the PIPES Act, which we expect to be finalized by January 2025.[39]   PROJECT*pipes* is one of WGL's plans to address the PIPES Act.

11.       The Clean Energy DC Building Code Amendment Act of 2022, passed on September 21, 2022, established standards for new buildings and major renovations to be built to net zero standards starting after 2026, requiring no on-site combustion, with an exception for buildings essential to public health and safety.[40]

12.       On September 21, 2022, the District enacted the Climate Commitment Act of 2022 ("Climate Commitment Act").  The Climate Commitment Act, among other things, accelerates the District's carbon neutrality commitment from 2050 to 2045, as well as adds District-wide interim targets for GHG reductions between 2025 and 2050 to the following levels:

(1) Not less than 45% below 2006 greenhouse gas emission levels by 2025;

---

[37]       D.C. Code § 34 -808.02 (March 22, 2019).

[38]       Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat 1182 (December 27, 2020) ("PIPES Act of 2020").

[39]       *See* PHMSA PIPES Act Web Chart, May 2024 update, https://www.phmsa.d.gov/sites/phmsa.dot.gov/files/2024-05/2024%20May%20PIPES%20Act%20Chart.pdf.

[40]       D.C. Code § 6-1453.01 (September 21, 2022).

(2) Not less than 60% below 2006 greenhouse gas emission levels by 2030;

(3) Not less than 70% below 2006 greenhouse gas emission levels by 2035;

(4) Not less than 85% below 2006 greenhouse gas emission levels by 2040; and

(5) A level consistent with carbon neutrality by 2045, and in each year thereafter.[41]

Because of the District's climate commitments, the Commission is responsible for ensuring that the utilities that we regulate adopt programs to assist the District in reaching its climate goal of 85% greenhouse gas emission reductions by 2040 relative to 2006 and carbon neutrality by 2045.

13.     Finally, the Inflation Reduction Act ("IRA") provides a variety of climate and clean energy-related tax incentives that WGL and consumers may take advantage in addressing District climate initiatives.[42]

## B.    Relevant Filings from Other Dockets

14.     DCG filed its Fugitive Methane Emissions Survey of the District of Columbia ("DOEE Methane Survey") on November 30, 2021.[43]

15.     On February 28, 2023, DOEE filed its report titled "Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition From Gas to Electric-based Building Heating ("DOEE Neighborhood Electrification Study"), the companion analysis to the DOEE Methane Survey, which assessed potential cost savings from repairing pipes to prepare for decommissioning in lieu of pipe replacement.[44]

16.     On March 10, 2023, the Commission issued Order No. 21580, denying cost recovery for WGL's use of satellite technology under the Advanced Leak Detection ("ALD") program in PIPES 2.[45]

17.     When addressing the issue of whether the Commission has the authority to curtail WGL's right to sell natural gas, the Commission concluded that it "[could not] order Washington

---

[41]     D.C. Code § 8-151.09d (September 21, 2022).

[42]     Public Law No. 117-58 (November 15, 2021).

[43]     *Formal Case No. 1154,* and *Formal Case No. 1130, In the Matter of the Investigation into Modernizing the Energy Delivery System for Increased Sustainability ("Formal Case No. 1130"),* 2021 Fugitive Methane Emission Survey of the District of Columbia for the District of Columbia Department of Energy and Environment, filed November 30, 2021 ("DOEE Methane Survey").

[44]     *Formal Case No. 1167, In the Matter of the Implementation of Electric and Natural Gas Climate Change Proposals, Formal Case No. 1154,* and *Formal Case No. 1130, In the Matter of the Investigation into Modernizing the Energy Delivery System for Increased Sustainability,* Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition from Gas to Electric-based Building Heating, filed February 28, 2023 ("DOEE Electrification Study").

[45]     *Formal Case No. 1154,* Order No. 21580, rel. March 10, 2023.

Gas Light Company [ ] to end the sale of natural gas that Washington Gas Light Company is authorized to provide under its Congressional Charter."[46]  The Commission reaffirmed its decision in Order No. 21631 in response to a Joint Request for Reconsideration and Clarification filed by OPC, DCG, and Sierra Club.[47]

18.     By Order No. 21938 on December 8, 2023, in *GD-2019-04-M*, the Commission set forth the next steps in the development of the Commission's standardized benefit-cost analysis ("BCA") framework, including the adoption of a social cost of carbon of $160 per metric ton of carbon dioxide equivalent ("$CO_2e$").[48]  Order No. 21938 also adopted the alignment of GHG reduction targets for both the electric and gas utilities with the targets adopted in the Climate Commitment Act of 2022.[49]

### C.     PIPES 2 Continuum Audit, Comments, and Reply Comments

19.     **Audit Report.**  The Continuum Audit covered three tasks: (1) under Task 1, Continuum determined whether the PROJECT*pipes* projects were completed and recovered through the surcharge mechanism consistent with the Commission's restrictions on material selection, spending cap, improvements to safety and reliability of WGL's distribution system. Continuum evaluated whether the work was managed and completed prudently, with sound engineering judgment and construction integrity; (2) under Task 2, Continuum evaluated WGL's implementation of the 24 recommendations from the PIPES 1 Liberty Management Audit; ("LMA"); and (3) under Task 3, Continuum evaluated  WGL's compliance with *Formal Case No. 1142*'s Merger Commitment Number 72 (*i.e.*, evaluate the calculation of average costs, annual costs, and determination of any excess cost beyond those allowed under Merger Commitment 72).[50]

20.     For Task 1, Continuum found that the PIPES 2 Program met the targets directed in Order No. 20671 and that all the projects identified in WGL's Annual Project List for the first two years of PIPES 2 (2021-2022) were completed consistent with the Commission's directives on materials and spending caps, within an overall cost variance of 2%, and were properly recovered through the surcharge mechanism.[51]  Continuum concluded that all completed PIPES 2 projects reduced risk and enhanced safety by replacing at-risk pipe (aging, corroded, or leaking cast iron mains and/or unprotected steel main and services, vintage mechanical coupled wrapped steel mains

---

[46]     *Formal Case No. 1167,* Order No. 21593, ¶ 1, rel. April 6, 2023 ("Order No. 21593").

[47]     *Formal Case No. 1167,* Order No. 21631,  ¶ 13, rel. June 1, 2023 ("Order No. 21631").

[48]     *GD-2019-04-M, In the Matter of the Implementation of the 2019 Clean Energy DC Omnibus Act Compliance Requirements ("GD-2019-04-M"),* Order No. 21938, ¶¶ 39 and 80, rel. December 8, 2023.

[49]     *GD-2019-04-M,* Order No. 21938, ¶ 48, rel. December 8, 2023.

[50]     Audit Report at 1, *citing Formal Case No. 1154*, Order No. 20671, ¶ 37, rel. December 11, 2020.

[51]     Audit Report at 16, 22-23.  The Commission imposed a total target of 9.2 miles of main replacement and 2,605 services, with a surcharge eligible spend of $92.7 million.  *See Formal Case No. 1154,* Order No. 20671, ¶ 92.

and services, copper services and black plastic services) in the distribution system.[52] For the first two years of PIPES 2 (2021-2022), the Commission imposed a total target of 9.2 miles of main replacement and 2,605 services. During the first two years of PIPES 2, WGL completed approximately 11 miles of main replacement and remediated/replaced 2,200 services.[53]

21.     In assessing the implementation of the 24 LMA recommendations (Task 2), Continuum concludes the Company made significant progress in implementing the LMA recommendations. WGL implemented 16 of the recommendations. Of the eight (8) remaining recommendations, Continuum notes that the Commission rejected four (4) LMA recommendations, and for the remaining four (4) recommendations, Continuum proposed alternatives that would achieve similar performance goals.[54] Overall, Continuum concluded WGL's PIPES 2 program was robust and made significant progress in implementing the LMA recommendations. The Continuum Audit also found that the majority of LMA's recommendations were implemented in a high-quality manner. Continuum's Audit offers additional recommendations for improving the PIPES program.[55]

22.     For Task 3, Continuum concluded that WGL had correctly calculated excess costs for all programs except year 6 of Program 2.[56] The Audit Report has two recommendations regarding improving the accuracy of documents and the accuracy in project file nomenclature.[57]

23.     **Comments.** Both OPC and DCG question the overall conclusions in the Continuum Audit. In addition, OPC questions the thoroughness of the analysis. OPC raised concerns about invoice irregularities, projects lacking variance explanations, the high cost and variance of scattered services, and improper sample sizes for consulted documents.[58] DCG questions the overall cost efficiency of PIPES 2 and the Company's performance in reducing risk and leaks in the District.[59]

24.     **WGL's Response.** WGL provided responses noting that eight (8) of the 21

---

[52]     Audit Report at 18.

[53]     *See Formal Case No. 1154,* Order No. 20671, ¶ 92. *See also* WGL's Reply at Attachment A; *See also*, *Formal Case No. 1154*, Washington Gas Light Company's Annual Reconciliation Report for 2021, filed March 31, 2022; and *Formal Case No. 1154*, Washington Gas Light Company's Amended Year 8 Annual Project Reconciliation Report for 2022, filed April 13, 2023.

[54]     Audit Report at 36-37.

[55]     Audit Report at 109.

[56]     Audit Report at 109.

[57]     Audit Report at 109.

[58]     OPC Audit Comments at 4-5.

[59]     DCG Audit Comments at 1, 3, 4, and 6.

recommendations are either in progress or already implemented.[60]  WGL took issue with OPC and DCG's claims that PIPES 2 is far behind their targets.  WGL, among other things, reiterates that the Company achieved the replacement targets set by the Commission while remaining under budget during PIPES 2, highlighting the reduction in leaks since 2020.[61]

### D.  WGL's PIPES 3 Application

25.  WGL requests that the Commission approve $671.8 million in surcharge recovery for its five-year PIPES 3 program, including $431.3 million for Programs 1-5, 9, and 10, and $240.5 million for three years of Program 11.  WGL seeks the authority to extend Program 11 for an additional two years as warranted.[62]  WGL plans to replace approximately 27.6 miles of main and 7,637 services over the proposed five-year period.[63]  WGL avers that "[o]ver time, the Company's replacement activity will result in reduced leak rate trending related to aging infrastructure."[64]

26.  WGL estimates that implementing PIPES 3 would result in a "cumulative reduction total of 16,523 metric tons" of $CO_2e$.[65]  WGL indicates that the Optimain software it was previously using for risk modeling is being discontinued and replaced by a new risk modeling software, JANA.[66]  WGL proposes to modify the calculation in the surcharge mechanism to shift operations and maintenance costs specific to Program 9, ALD, which are not currently included in the surcharge mechanism.[67]

### E.  Comments and Reply Comments

27.  **DOEE.**  DOEE's consultant, Synapse, provided an assessment of WGL's PIPES 3 Application, stating that "the utility does not prioritize replacement of pipe that is actively leaking, nor does it consider repair rather than replacement, a much less costly alternative that can provide substantial safety benefits."[68]  DOEE asserts that the PIPES 3 proposal is inconsistent with the

---

[60]     WGL's Audit Reply at 1-10.

[61]     WGL's Audit Reply at 6.

[62]     PIPES 3 Application at 7.

[63]     PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 18.

[64]     PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 25.

[65]     PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 30.

[66]     PIPES 3 Application, Exhibit B, Testimony of Witness Stuber at 1-3.

[67]     PIPES 3 Application, Exhibit E, Testimony of Witness Lawson at 4.

[68]     DOEE Comments at 1.

District's climate decarbonization approach,[69] because it is built on the assumption that the gas system will remain in its current state, serving all customers into the future. DOEE avers that it does not make sense to invest $671.8 million over the next five years if that assumption does not hold.[70] DOEE states that District ratepayers have limited funds to put towards the energy transition and that the sheer cost of pipe replacement, rather than the DCG strategy of repair and decommissioning, is an unwise use of ratepayer funds. According to DOEE, the approach proposed in DOEE's electrification studies limits the amount of stranded asset costs levied on the District's most vulnerable ratepayers.[71]

28.    DOEE argues that WGL's proposed approach neither minimizes costs nor maximizes safety. According to DOEE's calculations, the pace of spending proposed in PIPES 3 is nearly double that of PIPES 2.[72] Given that the programs are so costly per mile, DOEE argues that they should only be targeted to the highest-risk pipes.[73] DOEE also points out that WGL's proposed plan would continue until 2054, nine years after the District is required to achieve carbon neutrality, meaning that ratepayers would be charged for the program through 2109 without any changes to WGL's depreciation schedule.[74] Regarding safety, DOEE avers that "WGL's Application for its PROJECT*pipes* 3 Plan is founded on the idea that accelerating the replacement of natural gas pipelines will enhance safety and reliability of its distribution system. In reality, WGL's Application fails to provide a convincing case that it will advance public safety while substantially increasing costs."[75]

29.    **DDOT.** DDOT has no objection to WGL's efforts to identify and replace aging pipes with potentially hazardous leaks on its system. However, DDOT has concerns about how D.C. PLUG is mischaracterized as the justification for identifying and replacing WGL's pipes.[76] DDOT believes that WGL should focus on replacing pipes that pose the greatest risk to public safety rather than tying pipe replacement to D.C. PLUG or other third-party work.[77]

30.    **DCCA**. DCCA argues that an extension of the Pipes program by approving PIPES

---

[69]    DOEE Comments at 2, *citing* the Clean Energy DC Plan, Carbon Free D.C., the Building Energy Performance Standard, the Clean Energy DC Building Code Amendment Act of 2022, DOEE's "Strategic Electrification Roadmap for Buildings and Transportation in the District of Columbia," and DOEE's "Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition from Gas to Electric-Based Building Heating."

[70]    DOEE Comments at 2.

[71]    DOEE Comments at 6.

[72]    DOEE Comments at 7.

[73]    DOEE Comments 7-8.

[74]    DOEE Comments at 8.

[75]    DOEE Comments at 9.

[76]    DDOT Comments at 3.

[77]    DDOT Comments at 3.

3 is significantly more expensive than reasonable alternatives without being more effective, and that the program conflicts with the District's policy of reducing GHG emissions to net zero by 2045, as well as the Commission's legislated responsibility to consider the environment in its decision-making. DCCA requests a litigated proceeding to resolve issues of fact.[78] DCCA supports, instead of PIPES 3, an ALD-based program of repair and replacement for priority leaks.[79] According to DCCA, this would be far less expensive than WGL's predictive analytics process.[80]

31. **Rewiring America.** Rewiring America asserts that the Commission should reject PIPES 3 in favor of a targeted leak repair program.[81] Rewiring America also asserts that the Commission should "direct WGL to explore pipe repair solutions, like the Cast Iron Joint Sealing Robot (CISBOT) [ ] successfully implemented in various cities. By directing WGL to repair the approximately 700 miles of leak-prone pipes instead of replacing them, the Commission would protect D.C. ratepayers, ensure the safety and reliability of the gas system, and demonstrate the Commission's commitment to upholding the District's Climate and Energy Goals that centers the transition towards electrification and away from fossil fuels."[82] Because installing new gas infrastructure rather than repairing it could lock the District into gas use beyond the legislated climate commitments, Rewiring America encourages the Commission to "endorse a proactive and targeted electrification approach, as proposed in Rewiring America's DC Electrification Report submitted in the *Formal Case No. 1167* docket. This approach would concentrate efforts on specific neighborhoods, such as River Terrace and Deanwood, as proposed in the FY 2024 DC Council proposed budget, with the aim of electrifying all appliances and facilitating the decommissioning of gas distribution systems in those areas. Priority could be given to communities with high energy burdens or a high incidence of methane gas leaks."[83]

32. **OPC.** OPC asserts that "WGL has been unable to keep up with the repair of *existing* leaks along its distribution system, leaving one to question whether it is in any position to continue receiving accelerated cost recovery for proactively replacing those pipes that merely have the *potential* to leak."[84] OPC requests that the Commission reject the PIPES 3 Application, which OPC avers dwarfs PIPES 1 and 2 due to WGL's inability to appropriately reduce leaks over the life of the accelerated pipe replacement program.[85] Additionally, since WGL's Application was designed with Optimain software while WGL has since switched to JANA, OPC argues that it

---

[78]     DCCA Comments at 2. The pages to DCCA's Comments are not numbered and are referenced sequentially beginning with page one (1) of the Comments.

[79]     DCCA Comments at 2.

[80]     DCCA Comments at 2.

[81]     Rewiring America Comments at 2.

[82]     Rewiring America Comments at 2.

[83]     Rewiring America Comments at 13.

[84]     OPC Comments at 2.

[85]     OPC Comments at 2-3.

does not make sense to implement the program with a different type of software than was used to design the program.[86]   OPC concludes that if the Commission declines to reject PIPES 3, an evidentiary proceeding is necessary.[87]   OPC states that it worked with DCG, AOBA, Sierra Club, and DCCA to develop a procedural schedule, which is included with OPC's comments.[88]

33.      **Sierra Club**.  Sierra Club is concerned that the PIPES program is a major expense incompatible with the District's climate laws and that the PIPES program has been performing poorly.[89]   Sierra Club echoes the concerns raised by other commenters regarding stranded assets, arguing that the PIPES program is "gold-plating" the gas distribution system by WGL.[90]

34.      Sierra Club agrees with DOEE that WGL should focus on repair rather than replacement since it is a quicker, less expensive method of addressing leaks.  Sierra Club argues that even by what it believes are WGL's inflated emissions savings, WGL asserts that only 2% GHG reductions will be achieved through the PIPES program by 2032 and 4% by 2050. [91]

35.      **AOBA**.  AOBA avers that "Washington Gas' third iteration of PROJECT*pipes* is highly problematic and inappropriate as proposed.  AOBA submits that the District of Columbia is now facing an infrastructure crucible.   The Commission can no longer delay or defer determinations regarding balancing the needs of District ratepayers, the health of the District's economy, the District's mandated environmental goals, the affordability of overlapping and, at times, competing infrastructure plans."[92]   AOBA agrees with the comments filed by both DOEE and DDOT.  AOBA contends that "Washington Gas' prioritization of projects that qualify for accelerated recovery has not improved the integrity of the Washington Gas system, has increased greenhouse gas emissions, and has not meaningfully reduced the amount of cast iron mains within the District."[93]   AOBA agrees with the other commenters that if the Commission moves ahead with PIPES 3, an evidentiary proceeding is required.[94]

36.      **ICCR**.  ICCR opposes the PIPES 3 Application and argues that the Commission should instead focus on leak repair due to the expense of pipe replacement, incompatibility with

---

[86]      OPC Comments at 3.

[87]      OPC Comments at 5.

[88]      OPC Comments at 23.

[89]      Sierra Club Comments at 1.

[90]      Sierra Club Comments at 3.  Generally, stranded assets are those assets that lose value or turn into liabilities before the end of their expected economic or useful life.

[91]      Sierra Club Comments at 17.

[92]      AOBA Comments at 1-2.

[93]      AOBA Comments at 3.

[94]      AOBA Comments at 4.

the District's climate mandates, and risk of stranded assets.[95]    ICCR suggests an alternative investment by WGL in "sustainable thermal networks" and non-pipe alternatives.[96]    ICCR points out that "[s]everal energy utilities, including Eversource, National Grid, and Con Edison in NY and MA are piloting networked geothermal systems as an alternative to existing gas systems."[97] ICCR avers that "[i]nvestors are concerned that the failure of companies to achieve alignment with Paris goals poses material financial, operational, reputational, and regulatory risks, and have been filing proxy resolutions on the energy transition that have met with significant support from other investors."[98]

37.    **District of Columbia Council.**    Ten Councilmembers penned a letter to the Commission regarding the future of the District's gas distribution network, stating that the Pipes program is incompatible with the District's statutory climate mandates.[99]    The Councilmembers point to the expense of the program, the concern that it will fall disproportionately on vulnerable ratepayers, and that other options exist, such as pipeline repair.    The Councilmembers state, "[r]ather than proceeding with PROJECT*pipes*, we recommend that the Commission begin integrated, comprehensive thermal energy planning consistent with the carbon neutrality goals laid out in the Climate Commitment Amendment Act of 2022."[100]

38.    **District Political Parties and Advisory Neighborhood Commissions ("ANC").** The Ward 3 Democratic Committee passed a unanimous resolution in opposition to PIPES 3 because it argues PIPES 3 contradicts the District's climate goals and costs.    The Committee instead urges the Commission to focus on repairing leaks in the system.[101]    Several ANCs opposed WGL's PIPES 3 Application for various reasons ranging from incompatibility with the District's climate goals, mismanagement of the program, and disruption of life in neighborhoods because of failure to coordinate with other ongoing projects.[102]    ANC 6A also makes a request of "elected officials to ensure that Washington Gas engages in a robust planning process to redefine its business model as the District of Columbia weans itself off fossil fuel and that The DC Public Service Commission develops a plan to phase out the use of greenhouse-gas-producing fuels to bring about a just and equitable transition to clean, renewable energy, consistent with DC law."[103]

---

[95]    ICCR Comments at 1.

[96]    ICCR Comments at 1.

[97]    ICCR Comments at 1-2.

[98]    ICCR Comments at 3.

[99]    Council Letter at 1.

[100]    Council Letter at 2-3.

[101]    *Formal Case No. 1175,* Public Comments of Beau Finley (on behalf of Ward 3 Democratic Committee), filed May 1, 2023.

[102]    *See* Comments of ANCs 3A, 3B, 3C, and 6A.

[103]    ANC 6A Resolution at 3.

39.     **Civic Organizations**.  A collection of several local organizations provided a letter to the Commission opposing the PIPES 3 Application.[104]  The groups argue that "[a]pproving the next phase of PROJECT*pipes* will be in contravention of DC's climate commitments and will force DC residents to waste hundreds of millions of dollars for the replacement of infrastructure that is destined to become obsolete."[105]  The organizations also raise the issue of disproportionate costs on the District residents least likely to be able to afford electrification, and the rate of hazardous leaks on WGL's system.[106]

40.     **Community Comments.**  The Commission has received more than 400 comments from individuals in opposition to PIPES 3.  The commenters urge the Commission to reject WGL's PIPES 3 Application because: 1) it stands in direct conflict with the District's climate goals, 2) it is a waste of ratepayer funds, and 3) it will disproportionately burden low-income District residents as wealthier households electrify.[107]

41.     **WGL Reply**.  In reply comments, WGL argues those comments criticizing the Company for not prioritizing leaking infrastructure "are misplaced because the fundamental purpose of PROJECT*pipes* is to target the replacement of relatively *higher-risk* infrastructure and facilities in order to enhance public safety and improve reliability on the distribution system and to achieve the reduced greenhouse gas ("GHG") emissions that follow therefrom."[108] "Washington Gas reviews the risk profile of all assets within PIPES 3 and identifies and prioritizes projects with higher relative risk scores, taking into consideration important situational, operational, and economic factors to target those projects that *optimize* reductions in risk in a cost-effective manner."[109]

42.     WGL opposes DOEE's proposal to focus on repair rather than replacement, asserting that "the Company actively repairs against industry standards.  PROJECT*pipes* is focused

---

[104]     *Formal Case No. 1175,* Letter ("Civic Organizations' Letter"), December 6, 2023. The signatories include: CCAN Action Fund, Sierra Club DC, DC Voters for Animals, Metro DC DSA, We Power DC, Nature Forward, Third Act (MD, DC, and VA affinity groups), DC Asthma Coalition, Moms Clean Air Force DC Chapter, Extinction Rebellion DC, League of Women Voters of the District of Columbia, Howard University Water Environmental Association, DC Environmental Network, Center for Biological Diversity, Ward 3 Democrats, Anacostia Parks & Community Collaborative, Empower DC, Georgetown Renewable Energy and Environmental Network, Electrify DC, Green New Deal for DC, Washington Interfaith Network, Ward 8 Woods Conservancy, and Institute for Policy Studies – Climate Policy.

[105]     *See* generally, Civic Organization Letters at 1.

[106]     Civic Organizations' Letter at 1.

[107]     *See Formal Case No. 1175,* Individual Comments.

[108]     WGL Reply at 3.

[109]     WGL Reply at 5. In their Audit Reply Comments, WGL also reiterated the Company's successful completion of replacements in excess of Commission targets for PIPES 2, indicating the Company completed 111% of targeted main retirements and 105% of targeted service replacements during the PIPES 2 period.  WGL argued that those replacements contributed to a 29% reduction in main leaks and a 22% reduction in service leaks between 2018 and 2022. WGL's Audit Reply at 2-4.

on removing materials that are no longer deemed acceptable for installation today. The natural gas industry ceased using materials composed of cast-iron, wrought-iron, and non-cathodically protected steel over 60 years ago. PROJECT*pipes* will remove these from the distribution system."[110] WGL notes that "[g]as companies are obligated to protect the public safety and achieve an appropriate level of service reliability through leak-management, leak repair, and emergency response programs, as well as through replacement activities," and "the Company expects the rate of corrosion and coupling leaks on the system would continue to decrease with the continuation of PIPES 3," because leak-prone pipe materials will be replaced with polyethylene.[111]

## IV.    DECISION

43.    The Company originally proposed PROJECT*pipes* as a 40-plus-year program that was reduce leaks through the replacement of all aging, leak-prone pipes in an effort to enhance the safety and reliability of gas service in the District.[112] The Commission notes that the problem presented with the PIPES 3 Application is the same one with which the Federal government is currently grappling in its proposed PHMSA regulations. Specifically, PHMSA states:

> The Federal pipeline safety regulations currently covering leak detection and repair reflect a regulatory approach focused on public safety risks posed by incidents on gas pipeline facilities. The regulations do not sufficiently capture environmental costs, align with the importance attached to environmental protection in PHMSA's enabling statutes, or reflect the scientific consensus that prompt reductions in methane emissions from natural gas infrastructure are critical to limiting the impacts of climate change…. The current pipeline safety regulations do not include any meaningful performance standards for leak detection equipment, nor requirements that leverage the significant advancements in the sensitivity, efficiency, and variety of leak detection technologies in the last five decades . . . Further, the current pipeline safety regulations do not explicitly require repair of all – or even most- leaks on pipeline facilities.[113]

However, PHMSA continues to encourage the Commission to consider initiatives to remove and/or replace unprotected steel, cast iron, and other high-risk pipes within the District to enhance

---

[110]    WGL Reply at 10.

[111]    WGL Reply at 11-12.

[112]    As filed with PHMSA in 2014, approximately 34% of WGL's pipelines were made of cast iron compared to the national average of 2% making the District one of the highest concentrations of cast iron in the nation. *See generally*    https://www.phmsa.dot.gov/data-and-statistics/pipeline/gas-distribution-gas-gathering-gas-transmission-hazardous-liquids.

[113]    Pipeline and Hazardous Materials Safety Administration, Department of Transportation, Notice of Proposed Rulemaking. May 18, 2023, https://www.federalregister.gov/documents/2023/05/18/2023-09918/pipeline-safety-gas-pipeline-leak-detection-and-repair.

pipeline safety.[114]

44.    With regard to the PIPES 3 Application, commenters allege that the Application does not include sufficient data or information to verify its claims about safety and GHG emissions reduction and that it will require discovery to be able to fully review the impact of the proposed programs for which surcharge recovery is requested.[115]  Stakeholders also take issue with the cost of the program, which would be more than double the cost of the first 10 years of the program for a five-year continuation.  Although the Company asserts that the surcharge allows replacements that would increase safety and reliability while reducing GHG emissions, the Application is thin on any actual evidence or data to substantiate that claim.  Moreover, WGL's performance overall has not matched the originally proposed timeline (submitted in 2014) and schedule for PROJECT*pipes*.  Therefore, we decline to approve the Application and surcharge as filed.  Although we decline to approve the Application, we remind WGL that it is obligated to maintain the safety and reliability of the gas distribution system with or without surcharge recovery.

45.    Several stakeholders, including 10 Councilmembers of the Council of the District of Columbia, have alleged that the continuation of the PIPES program is no longer compatible with the District's legislated climate mandates, including achieving carbon neutrality by 2045.[116]  Instead, the Councilmembers and other stakeholders recommend neighborhood electrification alternatives, gas pipeline decommissioning, and "integrated thermal energy planning" to ensure the Company's business model is compatible with the District's climate policy.[117]

46.    While the Commission has an obligation, within its statutory authority, to help advance the District's climate policies, we remind all concerned that the Commission cannot and is without authority to prevent WGL from selling natural gas.[118]  This statutory barrier creates obstacles to the neighborhood electrification initiatives proffered by many of the commentators.  These obstacles are not entirely unique to the District as recognized by other state Commissions.  In Massachusetts, the Department of Utilities recently noted in its "Future of Gas" docket that geographically targeted electrification should be cautioned because electrification raises concerns over customer choice, cost, obligation to serve, and customer service protections.[119]  Moreover, a recent Rocky Mountain Institute white paper, titled "*Non-Pipeline Alternatives ("NPA"):*

---

[114]    *See* PSE2024-01, PHMSA Letter to Chairman Thompson, filed May 13, 2024, regarding CY 2023 pipeline safety program and progress report reviews.  According to PHMSA's records, there was a total of 392.56 miles of cast iron mains remaining in CY 2023 in the District of Columbia.

[115]    *See* DOEE Comments at 7-9.

[116]    *See* DCCA Comments at 2; *see also* Council Letter at 1.

[117]    We believe that *Formal Case No. 1167* is the more appropriate docket to address the integrated infrastructure planning issues raised by the Council and commenters.

[118]    *Formal Case No. 1167*, Order No. 21593 and Order No. 21631 (Unanimous vote by Commissioners).

[119]    Docket No. D.P.U.20-80, Massachusetts Department of Public Utilities, Order No. 20-80-B, at 41 (rel. December 6, 2023).

*Emerging Opportunities in Planning for U.S. Gas System Decarbonization*,"[120] further highlights the difficulty of neighborhood electrification by detailing the limited success of state electrification efforts, noting that no avoided replacement NPA project involving more than five customers has been successful in the United States.[121]

47.      At the same time, the Commission is also acutely aware of the District's aging gas system and is concerned that without intervention, that system will continue to degrade, and leak rates would be expected to grow.[122]  While the Commission agrees that pipe repairs continue to be necessary for controlling the active leaks occurring in the District, the Commission cannot allow the system to deteriorate unabated, even as the District undergoes its energy transition thus, a strategically focused pipe replacement program needs to be considered to avoid cascading leaks in the future by replacing aging, leak-prone high-risk mains and services, thereby enhancing the safety, reliability, and GHG emissions for the District residents until the plans for full electrification are solidified.

48.      It is within this context that it is clear that our pipeline replacement program needs to be revised to better align with both Federal and District climate initiatives.  Therefore, we believe that it is necessary for WGL to file a new restructured PIPES plan to ensure safe and reliable operation of the natural gas system that appropriately aligns with the District's Climate goals.  The Company's new approach must balance the need to replace leak-prone, highest-risk pipe segments to prevent dangerous cascading and potentially hidden "super emitter" leaks before they happen while minimizing the stranded assets as the District continues to undergo the energy transition.  The new PIPES plan shall be based, in part, on the Commission's accepted findings and modifications to the Continuum PIPES 2 Audit recommendations that are summarized below and further discussed in the Addendum attached to this Order.  We believe that the new restructured plan will allow WGL to take a strategically targeted approach to pipe replacement, preventing future leaks and reducing GHG emissions in the District.

49.      Accordingly, we direct WGL to file a new restructured Pipes Application that targets the highest-risk segments of the aging, leak-prone mains, and services in the District for a period of three years (2025-2027) within 45 days of the date of the Order.  The Commission expects WGL's new Application to reflect a focused approach, demonstrating the critical balance between reductions in future leaks and GHG emissions against the risk of stranded assets as the District continues its energy transition.  The Commission acknowledges the reality of the need to change the focus of the pipe replacement program to address the District's climate policies, which promote electrification as opposed to use of natural gas.[123]  Therefore the Company's new

---

[120]      Rocky Mountain Institute, <u>Non-Pipeline Alternatives: Emerging Opportunities in Planning for U.S. Gas System Decarbonization</u> (2024), https://rmi.org/insight/non-pipeline-alternatives/.

[121]      *Id.* at 3.

[122]      *See, e.g*., PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 25.

[123]      NARUC Task Force on Natural Gas Resource Planning research shows states in the northeast with similar clean energy and decarbonization goals that also have accelerated pipe programs and continue to review and revise

Application should be narrowly focused on the aging highest-risk pipe segments that are highly susceptible to leaks, increased GHG emissions from leaks, and subsequent failures in the near future if not replaced. The Application should focus on originally conceived 40 plus year replacements based on only pipe age and material type. The change in focus will contract the scope of the work that is necessary in addressing the District's aging infrastructure with the highest risk to help maintain the safety and reliability of the gas distribution system. In addition to redefining a "new normal" (*i.e.,* electrification and targeted replacement as opposed to the complete replacement of over 400 miles of aging, high risk pipelines ) and new targeted prioritization of highest-risk segments of the aging leak prone pipe replacements, the Commission also expects the Company's new restructured pipe replacement plan to reflect the actual rates of replacements seen over the first 10 years of *PROJECTpipes* and incorporate the lessons learned and the Commission's directives based on the Continuum Audit to establish an achievable "new normal" for accelerated replacements.

50.     Additionally, WGL's new PIPES plan must demonstrate greater cost effectiveness. In 2022, WGL reported that the cost of replacing main pipelines was $7.8 million per mile. While WGL has attributed these high costs due to factors such as operating in a dense urban environment, adherence to safety protocols, and compliance with District regulations,[124] a review of similar pipe replacement programs across the Northeast reveals that no other utility incurs costs as high as the costs that WGL submits in the PIPES 3 Application.[125] Indeed, the proposed budget for PIPES 3, totaling $671.8 million, underscores the need for a more cost-effective approach, as that figure is excessively steep, and ratepayers would bear the financial burden.

51.     The new Application shall include the following items reflecting lessons learned during the first 10 years of PIPES:[126]

---

their plans appropriately. *See generally*, https://www.naruc.org/committees/task-forces-working-groups/task-force-on-natural-gas-resource-planning/state-policies/.

[124]     WGL Audit Comments at 15-16.

[125]     For example, even when compared against Con Edison's application for recovery of its Leak-Prone Main Replacement Program, the estimated cost of their 2022 plan was $965 per foot. This estimate equals roughly $5 million per mile. The Commission cannot fathom that WGL's pipe replacement program is more expensive than that of a utility that covers Manhattan, Brooklyn, Queens, Bronx, Staten Island and Westchester. WGL must present a more cost-effective program in a new PIPES Application.

[126]     We note that the Partial Concurrence recommends that PROJECT*pipes* be rethought by collecting a variety of data/information, creating a digital map and dataset, and by creating an integrated infrastructure plan. Partial Concurrence of Commissioner Beverly at 5-7. However, we believe that the Concurrence's approach presents challenges in that it, in part, seeks critical infrastructure information such as the location of all distribution system pipes and other infrastructure—and their age, material, pressure, and condition, to which the Commission only requires access if there is an emergent need. Additionally, some of the requested information may not be useful since it deals with moving targets such as the location, concentration, volume, and grade of leaks. In addition, some of the requested information (such as data on fugitive methane emissions from distribution system leaks) can be found in other formal case matters, specifically *Formal Case No. 1162*. Finally, the Partial Concurrence seeks information on the impact of existing climate legislation on baseline gas demand, which is already addressed in *Formal Case No. 1167*'s implementation of the Climate Business Plan.

a.      Miles of aging high-risk leak-prone main replaced to date per year by program and material type (*e.g.*, cast-iron, bare and unprotected steel, etc.);

b.      The number of aging high-risk leak-prone services replaced to date per year by program and material type (*e.g.*, copper, bare and unprotected steel, etc.);

c.      Miles of aging high-risk leak-prone main remaining to be replaced by program and material type;

d.      The number of aging high-risk leak-prone services remaining to be replaced by program and material type;

e.      Current estimated leak rates for existing pipes by material type (including methodology for calculation);

f.      Expected completion date for each program based upon current replacement rates, replacements to date, and remaining work to be completed.  These estimates should include a detailed analysis of the need to replace the identified high-risk pipes and the ability to achieve this completion target;

g.      Expected replacements by program and material for the three-year period;

h.      Provide the basis for the proposed annual budgets for the three-year period;

i.      Explain how, if at all, ALD is incorporated into proposed project selection. Specifically, whether leaks identified via ALD are processed differently in the risk modeling software than leaks found through traditional sources;

j.      For proposed planned replacements for the next three years, provide a method for tracking estimated leak reductions and GHG emissions reductions that considers the actual condition, previous leaks, and material type of the pipes actually replaced (in contrast to the current approach for calculating fugitive emissions, which relies on general assumptions based on the pipe material).[127]  Figures shall be reported as annual reductions from each year of work, not cumulative totals, and shall include detailed explanations of the methodology used to calculate the avoided leaks and GHG emissions;

k.      Explain how JANA Lighthouse will aid in a project prioritization that aligns with the District's climate goals, including projections on GHG emission reductions and preventing leaks each year.  This should include details on how JANA produces risk scores and risk rankings;

---

[127]       The Commission seeks estimated GHG emission reductions as the Commission is not aware of any current industry standard for direct measurement of fugitive emissions.

l.      Explain how the restructured targeted replacement program would account for any electrification programs within the District. This explanation should include specific plans for coordination with interested stakeholders and the D.C. Government to ensure that replaced pipes are not expected to be decommissioned within 10 years of installation;

m.      Identify the number of miles of mains and number of services that can be decommissioned each year of the program either due to abandonment of redundant facilities or customers pursuing electrification opportunities on radial portions of the system;

n.      Explain how "normal" replacements will be differentiated from targeted "accelerated" replacements under the new program. Identify criteria beyond material type(s) and potential program qualification that will be used by WGL when categorizing whether a replacement is "normal" or "accelerated;"

o.      Explain and demonstrate the need for a surcharge recovery mechanism for the new restructured pipe replacement program;[128]

p.      Other than pipe replacements, identify techniques, technologies, strategies, or other options the Company considered to reduce the leak rates and risk of the aging leak-prone pipes in the distribution system;

q.      Provide the results of the formal assessment on internal versus external crew usage; and

r.      Provide any results from WGL's industry peer review on construction execution best practices begun in 2023,[129] including explaining the impacts on cost and schedule of any unique construction conditions in the District.[130]

52.      In addition to more narrowly targeted replacements of the highest-risk segments of the aging, leak-prone pipe, the new restructured pipes replacement plan shall incorporate the Commission's directives based on Continuum's Audit as outlined in the summary below:

---

[128]      It is noted that prior to receiving surcharge recovery for pipe replacement, the Company replaced more miles of main, at a lower cost, using their capital expenditure budget. *See Formal Case No. 1154*, Notice of Commissioner Beverly, filed January 8, 2024.

[129]      WGL Audit Comments at 15-16.

[130]      According to WGL their costs are driven (in part) by an extremely restrictive permitting and work environment in the District. *Id.* We believe that requiring WGL to quantify the costs of any permitting restrictions will give the stakeholders a better understanding of these costs in comparison with other jurisdictions.

**Order No. 22003** **Page 21**

| Table 1: Summary of Continuum Recommendations | | | |
|---|---|---|---|
| Continuum Audit Recommendation | Task | Description | Commission Action |
| 1.1 Variance Analysis | 1 | Comply with requirements to complete variance analysis and formally use this to make process improvements to actual variance | Accept |
| 1.2 Project Addition Flexibility | 1 | Increase flexibility for WGL to backfill work | Reject |
| | | | |
| 2.1 Retain but modify Program 1 | 2 | Remove Grade 1 leaks from PROJECT*pipes* replacements, maintain scattered services projects otherwise | Accept |
| 2.2 Services Life of Plan | 2 | Increase Life-of- Plan reporting and planning for Program 1 (services) | Accept |
| 2.3 Small Diameter Main Focus | 2 | Develop a dedicated program to focus on small-diameter main | Partially Accept; use diameter as a "tiebreaker" for similar risk projects |
| 2.4 EVA Program | 2 | Apply Earned Value Analysis ("EVA") techniques for planning and reporting | Accept |

<table>
<tr><td colspan="4" align="center">Table 1:<br>Summary of Continuum Recommendations</td></tr>
<tr><td>Continuum Audit Recommendation</td><td>Task</td><td>Description</td><td>Commission Action</td></tr>
<tr><td>2.5 Integrated & Resource Loaded Schedule</td><td>2</td><td>Develop a fully resource-loaded schedule across all PROJECT*pipes* programs with reporting on the current status of the overall accelerated pipe replacement program</td><td>Accept</td></tr>
<tr><td>2.6 Accountability for Cost Estimates</td><td>2</td><td>Have Project Manager sign off on cost estimates before they are finalized</td><td>Accept</td></tr>
<tr><td>2.7 PMO Strategic Planning</td><td>2</td><td>Have the Project Management Office ("PMO") complete planning every 2-3 years instead of 5</td><td>Accept</td></tr>
<tr><td>2.8 Project EVA, Resource Loaded & Integrated Schedule</td><td>2</td><td>Apply EVA techniques at a project level and update schedules to reflect fully resource-loaded planning</td><td>Accept</td></tr>
<tr><td>2.9 Standard Reconciliation Reporting</td><td>2</td><td>Standardize reporting using PIPES 1 format for PIPES2 and new PIPES reports</td><td>Partially Accept; require WGL to submit consolidated reporting on all programs by year in future annual reports</td></tr>
<tr><td>2.10 Dashboard Augmentation</td><td>2</td><td>Improve PROJECT*pipes* Dashboard to include Life-of- Plan totals with year-over-year comparisons</td><td>Accept</td></tr>
</table>

| Continuum Audit Recommendation | Task | Description | Commission Action |
|---|---|---|---|
| \multicolumn Table 1: Summary of Continuum Recommendations | | | |
| 2.11 Life-of-Plan Reporting | 2 | Provide reporting to the Commission on Life-of-Plan expectations | Accept |
| 2.12 17-page executive summary for the PIP | 2 | Create a 17-page "at a glance" summary for the PIP, including EVA and Life-of-Plan information | Accept |
| 2.13 Cost Driver Conference Recommendations | 2 | Take steps to implement discussed improvements from the Technical Conference | Accept |
| 2.14 Internal Crew Usage | 2 | Evaluate using internal crews instead of external contractors for PROJECT*pipes* | Accept |
| 2.15 Best Practices Comparison | 2 | Conduct Benchmark of Best Practices with other urban utilities | Accept |
| 2.16 GIS System Adoption | 2 | Adopt GIS system mapping tied to GPS coordinates to allow more accurate tracking of assets and listing of projects | Reject; this is premature and will be evaluated once WGL implements its new mapping software |

| Table 1: Summary of Continuum Recommendations | | | |
|---|---|---|---|
| Continuum Audit Recommendation | Task | Description | Commission Action |
| 2.17 New Technology Investigation | 2 | Set up new efforts in the District targeting two new techniques, processes, etc., each year | Accept |
| | | | |
| 3.1 Document Accuracy | 3 | Develop a Formal Document review process | Accept |
| 3.2 File Nomenclature | 3 | Develop a file nomenclature process for Class 3 estimates that shows the document is the final document | Accept |

53.     We note that the benefits of electrification efforts are the reduction of GHG emissions and reducing expenditures on an aging gas distribution system.  While the District has moved beyond pilot projects for electrification to fully developed programs, the Commission notes that we have seen a lack of coordination between WGL and electrification programs in the District. As we continue to advance the District's climate goals, the Commission acknowledges that there is a need for more coordination amongst District entities and stakeholders to examine how to best address moving towards the decommissioning of main pipelines.  Accordingly, we encourage the Company to engage all interested stakeholders in a robust discussion identifying critical policy questions that WGL should address in developing the Company's new plan, and the Commission must consider when evaluating the Company's new application, in addition to the items identified by the Commission in paragraphs 48-52 prior to the filing of the new PIPES application.

**Procedural Schedule**

54.     The Commission adopts the following procedural schedule to consider the new WGL plan.  The Commission believes that the procedural schedule affords parties the requisite amount of time to meaningfully assess the Company's new Pipes Application in developing a comprehensive evidentiary record for the Commission's consideration of this matter.   The Commission also believes the adopted schedule recognizes and accommodates the parties' case preparation.

| Date | Action/Deliverable |
|---|---|
| 6/12/24 | Case Opening/Procedural Order |
| 7/29/24 | WGL Files Revised Application and Discovery Begins |
| 9/12/24 | Direct Testimony and Exhibits of OPC and Intervenors |
| 10/14/24 | Rebuttal Testimony and Exhibits of OPC/Intervenors |
| 10/21/24 | Settlement and Stipulation Conference |
| 11/4/24 | Discovery Ends |
| 11/4/24 | Joint Statement of Stipulation of Facts and Settlement Conference Report |
| 11/8/24 | Prehearing/Status Conference |
| 11/22/24 (Friday) 11/25-26 (Monday and Tuesday - Thanksgiving week) | Evidentiary Hearings- **if needed** |
| 12/10/24 | All Post-Hearing Briefs |

### Prehearing/Status Conference and Proposed Issues

55.        The Commission directs the parties to meet in conference and prepare a Joint Prehearing Statement identifying the material issues of fact in dispute (if any).  Once the parties have identified any material issues of fact, the Commission directs each party to submit a list of witnesses to be called, briefly describe the purpose of the testimony (*i.e.,* link the testimony to one or more material issues of fact), and provide an explanation for why the witness's oral testimony will give meaningful insight that the written testimony does not.  Providing this information assists the Commission in streamlining the proceedings, so we can better determine if material issues of fact in dispute require an evidentiary hearing.  Following usual Commission policy, we will only hold an evidentiary hearing if we determine that material issues of fact are in dispute in this proceeding.[131]  In addition, the Joint Prehearing Statement shall include a Joint Stipulation signed by all parties to the Joint Stipulation, and it shall be treated as a conclusive admission by the parties to the issues in Joint Stipulation and, except where justice requires it, the Commission will not permit a party to qualify, change, or contradict a stipulation in whole or in part.  Note that at the Prehearing/Status Conference, Commission Staff will be responsible for reviewing the Joint Statement and Joint Stipulation in order to identify the material issues in dispute and will address

---

[131]        By "material issues in dispute," the Commission means disputes that are pivotal to the Commission's ultimate decision in this matter.  *See, Lopez v. Council on American Islamic Relations Action Network, Inc*., 826 F.3d 492, 496 (D.C. Cir. 2016).  *See also, Formal Case No. 1116, In the Matter of Application for Approval of Triennial Underground Infrastructure Improvement Projects Plan,* Order No. 17627, ¶ 71, rel. September 9, 2014.

the remainder of the procedural schedule.[132]

### Discovery

56.      Discovery in this proceeding is to be conducted in accordance with Commission Rules 122 through 126.[133]  Once discovery concludes, the Commission will ask parties to identify genuine issues of material fact in dispute that would require a hearing.[134]  If an evidentiary hearing is necessary, the evidentiary hearing is not to be used as the forum for the parties to conduct discovery.  The Commission encourages the parties to use every available method of discovery, including depositions, to obtain answers to questions so that the parties can determine what, if any, material issues of fact in dispute cannot be resolved by the parties, and will be presented for the Commission to consider at the evidentiary hearing.  Any objections to discovery requests must be served within five (5) business days after service of the request.  Any follow-up discovery requests are due within five (5) business days of service, and any objections are due to such follow-up requests within two (2) business days.  The parties shall consult with each other and attempt in good faith to resolve all discovery disputes prior to making an objection, and again prior to filing a motion seeking relief from the Commission.  If parties cannot resolve a dispute, the aggrieved party may file a motion for relief within three (3) business days from service of the written objection.  The opponent shall respond to the motion within two (2) business days of service of the motion.  The motion and response shall be in letter format and shall each be limited in length to three (3) single-spaced pages with a 12-point or greater font.  The letters must specify the dates and times of all consultations the moving party has had to resolve the dispute with the party failing to make the disclosure or discovery.

### Delegation of Authority

57.      To ensure that procedural issues do not impede the parties' hearing preparations, the Commission delegates to its General Counsel, for this case only, decision-making authority for all procedural motions, such as motions for extension of time and for special appearance. Additionally, the General Counsel is directed to issue other scheduling notices as needed during this proceeding.  Finally, the Commission directs the General Counsel to issue an initial decision on any motions to compel.  Any party may file a petition for reconsideration of the General Counsel's decision with the Commission.

---

[132]      *See Formal Case No. 1154,* Order No. 20333, ¶ 9.

[133]      15 DCMR §§ 122-126 (2023).

[134]      *See*, *Potomac Elec. Power Company v. Public Service Commission of the District of Columbia*, 457 A.2d 776, 789 (1983). The D.C. Court of Appeals has indicated that a fact is "material if a dispute over it might affect the outcome of a suit under governing law." (*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.  248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court has further stated, "[A]n issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" (*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**THEREFORE, IT IS ORDERED THAT:**

58.    The PROJECT*pipes* 2 Audit Report is **ACCEPTED**;

59.    Washington Gas Light Company's PROJECT*pipes* 3 Application is **REJECTED** and *Formal Case No. 1175* is **CLOSED**:

60.    The Commission **OPENS** *Formal Case No. 1179,* In the Matter of Washington Gas Light Company's Strategically Targeted Pipe Replacement Plan;

61.    The Commission **DIRECTS** Washington Gas Light Company to file an updated and restructured Strategically Targeted Pipe Replacement Plan Application in accordance with the directives prescribed in this Order within 45 days of the date of this Order; and

62.    The Commission **ADOPTS** the Procedural Schedule set forth above.


**A TRUE COPY:**                         **BY DIRECTION OF THE COMMISSION:**


**CHIEF CLERK:**                         **BRINDA WESTBROOK-SEDGWICK**
                                        **COMMISSION SECRETARY**

**Attachment to Order No. 22003**

**Addendum: Audit Report Summary**

1. The Continuum PIPES 2 Audit Report determined that WGL successfully met the replacement targets set by the Commission in Order No. 20671, and the Commission accepts the Audit findings that WGL completed the projects prudently, with sound engineering judgment, and constructional integrity. We also accept the Audit Report's finding that the work WGL performed reduced the risk, leaks, and improved safety within the District. However, as further explained below, WGL's new/updated accelerated pipe replacement Application shall be consistent with the specific recommendations.

2. For Task 1, Audit Report Recommendation 1.1 (Variance Analysis), the commission accepts the recommendation that WGL shall complete a variance analysis on any project that exceeds five percent (5%) positive or negative variance from that original estimate and formally use this analysis to make process improvements in estimation to actual variance.[1]

3. With respect to Task 2's requirement to review the Liberty Management Audit ("LMA") for PIPES 1, the Commission agrees with the Continuum Audit Report determination that WGL has incorporated the majority of the recommendations from the PIPES 1 LMA. The Audit Report makes 17 recommendations for Task 2, and we agree these 17 recommendations provide an opportunity for further improvement by WGL. The recommendations note cohesive planning from the various groups within the Company to increase accountability and coordination, from the planning of a program through execution. In conjunction with the specific Task 2 recommendations, the Commission directs that replacement of services triggered by Grade 1 leaks should be removed from PROJECT*pipes*, as this type of emergency work should be considered "normal replacements".[2] The Commission agrees with Recommendation 2.1 to retain Program 1 (Scattered Services) as a separate program, but to remove all emergency work from eligibility even when the material replaced would otherwise qualify.

4. With respect to Recommendation 2.2 (Service-Life-of-Plan), of the three options presented (revise the estimated service that can be replaced; revise the forecasted end date; or propose a specific mitigation plan), WGL proposes to update completion dates for all programs consistent with Option 1.[3] Although we are moving away from a program that contemplates the complete replacement of all high-risk materials, we believe that there is still merit in an ongoing evaluation of the Company's performance. WGL's updated Application must also consider future electrification programs in the District.

5. The Commission accepts in part Recommendation 2.3 (Small-Diameter Main

---

[1]    Audit Report at 23. The Commission rejects Audit Report Recommendation 1.2, to allow more project addition flexibility, because we believe that the existing process for addition of projects is functional. With the additional concern of meeting DC climate goals, our review is necessary to ensure alignment with those goals as well as proper cost recovery.

[2]    Audit Report at 46.

[3]    Audit Report at 46-48. *See also* WGL Comments at 5.

1

**Attachment to Order No. 22003**

Focus).[4]  WGL's DIMP analysis and risk-modeling evaluation includes consideration of the risk from small diameter pipe along with the attempt to maximize total risk removed through the Risk Reduced per Dollar Spent ("RRDS") metric.  WGL claims that the Company does not need to utilize a separate program specifically for a small diameter main;[5]  however, the Commission believes more information is needed on the operation of WGL's JANA risk model and how it evaluates both small diameter and other types of main.  The Recommendation otherwise reiterates the 2019 LMA recommendation. The Audit Report notes that, at a certain point, the RRDS[6] metric will be similar for many programs, including both large and small diameter mains, and at that point WGL will need to prioritize small diameter mains.[7] The Commission previously elected not to implement this Recommendation from PIPES 1 in favor of the RRDS approach. The Commission believes there is value in a tiebreaker or sub-prioritization as recommended by Continuum as many projects have had very similar RRDS scores, but the Commission does not believe a separate program is required at this time.

6.        The Commission accepts Recommendation 2.4 ( Earned Value Analysis Program) to allow the EVA techniques to be applied throughout the course of the accelerated mains replacement program; to establish a schedule and budget performance on the entirety of the accelerated mains replacement program; and report quarterly to senior executives, allowing for course corrections as necessary.[8]  WGL indicated that the Company already performed an EVA reporting at the program level, and they plan to improve reporting and will submit a presentation of improvements within 6 months of approval of an updated Application and PIP updates.[9]  Because of the PIPES 2 extension, and the evaluation period for a new Application filing, the Commission directs the Company to update the EVA implementation as part of this and any future PIPES plans.

7.        The Commission accepts the Audit Report's Recommendation 2.5 (Integrated & Resource Loaded Schedule Program) to require WGL to develop a resource-loaded schedule that is fully integrated across planning, budgeting, engineering, design, permitting, construction, and close out, for the entirety of the accelerated mains replacement program, and updated quarterly to demonstrate the progress and accuracy of the schedule and resource forecast.[10]  The updated processes shall contain a master schedule, as OPC requests[11], with all the components of an integrated schedule recommended by the Audit Report.  We believe fully integrating the design,

---

[4]        Audit Report at 41, 50-57.

[5]        WGL Audit Reply at 5-6.

[6]        In PIPES 2, WGL was instructed to prioritize projects based upon risk reduced per dollar spent, which allowed them to remove the maximum total risk from the system with the available funds rather than solely prioritizing the highest raw risk score regardless of cost.

[7]        Audit Report at 49-51.

[8]        Audit Report at 58.

[9]        WGL Audit Comments at 6.

[10]       Audit Report 58-59.

[11]       OPC Audit Comments at 1 and 8.

**Attachment to Order No. 22003**

budgeting, and planning process with the construction process will not only increase reporting visibility but will provide a complete view of the Company's plans and progress.  The resource-loaded integrated schedule shall contain the following:

> a. Components:
> > i. Start dates, end dates, durations, remaining duration.
> > ii. Total quantities, remaining quantities.
> > iii. Resources.
>
> b. Activities:
> > i. Planning activities.
> > ii. Budgeting activities.
> > iii. Estimating activity.
> > iv. Design activities.
> > v. Contractor work distribution process as an activity.
> > vi. Permitting activity.
> > vii. Cover construction including various parts such as paving (currently included in annual project list).
> > viii. Close out activities.
>
> c. Framework:
> > i. Cost-loaded schedule.
> > ii. Labor loaded schedule.
> > iii. Program baseline schedule.
> > iv. Project by project breakdown.[12]

8.      Audit Report Recommendation 2.6 (Accountability for Cost Estimates) recommends development of a requirement of accountability into the cost estimate and project management function, which will require the project manager to develop and/or sign off on the cost estimate before it is submitted to the Construction Manager for approval.[13]  WGL indicates that the Company will consider whether Project Management department sign off should be incorporated into the process.[14]  The Commission accepts this recommendation and directs this measure to be included in the new/updated Application.

9.      Audit Report Recommendation ("ARP") 2.7 (PMO Strategic Planning) suggests that the PMO must go through the process of strategic planning every two to three years to align their plans and resources to an overarching construction and corporate strategies. The VP of Construction and/or ARP Executive Governance Committee is responsible for approving this plan or sending it back for refinement when presented.[15]  WGL states that the Company works in five-year tranches for

---

[12]     Audit Report at 58.

[13]     Audit Report at 61.

[14]     WGL Audit Comments at 8.

[15]     Audit Report at 61.

3

**Attachment to Order No. 22003**

planning purposes, and that this long-range plan considers both available and needed resources for the PIPES programs. The plan is vetted by the Company's senior executive leadership for alignment with the Company's long-term strategic plans.[16]    The Commission accepts the Audit Report recommendation of shortening the strategic plan, and directs that the new/updated Application provide for a three-year process to better align with the District's climate goals.

10.    For Audit Report Recommendation 2.8 (Project EVA, Resource Loaded Integrated Schedule), the Commission accepts the recommendation that WGL is to apply EVA techniques to a subset of accelerated mains replacement projects in order to establish the schedule and budget performances.  The Audit Report recommends building resource-loaded and fully integrated schedule as part of the PMO philosophy.  The new/update plan shall utilize the same resource-loaded integrated schedule noted in Recommendation 2.5 for analysis.[17]

11.    The Commission partially accepts Audit Report Recommendation 2.9 (Standard Reconciliation Reporting), which requires WGL to provide more robust and detailed reporting associated with the reconciliation reports prepared as part of PIPES 1.[18]  The ability to accurately compare the performance each year to prior years is important in evaluating progress on any pipe replacement program.  To that end, in the new/updated Application, WGL should maintain the presentation format and data set each year.  Additionally, although WGL notes that the historical data is available in previous filings, we believe it would be an easier comparison of the data and to track progress for any PIPES program if the Company re-submitted a consolidated report on all PIPES 1 and PIPES 2 projects in a single format.

12.    Audit Report Recommendation 2.10 (Dashboard Augmentation) proposes augmenting the existing PROJECT*pipes* program dashboard to include the following requirements: (a) Compare the total program units and costs plan to year-over-year and year-to-date actual performance, and provide a short (1-3 sentence) narrative describing if the entire program is on pace for successful completion; (b) When a monthly variance exceeds 10%, or an accumulated year-to-date variance exceeds 10%, a formal root cause analysis should be conducted to establish the source and cause(s) of the variance; and (c) When a monthly variance exceeds 10%, or an accumulated year-to-date variance exceeds 10%, a formal mitigation plan should be submitted to the VP of Construction and/or ARP Executive Governance Committee for approval and implementation.[19]  WGL states that it uses the dashboard to update senior executives with metrics and graphs of actual performance (versus a 3-year plan) on a monthly basis, and to track year-to-date units, project management, and construction work in order to determine if corrective actions are necessary.[20]  Although WGL maintains a robust year-to-date reporting infrastructure, the year-over-year and program total reporting is lacking and should be enhanced to ensure that

---

[16]    WGL's Audit Report at 9.

[17]    Audit Report at 61-63.

[18]    Audit Report at 63-64.

[19]    Audit Report at 65.

[20]    WGL Audit Comments at 11.

**Attachment to Order No. 22003**

the total program remains on course. Therefore, for the new/updated plan, the Commission accepts the recommendation to add year-over-year and sum-of-program reporting requirements to ensure the overall replacement of high-risk pipes if the District continues on schedule, and that WGL's program remains on track in support of improved safety, reliability, and the District's climate goals.

13.    The Commission accepts Audit Report Recommendation 2.11 (Life-of-Plan Reporting; see also Recommendation 2.2), which requires annual performance reports to meet Life-of-Plan expectations.  The reporting shall include the following: (a) Compare the Life-of-Plan expectation for units to year-over-year actual performance, and provide a short (1-3 sentence) narrative describing if the Life-of-Plan is on pace for successful completion; (b) When an annual variance against Life-of-Plan expectations exceeds 10%, a formal root cause analysis should be conducted to establish the source and cause(s) of the variance; and (c) When an annual variance against Life-of-Plan expectations exceeds 10%, a formal mitigation plan should be submitted to the VP of Construction and/or ARP Executive Governance Committee for approval and implementation.[21] WGL asserts replacing pipe throughout the District has reduced risk and GHG emissions, by the Company's calculations a cumulative 23,726 metric tons of CO2 equivalent to date.[22]

14.    WGL also asserts the GHG performance metrics are already incorporated in filings in *Formal Case 1162*.[23]  The Company argues that the dynamic nature of risk profile prioritization does not allow for reliable predictions of the exact mains to be replaced (including size, material, location, or specific services), and thus year over year comparisons are not possible.[24] The Company argues this complexity is further exacerbated by the difficulty to predict events such as rapid inflation or the COVID-19 pandemic.  OPC argues the Audit Report's re-defining of a new normal for WGL lowers the standards for evaluating the Company's performance.[25] OPC also expresses concerns on the challenges of DC undergrounding work, as well as concerns on District ratepayers having to bear the cost for acceleration as the District transitions toward electrification.[26] The Commission notes that replacements play a significant role in ensuring the safety and reliability of the gas distribution system in the District.  We believe that the pipe replacements completed through the PROJECT*pipes* program have significantly aided in the reduction of gas leaks, and in the maintenance of a safe and reliable gas system in the District. Keeping this in mind, we believe that the new/updated plan will need to establish a new baseline to help reflect the changing environment in the District, including the District's climate goals and ongoing electrification efforts. Although WGL submits robust annual reports on replacements,

---

[21]    Audit Report at 68-71.

[22]    WGL Audit Comments at 11-13.

[23]    WGL Audit Comments at 12.

[24]    WGL Audit Comments at 13.

[25]    OPC Audit Comments at 7.

[26]    OPC Audit Comments at 7.

**Attachment to Order No. 22003**

costs and project status, those reports provide little information on the overall progress of PROJECT*pipes* against the long-term targets for pipe replacement. The Commission believes that accepting this recommendation and requiring WGL to include it in the new/updated plan will produce better Life-of-Plan reporting and analysis to ensure that PROJECT*pipes* remains on track as a cohesive plan to accomplish these objectives.

15.    With respect to Audit Report Recommendation 2.12 (Executive Summary for the PIP), the Commission accepts the recommendation to provide a cover page plus three pages for each approved program (currently six approved programs): Current year, current year in PROJECT*pipes*, and current year in Life-of-Plan – (See Recommendation 2.2: Services Life-of-Plan, Recommendation 2.4: EVA Program, and Recommendation 2.11: Life-of-Plan for related commentary).  The new/updated plan shall include: (1) an executive summary that provides the current year compared to both the Annual Project List, and the overall approved plan filtered by sub-program; (2) Program 10 performance as related to each sub-program to help track progress on each material category; and (3) current crews and estimates on crews required to complete the current PIPES plan.[27]

16.    The Commission accepts with modifications the Audit Report Recommendation 2.13 (Cost Driver Conference).  The Audit Report recommends encouraging WGL to take definitive action with respect to its interaction with DDOT and to implement, refine, or define why they are inappropriate, and annually report these efforts as part of the PIP.[28]  The recommendations or actions include: (a): develop a committee (DDOT Regulation Refinement Committee) comprised of affected utilities and interested stakeholders to present a cost and impact analysis of DDOT's current requirements and propose changes to DDOT's regulations to the D.C. Council; (b) assist the DC UCC regulation refinement efforts by participating in the Utility Coordination Committee (UCC), which includes utilities operating in the District of Columbia and DDOT, to allow discuss issues affecting all participants, such as proposed DDOT regulation changes and impacts on ratepayers, better coordination on projects, and comparison of permit approval requirements; and (c) Conducting a formal Impact Study on permitting in D.C. Code and regulations to suggest ways to streamline the permitting process.[29]  WGL states that the Company solicits external stakeholder involvement and that it is not opposed to these recommendations.[30]  The Commission recognizes that this has been an ongoing challenge for WGL, and permitting delays affects the Company's productivity and costs.  The Commission will facilitate additional technical conferences with DDOT and WGL to continue the ongoing dialogue started in 2023.

17.    Audit Report Recommendation 2.14 (Internal Crew Usage) makes a formal assessment of the opportunity, strengths, and weaknesses of internal crew use by WGL as part of a larger capital construction and O&M strategy to support PROJECT*pipes* Life-of-Plan

---

[27]    Audit Report at 43, 71-72.

[28]    Audit Report at 43-44, 80-81.

[29]    Audit Report at 44 and 80.

[30]    WGL Audit Comments at 14.

6

**Attachment to Order No. 22003**

requirements at each PIPES renewal, or every five years, whichever is shorter.[31]  WGL states the Company appreciates the flexibility to use internal and external crews, but the Company will make a formal assessment of internal/external crews in a PIPES renewal request.[32]  In addition, WGL notes that it has benchmarking analysis for 2023 for similar utilities, in accordance with Audit Report Recommendation 2.15, and will evaluate the results.[33] WGL ALSO noted the Company plans to include their evaluation of new technologies with the PIPES 3 Annual Report, as recommended by Audit Report Recommendation 2.17.[34]   PWBLDC asserts the Commission should reject the recommendation and notes the extensive training necessary to bring on qualified crews.[35]  The Commission accepts Recommendation 2.14 and modifies the recommendation to include the suggested evaluations to be added to the restructured PROJECT*pipes* Application.  The new/updated plan should include the aforementioned modifications.

18.    The Commission accepts Audit Report Recommendation 2.15 (Urban Challenges Benchmark/Best Practice Comparison), which suggests that WGL perform a benchmark and best practice comparison of major urban cities where critical coordination on underground infrastructure construction is necessary among city permitting authority, city transportation authority, electric utility, gas utility, and separate 811 authority. The objective of this study is to establish the process specifically used to coordinate underground construction, and then document the best practices used to control cost, protect the public, and speed the resolution of work.  Areas that should be used for potential benchmark and best practice comparison include:[36]

| City | Gas | Electric | Separate 811 |
|---|---|---|---|
| Birmingham, AL | Spire | Alabama Power | No |
| Boston, MA | National Grid | Eversource | No |
| Brooklyn, NY | National Grid | ConEd | Yes |
| Chicago, IL | Peoples Gas | Exelon | Yes |
| Columbus, OH | NiSource | AEP | No |
| Jacksonville, FL | TECO | JEA | No |
| Las Vegas, NV | Southwest Gas | NV Energy | No |
| Los Angeles, CA | SoCal Gas | LADWP | No |
| Philadelphia, PA | PGW | PECO | No |
| Phoenix, AZ | Southwest Gas | Arizona Public Service | No |
| St. Louis, MO | Spire | Ameren | No |

19.    WGL conducted a benchmark assessment in 2021 to evaluate contract rates and terms, and concluded their rates were below benchmark averages. In 2022 Q4 the Company established a Business Transformation Office for the purpose of evaluating potential process

---

[31]    Audit Report 44 and 90.

[32]    WGL Audit Comments at 14.

[33]    WGL Audit Comments at 14.

[34]    WGL Audit Comments at 17-18.

[35]    PBWCLD Audit Comments at 2-3 and 6-7.

[36]    Audit Report at 44, 98-99.

**Attachment to Order No. 22003**

improvements. In 2023, WGL supported an industry peer review of construction best practices and plans to evaluate those results once they are available.[37] PBWDLC was supportive of the benchmarking recommendations and requested to be included in any benchmarking studies.[38] We believe that the recommendation of benchmarking and best practice comparisons with major urban cities is a good suggestion, even where WGL faces challenges that may not be comparable to other jurisdictions. WGL shall provide the results of their 2023 best practices evaluation and work with peers who have similar dense urban environments to evaluate further potential improvements and best practices.

20.     Audit Report Recommendation 2.16 (GIS System Adoption), would require WGL to adopt a GIS system for asset mapping, and require notification through 811 using GPS coordinates.[39] In response, WGL contends it uses Smallworld as their GIS asset mapping, but plans to build out and transition to ESRI ArcGIS in 2Q of 2024, with completion in 2026, and will reevaluate mapping at that time. Smallworld is incapable of mapping with GPS accuracy.[40] The Commission rejects this recommendation as premature, since WGL is transitioning to a new GIS system for asset mapping that will not be operable until 2026. The evaluation of the new software will be part of future prudency review and rate case evaluations and should be handled at that time.

21.     Audit Report Recommendation 2.17 (New Technology Investigation) recommends WGL create a continuous process improvement effort in the District with a target of investigating a minimum of two new techniques, processes, and excavation methods on an annual basis. The results of the tests on the impact on reduced cost incurred, field production, and safety should be reported annually to VP of Construction and/or ARP Executive Governance Committee.[41] WGL asserts the Company participates in numerous natural gas industry resource groups and is continuously looking to improve process and construction practices. WGL states it continues to evaluate areas of improvement and will formally document any technologies considered for implementation in the District on an annual basis as part of a PIPES 3 reporting requirements.[42] The Commission accepts the recommendation and directs WGL to also include in the annual report any operational or technological differences in Virginia and Maryland and the rationale for those differences.

22.     Task 3 of the Audit required review of excess costs in *Formal Case No. 1142* Merger Commitment No. 72. The Audit Report concluded that WGL incorrectly calculated the baseline (target) value for Program 2 in their Year 6 (2019-2020) filings.[43] The error was the result

---

[37]     WGL Audit Comments at 15-16.

[38]     PBWCLD Audit Comments at 6.

[39]     Audit Report at 44, 101.

[40]     WGL Audit Comments at 16.

[41]     Audit Report at 44, 103.

[42]     WGL Audit Comments at 17-18.

[43]     Audit Report at 109.

**Attachment to Order No. 22003**

of incorrectly stating the target unit cost was $1,078 instead of $1,048.  As a result, there was an approximate $9,333 increase over the reported excess cost.  WGL previously indicated it would remove the excess costs from their upcoming reconciliation filing in March 2024 and adjust the Current Factor at that time, as the error wouldn't affect customers billing rates in 2023.  This adjustment was completed and incorporated into the 2024 surcharge.[44] There were no other errors in calculation for the baseline and actual costs, resulting in accurate excessive costs calculations and adjustments.[45]  The Report also notes that the nomenclature needs to be consistent in preparing the annual American Association of Code Enforcement Class 3 cost estimates, so that it will be less difficult to determine the numbers used in the final submission for annual projects.

23.     The Audit Report Recommendation 3.1 (Document Accuracy) recommends that WGL develop a formal document review process to improve accuracy of documents.[46]  WGL indicates that the Company will enhance their current document process to include formal review and approval from the directors of Construction, Construction Management, and Construction Program Strategy and Management. Such enhancement will be documented in the PIP and will be added to Governance dashboards to ensure that tracking of Commitment 72 requirements is part of regular reporting.[47]   The Commission accepts the recommendations for document improvement and monitoring accuracy.

24.     The Commission accepts the Audit Report Recommendation 3.2 (File Nomenclature) requiring the Company to develop a file nomenclature process for Class 3 Estimates that would clarify a document is a final document.[48]  The new/update Application should include detailed information on the nomenclature process for Class 3 Estimates.

---

[44]     WGL response to PSC DR 19-1

[45]     Audit Report at 109.

[46]     Audit Report at 109.

[47]     WGL Audit Comments at 18-19.

[48]     Audit Report at 109.

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA**
**1325 G STREET, N.W., SUITE 800**
**WASHINGTON, D.C. 20005**

**June 12, 2024**

**FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN; and**

**GD-2024-01-G, IN THE MATTER OF THE PETITION FOR AN INVESTIGATION INTO WASHINGTON GAS LIGHT COMPANY'S NATURAL GAS INFRASTRUCTURE**

**PARTIAL CONCURRENCE OF COMMISSIONER BEVERLY**
**TO ORDER NOS. 22003 & 22004**

1.      I concur with the majority opinions insofar as they dismiss the PIPES 3 Application and open the investigation that OPC has requested. However, in my opinion, we need to go farther and rethink our entire approach to pipe replacement and leaks and make it part of one plan involving every related issue regardless of the case in which it arises, rather than fragmented into two or more separate proceedings as the majority opinion does. Because my view covers Order No. 22003 and Order No. 22004, I have filed a single statement in both *General Docket 2024-01-G* and *Formal Case No. 1175.*

2.      As I have said in a prior dissent, there is inadequate evidence that PROJECT*pipes* is significantly more successful with the surcharge than it is without it. Because the surcharge is extremely expensive and ratepayers are hemorrhaging cash, I think the new approach should begin with immediately suspending the surcharge[1] and then use the investigation proposed by OPC to develop an integrated planning framework as suggested by 10 Councilmembers in their February 8, 2024, letter to us. [2]

3.      The approach in the majority opinion essentially invites the Company to file a new plan that is likely to be much the same as the plan it replaces. I recognize that the majority opinion directs the company to justify surcharge recovery as part of a new pipes plan but doesn't give the company any incentive to do anything but repeat what it has already said, especially since the majority opinion is wrapped in a review of the audit that doesn't suggest any change in direction. To be clear, I don't expect an auditor to examine policies. Instead, I expect the auditor to limit the audit to a determination of whether the Company did as we told them to do. However, my question is not whether the Company followed directions but whether, as a matter of policy, we need to change course.

---

[1]      Instead of a surcharge, I think WGL should continue with normal pipe replacement that is subject to review under a traditional rate case.

[2]      Signatories included: Chairman Phil Mendelson, Councilmember Charles Allen, Councilmember Matthew Frumin, Councilmember Vincent C. Gray, Councilmember Christina Henderson, Councilmember Janeese Louis George, Councilmember Brianne K. Nadeau, Councilmember Zachary Parker, Councilmember Brooke Pinto, and Councilmember Robert C. White Jr.

**Partial Concurrence**                                                                                               **Page 2**

---

4.        In examining the Company's performance, I asked my Office to examine the available data from PHMSA, which tracks inventories of both cast/wrought iron and unprotected steel nationwide, and compare our progress to national trends. My office has provided charts below, but I invite other parties to provide their own graphical interpretations of PHMSA's data or other datasets.



5.        The chart above illustrates the rate of replacement of cast/wrought iron mains, both by WGL and nationwide, using 2005 as a baseline year. By 2023, nationally, 60% of iron mains had been replaced, while WGL had replaced 20%. At the current rate, the U.S. is set to replace iron mains by 2035, while it will take WGL until 2094.[3] I also note that according to PHMSA, the U.S. has about 1% iron mains remaining,[4] while WGL has over 32%.

---

[3]        I focus on iron mains here because, according to PHMSA's inventory, they constitute over 32% of the main miles in the District of Columbia. Conversely, iron services represent 0% of the District's services, bare steel mains represent 1.6% of the District's mains, and bare steel services represent 4.3% of the District's services.

[4]        https://www.phmsa.dot.gov/data-and-statistics/pipeline-replacement/pipeline-replacement-background

**Partial Concurrence** **Page 3**



6.     The chart above illustrates the miles of iron mains replaced by WGL (across all jurisdictions) since 2005 based on PHMSA's inventory. The replacement of iron mains does not appear to be occurring at an "accelerated" pace, either compared to WGL's pre-2013 pace or compared to the U.S. as a whole. Without evidence that the program has resulted in accelerated pipe replacement, I don't see the justification for giving WGL accelerated cost recovery.

7.     There is also the issue of overall cost. Based on the most recent data WGL provided in *Formal Case No. 1154,* for the last full year of data (2022), the cost per mile was about $7.8 million (in 2028 dollars, this would be about $9.2 million per mile).[5] For comparison, WGL's projected per-mile cost of replacement under the STRIDE program in Maryland for 2028 is $4.3 million per mile (less than half WGL DC's costs), even though WGL has by far the most expensive cost of pipe replacement in Maryland.[6] The cost of service replacement for WGL in DC in 2022 was about $23,000 per service, and the total cost of service replacement was more than the amount spent on mains for 2022. BG&E's total service replacement budget was only 15% of the overall STRIDE 2 budget.[7] It is unclear why the costs for both main and service replacement in the District of Columbia are so elevated or why service replacement constitutes such a large portion of the spending for the program. The majority's Orders have asked WGL to justify its inflated prices, , and therefore I expect WGL's next Application to be similarly priced with WGL's provided justification.

---

[5]     *Formal Case No. 1154,* Washington Gas Light Company's Response to Order No. 21940. January 4, 2024. Attachment A.

[6]     BG&E's costs are $2.6 million per mile and CMD's costs are $2.8 million per mile. I note that this discrepancy is on top of the larger rate increase that WGL received in D.C. *($25 million) vs. Maryland ($10 million).

[7]     Office of the People's Counsel of the State of Maryland, Maryland Gas Utility Spending. November 2023. https://opc.maryland.gov/Portals/0/Files/Publications/Reports/GasUtilitySpending%2011-5-23%20FINAL.pdf?ver=QdfdqphWg8P8SSpjtB29YQ%3d%3d

8.      When we shift from pipeline safety to climate issues, the situation doesn't improve. As pointed out by the 10 Councilmembers, the City's carbon neutrality goals are laid out in the Climate Commitment Amendment Act of 2022. Although we adopted the 5-year targets in the Climate Commitment Act for both utilities on December 8, 2023,[8] we have not yet issued the order establishing next steps for Pepco and WGL's reporting requirements.[9] The majority's Order asks WGL to submit a new plan that aligns with the District's targets, however the next GHG reduction milestones in the Climate Commitment Act are in 2025 (45% reduction from 2006) and in 2030 (60% reduction from 2006). To me, it would make sense to first issue the Order establishing the GHG reporting requirements, and then to have WGL develop 5-year integrated plans that align with the Climate Commitment Act.

9.      Our view on whether the Pipes program is also a climate program tends to vacillate. In Order No. 21960, the majority leveraged GHG reductions as a reason for extending Pipes 2 for 12 months: "We…note that the proactive replacement of high-risk vulnerable main and service pipes reduces future greenhouse gas ("GHG") emissions."[10] However, in Order No. 22004 granting OPC's Petition, the majority underscores that Pipes is not a leak management program and therefore should not be part of the investigation.[11] In Order No. 22003 addressing Pipes 3, the majority again relies on the need to manage leaks and GHG emissions to justify a revised Application from the Company, going so far as to explicitly ask the Company to align its revised Application with the District's climate mandates.[12]

10.      If we want to measure a reduction in GHG emissions from <u>existing</u> leaks and develop an effective plan, we need actual data rather than estimates of fugitive methane emissions as well as data on the location, concentration, and flow rates of the existing leaks. Given the problems with prior leak surveys pointed out by DCG (where DCG found more leaks in just part of the city than WGL found in the entire city), I suggest that the Commission undertake its own leak baseline survey to capture the location of leaks, their concentration, flow rate, and grade, using a level of sensitivity the same or higher than was used in DCG's survey.

11.      My office has undertaken some analysis regarding the GHG impact of the Pipes program to date. The most recent estimates that WGL has provided regarding the impact of the Pipes program on GHG emissions is an avoided 23,726 metric tons of $CO_2e$ over ten years.

---

[8]      *See GD2019-04-M,* Order No. 21938, ¶ December 8, 2023.

[9]      *See* Order No. 21938, ¶ 30: "Since the filing of the BCA Report, the D.C. Council has established interim targets for the District of Columbia. The Climate Commitment Act of 2021 adopted several interim targets on the path to carbon neutrality by 2045 based on reductions from 2006 as the baseline year: 45% reduction by 2025, 60% reduction by 2030, 70% reduction by 2035, and 85% reduction by 2040. The Commission adopts those targets for Pepco and WGL and will issue an order prescribing next steps on reporting requirements for both Pepco and WGL related to these targets."

[10]      *See* Order No. 21960, ¶ 12.

[11]      *See Formal Case No. 1178, In the Matter of the Petition for Investigation Into Washington Gas Light Company's System Leak Reduction Practices,* No. 22004, ¶ 15, rel. June 12, 2024.

[12]      *See Formal Case No. 1179, In the Matter of the Investigation Into Washington Gas Light Company's Strategically Targeted Pipe Replacement Plan*, Order No. 22003, ¶ 47-49, rel. June 12, 2024.

**Partial Concurrence** Page 5

Without actual GHG emissions data from leaks, we have to rely on that estimate. The Commission has also recently adopted a social cost of carbon for use in our forthcoming BCA framework that allows us to assess the benefits of such avoided emissions, which is $160 per metric ton. Therefore, if we assume WGL's GHG estimates are correct for the sake of the calculation, the program has achieved approximately $3.8 million in climate benefits since 2014. For comparison, the total cost of the program to date has been over $305 million. We can also look at those savings in terms of WGL's overall GHG footprint. According to the District's GHG inventory, WGL's total GHG emissions over the period from 2014-2023 was 15,674,606 metric tons of $CO_2e$. Based on WGL's estimate, without Project*pipes,* WGL's emissions over that period would have been 15,698,332 metric tons of $CO_2e$, representing a reduction of 0.15%. A graphic representation of these estimated avoided GHG reductions is included below. Clearly, Pipes is not a climate program, and was never intended to be one. However, as DCG has pointed out, it is likely that a small proportion of the leaks on the system may be producing more than half of the fugitive methane emissions. Therefore, actual emissions data would allow the Commission to provide more specific direction to WGL regarding those super-emitting leaks to protect the climate.



12.    I note that AOBA has flagged issues with lost and unaccounted for ("LAUF") gas in the District, with WGL having one of the highest LAUF gas rates in the United States. This is a significant concern because the cost of LAUF gas falls on the backs of ratepayers and may reflect significant methane emissions into the atmosphere, whose impact is unknown due to the lack of GHG emissions reporting requirements. I would be interested to hear from stakeholders regarding the best practices from other jurisdictions for the regulation of LAUF gas, including but not limited to Performance Incentive Mechanisms ("PIMs"), or setting a cap on what may be transferred to rates.

13.    In rethinking this initiative, we should begin our investigation by collecting the following information (subject to infrastructure security constraints):

**Partial Concurrence** **Page 6**

ï The location of all distribution system pipes and other infrastructure and their age, material, pressure, and condition

ï The location, concentration, volume, and grade of leaks

ï The volume of fugitive methane emissions from distribution system leaks for the purpose of calculating GHG impacts

ï The impact of existing climate legislation on baseline gas demand

ï The location and tariff class of all gas customers

14.     To that end, I think the Commission should direct WGL to provide a digital map and dataset with the following layers and datasets:[13]

ï Infrastructure Layer: location, length and diameter of pipes (including all mains and services); pipeline pressure; material; age; depreciation status; leaks per mile; interconnects; gate stations; compressor stations; and storage facilities.

ï Replacement Layer: Pipes segments that have been replaced, length, year of replacement, and whether replaced under normal replacement, PIPES 1, PIPES 2, or *Formal Case No. 1027*;

ï System Constraints Layer: areas of constraint or congestion;

ï Customer Layer: customer locations and tariffs;

ï Existing Leak Layer: location of known leaks, concentration, flow rate, and grade;

ï Repair Layer: location of repaired leaks, concentration, flow rate, and grade;

ï Supply Dataset: Sources of supply; supply contracts, including amounts and duration; storage and contingency resources;

ï Demand Dataset: Current and anticipated demand under the baseline scenario (also known as "business as usual") from 2025-2030. The baseline scenario shall include the impacts of existing legislation in the District, including the Building Energy Performance Standard, and the Clean Energy DC Building Code Amendment Act of 2022. Demand shall be broken out by customer class, season, and volumetric and peak requirements, based on current and historical delivery.

15.     In addition to data collection and addressing the significant issues raised by stakeholders, I present an outline of integrated infrastructure planning for WGL for discussion purposes, below. I divide this exercise broadly into the following categories:[14] 1) Cost and Revenue Analysis and Projections; 2) Customer Acquisition and Loss Scenarios; 3) Financial Modeling; 4) Accuracy of Demand Forecasting; 5) Development of a Regulatory Roadmap; and 6) Development of Short and Long-Term Business Plans. It may useful for the Commission to hire a consultant to oversee the development of an integrated planning framework for WGL.

1. Cost and Revenue Analysis and Projections. This exercise would include scenarios for demand forecasting, including weather forecasting; expected heating degree days

---

[13]     I leave it up to the other parties in these cases to seek such information in discovery if they wish.

[14]     Note: This framework is based generally on a whitepaper by Megan Anderson, Mark LeBel, and Max Dupuy of the Regulatory Assistance Project titled "Under Pressure: Gas Utility Regulation for a Time of Transition," released May 2021.

according to climate models; the impact of the Building Energy Performance Standard and the Green Buildings Act; and an analysis of potential end-use electrification scenarios.

2. <u>Customer Acquisition and Loss Scenarios</u>. The baseline scenario should include the impact of the Green Buildings Act.

3. <u>Financial modeling</u>. This should consist of financial models of the above scenarios, including the financial impacts on both WGL and on ratepayers, including under the business-as-usual scenario.

4. <u>Accuracy of Demand Forecasting</u>. This should include a review of historical demand forecasts against actual demand and explain any deviations.

5. <u>Regulatory Roadmap</u>. This would include a roadmap toward performance-based regulation. This should include parameters to adopt in future rate cases, such as changes to depreciation and/or amortization rates that may be beneficial.

6. <u>Business Plans</u>. These plans should determine areas where zero-carbon infrastructure may be deployed (i.e. geothermal); analyze cost trade-offs between pipe replacement, repair, and non-pipe alternatives; develop a plan for the treatment of areas of the gas distribution system that may become underutilized based on demand forecasting; and develop GHG analysis and scenarios that align with the 5-year targets under the Climate Commitment Act.[15] The short-term business plan should be established under the existing regulatory paradigm for reducing GHG emissions from WGL's operations to meet the 2025 GHG reduction target. The long-term plan should be developed from 2025 to 2045 under the performance-based regulatory framework, aligning with the 5-year targets under the Climate Commitment Act. This long-term planning should account for the change to customer acquisition starting in 2026 as a result of the Green Buildings Act.

16.     I present all of this as a starting point for future discussion towards the development of an integrated infrastructure plan for WGL that aligns with the 5-year GHG reduction targets the Commission has already adopted. To that end, I seek input from all stakeholders regarding best practices from other jurisdictions for the development of a comprehensive and integrated regulatory framework for WGL. I also welcome graphics or additional datasets.

---

[15]     I'm not at this point determining whether our pipes are or are not too old to repair.

**COMMISSION ACTION**

FORMAL CASE NO. 1154, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECT*PIPES* 2 PLAN:

FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN; and

FORMAL CASE NO. 1179, IN THE MATTER OF THE INVESTIGATION INTO WASHINGON GAS LIGHT COMPANY'S STRATEGICALLY TARGETED PIPE REPLACEMENT PLAN,

Date   **6/12/24**   Formal Case Nos.  **1154, 1175, & 1179**   Tariff No. _____   Order No.   **22003**

| | Approved<br>Initial & Date | Concur In Part<br>Initial & Date | Abstain<br>Initial & Date |
|---|---|---|---|
| Chairman Emile Thompson | ET/CL 6/12/24 | | |
| Commissioner Richard A. Beverly | | RB/CL 6/12/24 | |
| Commissioner Ted Trabue | TT/CL 6/12/24 | | |

Certification of Action

*C. Lipscombe*
General/Deputy General Counsel

  Kimberly Lincoln-Stewart
     OGC Counsel/Staff

Exhibit 8

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96<br><br>    *Plaintiffs*,<br><br>  v.<br><br>DISTRICT OF COLUMBIA,<br><br>    *Defendant*. | **Case No.** |

**<u>DECLARATION OF RYAN BOYER</u>**

1. My name is Ryan Boyer. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the Business Manager of the Philadelphia-Baltimore-Washington Laborers' District Council. The district council is an affiliate of the Laborers International Union of North America (LIUNA), AFL-CIO, a 120 year-old labor organization with over 500,000 members throughout the United States and Canada. The district council has approximately 13,000 members. Nationally, one-third of construction work performed by LIUNA members is in the energy sector.

3. Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by Washington Gas Light Company, such as Miller Pipeline, Infrasource, Skoda Contracting Company, and Vector Services, 70 of whom regularly work in the

1

District.  LIUNA members working for these companies install and replace services, install new mains and distribution pipes, and replace mains and distribution pipes throughout the District of Columbia. Many of our local members also are Washington Gas customers.

4.      The members working on gas distributions lines are required to hold an operator qualification under Subpart G in 49 CFR Part 195. This valuable employment credential is applicable only to work on gas lines.

5.      D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6.      The DC Appliance Ban will reduce the work performed by our members, leading to layoffs and the permanent loss of employment. Furthermore, it will cause the gas industry in the local area to shrink, restricting our members' ability to find employment in the industry for which they have non-transferrable training and credentials. Furthermore, loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans.

7.      The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers like our members to pay higher rates for gas service than they otherwise would pay.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on:  10-16-2024

Ryan Boyer
Business Manger
Philadelphia-Baltimore-Washington Laborers' District Council

3

# Exhibit 9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, AND TEAMSTERS LOCAL 96 | **Case No.** |
| *Plaintiffs*, | |
| v. | |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**<u>DECLARATION OF WILDER REED</u>**

1. My name is Wilder Reed. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the President and Principal Executive Officer of Teamsters Local 96 ("Local 96"). In addition to being the Union President, I am employed in a full-time position by Washington Gas Light Company ("WGL") as a Service Technician.

3. Local 96 is a labor union with approximately 600 members, all of whom are employed in various positions at WGL. As employees of WGL, Local 96 members service the over 160,000 WGL customers in the District of Columbia.

1

4.  Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses.

5.  D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6.  The D.C. Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. The D.C. Appliance Ban will therefore harm Local 96's members. Additionally, the D.C. Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade.

7.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: 10/16/2024

Signed by:

B0C2E1533E4D4D7...

Wilder Reed
President
Teamsters Local 96

2