# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,
*Appellants*

v.

DISTRICT OF COLUMBIA,
*Appellee*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:24-CV-02942-ACR, District Judge Ana C. Reyes

## OPENING BRIEF OF APPELLANTS

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

*Additional counsel and parties listed on next page*

Abigail V. Carter
BREDHOFF & KAISER, P.L.L.C.
805 15th St. NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

Lauren McDermott
MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.
1920 L St. NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties**

The parties and *amici* known to Plaintiff-Appellants are:

**<u>Plaintiff-Appellants</u>**

National Association of Home Builders of the United States

Restaurant Law Center

National Apartment Association

Maryland Building Industry Association

Washington Gas Light Company[*]

Philadelphia-Baltimore-Washington Laborers' District Council[†]

Teamsters Local 96

**<u>Defendant-Appellee</u>**

District of Columbia

**<u>*Amici* Below</u>**

American Gas Association

---

[*] AltaGas Ltd. owns 10% or more of WGL's stock. ALA is the parent of AltaGas Services (U.S.) Inc., which is the parent of AltaGas Utility Holdings (U.S.) Inc., which is the parent of Wrangler 1 LLC, which is the parent of WGL Holdings, Inc., which is the parent of Wrangler SPE LLC, which is the parent of Washington Gas Light Company.

[†] The District Council is also known as Metropolitan Area Philadelphia/Baltimore/Washington Laborers' District Council.

Public Health Law Center

Sierra Club

Chesapeake Climate Action Network

**B.      Ruling Under Review**

The ruling under review is the Memorandum Opinion and Order dated March 26, 2026, entered by Judge Ana C. Reyes below. *National Association of Home Builders of the United States, et al. v. District of Columbia*, No. 24-cv-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026). That ruling is included in the appendix at JA377-398.

**C.      Related Cases**

This case was not on review previously before this Court or any other court.

Plaintiffs are aware of four cases pending in the courts of appeals that raise similar issues:

- *Maryland Building Industry Association, Inc. v. McIlwain*, No. 26-1552 (4th Cir.).
- *National Association of Home Builders of the United States v. Montgomery County*, *Maryland*, No. 26-1449 (4th Cir.).
- *Mulhern Gas Co., Inc. v. Mosley*, No. 25-2041 (2d Cir.).
- *Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 25-977 (2d Cir.).

# TABLE OF CONTENTS

Certificate of Parties, Rulings, and Related Cases ...................................................... i

    A. Parties ........................................................................................... i

    B. Ruling Under Review ..................................................................... ii

    C. Related Cases ................................................................................ ii

Table of Contents ........................................................................................ iii

Table of Authorities ..................................................................................... vi

Glossary ...................................................................................................... xiii

Jurisdictional Statement ...............................................................................1

Statement of Issues .......................................................................................1

Statutes and Regulations ..............................................................................1

Introduction ..................................................................................................2

Statement of the Case ..................................................................................2

I. Legal Background ................................................................................2

    A. The Energy Policy and Conservation Act ......................................2

    B. The Ninth Circuit has held that EPCA preempts local gas bans. ...........5

II. Factual Background ............................................................................7

    A. The Clean Buildings Act ...............................................................7

    B. Plaintiffs challenge the Clean Buildings Act as preempted under EPCA. ..............................................................................................10

    C. The district court grants summary judgment in favor of the District. ...........................................................................................11

Summary of Argument ................................................................................12

Standard of Review ....................................................................................14

Argument ....................................................................................................16

I. EPCA preempts the Clean Buildings Act. ...........................................16

    A. EPCA's plain text establishes that it preempts the Clean Buildings Act. ..................................................................................16

        1. The Clean Buildings Act "concern[s]" the "energy use" of gas appliances because it sets their maximum energy use at zero. ..................................................................................16

        2. EPCA's preemption provision's use of the broadening term "concerning" confirms that it reaches outright prohibitions like the Clean Buildings Act. ...............................19

    B. EPCA's structure, purpose, and history further confirm that it preempts the Clean Buildings Act. ....................................22

        1. The building code exception establishes that EPCA preempts regulations like the Clean Buildings Act. ...................23

        2. Numerous other EPCA provisions demonstrate that the Clean Buildings Act would imperil the statute's core goals. ...............................................................................27

        3. EPCA's purpose and history further confirm that it preempts the Clean Buildings Act. ...........................................30

    C. Even without its prohibition on the use of gas appliances, the Clean Buildings Act still would be preempted due to its penalization of the use of gas appliances. .........................................32

II. The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision. ......................34

    A. EPCA's preemptive reach extends beyond literal energy conservation standards. ...................................................................35

    B. The Clean Buildings Act operates as the most stringent kind of energy conservation standard. .........................................................38

iv

C.     The Clean Buildings Act remains preempted regardless of how one reads "energy use" and "point of use." ...........................41

D.     The district court overlooked the interpretive importance of EPCA's building code exception and waiver provision. .....................47

E.     Plaintiffs did not forfeit their challenge to the Clean Buildings Act's application of Appendix Z to covered buildings. ......................49

III.    No exception or waiver applies to save the Clean Buildings Act from preemption. ...............................................................51

IV.    Plaintiffs are entitled to declaratory and injunctive relief. ...........................52

Conclusion ...................................................................................................55

Certificate of Compliance ...........................................................................58

Certificate of Service ...................................................................................59

# TABLE OF AUTHORITIES*

**Page(s)**

**CASES**

*Air Evac EMS v. Cheatham*,
910 F.3d 751 (4th Cir. 2018) ....................................................15

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) .................................................................54

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
569 U.S. 641 (2013) .................................................................40

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .................................................................53

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*,
No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ..................12

*Assurance Wireless USA, LP v. Reynolds*,
100 F.4th 1024 (9th Cir. 2026) ................................................15

*Bio Gen LLC v. Sanders*,
142 F.4th 591 (8th Cir. 2025) ..................................................15

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) ..................................................26

*Buono v. Tyco Fire Prods, LP*,
78 F.4th 490 (2d Cir. 2023) ......................................................15

*California Restaurant Association v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ................. 2, 5, 6, 11, 22, 24, 31, 37, 39, 45, 46

*California v. Texas*,
593 U.S. 659 (2021) .................................................................52

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Chamber of Comm. of U.S. v. Whiting*,
563 U.S. 582 (2011) ............................................................................14

*Champion v. Ames*,
188 U.S. 321 (1903) ............................................................................18

*Chevron USA Inc. v. Plaquemines Parish, La.*,
146 S. Ct. 1052 (2026) ........................................................................20

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ............................................................................23

*Ciralsky v. CIA*,
355 F.3d 661 (D.C. Cir. 2004) ............................................................50

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) ..............................................................15

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ..............................................................23, 37, 48

*Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conserv. Comm'n*,
127 F.4th 1294 (11th Cir. 2025) .........................................................15

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................................................53

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ............................................................................40

*Env't Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007) ............................................................................42

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................................30

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ..............................................................55

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ...................................................................20, 21

*Greenbaum v. Islamic Republic of Iran*,
67 F.4th 428 (D.C. Cir. 2023) .............................................................45

*He Depu v. Yahoo! Inc.*,
950 F.3d 897 (D.C. Cir. 2020) ...........................................................50

*Hemp Indus. Ass'n v. DEA*,
36 F.4th 278 (D.C. Cir. 2022) ............................................................52

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ..........................................................................20

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ...........................................................55

*Krieger v. Fadely*,
211 F.3d 134 (D.C. Cir. 2000) ...........................................................50

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .............................................................19, 20, 36

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...............................................................55

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
312 U.S. 270 (1941) ..........................................................................52

*Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico v. Hernandez*,
58 F.4th 5 (1st Cir. 2023) ...................................................................15

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ..........................................................................52

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .............................................................19, 20, 21

*Mulhern Gas Co. v. Mosley*,
798 F. Supp. 3d 304 (N.D.N.Y. 2025) ...........................................................12

*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*,
No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) ..........12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ......................................................................................37

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ......................................................................................39

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................................55

*Ohio v. EPA*,
603 U.S. 279 (2024) ......................................................................................54

*Philip Morris USA Inc. v. Scott*,
561 U.S. 1301 (2010) ....................................................................................54

*President v. Vance*,
627 F.2d 353 (D.C. Cir. 1980) ......................................................................53

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ................................................................................14, 15

*Pulsifer v. United States*,
601 U.S. 124 (2024) ................................................................................23, 26

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ................................................................................20, 21

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) ........................................................................................21

*Shuker v. Smith & Nephew, PLC*,
885 F.3d 760 (3d Cir. 2018) .........................................................................16

*Sickle v. Torres Advanced Enters. Sols., LLC,*
    884 F.3d 338 (D.C. Cir. 2018) ........................................................15

*Simpson v. Colbert,*
    No. 1:21-cv-00479, 2024 WL 3887393 (D.D.C. 2024) .............................54

*Taniguchi v. Kan. Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) ....................................................................45

*Thornton v. Tyson Foods, Inc.,*
    28 F.4th 1016 (10th Cir. 2022) ......................................................15

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ....................................................................54

*United States v. Burwell,*
    122 F.4th 984 (D.C. Cir. 2024) ......................................................30

*United States v. Palmer,*
    35 F.4th 841 (D.C. Cir. 2022) ........................................................14

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ....................................................................42

*Ye v. GlobalTranz Enterp., Inc.,*
    74 F.4th 453 (7th Cir. 2023) ..........................................................15

*Young Conservatives of Tex. Found. v. Smatresk,*
    73 F.4th 304 (5th Cir. 2023) ..........................................................15

**STATUTES AND REGULATIONS**

28 U.S.C. §1291 ..............................................................................1

28 U.S.C. §1331 ..............................................................................1

28 U.S.C. §2201 ............................................................................52

42 U.S.C. §6202 ............................................................................17

42 U.S.C. §6291 ...................................................... 17, 33, 34, 38, 39, 41, 44, 45

42 U.S.C. §6292 ................................................................................17, 43

42 U.S.C. §6293 ............................................................17, 41, 42, 45, 46

42 U.S.C. §6295 ...................................... 4, 5, 16, 17, 25, 28, 29, 31, 43

42 U.S.C. §6297 .... 2, 4-5, 12, 16-19, 23, 25-26, 28-29, 31-32, 34, 36, 44, 48-49, 51

42 U.S.C. §6311 ...................................................... 17, 33, 34, 38, 39, 41, 44, 45

42 U.S.C. §6314 ............................................................17, 41, 42, 45, 46

42 U.S.C. §6316 ................................ 2, 4, 12, 17, 18, 19, 22, 24, 31, 34, 35, 40, 51

12A D.C. Mun. Regs. §101.10.5 ........................................................7

D.C. Code §6-1451.01 ...................................................................8, 9

D.C. Code §6-1453.01 ......................................... 7, 8, 9, 18, 33, 50, 52

D.C. Building Code §310.4 (2020) ...................................................8

D.C. Building Code §310.5 (2020) ...................................................8

D.C. Building Code §310.6 (2020) ...................................................8

D.C. Energy Conservation Code §R202 ...........................................8

D.C. Energy Conservation Code, Appendix Z ..........................10, 33, 34

Clean Energy DC Building Code Amendment Act of 2022, D.C. Law 24-177 ...1, 7

Net Zero Modification and Preservation Emergency Amendment Act of 2026,
D.C. Act 26-275 ...............................................................................7

Net Zero Modification and Preservation Temporary Act of 2026,
D.C. Act 26-280 ...............................................................................7

Pub. L. No. 94-163, 89 Stat. 871 (1975) ...........................................2, 3, 30, 35, 36

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ......................................................30, 36

Pub. L. No. 100-12, 101 Stat. 103 (1987) ...........................................................3

10 C.F.R. §430.32 .........................................................................5, 17, 38

**LEGISLATIVE AND REGULATORY MATERIALS**

H.R. Rep. No. 100-11 (1987) .....................................................................3, 31

S. Rep. No. 100-6 (1987) ..........................................................3, 4, 28, 30, 31, 32

DOE, *Standards and Test Procedures*,
        https://www.energy.gov/eere/buildings/standards-and-test-procedures .........5

Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy
        Conservation Standards Program, 76 Fed. Reg. 51,281 (Aug. 18, 2011) ....45

U.S. Dep't of Energy, *Technical Support Document: Energy Efficiency
        Program for Consumer Products and Commercial and Industrial
        Equipment: Consumer Conventional Cooking Products* (Jan. 2024) ..........43

**OTHER AUTHORITIES**

Black's Law Dictionary (5th ed. 1979) .................................................................19

Cambridge English Dictionary Online (2025) .....................................................45

Oxford English Dictionary Online (2022) ...........................................................45

# GLOSSARY

| | |
|---|---|
| EPCA | Energy Policy and Conservation Act |
| NAECA | National Appliance Energy Conservation Act |
| DOE | Department of Energy |
| zEPI | Zero Energy Performance Index |
| kBtu | Thousand British thermal units |
| JA | Joint Appendix |

## JURISDICTIONAL STATEMENT

After the District of Columbia passed a law banning the use of gas appliances in certain newly constructed buildings and substantial improvements to existing buildings, Plaintiffs challenged the law in D.C. federal court, asserting that the District's law was preempted by the Energy Policy and Conservation Act, 42 U.S.C. §6201, *et seq.*, and seeking declaratory and injunctive relief. JA12-36. Because Plaintiffs' preemption claim arose under federal law, the district court exercised subject-matter jurisdiction over the suit pursuant to 28 U.S.C. §1331.

After the parties cross-moved for summary judgment, the district court granted the District's motion and denied Plaintiffs' motion. JA398. The district court's memorandum opinion and order, which disposed of all parties' claims, was entered on March 26, 2026. JA398. Plaintiffs filed a timely notice of appeal from that order on April 14, 2026. JA399. This Court accordingly has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES

Whether the federal Energy Policy and Conservation Act, which preempts any local regulation "concerning the energy efficiency [or] energy use" of gas appliances, preempts D.C. Law 24-177, the "Clean Energy DC Building Code Amendment Act of 2022."

## STATUTES AND REGULATIONS

The Addendum to this brief contains the relevant statutes and regulations.

**INTRODUCTION**

This is a straightforward case. The Energy Policy and Conservation Act ("EPCA") expressly preempts state and local laws "concerning the … energy use" of gas appliances. 42 U.S.C. §§6297(c), 6316(b)(2)(A). D.C. Law 24-177 (the "Clean Buildings Act") bans the use of gas appliances in a broad swath of newly constructed buildings and substantial improvements to existing buildings in the District. By prohibiting gas appliances from using any energy whatsoever—*i.e.*, setting their maximum allowed energy use at zero—the Clean Buildings Act plainly qualifies as a state or local law "concerning the … energy use" of gas appliances. Therefore, EPCA expressly preempts it. EPCA's text, structure, history, and purpose are all in accord on this point and confirm that EPCA preempts laws like the Clean Buildings Act. The Ninth Circuit followed this clear chain of reasoning to that conclusion when it struck down the City of Berkeley's similar gas ban in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). This Court should do the same, hold that EPCA preempts the Clean Buildings Act, and reverse the district court's contrary judgment.

**STATEMENT OF THE CASE**

## I.    Legal Background

### A. The Energy Policy and Conservation Act

The Energy Policy and Conservation Act ("EPCA") was first passed in 1975 to create a national, comprehensive energy policy. *See* Pub. L. No. 94-163, 89 Stat.

2

871 (1975). As originally enacted, EPCA mandated that appliance manufacturers label their appliances with energy-efficiency standards, but permitted significant state involvement in appliance regulation. *See id.* §327(b), 89 Stat. at 927. Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards.

The most important of these amendments was the National Appliance Energy Conservation Act of 1987 ("NAECA"). Pub. L. No. 100-12, 101 Stat. 103 (1987). NAECA was designed to "reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6 at 2 (1987). Through it, Congress sought to "end an era of confusion and uncertainty" for the appliance industry and to "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11 at 24, 30 (1987); *see also* S. Rep. No. 100-6 at 4 (1987) (similar).

NAECA thus contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6 at 2 (1987). "In general, these national standards would preempt all State standards." *Id.* To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. §6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** … .

42 U.S.C. §6297(c) (emphases added).

After NAECA, federal law provided two routes for a state or local jurisdiction to avoid preemption. First, the Department of Energy ("DOE") can grant a waiver of preemption in limited circumstances. *Id.* §6297(d). Second, there is an exception from preemption for certain performance-based building codes for new construction that meet a strict seven-part test enumerated in 42 U.S.C. §6297(f)(3).

Congress later expanded the federal appliance program to industrial appliances and added a preemption provision to "**supersede any State or local regulation concerning the energy efficiency or energy use of a product** for which a standard is prescribed or established pursuant to [EPCA]." 42 U.S.C. §6316(b)(2)(A) (emphasis added). Congress also provided an exception that excepted certain building regulations from that preemption provision. 42 U.S.C. §6316(b)(2)(B)(i).

Thus, in its present form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts state regulations concerning those matters. Invoking its authority under EPCA, DOE has set energy conservation standards for all manner of consumer

4

and industrial appliances. DOE, *Standards and Test Procedures*, https://www.energy.gov/eere/buildings/standards-and-test-procedures. To name a few, gas stoves, ovens, heaters, water heaters, and dryers are all subject to federal energy conservation standards DOE has promulgated under EPCA. *Id.*; 42 U.S.C. §6295; 10 C.F.R. §430.32.

**B.     The Ninth Circuit has held that EPCA preempts local gas bans.**

In *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), the Ninth Circuit became the first (and so far only) court of appeals to confront the question of whether EPCA preempts local gas bans. There, the City of Berkeley, California, passed a law "prohibiting the installation of natural gas piping within newly constructed buildings." *Id.* at 1098. Relying on the "text, structure, and context" of EPCA, *id.* at 1101, the Ninth Circuit held that the City's law was preempted as a local law "concerning the energy use" of EPCA-covered gas appliances, *id.* at 1098 (citing 42 U.S.C. §6297(c)).

"Of critical importance" to this determination, the court wrote, was EPCA's exception to preemption for certain building codes, a piece of EPCA's "structure" which "demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy … use' of such products." *Id.* at 1101. The court then turned to the terms of the EPCA preemption provision itself, 42 U.S.C. §6297(c), and interpreted them to

mean that "EPCA preempts regulations, including building code requirements, that relate to 'the quantity of natural gas directly consumed by' certain consumer appliances at the place where those products are used," *id.* at 1101 (internal brackets and citations omitted).

With that understanding, the court rejected the City's "main contention" that "its Ordinance doesn't regulate 'energy use' because it bans natural gas rather than prescribes an affirmative 'quantity of energy.'" *Id.* at 1102. The City's argument "defies the ordinary meaning of 'quantity,'" the court said, "[a]nd it is well accepted in ordinary usage that 'zero' is a 'quantity.'" *Id.* "Thus, a building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" *Id.*

Notably, in reaching this conclusion, the Ninth Circuit confirmed that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at 1107. It followed that, given the breadth of EPCA's preemption provision, the City could not so easily "evade preemption by merely moving up one step in the energy chain [by] banning natural gas piping within those buildings." *Id.*

The Ninth Circuit declined to rehear the case en banc. *See id.* at 1098.

## II. Factual Background

### A. The Clean Buildings Act

With that legal background as context, consider the District of Columbia law that is the focus of this appeal. In July 2022, District of Columbia Mayor Muriel Bowser signed into law D.C. Law 24-177, the "Clean Energy DC Building Code Amendment Act of 2022" (the "Clean Buildings Act"), which bans the use of gas appliances in a broad swath of newly constructed buildings and substantial improvements to existing buildings in the District. JA173, JA276.

Specifically, the Clean Buildings Act applies to all "[c]overed buildings," which "means all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions … ." D.C. Code §6-1453.01(a)(2).[1] Those provisions of the Code apply to "commercial buildings," 12A D.C. Mun. Regs. §101.10.5, which encompass "all buildings that are not included in the

_____

[1] The District temporarily altered the text of the Clean Buildings Act through the Net Zero Modification and Preservation Emergency Amendment Act of 2026, D.C. Act 26-275 (Mar. 6, 2026), and the Net Zero Modification and Preservation Temporary Act of 2026, D.C. Act 26-280 (Mar. 20, 2026). As the district court explained, these temporary amendments "replace[] 'substantial improvements' with 'Level 3 alterations,' for example, and clarif[y] the definition of '[n]et-zero-energy standard.'" JA382. But, importantly, "[t]hese temporary changes do not affect the Court's analysis." JA382. Accordingly, Plaintiffs herein cite to and quote from the permanent version of the Clean Buildings Act.

definition of '[r]esidential building,'" D.C. Energy Conservation Code §R202.[2] The Code then defines "residential building[s]" as "detached one- and two-family dwellings and multiple single-family dwellings (townhouses) as well as Group R-2, R-3, and R-4 buildings three stories or less in height above grade plane." *Id.*[3] All other buildings are "commercial building[s]," which include businesses and residences (such as condos and apartment complexes) more than three stories tall. *Id.*

The Clean Buildings Act prohibits the use of gas appliances in those buildings through one of two pathways. First, the Clean Buildings Act directs the Mayor to issue, by December 31, 2026, at the latest, "final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code §6-1453.01(b)(1). "New construction" includes "new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building." *Id.* §6-1451.01(33); *id.* §6-1453.01(a)(4). "Substantial improvement" means "any repair, alteration, addition, or improvement of a building or structure, … the cost of which

---

[2] The District of Columbia Energy Conservation Code is available at https://dob.dc.gov/sites/default/files/dc/sites/dob/publication/attachments/2017%20DC%20Energy%20Code.pdf.

[3] Group R-2, R-3, and R-4 buildings are generally used for residential purposes and include buildings such as dormitories, apartment houses, and assisted living facilities. *See* D.C. Building Code §§310.4-310.6 (2020).

equals or exceeds 50% of the market value of the structure before the improvement or repair is started." *Id.* §6-1451.01(40); *id.* §6-1453.01(a)(5). Critically, the definition of "net-zero-energy standard" states that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building." *Id.* §6-1453.01(a)(3)(B)(iii).[4] That necessarily prohibits the use of gas appliances since they require fuel combustion to function. In this way, the Clean Buildings Act mandates that the Mayor promulgate regulations that ban the use of gas appliances in newly constructed covered buildings or substantial improvements to existing covered buildings by the end of this year.

Second, the Clean Buildings Act provides a backup pathway in the event the Mayor does not act by the December 31, 2026, deadline. In that event, "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z [of the District of Columbia Energy Conservation Code – Commercial Provisions] … ." D.C. Code §6-1453.01(b)(2). Appendix Z, in turn, provides that "[o]n-site combustion of fossil

---

[4] A "net-zero-energy standard" also must require that:

(A)    A building conserves an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z; and

(B)    A building obtains energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z … .

D.C. Code §6-1453.01(a)(3).

9

fuels shall not be permitted for the provision of thermal energy to the building except as specified by the *code official*," D.C. Energy Conservation Code, Appendix Z, §Z3.1. JA184. This second pathway thus results in a similar ban on the use of gas appliances in covered buildings. Therefore, even if the Mayor does not act by the deadline, the Clean Buildings Act will still prohibit the use of gas appliances in newly constructed covered buildings and substantial improvements to existing covered buildings in the District after December 31, 2026.

**B.     Plaintiffs challenge the Clean Buildings Act as preempted under EPCA.**

In October 2024, Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems—filed suit seeking a declaration that the Clean Buildings Act is preempted by EPCA and an injunction against its enforcement. JA34. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, and delivery related to gas and gas infrastructure. JA16-21. In support of their requests for declaratory and injunctive relief, Plaintiffs submitted multiple sworn declarations from their members, all attesting to the extensive harm that the Clean Buildings Act causes to their trades, industries, and jobs. JA37-108. That harm included significant declines in revenue, higher capital expenditures and operational costs, burdensome constraints on energy choice, higher rates for gas, and loss of customers, work, and jobs. JA39, JA42-43, JA47-48, JA51, JA55-56, JA104, JA108.

10

Both Plaintiffs and the District moved for summary judgment on whether EPCA preempted the Clean Buildings Act. JA378. The district court held a hearing on the motions in September 2025, JA296, thereafter taking the motions under advisement. JA359.

### C. The district court grants summary judgment in favor of the District.

The district court agreed with the District and held that EPCA did not preempt the Clean Buildings Act. The district court recognized that the Clean Buildings Act "bans the use of natural-gas appliances in applicable buildings," JA383, but nevertheless held that EPCA preemption did not apply because "EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones," JA396. As the district court explained, it viewed EPCA's preemption provision as being tightly focused on "regulations that govern the design, manufacture, and production of an appliance," JA388, rather than "whether the appliance can be used in a particular context," JA385. And it viewed the Clean Buildings Act as "only regulat[ing] the latter." JA385.

Notably, the district court expressly disagreed with the Ninth Circuit's preemption analysis in *Berkeley* and sided instead with the opinion dissenting from the denial of rehearing en banc in that case. *See* JA389-390 (citing *Berkeley*, 89 F.4th at 1120-23 (Friedland, J., dissenting from denial of rehearing en banc)). The district court also referenced the opinions of a few other district courts that have upheld

11

similar building regulations against EPCA preemption challenges. *See* JA384 (citing *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) (upholding similar Maryland building regulation); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (upholding similar New York state building regulation); *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (upholding similar New York City building regulation)).

Accordingly, the district court granted the District summary judgment and denied Plaintiffs' cross-motion. JA398. This appeal followed. JA399.

## SUMMARY OF ARGUMENT

EPCA's preemption provision sweeps broadly, displacing any state or local regulation "concerning the … energy use" of a covered appliance. 42 U.S.C. §§6297(c), 6316(b)(2)(A). The Clean Buildings Act falls squarely within the scope of that preemption clause. By banning the use of gas appliances in many buildings in the District, the Clean Buildings Act sets the maximum "energy use" of EPCA-covered gas appliances at zero, thus yielding the harshest possible kind of regulation "concerning" the "energy use" of those products.

EPCA's use of the broadening term "concerning"—the equivalent of "relating to" or "respecting"—warrants special emphasis. The Supreme Court has repeatedly

held that such language significantly expands a federal statute's preemptive scope. Thus broadened, EPCA's expansive preemption provision easily reaches laws like the Clean Buildings Act that so strictly regulate the "energy use" of EPCA-covered products.

EPCA's structure, purpose, and history reinforce what its plain text provides. EPCA's building code exception demonstrates that the statute's preemptive scope extends to building-level regulations, including to some rather benign performance-based building codes that ban no appliances and instead set an overall energy-consumption target for an entire building. If EPCA would preempt even those relatively gentle building regulations in the absence of the exception, then surely it preempts the far harsher Clean Buildings Act. Other provisions in EPCA evidence Congress's intent to ensure regulatory uniformity and protect product availability—goals that the Clean Buildings Act directly undermines. And EPCA's statutory history further shows Congress progressively clamping down on state regulatory departures to prevent the patchwork regulatory framework that the Clean Buildings Act would usher in.

Despite all the statutory indicia pointing toward preemption, the district court nevertheless held that EPCA did not preempt the Clean Buildings Act. But it did so only by adopting an overly narrow view of EPCA's preemptive scope—one in which only literal energy conservation standards would be preempted. Congress, however,

deliberately provided for the preemption not only of "energy conservation standards," but rather of all state and local regulations "concerning the … energy use" of covered appliances. Moreover, the district court's conclusion was wrong on its own terms. Even under its cramped view of EPCA, the Clean Buildings Act would still qualify for preemption because it is the most stringent kind of energy conservation standard—one that sets the maximum quantity of "energy use" at zero.

Accordingly, this Court should reverse the district court's judgment, hold that EPCA preempts the Clean Buildings Act, and grant Plaintiffs their requested declaratory and injunctive relief.

## STANDARD OF REVIEW

This appeal turns on the meaning of EPCA. Questions of statutory interpretation are reviewed *de novo*. *United States v. Palmer*, 35 F.4th 841, 848 (D.C. Cir. 2022). And when, as here, the federal statute contains an express preemption provision, no presumption against preemption applies. "[B]ecause the statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause[.]'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Comm. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).

Although this Court has not yet addressed *Franklin*,[5] the vast majority of the circuits that have agree that it eliminates the presumption against preemption in express-preemption cases. *See Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico v. Hernandez*, 58 F.4th 5, 11-12 (1st Cir. 2023); *Air Evac EMS v. Cheatham*, 910 F.3d 751, 761-62 (4th Cir. 2018); *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023); *Ye v. GlobalTranz Enterp., Inc.*, 74 F.4th 453, 465 (7th Cir. 2023), *abrogated on other grounds by Montgomery v. Caribe Transp. II, LLC*, 146 S. Ct. 1199, 1204 (2026); *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025); *Assurance Wireless USA, LP v. Reynolds*, 100 F.4th 1024, 1032 n.4 (9th Cir. 2026); *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023-24 (10th Cir. 2022); *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conserv. Comm'n*, 127 F.4th 1294, 1305 (11th Cir. 2025).[6] Given *Franklin*'s clear language on this matter, that plainly is the right result.

---

[5] Below, the District cited *Sickle v. Torres Advanced Enterprise Solutions, LLC*, 884 F.3d 338 (D.C. Cir. 2018), which post-dates *Franklin*. But neither the parties nor the Court even cited *Franklin* in that case. And the Court merely recited the presumption in the legal-standards section of its opinion before engaging in a full-scale express *and implied* preemption analysis. *Id.* at 346-50. So *Sickle* in no way represents the Court's considered view of how *Franklin* applies in express-preemption cases.

[6] The Second Circuit likewise applies the plain text of express preemption provisions without any presumption against preemption, *Buono v. Tyco Fire Prods, LP*, 78 F.4th 490, 495 (2d Cir. 2023), but it does so only when, as here, the language of the provision is plain and not ambiguous, *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025). Only the Third Circuit has confined *Franklin*

**ARGUMENT**

## I. EPCA preempts the Clean Buildings Act.

All the sources of legislative intent—EPCA's plain text, structure, context, history, and overarching purpose—point toward the same conclusion: that EPCA preempts the Clean Buildings Act. That results in a straightforward preemption analysis that provides a direct path for reversing the district court's contrary holding below.

### A. EPCA's plain text establishes that it preempts the Clean Buildings Act.

EPCA's plain text provides all the Court needs to resolve the preemption question before it. It clearly establishes that the Clean Buildings Act—which prohibits in certain buildings all appliances that use any gas energy whatsoever—is preempted as a local regulation "concerning the … energy use" of EPCA-covered appliances. 42 U.S.C. §6297(c).

#### 1. The Clean Buildings Act "concern[s]" the "energy use" of gas appliances because it sets their maximum energy use at zero.

EPCA's preemption provision broadly provides:

---

to the bankruptcy context. *See Shuker v. Smith & Nephew*, *PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018).

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. §6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** … .

42 U.S.C. §6297(c) (emphases added); *see also* 42 U.S.C. §6316(b)(2)(A) (similarly preempting for industrial appliances "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section").

Examining each of the key terms in that provision, "State regulation" includes laws promulgated by the District. 42 U.S.C. §§6202(4), 6297(a)(2). "Energy" includes "electricity[] or fossil fuels," such as natural gas. 42 U.S.C. §§6291(3), 6311(7). "Energy use" means "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and as "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products, "determined in accordance with test procedures" specified elsewhere in the statute. *Id.* §§6291(4), 6311(4). Those test procedures are designed to measure "energy use … during a representative average use cycle." *Id.* §§6293(b)(3), 6314(a)(2). Lastly, "covered product[s]" for which an "energy conservation standard [has been] established" include a wide variety of appliances—including gas stoves, ovens, heaters, water heaters, and dryers—that are covered by an EPCA energy conservation standard. 42 U.S.C. §§6291(1)-(2), 6292(a); 10 C.F.R.

17

§430.32. Putting that all together, EPCA preempts local laws "concerning" the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—that can be "use[d]" by an EPCA-covered product.

The Clean Buildings Act runs into the teeth of that preemption provision. It has much to say about the "quantity" of "energy" that EPCA's covered gas appliances may "use." Specifically, by banning "[o]n-site fuel combustion," D.C. Code §6-1453.01(a)(3)(B)(iii), the Clean Buildings Act prohibits EPCA-covered gas appliances from using any gas energy whatsoever. Or, stated in terms of an energy conservation standard, the Clean Buildings Act sets the maximum "energy use" of EPCA-covered gas appliances at zero, as it prohibits any appliance that is designed to use more than zero gas energy.

Thus, the Clean Buildings Act straightforwardly qualifies as a regulation "concerning the … energy use" of an EPCA-covered product. 42 U.S.C. §§6297(c), 6316(b)(2)(A). Indeed, it is one of the harshest kinds of such regulations because it does not merely seek to minimize the energy use of gas appliances, but rather prohibits all appliances that use any gas energy whatsoever. *See Champion v. Ames*, 188 U.S. 321, 358 (1903) ("[R]egulation may sometimes … assume the form of

prohibition … .”). That makes this an easy case, as the Clean Buildings Act falls within the heartland of EPCA's preemption provision.[7]

> **2.** **EPCA's preemption provision's use of the broadening term "concerning" confirms that it reaches outright prohibitions like the Clean Buildings Act.**

The broadening effect of the term "concerning" further confirms that EPCA's preemptive scope reaches more than far enough to encompass the Clean Buildings Act. Congress could have employed narrower language—for example, preempting only regulations "of" the energy use of EPCA-covered appliances—but instead chose to preempt all regulations "*concerning* the … energy use" of EPCA-covered appliances. 42 U.S.C. §§6297(c), 6316(b)(2)(A) (emphasis added). That word choice substantially broadens the scope of EPCA preemption. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717, 719 (2018) (recognizing that Congress broadened a statute by specifying "statement respecting" rather than "statement of").

"'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Id.* Those terms mean "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's

---

[7] Similarly, while the Clean Buildings Act most directly concerns the "energy use" of gas appliances, it also concerns their "energy efficiency," in that it bans gas appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas. *See also* §I.C, *infra*.

Law Dictionary 1158 (5th ed. 1979)); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016) (noting that ERISA's "related to" preemption provision preempts any state law that has a "connection with" or "reference to" ERISA plans). "One thing can relate to another even if the connection is 'indirect' [or] … it was 'not specifically designed to affect' it." *Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 146 S. Ct. 1052, 1060 (2026) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," and courts therefore read it "expansively." *Appling*, 584 U.S. at 717. It "express[es] a broad pre-emptive purpose" and yields a "deliberately expansive" preemption provision with "expansive sweep" that is "conspicuous for its breadth." *Morales*, 504 U.S. at 383-84.

The Supreme Court has illustrated the broad reach of these kinds of preemption provisions. In *Rowe v. New Hampshire Motor Transportation Association*, for example, the Supreme Court held that a federal motor-carrier law with a "related to" provision preempted not only state laws that directly regulated motor carriers, but also those state laws with a "less direct" or "indirect" effect on motor carriers. 552 U.S. 364, 370, 372 (2008). Thus, in *Rowe*, it did not matter that the state law at issue there directly regulated only "shippers" and "retailers" rather than "carriers." *Id.* at 371-72. The key was that the state law "produce[d] the very

effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.* Additionally, the Court explained, "to interpret the federal law to permit these, and similar, state [laws]" would produce the very "state regulatory patchwork" that Congress sought to foreclose. *Id.* at 373.

*Rowe*'s holding followed from the Court's prior decision in *Morales*, a case in which various states attempted to enforce consumer-protection laws against certain airline companies for their allegedly misleading advertising on airfares. 504 U.S. at 379. In the states' view, their consumer-protection laws avoided the "related to" preemption provision in the federal Airline Deregulation Act because their laws were of "general applicability" and did not "specifically address[] the airline industry." *Id.* at 386. The Court rejected this argument, observing that the states "ignore[d] the sweep of the 'relating to' language," *id.*, which, as the Court observed earlier, was "wide and inclusive," *id.* at 384. Granted, the Court acknowledged, some state laws may be "too tenuous, remote, or peripheral" to be preempted, but this was not a "borderline" case, so the Court "express[ed] no views about where it would be appropriate to draw the line." *Id.* at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

Applying these teachings in the context of EPCA's preemption provision, the Ninth Circuit explained that, at the very least, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Berkeley*, 89 F.4th at 1103. For example, "a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* Just so. And a local regulation like the Clean Buildings Act that goes a step further to ban any appliances that use more than zero gas energy even more obviously "concern[s]" the "energy use" of EPCA-covered appliances. *See id.* at 1107 ("EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings.").

**B.    EPCA's structure, purpose, and history further confirm that it preempts the Clean Buildings Act.**

The other indicia of congressional intent confirm what the plain text of EPCA's preemption provision already makes clear. EPCA's other provisions, purpose, and history put an exclamation mark on the conclusion that the statute preempts the Clean Buildings Act.

**1. The building code exception establishes that EPCA preempts regulations like the Clean Buildings Act.**

Exceptions to a statute can serve as an "interpretive guide" to the scope of EPCA preemption, *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013), and assist in illuminating the "domain expressly pre-empted," *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). EPCA's limited building code exception establishes that the statute's preemptive scope extends beyond direct regulation of appliances at the time of manufacture. 42 U.S.C. §6297(f). That exception lists seven requirements that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" must meet to avoid preemption. *Id.* §6297(f)(3).

To avoid reading this exception as a nullity, the implication must be that in the absence of this exception, EPCA's preemption provision would otherwise extend to at least some building codes. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus render[s] an entire subparagraph meaningless, this Court has noted, the canon against surplusage applies with special force." (internal quotation marks omitted)). As the Ninth Circuit put it, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the

energy … use' of such products." *Berkeley*, 89 F.4th at 1101.[8] Accordingly, this exception rules out a narrow conception of EPCA preemption that covers only direct regulation of appliances as manufactured. Instead, EPCA preemption must extend to laws like the Clean Buildings Act that operate at the building level as well. Any such building regulation that "concern[s]" the "energy use" of an EPCA-covered product—like a prohibition on appliances with an energy use rating above a specified kBtu/year[9] value—falls to EPCA preemption. The Clean Buildings Act, with its 0 kBtu/year limit on gas appliances, fits that bill.

But that actually undersells the importance of the building code exception. It is not just that EPCA preemption would apply to some building codes but for the exception. Rather, it is that but for the exception, EPCA preemption would apply to some building codes *that meet the seven requirements for the exception*. Consider those seven requirements:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

---

[8] EPCA's preemption provision for industrial appliances similarly provides that a "State or local building code for new construction" can avoid preemption if "the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. §6316(b)(2)(B)(i). The implication is similar—that without the exception, EPCA's preemption provision would extend to reach at least some subset of such building codes.

[9] "kBtu" stands for thousand British thermal units.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title … .

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title … is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard … .

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [the] standard … , there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard … by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

42 U.S.C. §6297(f)(3).

A building code that meets all of those requirements would be rather benign. It would set an "energy consumption or conservation objective for a building" and allow the public the freedom to "select[] items whose combined energy efficiencies meet the objective." *Id.* §6297(f)(3)(A). It would also operate its credit system "on a one-for-one equivalent energy use or equivalent cost basis." *Id.* §6297(f)(3)(C); *see also id.* §6297(f)(3)(F). And perhaps most importantly here, it would not prohibit the use of any product that meets EPCA's energy conservation standards. *See* 42 U.S.C. §§6297(f)(3)(A), (B), (D), (E); *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012) ("Section 6297(f)(3)(B) is violated when the [building] code requires a builder, as a matter of law, to select a particular product or option."). Yet even some flexible, performance-based building codes that meet each of those requirements would be preempted by EPCA in the absence of the building code exception. Otherwise, the exception would be a nullity that serves no purpose. *See Pulsifer*, 601 U.S. at 143.

26

That illustrates the kind of regulations Congress intended EPCA's preemption provision to reach. Performance-based building codes that set building-wide energy consumption targets and do not prohibit any particular EPCA-compliant product still would "concern" the "energy use" of EPCA-covered products in at least some instances by virtue of their regulation of the building's energy use. Again, that is the necessary implication of the building code exception—that EPCA's preemption provision extends at least this far on its face and that only the operation of the exception prevents such building codes from being preempted.

Now compare the Clean Buildings Act to those kinds of flexible building codes. It has no such flexibility. It offers no performance-based credit system that allows the public to choose their path to compliance. And, most importantly, it bans entire classes of EPCA-covered products. If some relatively gentle building codes that meet the seven requirements for the exception would be preempted, then this much harsher form of building regulation must be preempted as well.

### 2. Numerous other EPCA provisions demonstrate that the Clean Buildings Act would imperil the statute's core goals.

The building code exception is not the only provision that sheds light on EPCA's preemptive scope. Multiple other provisions also evidence EPCA's focus on ensuring regulatory uniformity and the availability of covered products for consumer use.

For example, DOE cannot promulgate a new conservation standard if doing

27

so "is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States." 42 U.S.C. §6295(o)(4); *see also id.* §6297(d)(4) (placing a similar limitation on DOE's ability to waive preemption for state regulations).[10] Nor can DOE waive preemption for a state regulation if doing so would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." *Id.* §6297(d)(3). In conducting that analysis, DOE must consider not only the effect of the state regulation at issue, but also "the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have." *Id.* §6297(d)(3)(D).

The Clean Buildings Act imperils what Congress sought to protect. It imposes real and significant financial burdens on local businesses and manufacturers—a consideration expressly spelled out in EPCA's preemption-waiver provision. *See id.* §6297(d)(1)(C)(ii) (directing DOE to consider the "costs, benefits, burdens, and

---

[10] The Senate Report provided an example of how these provisions would work in practice: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." S. Rep. No. 100-6, at 8-9 (1987).

reliability" resulting from the local regulation). More broadly speaking, if bans like the District's are allowed to proliferate, appliance manufacturers would be forced to radically shift or add production lines—by redesigning and retooling them for electric appliances rather than gas ones, for example—in an attempt to accommodate discrete jurisdictions all over the nation. The sale and marketing of gas appliances would, in turn, become increasingly complex and economically burdensome, with no-go zones scattered across the country. *Cf. id.* §6295(o)(2)(B)(i)(I) (directing DOE to evaluate, among other things, the "economic impact of the standards on the manufacturers" to determine whether the standards are "economically justified"). So would the servicing of gas appliances, as consumers in an area where new gas appliances are banned could find themselves hours away from a business that could repair their gas appliances. *Cf. id.* §6297(d)(3) (DOE cannot grant a preemption waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis.").

In short, the Clean Buildings Act is exactly the sort of local regulation that burdens operation of interstate commerce and prevents the uniform regulation that Congress sought to maintain in the appliance industry. If Congress denied that power even to DOE in exercising its core functions of promulgating standards and granting waivers, then surely it also intended to prevent localities from doing the same.

### 3. EPCA's purpose and history further confirm that it preempts the Clean Buildings Act.

EPCA's purpose and history provide yet more confirmation that the Clean Buildings Act is preempted. The several amendments to EPCA over the years, which have progressively clamped down on state regulatory departures and ratcheted up on federal uniformity, further contextualize EPCA's broad preemptive scope. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (observing that, "over time … subsequent acts can shape or focus those meanings" of a statute); *United States v. Burwell*, 122 F.4th 984, 991 (D.C. Cir. 2024) (considering the statute's history, prior amendments, and contemporaneous legislative reports for interpretive guidance). As originally enacted in 1975, EPCA permitted differing state appliance regulations, so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than the federal standard. *See* Pub. L. No. 94-163, §327(b)(2), 89 Stat. 871, 927 (1975). Three years later, Congress added the requirement that states also must obtain a waiver from DOE. *See* Pub. L. No. 95-619, §424, 92 Stat. 3206, 3263-64 (1978). But in the ensuing years, as states frequently sought waivers from EPCA's preemption provision, Congress came to recognize "the problem of a growing patchwork of differing State regulations" across the country that had "increasingly complicate[d] [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). The parochial state regulatory regimes had, according

to federal lawmakers, created "an era of confusion and uncertainty" for appliance manufacturers, who were forced to comply with "numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

Congress fixed this problem of balkanization by amending EPCA to centralize appliance regulation in DOE and strengthen EPCA's preemptive effect, both of which brought needed uniformity to the appliance industry. As a Senate report at the time put it, the overarching purpose of the amendments was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2 (1987). Nationalizing these standards and tightening waiver requirements benefited consumers as well. Rather than subjecting them to a "patchwork" of state regulations, Congress expressly sought to avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class." *Id.*; *see* 42 U.S.C. §§6295(o)(4), 6297(d)(4).

Through these amendments, EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations. Or, in the Ninth Circuit's words, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Berkeley*, 89 F.4th at 1103. Hence EPCA's broadly

phrased preemption clause preempting any "State regulation concerning [covered appliances'] energy efficiency [or] energy use," 42 U.S.C. §§6297(c); 6316(b)(2)(A), along with the stringent requirements for a waiver or exception, *id.* §§6297(d), (f); 6316(b)(2)(D).

The purpose and history of EPCA, in short, reinforce Congress's intent to preempt state regulations concerning appliances' energy use and energy efficiency. And they demonstrate, more specifically, that the Clean Buildings Act is exactly the sort of localized regulation that Congress sought to prevent. If allowed to stand, appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation. S. Rep. No. 100-6, at 4 (1987). Likewise, consumers and builders in all these jurisdictions would have the choice of gas appliances stripped from them, rendering those "covered products" effectively "unavailab[le]." *Id.* at 2. It is clear from EPCA's history and purpose that Congress intended to avoid all of this. That manifest intention bolsters the plain-text analysis discussed above and confirms that EPCA preempts the Clean Buildings Act.

C. **Even without its prohibition on the use of gas appliances, the Clean Buildings Act still would be preempted due to its penalization of the use of gas appliances.**

The Clean Buildings Act's outright prohibition on gas combustion is not the only reason why it is preempted by EPCA. It also "concern[s]" the "energy use" or "energy efficiency" of gas appliances because it caps how much non-renewable

32

energy a building can use and penalizes the use of gas appliances.

Most notably, the Clean Buildings Act requires compliance with the Appendix Z provisions regarding energy conservation. D.C. Code §6-1453.01(a)(3), (b)(2). Appendix Z, in turn, provides that buildings must have a Zero Energy Performance Index ("zEPI"[11]) of 30 or lower as determined by the following equation: zEPI = 50.4 x (EUIp/EUI). D.C. Energy Conservation Code, Appendix Z, §Z2.1.1. In this equation, EUIp is "[t]he annual energy use of the building in source $kBtu/ft^2$, for the proposed design of the building and its site … not taking into account any on-site or off-site renewable energy," and EUI is "[t]he annual energy use of the building in source $kBtu/ft^2$ for a baseline building and its site … not taking into account any on-site or off-site renewable energy." *Id.*

In plainer terms, zEPI effectively caps the amount of non-renewable energy a building can use. And because gas appliances consume natural gas, zEPI caps the amount of energy they can use in covered buildings. Those regulations, therefore, "concern[] the energy use" of EPCA-covered gas appliances because they regulate and restrict the "quantity of energy directly consumed by [these appliances] at their point of use." 42 U.S.C. §§6291(4), 6311(4).

---

[11] Appendix Z defines zEPI as "[a] scale representing the ratio of the energy performance of a proposed design or an existing building compared to the mean energy performance of the building stock from the benchmark year of 2000 … ." D.C. Energy Conservation Code, Appendix Z, §Z1.1. JA182.

The Appendix Z regulations that the Clean Buildings Act imports also concern gas appliances' "energy efficiency"—*i.e.*, "the ratio of the useful output of services from a [consumer or industrial appliance] to the energy use [of the appliance]," *id.* §§6291(5), 6311(3)—because less efficient (but still EPCA-compliant) gas appliances that use more gas energy for the same output necessarily increase a building's zEPI score. Thus, these regulations effectively penalize the use of less efficient gas appliances and reward more efficient gas appliances.

The Clean Buildings Act's adoption of Appendix Z likewise penalizes EPCA-covered gas appliances by requiring that covered buildings be provided with renewable energy "equal to the EUIp on an annual basis." D.C. Energy Conservation Code, Appendix Z, §Z3. JA184. In other words, 100% of the building's energy usage must be covered by renewable energy. Even if that were compatible and feasible with the use of any gas appliances, at the very least such appliances would increase the building's EUIp and therefore require more renewable energy to be provided to the building. That, again, would be a regulation "concerning" the "energy use" and "energy efficiency" of gas appliances, *id.* §§6297(c), 6316(b)(2)(A), and thus would fall within EPCA's preemptive scope.

## II. The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision.

The district court avoided the straightforward conclusion that EPCA preempts the Clean Buildings Act through a series of interpretive errors that ranged from

trying to limit EPCA's preemptive reach to only literal energy conservation standards in direct contravention of the statutory text and history to dismissing the interpretive insights from EPCA's building code exception and waiver provision. These errors thwarted Congress's clearly expressed intent and warrant reversal.

### A. EPCA's preemptive reach extends beyond literal energy conservation standards.

The district court recognized that the Clean Buildings Act "bans the use of natural-gas appliances in applicable buildings." JA383. That would seem to be the start of a short chain of reasoning that leads to the conclusion that EPCA preempts the Clean Buildings Act. Instead, however, the district court claimed that despite its prohibitive effect, the Clean Buildings Act escaped EPCA preemption because it "says nothing about the performance standards the appliances must meet when used elsewhere." JA377. The district court thought that was dispositive because, in its view, "EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones." JA396. But that is not what the statute says.

To be fair, it used to read something close to that. The original 1975 version of EPCA's preemption provision extended to cover only state and local laws that "*provide for … any energy efficiency standard or similar requirement* with respect to energy efficiency or energy use of a covered product." Pub. L. No. 94-163, §327(a)(2), 89 Stat. 871, 926-27 (1975) (emphasis added). Perhaps under that

version there could have been some debate about what qualifies as a "similar requirement." But Congress made that a moot point in 1978 by replacing "similar requirement" with "other requirement respecting energy use or energy efficiency" of a covered product. Pub. L. No. 95-619, §424(b)(2), 92 Stat. 3206, 3264 (1978) (preempting state and local laws "which establish[] an energy efficiency standard or other requirement respecting energy use or energy efficiency of a type (or class) of covered products"). The result—especially given the use of the broadening term "respecting"—was a substantial expansion of EPCA's preemptive scope beyond energy conservation standards and similar requirements. The current version of EPCA's preemption provision, amended in 1987, is yet more expansive. It dispenses even with the reference to energy efficiency standards and instead broadly preempts all state and local laws "concerning the energy efficiency [or] energy use" of covered products. 42 U.S.C. §6297(c).

The district court downplayed the breadth of that sweeping preemption provision and specifically focused on the term "concerning." JA393. Although the district court acknowledged that the term "generally has a broadening effect," JA393 (quoting *Appling*, 584 U.S. at 716-17), it then pivoted to warning against an overly broad conception of the term that would "cover *any* state or local prohibition of appliance use" and preclude "a host of critical regulations—such as fire codes that prevent placement of gas appliances" in certain areas for safety reasons. JA393.

Plaintiffs agree both that "the breadth of EPCA's preemption provision 'does not mean the sky is the limit,'" *Berkeley*, 89 F.4th at 1103 (quoting *Pelkey*, 569 U.S. at 260), and that delimiting the outer bounds of EPCA preemption will involve some edge cases. The problem is that this is not one of them. The Clean Buildings Act is not some targeted provision of a fire code with only incidental or peripheral effects on gas appliances. Rather, it is an outright ban on the use of covered gas appliances in many commercial and residential buildings throughout the District. Because that kind of law falls within the core of EPCA's preemption provision, the Court can and should wait for closer cases to make the tough calls regarding the limits of EPCA preemption. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) ("It is enough for today that wherever that line may be, the statute is surely beyond it.").

In sum, the district court's cramped view of EPCA's preemptive scope cannot be squared with the preemption provision's present broad language and Congress's deliberate move away from a narrower conception of it that was more tethered to energy conservation standards. There simply is no basis for contending that EPCA's preemptive scope encompasses "only laws that impose additional performance standards for appliances on top of federally established ones." JA396. Maybe that view would have been defensible under the original version of EPCA's preemption provision, but it is incompatible with the expansive preemption provision that is on the books today.

**B.     The Clean Buildings Act operates as the most stringent kind of energy conservation standard.**

Even if EPCA preemption were cabined to state and local laws that operate as competing energy conservation standards, the Clean Buildings Act still would qualify for preemption because it does precisely that.

"Energy conservation standard" means "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." 42 U.S.C. §§6291(6), 6311(18). For example, the energy conservation standard for "Gas Standalone Cooking Tops" specifies a "[m]aximum integrated annual energy consumption" of "1,770 kBtu/year." 10 C.F.R. §430.32(j); *see* JA387 (district court referencing the same example). Everyone agrees that the District could not require that those cooking tops instead have a maximum integrated annual energy consumption of, say, 1,000 kBtu/year. That would be a competing energy conservation standard that seeks to directly override DOE's standard. The result would be the same if the District tried to make the standard 100 kBtu/year or even .0001 kBtu/year. Those, too, would be energy conservation standards that both the district court and the District would agree are preempted by EPCA.

Why would the result be different when the District sets the standard at 0 kBtu/year? After all, that is what the Clean Buildings Act does. True, the Clean Buildings Act does not speak in the language of kilowatt-hours, Btus, or any other technical "energy use" measurement. But it nevertheless sets a "maximum quantity

38

of energy use" standard for gas appliances just as a more traditional energy conservation standard would. 42 U.S.C. §§6291(6), 6311(18). By prohibiting gas use entirely, it sets that value at zero. Any gas appliance with an "energy use" of more than 0 kBtu/year is prohibited. That is the harshest possible type of energy conservation standard. Under it, no appliance that is designed and manufactured to use any gas energy may be operated in covered buildings. If that does not "concern" the "energy use" of gas appliances, it is hard to know what would.

Simply put, the District cannot sidestep EPCA by essentially creating a backdoor energy conservation standard that imposes an "energy use" limit of zero for EPCA-covered gas appliances. Otherwise, EPCA preemption would be trivially easy to evade, as localities could effectively set energy conservation standards on EPCA-covered products by banning all products that do not meet their preferred standard. That may not look exactly like a traditional energy conservation standard, but it would operate as one in practice. And EPCA plainly would preempt it. *See Berkeley*, 89 F.4th at 1107 ("States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*.").

Indeed, the Supreme Court has never condoned this kind of maneuvering and manipulation to avoid the dictates of federal law. *See, e.g., Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly

what she is barred from doing directly."). And that has been especially true in preemption cases, where the Supreme Court has rejected attempts by local jurisdictions to evade preemption by moving up or down in a supply chain. *See, e.g.*, *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 652 (2013) ("We have often rejected efforts by States to avoid preemption by shifting their regulatory focus from one company to another in the same supply chain."). It should be no less true in this case, where the District has effectively imposed the strictest kind of energy conservation standard to ban from use an entire class of EPCA-covered appliances.

Notably, the district court essentially recognized this point when it acknowledged that "[t]he inclusion of the term 'concerning' likely closes … a loophole" that would otherwise permit "building codes that smuggle in design-related restrictions." JA393. As an example of the kind of building code EPCA would preempt along these lines, the district court explained that "a building code could provide that all gas appliances consume only a certain amount of energy while switched on in certain buildings." JA393. Yet that is precisely what the Clean Buildings Act does. It "provide[s] that all gas appliances consume only a certain amount of energy while switched on in certain buildings." JA393. That "certain

amount" is zero in covered buildings. With that, the district court's reasoning collapses in on itself and confirms that EPCA preempts the Clean Buildings Act.

### C. The Clean Buildings Act remains preempted regardless of how one reads "energy use" and "point of use."

The district court also focused on the definitions of "energy use" and "point of use," JA386-391, but in doing so it missed the forest for the trees. The key point—which the district court missed—is that the Clean Buildings Act would be preempted under any conceivable definition of those terms. So while Plaintiffs believe they have the better reading of them, it does not ultimately matter to the outcome here. The Clean Buildings Act is preempted either way.

1. Starting with "energy use," the district court and the District read that as a technical term that refers back to the supplied definition: "the quantity of energy directly consumed … at point of use, determined in accordance with test procedures" that measure "energy use … during a representative average use cycle." 42 U.S.C. §§6291(4), 6293(b)(3), 6311(4), 6314(a)(2). That is a factory-floor, static value that can be displayed on the label of a product.

The Clean Buildings Act plainly "concern[s]" gas appliances' "energy use" in that sense. Specifically, it prohibits all gas appliances that have a value greater than 0 kBtu/year on their energy use labels—much like a less harsh energy conservation standard may prohibit gas appliances with an energy use value greater than, say, 100 kBtu/year. In that way, the Clean Buildings Act "concern[s]" how much energy gas

appliances are designed and manufactured to use.

Notably, that conclusion also holds true under a conception of "energy use" that focuses on the actual use of energy in the real world. In truth, there is not all that much daylight between this conception of the term and the more technical one. That, too, is closely linked to real-world usage because the test procedures must measure "energy use … during a representative average use cycle." *Id.* §§6293(b)(3), 6314(a)(2). But, for what it is worth, there is much reason to think that the "energy use" referred to in EPCA's preemption provision means actual use of energy in practice rather than a technical, factory-floor value.

To be sure, EPCA provides a technical definition for "energy use," but the presence of a statutory definition does not foreclose adopting the plain meaning of the term in certain circumstances. As the Supreme Court has recognized, "the presumption of consistent usage 'readily yields' to context, and a statutory term— even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). As cases like *Utility Air Regulatory Group*, 573 U.S. at 320, and *Duke Energy*, 549 U.S. at 574, make clear, that approach is particularly appropriate where a particular term is used in multiple statutory provisions in multiple different senses.

That is the case here. Consider §§6292(b)(1)(B) and 6295(*l*)(1)(B). Those provisions mark the outer bounds of DOE's authority under EPCA, and both employ the term "energy use" to refer to the actual, real-world energy usage of a product rather than a technical, static value. Specifically, §6292(b)(1)(B) permits DOE to classify a product as a covered product if, *inter alia*, the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." 42 U.S.C. §6292(b)(1)(B) (emphasis added). Section 6295(*l*)(1)(B) similarly permits DOE to promulgate energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period." 42 U.S.C. §6295(*l*)(1)(B) (emphasis added). Determining EPCA's preemptive scope involves a similar analysis in that it too looks to demarcate the limits of EPCA's reach. Accordingly, "energy use" in this analogous context should carry the same meaning.[12]

---

[12] In fact, in setting energy conservation standards, DOE itself conducts an Energy Use Analysis, which evaluates end-user consumption data, not test procedure estimates. *See, e.g.*, U.S. Dep't of Energy, Technical Support Document: Energy Efficiency Program for Consumer Products and Commercial and Industrial Equipment: Consumer Conventional Cooking Products §2.6 (Jan. 2024), available at https://perma.cc/52PW-76YK.

The district court dismissed these other uses of "energy use" because those "sections do not refer to the 'performance standard,' 42 U.S.C. §6291(6)(A), associated with 'a covered product,' *id.* §6297(c), as the preemption provision and its associated statutory definitions do." JA395. But that is not what EPCA's preemption provision says. Instead, it preempts "State regulation[s] concerning the energy efficiency [or] energy use … of [a] covered product." 42 U.S.C. §6297(c). As discussed above, previous iterations of that provision referred explicitly to EPCA performance standards, but Congress removed those references when it broadened the reach of the preemption provision that is in effect today. *See supra* §II.A.

In any event, the key point is that the Clean Buildings Act is preempted under either conception of "energy use." Either way, gas appliances cannot use any gas energy whatsoever under the Clean Buildings Act: zero therms, zero Btus, zero anything. Framed in terms of the parties' differing views of the preemption provision, that means both prohibiting all gas appliances that have a figure greater than zero specified on their kBtu/year energy use labels and barring the actual use of any gas appliance in practice. So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the Clean Buildings Act "concern[s]" that "energy use" by dialing back its maximum to nil.

2.      As for "point of use," the disagreement on its meaning matters even less. "Point of use" appears in the definition of "energy use." "Energy use" is defined

44

as "the quantity of energy directly consumed … *at point of use*," as determined in accordance with the test procedures. 42 U.S.C. §6291(4) (emphasis added); *see id.* §6311(4). EPCA does not define "point of use," and "[w]hen a term goes undefined in a statute, we give the term its ordinary meaning." *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (quoting *Taniguchi v. Kan. Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). The plain and ordinary meaning of "point of use" is "the place where or time when a product or service is used," Cambridge English Dictionary Online (2025)[13]; *see Berkeley*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022))). The plain meaning comports with the existence of EPCA's building code exception (where appliances are actually used) and DOE's understanding of the term. *See Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program*, 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) (explaining that the "point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site *where the appliance is operated*" (emphasis added)). Accordingly, the most natural reading of "point of use" here is that it tightens the focus on actual energy use of products in the real world, much like how the provision on the test

---

[13] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

procedures requires that they reflect real-world conditions "during a representative average use cycle." 42 U.S.C. §§6293(b)(3), 6314(a)(2).

The district court instead agreed with Judge Friedland that Congress used the "phrase 'point of use' to 'convey that the "energy use" of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain.'" JA390 (quoting *Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting from denial of rehearing en banc)). Surely Congress would have supplied a definition if it had intended such a technical meaning, and yet one is conspicuously absent here.

The point, however, is that this disagreement on "point of use" is entirely academic. Whether it refers to the place where a product is used or to some technical specification regarding the omission of indirect energy consumption from the energy use value, the Clean Buildings Act would remain a regulation "concerning the … energy use" of EPCA-covered appliances.

3. The district court's confusion on these points is vividly illustrated in its "chips and salsa" hypothetical. The district court posited a "federal law that defines the point of use as restaurants, sets a national tortilla chips-to-salsa ratio of 2 grams for every 3 grams, and preempts states from regulating that ratio." JA390-391. According to the district court such a law would not preempt "a state regulation prohibiting French restaurants from serving chips and salsa … because it would operate in an entirely different regulatory space." JA391. Therefore, the district court

reasoned, EPCA does not preempt the Clean Buildings Act because "the situation is the same." JA391.

But it is not even close to the same. For one, the district court's hypothetical is aimed at "energy efficiency," JA391, whereas Plaintiffs' primary argument concerns "energy use." In that context, a closer analogy would be a federal law that preempts any local regulation "concerning" the food restaurants may serve and a local law that prohibits restaurants from serving chips and salsa and mandates that they serve refried beans instead. That better maps onto the scenario presented here, as EPCA preempts regulations "concerning" the "energy use" of covered appliances and the Clean Buildings Act prohibits some appliances (*i.e.*, those that use gas energy) and effectively mandates others (*i.e.*, those that use electric energy) based on their "energy use." Both make for straightforward cases of preemption, made even clearer by the fact that the purpose of the federal law is, in part, to preserve consumer choice, either in gastronomic options or appliance usage. *See supra* §I.B.2-3.

Hypotheticals aside, the key point remains that under any conceivable definition of "energy use" and "point of use," the Clean Buildings Act is preempted.

**D.    The district court overlooked the interpretive importance of EPCA's building code exception and waiver provision.**

As for the building code exception and waiver provision, the district court essentially wrote them off entirely.

The district court appeared to miss the point of the building code exception. Plaintiffs do not advance the discredited argument the plaintiff did in *Pelkey*—the district court's sole authority on this point, JA394—that "[b]ecause [the law] do[es] not fit within any exception to preemption, … [it] must be preempted." *Pelkey*, 569 U.S. at 264. Rather, the key insight from the building code exception is that EPCA preemption must reach at least some building codes that satisfy all seven of the exception's requirements—or else the exception would serve no purpose. *See supra* §I.B.1.

The district court never quite grasped that point. To be sure, it recognized that "even building codes that *do* concern energy efficiency or use could still be excepted from preemption if they meet one of the tests" for the building code exception. JA394. But the district court never took the next step to ask how its energy conservation-standards-only conception of EPCA preemption could ever encompass building codes at all. Had it done so, the district court would have realized that its narrow view of EPCA preemption could not be squared with EPCA as a whole because, at the very least, EPCA preemption must extend beyond direct, factory-floor regulation of appliances and reach even some rather benign performance-based building codes. *See supra* §I.B.1.

It was much the same with the waiver provision. The district court acknowledged that EPCA prohibits DOE from waiving preemption for local laws

that "will significantly burden the manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." JA394 (quoting 42 U.S.C. §6297(d)(3)). But it then held that cannot mean that the "preemption provision covers *all* laws governing an appliance's entire life cycle in all contexts." JA395. Perhaps not, but that is not Plaintiffs' argument. Rather, the point is that the waiver provision conveys a sense of the broad reach of EPCA's preemption provision and an idea of the kind of state and local laws it was intended to preempt. *See supra* §I.B.2. Laws like the Clean Buildings Act that imperil those important congressional goals so much that Congress denied even DOE the power to waive preemption for them surely cannot escape EPCA's preemptive reach. *See supra* §I.B.2.

**E.** **Plaintiffs did not forfeit their challenge to the Clean Buildings Act's application of Appendix Z to covered buildings.**

Lastly, the district court appeared to misunderstand Plaintiffs' argument regarding the portions of Appendix Z that the Clean Buildings Act applies to covered buildings. *See supra* §I.C. In a footnote, the district court held that "Plaintiffs have forfeited this challenge" because "[on] summary judgment, Plaintiffs for the first time raise the question of whether EPCA also preempts certain provisions of Appendix Z." JA396. Plaintiffs, however, are not mounting a freestanding challenge to Appendix Z, but rather to the Clean Buildings Act's application of certain of its provisions to covered buildings. And there can be no question that Plaintiffs' pleaded claim encompasses the entirety of the Clean Buildings Act. *See* JA13 (stating that

Plaintiffs "seek declaratory and injunctive relief under federal law against enforcement of the Clean Energy DC Building Code Amdendment Act of 2022 … codified at D.C. Code §6-1453.01"); JA34 (praying for "a permanent injunction enjoining Defendant from enforcing or attempting to enforce D.C. Law 24-177"); JA34 (praying "[f]or a declaratory judgment … that D.C. Law 24-177 is preempted by … the federal Energy Policy and Conservation Act").

To be sure, Plaintiffs did not detail the specifics of the Appendix Z aspects of their argument in their complaint, but that kind of pre-briefing and legal theorizing has never been required under the federal pleading standard. *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 904 n.9 (D.C. Cir. 2020) ("[A] plaintiff is not required to include in its complaint every argument that might support its general claims."); *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) ("[C]omplaints need not plead law or match facts to every element of a legal theory." (internal quotation marks omitted)). Rather, Rule 8(a) creates a "liberal notice pleading" standard, and for that reason this Court prefers to adjudicate "cases on their merits rather than on the basis of formalities." *Ciralsky v. CIA*, 355 F.3d 661, 674 (D.C. Cir. 2004).

On the merits, the district court offered the alternative holding that "EPCA does not preempt Appendix Z for the same reasons it does not preempt the Clean Buildings Act." JA396. In doing so, the district court merely imported its flawed reasoning discussed above into this new context. It fails here just as it does

elsewhere. *See supra* §I.C (detailing the reasons why EPCA preempts the Clean Buildings Act's importation of these parts of Appendix Z).

## III. No exception or waiver applies to save the Clean Buildings Act from preemption.

The District has not claimed any waiver of or exception to EPCA preemption. In fact, in its Answer below, the District "admit[ted] that it has not applied for a waiver" from EPCA preemption. JA118, JA162.

The Clean Buildings Act also does not qualify for the building code exception to EPCA preemption because it fails many of the seven requirements. For example, the Clean Buildings Act does not establish an "energy consumption or conservation objective [that] is specified in terms of an estimated total consumption of energy" or "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. §§6297(f)(3)(A), (F).[14] Moreover, the Clean Buildings Act would still be preempted even if it met those seven requirements because EPCA's building code exception applies only to building codes "for new construction," 42 U.S.C.

---

[14] It is much the same for the exception for industrial appliances. To avoid preemption regarding industrial appliances, a state building code for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. §6316(b)(2)(B)(i). The Clean Buildings Act does not meet this requirement because its ban on EPCA-covered gas industrial appliances that use any gas energy whatsoever effectively requires them to have an impossible level of energy efficiency.

§§6297(f)(3), 6316(b)(2)(B), whereas the Clean Buildings Act extends beyond new construction to reach substantial improvements to existing buildings, *see* D.C. Code §§6-1453.01(b)(1).

Therefore, no waiver or exception can save the Clean Buildings Act from preemption.

## IV. Plaintiffs are entitled to declaratory and injunctive relief.

The only question remaining is whether Plaintiffs meet the requirements for declaratory and injunctive relief. They do.

A federal court may grant a declaratory judgment when there is "a case of actual controversy within [its] jurisdiction" that satisfies "Article III's case-or-controversy requirement." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 290 (D.C. Cir. 2022) (quoting 28 U.S.C. §2201(a) and *California v. Texas*, 593 U.S. 659, 672 (2021)). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Plaintiffs meet these basic requirements here. There is a substantial, ongoing controversy between the parties concerning the legality of the Clean Buildings Act.

A declaratory judgment would "serve a useful purpose in clarifying the legal relations in issue" and would "terminate and afford relief from the uncertainty, insecurity, and controversy" that the Clean Buildings Act wreaks on Plaintiffs and their livelihoods. *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (internal quotation marks omitted).

As for injunctive relief, federal courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). To be entitled to permanent injunctive relief, Plaintiffs must show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of those elements.

First, the Clean Buildings Act irreparably harms Plaintiffs. Plaintiffs will experience—and in some cases have already experienced—serious harms. These include lost customers, sales, and revenue; loss of employment; loss of their preferred and cheaper form of energy that allows them to maintain their profitable enterprises; and increased expenses, including as a result of higher gas prices. JA37-

108 (Plaintiffs' declarations chronicling these harms). Even purely economic damages may constitute irreparable harm where, as here, money damages cannot be recovered. *See Ohio v. EPA,* 603 U.S. 279, 291-92 (2024) (holding that incurring significant "nonrecoverable" compliance costs "during the pendency of th[e] litigation" constitutes a "strong argument[]" on "[irreparable] harm[]"); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) (recognizing a "risk of irreparable harm by depriving [landlords] of rent payments with no guarantee of eventual recovery"); *Philip Morris USA Inc. v. Scott,* 561 U.S. 1301, 1304 (2010) (observing that economic harm is irreparable "[i]f expenditures cannot be recouped"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." (emphasis in original)).

Second, there is no adequate remedy at law for Plaintiffs' harms. Plaintiffs' monetary losses cannot be made whole in an action at law against the District because the District has sovereign immunity. *See Simpson v. Colbert*, No. 1:21-cv-00479, 2024 WL 3887393, at *2 (D.D.C. 2024) ("A plaintiff cannot pursue damages from the District of Columbia without an express waiver of sovereign immunity from Congress."). Without an injunction, moreover, Plaintiffs and their members will be denied the right to plan and conduct their lives and businesses unburdened

by the prospect of the enforcement of a preempted law. Money damages would do little to remedy that harm.

The third and fourth factors—the balance of equities and the public interest—merge where, as here, the government is the defendant. *Global Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As noted above, Plaintiffs and their members are suffering, and will continue to suffer, substantial harm. The District, by contrast, will suffer no harm at all. That is because the District has no legitimate interest in enforcing a preempted law. By the same token, there is a substantial public interest in ensuring that federal law is followed, and that unlawful action is ended. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having [the government] abide by the federal laws … ." (internal quotation marks omitted)); *cf. Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (internal quotation marks omitted)).

Thus, Plaintiffs satisfy all four factors for injunctive relief.

## CONCLUSION

For these reasons, Plaintiffs request that the Court reverse the district court's judgment and render judgment in Plaintiffs' favor, enter a declaratory judgment that the Clean Buildings Act is void and unenforceable because it is preempted by EPCA,

and enter a permanent injunction enjoining the District from enforcing or attempting to enforce the Clean Buildings Act. Alternatively, Plaintiffs request that the Court reverse the district court's judgment and remand the case for further proceedings.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ J. Mark Little*
J. Mark Little
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
700 K Street NW
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

Daniel B. Rankin
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

BREDHOFF & KAISER, P.L.L.C.

/s/ *Abigail V. Carter*
Abigail V. Carter
805 15th Street, NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAIDON, MURPHY
& WELCH, P.C.

/s/ *Lauren McDermott*
Lauren McDermott
1920 L Street NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

57

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

*/s/ J. Mark Little*
J. Mark Little

**CERTIFICATE OF SERVICE**

I certify that on June 8, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ *J. Mark Little*
J. Mark Little

# ADDENDUM

# TABLE OF CONTENTS

D.C. Code §6-1451.01 (excerpts) ...................................................................A1

D.C. Code §6-1453.01 ................................................................................A2

D.C. Energy Conservation Code, Appendix Z (excerpts) ......................................A4

42 U.S.C. §6291 (excerpts)..........................................................................A5

42 U.S.C. §6292 ......................................................................................A7

42 U.S.C. §6293 (excerpts).........................................................................A9

42 U.S.C. §6295 (excerpts)........................................................................A10

42 U.S.C. §6297 .....................................................................................A15

42 U.S.C. §6311 (excerpts) .......................................................................A26

42 U.S.C. §6314 (excerpts) .......................................................................A29

42 U.S.C. §6316 (excerpts).........................................................................A30

# D.C. Code §6-1451.01. Definitions

For purposes of this chapter, the term:

…

(33) "New construction" means the construction of any building whether as a stand-alone building or an addition to an existing building. The term "new construction" includes new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building.

…

(40) "Substantial improvement" means any repair, alteration, addition, or improvement of a building or structure, excluding repairs, alterations, additions, or improvements of a building structure made through the Breathe Easy Program, established by §8-1774.17, the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started.

….

# D.C. Code §6-1453.01. Net-zero-energy building code requirements

(a) For the purposes of this section, the term:

(1) "Appendix Z" means Appendix Z of the District of Columbia Energy Conservation Code – Commercial Provisions (12-I [CE] DCMR §Z1 *et seq.*).

(2) "Covered buildings" means all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions (12-I [CE] DCMR §1 et seq.).

(3) "Net-zero-energy standard" means a standard under which:

(A) A building conserves an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z; and

(B) A building obtains energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z; provided, that the following restrictions shall apply:

(i) Renewable energy shall be generated at the building site wherever feasible;

(ii) To the extent a building owner procures renewable energy through offsite sources, the building owner may not rely on unbundled renewable energy credits to satisfy the renewable energy requirement; and

(iii) On-site fuel combustion shall not be permitted for the provision of thermal energy to the building.

(4) "New construction" shall have the same meaning as provided in §6-1451.01(33).

(5) "Substantial improvement" shall have the same meaning as provided in §6-1451.01(40).

(b)

(1) By December 31, 2026, the Mayor, pursuant to subchapter I of Chapter 5 of Title 2, shall issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard.

(2) If the Mayor does not comply with paragraph (1) of this subsection, no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z; except, that nothing in this paragraph shall be construed to prohibit the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety.

(c)

(1) Beginning in 2029, and every 3 years thereafter, the Department of Buildings shall arrange for an independent audit that assesses a representative sample of newly constructed or substantially improved covered buildings that received certificates of occupancy in the District in the preceding 3 years and quantifies the percentage of those covered buildings that comply with the requirements of subsection (b) of this section. The audit shall detail the replicable method used to select a representative sample of covered buildings for the audit.

(2) The Department of Buildings shall submit a complete copy of the audit findings to the Council and the Mayor no later than March 31 of the year following the initiation of the audit.

…

**Zero Energy Performance Index (zEPI).** A scale representing the ratio of the energy performance of a proposed design or an existing building compared to the mean energy performance of the building stock from the benchmark year of 2000 (Commercial Buildings Energy Consumption Survey, US Department of Energy, 2003 Average).

…

**Z2.1.1 Zero Energy Performance Index, zEPI**. Building design shall demonstrate a zEPI of 30 or lower as determined in accordance with Equation 1.

zEPI = 50.4 x (EUIp/EUI) (Equation 1)

Where:

EUIp = The annual energy use of the building in source $kBtu/ft^2$, for the proposed design of the building and its site, calculated in accordance with Section Z2.1.2, not taking into account any onsite or off-site renewable energy.

EUI = The annual energy use of the building in source $kBtu/ft^2$ for a baseline building and its site, calculated in accordance with Section Z2.1.2, not taking into account any on-site or off-site renewable energy.

…

**Z3. RENEWABLE ENERGY.** The building and building site shall be provided with renewable energy equal to the EUIP on an annual basis and calculated in accordance with Section Z2.1.1. Sources of renewable energy shall comply with Sections Z3.1 through Z3.3.

**Z3.1 On-site Combustion.** On-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building except as specified by the *code official.*

….

**§6291. Definitions**

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of title 49) of a type—

> (A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

> (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

> (A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

. . .

(8) The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

(9) The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

. . . .

**§6292. Coverage**

**(a) In general**

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

**(b) Special classification of consumer product**

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

**§6293. Test procedures**

. . .

**(b) Amended and new procedures**

(1) Test procedures.—

. . .

(B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

. . .

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

. . . .

**§6295. Energy conservation standards**

**(a) Purposes**

The purposes of this section are to—

> (1) provide Federal energy conservation standards applicable to covered products; and

> (2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

. . .

**(*l*) Standards for other covered products**

> (1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in subsections (o) and (p) are met and the Secretary determines that—

>> (A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt hours (or its Btu equivalent) for any 12-month period ending before such determination;

>> (B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

>> (C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

>> (D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

. . .

**(*o*) Criteria for prescribing new or amended standards**

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

(2)

(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)

(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that

the establishment of such standard is not technologically feasible or economically justified.

> For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

. . .

**(q) Special rule for certain types or classes of products**

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

> (A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

> (B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

>> In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

. . . .

**§6297. Effect on other law**

**(a) Preemption of testing and labeling requirements**

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)

(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or

faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)

    (A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

    (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324; adopted by the California Energy Commission before January 1, 2005; or

(8)

    (A) is a regulation concerning standards for pedestrian adopted by the California Energy Commission before January 1, 2005; or

    (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

    (A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

        (i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

        (ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

**(d) Waiver of Federal preemption**

(1)

(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin

A19

commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction-

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

A21

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

**(e) Exception for certain State procurement standards**

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

**(f) Exception for certain building code requirements**

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation

standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

> (A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

> (B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5), whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

> (B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

> (C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)

(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

**(g) No warranty**

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

**§6311. Definitions**

For purposes of this part—

(1) The term "covered equipment" means one of the following types of industrial equipment:

(A) Electric motors and pumps.

(B) Small commercial package air conditioning and heating equipment.

(C) Large commercial package air conditioning and heating equipment.

(D) Very large commercial package air conditioning and heating equipment.

(E) Commercial refrigerators, freezers, and refrigerator-freezers.

(F) Automatic commercial ice makers.

(G) Walk-in coolers and walk-in freezers.

(H) Commercial clothes washers.

(I) Packaged terminal air-conditioners and packaged terminal heat pumps.

(J) Warm air furnaces and packaged boilers.

(K) Storage water heaters, instantaneous water heaters, and unfired hot water storage tanks.

(L) Any other type of industrial equipment which the Secretary classifies as covered equipment under section 6312(b) of this title.

(2)

(A) The term "industrial equipment" means any article of equipment referred to in subparagraph (B) of a type—

(i) which in operation consumes, or is designed to consume, energy;

(ii) which, to any significant extent, is distributed in commerce for industrial or commercial use; and

(iii) which is not a "covered product" as defined in section 6291(a)(2) of this title, other than a component of a covered product with respect to which there is in effect a determination under section 6312(c) of this title;

without regard to whether such article is in fact distributed in commerce for industrial or commercial use.

(B) The types of equipment referred to in this subparagraph (in addition to electric motors and pumps, commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, packaged terminal air conditioners, packaged terminal heat pumps, warm air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks) are as follows:

(i) compressors;

(ii) fans;

(iii) blowers;

(iv) refrigeration equipment;

(v) electric lights and lighting power supply circuits;

(vi) electrolytic equipment;

(vii) electric arc equipment;

(viii) steam boilers;

(ix) ovens;

(x) kilns;

(xi) evaporators;

(xii) dryers; and

(xiii) other motors.

(3) The term "energy efficiency" means the ratio of the useful output of services from an article of industrial equipment to the energy use by such article, determined in accordance with test procedures under section 6314 of this title.

(4) The term "energy use" means the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314 of this title.

…

(7) The terms "energy", "manufacture", "import", "importation", "consumer product", "distribute in commerce", "distribution in commerce", and "commerce" have the same meaning as is given such terms in section 6291 of this title.

…

(18) The term "energy conservation standard" means—

    (A) a performance standard that prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a product; or

    (B) a design requirement for a product.

…

# 42 U.S.C. §6314

## (a) Prescription by Secretary; requirements

(1) Test procedures.—

…

(2) Test procedures prescribed in accordance with this section shall be reasonably designed to produce test results which reflect energy efficiency, energy use, and estimated operating costs of a type of industrial equipment (or class thereof) during a representative average use cycle (as determined by the Secretary) and shall not be unduly burdensome to conduct.

….

**§6316. Administration, penalties, enforcement, and preemption**

(a) The provisions of section 6296(a), (b), and (d) of this title, the provisions of subsections (l) through (s) of section 6295 of this title, and section 1 6297 through 6306 of this title shall apply with respect to this part (other than the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title) to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of this part

(1) references to sections 6293, 6294, and 6295 of this title shall be considered as references to sections 6314, 6315, and 6313 of this title, respectively;

(2) references to "this part" shall be treated as referring to part A-1;

(3) the term "equipment" shall be substituted for the term "product";

(4) the term "Secretary" shall be substituted for "Commission" each place it appears (other than in section 6303(c) of title);

(5) section 6297(a) of this title shall be applied, in the case of electric motors, as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 1992;

(6) section 6297(b)(1) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if the National Appliance Energy Conservation Amendments of 1988 were the Energy Policy Act of 1992;

(7) section 6297(b)(4) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if paragraph (5) of section 6295(g) of this title were section 6313 of this title;

(8) notwithstanding any other provision of law, a regulation or other requirement adopted by a State or subdivision of a State contained in a State or local building code for new construction concerning the energy efficiency or energy use of an electric motor covered under this part is not superseded by the standards for such electric motor established or prescribed under section 6313(b) of this title if such regulation or requirement is identical to the standards established or prescribed under such section;

(9) in the case of commercial clothes washers, section 6297(b)(1) of this title shall be applied as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 2005; and

(10) section 6297 of this title shall apply with respect to the equipment described in section 6311(1)(L) of this title beginning on the date on which a final rule establishing an energy conservation standard is issued by the Secretary, except that any State or local standard prescribed or enacted for the equipment before the date on which the final rule is issued shall not be preempted until the energy conservation standard established by the Secretary for the equipment takes effect.

(b)

(1) The provisions of section 6295(p)(4) of this title, section 6296(a), (b), and (d) of this title, section 6297(a) of this title, and sections 6298 through 6306 of this title shall apply with respect to the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of such equipment, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)

(A) A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

(B) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction if—

(i) the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1; and

(ii) the standard in the building code does not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1.

(C) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede the standards established by the State of California set forth in Table C-6, California Code of Regulations, Title 24, Part 2, Chapter 2-53, for water-source heat pumps below 135,000 Btu per hour (cooling capacity) that become effective on January 1, 1993.

(D) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a State regulation which has been granted a waiver by the Secretary. The Secretary may grant a waiver pursuant to the terms, conditions, criteria, procedures, and other requirements specified in section 6297(d) of this title.

(c) With respect to any electric motor to which standards are applicable under section 6313(b) of this title, the Secretary shall require manufacturers to certify, through an independent testing or certification program nationally recognized in the United States, that such motor meets the applicable standard.

(d)

(1) Except as provided in paragraphs (2) and (3), section 6297 of this title shall apply with respect to very large commercial package air conditioning and heating equipment to the same extent and in the same manner as section 6297 of this title applies under part A on August 8, 2005.

(2) Any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(a)(9) of this title take effect on January 1, 2010.

(e)

(1)

(A) Subsections (a), (b), and (d) of section 6296 of this title, subsections (m) through (s) of section 6295 of this title, and sections 6298 through 6306 of this title shall apply with respect to commercial refrigerators,

freezers, and refrigerator-freezers to the same extent and in the same manner as those provisions apply under part A.

(B) In applying those provisions to commercial refrigerators, freezers, and refrigerator-freezers, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)

(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under paragraphs (2) and (3) of section 6313(c) of this title to the same extent and in the same manner as those provisions apply under part A on August 8, 2005, except that any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under paragraphs (2) and (3) of section 6313(c) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)

(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under section 6313(c)(4) of this title to the same extent and in the same manner as the provisions apply under part A on the date of publication of the final rule by the Secretary, except that any State or local standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(4)

(A) If the Secretary does not issue a final rule for a specific type of commercial refrigerator, freezer, or refrigerator-freezer within the time frame specified in section 6313(c)(5) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to that specific type

of refrigerator, freezer, or refrigerator-freezer for the period beginning on the date that is 2 years after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of refrigerator, freezer, or refrigerator-freezer.

(B) Any State or local standard issued before the date of publication of the final rule shall not be preempted until the final rule takes effect.

(5)

(A) In the case of any commercial refrigerator, freezer, or refrigerator-freezer to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the Secretary shall require manufacturers to certify, through an independent, nationally recognized testing or certification program, that the commercial refrigerator, freezer, or refrigerator-freezer meets the applicable standard.

(B) The Secretary shall, to the maximum extent practicable, encourage the establishment of at least 2 independent testing and certification programs.

(C) As part of certification, information on equipment energy use and interior volume shall be made available to the Secretary.

(f)

(1)

(A)

(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(1) of this title to the same extent and in the same manner as the section applies under part A on August 8, 2005.

(ii) Any State standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(d)(1) of this title take effect.

(B) In applying section 6297 of this title to the equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2)

(A)

(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(2) of this title to the same extent and in the same manner as the section applies under part A on the date of publication of the final rule by the Secretary.

(ii) Any State standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards established under section 6313(d)(2) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)

(A) If the Secretary does not issue a final rule for a specific type of automatic commercial ice maker within the time frame specified in section 6313(d) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of automatic commercial ice maker for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of automatic commercial ice maker.

(B) Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(4)

(A) The Secretary shall monitor whether manufacturers are reducing harvest rates below tested values for the purpose of bringing non-complying equipment into compliance.

(B) If the Secretary finds that there has been a substantial amount of manipulation with respect to harvest rates under subparagraph (A), the Secretary shall take steps to minimize the manipulation, such as requiring harvest rates to be within 5 percent of tested values.

(g)

(1)

(A) If the Secretary does not issue a final rule for commercial clothes washers within the timeframe specified in section 6313(e)(2) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to commercial clothes washers for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering commercial clothes washers.

(B) Any State or local standard issued before the date on which the Secretary publishes a final rule shall not be preempted until the standards established under section 6313(e)(2) of this title take effect.

(2) The Secretary shall undertake an educational program to inform owners of laundromats, multifamily housing, and other sites where commercial clothes washers are located about the new standard, including impacts on washer purchase costs and options for recovering those costs through coin collection.

….