# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,

*Appellants*,

*v.*

DISTRICT OF COLUMBIA,

*Appellee*.

On Appeal from the U.S. District Court for the
District of Columbia, No. 1:24-CV-02942-ACR

## JOINT APPENDIX

Bryan Leitch
Ashwin P. Phatak
Carl James Schifferle
Caroline S. Van Zile
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 6th St., NW
Washington, D.C. 20001
(202) 727-3400
bryan.leitch@dc.gov
ashwin.phatak@dc.gov
carl.schifferle@dc.gov
caroline.vanzile@dc.gov

*Counsel for Appellee*

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

*Additional counsel listed on next page*

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

Abigail V. Carter
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

Lauren McDermott
MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.
1920 L Street NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**CERTIFICATE OF SERVICE**

I certify that on June 8, 2026, this document was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little

# TABLE OF CONTENTS

Docket Sheet ..................................................................................JA1

Complaint [dkt 1] ...........................................................................JA12

    Exhibit 1: Declaration of Perry McGuire [dkt 1-1] ..................JA37

    Exhibit 2: Declaration of Angelo Amador [dkt 1-2]................JA40

    Exhibit 3: Declaration of Nicole Upano [dkt 1-3]...................JA45

    Exhibit 4: Declaration of Lori Graf [dkt 1-4]..........................JA49

    Exhibit 5: Declaration of Donald "Blue" Jenkins [dkt 1-5] .....JA53

    Exhibit 6: Declaration of Ryan Boyer [dkt 1-6] ....................JA102

    Exhibit 7: Declaration of Wilder Reed [dkt 1-7]...................JA106

District of Columbia's Answer [dkt 18]........................................JA109

Transcript of Pre-Motion Conference Held on January 29, 2025.....................JA121

Plaintiffs' Statement of Material Facts Not in Dispute [dkt 26-1]....................JA156

Plaintiffs' Exhibit Index to Motion for Summary Judgment [dkt 26-2]...........JA161

District of Columbia's Counter-Statement of Disputed Facts [dkt 29-1]........................................................................JA162

District of Columbia Exhibit Index to Cross-Motion for Summary Judgment [dkt 29-2] .....................................................JA169

    Exhibit 1: D.C. Act 24-528, Enrolled Original [dkt. 29-3] ...................JA171

    Exhibit 4 (relevant excerpts): Construction Codes Coordinating Board Minutes [dkt. 29-6] ....................................................JA176

    Exhibit 5: Appendix Z to the Energy Conservation Code (2017) [dkt. 29-7] ........................................................................JA179

    Exhibit 6: Appendix Z to the Energy Conservation Code (2023) [dkt. 29-8] ........................................................................JA186

Exhibit 7 (relevant excerpts): National Research Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report* (2009) [dkt. 29-9] .......................... JA195

Exhibit 8 (relevant excerpts): David Santanna Ortiz & Mark Allen Bernstein, RAND, Measures of Residential Energy Consumption and Their Relationships to DOE Policy (1999) [dkt 29-10] ...................................................................................... JA217

Exhibit 9: American Public Gas Association, Comments (Apr. 30, 2014) [dkt 29-11] ........................................................................ JA245

Exhibit 10: National Association of Home Builders, Comments (Oct. 19, 2010) [dkt 29-12] ............................................................... JA250

Exhibit 11 (relevant excerpts): American Gas Association, Comments (Oct. 19, 2010) [dkt 29-13] .................................................. JA254

Exhibit 12 (relevant excerpts): U.S. Department of Energy, A Common Definition of Zero Energy Buildings [dkt 29-14] ................... JA258

Exhibit 13 (relevant excerpts): Public Service Commission Order No. 19396 [dkt 29-15] ...................................................................... JA263

Exhibit 14 (relevant excerpts): Washington Gas Light Company, Comments (Feb. 21, 2023) [dkt 29-16] ............................................... JA269

District of Columbia's Statement of Undisputed Material Facts [dkt 30-1]............................................................................................... JA273

Plaintiffs' Counter-Statement of Undisputed Facts [dkt 38-1] ......................... JA276

Exhibit 15 (relevant excerpts): Washington Gas's 15-Year Plan [dkt 45-1]................................................................................................ JA280

Transcript of Summary Judgment Hearing Held on September 25, 2025.................................................................................. JA296

Memorandum Opinion and Order [dkt 48]................................................... JA377

Notice of Appeal [dkt 49] ........................................................................... JA399

APPEAL,TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:24−cv−02942−ACR

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES et al v. DISTRICT OF COLUMBIA
Assigned to: Judge Ana C. Reyes
Cause: 28:2201 Declaratory Judgment (aliens and nationality)

Date Filed: 10/17/2024
Jury Demand: Defendant
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES**

represented by **Jonathan Mark Little**
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
713−229−1489
Email: mark.little@bakerbotts.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Scott Novak , Jr**
BAKER BOTTS, LLP
700 K St NW
Washington, DC 20001
202−304−5099
Email: scott.novak@bakerbotts.com
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
BAKER BOTTS LLP
101 California Street
Suite 3200
San Francisco, CA 94111
202−639−1308
Email: megan.berge@bakerbotts.com
*TERMINATED: 01/31/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RESTAURANT LAW CENTER**

represented by **Jonathan Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Scott Novak , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**

1

JA001

(See above for address)
*TERMINATED: 01/31/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL APARTMENT ASSOCIATION**     represented by     **Jonathan Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Scott Novak , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
(See above for address)
*TERMINATED: 01/31/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARYLAND BUILDING INDUSTRY ASSOCIATION**     represented by     **Jonathan Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Scott Novak , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
(See above for address)
*TERMINATED: 01/31/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WASHINGTON GAS LIGHT COMPANY**     represented by     **Jonathan Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Scott Novak , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
(See above for address)
*TERMINATED: 01/31/2025*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

2

JA002

| | | |
|---|---|---|
| **PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL** | represented by | **Abigail V. Carter**<br>BREDHOFF & KAISER P.L.L.C.<br>805 15th Street, NW<br>Suite 1000<br>Washington DC, DC 20005<br>202−842−2600<br>Email: acarter@bredhoff.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Megan H. Berge**<br>(See above for address)<br>*TERMINATED: 01/31/2025*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **TEAMSTERS LOCAL 96** | represented by | **Megan H. Berge**<br>(See above for address)<br>*TERMINATED: 01/31/2025*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA** | represented by | **Adam J. Tuetken**<br>OFFICE OF ATTORNEY GENERAL/DC<br>400 6th Street, NW<br>Suite 8100<br>Washington, DC 20001<br>(202) 735−7474<br>Fax: (202) 741−0649<br>Email: adam.tuetken@dc.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **AMERICAN GAS ASSOCIATION** | represented by | **Gary A. Wilson**<br>POST & SCHELL, P.C.<br>607 14th Street NW<br>Suite 600<br>Washington, DC 20005−2006<br>202−661−6956<br>Fax: 202−661−6977<br>Email: GWilson@postschell.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **PUBLIC HEALTH LAW CENTER** | represented by | **Daniel Nathan Carpenter−Gold**<br>PUBLIC HEALTH LAW CENTER |

JA003

Climate Justice
875 Summit Avenue
Saint Paul, MN 90095
651−290−6329
Email: daniel.carpentergold@mitchellhamlir
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michelle Amelia Newman Fein**
50 W Broadway
Suite 333
Pmb 49891
Salt Lake City, UT 84101
610−761−7643
Email: michelle@fein.law
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**SIERRA CLUB**                represented by  **Timothy Oberleiton**
EARTHJUSTICE
1250 I St. NW
Fourth Floor
Washington, DC 20005
202−667−4500
Email: toberleiton@earthjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**CHESAPEAKE CLIMATE ACTION NETWORK**    represented by  **Timothy Oberleiton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/17/2024 | 1 | COMPLAINT against DISTRICT OF COLUMBIA ( Filing fee $ 405 receipt number ADCDC−11240106) filed by PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, NATIONAL APARTMENT ASSOCIATION, TEAMSTERS LOCAL 96, RESTAURANT LAW CENTER, MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, WASHINGTON GAS LIGHT COMPANY. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Civil Cover Sheet, # 9 Summons 1, # 10 Summons 2)(Berge, Megan) (Entered: 10/17/2024) |
| 10/18/2024 | 2 | Case Assigned to Judge Ana C. Reyes. (znmw) (Entered: 10/18/2024) |
| 10/18/2024 | 3 | SUMMONS (2) Issued Electronically as to DISTRICT OF COLUMBIA, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachments: # 1 |

4

JA004

| | | Notice and Consent)(znmw) (Entered: 10/18/2024) |
|---|---|---|
| 10/18/2024 | 4 | NOTICE *of Errata* by MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, RESTAURANT LAW CENTER, TEAMSTERS LOCAL 96, WASHINGTON GAS LIGHT COMPANY re 1 Complaint,, (Attachments: # 1 Errata Complaint)(Berge, Megan) (Entered: 10/18/2024) |
| 10/21/2024 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MARYLAND BUILDING INDUSTRY ASSOCIATION (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 6 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL APARTMENT ASSOCIATION (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 7 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 8 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by WASHINGTON GAS LIGHT COMPANY (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 10/21/2024. Answer due for ALL D.C. DEFENDANTS by 11/11/2024. (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on the Mayor of the District of Columbia. Date of Service Upon the Mayor for the District of Columbia on 10/21/2024. (Berge, Megan) (Entered: 10/21/2024) |
| 10/21/2024 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by RESTAURANT LAW CENTER (Berge, Megan) (Entered: 10/21/2024) |
| 10/30/2024 | 12 | NOTICE of Appearance by Adam J. Tuetken on behalf of DISTRICT OF COLUMBIA (Tuetken, Adam) (Entered: 10/30/2024) |
| 11/08/2024 | 13 | NOTICE of Appearance by Ronald Scott Novak, Jr on behalf of NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, TEAMSTERS LOCAL 96 (Novak, Ronald) (Entered: 11/08/2024) |
| 11/08/2024 | 14 | Joint MOTION for Extension of Time to File Answer re 1 Complaint,, , Joint MOTION Set Deadlines by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Tuetken, Adam) (Entered: 11/08/2024) |
| 11/12/2024 | 15 | STANDING ORDER. The Court hereby ORDERS the parties to comply with its Standing Order. See Standing Order for details. Signed by Judge Ana C. Reyes on 11/12/2024. (lcacr2) (Entered: 11/12/2024) |

| 11/12/2024 | | MINUTE ORDER. Upon consideration of the parties' 14 Joint Motion to Set Deadlines, the Court GRANTS it in part and DENIES it in part. The Court ORDERS Defendant to respond to Plaintiffs' 1 Complaint on or before December 10, 2024. The Court further ORDERS the parties to comply with the pre−motion notice requirement described in Section 7(f) of the Court's 15 Standing Order. Further filings should conform to the Court's procedures and rules. Signed by Judge Ana C. Reyes on 11/12/2024. (lcacr2) (Entered: 11/12/2024) |
|---|---|---|
| 11/14/2024 | | Set/Reset Deadlines/Hearings: Response to Complaint due by 12/10/2024. (zcdw) (Entered: 11/14/2024) |
| 11/22/2024 | 16 | NOTICE of Appearance by Megan H. Berge on behalf of NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY (Berge, Megan) (Entered: 11/22/2024) |
| 12/06/2024 | 17 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− J. Mark Little, Filing fee $ 100, receipt number ADCDC−11341542. Fee Status: Fee Paid. by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY. (Attachments: # 1 Exhibit PHV Declaration and Attorney Certification, # 2 Exhibit Certificates of Good Standing, # 3 Text of Proposed Order)(Novak, Ronald) (Entered: 12/06/2024) |
| 12/09/2024 | | MINUTE ORDER granting 17 Motion for Leave to Appear Pro Hac Vice. Attorney J. Mark Little is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Ana C. Reyes on 12/09/2024. (lcacr2) (Entered: 12/09/2024) |
| 12/10/2024 | 18 | ANSWER to Complaint with Jury Demand by DISTRICT OF COLUMBIA.(Tuetken, Adam) (Entered: 12/10/2024) |
| 12/10/2024 | 19 | NOTICE *of Anticipated Dispositive Motion* by DISTRICT OF COLUMBIA (Tuetken, Adam) (Entered: 12/10/2024) |
| 12/11/2024 | 20 | NOTICE of Appearance by Jonathan Mark Little on behalf of NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY (Little, Jonathan) (Entered: 12/11/2024) |
| 12/17/2024 | 21 | NOTICE *of Plaintiffs' Anticipated Cross−Motion for Summary Judgment and Request for Pre−Motion Conference* by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, TEAMSTERS LOCAL 96 re 19 Notice (Other) (Novak, Ronald) (Entered: 12/17/2024) |
| 12/30/2024 | | NOTICE of Hearing: Pre−motion Conference set for 1/16/2025 at 2:00 PM in Courtroom 12 before Judge Ana C. Reyes. (zcdw) (Entered: 12/30/2024) |

JA006

| | | |
|---|---|---|
| 01/17/2025 | | NOTICE of Hearing: Pre−motion Conference reset for 1/29/2025 at 3:00 PM in Courtroom 12 before Judge Ana C. Reyes. (zcdw) (Entered: 01/17/2025) |
| 01/29/2025 | | Minute Entry for Pre−Motion Conference proceedings held on 1/29/2025 before Judge Ana C. Reyes. DISTRICT OF COLUMBIA will look into issues related to standing. Status Report due by 2/19/2025. (Court Reporter Christine Asif.) (zdrf) (Entered: 01/29/2025) |
| 01/31/2025 | 22 | NOTICE OF WITHDRAWAL OF APPEARANCE as to NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, TEAMSTERS LOCAL 96. Attorney Megan H. Berge terminated. (Novak, Ronald) (Entered: 01/31/2025) |
| 02/19/2025 | 23 | Joint STATUS REPORT by DISTRICT OF COLUMBIA. (Tuetken, Adam) (Entered: 02/19/2025) |
| 02/20/2025 | | MINUTE ORDER. Upon consideration of the 23 Joint Status Report, the Court ORDERS the parties to submit another Joint Status Report on or before February 26, 2025. Signed by Judge Ana C. Reyes on 02/20/2025. (lcacr2) (Entered: 02/20/2025) |
| 02/26/2025 | 24 | Joint STATUS REPORT by DISTRICT OF COLUMBIA. (Tuetken, Adam) (Entered: 02/26/2025) |
| 02/27/2025 | | MINUTE ORDER. Upon consideration of the parties' 24 Joint Status Report, the Court ORDERS the following briefing schedule for the parties' cross−motions for summary judgment: <br><br> 1. Plaintiffs shall file their Motion for Summary Judgment on or before April 9, 2025; <br><br> 2. Defendant shall file its Combined Opposition to Plaintiffs' Motion and Cross−Motion for Summary Judgment on or before May 21, 2025; <br><br> 3. Plaintiffs shall file their Combined Reply in Support of their Motion and Opposition to Defendant's Cross−Motion on or before June 18, 2025; <br><br> 4. Defendant shall file its Reply in Support of its Motion on or before July 16, 2025. <br><br> Signed by Judge Ana C. Reyes on 02/27/2025. (lcacr2) (Entered: 02/27/2025) |
| 04/01/2025 | 25 | Consent MOTION to Modify *Briefing Schedule* by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, TEAMSTERS LOCAL 96. (Attachments: # 1 Text of Proposed Order)(Little, Jonathan) (Entered: 04/01/2025) |
| 04/03/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 25 Consent Motion to Modify Deadlines, the Court GRANTS the Motion and ORDERS the following revised briefing schedule for the parties' cross−motions for summary judgment: <br><br> 1. Plaintiffs shall file their Motion for Summary Judgment on or before April 16, 2025; |

| | | |
|---|---|---|
| | | 2. Defendant shall file its Combined Opposition to Plaintiffs' Motion and Cross−Motion for Summary Judgment on or before May 28, 2025;<br><br>3. Plaintiffs shall file their Combined Reply in Support of their Motion and Opposition to Defendant's Cross−Motion on or before June 25, 2025;<br><br>4. Defendant shall file its Reply in Support of its Motion on or before July 23, 2025.<br><br>Signed by Judge Ana C. Reyes on 04/03/2025. (lcacr2) (Entered: 04/03/2025) |
| 04/07/2025 | | Set/Reset Deadlines/Hearings: Plaintiff's Summary Judgment motion due by 4/16/2025. Response to Motion for Summary Judgment due by 5/28/2025. Reply to Motion for Summary Judgment due by 6/25/2025. Cross Motion due by 5/28/2025. Response to Cross Motion due by 6/25/2025. Reply to Cross Motion due by 7/23/2025. (zcdw) (Entered: 04/07/2025) |
| 04/16/2025 | 26 | MOTION for Summary Judgment , MOTION for Declaratory Judgment , MOTION for Permanent Injunction by MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, RESTAURANT LAW CENTER, TEAMSTERS LOCAL 96, WASHINGTON GAS LIGHT COMPANY. (Attachments: # 1 Statement of Facts Statement Of Material Facts Not In Dispute, # 2 Exhibit Exhibit Index, # 3 Exhibit Exhibit 1 − D.C. Law 24−177, # 4 Exhibit Exhibit 2− Complaint, # 5 Exhibit Exhibit 3 − Declaration of Perry McGuire, # 6 Exhibit Exhibit 4 − Declaration of Angelo Amador, # 7 Exhibit Exhibit 5 − Declaration of Nicole Upano, # 8 Exhibit Exhibit 6 − Declaration of Lori Graf, # 9 Exhibit Exhibit 7 − Declaration of Donald "Blue" Jenkins, # 10 Exhibit Exhibit 8 − Declaration of Ryan Boyer, # 11 Exhibit Exhibit 9 − Declaration of Wilder Reed)(Little, Jonathan) (Entered: 04/16/2025) |
| 05/15/2025 | 27 | ENTERED IN ERROR.....MOTION for Leave to File Amicus Brief*In Support of Plaintiffs* by NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES. (Wilson, Gary) Modified on 5/15/2025, Counsel will refile (mg). (Entered: 05/15/2025) |
| 05/15/2025 | 28 | MOTION for Leave to File Amicus Brief*IN SUPPORT OF PLAINTIFFS* by AMERICAN GAS ASSOCIATION. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Wilson, Gary) (Entered: 05/15/2025) |
| 05/28/2025 | 29 | Memorandum in opposition to re 26 MOTION for Summary Judgment MOTION for Declaratory Judgment MOTION for Permanent Injunction filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Statement of Facts Response to Plaintiffs' Facts, # 2 Exhibit List, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Text of Proposed Order)(Tuetken, Adam) (Entered: 05/28/2025) |
| 05/28/2025 | 30 | MOTION for Summary Judgment by DISTRICT OF COLUMBIA. (Attachments: # 1 Statement of Facts, # 2 Exhibit List, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Text of Proposed Order)(Tuetken, Adam) (Entered: 05/28/2025) |

8

| 05/30/2025 | 31 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel Carpenter−Gold, Filing fee $ 100, receipt number ADCDC−11724014. Fee Status: Fee Paid. by PUBLIC INTEREST LAW CENTER. (Attachments: # 1 Declaration Ex 1 − PHV Decl of Daniel Carpenter−Gold, # 2 Exhibit 2 − Daniel Carpenter−Gold Cert of Good Standing, # 3 Text of Proposed Order)(Fein, Michelle) (Entered: 05/30/2025) |
| 06/03/2025 | | MINUTE ORDER granting 31 Motion for Leave to Appear Pro Hac Vice. Attorney Daniel Carpenter−Gold is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 06/03/2025. (lcacr2) (Entered: 06/03/2025) |
| 06/04/2025 | 32 | NOTICE of Appearance by Timothy Oberleiton on behalf of SIERRA CLUB, CHESAPEAKE CLIMATE ACTION NETWORK (Oberleiton, Timothy) (Entered: 06/04/2025) |
| 06/04/2025 | 33 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SIERRA CLUB (Oberleiton, Timothy) (Entered: 06/04/2025) |
| 06/04/2025 | 34 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHESAPEAKE CLIMATE ACTION NETWORK (Oberleiton, Timothy) (Entered: 06/04/2025) |
| 06/04/2025 | 35 | MOTION for Leave to File Amicus Brief by CHESAPEAKE CLIMATE ACTION NETWORK, SIERRA CLUB. (Attachments: # 1 Proposed Amicus Brief, # 2 Proposed Order)(Oberleiton, Timothy) (Entered: 06/04/2025) |
| 06/04/2025 | 36 | NOTICE of Appearance by Daniel Nathan Carpenter−Gold on behalf of Public Health Law Center (Carpenter−Gold, Daniel) Modified on 6/5/2025; at the request of counsel (zdp). (Entered: 06/04/2025) |
| 06/04/2025 | 37 | MOTION for Leave to File Amicus Brief by Public Health Law Center. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Carpenter−Gold, Daniel) Modified docket text on 6/5/2025; at the request of counsel (zdp). (Entered: 06/04/2025) |
| 06/24/2025 | | MINUTE ORDER granting Motions for Leave to File *Amicus Curiae* Brief, Dkts. 28 , 35 , 37 . Signed by Judge Ana C. Reyes on 06/24/2025. (lcacr2) (Entered: 06/24/2025) |
| 06/24/2025 | 39 | AMICUS BRIEF by AMERICAN GAS ASSOCIATION. (zdp) (Entered: 07/01/2025) |
| 06/24/2025 | 40 | AMICUS BRIEF by CHESAPEAKE CLIMATE ACTION NETWORK, SIERRA CLUB. (zdp) (Entered: 07/01/2025) |
| 06/24/2025 | 41 | AMICUS BRIEF by PUBLIC HEALTH LAW CENTER. (zdp) (Entered: 07/01/2025) |
| 06/25/2025 | 38 | RESPONSE re 30 MOTION for Summary Judgment filed by MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, RESTAURANT LAW CENTER, TEAMSTERS LOCAL 96, WASHINGTON GAS LIGHT COMPANY. (Attachments: # 1 Statement of Facts, # 2 Text of Proposed Order)(Little, Jonathan) (Entered: 06/25/2025) |
| 07/16/2025 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 30 MOTION for Summary Judgment by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of |

| | | Proposed Order)(Tuetken, Adam) (Entered: 07/16/2025) |
|---|---|---|
| 07/17/2025 | | MINUTE ORDER. Upon consideration of Defendant's 42 Motion for Extension of Time to File Response/Reply, the Court GRANTS the Motion. Defendant shall file its reply on or before August 20, 2025. Signed by Judge Ana C. Reyes on 07/17/2025. (lcacr2) (Entered: 07/17/2025) |
| 08/14/2025 | 43 | Consent MOTION for Extension of Time to File Response/Reply as to 30 MOTION for Summary Judgment by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Tuetken, Adam) (Entered: 08/14/2025) |
| 08/20/2025 | | MINUTE ORDER granting 43 Motion for Extension of Time to File Response/Reply. The Court ORDERS that the Defendant's reply in further support of its cross−motion for summary judgment is due on or before September 10, 2025. The Court further ORDERS the parties to reach out to the courtroom deputy (chashawn_white@dcd.uscourts.gov) to schedule a motions hearing for the week of September 22, 2025. Signed by Judge Ana C. Reyes on 08/20/2025. (lcacr2) (Entered: 08/20/2025) |
| 09/02/2025 | | NOTICE of Hearing: Motion Hearing set for 9/25/2025 at 2:45 PM in Courtroom 12 before Judge Ana C. Reyes. (zcdw) (Entered: 09/02/2025) |
| 09/03/2025 | 44 | NOTICE of Appearance by Abigail V. Carter on behalf of PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL (Carter, Abigail) (Entered: 09/03/2025) |
| 09/10/2025 | 45 | REPLY to opposition to motion re 30 Motion for Summary Judgment, filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit 15)(Tuetken, Adam) (Entered: 09/10/2025) |
| 09/19/2025 | 46 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel B. Rankin, Filing fee $ 100, receipt number ADCDC−11970501. Fee Status: Fee Paid. by MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, WASHINGTON GAS LIGHT COMPANY. (Attachments: # 1 Exhibit 1 − Declaration for Pro Hac Vice Admission, # 2 Exhibit 2 − Certificates of Good Standing, # 3 Proposed Order)(Novak, Ronald) (Entered: 09/19/2025) |
| 09/19/2025 | | MINUTE ORDER granting 46 Motion for Leave to Appear Pro Hac Vice. Attorney Daniel B. Rankin is admitted pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 09/19/2025. (lcacr2) (Entered: 09/19/2025) |
| 09/25/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 9/25/2025 in re Cross Motions 26 , 30 for Summary Judgment. Motions heard and taken under advisement. (Court Reporter: Christine Asif) (zcdw) (Entered: 09/26/2025) |
| 03/26/2026 | 47 | NOTICE OF SUPPLEMENTAL AUTHORITY by DISTRICT OF COLUMBIA (Tuetken, Adam) (Entered: 03/26/2026) |
| 03/26/2026 | 48 | MEMORANDUM OPINION AND ORDER granting Defendant's 30 Cross−Motion for Summary Judgment; and denying Plaintiffs' 26 Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction. See document for details. Signed by Judge Ana C. Reyes on 3/26/2026. (lcacr2) (Entered: 03/26/2026) |

| 04/14/2026 | 49 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 48 Order on Motion for Summary Judgment,, Order on Motion for Declaratory Judgment,, Order on Motion for Permanent Injunction,,, by MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL APARTMENT ASSOCIATION, NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, PHILADELPHIA−BALTIMORE−WASHINGTON LABORERS DISTRICT COUNCIL, RESTAURANT LAW CENTER, TEAMSTERS LOCAL 96, WASHINGTON GAS LIGHT COMPANY. Filing fee $ 605, receipt number ADCDC−12359343. Fee Status: Fee Paid. (Little, Jonathan) (Entered: 04/14/2026) |

JA011

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES<br>1201 15th St NW, Suite 400<br>Washington, DC 20005 | CASE NO. 24-2492 |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| RESTAURANT LAW CENTER<br>2055 L St NW, Suite 700<br>Washington, DC 20036 | |
| NATIONAL APARTMENT ASSOCIATION<br>4300 Wilson Blvd, Suite 800<br>Arlington, VA 22203 | |
| MARYLAND BUILDING INDUSTRY ASSOCIATION<br>11825 West Market Place<br>Fulton, MD 20759 | |
| WASHINGTON GAS LIGHT COMPANY<br>1000 Maine Ave, SW<br>Washington, DC 20024 | |
| PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL<br>665 N. Broad Street<br>Philadelphia, PA 19123 | |
| TEAMSTERS LOCAL 96<br>5627 Allentown Rd, Suite 202<br>Camp Springs, MD 20746 | |
| *Plaintiffs,* | |
| v. | |
| DISTRICT OF COLUMBIA, | |
| *Defendant.* | |

1

**INTRODUCTION**

1. Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 seek declaratory and injunctive relief under federal law against enforcement of the Clean Energy DC Building Code Amendment Act of 2022 ("D.C. Appliance Ban"), codified at D.C. Code § 6-1453.01. The D.C. Appliance Ban prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings, including buildings used as residences over three stories (such as apartment buildings), in the District of Columbia after December 31, 2026, at latest. D.C. Code § 6-1453.01(b)(1). But the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly and broadly preempts state and local laws on that subject. The D.C. Appliance Ban falls within the heartland of EPCA's express preemption provision because it too purports to regulate the energy use of gas appliances—by preventing such use entirely. As such, the D.C. Appliance Ban is preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets

2

energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4.    The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this same kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the D.C. Appliance Ban does exactly that, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and abandoned their efforts to enact similar bans. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. Because the District did not do so on its own, the Court must order it to do the same.

5.    The D.C. Appliance Ban inflicts serious and irreparable harm. Banning the use of gas appliances in new construction and renovations is at odds with the needs of District residents, workers, and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest and consumer choice, exacerbates the District's housing crisis, and aims to shift the District's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. Due to the D.C. Appliance Ban artificially limiting the pool of gas customers, homes, apartments, restaurants, and other businesses that rely upon gas services will be forced to pay higher gas prices than they would

otherwise have to pay. Thus, the D.C. Appliance Ban will negatively impact existing buildings as well, even those that do not undergo substantial improvements.

6. Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—stand to lose much if the D.C. Appliance Ban is not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, apartment owners, retail, and delivery related to gas and gas infrastructure. Even though the D.C. Appliance Ban does not go into effect until the end of 2026 at latest, its chilling effect is already undermining their livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing maintenance of existing and development of new desperately needed multifamily homes. Ultimately, the D.C. Appliance Ban will compel Plaintiffs to exit some or all of their businesses and trades and substantially increase the cost in the District for apartment homes, lodging, energy, and food service—all despite federal law's express preemption of it.

7. In sum, the D.C. Appliance Ban is plainly preempted by EPCA, is already inflicting substantial irreparable harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the D.C. Appliance Ban is preempted by EPCA and an injunction preventing its enforcement.

**JURISDICTION AND VENUE**

8. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. 42 U.S.C. § 6202(4) defines the term "State" to encompass the District of Columbia under EPCA, and as such, references to states throughout this Complaint should be read to encompass the District of Columbia as well. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

4

9.  This Court has personal jurisdiction over the District of Columbia and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the District of Columbia, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

**PARTIES**

11. Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. The National Association of Home Builders' mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. The National Association of Homebuilders has one or more members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of NAHB's members is an appliance manufacturer that sells gas appliances, "including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers," in the District of Columbia. Ex. 1, Perry McGuire Decl., ¶ 2. The D.C. Appliance Ban will harm this member, as the company "will face significant sales losses if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances we manufacture and sell due to the D.C. Appliance Ban." *Id.* at ¶ 5.

JA016

12. The Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including businesses in the District of Columbia. RLC's members will be harmed by D.C. Law 24-177 by restricting energy choice, by losing the ability to cook with gas, which is necessary for many of their restaurants' menus, and by increasing the costs of building and maintaining their restaurants. Ex. 2, Angelo Amador Decl., ¶ 7. Furthermore, many RLC members run on thin margins, making any increase in business operations significant. *Id.* at ¶ 8. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay. *Id.* Notably, many RLC members in the District of Columbia are already struggling due to a variety of unfavorable economic conditions. *Id.* at ¶ 9. D.C. restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. *Id.* The D.C. Appliance Ban will further exacerbate these unfavorable economic conditions. *Id.*

13. The National Apartment Association ("NAA") is the leading voice and preeminent resource for the rental housing industry across the country. As a federation of 141 affiliated apartment associations, NAA encompasses over 97,000 members, representing more than 12 million apartment

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in the District of Columbia).

6

homes globally. NAA emphasizes integrity, accountability, collaboration, inclusivity, and innovation, and believes that rental housing is a valuable partner in every community. In addition to providing professional development, education, and credentialing, NAA and its network of affiliated apartment associations work to ensure that public policy does not impede but promotes the businesses of apartment owners and operators to run their businesses and provide housing to more than 30 million American households. D.C. Law 24-177 harms NAA's members by restricting energy choice and increasing the costs of building and maintaining apartment buildings. Ex. 3, Nicole Upano Decl., ¶ 6. Having access to affordable gas services is important to NAA members. *Id.* at ¶ 7. Many NAA members run on thin margins, making any increase in business operations significant. *Id.* For example, based on data from the operating statements of federally mortgaged properties, each dollar of rent results in a profit of only seven cents to the owners, a slim margin that underscores the challenging financial pressures that the rental housing industry faces.[2] *Id.* The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are NAA members to pay higher rates for gas service than they otherwise would pay. *Id.* Furthermore, research has shown that more than 40% of multifamily development costs derive from regulations imposed by all levels of government.[3] *Id.* at ¶ 8. The D.C. Appliance Ban is another regulation which will further drive up the costs of multifamily rental housing in the District of Columbia. *Id.*

14. Plaintiff Maryland Building Industry Association ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience; the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-

---

[2] National Apartment Association, *Breaking Down One Dollar of Rent: 2023*, https://www.naahq.org/breaking-down-one-dollar-rent-2023 (last visited Oct. 3, 2024).

[3] National Association of Home Builders and National Multifamily Housing Council, *Regulation: 40.6 Percent fo the Cost of Multifamily Development*, (2022), https://www.nmhc.org/globalassets/research--insight/research-reports/cost-of-regulations/2022-nahb-nmhc-cost-of-regulations-report.pdf.

7

JA018

Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the NAHB. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's, as well as Baltimore City, the Eastern Shore, the District of Columbia. MBIA has members that do business in the District of Columbia and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. Ex. 4, Lori Graf Decl., at ¶¶ 6–8. The D.C. Appliance Ban will restrict MBIA members from using gas in new commercial buildings, and they will be forced to conduct expensive electric retrofits in existing commercial buildings they make substantial modifications to that currently have gas service. *Id.* at ¶ 6. Additionally, the D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are MBIA members to pay higher rates for gas service than they otherwise would pay. *Id.* at ¶ 7. By contributing to rising construction and energy costs, the D.C. Appliance Ban will also further exacerbate the affordable housing crisis in the District.[4] *Id.* at ¶ 8.

15. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 160,000 customers in the District of Columbia, which make up nearly 13% of WGL's customers overall. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. "The D.C. Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers

---

[4] *See, e.g.,* Aaron Wiener, *A 'perfect storm' of problems pushes D.C. toward full-blown housing crisis*, WASHINGTON POST (Sept. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/25/dc-affordable-housing-crisis/.

JA019

and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had." Ex. 5, Donald "Blue" Jenkins Decl., ¶ 6. Additionally, "[b]y capping a portion of WGL's customer growth, the D.C. Appliance Ban impedes [the company's] ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system." *Id.* at ¶ 8. The result will be financial harm to and lower profits for WGL. Furthermore, the D.C. Public Service Commission has already relied on the D.C. Appliance Ban to deny WGL's requests regarding pipeline replacement. *Id.* at ¶ 10.

16. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council ("District Council") is an affiliate of the Laborers International Union of North America ("LIUNA"), AFL-CIO, a 120-year-old labor organization with over 500,00 members throughout the United States and Canada. Ex. 6, Ryan Boyer Decl., ¶ 2. The District Council has approximately 13,000 members, and nationally, one-third of construction work performed by LIUNA members is in the energy sector. *Id.* Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by WGL, such as Miller Pipeline, Infrasource, Skoda Contracting Company, and Vector Services, 70 of whom regularly work in the District. *Id.* at ¶ 3. Notably, District Council members who work on gas distribution lines are required to hold an operator qualification under Subpart G in 49 C.F.R. Part 195. *Id.* at ¶ 4. This valuable employment credential is applicable only to work on gas lines. *Id.* The D.C. Appliance Ban will reduce the work performed by District Council members, leading to layoffs and the permanent loss of employment. *Id.* at ¶ 6. Furthermore, it will cause the gas industry in the local area to shrink, restricting District Council members' ability to find employment in the industry for which they have non-transferrable training and credentials. *Id.*

Loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans. *Id.* Many District Council local members are also WGL customers. *Id.* at ¶ 7. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers like these local members to pay higher rates for gas service than they otherwise would pay. *Id.*

17. Plaintiff Teamsters Local 96 ("Local 96") is a union. Local 96 has approximately 600 members, all of whom are employed by Plaintiff WGL. Ex. 7, Wilder Reed Decl., ¶ 3. As WGL employees, Local 96 members service the more than 160,000 WGL customers in the District of Columbia. *Id.* Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses. *Id.* at ¶ 4. The D.C. Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. *Id.* at ¶ 6. The D.C. Appliance Ban will therefore harm Local 96's members. *Id.* Additionally, the D.C. Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade. *Id.*

18. Defendant District of Columbia is a municipal corporation that adopted D.C. Law 24-177.

19. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of D.C. Law 24-177. Plaintiffs contend that the D.C. Appliance Ban is preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and assert that the appliance ban is lawful and enforceable. Enforcement of the appliance ban will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

20. The claims asserted herein are ripe for review because Plaintiffs challenge the facial validity of D.C. Law 24-177, thereby raising a legal question. When a question is "predominantly legal,"

10

JA021

there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which D.C. Law 24-177 would be valid under federal law.

## ALLEGATIONS

**D.C. Law 24-177's Ban on Federally Regulated Appliances**

21. D.C. Law 24-177 bans the use of gas appliances in newly constructed or substantially improved existing commercial buildings (which encompasses residences over three stories), including mixed-use buildings with restaurants, apartment buildings, hotels, condos, or houses, located in the District of Columbia.

22. D.C. Law 24-177 applies to "covered buildings," which means "all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions." D.C. Code § 6-1453.01(a)(2). The District of Columbia Energy Conservation Code defines commercial buildings to encompass "all buildings that are not included in the definition of 'Residential building.'" D.C. Energy Conservation Code, R202 (2017) The Code defines residential buildings to include "detached one- and two-family dwellings and multiple single-family dwellings (townhouses) as well as Group R-2, R-3 and R-4 buildings three stories or less in height above grade plane." *Id.* Accordingly, the D.C. Appliance Ban applies to all such buildings that are more that than three stories.

23. For covered buildings, D.C. Law 24-177 requires the Mayor of the District of Columbia to issue, by December 31, 2026, at latest, "final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1).

JA022

24. "New construction" includes "new buildings and additions or enlargements of existing buildings, exclusive of any alterations or repairs to any existing portion of a building." *Id.* § 6-1451.01(33); *id.* § 6-1453.01(a)(4).

25. "Substantial improvement" means "any repair, alteration, addition, or improvement of a building or structure, the cost of which equals or exceeds 50% of the market value of the structure before the improvement or repair is started." *Id.* § 6-1451.01(40); *Id.* § 6-1453.01(a)(5).

26. The definition of "net-zero-energy standard" states that "[o]n-site fuel combustion shall not be permitted for the provision of thermal energy to the building." *Id.* § 6-1453.01(a)(3)(B)(iii). This prohibits the use of gas appliances, which necessarily rely upon fuel combustion in their energy use.

27. If the Mayor does not adopt the aforementioned net-zero-energy standard regulations by December 31, 2026, "no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z [of the District of Columbia Energy Conservation Code – Commercial Provisions] . . . ." *Id.* § 6-1453.01.

28. Under Appendix Z, "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building . . . ." D.C. Energy Conservation Code, Appendix Z, Section Z3.1 (2017). This prohibits the use of gas appliances, which necessarily rely upon fossil fuel combustion in their energy use.

29. As a result, use of federally regulated gas appliances will be banned in covered buildings in the District after December 31, 2026, at latest, regardless of whether the Mayor promulgates net-zero-energy standard regulations.

30. The Council of the District of Columbia adopted Bill 24-420, which eventually became D.C. Law 24-177, on First Reading and Final Reading, on June 28, 2022, and July 12, 2022, respectively.

31. Following execution by the Mayor on July 27, 2022, the bill became Act 24-528 and was published in the August 5, 2022 edition of the D.C. Register (Vol. 69, page 009924).

32. Act 24-528 was then transmitted to the U.S. Congress on August 9, 2022 for a 30-day review period. The 30-day review period ended on September 21, 2022, at which point Act 24-528 became D.C. Law 24-177 and took effect the same day.

33. On October 7, 2022, D.C. Law 24-177 was published in the D.C. Register (Vol. 69, page 011947).

**EPCA Establishes National Binding Appliance Energy Regulations**

34. D.C. Law 24-177 impermissibly regulates the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

35. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

36. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

37. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

13

38. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

39. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

40. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

41. One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations

14

JA025

that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

42. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

43. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

44. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

45. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

46. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states can seek permission to establish their own standards, "achieving the

15

waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

47. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

48. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state

building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

49.   Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts State Regulation of Consumer and Industrial Appliances**

50.   EPCA expressly preempts state regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state  regulations must meet to avoid preemption.

51.   EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters,"  "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

52. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the

17

products are used in a commercial building or a residential building. Some of the appliances regulated under D.C. Law 24-177 are considered "consumer products."

53. The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

54. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

55. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters and furnaces and gas stoves) which are regularly sold to individuals.

56. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

57. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

58. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

59. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if

18

JA029

they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

60.  Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning the energy use or energy efficiency of heating equipment, water heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use.

**EPCA Preempts the D.C. Appliance Ban**

61. EPCA preempts D.C. Law 24-177 because D.C. Law 24-177 expressly concerns the energy use of EPCA-covered gas appliances which are regularly sold for residential, commercial, or industrial use, as it bans the use of entire classes of such appliances in newly constructed and substantially improved existing buildings over three stories in the District of Columbia.

62. D.C. Law 24-177 concerns the quantity of natural gas consumed by appliances in the buildings it regulates because it prohibits the installation of EPCA-covered products. As a result, D.C. Law 24-177 requires that *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts D. C. Law 24-177.

63. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation must meet *all seven* of these requirements to avoid preemption.

64. The EPCA provisions providing the possibility of an exemption from preemption for consumer appliances only apply to codes governing new construction. For the provisions of D.C. Law 24-177 that impose requirements concerning the energy use or energy efficiency of EPCA-

covered appliances in existing buildings that undergo substantial modifications, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

65. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

66. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives in new construction, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

67. When it comes to new construction, D.C. Law 24-177 does not meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted. For example, the first requirement to avoid preemption is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). D.C. Law 24-177 does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* EPCA-covered gas appliance, no matter the energy use or efficiency of the appliance.

68. The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). D.C. Law 24-177 does not meet this requirement, because it prohibits the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

69. The third requirement is that "[t]he credit to the energy consumption or conservation

objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). D.C. Law 24-177 does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require. Instead, D.C. Law 24-177 bans the use of EPCA-covered consumer products.

70.  The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, *except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard*." *Id.* § 6297(f)(3)(E) (emphasis added). Here, D.C. Law 24-177 does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

71. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a state building code regulation for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

72. D.C. Law 24-177 does not meet this requirement, because it bans EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

73. Like the EPCA preemption exemption for consumer appliances, the preemption exemption

21

for industrial appliances only applies to codes governing new construction. To the extent that D.C. Law 24-177 attempts to impose requirements concerning the energy use or energy efficiency of EPCA-covered appliances in the context of substantial modifications to existing buildings, EPCA provides no exemption from preemption, and D.C. Law 24-177 is thus preempted.

74. On information and belief, the District of Columbia has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an exemption under 42 U.S.C. § 6297(d). Even if the District of Columbia did make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

## CAUSES OF ACTION

### <u>COUNT ONE</u>: FEDERAL PREEMPTION BY
### THE ENERGY POLICY AND CONSERVATION ACT

75. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

76. D.C. Law 24-177 concerns the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in newly constructed or substantially improved existing buildings—including but not limited to certain apartment buildings, condos, and homes—that are more than three stories tall.

77. On information and belief, the District of Columbia has not applied for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption, and it could not lawfully obtain such a waiver even if it had applied for one.

22

JA033

78. D.C. Law 24-177's requirements for new construction do not meet EPCA's requirements to be exempt from preemption, including because, inter alia:

    a.  It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather bans EPCA-covered gas appliances;

    b.  It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency; and

    c.  It bans EPCA-covered gas appliances, even when they meet the federal efficiency standards.

79. D.C. Law 24-177's requirements for substantial modifications of existing construction are not eligible for an exemption from preemption, as any applicable exemptions only apply to new construction.

80. D.C. Law 24-177 is therefore preempted by the federal EPCA.

81. There is no set of circumstances under which D.C. Law 24-177 would be valid.

82. Plaintiffs accordingly request that the Court declare that D.C. Law 24-177 is preempted by EPCA and enjoin Defendant from enforcing D.C. Law 24-177.

**PRAYER FOR RELIEF**

83. WHEREFORE, Plaintiffs pray for relief as follows:

84.  For a permanent injunction enjoining Defendant from enforcing or attempting to enforce D.C. Law 24-177;

85.  For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that D.C. Law 24-177 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

23

JA034

86. For costs of this suit, including reasonable attorney's fees; and

87. For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

BAKER BOTTS L.L.P.

   /s/ Megan H. Berge
Megan H. Berge (Bar ID: 983714)
Scott Novak (DC Bar No. 1736274) (*admission pending*)
700 K St NW
Washington, DC
202-639-1308
megan.berge@bakerbotts.com
scott.novak@bakerbotts.com
*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*

RESTAURANT LAW CENTER

   /s/ Angelo Amador
Angelo Amador (Bar ID: 480031)
2055 L St NW
Washington, DC 20036
202-331-5913
AAmador@restaurant.org
*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

   /s/ Brian Petruska
Brian Petruska (Bar ID: 498321)
1875 Explorer Dr, Ste. 920
Reston, VA 20190
703-860-4194
bpetruska@mailliuna.org
*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

24

JA035

MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C

   /s/ Lauren McDermott
Lauren McDermott (Bar ID: 1008301)
1920 L St NW
Washington, DC 20036
202-783-0010
lmcdermott@mooneygreen.com
*Counsel for Teamsters Local 96*

# EXHIBIT 1

JA037

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96,<br><br>            *Plaintiffs*,<br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>            *Defendant*. | **Case No.** |

**<u>DECLARATION OF PERRY MCGUIRE</u>**

1. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Vice President and General Counsel of Rinnai America Corporation. Rinnai America Corporation manufactures gas appliances, including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers. We sell these gas appliances throughout the United States, including in the District of Columbia.

3. Rinnai America Corporation is a member of the National Association of Home Builders of the United States.

4. D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

1

5.    Rinnai America Corporation will face significant sales losses if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances we manufacture and sell due to the D.C. Appliance Ban.

6.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: October 14, 2024

_____
Perry McGuire
Vice President and General Counsel
Rinnai America Corporation

2

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant*. | **Case No.** |

**<u>DECLARATION OF ANGELO AMADOR</u>**

1. My name is Angelo Amador. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the Executive Director of the Restaurant Law Center ("RLC"), a business association supporting the restaurant and food-service industry across the United States. While the RLC is an independent organization with its own Board of Directors, all members in good standing with its affiliate, the National Restaurant Association, are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.5 million employees, or approximately 10% of the workforce of the United States. Our members are predominantly small businesses. Even restaurants with well-established brand names are often franchisees who own only one or several locations.

1

3. The RLC's main purpose is to support the growth and development of the restaurant industry, which is the second largest private sector employer. RLC does so through numerous channels, including by conducting direct outreach efforts for our members, by hosting educational and informational meetings, seminars, and webinars, by submitting regulatory comments at the federal, state, and local level advocating for restaurant-friendly policies, and by helping our members navigate their legal and regulatory obligations.

4. The RLC is the only independent public policy organization created specifically to represent the interests of the American foodservice industry in the judicial system and before quasi-judicial bodies like the National Labor Relations Board. The RLC regularly provides courts and agencies with the industry's perspective on legal issues that significantly impact its members and the health of the foodservice industry.

5. As Executive Director of the RLC, I am responsible for managing and leading the RLC's efforts to advocate for restaurant-friendly policies and regulations at the federal level and in numerous state and local jurisdictions. I have been the Executive Director since the RLC was launched in 2016.

6. I am providing this declaration to discuss the negative impacts upon RLC members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

7. I have held multiple calls with RLC members to address their concerns arising from the D.C. Appliance Ban. Our RLC members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on restaurant employers who are subject to the D.C. Appliance Ban. Specifically, RLC members have informed me that the D.C.

Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. The D.C. Appliance Ban is especially concerning to RLC members because many restaurant owners rely on gas for cooking, as well as for space and water heating, in their restaurants, and RLC members want to have the choice to use gas in the future to meet their energy needs.

8.  Furthermore, RLC members have told me that having access to affordable energy, including gas services, is important to them. Many RLC members run on thin margins, making any increase in business operations significant and potentially devastating. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay.

9.  Notably, many RLC members in the District of Columbia are already struggling due to a variety unfavorable economic conditions. D.C. restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. The D.C. Appliance Ban will further exacerbate these unfavorable economic conditions.

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in the District of Columbia).

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: <u>October 16, 2024</u>

Angelo I. Amador, Esq.
Executive Director
Restaurant Law Center

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br>    v. <br><br> DISTRICT OF COLUMBIA, <br><br>                  *Defendant*. | **Case No.** |

**DECLARATION OF NICOLE UPANO**

1. My name is Nicole Upano. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the Assistant Vice President of Housing Policy & Regulatory Affairs for the National Apartment Association ("NAA").

3. The NAA serves as the leading voice and preeminent resource through advocacy, education, and collaboration on behalf of the rental housing industry. As a federation of 141 state, local, and global affiliates, NAA encompasses over 97,000 members representing more than 12 million apartment homes globally. NAA has members in all 50 states and the District of Columbia.

4. I am providing this declaration to discuss the negative impacts upon NAA members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the

1

construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

5.   NAA's members include apartment developers and owners and operators of rental housing whose buildings use gas appliances and intend to continue to use gas appliances in new and substantially modified commercial building construction in the District of Columbia. Notably, commercial buildings in the District of Columbia include buildings more than three stories in height, thereby encompassing many apartment buildings that our members either develop or own and operate.

6.   Our NAA members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on them. Specifically, NAA members have informed me that the D.C. Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service.

7.   Furthermore, NAA members have told me that having access to affordable energy, including gas services, is important to them. Many NAA members run on thin margins, making any increase in business operations significant and potentially devastating. For example, based on data from the operating statements of federally mortgaged properties, each dollar of rent results in a profit of only seven cents to the owners, a slim margin that underscores the challenging financial pressures that the rental housing industry faces.[1] The D.C. Appliance Ban will limit the pool of gas customers and force existing gas customers who are NAA members to pay higher rates for gas service than they otherwise would pay.

---

[1] National Apartment Association, *Breaking Down One Dollar of Rent: 2023*, https://www.naahq.org/breaking-down-one-dollar-rent-2023 (last visited Oct. 3, 2024).

2

8.   Research has shown that more than 40% of multifamily development costs derive from regulations imposed by all levels of government.[2] The D.C. Appliance Ban is another regulation which will further drive up the costs of multifamily rental housing in the District of Columbia.

9.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: October 15, 2024

Nicole Upano
AVP, Housing Policy & Regulatory Affairs
National Apartment Association

---

[2] National Association of Home Builders and National Multifamily Housing Council, *Regulation: 40.6 Percent fo the Cost of Multifamily Development*, (2022), https://www.nmhc.org/globalassets/research--insight/research-reports/cost-of-regulations/2022-nahb-nmhc-cost-of-regulations-report.pdf.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant*. | **Case No.** |

**DECLARATION OF LORI GRAF**

1. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Chief Executive Officer for the Maryland Building Industry Association ("MBIA").

3. MBIA formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience; the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-Capital Building Industry Association that covered DC and Southern Maryland. MBIA is a local chapter of the National Association of Home Builders of the United States. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's as well as Baltimore City, the Eastern Shore and Washington, DC.

1

4.  I am providing this declaration to discuss the negative impacts upon MBIA members of D.C. Code § 6-1453.01 ("D.C. Appliance Ban"), which prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

5.  MBIA's members include home builders and developers whose buildings use gas appliances. These home builders and developers intend to continue to use gas appliances in new and substantially modified commercial buildings they construct in the District of Columbia.

6.  MBIA members have informed me that they are concerned the D.C. Appliance Ban will impose a significant burden and expense on them. Specifically, MBIA members have informed me that the D.C. Appliance Ban will restrict them from using gas in new buildings, and that they will be forced to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service.

7.  Furthermore, MBIA members have told me that having access to affordable energy, including gas services, is important to them. The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are MBIA members to pay higher rates for gas service than they otherwise would pay.

8.  By contributing to rising construction and energy costs, the D.C. Appliance Ban will also further exacerbate the affordable housing crisis in the District of Columbia.[1]

---

[1] *See, e.g.,* Aaron Wiener, *A 'perfect storm' of problems pushes D.C. toward full-blown housing crisis*, WASHINGTON POST (Sept. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/25/dc-affordable-housing-crisis/.

3

9.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: October 14, 2024

Lori Graf
Chief Executive Officer
Maryland Building Industry Association

# EXHIBIT 5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF
HOME BUILDERS OF THE
UNITED STATES, RESTAURANT
LAW CENTER, NATIONAL
APARTMENT ASSOCIATION,
MARYLAND BUILDING
INDUSTRY ASSOCIATION,
WASHINGTON GAS LIGHT
COMPANY, PHILADELPHIA-
BALTIMORE-WASHINGTON
LABORERS' DISTRICT COUNCIL,
and TEAMSTERS LOCAL 96,

                *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA,

                *Defendant*.

**Case No.**

## DECLARATION OF DONALD "BLUE" JENKINS

1. My name is Donald "Blue" Jenkins. I am Executive Vice President & President, Utilities, AltaGas and President, Washington Gas Light Company ("WGL").

2. I have personal knowledge of the facts set out below, and I am competent to testify herein.

3. WGL is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 163,000 customers in the District of Columbia, which make up nearly 13% of WGL's customers overall.

4. As President, I am responsible for delivering on the company's commitment to customer satisfaction and operational excellence. This includes WGL's customer-facing functions, including the customer contact center, billing, and account management.

5. D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6. The D.C. Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had.

7. The D.C. Appliance Ban limits a portion of WGL's customer growth. Customer growth is a crucial component of the utility business model. Each year, we make significant and necessary investments in our system to ensure safety, reliability, and resiliency. Customer growth helps to ensure that those costs can be spread over a growing customer base and helps to keep costs for all of our customers at an affordable level.

8. By capping a portion of WGL's customer growth, the D.C. Appliance Ban impedes our ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system.

9. Notably, S&P Global's Regulatory Research Associates has ranked the District of Columbia as a restrictive regulatory environment for gas utilities from an investor viewpoint.

10. Recently, the D.C. Public Service Commission ("PSC") has relied on the D.C. Appliance Ban to deny WGL's requests. For instance, in denying WGL's PIPES 3 Plan (see attached Order No. 22003), the PSC stated that it "must take in account" "the District's new aggressive climate

initiatives."[1] One such initiative the PSC specifically noted was the D.C. Appliance Ban, which it observed "established standards for new buildings and major renovations to be built to net zero standards starting after 2026, requiring no on-site combustion, with an exception for buildings essential to public health and safety."[2] The PSC went on to conclude: "It is within this context that it is clear that our pipeline replacement program needs to be revised to better align with both Federal and District climate initiatives. Therefore, we believe that it is necessary for WGL to file a new restructured PIPES plan to ensure safe and reliable operation of the natural gas system that appropriately aligns with the District's Climate goals."[3]

11. I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on October 15, 2024

Blue Jenkins (Oct 15, 2024 12:08 PDT)

Donald "Blue" Jenkins
Executive Vice President & President, Utilities, AltaGas and President, Washington Gas Light Company

---

[1] Public Service Commission of the District of Columbia, Formal Case No. 1154, 1775, and 1179, Order No. 22003, ¶ 9 (June 12, 2024).
[2] *Id.* at ¶ 11.
[3] *Id.* at ¶ 48.

3

JA057

# Attachment – D.C. Public Service Commission Order No. 22003

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA**
**1325 G STREET, N.W., SUITE 800**
**WASHINGTON, D.C. 20005**

**ORDER**

**June 12, 2024**

**FORMAL CASE NO. 1154, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECT*PIPES* 2 PLAN:**

**FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN;**

**and**

**FORMAL CASE NO. 1179, IN THE MATTER OF THE INVESTIGATION INTO WASHINGON GAS LIGHT COMPANY'S STRATEGICALLY TARGETED PIPE REPLACEMENT PLAN, Order No. 22003**

## I.     INTRODUCTION

1.      By this Order, the Public Service Commission of the District of Columbia ("Commission") accepts Continuum Capital's Audit Report on Washington Gas Light Company's ("WGL" or the "Company") PROJECT*pipes* 2 ("PIPES 2") Plan.  The Commission dismisses WGL's PROJECT*pipes* 3 Application ("PIPES 3").  Finally, the Commission opens *Formal Case No. 1179*, and within 45 days of the date of this Order, WGL shall submit a restructured pipes plan that ensures the safe and reliable operation of the natural gas infrastructure to meet the energy needs of all District consumers in the District as well as aligns with the District's climate goals.

## II.     BACKGROUND

2.      More than a decade ago, the Commission approved the first five (5) year phase of WGL's 40-year Revised Accelerated Pipe Replacement Plan ("PIPES 1").[1]  The PIPES 1 plan included proposals for the replacement of aging leak-prone pipeline infrastructure with the highest risk and leak rates (*i.e.*, cast iron main lines and bare and unprotected steel mains) at an estimated cost of $110 million.[2]  The Commission's approval required an audit of the PIPES 1 Program.[3]

---

[1]      *Formal Case No. 1093, In the Matter of the Investigation Into the Reasonableness of Washington Gas Light Company's Existing Rates and Charges for Gas Service, and Formal Case No. 1115, Application of Washington Gas Light Company for Approval of a Revised Accelerated Pipe Replacement Program*, Order No. 17431, ¶ 1, rel. March 31, 2014 ("Order No. 17431").  The Accelerated Pipes Replacement Plan was renamed and is currently known as PROJECT*pipes.*

[2]      *Formal Case No. 1093*, Washington Gas Light Company's Request for Approval of a Revised Accelerated Pipe Replacement Plan (Public Version and Confidential Version), at 2-3, and 6, filed August 15, 2013.

[3]      *Formal Case No. 1115,* Liberty Consultant's Management Review of PROJECT*pipes*, filed April 19, 2019 ("LMA Audit Report").

The PIPES 1 Audit Report found mixed performance for the PIPES 1 Program, specifically finding that WGL's management of the program was deficient in years one and two, but concluded years three and four showed significant improvement.[4]   The PIPES 1 Audit Report offered 24 recommendations encompassing WGL's nine (9) program areas, including risk ranking and project prioritization, program management, program planning, cost estimating, cost management, scheduling, resource planning, oversight, and field execution.[5]

3.      WGL filed its PIPES 2 plan on December 7, 2018, requesting approval for five years (*i.e.,* October 1, 2019, through December 31, 2024).[6]   The PIPES 2 plan included proposals for eight distribution replacement programs and five transmission replacement programs at an estimated cost of $305.3 million.[7]   Instead of a five-year approval, the Commission approved a three-year Plan requiring WGL to address distribution system safety and reliability, including more restrictive performance targets for replaced pipe and the District's climate goals.[8]   The Commission established a spending cap at $150 million and directed another audit of WGL's PIPES 2 performance for Calendar Years 2021 and 2022.[9]   Through Order No. 21620, the Company selected Continuum Capital to perform an Audit of the first two years of PIPES 2 program using a scope of work that we previously approved.[10]

4.      WGL filed its PIPES 3 Application on December 22, 2022.[11]   The Commission invited stakeholder comments on the Application.[12]   Initial comments were received from the District Department of Energy and Environment ("DOEE"),[13] the District Department of

---

[4]        LMA Audit Report at 4-14.

[5]        LMA Audit Report at 14-16.

[6]        *Formal Case No. 1154, Washington Gas Light Company's Application for Approval of PROJECTpipes 2 Plan ("Formal Case No. 1154")*, filed December 7, 2018 ("WGL's PIPES 2 Plan").

[7]        WGL's PIPES 2 Plan at 5.

[8]        *Formal Case No. 1154,* Order No. 20671, ¶¶ 35-36, rel. December 11, 2020 ("Order No. 20671").

[9]        *Formal Case No. 1154*, Order No. 20671, rel. December 11, 2020.

[10]       *Formal Case No. 1154,* Order No.  21620, rel. May 17, 2023 ("Order No. 20620").

[11]       *Formal Case No. 1175, In the Matter of Washington Gas Light Company's Application for Approval of* PROJECT*pipes 3 Plan ("Formal Case No. 1175").* Washington Gas Light Company's Application for Approval of PROJECT*pipes* 3 Plan, filed December 22, 2022 ("PIPES 3 Application").

[12]       70 *D.C. Reg.* 000777-000779, January 20, 2023.  *See also*, *Formal Case No. 1175,* Public Notice, filed January 20, 2023.

[13]       *Formal Case No. 1175,* Department of Energy and Environment's Initial Comments on Washington Gas Light Company's PROJECT*pipes* 3 Application, filed May 2, 2023 ("DOEE Comments").

Transportation ("DDOT"),[14] D.C. Climate Action ("DCCA"),[15] Rewiring America,[16] Office of the People's Counsel for the District of Columbia ("OPC"),[17] Sierra Club,[18] the Apartment and Office Building Association of Metropolitan Washington ("AOBA"),[19] Advisory Neighborhood Commission ("ANC") 3B,[20] Interfaith Center on Corporate Responsibility ("ICCR"),[21] ANC 3C,[22] ANC 3A,[23] ANC 6A,[24] and 10 Councilmembers of the Council of the District of Columbia.[25] Reply comments were filed by WGL on July 17, 2023.[26]

5.        On December 13, 2023, the PIPES 2 Continuum Audit Report was filed.[27]  On January 22, 2024, WGL, OPC, the District of Columbia Government ("DCG"), and Philadelphia-Baltimore-Washington Construction Laborers' District Council ("PBWCLDC") each filed

---

[14]        *Formal Case No. 1175,* Comments of the District Department of Transportation on Washington Gas Light Company's PROJECT*pipes* 3 Plan Application, filed May 2, 2023 ("DDOT Comments").

[15]        *Formal Case No. 1175,* DC Climate Action's Initial Comments, filed June 16, 2023 ("DCCA Comments").

[16]        *Formal Case No. 1175,* Comments of Rewiring America, filed June 16, 2023 ("Rewiring America Comments").

[17]        *Formal Case No. 1175*, Office of the People's Counsel for the District of Columbia's Comments on Washington Gas Light's PROJECT*pipes* 3 Plan, filed June 16, 2023 ("OPC Comments").

[18]        *Formal Case No. 1175,* Sierra Club's Initial Comments, filed June 16, 2023 ("Sierra Club Comments").

[19]        *Formal Case No. 1175,* Comments of the Apartment and Office Building Association of Metropolitan Washington on Washington Gas Light Company's PROJECT*pipes* 3 Plan, filed June 16, 2023 ("AOBA Comments").

[20]        *Formal Case No. 1175,* Resolution in Opposition to Washington Gas PROJECT*pipes,* filed November 13, 2023 ("ANC 3B Resolution").

[21]        *Formal Case No. 1175,* Comments of the Interfaith Center on Corporate Responsibility, filed December 4, 2023 ("ICCR Comments").

[22]        *Formal Case No. 1175,* ANC3C Resolution 2023-CONSENT Resolution in Opposition to Washington Gas' Application to the DC Public Service Commission for Approval of the PROJECT*pipes* 3 Plan, filed December 18, 2023 ("ANC 3C Resolution").

[23]        *Formal Case No. 1175,* ANC 3A Resolution Regarding Washington Gas Light (WGL) PROJECT*pipes,* filed December 18, 2023 ("ANC 3A Resolution").

[24]        *Formal Case No. 1175,* ANC 6A Resolution 3-2023 Opposition to Washington Gas' Application to the DC Public Service Commission for Approval of the PROJECT*pipes* 3 Plan, filed January 22, 2024 ("ANC 6A Resolution").

[25]        *Formal Case No. 1175*, Council of the District of Columbia Letter on the Future of the District's Gas Distribution Network, filed February 8, 2024 ("Council Letter").

[26]        *Formal Case No. 1175,* Reply Comments of Washington Gas Light Company, filed July 17, 2023 ("WGL Reply").  More than 400 community comments were also received in opposition to the PIPES 3 Application, in addition to letters of opposition from District political parties and civic organizations.

[27]        *Formal Case No. 1154*, Continuum Capital's Independent Management Audit of PROJECT*pipes* 2, filed December 13, 2023 ("Continuum Audit Report").

comments on the Audit Report. [28]  On February 5, 2024, WGL filed reply comments.[29]

6.        On February 23, 2024, by Order No. 21960, the Commission granted WGL a 12-month extension of the PIPES 2 Program until February 28, 2025.[30]  The Order capped the surcharge eligible target spend not to exceed $50 million for previously approved PIPES 2 Programs 1, 2, 3, 4, 5, and 10.[31]  The Commission stated that "[t]his extension period will allow the Commission to evaluate how we appropriately move forward with WGL's request to continue replacing high-risk leak-prone aging infrastructure subject to increased risk of leaks and/or failure."[32]  On April 24, 2024, by Order No. 21892, the Commission denied the District of Columbia Government's ("DCG") motion to reconsider Order No. 21960.[33]

7.        On May 6, 2024, OPC filed a Motion for Status requesting that the Commission issue an Order setting forth a procedural schedule, policy framework, and evaluation process to be utilized for any project adopted to replace PROJECT*pipes*.[34]  On May 10, 2024, WGL filed a response opposing OPC's motion, asserting that the policy considerations associated with the alignment of the PIPES program with the District's climate goals are being addressed in *Formal Case No. 1175* and that any evaluation of a cohesive strategy and integrated plan to address climate goals should be addressed in *Formal Case No. 1167*.[35]  On June 11, 2024, DCG filed a letter in support of OPC's request to set a procedural schedule and critical policy framework for interested parties to address as the Commission considers potential adjustments or alternatives to PROJECT*pipes*.[36]

---

[28]      *Formal Case No. 1154*, Washington Gas Light Company's Comments on PROJECT*pipes* 2 Management Audit Report, filed January 22, 2024 (WGL Audit Comments"); *Formal Case No. 1154*, the Office of the People's Counsels Comments on Continuum Capital's Audit Report of Washington Gas Light Company's PROJECT*pipes* 2 Program, filed January 22, 2024 ("OPC Audit Comments"); *Formal Case No. 1154*, the District of Columbia Government's Comments, filed January 22, 2024 ("DCG Audit Comments"); *Formal Case No. 1154*, Philadelphia-Baltimore-Washington Construction Laborers' District Council's Comments on Continuum Capital's Independent Management Audit Report of WGL's PIPES 2 Plan, filed January 22, 2024 ("PBWCLDC Audit Comments").

[29]      *Formal Case No. 1154*, Washington Gas Light Company's Reply Comments on PROJECT*pipes* 2 Management Audit Report, filed February 5, 2024 ("WGL's Audit Reply").

[30]      *Formal Case No. 1154*, Order No. 21960, ¶ 13, rel. February 23, 2024 (Order No. 21960").

[31]      *Formal Case No. 1154*, Order No. 21960, ¶ 14.

[32]      *Formal Case No. 1154*, Order No. 21960, ¶ 13.

[33]      *Formal Case No. 1154*, Order No. 21982, rel. April 24, 2024 ("Order No. 21982").

[34]      *Formal Case No. 1154*, Office of the People's Counsels for the District of Columbia's Motion for Status, filed May 6, 2024, at 2-4 ("OPC's Motion").

[35]      *Formal Case No. 1154*, Washington Gas Light Company's Response to Office of People's Counsel for the District of Columbia's Motion for Status,  at 2-3, filed May 10, 2024 ("WGL Response").  OPC's Motion is denied as moot since this Order sets forth a procedural schedule and policy framework for addressing pipeline infrastructure and repair in the future.

[36]      *Formal Case No. 1154*, District of Columbia Government's Letter in Support of the Office of the People's Counsel, filed June 11, 2024 ("DCG Letter").

### III.    DISCUSSION

8.      We begin our review by briefly identifying the statutes, rulemaking efforts, and activities in other cases that have, or will, impact the restructured PIPES plan we are directing WGL to develop.  Thereafter we address the PIPES 2 Continuum Audit Report and make recommendations that WGL should consider in developing its new PIPES plan.  Finally, we review WGL's PIPES 3 Application.

#### A.    Statutes and Proposed Federal Rules

9.      The Commission must ensure the continued safety and reliability of the gas distribution system in the District while also supporting the District's climate goals.  In addition, our review requires the Commission and WGL to consider the federal regulations on eliminating hazardous leaks and reducing fugitive gas emissions in the United States.  These considerations are in addition to addressing the District's new aggressive climate initiatives that the Commission must take in account all matters that come before us.[37]

10.      The Federal PIPES Act of 2020 ("PIPES Act") was signed into law on December 27, 2020.[38]  Under the PIPES Act, WGL must update its inspection and maintenance plans to address eliminating hazardous leaks and minimizing fugitive methane emissions.  The Pipeline and Hazardous Materials Safety Administration ("PHMSA") under the United States Department of Transportation ("USDOT") is in the process of updating its rules in compliance with the PIPES Act, which we expect to be finalized by January 2025.[39]  PROJECT*pipes* is one of WGL's plans to address the PIPES Act.

11.      The Clean Energy DC Building Code Amendment Act of 2022, passed on September 21, 2022, established standards for new buildings and major renovations to be built to net zero standards starting after 2026, requiring no on-site combustion, with an exception for buildings essential to public health and safety.[40]

12.      On September 21, 2022, the District enacted the Climate Commitment Act of 2022 ("Climate Commitment Act").  The Climate Commitment Act, among other things, accelerates the District's carbon neutrality commitment from 2050 to 2045, as well as adds District-wide interim targets for GHG reductions between 2025 and 2050 to the following levels:

(1) Not less than 45% below 2006 greenhouse gas emission levels by 2025;

---

[37]      D.C. Code § 34 -808.02 (March 22, 2019).

[38]      Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat 1182 (December 27, 2020) ("PIPES Act of 2020").

[39]      *See* PHMSA PIPES Act Web Chart, May 2024 update, https://www.phmsa.d.gov/sites/phmsa.dot.gov/files/2024-05/2024%20May%20PIPES%20Act%20Chart.pdf.

[40]      D.C. Code § 6-1453.01 (September 21, 2022).

    (2) Not less than 60% below 2006 greenhouse gas emission levels by 2030;

    (3) Not less than 70% below 2006 greenhouse gas emission levels by 2035;

    (4) Not less than 85% below 2006 greenhouse gas emission levels by 2040; and

    (5) A level consistent with carbon neutrality by 2045, and in each year thereafter.[41]

Because of the District's climate commitments, the Commission is responsible for ensuring that the utilities that we regulate adopt programs to assist the District in reaching its climate goal of 85% greenhouse gas emission reductions by 2040 relative to 2006 and carbon neutrality by 2045.

13.    Finally, the Inflation Reduction Act ("IRA") provides a variety of climate and clean energy-related tax incentives that WGL and consumers may take advantage in addressing District climate initiatives.[42]

### B.    Relevant Filings from Other Dockets

14.    DCG filed its Fugitive Methane Emissions Survey of the District of Columbia ("DOEE Methane Survey") on November 30, 2021.[43]

15.    On February 28, 2023, DOEE filed its report titled "Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition From Gas to Electric-based Building Heating ("DOEE Neighborhood Electrification Study"), the companion analysis to the DOEE Methane Survey, which assessed potential cost savings from repairing pipes to prepare for decommissioning in lieu of pipe replacement.[44]

16.    On March 10, 2023, the Commission issued Order No. 21580, denying cost recovery for WGL's use of satellite technology under the Advanced Leak Detection ("ALD") program in PIPES 2.[45]

17.    When addressing the issue of whether the Commission has the authority to curtail WGL's right to sell natural gas, the Commission concluded that it "[could not] order Washington

---

[41]    D.C. Code § 8-151.09d (September 21, 2022).

[42]    Public Law No. 117-58 (November 15, 2021).

[43]    *Formal Case No. 1154,* and *Formal Case No. 1130, In the Matter of the Investigation into Modernizing the Energy Delivery System for Increased Sustainability ("Formal Case No. 1130"),* 2021 Fugitive Methane Emission Survey of the District of Columbia for the District of Columbia Department of Energy and Environment, filed November 30, 2021 ("DOEE Methane Survey").

[44]    *Formal Case No. 1167, In the Matter of the Implementation of Electric and Natural Gas Climate Change Proposals, Formal Case No. 1154,* and *Formal Case No. 1130, In the Matter of the Investigation into Modernizing the Energy Delivery System for Increased Sustainability,* Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition from Gas to Electric-based Building Heating, filed February 28, 2023 ("DOEE Electrification Study").

[45]    *Formal Case No. 1154,* Order No. 21580, rel. March 10, 2023.

Gas Light Company [ ] to end the sale of natural gas that Washington Gas Light Company is authorized to provide under its Congressional Charter."[46]  The Commission reaffirmed its decision in Order No. 21631 in response to a Joint Request for Reconsideration and Clarification filed by OPC, DCG, and Sierra Club.[47]

18.     By Order No. 21938 on December 8, 2023, in *GD-2019-04-M*, the Commission set forth the next steps in the development of the Commission's standardized benefit-cost analysis ("BCA") framework, including the adoption of a social cost of carbon of $160 per metric ton of carbon dioxide equivalent ("$CO_2e$").[48]  Order No. 21938 also adopted the alignment of GHG reduction targets for both the electric and gas utilities with the targets adopted in the Climate Commitment Act of 2022.[49]

### C.     PIPES 2 Continuum Audit, Comments, and Reply Comments

19.     **Audit Report.**  The Continuum Audit covered three tasks: (1) under Task 1, Continuum determined whether the PROJECT*pipes* projects were completed and recovered through the surcharge mechanism consistent with the Commission's restrictions on material selection, spending cap, improvements to safety and reliability of WGL's distribution system. Continuum evaluated whether the work was managed and completed prudently, with sound engineering judgment and construction integrity; (2) under Task 2, Continuum evaluated WGL's implementation of the 24 recommendations from the PIPES 1 Liberty Management Audit; ("LMA"); and (3) under Task 3, Continuum evaluated  WGL's compliance with *Formal Case No. 1142*'s Merger Commitment Number 72 (*i.e.*, evaluate the calculation of average costs, annual costs, and determination of any excess cost beyond those allowed under Merger Commitment 72).[50]

20.     For Task 1, Continuum found that the PIPES 2 Program met the targets directed in Order No. 20671 and that all the projects identified in WGL's Annual Project List for the first two years of PIPES 2 (2021-2022) were completed consistent with the Commission's directives on materials and spending caps, within an overall cost variance of 2%, and were properly recovered through the surcharge mechanism.[51]  Continuum concluded that all completed PIPES 2 projects reduced risk and enhanced safety by replacing at-risk pipe (aging, corroded, or leaking cast iron mains and/or unprotected steel main and services, vintage mechanical coupled wrapped steel mains

---

[46]     *Formal Case No. 1167,* Order No. 21593, ¶ 1, rel. April 6, 2023 ("Order No. 21593").

[47]     *Formal Case No. 1167,* Order No. 21631,  ¶ 13, rel. June 1, 2023 ("Order No. 21631").

[48]     *GD-2019-04-M, In the Matter of the Implementation of the 2019 Clean Energy DC Omnibus Act Compliance Requirements ("GD-2019-04-M"),* Order No. 21938, ¶¶ 39 and 80, rel. December 8, 2023.

[49]     *GD-2019-04-M,* Order No. 21938, ¶ 48, rel. December 8, 2023.

[50]     Audit Report at 1, *citing Formal Case No. 1154*, Order No. 20671, ¶ 37, rel. December 11, 2020.

[51]     Audit Report at 16, 22-23.  The Commission imposed a total target of 9.2 miles of main replacement and 2,605 services, with a surcharge eligible spend of $92.7 million.  *See Formal Case No. 1154,* Order No. 20671, ¶ 92.

and services, copper services and black plastic services) in the distribution system.[52]  For the first two years of PIPES 2 (2021-2022), the Commission imposed a total target of 9.2 miles of main replacement and 2,605 services. During the first two years of PIPES 2, WGL completed approximately 11 miles of main replacement and remediated/replaced 2,200 services.[53]

21.     In assessing the implementation of the 24 LMA recommendations (Task 2), Continuum concludes the Company made significant progress in implementing the LMA recommendations.  WGL implemented 16 of the recommendations.  Of the eight (8) remaining recommendations, Continuum notes that the Commission rejected four (4) LMA recommendations, and for the remaining four (4) recommendations, Continuum proposed alternatives that would achieve similar performance goals.[54]  Overall, Continuum concluded WGL's PIPES 2 program was robust and made significant progress in implementing the LMA recommendations.  The Continuum Audit also found that the majority of LMA's recommendations were implemented in a high-quality manner.  Continuum's Audit offers additional recommendations for improving the PIPES program.[55]

22.     For Task 3, Continuum concluded that WGL had correctly calculated excess costs for all programs except year 6 of Program 2.[56]  The Audit Report has two recommendations regarding improving the accuracy of documents and the accuracy in project file nomenclature.[57]

23.     **Comments.**  Both OPC and DCG question the overall conclusions in the Continuum Audit.  In addition, OPC questions the thoroughness of the analysis.  OPC raised concerns about invoice irregularities, projects lacking variance explanations, the high cost and variance of scattered services, and improper sample sizes for consulted documents.[58]  DCG questions the overall cost efficiency of PIPES 2 and the Company's performance in reducing risk and leaks in the District.[59]

24.     **WGL's Response.**  WGL provided responses noting that eight (8) of the 21

---

[52]     Audit Report at 18.

[53]     *See Formal Case No. 1154,* Order No. 20671, ¶ 92.  *See also* WGL's Reply at Attachment A; *See also*, *Formal Case No. 1154*, Washington Gas Light Company's Annual Reconciliation Report for 2021, filed March 31, 2022; and *Formal Case No. 1154*, Washington Gas Light Company's Amended Year 8 Annual Project Reconciliation Report for 2022, filed April 13, 2023.

[54]     Audit Report at 36-37.

[55]     Audit Report at 109.

[56]     Audit Report at 109.

[57]     Audit Report at 109.

[58]     OPC Audit Comments at 4-5.

[59]     DCG Audit Comments at 1, 3, 4, and 6.

**Order No. 22003**                                                                                           **Page 9**

recommendations are either in progress or already implemented.[60] WGL took issue with OPC and DCG's claims that PIPES 2 is far behind their targets. WGL, among other things, reiterates that the Company achieved the replacement targets set by the Commission while remaining under budget during PIPES 2, highlighting the reduction in leaks since 2020.[61]

### D.    WGL's PIPES 3 Application

25.    WGL requests that the Commission approve $671.8 million in surcharge recovery for its five-year PIPES 3 program, including $431.3 million for Programs 1-5, 9, and 10, and $240.5 million for three years of Program 11. WGL seeks the authority to extend Program 11 for an additional two years as warranted.[62] WGL plans to replace approximately 27.6 miles of main and 7,637 services over the proposed five-year period.[63] WGL avers that "[o]ver time, the Company's replacement activity will result in reduced leak rate trending related to aging infrastructure."[64]

26.    WGL estimates that implementing PIPES 3 would result in a "cumulative reduction total of 16,523 metric tons" of $CO_2e$.[65] WGL indicates that the Optimain software it was previously using for risk modeling is being discontinued and replaced by a new risk modeling software, JANA.[66] WGL proposes to modify the calculation in the surcharge mechanism to shift operations and maintenance costs specific to Program 9, ALD, which are not currently included in the surcharge mechanism.[67]

### E.    Comments and Reply Comments

27.    **DOEE.** DOEE's consultant, Synapse, provided an assessment of WGL's PIPES 3 Application, stating that "the utility does not prioritize replacement of pipe that is actively leaking, nor does it consider repair rather than replacement, a much less costly alternative that can provide substantial safety benefits."[68] DOEE asserts that the PIPES 3 proposal is inconsistent with the

---

[60]    WGL's Audit Reply at 1-10.

[61]    WGL's Audit Reply at 6.

[62]    PIPES 3 Application at 7.

[63]    PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 18.

[64]    PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 25.

[65]    PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 30.

[66]    PIPES 3 Application, Exhibit B, Testimony of Witness Stuber at 1-3.

[67]    PIPES 3 Application, Exhibit E, Testimony of Witness Lawson at 4.

[68]    DOEE Comments at 1.

District's climate decarbonization approach,[69] because it is built on the assumption that the gas system will remain in its current state, serving all customers into the future.  DOEE avers that it does not make sense to invest $671.8 million over the next five years if that assumption does not hold.[70]  DOEE states that District ratepayers have limited funds to put towards the energy transition and that the sheer cost of pipe replacement, rather than the DCG strategy of repair and decommissioning, is an unwise use of ratepayer funds.  According to DOEE, the approach proposed in DOEE's electrification studies limits the amount of stranded asset costs levied on the District's most vulnerable ratepayers.[71]

28.      DOEE argues that WGL's proposed approach neither minimizes costs nor maximizes safety.  According to DOEE's calculations, the pace of spending proposed in PIPES 3 is nearly double that of PIPES 2.[72]  Given that the programs are so costly per mile, DOEE argues that they should only be targeted to the highest-risk pipes.[73]  DOEE also points out that WGL's proposed plan would continue until 2054, nine years after the District is required to achieve carbon neutrality, meaning that ratepayers would be charged for the program through 2109 without any changes to WGL's depreciation schedule.[74]  Regarding safety, DOEE avers that "WGL's Application for its PROJECT*pipes* 3 Plan is founded on the idea that accelerating the replacement of natural gas pipelines will enhance safety and reliability of its distribution system.  In reality, WGL's Application fails to provide a convincing case that it will advance public safety while substantially increasing costs."[75]

29.      **DDOT.**  DDOT has no objection to WGL's efforts to identify and replace aging pipes with potentially hazardous leaks on its system.  However, DDOT has concerns about how D.C. PLUG is mischaracterized as the justification for identifying and replacing WGL's pipes.[76]  DDOT believes that WGL should focus on replacing pipes that pose the greatest risk to public safety rather than tying pipe replacement to D.C. PLUG or other third-party work.[77]

30.      **DCCA**.  DCCA argues that an extension of the Pipes program by approving PIPES

---

[69]      DOEE Comments at 2, *citing* the Clean Energy DC Plan, Carbon Free D.C., the Building Energy Performance Standard, the Clean Energy DC Building Code Amendment Act of 2022, DOEE's "Strategic Electrification Roadmap for Buildings and Transportation in the District of Columbia," and DOEE's "Strategic Electrification in Washington, D.C.: Neighborhood Case Studies of Transition from Gas to Electric-Based Building Heating."

[70]      DOEE Comments at 2.

[71]      DOEE Comments at 6.

[72]      DOEE Comments at 7.

[73]      DOEE Comments 7-8.

[74]      DOEE Comments at 8.

[75]      DOEE Comments at 9.

[76]      DDOT Comments at 3.

[77]      DDOT Comments at 3.

3 is significantly more expensive than reasonable alternatives without being more effective, and that the program conflicts with the District's policy of reducing GHG emissions to net zero by 2045, as well as the Commission's legislated responsibility to consider the environment in its decision-making.  DCCA requests a litigated proceeding to resolve issues of fact.[78]  DCCA supports, instead of PIPES 3, an ALD-based program of repair and replacement for priority leaks.[79] According to DCCA, this would be far less expensive than WGL's predictive analytics process.[80]

31.    **Rewiring America.**  Rewiring America asserts that the Commission should reject PIPES 3 in favor of a targeted leak repair program.[81]  Rewiring America also asserts that the Commission should "direct WGL to explore pipe repair solutions, like the Cast Iron Joint Sealing Robot (CISBOT) [ ] successfully implemented in various cities.  By directing WGL to repair the approximately 700 miles of leak-prone pipes instead of replacing them, the Commission would protect D.C. ratepayers, ensure the safety and reliability of the gas system, and demonstrate the Commission's commitment to upholding the District's Climate and Energy Goals that centers the transition towards electrification and away from fossil fuels."[82]  Because installing new gas infrastructure rather than repairing it could lock the District into gas use beyond the legislated climate commitments, Rewiring America encourages the Commission to "endorse a proactive and targeted electrification approach, as proposed in Rewiring America's DC Electrification Report submitted in the *Formal Case No. 1167* docket.  This approach would concentrate efforts on specific neighborhoods, such as River Terrace and Deanwood, as proposed in the FY 2024 DC Council proposed budget, with the aim of electrifying all appliances and facilitating the decommissioning of gas distribution systems in those areas.  Priority could be given to communities with high energy burdens or a high incidence of methane gas leaks."[83]

32.    **OPC.**  OPC asserts that "WGL has been unable to keep up with the repair of *existing* leaks along its distribution system, leaving one to question whether it is in any position to continue receiving accelerated cost recovery for proactively replacing those pipes that merely have the *potential* to leak."[84]  OPC requests that the Commission reject the PIPES 3 Application, which OPC avers dwarfs PIPES 1 and 2 due to WGL's inability to appropriately reduce leaks over the life of the accelerated pipe replacement program.[85]  Additionally, since WGL's Application was designed with Optimain software while WGL has since switched to JANA, OPC argues that it

---

[78]    DCCA Comments at 2.  The pages to DCCA's Comments are not numbered and are referenced sequentially beginning with page one (1) of the Comments.

[79]    DCCA Comments at 2.

[80]    DCCA Comments at 2.

[81]    Rewiring America Comments at 2.

[82]    Rewiring America Comments at 2.

[83]    Rewiring America Comments at 13.

[84]    OPC Comments at 2.

[85]    OPC Comments at 2-3.

does not make sense to implement the program with a different type of software than was used to design the program.[86]  OPC concludes that if the Commission declines to reject PIPES 3, an evidentiary proceeding is necessary.[87]  OPC states that it worked with DCG, AOBA, Sierra Club, and DCCA to develop a procedural schedule, which is included with OPC's comments.[88]

33.     **Sierra Club**.  Sierra Club is concerned that the PIPES program is a major expense incompatible with the District's climate laws and that the PIPES program has been performing poorly.[89]  Sierra Club echoes the concerns raised by other commenters regarding stranded assets, arguing that the PIPES program is "gold-plating" the gas distribution system by WGL.[90]

34.     Sierra Club agrees with DOEE that WGL should focus on repair rather than replacement since it is a quicker, less expensive method of addressing leaks.  Sierra Club argues that even by what it believes are WGL's inflated emissions savings, WGL asserts that only 2% GHG reductions will be achieved through the PIPES program by 2032 and 4% by 2050. [91]

35.     **AOBA**.  AOBA avers that "Washington Gas' third iteration of PROJECT*pipes* is highly problematic and inappropriate as proposed.  AOBA submits that the District of Columbia is now facing an infrastructure crucible.  The Commission can no longer delay or defer determinations regarding balancing the needs of District ratepayers, the health of the District's economy, the District's mandated environmental goals, the affordability of overlapping and, at times, competing infrastructure plans."[92]  AOBA agrees with the comments filed by both DOEE and DDOT.  AOBA contends that "Washington Gas' prioritization of projects that qualify for accelerated recovery has not improved the integrity of the Washington Gas system, has increased greenhouse gas emissions, and has not meaningfully reduced the amount of cast iron mains within the District."[93]  AOBA agrees with the other commenters that if the Commission moves ahead with PIPES 3, an evidentiary proceeding is required.[94]

36.     **ICCR**.  ICCR opposes the PIPES 3 Application and argues that the Commission should instead focus on leak repair due to the expense of pipe replacement, incompatibility with

---

[86]        OPC Comments at 3.

[87]        OPC Comments at 5.

[88]        OPC Comments at 23.

[89]        Sierra Club Comments at 1.

[90]        Sierra Club Comments at 3.  Generally, stranded assets are those assets that lose value or turn into liabilities before the end of their expected economic or useful life.

[91]        Sierra Club Comments at 17.

[92]        AOBA Comments at 1-2.

[93]        AOBA Comments at 3.

[94]        AOBA Comments at 4.

the District's climate mandates, and risk of stranded assets.[95]   ICCR suggests an alternative investment by WGL in "sustainable thermal networks" and non-pipe alternatives.[96]   ICCR points out that "[s]everal energy utilities, including Eversource, National Grid, and Con Edison in NY and MA are piloting networked geothermal systems as an alternative to existing gas systems."[97] ICCR avers that "[i]nvestors are concerned that the failure of companies to achieve alignment with Paris goals poses material financial, operational, reputational, and regulatory risks, and have been filing proxy resolutions on the energy transition that have met with significant support from other investors."[98]

37.     **District of Columbia Council.**   Ten Councilmembers penned a letter to the Commission regarding the future of the District's gas distribution network, stating that the Pipes program is incompatible with the District's statutory climate mandates.[99]   The Councilmembers point to the expense of the program, the concern that it will fall disproportionately on vulnerable ratepayers, and that other options exist, such as pipeline repair.   The Councilmembers state, "[r]ather than proceeding with PROJECT*pipes*, we recommend that the Commission begin integrated, comprehensive thermal energy planning consistent with the carbon neutrality goals laid out in the Climate Commitment Amendment Act of 2022."[100]

38.     **District Political Parties and Advisory Neighborhood Commissions ("ANC").** The Ward 3 Democratic Committee passed a unanimous resolution in opposition to PIPES 3 because it argues PIPES 3 contradicts the District's climate goals and costs.   The Committee instead urges the Commission to focus on repairing leaks in the system.[101]   Several ANCs opposed WGL's PIPES 3 Application for various reasons ranging from incompatibility with the District's climate goals, mismanagement of the program, and disruption of life in neighborhoods because of failure to coordinate with other ongoing projects.[102]   ANC 6A also makes a request of "elected officials to ensure that Washington Gas engages in a robust planning process to redefine its business model as the District of Columbia weans itself off fossil fuel and that The DC Public Service Commission develops a plan to phase out the use of greenhouse-gas-producing fuels to bring about a just and equitable transition to clean, renewable energy, consistent with DC law."[103]

---

[95]     ICCR Comments at 1.

[96]     ICCR Comments at 1.

[97]     ICCR Comments at 1-2.

[98]     ICCR Comments at 3.

[99]     Council Letter at 1.

[100]     Council Letter at 2-3.

[101]     *Formal Case No. 1175,* Public Comments of Beau Finley (on behalf of Ward 3 Democratic Committee), filed May 1, 2023.

[102]     *See* Comments of ANCs 3A, 3B, 3C, and 6A.

[103]     ANC 6A Resolution at 3.

39.    **Civic Organizations**.  A collection of several local organizations provided a letter to the Commission opposing the PIPES 3 Application.[104]  The groups argue that "[a]pproving the next phase of PROJECT*pipes* will be in contravention of DC's climate commitments and will force DC residents to waste hundreds of millions of dollars for the replacement of infrastructure that is destined to become obsolete."[105]  The organizations also raise the issue of disproportionate costs on the District residents least likely to be able to afford electrification, and the rate of hazardous leaks on WGL's system.[106]

40.    **Community Comments.**  The Commission has received more than 400 comments from individuals in opposition to PIPES 3.  The commenters urge the Commission to reject WGL's PIPES 3 Application because: 1) it stands in direct conflict with the District's climate goals, 2) it is a waste of ratepayer funds, and 3) it will disproportionately burden low-income District residents as wealthier households electrify.[107]

41.    **WGL Reply**.  In reply comments, WGL argues those comments criticizing the Company for not prioritizing leaking infrastructure "are misplaced because the fundamental purpose of PROJECT*pipes* is to target the replacement of relatively *higher-risk* infrastructure and facilities in order to enhance public safety and improve reliability on the distribution system and to achieve the reduced greenhouse gas ("GHG") emissions that follow therefrom."[108] "Washington Gas reviews the risk profile of all assets within PIPES 3 and identifies and prioritizes projects with higher relative risk scores, taking into consideration important situational, operational, and economic factors to target those projects that *optimize* reductions in risk in a cost-effective manner."[109]

42.    WGL opposes DOEE's proposal to focus on repair rather than replacement, asserting that "the Company actively repairs against industry standards.  PROJECT*pipes* is focused

---

[104]    *Formal Case No. 1175,* Letter ("Civic Organizations' Letter"), December 6, 2023. The signatories include: CCAN Action Fund, Sierra Club DC, DC Voters for Animals, Metro DC DSA, We Power DC, Nature Forward, Third Act (MD, DC, and VA affinity groups), DC Asthma Coalition, Moms Clean Air Force DC Chapter, Extinction Rebellion DC, League of Women Voters of the District of Columbia, Howard University Water Environmental Association, DC Environmental Network, Center for Biological Diversity, Ward 3 Democrats, Anacostia Parks & Community Collaborative, Empower DC, Georgetown Renewable Energy and Environmental Network, Electrify DC, Green New Deal for DC, Washington Interfaith Network, Ward 8 Woods Conservancy, and Institute for Policy Studies – Climate Policy.

[105]    *See* generally, Civic Organization Letters at 1.

[106]    Civic Organizations' Letter at 1.

[107]    *See Formal Case No. 1175,* Individual Comments.

[108]    WGL Reply at 3.

[109]    WGL Reply at 5. In their Audit Reply Comments, WGL also reiterated the Company's successful completion of replacements in excess of Commission targets for PIPES 2, indicating the Company completed 111% of targeted main retirements and 105% of targeted service replacements during the PIPES 2 period.  WGL argued that those replacements contributed to a 29% reduction in main leaks and a 22% reduction in service leaks between 2018 and 2022. WGL's Audit Reply at 2-4.

on removing materials that are no longer deemed acceptable for installation today. The natural gas industry ceased using materials composed of cast-iron, wrought-iron, and non-cathodically protected steel over 60 years ago. PROJECT*pipes* will remove these from the distribution system."[110] WGL notes that "[g]as companies are obligated to protect the public safety and achieve an appropriate level of service reliability through leak-management, leak repair, and emergency response programs, as well as through replacement activities," and "the Company expects the rate of corrosion and coupling leaks on the system would continue to decrease with the continuation of PIPES 3," because leak-prone pipe materials will be replaced with polyethylene.[111]

## IV.    **DECISION**

43.    The Company originally proposed PROJECT*pipes* as a 40-plus-year program that was reduce leaks through the replacement of all aging, leak-prone pipes in an effort to enhance the safety and reliability of gas service in the District.[112]  The Commission notes that the problem presented with the PIPES 3 Application is the same one with which the Federal government is currently grappling in its proposed PHMSA regulations. Specifically, PHMSA states:

> The Federal pipeline safety regulations currently covering leak detection and repair reflect a regulatory approach focused on public safety risks posed by incidents on gas pipeline facilities. The regulations do not sufficiently capture environmental costs, align with the importance attached to environmental protection in PHMSA's enabling statutes, or reflect the scientific consensus that prompt reductions in methane emissions from natural gas infrastructure are critical to limiting the impacts of climate change…. The current pipeline safety regulations do not include any meaningful performance standards for leak detection equipment, nor requirements that leverage the significant advancements in the sensitivity, efficiency, and variety of leak detection technologies in the last five decades . . . Further, the current pipeline safety regulations do not explicitly require repair of all – or even most- leaks on pipeline facilities.[113]

However, PHMSA continues to encourage the Commission to consider initiatives to remove and/or replace unprotected steel, cast iron, and other high-risk pipes within the District to enhance

---

[110]    WGL Reply at 10.

[111]    WGL Reply at 11-12.

[112]    As filed with PHMSA in 2014, approximately 34% of WGL's pipelines were made of cast iron compared to the national average of 2% making the District one of the highest concentrations of cast iron in the nation. *See generally*    https://www.phmsa.dot.gov/data-and-statistics/pipeline/gas-distribution-gas-gathering-gas-transmission-hazardous-liquids.

[113]    Pipeline and Hazardous Materials Safety Administration, Department of Transportation, Notice of Proposed Rulemaking. May 18, 2023, https://www.federalregister.gov/documents/2023/05/18/2023-09918/pipeline-safety-gas-pipeline-leak-detection-and-repair.

pipeline safety.[114]

44.     With regard to the PIPES 3 Application, commenters allege that the Application does not include sufficient data or information to verify its claims about safety and GHG emissions reduction and that it will require discovery to be able to fully review the impact of the proposed programs for which surcharge recovery is requested.[115]  Stakeholders also take issue with the cost of the program, which would be more than double the cost of the first 10 years of the program for a five-year continuation.  Although the Company asserts that the surcharge allows replacements that would increase safety and reliability while reducing GHG emissions, the Application is thin on any actual evidence or data to substantiate that claim.  Moreover, WGL's performance overall has not matched the originally proposed timeline (submitted in 2014) and schedule for PROJECT*pipes*.  Therefore, we decline to approve the Application and surcharge as filed.  Although we decline to approve the Application, we remind WGL that it is obligated to maintain the safety and reliability of the gas distribution system with or without surcharge recovery.

45.     Several stakeholders, including 10 Councilmembers of the Council of the District of Columbia, have alleged that the continuation of the PIPES program is no longer compatible with the District's legislated climate mandates, including achieving carbon neutrality by 2045.[116]  Instead, the Councilmembers and other stakeholders recommend neighborhood electrification alternatives, gas pipeline decommissioning, and "integrated thermal energy planning" to ensure the Company's business model is compatible with the District's climate policy.[117]

46.     While the Commission has an obligation, within its statutory authority, to help advance the District's climate policies, we remind all concerned that the Commission cannot and is without authority to prevent WGL from selling natural gas.[118]  This statutory barrier creates obstacles to the neighborhood electrification initiatives proffered by many of the commentators.  These obstacles are not entirely unique to the District as recognized by other state Commissions.  In Massachusetts, the Department of Utilities recently noted in its "Future of Gas" docket that geographically targeted electrification should be cautioned because electrification raises concerns over customer choice, cost, obligation to serve, and customer service protections.[119]  Moreover, a recent Rocky Mountain Institute white paper, titled "*Non-Pipeline Alternatives ("NPA"):*

---

[114]     *See* PSE2024-01, PHMSA Letter to Chairman Thompson, filed May 13, 2024, regarding CY 2023 pipeline safety program and progress report reviews.  According to PHMSA's records, there was a total of 392.56 miles of cast iron mains remaining in CY 2023 in the District of Columbia.

[115]     *See* DOEE Comments at 7-9.

[116]     *See* DCCA Comments at 2; *see also* Council Letter at 1.

[117]     We believe that *Formal Case No. 1167* is the more appropriate docket to address the integrated infrastructure planning issues raised by the Council and commenters.

[118]     *Formal Case No. 1167*, Order No. 21593 and Order No. 21631 (Unanimous vote by Commissioners).

[119]     Docket No. D.P.U.20-80, Massachusetts Department of Public Utilities, Order No. 20-80-B, at 41 (rel. December 6, 2023).

*Emerging Opportunities in Planning for U.S. Gas System Decarbonization*,"[120] further highlights the difficulty of neighborhood electrification by detailing the limited success of state electrification efforts, noting that no avoided replacement NPA project involving more than five customers has been successful in the United States.[121]

47.    At the same time, the Commission is also acutely aware of the District's aging gas system and is concerned that without intervention, that system will continue to degrade, and leak rates would be expected to grow.[122] While the Commission agrees that pipe repairs continue to be necessary for controlling the active leaks occurring in the District, the Commission cannot allow the system to deteriorate unabated, even as the District undergoes its energy transition thus, a strategically focused pipe replacement program needs to be considered to avoid cascading leaks in the future by replacing aging, leak-prone high-risk mains and services, thereby enhancing the safety, reliability, and GHG emissions for the District residents until the plans for full electrification are solidified.

48.    It is within this context that it is clear that our pipeline replacement program needs to be revised to better align with both Federal and District climate initiatives. Therefore, we believe that it is necessary for WGL to file a new restructured PIPES plan to ensure safe and reliable operation of the natural gas system that appropriately aligns with the District's Climate goals. The Company's new approach must balance the need to replace leak-prone, highest-risk pipe segments to prevent dangerous cascading and potentially hidden "super emitter" leaks before they happen while minimizing the stranded assets as the District continues to undergo the energy transition. The new PIPES plan shall be based, in part, on the Commission's accepted findings and modifications to the Continuum PIPES 2 Audit recommendations that are summarized below and further discussed in the Addendum attached to this Order. We believe that the new restructured plan will allow WGL to take a strategically targeted approach to pipe replacement, preventing future leaks and reducing GHG emissions in the District.

49.    Accordingly, we direct WGL to file a new restructured Pipes Application that targets the highest-risk segments of the aging, leak-prone mains, and services in the District for a period of three years (2025-2027) within 45 days of the date of the Order. The Commission expects WGL's new Application to reflect a focused approach, demonstrating the critical balance between reductions in future leaks and GHG emissions against the risk of stranded assets as the District continues its energy transition. The Commission acknowledges the reality of the need to change the focus of the pipe replacement program to address the District's climate policies, which promote electrification as opposed to use of natural gas.[123] Therefore the Company's new

---

[120]    Rocky Mountain Institute, Non-Pipeline Alternatives: Emerging Opportunities in Planning for U.S. Gas System Decarbonization (2024), https://rmi.org/insight/non-pipeline-alternatives/.

[121]    *Id.* at 3.

[122]    *See, e.g.*, PIPES 3 Application, Exhibit A, Testimony of Witness Jacas at 25.

[123]    NARUC Task Force on Natural Gas Resource Planning research shows states in the northeast with similar clean energy and decarbonization goals that also have accelerated pipe programs and continue to review and revise

Application should be narrowly focused on the aging highest-risk pipe segments that are highly susceptible to leaks, increased GHG emissions from leaks, and subsequent failures in the near future if not replaced.  The Application should focus on originally conceived 40 plus year replacements based on only pipe age and material type.  The change in focus will contract the scope of the work that is necessary in addressing the District's aging infrastructure with the highest risk to help maintain the safety and reliability of the gas distribution system.  In addition to redefining a "new normal" (*i.e.,* electrification and targeted replacement as opposed to the complete replacement of over 400 miles of aging, high risk pipelines ) and new targeted prioritization of highest-risk segments of the aging leak prone pipe replacements, the Commission also expects the Company's new restructured pipe replacement plan to reflect the actual rates of replacements seen over the first 10 years of *PROJECTpipes* and incorporate the lessons learned and the Commission's directives based on the Continuum Audit to establish an achievable "new normal" for accelerated replacements.

50.    Additionally, WGL's new PIPES plan must demonstrate greater cost effectiveness. In 2022, WGL reported that the cost of replacing main pipelines was $7.8 million per mile.  While WGL has attributed these high costs due to factors such as operating in a dense urban environment, adherence to safety protocols, and compliance with District regulations,[124] a review of similar pipe replacement programs across the Northeast reveals that no other utility incurs costs as high as the costs that WGL submits in the PIPES 3 Application.[125]  Indeed, the proposed budget for PIPES 3, totaling $671.8 million, underscores the need for a more cost-effective approach, as that figure is excessively steep, and ratepayers would bear the financial burden.

51.    The new Application shall include the following items reflecting lessons learned during the first 10 years of PIPES:[126]

---

their plans appropriately.  *See generally*, https://www.naruc.org/committees/task-forces-working-groups/task-force-on-natural-gas-resource-planning/state-policies/.

[124]    WGL Audit Comments at 15-16.

[125]    For example, even when compared against Con Edison's application for recovery of its Leak-Prone Main Replacement Program, the estimated cost of their 2022 plan was $965 per foot.  This estimate equals roughly $5 million per mile.  The Commission cannot fathom that WGL's pipe replacement program is more expensive than that of a utility that covers Manhattan, Brooklyn, Queens, Bronx, Staten Island and Westchester.  WGL must present a more cost-effective program in a new PIPES Application.

[126]    We note that the Partial Concurrence recommends that PROJECT*pipes* be rethought by collecting a variety of data/information, creating a digital map and dataset, and by creating an integrated infrastructure plan.  Partial Concurrence of Commissioner Beverly at 5-7.  However, we believe that the Concurrence's approach presents challenges in that it, in part, seeks critical infrastructure information such as the location of all distribution system pipes and other infrastructure—and their age, material, pressure, and condition, to which the Commission only requires access if there is an emergent need.  Additionally, some of the requested information may not be useful since it deals with moving targets such as the location, concentration, volume, and grade of leaks.  In addition, some of the requested information (such as data on fugitive methane emissions from distribution system leaks) can be found in other formal case matters, specifically *Formal Case No. 1162*.  Finally, the Partial Concurrence seeks information on the impact of existing climate legislation on baseline gas demand, which is already addressed in *Formal Case No. 1167*'s implementation of the Climate Business Plan.

a.   Miles of aging high-risk leak-prone main replaced to date per year by program and material type (*e.g.*, cast-iron, bare and unprotected steel, etc.);

b.   The number of aging high-risk leak-prone services replaced to date per year by program and material type (*e.g.*, copper, bare and unprotected steel, etc.);

c.   Miles of aging high-risk leak-prone main remaining to be replaced by program and material type;

d.   The number of aging high-risk leak-prone services remaining to be replaced by program and material type;

e.   Current estimated leak rates for existing pipes by material type (including methodology for calculation);

f.   Expected completion date for each program based upon current replacement rates, replacements to date, and remaining work to be completed.  These estimates should include a detailed analysis of the need to replace the identified high-risk pipes and the ability to achieve this completion target;

g.   Expected replacements by program and material for the three-year period;

h.   Provide the basis for the proposed annual budgets for the three-year period;

i.   Explain how, if at all, ALD is incorporated into proposed project selection. Specifically, whether leaks identified via ALD are processed differently in the risk modeling software than leaks found through traditional sources;

j.   For proposed planned replacements for the next three years, provide a method for tracking estimated leak reductions and GHG emissions reductions that considers the actual condition, previous leaks, and material type of the pipes actually replaced (in contrast to the current approach for calculating fugitive emissions, which relies on general assumptions based on the pipe material).[127]  Figures shall be reported as annual reductions from each year of work, not cumulative totals, and shall include detailed explanations of the methodology used to calculate the avoided leaks and GHG emissions;

k.   Explain how JANA Lighthouse will aid in a project prioritization that aligns with the District's climate goals, including projections on GHG emission reductions and preventing leaks each year.  This should include details on how JANA produces risk scores and risk rankings;

---

[127]     The Commission seeks estimated GHG emission reductions as the Commission is not aware of any current industry standard for direct measurement of fugitive emissions.

l.    Explain how the restructured targeted replacement program would account for any electrification programs within the District. This explanation should include specific plans for coordination with interested stakeholders and the D.C. Government to ensure that replaced pipes are not expected to be decommissioned within 10 years of installation;

m.    Identify the number of miles of mains and number of services that can be decommissioned each year of the program either due to abandonment of redundant facilities or customers pursuing electrification opportunities on radial portions of the system;

n.    Explain how "normal" replacements will be differentiated from targeted "accelerated" replacements under the new program. Identify criteria beyond material type(s) and potential program qualification that will be used by WGL when categorizing whether a replacement is "normal" or "accelerated;"

o.    Explain and demonstrate the need for a surcharge recovery mechanism for the new restructured pipe replacement program;[128]

p.    Other than pipe replacements, identify techniques, technologies, strategies, or other options the Company considered to reduce the leak rates and risk of the aging leak-prone pipes in the distribution system;

q.    Provide the results of the formal assessment on internal versus external crew usage; and

r.    Provide any results from WGL's industry peer review on construction execution best practices begun in 2023,[129] including explaining the impacts on cost and schedule of any unique construction conditions in the District.[130]

52.    In addition to more narrowly targeted replacements of the highest-risk segments of the aging, leak-prone pipe, the new restructured pipes replacement plan shall incorporate the Commission's directives based on Continuum's Audit as outlined in the summary below:

---

[128]    It is noted that prior to receiving surcharge recovery for pipe replacement, the Company replaced more miles of main, at a lower cost, using their capital expenditure budget. *See Formal Case No. 1154*, Notice of Commissioner Beverly, filed January 8, 2024.

[129]    WGL Audit Comments at 15-16.

[130]    According to WGL their costs are driven (in part) by an extremely restrictive permitting and work environment in the District. *Id.* We believe that requiring WGL to quantify the costs of any permitting restrictions will give the stakeholders a better understanding of these costs in comparison with other jurisdictions.

| Continuum Audit Recommendation | Task | Description | Commission Action |
|---|---|---|---|
| 1.1 Variance Analysis | 1 | Comply with requirements to complete variance analysis and formally use this to make process improvements to actual variance | Accept |
| 1.2 Project Addition Flexibility | 1 | Increase flexibility for WGL to backfill work | Reject |
| | | | |
| 2.1 Retain but modify Program 1 | 2 | Remove Grade 1 leaks from PROJECT*pipes* replacements, maintain scattered services projects otherwise | Accept |
| 2.2 Services Life of Plan | 2 | Increase Life-of- Plan reporting and planning for Program 1 (services) | Accept |
| 2.3 Small Diameter Main Focus | 2 | Develop a dedicated program to focus on small-diameter main | Partially Accept; use diameter as a "tiebreaker" for similar risk projects |
| 2.4 EVA Program | 2 | Apply Earned Value Analysis ("EVA") techniques for planning and reporting | Accept |

Table 1:
Summary of Continuum Recommendations

| Table 1: Summary of Continuum Recommendations | | | |
|---|---|---|---|
| Continuum Audit Recommendation | Task | Description | Commission Action |
| 2.5 Integrated & Resource Loaded Schedule | 2 | Develop a fully resource-loaded schedule across all PROJECT*pipes* programs with reporting on the current status of the overall accelerated pipe replacement program | Accept |
| 2.6 Accountability for Cost Estimates | 2 | Have Project Manager sign off on cost estimates before they are finalized | Accept |
| 2.7 PMO Strategic Planning | 2 | Have the Project Management Office ("PMO") complete planning every 2-3 years instead of 5 | Accept |
| 2.8 Project EVA, Resource Loaded & Integrated Schedule | 2 | Apply EVA techniques at a project level and update schedules to reflect fully resource-loaded planning | Accept |
| 2.9 Standard Reconciliation Reporting | 2 | Standardize reporting using PIPES 1 format for PIPES2 and new PIPES reports | Partially Accept; require WGL to submit consolidated reporting on all programs by year in future annual reports |
| 2.10 Dashboard Augmentation | 2 | Improve PROJECT*pipes* Dashboard to include Life-of- Plan totals with year-over-year comparisons | Accept |

| Table 1: Summary of Continuum Recommendations | | | |
|---|---|---|---|
| Continuum Audit Recommendation | Task | Description | Commission Action |
| 2.11 Life-of-Plan Reporting | 2 | Provide reporting to the Commission on Life-of-Plan expectations | Accept |
| 2.12 17-page executive summary for the PIP | 2 | Create a 17-page "at a glance" summary for the PIP, including EVA and Life-of-Plan information | Accept |
| 2.13 Cost Driver Conference Recommendations | 2 | Take steps to implement discussed improvements from the Technical Conference | Accept |
| 2.14 Internal Crew Usage | 2 | Evaluate using internal crews instead of external contractors for PROJECT*pipes* | Accept |
| 2.15 Best Practices Comparison | 2 | Conduct Benchmark of Best Practices with other urban utilities | Accept |
| 2.16 GIS System Adoption | 2 | Adopt GIS system mapping tied to GPS coordinates to allow more accurate tracking of assets and listing of projects | Reject; this is premature and will be evaluated once WGL implements its new mapping software |

| Table 1: Summary of Continuum Recommendations | | | |
|---|---|---|---|
| Continuum Audit Recommendation | Task | Description | Commission Action |
| 2.17 New Technology Investigation | 2 | Set up new efforts in the District targeting two new techniques, processes, etc., each year | Accept |
|  |  |  |  |
| 3.1 Document Accuracy | 3 | Develop a Formal Document review process | Accept |
| 3.2 File Nomenclature | 3 | Develop a file nomenclature process for Class 3 estimates that shows the document is the final document | Accept |

53.     We note that the benefits of electrification efforts are the reduction of GHG emissions and reducing expenditures on an aging gas distribution system.  While the District has moved beyond pilot projects for electrification to fully developed programs, the Commission notes that we have seen a lack of coordination between WGL and electrification programs in the District. As we continue to advance the District's climate goals, the Commission acknowledges that there is a need for more coordination amongst District entities and stakeholders to examine how to best address moving towards the decommissioning of main pipelines.  Accordingly, we encourage the Company to engage all interested stakeholders in a robust discussion identifying critical policy questions that WGL should address in developing the Company's new plan, and the Commission must consider when evaluating the Company's new application, in addition to the items identified by the Commission in paragraphs 48-52 prior to the filing of the new PIPES application.

**Procedural Schedule**

54.     The Commission adopts the following procedural schedule to consider the new WGL plan.  The Commission believes that the procedural schedule affords parties the requisite amount of time to meaningfully assess the Company's new Pipes Application in developing a comprehensive evidentiary record for the Commission's consideration of this matter.   The Commission also believes the adopted schedule recognizes and accommodates the parties' case preparation.

**Order No. 22003**                                                           **Page 25**

| Date | Action/Deliverable |
|---|---|
| 6/12/24 | Case Opening/Procedural Order |
| 7/29/24 | WGL Files Revised Application and Discovery Begins |
| 9/12/24 | Direct Testimony and Exhibits of OPC and Intervenors |
| 10/14/24 | Rebuttal Testimony and Exhibits of OPC/Intervenors |
| 10/21/24 | Settlement and Stipulation Conference |
| 11/4/24 | Discovery Ends |
| 11/4/24 | Joint Statement of Stipulation of Facts and Settlement Conference Report |
| 11/8/24 | Prehearing/Status Conference |
| 11/22/24 (Friday) 11/25-26 (Monday and Tuesday - Thanksgiving week) | Evidentiary Hearings- **if needed** |
| 12/10/24 | All Post-Hearing Briefs |

### Prehearing/Status Conference and Proposed Issues

55.    The Commission directs the parties to meet in conference and prepare a Joint Prehearing Statement identifying the material issues of fact in dispute (if any).  Once the parties have identified any material issues of fact, the Commission directs each party to submit a list of witnesses to be called, briefly describe the purpose of the testimony (*i.e.,* link the testimony to one or more material issues of fact), and provide an explanation for why the witness's oral testimony will give meaningful insight that the written testimony does not.  Providing this information assists the Commission in streamlining the proceedings, so we can better determine if material issues of fact in dispute require an evidentiary hearing.  Following usual Commission policy, we will only hold an evidentiary hearing if we determine that material issues of fact are in dispute in this proceeding.[131]  In addition, the Joint Prehearing Statement shall include a Joint Stipulation signed by all parties to the Joint Stipulation, and it shall be treated as a conclusive admission by the parties to the issues in Joint Stipulation and, except where justice requires it, the Commission will not permit a party to qualify, change, or contradict a stipulation in whole or in part.  Note that at the Prehearing/Status Conference, Commission Staff will be responsible for reviewing the Joint Statement and Joint Stipulation in order to identify the material issues in dispute and will address

---

[131]    By "material issues in dispute," the Commission means disputes that are pivotal to the Commission's ultimate decision in this matter. *See, Lopez v. Council on American Islamic Relations Action Network, Inc*., 826 F.3d 492, 496 (D.C. Cir. 2016). *See also, Formal Case No. 1116, In the Matter of Application for Approval of Triennial Underground Infrastructure Improvement Projects Plan,* Order No. 17627, ¶ 71, rel. September 9, 2014.

the remainder of the procedural schedule.[132]

### Discovery

56.    Discovery in this proceeding is to be conducted in accordance with Commission Rules 122 through 126.[133]  Once discovery concludes, the Commission will ask parties to identify genuine issues of material fact in dispute that would require a hearing.[134]  If an evidentiary hearing is necessary, the evidentiary hearing is not to be used as the forum for the parties to conduct discovery.  The Commission encourages the parties to use every available method of discovery, including depositions, to obtain answers to questions so that the parties can determine what, if any, material issues of fact in dispute cannot be resolved by the parties, and will be presented for the Commission to consider at the evidentiary hearing.  Any objections to discovery requests must be served within five (5) business days after service of the request.  Any follow-up discovery requests are due within five (5) business days of service, and any objections are due to such follow-up requests within two (2) business days.  The parties shall consult with each other and attempt in good faith to resolve all discovery disputes prior to making an objection, and again prior to filing a motion seeking relief from the Commission.  If parties cannot resolve a dispute, the aggrieved party may file a motion for relief within three (3) business days from service of the written objection.  The opponent shall respond to the motion within two (2) business days of service of the motion.  The motion and response shall be in letter format and shall each be limited in length to three (3) single-spaced pages with a 12-point or greater font.  The letters must specify the dates and times of all consultations the moving party has had to resolve the dispute with the party failing to make the disclosure or discovery.

### Delegation of Authority

57.    To ensure that procedural issues do not impede the parties' hearing preparations, the Commission delegates to its General Counsel, for this case only, decision-making authority for all procedural motions, such as motions for extension of time and for special appearance.  Additionally, the General Counsel is directed to issue other scheduling notices as needed during this proceeding.  Finally, the Commission directs the General Counsel to issue an initial decision on any motions to compel.  Any party may file a petition for reconsideration of the General Counsel's decision with the Commission.

---

[132]    *See Formal Case No. 1154,* Order No. 20333, ¶ 9.

[133]    15 DCMR §§ 122-126 (2023).

[134]    *See*, *Potomac Elec. Power Company v. Public Service Commission of the District of Columbia*, 457 A.2d 776, 789 (1983). The D.C. Court of Appeals has indicated that a fact is "material if a dispute over it might affect the outcome of a suit under governing law." (*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.  248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court has further stated, "[A]n issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" (*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**THEREFORE, IT IS ORDERED THAT:**

58.      The PROJECT*pipes* 2 Audit Report is **ACCEPTED**;

59.      Washington Gas Light Company's PROJECT*pipes* 3 Application is **REJECTED** and *Formal Case No. 1175* is **CLOSED**:

60.      The Commission **OPENS** *Formal Case No. 1179,* In the Matter of Washington Gas Light Company's Strategically Targeted Pipe Replacement Plan;

61.      The Commission **DIRECTS** Washington Gas Light Company to file an updated and restructured Strategically Targeted Pipe Replacement Plan Application in accordance with the directives prescribed in this Order within 45 days of the date of this Order; and

62.      The Commission **ADOPTS** the Procedural Schedule set forth above.

**A TRUE COPY:**                          **BY DIRECTION OF THE COMMISSION:**

**CHIEF CLERK:**                          **BRINDA WESTBROOK-SEDGWICK**
**COMMISSION SECRETARY**

**Attachment to Order No. 22003**

**Addendum: Audit Report Summary**

1.        The Continuum PIPES 2 Audit Report determined that WGL successfully met the replacement targets set by the Commission in Order No. 20671, and the Commission accepts the Audit findings that WGL completed the projects prudently, with sound engineering judgment, and constructional integrity.  We also accept the Audit Report's finding that the work WGL performed reduced the risk, leaks, and improved safety within the District.  However, as further explained below, WGL's new/updated accelerated pipe replacement Application shall be consistent with the specific recommendations.

2.        For Task 1, Audit Report Recommendation 1.1 (Variance Analysis), the commission accepts the recommendation that WGL shall complete a variance analysis on any project that exceeds five percent (5%) positive or negative variance from that original estimate and formally use this analysis to make process improvements in estimation to actual variance.[1]

3.        With respect to Task 2's requirement to review the Liberty Management Audit ("LMA") for PIPES 1, the Commission agrees with the Continuum Audit Report determination that WGL has incorporated the majority of the recommendations from the PIPES 1 LMA.   The Audit Report makes 17 recommendations for Task 2, and  we agree these 17 recommendations provide an opportunity for further improvement by WGL.  The recommendations note cohesive planning from the various groups within the Company to increase accountability and coordination, from the planning of a program through execution.  In conjunction with the specific Task 2 recommendations, the Commission directs that replacement of services triggered by Grade 1 leaks should be removed from PROJECT*pipes*, as this type of emergency work should be considered "normal replacements".[2]   The Commission agrees with Recommendation 2.1 to retain Program 1 (Scattered Services) as a separate program, but to remove all emergency work from eligibility even when the material replaced would otherwise qualify.

4.        With respect to Recommendation 2.2 (Service-Life-of-Plan), of the three options presented (revise the estimated service that can be replaced; revise the forecasted end date; or propose a specific mitigation plan), WGL proposes to update completion dates for all programs consistent with Option 1.[3]  Although we are moving away from a program that contemplates the complete replacement of all high-risk materials, we believe that there is still merit in an ongoing evaluation of the Company's performance. WGL's updated Application must also consider future electrification programs in the District.

5.        The Commission accepts in part Recommendation 2.3 (Small-Diameter Main

---

[1]        Audit Report at 23.  The Commission rejects Audit Report Recommendation 1.2, to allow more project addition flexibility, because we believe that the existing process for addition of projects is functional. With the additional concern of meeting DC climate goals, our review is necessary to ensure alignment with those goals as well as proper cost recovery.

[2]        Audit Report at 46.

[3]        Audit Report at 46-48.  *See also* WGL Comments at 5.

1

**Attachment to Order No. 22003**

Focus).[4]  WGL's DIMP analysis and risk-modeling evaluation includes consideration of the risk from small diameter pipe along with the attempt to maximize total risk removed through the Risk Reduced per Dollar Spent ("RRDS") metric.  WGL claims that the Company does not need to utilize a separate program specifically for a small diameter main;[5]  however, the Commission believes more information is needed on the operation of WGL's JANA risk model and how it evaluates both small diameter and other types of main.   The Recommendation otherwise reiterates the 2019 LMA recommendation. The Audit Report notes that, at a certain point, the RRDS[6] metric will be similar for many programs, including both large and small diameter mains, and at that point WGL will need to prioritize small diameter mains.[7] The Commission previously elected not to implement this Recommendation from PIPES 1 in favor of the RRDS approach. The Commission believes there is value in a tiebreaker or sub-prioritization as recommended by Continuum as many projects have had very similar RRDS scores, but the Commission does not believe a separate program is required at this time.

6.       The Commission accepts Recommendation 2.4 ( Earned Value Analysis Program) to allow the EVA techniques to be applied throughout the course of the accelerated mains replacement program; to establish a schedule and budget performance on the entirety of the accelerated mains replacement program; and report quarterly to senior executives, allowing for course corrections as necessary.[8]  WGL indicated that the Company already performed an EVA reporting at the program level, and they plan to improve reporting and will submit a presentation of improvements within 6 months of approval of an updated Application and PIP updates.[9]  Because of the PIPES 2 extension, and the evaluation period for a new Application filing, the Commission directs the Company to update the EVA implementation as part of this and any future PIPES plans.

7.       The Commission accepts the Audit Report's Recommendation 2.5 (Integrated & Resource Loaded Schedule Program) to require WGL to develop a resource-loaded schedule that is fully integrated across planning, budgeting, engineering, design, permitting, construction, and close out, for the entirety of the accelerated mains replacement program, and updated quarterly to demonstrate the progress and accuracy of the schedule and resource forecast.[10]  The updated processes shall contain a master schedule, as OPC requests[11], with all the components of an integrated schedule recommended by the Audit Report.  We believe fully integrating the design,

---

[4]        Audit Report at 41, 50-57.

[5]        WGL Audit Reply at 5-6.

[6]        In PIPES 2, WGL was instructed to prioritize projects based upon risk reduced per dollar spent, which allowed them to remove the maximum total risk from the system with the available funds rather than solely prioritizing the highest raw risk score regardless of cost.

[7]        Audit Report at 49-51.

[8]        Audit Report at 58.

[9]        WGL Audit Comments at 6.

[10]        Audit Report 58-59.

[11]        OPC Audit Comments at 1 and 8.

2

**Attachment to Order No. 22003**

budgeting, and planning process with the construction process will not only increase reporting visibility but will provide a complete view of the Company's plans and progress.  The resource-loaded integrated schedule shall contain the following:

      a. Components:
            i. Start dates, end dates, durations, remaining duration.
            ii. Total quantities, remaining quantities.
            iii. Resources.

      b. Activities:
            i. Planning activities.
            ii. Budgeting activities.
            iii. Estimating activity.
            iv. Design activities.
            v. Contractor work distribution process as an activity.
            vi. Permitting activity.
            vii. Cover construction including various parts such as paving (currently included in annual project list).
            viii. Close out activities.

      c. Framework:
            i. Cost-loaded schedule.
            ii. Labor loaded schedule.
            iii. Program baseline schedule.
            iv. Project by project breakdown.[12]

8.      Audit Report Recommendation 2.6 (Accountability for Cost Estimates) recommends development of a requirement of accountability into the cost estimate and project management function, which will require the project manager to develop and/or sign off on the cost estimate before it is submitted to the Construction Manager for approval.[13]  WGL indicates that the Company will consider whether Project Management department sign off should be incorporated into the process.[14]  The Commission accepts this recommendation and directs this measure to be included in the new/updated Application.

9.      Audit Report Recommendation ("ARP") 2.7 (PMO Strategic Planning) suggests that the PMO must go through the process of strategic planning every two to three years to align their plans and resources to an overarching construction and corporate strategies. The VP of Construction and/or ARP Executive Governance Committee is responsible for approving this plan or sending it back for refinement when presented.[15]  WGL states that the Company works in five-year tranches for

---

[12]      Audit Report at 58.

[13]      Audit Report at 61.

[14]      WGL Audit Comments at 8.

[15]      Audit Report at 61.

3

**Attachment to Order No. 22003**

planning purposes, and that this long-range plan considers both available and needed resources for the PIPES programs. The plan is vetted by the Company's senior executive leadership for alignment with the Company's long-term strategic plans.[16]    The Commission accepts the Audit Report recommendation of shortening the strategic plan, and directs that the new/updated Application provide for a three-year process to better align with the District's climate goals.

10.    For Audit Report Recommendation 2.8 (Project EVA, Resource Loaded Integrated Schedule), the Commission accepts the recommendation that WGL is to apply EVA techniques to a subset of accelerated mains replacement projects in order to establish the schedule and budget performances.  The Audit Report recommends building resource-loaded and fully integrated schedule as part of the PMO philosophy.  The new/update plan shall utilize the same resource-loaded integrated schedule noted in Recommendation 2.5 for analysis.[17]

11.    The Commission partially accepts Audit Report Recommendation 2.9 (Standard Reconciliation Reporting), which requires WGL to provide more robust and detailed reporting associated with the reconciliation reports prepared as part of PIPES 1.[18] The ability to accurately compare the performance each year to prior years is important in evaluating progress on any pipe replacement program.  To that end, in the new/updated Application, WGL should maintain the presentation format and data set each year.  Additionally, although WGL notes that the historical data is available in previous filings, we believe it would be an easier comparison of the data and to track progress for any PIPES program if the Company re-submitted a consolidated report on all PIPES 1 and PIPES 2 projects in a single format.

12.    Audit Report Recommendation 2.10 (Dashboard Augmentation) proposes augmenting the existing PROJECT*pipes* program dashboard to include the following requirements: (a) Compare the total program units and costs plan to year-over-year and year-to-date actual performance, and provide a short (1-3 sentence) narrative describing if the entire program is on pace for successful completion; (b) When a monthly variance exceeds 10%, or an accumulated year-to-date variance exceeds 10%, a formal root cause analysis should be conducted to establish the source and cause(s) of the variance; and (c) When a monthly variance exceeds 10%, or an accumulated year-to-date variance exceeds 10%, a formal mitigation plan should be submitted to the VP of Construction and/or ARP Executive Governance Committee for approval and implementation.[19]  WGL states that it uses the dashboard to update senior executives with metrics and graphs of actual performance (versus a 3-year plan) on a monthly basis, and to track year-to-date units, project management, and construction work in order to determine if corrective actions are necessary.[20]  Although WGL maintains a robust year-to-date reporting infrastructure, the year-over-year and program total reporting is lacking and should be enhanced to ensure that

---

[16]    WGL's Audit Report at 9.

[17]    Audit Report at 61-63.

[18]    Audit Report at 63-64.

[19]    Audit Report at 65.

[20]    WGL Audit Comments at 11.

4

**Attachment to Order No. 22003**

the total program remains on course. Therefore, for the new/updated plan, the Commission accepts the recommendation to add year-over-year and sum-of-program reporting requirements to ensure the overall replacement of high-risk pipes if the District continues on schedule, and that WGL's program remains on track in support of improved safety, reliability, and the District's climate goals.

13.     The Commission accepts Audit Report Recommendation 2.11 (Life-of-Plan Reporting; see also Recommendation 2.2), which requires annual performance reports to meet Life-of-Plan expectations.  The reporting shall include the following: (a) Compare the Life-of-Plan expectation for units to year-over-year actual performance, and provide a short (1-3 sentence) narrative describing if the Life-of-Plan is on pace for successful completion; (b) When an annual variance against Life-of-Plan expectations exceeds 10%, a formal root cause analysis should be conducted to establish the source and cause(s) of the variance; and (c) When an annual variance against Life-of-Plan expectations exceeds 10%, a formal mitigation plan should be submitted to the VP of Construction and/or ARP Executive Governance Committee for approval and implementation.[21] WGL asserts replacing pipe throughout the District has reduced risk and GHG emissions, by the Company's calculations a cumulative 23,726 metric tons of $CO_2$ equivalent to date.[22]

14.     WGL also asserts the GHG performance metrics are already incorporated in filings in *Formal Case 1162*.[23]  The Company argues that the dynamic nature of risk profile prioritization does not allow for reliable predictions of the exact mains to be replaced (including size, material, location, or specific services), and thus year over year comparisons are not possible.[24] The Company argues this complexity is further exacerbated by the difficulty to predict events such as rapid inflation or the COVID-19 pandemic.  OPC argues the Audit Report's re-defining of a new normal for WGL lowers the standards for evaluating the Company's performance.[25] OPC also expresses concerns on the challenges of DC undergrounding work, as well as concerns on District ratepayers having to bear the cost for acceleration as the District transitions toward electrification.[26] The Commission notes that replacements play a significant role in ensuring the safety and reliability of the gas distribution system in the District.  We believe that the pipe replacements completed through the PROJECT*pipes* program have significantly aided in the reduction of gas leaks, and in the maintenance of a safe and reliable gas system in the District. Keeping this in mind, we believe that the new/updated plan will need to establish a new baseline to help reflect the changing environment in the District, including the District's climate goals and ongoing electrification efforts. Although WGL submits robust annual reports on replacements,

---

[21]     Audit Report at 68-71.

[22]     WGL Audit Comments at 11-13.

[23]     WGL Audit Comments at 12.

[24]     WGL Audit Comments at 13.

[25]     OPC Audit Comments at 7.

[26]     OPC Audit Comments at 7.

5

**Attachment to Order No. 22003**

costs and project status, those reports provide little information on the overall progress of PROJECT*pipes* against the long-term targets for pipe replacement. The Commission believes that accepting this recommendation and requiring WGL to include it in the new/updated plan will produce better Life-of-Plan reporting and analysis to ensure that PROJECT*pipes* remains on track as a cohesive plan to accomplish these objectives.

15.    With respect to Audit Report Recommendation 2.12 (Executive Summary for the PIP), the Commission accepts the recommendation to provide a cover page plus three pages for each approved program (currently six approved programs): Current year, current year in PROJECT*pipes*, and current year in Life-of-Plan – (See Recommendation 2.2: Services Life-of-Plan, Recommendation 2.4: EVA Program, and Recommendation 2.11: Life-of-Plan for related commentary).  The new/updated plan shall include: (1) an executive summary that provides the current year compared to both the Annual Project List, and the overall approved plan filtered by sub-program; (2) Program 10 performance as related to each sub-program to help track progress on each material category; and (3) current crews and estimates on crews required to complete the current PIPES plan.[27]

16.    The Commission accepts with modifications the Audit Report Recommendation 2.13 (Cost Driver Conference).  The Audit Report recommends encouraging WGL to take definitive action with respect to its interaction with DDOT and to implement, refine, or define why they are inappropriate, and annually report these efforts as part of the PIP.[28]  The recommendations or actions include: (a): develop a committee (DDOT Regulation Refinement Committee) comprised of affected utilities and interested stakeholders to present a cost and impact analysis of DDOT's current requirements and propose changes to DDOT's regulations to the D.C. Council; (b) assist the DC UCC regulation refinement efforts by participating in the Utility Coordination Committee (UCC), which includes utilities operating in the District of Columbia and DDOT, to allow discuss issues affecting all participants, such as proposed DDOT regulation changes and impacts on ratepayers, better coordination on projects, and comparison of permit approval requirements; and (c) Conducting a formal Impact Study on permitting in D.C. Code and regulations to suggest ways to streamline the permitting process.[29]  WGL states that the Company solicits external stakeholder involvement and that it is not opposed to these recommendations.[30]  The Commission recognizes that this has been an ongoing challenge for WGL, and permitting delays affects the Company's productivity and costs.  The Commission will facilitate additional technical conferences with DDOT and WGL to continue the ongoing dialogue started in 2023.

17.    Audit Report Recommendation 2.14 (Internal Crew Usage) makes a formal assessment of the opportunity, strengths, and weaknesses of internal crew use by WGL as part of a larger capital construction and O&M strategy to support PROJECT*pipes* Life-of-Plan

---

[27]    Audit Report at 43, 71-72.

[28]    Audit Report at 43-44, 80-81.

[29]    Audit Report at 44 and 80.

[30]    WGL Audit Comments at 14.

6

**Attachment to Order No. 22003**

requirements at each PIPES renewal, or every five years, whichever is shorter.[31] WGL states the Company appreciates the flexibility to use internal and external crews, but the Company will make a formal assessment of internal/external crews in a PIPES renewal request.[32] In addition, WGL notes that it has benchmarking analysis for 2023 for similar utilities, in accordance with Audit Report Recommendation 2.15, and will evaluate the results.[33] WGL ALSO noted the Company plans to include their evaluation of new technologies with the PIPES 3 Annual Report, as recommended by Audit Report Recommendation 2.17.[34] PWBLDC asserts the Commission should reject the recommendation and notes the extensive training necessary to bring on qualified crews.[35] The Commission accepts Recommendation 2.14 and modifies the recommendation to include the suggested evaluations to be added to the restructured PROJECT*pipes* Application. The new/updated plan should include the aforementioned modifications.

18. The Commission accepts Audit Report Recommendation 2.15 (Urban Challenges Benchmark/Best Practice Comparison), which suggests that WGL perform a benchmark and best practice comparison of major urban cities where critical coordination on underground infrastructure construction is necessary among city permitting authority, city transportation authority, electric utility, gas utility, and separate 811 authority. The objective of this study is to establish the process specifically used to coordinate underground construction, and then document the best practices used to control cost, protect the public, and speed the resolution of work. Areas that should be used for potential benchmark and best practice comparison include:[36]

| City | Gas | Electric | Separate 811 |
|---|---|---|---|
| Birmingham, AL | Spire | Alabama Power | No |
| Boston, MA | National Grid | Eversource | No |
| Brooklyn, NY | National Grid | ConEd | Yes |
| Chicago, IL | Peoples Gas | Exelon | Yes |
| Columbus, OH | NiSource | AEP | No |
| Jacksonville, FL | TECO | JEA | No |
| Las Vegas, NV | Southwest Gas | NV Energy | No |
| Los Angeles, CA | SoCal Gas | LADWP | No |
| Philadelphia, PA | PGW | PECO | No |
| Phoenix, AZ | Southwest Gas | Arizona Public Service | No |
| St. Louis, MO | Spire | Ameren | No |

19. WGL conducted a benchmark assessment in 2021 to evaluate contract rates and terms, and concluded their rates were below benchmark averages. In 2022 Q4 the Company established a Business Transformation Office for the purpose of evaluating potential process

---

[31]    Audit Report 44 and 90.

[32]    WGL Audit Comments at 14.

[33]    WGL Audit Comments at 14.

[34]    WGL Audit Comments at 17-18.

[35]    PBWCLD Audit Comments at 2-3 and 6-7.

[36]    Audit Report at 44, 98-99.

7

**Attachment to Order No. 22003**

improvements. In 2023, WGL supported an industry peer review of construction best practices and plans to evaluate those results once they are available.[37] PBWDLC was supportive of the benchmarking recommendations and requested to be included in any benchmarking studies.[38] We believe that the recommendation of benchmarking and best practice comparisons with major urban cities is a good suggestion, even where WGL faces challenges that may not be comparable to other jurisdictions. WGL shall provide the results of their 2023 best practices evaluation and work with peers who have similar dense urban environments to evaluate further potential improvements and best practices.

20.    Audit Report Recommendation 2.16 (GIS System Adoption), would require WGL to adopt a GIS system for asset mapping, and require notification through 811 using GPS coordinates.[39] In response, WGL contends it uses Smallworld as their GIS asset mapping, but plans to build out and transition to ESRI ArcGIS in 2Q of 2024, with completion in 2026, and will reevaluate mapping at that time. Smallworld is incapable of mapping with GPS accuracy.[40] The Commission rejects this recommendation as premature, since WGL is transitioning to a new GIS system for asset mapping that will not be operable until 2026. The evaluation of the new software will be part of future prudency review and rate case evaluations and should be handled at that time.

21.    Audit Report Recommendation 2.17 (New Technology Investigation) recommends WGL create a continuous process improvement effort in the District with a target of investigating a minimum of two new techniques, processes, and excavation methods on an annual basis. The results of the tests on the impact on reduced cost incurred, field production, and safety should be reported annually to VP of Construction and/or ARP Executive Governance Committee.[41] WGL asserts the Company participates in numerous natural gas industry resource groups and is continuously looking to improve process and construction practices. WGL states it continues to evaluate areas of improvement and will formally document any technologies considered for implementation in the District on an annual basis as part of a PIPES 3 reporting requirements.[42] The Commission accepts the recommendation and directs WGL to also include in the annual report any operational or technological differences in Virginia and Maryland and the rationale for those differences.

22.    Task 3 of the Audit required review of excess costs in *Formal Case No. 1142* Merger Commitment No. 72. The Audit Report concluded that WGL incorrectly calculated the baseline (target) value for Program 2 in their Year 6 (2019-2020) filings.[43] The error was the result

---

[37]    WGL Audit Comments at 15-16.

[38]    PBWCLD Audit Comments at 6.

[39]    Audit Report at 44, 101.

[40]    WGL Audit Comments at 16.

[41]    Audit Report at 44, 103.

[42]    WGL Audit Comments at 17-18.

[43]    Audit Report at 109.

8

**Attachment to Order No. 22003**

of incorrectly stating the target unit cost was $1,078 instead of $1,048.  As a result, there was an approximate $9,333 increase over the reported excess cost.  WGL previously indicated it would remove the excess costs from their upcoming reconciliation filing in March 2024 and adjust the Current Factor at that time, as the error wouldn't affect customers billing rates in 2023.  This adjustment was completed and incorporated into the 2024 surcharge.[44] There were no other errors in calculation for the baseline and actual costs, resulting in accurate excessive costs calculations and adjustments.[45]  The Report also notes that the nomenclature needs to be consistent in preparing the annual American Association of Code Enforcement Class 3 cost estimates, so that it will be less difficult to determine the numbers used in the final submission for annual projects.

23.    The Audit Report Recommendation 3.1 (Document Accuracy) recommends that WGL develop a formal document review process to improve accuracy of documents.[46]  WGL indicates that the Company will enhance their current document process to include formal review and approval from the directors of Construction, Construction Management, and Construction Program Strategy and Management. Such enhancement will be documented in the PIP and will be added to Governance dashboards to ensure that tracking of Commitment 72 requirements is part of regular reporting. [47]  The Commission accepts the recommendations for document improvement and monitoring accuracy.

24.    The Commission accepts the Audit Report Recommendation 3.2 (File Nomenclature) requiring the Company to develop a file nomenclature process for Class 3 Estimates that would clarify a document is a final document.[48]  The new/update Application should include detailed information on the nomenclature process for Class 3 Estimates.

---

[44]       WGL response to PSC DR 19-1

[45]       Audit Report at 109.

[46]       Audit Report at 109.

[47]       WGL Audit Comments at 18-19.

[48]       Audit Report at 109.

9

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA**
**1325 G STREET, N.W., SUITE 800**
**WASHINGTON, D.C. 20005**

**June 12, 2024**

**FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN; and**

**GD-2024-01-G, IN THE MATTER OF THE PETITION FOR AN INVESTIGATION INTO WASHINGTON GAS LIGHT COMPANY'S NATURAL GAS INFRASTRUCTURE**

**PARTIAL CONCURRENCE OF COMMISSIONER BEVERLY**
**TO ORDER NOS. 22003 & 22004**

1.      I concur with the majority opinions insofar as they dismiss the PIPES 3 Application and open the investigation that OPC has requested. However, in my opinion, we need to go farther and rethink our entire approach to pipe replacement and leaks and make it part of one plan involving every related issue regardless of the case in which it arises, rather than fragmented into two or more separate proceedings as the majority opinion does. Because my view covers Order No. 22003 and Order No. 22004, I have filed a single statement in both *General Docket 2024-01-G* and *Formal Case No. 1175.*

2.      As I have said in a prior dissent, there is inadequate evidence that PROJECT*pipes* is significantly more successful with the surcharge than it is without it. Because the surcharge is extremely expensive and ratepayers are hemorrhaging cash, I think the new approach should begin with immediately suspending the surcharge[1] and then use the investigation proposed by OPC to develop an integrated planning framework as suggested by 10 Councilmembers in their February 8, 2024, letter to us. [2]

3.      The approach in the majority opinion essentially invites the Company to file a new plan that is likely to be much the same as the plan it replaces. I recognize that the majority opinion directs the company to justify surcharge recovery as part of a new pipes plan but doesn't give the company any incentive to do anything but repeat what it has already said, especially since the majority opinion is wrapped in a review of the audit that doesn't suggest any change in direction. To be clear, I don't expect an auditor to examine policies. Instead, I expect the auditor to limit the audit to a determination of whether the Company did as we told them to do. However, my question is not whether the Company followed directions but whether, as a matter of policy, we need to change course.

---

[1]      Instead of a surcharge, I think WGL should continue with normal pipe replacement that is subject to review under a traditional rate case.

[2]      Signatories included: Chairman Phil Mendelson, Councilmember Charles Allen, Councilmember Matthew Frumin, Councilmember Vincent C. Gray, Councilmember Christina Henderson, Councilmember Janeese Louis George, Councilmember Brianne K. Nadeau, Councilmember Zachary Parker, Councilmember Brooke Pinto, and Councilmember Robert C. White Jr.

4.      In examining the Company's performance, I asked my Office to examine the available data from PHMSA, which tracks inventories of both cast/wrought iron and unprotected steel nationwide, and compare our progress to national trends. My office has provided charts below, but I invite other parties to provide their own graphical interpretations of PHMSA's data or other datasets.



5.      The chart above illustrates the rate of replacement of cast/wrought iron mains, both by WGL and nationwide, using 2005 as a baseline year. By 2023, nationally, 60% of iron mains had been replaced, while WGL had replaced 20%. At the current rate, the U.S. is set to replace iron mains by 2035, while it will take WGL until 2094.[3] I also note that according to PHMSA, the U.S. has about 1% iron mains remaining,[4] while WGL has over 32%.

---

[3]      I focus on iron mains here because, according to PHMSA's inventory, they constitute over 32% of the main miles in the District of Columbia. Conversely, iron services represent 0% of the District's services, bare steel mains represent 1.6% of the District's mains, and bare steel services represent 4.3% of the District's services.

[4]      https://www.phmsa.dot.gov/data-and-statistics/pipeline-replacement/pipeline-replacement-background

**Partial Concurrence**                                                    **Page 3**



6.      The chart above illustrates the miles of iron mains replaced by WGL (across all jurisdictions) since 2005 based on PHMSA's inventory. The replacement of iron mains does not appear to be occurring at an "accelerated" pace, either compared to WGL's pre-2013 pace or compared to the U.S. as a whole. Without evidence that the program has resulted in accelerated pipe replacement, I don't see the justification for giving WGL accelerated cost recovery.

7.      There is also the issue of overall cost. Based on the most recent data WGL provided in *Formal Case No. 1154,* for the last full year of data (2022), the cost per mile was about $7.8 million (in 2028 dollars, this would be about $9.2 million per mile).[5] For comparison, WGL's projected per-mile cost of replacement under the STRIDE program in Maryland for 2028 is $4.3 million per mile (less than half WGL DC's costs), even though WGL has by far the most expensive cost of pipe replacement in Maryland.[6] The cost of service replacement for WGL in DC in 2022 was about $23,000 per service, and the total cost of service replacement was more than the amount spent on mains for 2022. BG&E's total service replacement budget was only 15% of the overall STRIDE 2 budget.[7] It is unclear why the costs for both main and service replacement in the District of Columbia are so elevated or why service replacement constitutes such a large portion of the spending for the program. The majority's Orders have asked WGL to justify its inflated prices, , and therefore I expect WGL's next Application to be similarly priced with WGL's provided justification.

---

[5]      *Formal Case No. 1154,* Washington Gas Light Company's Response to Order No. 21940. January 4, 2024. Attachment A.

[6]      BG&E's costs are $2.6 million per mile and CMD's costs are $2.8 million per mile. I note that this discrepancy is on top of the larger rate increase that WGL received in D.C. *($25 million) vs. Maryland ($10 million).

[7]      Office of the People's Counsel of the State of Maryland, Maryland Gas Utility Spending. November 2023. https://opc.maryland.gov/Portals/0/Files/Publications/Reports/GasUtilitySpending%2011-5-23%20FINAL.pdf?ver=QdfdqphWg8P8SSpjtB29YQ%3d%3d

8. When we shift from pipeline safety to climate issues, the situation doesn't improve. As pointed out by the 10 Councilmembers, the City's carbon neutrality goals are laid out in the Climate Commitment Amendment Act of 2022. Although we adopted the 5-year targets in the Climate Commitment Act for both utilities on December 8, 2023,[8] we have not yet issued the order establishing next steps for Pepco and WGL's reporting requirements.[9] The majority's Order asks WGL to submit a new plan that aligns with the District's targets, however the next GHG reduction milestones in the Climate Commitment Act are in 2025 (45% reduction from 2006) and in 2030 (60% reduction from 2006). To me, it would make sense to first issue the Order establishing the GHG reporting requirements, and then to have WGL develop 5-year integrated plans that align with the Climate Commitment Act.

9. Our view on whether the Pipes program is also a climate program tends to vacillate. In Order No. 21960, the majority leveraged GHG reductions as a reason for extending Pipes 2 for 12 months: "We…note that the proactive replacement of high-risk vulnerable main and service pipes reduces future greenhouse gas ("GHG") emissions."[10] However, in Order No. 22004 granting OPC's Petition, the majority underscores that Pipes is not a leak management program and therefore should not be part of the investigation.[11] In Order No. 22003 addressing Pipes 3, the majority again relies on the need to manage leaks and GHG emissions to justify a revised Application from the Company, going so far as to explicitly ask the Company to align its revised Application with the District's climate mandates.[12]

10. If we want to measure a reduction in GHG emissions from <u>existing</u> leaks and develop an effective plan, we need actual data rather than estimates of fugitive methane emissions as well as data on the location, concentration, and flow rates of the existing leaks. Given the problems with prior leak surveys pointed out by DCG (where DCG found more leaks in just part of the city than WGL found in the entire city), I suggest that the Commission undertake its own leak baseline survey to capture the location of leaks, their concentration, flow rate, and grade, using a level of sensitivity the same or higher than was used in DCG's survey.

11. My office has undertaken some analysis regarding the GHG impact of the Pipes program to date. The most recent estimates that WGL has provided regarding the impact of the Pipes program on GHG emissions is an avoided 23,726 metric tons of $CO_2$e over ten years.

---

[8]     *See GD2019-04-M,* Order No. 21938, ¶ December 8, 2023.

[9]     *See* Order No. 21938, ¶ 30: "Since the filing of the BCA Report, the D.C. Council has established interim targets for the District of Columbia. The Climate Commitment Act of 2021 adopted several interim targets on the path to carbon neutrality by 2045 based on reductions from 2006 as the baseline year: 45% reduction by 2025, 60% reduction by 2030, 70% reduction by 2035, and 85% reduction by 2040. The Commission adopts those targets for Pepco and WGL and will issue an order prescribing next steps on reporting requirements for both Pepco and WGL related to these targets."

[10]     *See* Order No. 21960, ¶ 12.

[11]     *See Formal Case No. 1178, In the Matter of the Petition for Investigation Into Washington Gas Light Company's System Leak Reduction Practices,* No. 22004, ¶ 15, rel. June 12, 2024.

[12]     *See Formal Case No. 1179, In the Matter of the Investigation Into Washington Gas Light Company's Strategically Targeted Pipe Replacement Plan*, Order No. 22003, ¶ 47-49, rel. June 12, 2024.

**Partial Concurrence** **Page 5**

Without actual GHG emissions data from leaks, we have to rely on that estimate. The Commission has also recently adopted a social cost of carbon for use in our forthcoming BCA framework that allows us to assess the benefits of such avoided emissions, which is $160 per metric ton. Therefore, if we assume WGL's GHG estimates are correct for the sake of the calculation, the program has achieved approximately $3.8 million in climate benefits since 2014. For comparison, the total cost of the program to date has been over $305 million. We can also look at those savings in terms of WGL's overall GHG footprint. According to the District's GHG inventory, WGL's total GHG emissions over the period from 2014-2023 was 15,674,606 metric tons of $CO_2e$. Based on WGL's estimate, without Project*pipes,* WGL's emissions over that period would have been 15,698,332 metric tons of $CO_2e$, representing a reduction of 0.15%. A graphic representation of these estimated avoided GHG reductions is included below. Clearly, Pipes is not a climate program, and was never intended to be one. However, as DCG has pointed out, it is likely that a small proportion of the leaks on the system may be producing more than half of the fugitive methane emissions. Therefore, actual emissions data would allow the Commission to provide more specific direction to WGL regarding those super-emitting leaks to protect the climate.



12. I note that AOBA has flagged issues with lost and unaccounted for ("LAUF") gas in the District, with WGL having one of the highest LAUF gas rates in the United States. This is a significant concern because the cost of LAUF gas falls on the backs of ratepayers and may reflect significant methane emissions into the atmosphere, whose impact is unknown due to the lack of GHG emissions reporting requirements. I would be interested to hear from stakeholders regarding the best practices from other jurisdictions for the regulation of LAUF gas, including but not limited to Performance Incentive Mechanisms ("PIMs"), or setting a cap on what may be transferred to rates.

13. In rethinking this initiative, we should begin our investigation by collecting the following information (subject to infrastructure security constraints):

**Partial Concurrence**                                                                 **Page 6**

- The location of all distribution system pipes and other infrastructure and their age, material, pressure, and condition
- The location, concentration, volume, and grade of leaks
- The volume of fugitive methane emissions from distribution system leaks for the purpose of calculating GHG impacts
- The impact of existing climate legislation on baseline gas demand
- The location and tariff class of all gas customers

14.    To that end, I think the Commission should direct WGL to provide a digital map and dataset with the following layers and datasets:[13]

- Infrastructure Layer: location, length and diameter of pipes (including all mains and services); pipeline pressure; material; age; depreciation status; leaks per mile; interconnects; gate stations; compressor stations; and storage facilities.
- Replacement Layer: Pipes segments that have been replaced, length, year of replacement, and whether replaced under normal replacement, PIPES 1, PIPES 2, or *Formal Case No. 1027*;
- System Constraints Layer: areas of constraint or congestion;
- Customer Layer: customer locations and tariffs;
- Existing Leak Layer: location of known leaks, concentration, flow rate, and grade;
- Repair Layer: location of repaired leaks, concentration, flow rate, and grade;
- Supply Dataset: Sources of supply; supply contracts, including amounts and duration; storage and contingency resources;
- Demand Dataset: Current and anticipated demand under the baseline scenario (also known as "business as usual") from 2025-2030. The baseline scenario shall include the impacts of existing legislation in the District, including the Building Energy Performance Standard, and the Clean Energy DC Building Code Amendment Act of 2022. Demand shall be broken out by customer class, season, and volumetric and peak requirements, based on current and historical delivery.

15.    In addition to data collection and addressing the significant issues raised by stakeholders, I present an outline of integrated infrastructure planning for WGL for discussion purposes, below. I divide this exercise broadly into the following categories:[14] 1) Cost and Revenue Analysis and Projections; 2) Customer Acquisition and Loss Scenarios; 3) Financial Modeling; 4) Accuracy of Demand Forecasting; 5) Development of a Regulatory Roadmap; and 6) Development of Short and Long-Term Business Plans. It may useful for the Commission to hire a consultant to oversee the development of an integrated planning framework for WGL.

1. Cost and Revenue Analysis and Projections. This exercise would include scenarios for demand forecasting, including weather forecasting; expected heating degree days

---

[13]    I leave it up to the other parties in these cases to seek such information in discovery if they wish.

[14]    Note: This framework is based generally on a whitepaper by Megan Anderson, Mark LeBel, and Max Dupuy of the Regulatory Assistance Project titled "Under Pressure: Gas Utility Regulation for a Time of Transition," released May 2021.

according to climate models; the impact of the Building Energy Performance Standard and the Green Buildings Act; and an analysis of potential end-use electrification scenarios.

2. <u>Customer Acquisition and Loss Scenarios</u>. The baseline scenario should include the impact of the Green Buildings Act.

3. <u>Financial modeling</u>. This should consist of financial models of the above scenarios, including the financial impacts on both WGL and on ratepayers, including under the business-as-usual scenario.

4. <u>Accuracy of Demand Forecasting</u>. This should include a review of historical demand forecasts against actual demand and explain any deviations.

5. <u>Regulatory Roadmap</u>. This would include a roadmap toward performance-based regulation. This should include parameters to adopt in future rate cases, such as changes to depreciation and/or amortization rates that may be beneficial.

6. <u>Business Plans</u>. These plans should determine areas where zero-carbon infrastructure may be deployed (i.e. geothermal); analyze cost trade-offs between pipe replacement, repair, and non-pipe alternatives; develop a plan for the treatment of areas of the gas distribution system that may become underutilized based on demand forecasting; and develop GHG analysis and scenarios that align with the 5-year targets under the Climate Commitment Act.[15] The short-term business plan should be established under the existing regulatory paradigm for reducing GHG emissions from WGL's operations to meet the 2025 GHG reduction target. The long-term plan should be developed from 2025 to 2045 under the performance-based regulatory framework, aligning with the 5-year targets under the Climate Commitment Act. This long-term planning should account for the change to customer acquisition starting in 2026 as a result of the Green Buildings Act.

16. I present all of this as a starting point for future discussion towards the development of an integrated infrastructure plan for WGL that aligns with the 5-year GHG reduction targets the Commission has already adopted. To that end, I seek input from all stakeholders regarding best practices from other jurisdictions for the development of a comprehensive and integrated regulatory framework for WGL. I also welcome graphics or additional datasets.

---

[15]    I'm not at this point determining whether our pipes are or are not too old to repair.

**COMMISSION ACTION**

**FORMAL CASE NO. 1154, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECT*PIPES* 2 PLAN:**

**FORMAL CASE NO. 1175, IN THE MATTER OF WASHINGTON GAS LIGHT COMPANY'S APPLICATION FOR APPROVAL OF PROJECTPIPES 3 PLAN; and**

**FORMAL CASE NO. 1179, IN THE MATTER OF THE INVESTIGATION INTO WASHINGON GAS LIGHT COMPANY'S STRATEGICALLY TARGETED PIPE REPLACEMENT PLAN,**

Date  __6/12/24__  Formal Case Nos.  __1154, 1175, & 1179__  Tariff No. _____  Order No.  __22003__

| | Approved Initial & Date | Concur In Part Initial & Date | Abstain Initial & Date |
|---|---|---|---|
| **Chairman Emile Thompson** | **ET/CL 6/12/24** | | |
| **Commissioner Richard A. Beverly** | | **RB/CL 6/12/24** | |
| **Commissioner Ted Trabue** | **TT/CL 6/12/24** | | |

 Certification of Action

*C. Lipscombe*

**General/Deputy General Counsel**

  __Kimberly Lincoln-Stewart__
   **OGC Counsel/Staff**

# EXHIBIT 6

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96 <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant*. | **Case No.** |

## <u>DECLARATION OF RYAN BOYER</u>

1.      My name is Ryan Boyer. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I am the Business Manager of the Philadelphia-Baltimore-Washington Laborers' District Council. The district council is an affiliate of the Laborers International Union of North America (LIUNA), AFL-CIO, a 120 year-old labor organization with over 500,000 members throughout the United States and Canada. The district council has approximately 13,000 members. Nationally, one-third of construction work performed by LIUNA members is in the energy sector.

3.      Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by Washington Gas Light Company, such as Miller Pipeline, Infrasource, Skoda Contracting Company, and Vector Services, 70 of whom regularly work in the

District.  LIUNA members working for these companies install and replace services, install new mains and distribution pipes, and replace mains and distribution pipes throughout the District of Columbia. Many of our local members also are Washington Gas customers.

4.      The members working on gas distributions lines are required to hold an operator qualification under Subpart G in 49 CFR Part 195. This valuable employment credential is applicable only to work on gas lines.

5.      D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6.      The DC Appliance Ban will reduce the work performed by our members, leading to layoffs and the permanent loss of employment. Furthermore, it will cause the gas industry in the local area to shrink, restricting our members' ability to find employment in the industry for which they have non-transferrable training and credentials. Furthermore, loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans.

7.      The D.C. Appliance Ban will limit the pool of gas customers, forcing existing gas customers like our members to pay higher rates for gas service than they otherwise would pay.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

2

Executed on: _10 -16 - 2024_

Ryan Boyer
Business Manger
Philadelphia-Baltimore-Washington Laborers' District Council

3

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL APARTMENT ASSOCIATION, MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, AND TEAMSTERS LOCAL 96 | **Case No.** |
| *Plaintiffs*, | |
| v. | |
| DISTRICT OF COLUMBIA, | |
| *Defendant*. | |

**<u>DECLARATION OF WILDER REED</u>**

1.  My name is Wilder Reed. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.  I am the President and Principal Executive Officer of Teamsters Local 96 ("Local 96"). In addition to being the Union President, I am employed in a full-time position by Washington Gas Light Company ("WGL") as a Service Technician.

3.  Local 96 is a labor union with approximately 600 members, all of whom are employed in various positions at WGL. As employees of WGL, Local 96 members service the over 160,000 WGL customers in the District of Columbia.

1

4.  Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses.

5.  D.C. Code § 6-1453.01 ("D.C. Appliance Ban") prohibits the use of gas appliances in the construction of new commercial buildings and substantially improved existing commercial buildings in the District of Columbia after December 31, 2026, at latest.

6.  The D.C. Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. The D.C. Appliance Ban will therefore harm Local 96's members. Additionally, the D.C. Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade.

7.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: _10/16/2024_____

Signed by:

_____
B0C2E1533E4D4D7...

Wilder Reed
President
Teamsters Local 96

2
JA108

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*,<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>        **Defendant.** | **No. 1:24-cv-02942-ACR** |

## DEFENDANT'S AFFIRMATIVE DEFENSES AND ANSWER TO PLAINTIFFS' COMPLAINT

Defendant the District of Columbia (the District) answers and asserts affirmative defenses to Plaintiffs' Complaint as follows:

## DEFENSES

The District asserts and preserves the defenses listed below based on information currently available and reserves the right to withdraw these defenses or assert additional defenses as additional information becomes available.

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

The Complaint fails to allege facts to establish municipal liability under 42 U.S.C. § 1983.

### THIRD DEFENSE

The District acted at all times consistently with all applicable laws, rules, regulations, constitutional provisions, and standards of care.

**FOURTH DEFENSE**

The District of Columbia, its agents, servants, and employees, acting within the course and scope of their employment, have performed their obligations, if any, toward Plaintiffs in accordance with all applicable regulatory, statutory, constitutional, and common law requirements.

**FIFTH DEFENSE**

The District of Columbia, its agents, servants, and employees, acting within the course and scope of their employment, have acted in good faith and with the reasonable belief that their actions were lawful under the circumstances.

**SIXTH DEFENSE**

Plaintiffs' claims against the District of Columbia are barred by sovereign immunity.

**SEVENTH DEFENSE**

Attorney's fees and costs are not recoverable against the District in this case.

**EIGHTH DEFENSE**

Plaintiffs are not entitled to any declaratory or equitable relief, as requested in this Complaint, because the District has not violated any statutory or constitutional rights.

**NINTH DEFENSE**

The equitable and declaratory relief requested by Plaintiffs exceeds the scope of their claims.

**TENTH DEFENSE**

Plaintiffs' claims are barred by the statute of limitations.

**ELEVENTH DEFENSE**

The District denies all allegations of wrongdoing including, but not limited to, any alleged

violations of statutory law, and further denies that Plaintiffs are entitled to any relief.

**TWELFTH DEFENSE**

The Court lacks jurisdiction.

## ANSWER TO THE COMPLAINT

The District asserts that any averment not specifically admitted in this Answer is denied and responds to the individually numbered paragraphs of the Complaint as follows.

1.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

2.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

3.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

4.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

5.   The District denies the allegations in this paragraph.

6.   The District lacks sufficient information to admit or deny the allegations in this paragraph.

7.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

8.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

9.   The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

10.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

11.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

12.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

13.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

14.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

15.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

16.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

17.    The District lacks sufficient information to admit or deny the allegations in this paragraph.

18.    The District admits the allegations in this paragraph.

19.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

20.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

JA112

21.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

22.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 and the D.C. Energy Conservation Code are the best evidence of their contents.

23.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

24.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

25.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

26.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

27.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents and requirements.

JA113

28.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  D.C. Law 24-177 is the best evidence of its contents.

29.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

30.    The District admits the allegations in this paragraph.

31.    The District admits the allegations in this paragraph.

32.    The District admits the allegations in this paragraph.

33.    The District admits the allegations in this paragraph.

34.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

35.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

36.    The paragraph consists of legal conclusions; to the extent a response is required, the District states that the Senate Report is the best evidence for its contents.

37.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

38.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

39.    The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

6

40.     The paragraph consists of legal conclusions; to the extent a response is required, the District admits that Congress passed the National Energy Act in 1978 and the Department of Energy was created in 1977, but the District otherwise denies the allegations in this paragraph.

41.     The paragraph consists of legal conclusions; to the extent a response is required, the District admits that Congress passed the National Energy Conservation and Policy Act in 1978, but the District otherwise denies the allegations in this paragraph.

42.     The paragraph consists of legal conclusions; to the extent a response is required, the District states that the Senate Report is the best evidence of its contents.

43.     The paragraph consists of legal conclusions; to the extent a response is required, the District admits that Congress passed the National Appliance Energy Conservation Act in 1987 and otherwise denies the allegations in this paragraph.  The Senate Report is the best evidence of its contents.

44.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  The Senate and House Reports are the best evidence for their contents.

45.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  The Senate Report is the best evidence for its contents.

46.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  The Senate Report is the best evidence for its contents.

JA115

47.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.  The Senate and House Reports are the best evidence for their contents.

48.     The paragraph consists of legal conclusions; to the extent a response is required, the District admits that Congress passed the Energy Policy Act in 1992, but the District otherwise denies the allegations in this paragraph.

49.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

50.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

51.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

52.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

53.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

54.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

55.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

56.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

57.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

58.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

59.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

60.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

61.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

62.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

63.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

64.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

65.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

66.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

67.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

68.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

69.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

70.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

71.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

72.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

73.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

74.     The District admits that it has not applied for a waiver.  Otherwise, the paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

75.     The District denies the allegations in this paragraph.

76.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

77.     The District admits that it has not applied for a waiver.  Otherwise, the paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

78.     The paragraph, and each of its three subparagraphs, consists of legal conclusions; to the extent a response is required, the District denies the allegations.

79.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

80.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

81.     The paragraph consists of legal conclusions; to the extent a response is required, the District denies the allegations in this paragraph.

82.     The District denies that Plaintiffs are entitled to declaratory and injunctive relief.

83.     The District denies that Plaintiffs are entitled to any relief.

84.     The District denies that Plaintiffs are entitled to a permanent injunction.

85.     The District denies that Plaintiffs are entitled to a declaratory judgment.

86.     The District denies that Plaintiffs are entitled to costs or attorney's fees.

87.     The District denies that Plaintiffs are entitled to any relief.

## DEMAND FOR JURY TRIAL

The District demands a jury trial on all issues and claims triable by jury in this case.

Date: December 10, 2024.                    Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*

11

JA119

ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

12

JA120

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF HOME  ) CIVIL NO.:
BUILDERS OF THE UNITED STATES ) 24-2942-ACR
                              )
            Plaintiff,        )
        vs.                   )
                              )
DISTRICT OF COLUMBIA,         )
                              ) January 29, 2025
            Defendant.        ) Washington, D.C.
_____  ) 3:00 p.m.

Transcript of Pre-motion Conference
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff:   Jonathan M. Little, Esquire
                     Baker Botts, LLP
                     910 Louisiana Street
                     Houston, Texas 77002

                     R. Scott Novak, Jr., Esquire
                     Baker Botts, LLP
                     700 K Street NW
                     Washington, DC 20001

For the Defendant:   Adam J. Tuetken, Esquire
                     Office of the Attorney General
                     400 6th Street NW
                     Suite 8100
                     Washington, D.C. 20001


Reported by:   Christine T. Asif, RPR, FCRR
               Federal Official Court Reporter
               333 Constitution Avenue, NW
               Washington, D.C. 20001
               (202) 354-3247

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription

P R O C E E D I N G S

THE CLERK: We are on the record with civil case 24-2942, National Association of Home Builders of the United States, et al., versus District of Columbia.

Counsel, starting with the plaintiff, please state your appearance for the record.

MR. LITTLE: Mark Little for the plaintiffs.

THE COURT: Hello, Mr. Little.

MR. NOVAK: Scott Novak for the plaintiffs.

THE COURT: All right. Good afternoon.

MR. TUETKEN: Adam Tuetken for the District of Columbia.

THE COURT: Mr. Tuetken, you're all alone today. What's going on?

MR. TUETKEN: Just me.

THE COURT: All right. So I've got your pre-motion conference memos. And Mr. Tuetken, I'm a bit concerned with the 9th Circuit case that basically says your regulation is expressly pre-empted. And I actually in my last couple years at the firm worked on a case where we dealt almost exclusively with pre-emption, so I have some vague memory of what it was. But then I also understand that we have a ripeness or standing argument because the law has not gone into effect, is that basically where we are with both of you sides?

MR. LITTLE: Yes, Your Honor.

MR. TUETKEN: Yes.

THE COURT: But I take it even though the law has not gone into effect, like, these commercial buildings are having to make plans now to put it into effect; right?

MR. LITTLE: Yes.

THE COURT: So, I mean, they're being harmed right now presumably?

MR. LITTLE: Yes, Your Honor.

THE COURT: Okay. Fair?

MR. TUETKEN: I would respectively disagree with that. To the extent -- sorry, would you like me to approach --

THE COURT: Yeah, yeah, come on up.

MR. TUETKEN: So the requirement that plaintiffs are challenging is not only not in effect, it's not clear what form it will take. So to the extent plaintiffs are incurring any costs, which I actually don't think is quite apparent from their declarations, that is self-incurred cost. And the Supreme Court is clear in cases like *Clapper versus Amnesty International,* as well as our own circuit, that that incurring costs in anticipation of a law that will go into effect just does not confer standing.

THE COURT: Okay. Well, that's fair enough. But the law is on the books, no?

MR. TUETKEN: The -- what the law says is it tasks

our agencies with coming up with revisions to the energy code that implement a few broad principles. And particularly what -- how they implement that principle is something that has to be worked out in rule making and the rule making hasn't even started yet. So what law plaintiffs are going to be subject to is not at all clear at this stage.

THE COURT: Okay. Well, let's pretend it was -- let me ask you this: When the law goes into effect how long will commercial buildings -- this is just for new ones, or for all new commercial buildings?

MR. TUETKEN: This is only for new construction and substantial improvements to new construction -- or sorry, new construction and substantial improvements to existing construction.

THE COURT: Okay. So if I'm about to start building a building today in D.C. --

MR. TUETKEN: Uh-huh.

THE COURT: I would be well advised to self-select to use not gas, right, because -- is it new building after the law goes into effect or when the law -- what's the new building as of what date?

MR. TUETKEN: So as of January 1st, 2027, the agencies have to promulgate the rule. And so after that, but that's the -- we get into the speculation problem because the rule-making hasn't happened yet, so I can't represent to Your

Honor today whether that rule-making is going to say, okay, by this date, like, this is exactly what you need to have versus there's some type of transition period.

Again, the way that counsel intended this to work is to say here are some kind of broad parameters and aspirational principles we want. Let's have our expert agencies who know how to make these rules, that are economists, that are environmental scientists, implement them and give life to them. So right now we're talk -- we're going to, you know, talking about the pre-emption, if we were to get to the merits it's going to be talking in very abstract principles because we don't have a concrete rule and we're not going to have one for some time.

THE COURT: Okay. And so we don't know yet -- so but the law doesn't say as of the date this law -- as of today's date, when we sign the law, any new building after this date has to have gas only. That's going to be left up to the agencies and the regulations as to what transition time there is, if any.

MR. TUETKEN: Right. Yeah, the rule-making I'm sure will raise transition time issues, but standing here today I don't think that's apparent on the face of the law.

THE COURT: Okay. And can you just tell me -- can you just speak a little bit to me about pre-emption.

MR. TUETKEN: Sure. So when doing express

pre-emption, which I believe we all agree is the claim here, the goal is to discern Congress's intent. What was Congress trying to do with the statutory scheme it was enacting and what role did they want pre-emption to play? And we look not just to the text, though, of course we start there, but other indicia of congressional intent; purpose, context, implementation, and even in this context legislative history.

And the way ECPA works is actually pretty straight forward. ECPA establishes energy conservation standards for manufacturers. They tell manufacturers how they have to design their products. It then pre-empts state level energy conservation standards that would tell manufacturers you need to make your refrigerator a different way. And so our Act doesn't say anything to manufacturers, doesn't say anything actually even about appliances, and doesn't tell them how they need to design.

THE COURT: It's called the D.C. appliance ban.

MR. TUETKEN: It is not. No that is a characterization by the plaintiffs. That is not the name of the act. And this is not a gas appliance ban. Gas appliances can be sold in the District manufactured in the District and installed in the vast majority of the buildings even when this act goes into effect.

THE COURT: But it says -- maybe they are just mis-citing the law to me, which I doubt they are, it says

prohibits the use of gas appliances in the construction of new and substantially improved commercial buildings, along with residential buildings over three stories. Is that right?

MR. TUETKEN: That is not what -- the law does not say we prohibit gas appliances, it says no on-site, it says the agencies have to come up with rules implementing a broad principle and flexible principle that on-site combustion is not allowed for the provision of thermal energy. In effect, yes, it will make gas, natural gas appliances in the specific covered buildings under the Act, which is a sliver of buildings in the District, will not be able to install -- or actually, no, they could install, they just can't use the gas appliances.

THE COURT: So they can install a gas stove in my new apartment, but I just can't turn it on and I'll be arrested by DCPD?

MR. TUETKEN: You will not be arrested. It's not a criminal prosecution, these are --

THE COURT: Okay. I'd be fined? I mean, I get fined because my garbage bin is outside of my house at the street wall thing for more than a day than it's supposed to be there, which makes me somewhat insane because I get fined for that and yet there's like people shooting people in front of my house and no one seems to care much about that, but the street is clean at least for the shootings. But let's put

that aside for the moment. So your argument is that they can install a gas stove in my house, but I can't use it without violating this law in some way?

MR. TUETKEN: The way the law is implemented and enforced is through building permits. And this is only -- this law is only applying to the biggest buildings that are going to be made by big developers. So they submit their plans for what their building is going to be. And this is all, by the way, three years from now talking about rules that aren't in place or even articulated yet. And then DOB, as it usually does with any building in the District, reviews -- will review whether it complies with whatever the amended regulations are.

THE COURT: Okay. That's helpful, but why don't you answer any question, because I'm taking it from -- I take it you're trying to say this doesn't apply to gas appliances. I have a feeling that I'm going the hear in a few minutes that it absolutely does, so I'm trying to understand.

I am going to hear that from you, yes?

MR. LITTLE: Yes.

THE COURT: All right. So I'm trying to understand from you what the position is.

MR. TUETKEN: Our position is not that it doesn't apply to gas appliances. Yes, if the Act goes into effect under the exact letter as it states here, or as the Act states

and is not interpreted or let's just say -- let's just focus on the exact words in the statute, then in new construction, yes, there won't be gas appliances. But to say gas appliance ban is a mischaracterization because it makes it seem like everyone in the District has to get rid of their gas appliances and --

THE COURT: If we called it the D.C. appliance ban for new construction that would be more correct? That would be a --

MR. TUETKEN: Well, because it's only a small sliver of buildings --

THE COURT: Okay. The D.C. appliance ban for new construction for certain types of buildings.

MR. TUETKEN: If Your Honor would like to call it that, that's fine. It's not what the Act says, but it also doesn't really matter for the pre-emption analysis, because as the federal government has said even under ECPA you can ban gas appliances.

THE COURT: All right. Let me hear from you. Let's start with the standing issue. I mean, he does have a good point that if you're incurring costs right now, the law hasn't actually gone into effect. So, you know, I understand why you would want to plan as if the law is going to go into effect, because otherwise you're going to be spending a ton of money getting rid of all the gas appliances in new construction if

you're required to do so. But if it's right that the regulations aren't even passed yet, we don't even actually know precisely what's going to be required or precisely who it's going to be required for or when it's going to be required, seems like we're kind of in fairness jumping the gun a bit.

MR. LITTLE: Well, Your Honor, I think we do know the answers to almost all of those questions, maybe all of them. But let me just read from the statute so that clear up what it does, when it goes into effect, all of those questions.

THE COURT: Okay. When you read you have to go really slowly.

MR. LITTLE: Of course. One, it whatever standards are promulgated, they must prohibit on site fuel -- sorry, on-site fuel combustion shall not be permitted for the provision of thermal energy to the building. That's going to be part of it. There's no --

THE COURT: So that means no gas appliances for what buildings?

MR. LITTLE: For covered buildings, which are --

THE COURT: For covered buildings. So we agree that's no gas appliances for covered buildings. Yes?

MR. TUETKEN: Eventually. Well, if -- the problem is, I'll let my colleague finish but that the --

THE COURT: He just read the statute to me.

MR. TUETKEN: Right. And the way the statute works is that that principle has to be interpreted and implemented by the Agency.

THE COURT: The Agency can't say I'm going to interpret that principle to mean I'm allowing new construction buildings to have whatever gas appliances they want.

MR. TUETKEN: I would say the Agency cannot go that far, yes.

THE COURT: Okay.

MR. LITTLE: Then, Your Honor, as to when it goes into effect there are two gates here. One, the law directs the mayor to issue regulations implementing this by December 31st, 2026.

THE COURT: Okay.

MR. LITTLE: But then if the mayor does not do that, there is an automatic effect, by operation of law, and I'm looking at -- well, I'm sorry, Your Honor, I'm looking at the actual Act and not the statute, so this is not helpful for me to cite things, it turns out. But if the mayor does not do that, automatically it says that no building permit applications submitted after December 31st, 2026 shall be approved, unless the building design complies with the most recent version of Appendix Z, which is a clean energy building standard that the District has, except that nothing in this

paragraph shall be construed to prohibit essentially gas for back-up power generation.

When you look at Appendix Z it says that you can't use gas. No on-site fuel combustion. So that's a very long way of saying that one way or another, by the end of 2026, there's going to be a gas ban for these buildings.

THE COURT: But for the buildings as that -- for the buildings that get a building permit after that date or that already have a building permit and are in construction but are not yet finished with construction.

MR. LITTLE: Sure. Yes, the law operates via the permit. So either when you pull a new permit for a new building or if you do a substantial modification, I believe the term is, which is renovations worth more than 50 percent of the building's value, then you have to rip out all the gas and put in electric.

THE COURT: All right. So what about his view that the Supreme Court and the D.C. Circuit are telling pretty clearly that the fact that you might be anticipating that law going into effect and even expending money on that law going into effect doesn't give you standing.

MR. LITTLE: Sure, I think there are a couple, maybe more than a couple things here. But one, it's one issue when there's a law that could potentially go into effect that there's a lot of uncertainty about what it's going to say and

that you're being perhaps very overcautious.  That's not this.

Two, there is really two parts of this harm.  One is the harm now, which is the chilling affect on the gas industry, on fewer people choosing gas because they know that the D.C. government is cracking down on this.  There are going to be fewer customers, prices will rise.  That's having some effect now.  But then I think everyone agrees that once this does go into effect, which again, end of 2026 at the latest, could be next week, right, I mean, because the mayor could issue these regs at any time.  But once it does go into effect I think everyone agrees that my clients suffer immense harm.

THE COURT:  What harm?

MR. LITTLE:  Harm both by not being able to use the type of energy that they want.  The restaurant association talks about how many restaurants prefer to use gas.  Their clientele wants them to use gas.  Washington Gas Light Company, the gas company is going to have its customer base eroded.  Those are a few examples.  But my point that I'm working up to kind of slowly it turns out, is that when you have very certain harm in this kind of ripeness inquiry, it's a balancing act between, you know, what are the risk of like waiting versus what are the benefits of waiting.  Will these things change or not.

THE COURT:  Okay.  One second.  What are the two cites to the Supreme Court and the D.C. Circuit case you cited

to me?

MR. TUETKEN: Sure. One second, Your Honor. Oh, I'm sorry I don't have that -- I can tell you the name.

THE COURT: Yeah.

MR. TUETKEN: Clapper C-l-a-p-p-e-r.

THE COURT: And that's in the Supreme Court.

MR. TUETKEN: Yeah, versus Amnesty International, it's a 2013 case by Justice Alito.

THE COURT: Okay.

MR. TUETKEN: And that's the primary case that I can remember the name off the top of my head. There are circuit cases, I'm happy once we brief this to provide them.

THE COURT: I'm just going to look at this case real quick.

Okay. Well, this seems more about it being speculative as to whether or not these individuals will actually be surveyed under a certain law, which is distinguishing Whitmer v. Arkansas. The Court says the respondent's theory of future -- well, respondents assert that they can establish injury in fact because there's an objectively reasonable likelihood that their communications will be acquired under 1881(a) at some point in the future. But respondents -- and that point in the future is when they might be forced to talk to individuals who are under surveillance.

The respondent's theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be certainly impeding. And -- impending. And they cite to that *Whitmer v. Arkansas*, so let's go there.

I mean, I don't know. I mean, I'm not sure you're going to be able to satisfy this certainly impending criteria for standing if nothing even potentially goes into effect until December 2026. And if he's telling you the regulations might change what it is you're having to do in any event. I understand your point for sure.

MR. LITTLE: Your Honor, may I correct one thing?

THE COURT: Yeah, go ahead.

MR. LITTLE: The regulations could go into effect next week, at the latest they're going to go into effect the end of --

THE COURT: Yeah is that -- you said that earlier, I'm sorry, you're right. Is that right or not right?

MR. TUETKEN: No, they cannot go into effect next week, we haven't even started the rules --

MR. LITTLE: He's right, Your Honor. I'm sorry. They could go into effect one month from now. There is a 30-day waiting period. My apologies for that.

THE COURT: No worries, you're fine. But wouldn't you have to exhaust your notice and comment rule-making in the

regulatory phase even before you could get to court on the regulations themselves, if you were to challenge the regulations as opposed to the statute? I mean, you are I guess just challenging a statute, so maybe the answer is no.

MR. LITTLE: If we're challenging the regulations you might be right, Your Honor. I'm not exactly sure of the answer to that if we're talking about the statute we would go over it this way.

THE COURT: Okay.

MR. LITTLE: The other issue, Your Honor, if I may?

THE COURT: Yeah, sure.

MR. LITTLE: Is that, and perhaps this hasn't been presented that clearly in the pre-motion notice, but there are really two different categories of harm.

THE COURT: Okay.

MR. LITTLE: There are all these harms that are going to hit when it goes into effect.

THE COURT: Those harms are just basically monetary that's -- no?

MR. LITTLE: Those are principally monetary harms, not sure if they're totally. But they are principally monetary harms, yes, fewer customers, less revenue, not being able to use your preferred fuel method may or may not be a monetary harm. But then the other theory of this, or the other strand of this is that there are effects now and not

because of anything that we're doing, but because of the fact that everyone knows that this gas ban is going to hit sometime between now and the end of 2026, people are less likely to choose gas appliances, less -- likely to move away from gas. Large buildings in the planning phases that have a pre-permit and having to plan for this aren't going to plan for gas.

So there are some effects now. And every fewer gas customer will inflict some type of monetary harm. And we can argue about the kind of quantum of that, but every fewer gas customer both hurts the gas company and hurts all gas consumers as we explained in the complaint, because as there are fewer customers there are fewer -- you have to spread the cost for the ongoing maintenance over a smaller pool of people, everyone's gas rates go up.

THE COURT: All right. I mean -- you can sit down.

MR. LITTLE: Thank you, Your Honor.

THE COURT: So sooner or later someone's going to have standing to challenge this law; right?

MR. TUETKEN: Yes.

THE COURT: All right. And wouldn't it be better from the government's perspective to have that issue decided sooner rather than later?

MR. TUETKEN: There is some merit to that argument, certainly, Your Honor, but at the same time --

THE COURT: Because what I can do is say there's no standing -- I mean, if I agree with you, I don't know that I agree with you. Let's say I agree with you for purposes of this hypothetical. And there won't be standing until the law goes into effect, which, you know, whenever that is, but let's say it's December 2026, because we know that's when it's going to happen, because no one moves quickly in government, especially my home government.

And now you've done all this work with regulations, people have come up to code on various things, people are ready to go. And I can assure you with utter certainty, if it's me that it gets in front of, I'm not going to care that all this work has been done. I'm just going to apply the legal pre-emption analysis just like I would apply it if I decide it now. And my guess is that I think probably every other judge on this bench would have the same view. Like, if it's a mess of your own making because you're pushing off having this decided until, you know, the regulation goes into effect or the statute goes into effect, no one's going to care.

And you have -- I mean, I have no idea how I'm going to come out pre-emption. I don't even know if it's a toss up. I have zero clue. But I do know that there's a circuit court argument out there that goes against you and none that favors you. So you certainly have something to worry about. And

wouldn't it be in the government's sort of best interest to just like settle that now?

Because I do understand, like, if the law has been passed, and the law is going to go into effect. Now the contours of the law you might not know exactly how it goes into effect, but it is going into effect. And if right now people are having to change their behavior, not because of something that might happen in the future but because of something that we all know will happen in the future, they've got good standing arguments. So why not just let them proceed, let's get this decided, and you'll have the decision sooner rather than later.

Because even after whatever decision comes out of this court, it's going to be a bit before it gets out of the D.C. Circuit, even assuming you're able to get them to speed it up, which I don't know that you will be. I know you can't, like, tell me that right now, because you don't have authority from your bosses. But --

I mean here's how I would like to proceed, unless you tell me that no, you know, absolutely the D.C. government does not care and is going to try to put off litigation, which might be its right to do as long as it can. And you're telling you absolutely know that you're going to move forward with the standing argument no matter what your supervisors say then I won't do what I'm about to do. But if you don't know

the answer to the question, then I'll suggest what I'm about to suggest.

So let me just suggest it and then you can tell me. So my suggestion is that you two -- you talk to your people and talk to his -- once you've talked to your people, talk to his people and let him know whether or not you all are going to pursue the standing argument. And if you're not, the plaintiffs in their summary judgment motion are going to have to establish standing because it's jurisdictional, but if you agree, if you all are agreed on it then we can move forward, take their arguments for what it's worth. And then we basically go straight into briefing the pre-emption issue.

If you're going to challenge standing, I want to do that as a standalone. Because if I find that I do not have jurisdiction I can't go to the merits, so I don't want you all briefing the merits if I can't get to them. And then we would do this all on a quick turnaround, the standing part at least. So I would imagine 21 days for SJ, 21 days for an opp, 14 days for reply, and then a hearing within 14 days of that. So we could get the standing issue, I think, decided in maybe three or four months.

MR. TUETKEN: Okay.

THE COURT: But that's just going to put off pre-emption. And if I do agree with them then you're going to have to deal with the fact that, you know, you're going to get

a pre-emption -- if they don't have standing, then you're going to be stuck with no pre-emption decision until after December 26th, probably. If they do have pre-emption, now we've wasted four months and you've wasted four months of doing whatever you do if I end up find that it is pre-empted. Because I mean if I find that it's pre-empted, they're going to ask me to have -- you're going to ask me for a stay pending appeal. And I don't know that I'd be able to grant it given that they are incurring a lot of costs right now.

So if the response is we don't really care what Reyes does, because smart as she is or isn't -- I think your colleagues have different views on that -- it's going to go up to the circuit court any way, and so this is all going to be implemented because the Court order is going to be stayed pending appeal. I'm not sure that's right.

Does this all make sense to you? I'm just trying to sort of think --

MR. TUETKEN: No, I appreciate it.

THE COURT: -- steps ahead.

MR. TUETKEN: And honestly there is a lot of logic there. I do agree with that. I think in terms of whether to raise the standing argument, I'm unfortunately a little boxed in Article III, like --

THE COURT: Well, I'm not sure that you are, because I think you might be overread- -- I would suggest that you

reread *Clapper.* And also read *Whitmore v. Arkansas*, which it distinguishes, because it seems to me *Clapper* was basically people who thought that the law might impact them at some point maybe in the future. And so that was totally, so far as I can tell from what the Court said -- well, my very smart clerk also suggests that you look carefully at *Commonwealth of Virginia versus State of Virginia,* 222 U.S. 553.

MR. TUETKEN: Okay.

THE COURT: Talking about whether suits were brought prematurely. Suits were brought a few days after an Act went into effect, but nothing had been ordered under it or had been tested in actual practice. So basically, the law had -- the law was in force but nothing had happened on it. And the Supreme Court says, but this does not prove that the suits were premature, of course, they were not so if it otherwise appeared that the Act certainly would operate as the complaint states apprehended it would. One does not have to await the consumption of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.

So I think that's the standard, right. So I would just -- I'm not sure that -- like if it was clear cut that they didn't have standing under Article III I wouldn't be bothering with this. Obviously, if they don't have standing I can't just magic it up like Glinda -- I guess like Elphaba.

MR. TUETKEN: Elphaba, she's the one with the magic.

THE COURT: So why don't you do this, why don't you and your colleagues take maybe what, two weeks, sort of look at this further. See if you are -- you do believe you are, in fact, constrained by Article III. And, of course, whatever you all decide about standing with these particular plaintiffs does not waive any arguments you might have as to other situations with other plaintiffs, right. This is not like for an all time kind of thing.

And if you agree -- I'm going to now call it Guillermo's reading of the Supreme Court law, because if it's wrong I'd rather him be wrong than me. So if you agree with Guillermo's version, then they do have Article III standing, we can just move straight to the merits, let them know. If you don't agree with Guillermo's version, then just let them and me know and I will set -- or you all can set a very quick briefing schedule for the standing issue alone.

And then I will try my hardest to get you a decision very quickly on that. It might just be, you know, an order without an opinion yet, just so you all know, and get going to the next step or not going to the next step and they can appeal. And then we'll move that way. Does that make sense?

MR. TUETKEN: Yes. Can I make two, like, suggestions?

THE COURT: Go ahead.

MR. TUETKEN: If we do proceed to briefing on the

standing issue, I think it would be preferable if it would be summary judgment briefing and not a motion to dismiss.

THE COURT: That's fine.

MR. TUETKEN: Great. And then --

THE COURT: I mean, you might need information from them to assess standing. I mean, what you're telling me right now you're telling me, but you'd actually have to show it in the brief if we got that far. So think about that.

MR. TUETKEN: That was actually my second suggestion that I think it both makes sense, and as a matter of D.C. Circuit precedent which I have here, that if we do do the briefing they need to go first because they're the ones with the evidence and facts about how their members --

THE COURT: They have to go first.

MR. TUETKEN: They have to go first.

THE COURT: I don't care. You guys figure it out. I'm sure they're happy to go first and go last and I'll give you a surreply if you want.

MR. TUETKEN: All right. And so you said to contact you after two -- like, are you like just a --

THE COURT: Why don't you just -- I'll give you three weeks, why don't you guys give me a JSR, what's three weeks from today?

MR. TUETKEN: Do you mind if I pull up my phone?

THE COURT: No, no, go ahead.

MR. TUETKEN: I believe it is February 19th.

THE COURT: Okay. February 19th. You all give me a JSR, which says, we you would agree to go brief pre-emption. And give me a briefing schedule for that. It doesn't have to be as quick as standing, but relatively quick hopefully, or no we need to address standing and give me a brief schedule for that.

MR. TUETKEN: Okay.

THE COURT: Does that make sense Mr. Little?

MR. LITTLE: Yes, Your Honor.

THE COURT: Okay. All right. Anything else?

MR. TUETKEN: No, thank you.

THE COURT: All right. Thank you so much.

(The proceedings were concluded at 3:32 p.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif
Official Court Reporter

< Dates >.
December 2026, 18:6.
December 2026. 15:9.
December 26th, 21:3.
December 31st, 2026 11:13, 11:22.
February 25:2.
February 19th 25:1.
January 1st, 2027, 4:22.

< 1 >.
14 20:18, 20:19.
1881(a 14:22.
19th 25:2.

< 2 >.
20001 1:31, 1:37, 1:44.
2013 14:8.
202 1:45.
2025 1:12.
2026 12:5, 13:8, 17:3.
21 20:18.
222 22:7.
24-2942 2:3.
24-2942-ACR 1:6.

< 3 >.
3 25:14.
30-day 15:23.
32 25:14.
333 1:43.

354-3247 1:45.
3:00 p.m. 1:14.

< 4 >.
400 1:35.

< 5 >.
50 12:14.
553 22:7.

< 6 >.
6th 1:35.

< 7 >.
700 1:30.
77002 1:26.

< 8 >.
8100 1:36.

< 9 >.
910 1:25.
9th 2:18.
_____/s/__
_____
25:20.

< A >.
able 7:11, 13:13, 15:7, 16:23, 19:15, 21:8.
above-entitled 25:18.
absolutely 8:18, 19:20, 19:23.
abstract 5:11.
acquired

14:22.
Act 6:13, 6:20, 6:23, 7:10, 8:24, 8:25, 9:15, 11:19, 13:21, 22:10, 22:16.
actual 11:19, 22:12.
actually 2:19, 3:17, 6:8, 6:15, 7:12, 9:22, 10:2, 14:17, 24:7, 24:9.
Adam 1:33, 2:11.
address 25:6.
advised 4:18.
affect 13:3.
afternoon 2:10.
agencies 4:1, 4:23, 5:6, 5:18, 7:6.
Agency 11:4, 11:5, 11:8.
agree 6:1, 10:22, 18:2, 18:3, 20:10, 20:24, 21:21, 23:9, 23:11, 23:14, 25:3.
agreed 20:10.
agrees 13:7, 13:11.
ahead 15:13, 21:19, 23:24, 24:25.
al 2:4.
Alito 14:8.

allowed 7:8.
allowing 11:6.
almost 2:20, 10:8.
alone 2:13, 23:16.
already 12:9.
amended 8:12.
Amnesty 3:19, 14:7.
Ana C. Reyes 1:18.
analysis 9:16, 18:14.
answer 8:15, 16:4, 16:7, 20:1.
answers 10:8.
anticipating 12:19.
anticipation 3:21.
apartment 7:15.
apologies 15:23.
apparent 3:17, 5:22.
appeal 21:8, 21:15, 23:21.
appearance 2:6.
APPEARANCES 1:21.
appeared 22:16.
Appendix 11:24, 12:3.
appliance 6:17, 6:20, 9:3, 9:7, 9:12.
appliances 6:15, 6:20,

7:1, 7:5, 7:9, 7:13, 8:16, 8:24, 9:3, 9:6, 9:18, 9:25, 10:19, 10:23, 11:7, 17:4.
applications 11:22.
apply 8:16, 8:24, 18:13, 18:14.
applying 8:6.
appreciate 21:18.
apprehended 22:17.
approach 3:12.
approved 11:23.
argue 17:9.
argument 2:23, 8:1, 17:24, 18:24, 19:24, 20:7, 21:22.
arguments 19:10, 20:11, 23:6.
Arkansas 14:18, 15:4, 22:1.
arrested 7:16, 7:17.
Article 21:23, 22:22, 23:4, 23:12.
articulated 8:10.
aside 8:1.
Asif 1:41, 25:16, 25:21.
aspirational 5:5.
assert

14:19.
assess 24:6.
Association 2:3, 13:14.
assuming 19:15.
assure 18:11.
Attorney 1:34.
authority 19:17.
automatic 11:17.
automatically 11:21.
Avenue 1:43.
await 22:17.
away 17:4.
.
.
< B >.
back-up 12:2.
Baker 1:24, 1:29.
balancing 13:21.
ban 6:17, 6:20, 9:4, 9:7, 9:12, 9:17, 12:6, 17:2.
base 13:17.
basically 2:18, 2:24, 16:18, 20:12, 22:2, 22:12.
behavior 19:7.
believe 6:1, 12:13, 23:3, 25:1.
bench 18:16.
benefits 13:22.
best 19:1.
better

17:21.
big 8:7.
biggest 8:6.
bin 7:20.
bit 2:17, 5:24, 10:6, 19:14.
books 3:24.
bosses 19:18.
bothering 22:23.
Botts 1:24, 1:29.
boxed 21:22.
brief 14:12, 24:8, 25:3, 25:6.
briefing 20:12, 20:16, 23:16, 23:25, 24:2, 24:12, 25:4.
broad 4:2, 5:5, 7:6.
brought 22:9, 22:10.
Builders 1:6, 2:3.
building 4:15, 4:16, 4:19, 4:21, 5:16, 8:5, 8:8, 8:11, 10:17, 11:21, 11:23, 11:24, 12:8, 12:9, 12:13, 12:15.
buildings 3:3, 4:9, 4:10, 6:22, 7:2, 7:3, 7:10, 7:11, 8:6, 9:11, 9:13, 10:20, 10:21, 10:22,

10:23, 11:7, 12:6, 12:7, 12:8, 17:5.
.
.
< C >.
C-l-a-p-p-e-r 14:5.
C. 1:13, 1:37, 1:44, 4:16, 6:17, 9:7, 9:12, 12:18, 13:5, 13:25, 19:15, 19:20, 24:10.
call 9:14, 23:9.
called 6:17, 9:7.
care 7:24, 18:12, 18:20, 19:21, 21:10, 24:16.
carefully 22:6.
case 2:2, 2:18, 2:20, 13:25, 14:8, 14:10, 14:13.
cases 3:19, 14:12.
categories 16:14.
certain 9:13, 13:20, 14:17.
certainly 15:3, 15:7, 17:25, 18:25, 22:16, 22:19.
certainty 18:11.
certify

25:16.
challenge 16:2, 17:19, 20:13.
challenging 3:15, 16:4, 16:5.
change 13:23, 15:10, 19:7.
characterization 6:19.
chilling 13:3.
choose 17:4.
choosing 13:4.
Christine 1:41, 25:16, 25:21.
Circuit 2:18, 3:20, 12:18, 13:25, 14:11, 18:23, 19:15, 21:13, 24:11.
cite 11:20, 15:4.
cited 13:25.
cites 13:25.
CIVIL 1:5, 2:2.
claim 6:1.
Clapper 3:19, 14:5, 22:1, 22:2.
clean 7:25, 11:24.
clear 3:15, 3:19, 4:6, 10:9, 22:21.
clearly 12:19, 16:13.
clerk 22:6.
clientele 13:16.
clients

13:11.
clue 18:23.
code 4:1, 18:10.
colleague 10:25.
colleagues 21:12, 23:2.
Columbia 1:2, 2:4, 2:12.
combustion 7:7, 10:16, 12:4.
comes 19:13.
coming 4:1.
comment 15:25.
commercial 3:3, 4:9, 4:10, 7:2.
Commonwealth 22:6.
communications 14:21.
Company 13:17, 17:10.
complaint 17:11, 22:16.
complies 8:12, 11:23.
computer-aided 1:49.
concerned 2:17.
concluded 25:14.
concrete 5:12.
confer 3:22.
conference 2:17.
Congress 6:2.
congressional 6:6.
conservation 6:9, 6:12.
Constitution

1:43.
constrained 23:4.
construction 4:11, 4:12, 4:13, 4:14, 7:1, 9:2, 9:8, 9:13, 9:25, 11:6, 12:9, 12:10.
construed 12:1.
consumers 17:11.
consumption 22:18.
contact 24:19.
context 6:6, 6:7.
contours 19:5.
correct 9:8, 15:12, 25:17.
cost 3:18, 17:13.
costs 3:17, 3:21, 9:21, 21:9.
Counsel 2:5, 5:4.
couple 2:19, 12:22, 12:23.
course 6:5, 10:14, 22:15, 23:4.
covered 7:10, 10:21, 10:22, 10:23.
cracking 13:5.
criminal 7:18.
criteria 15:7.

customer 13:17, 17:8, 17:10.
customers 13:6, 16:22, 17:12.
cut 22:21.
.
.
< D >.
date 4:21, 5:2, 5:15, 5:16, 5:17, 12:8.
day 7:21.
days 20:18, 20:19, 22:10.
DC 1:31.
DCPD 7:16.
deal 20:25.
dealt 2:20.
decide 18:15, 23:5.
decided 17:22, 18:18, 19:11, 20:20.
decision 19:11, 19:13, 21:2, 23:17.
declarations 3:18.
Defendant 1:13, 1:33.
design 6:11, 6:16, 11:23.
developers 8:7.
different 6:13, 16:14, 21:12.
directs 11:12.
disagree 3:10.
discern 6:2.

dismiss 24:2.
distinguishes 22:2.
distinguishing 14:18.
District 1:1, 1:2, 1:19, 2:4, 2:11, 6:21, 7:11, 8:11, 9:5, 11:25.
DISTRICT OF COLUMBIA 1:11.
DOB 8:10.
doing 5:25, 17:1, 21:5.
done 18:9, 18:13.
doubt 6:25.
down 13:5, 17:16.
.
.
< E >.
earlier 15:17.
economists 5:7.
ECPA 6:8, 6:9, 9:17.
effects 16:25, 17:7.
either 12:12.
electric 12:16.
Elphaba 22:24, 22:25.
enacting 6:3.
end 12:5, 13:8, 15:16, 17:3, 21:5.
energy 4:1, 6:9, 6:11, 7:8, 10:17,

11:24, 13:14.
enforced 8:5.
enough 3:23, 22:19.
environmental 5:8.
eroded 13:18.
especially 18:8.
Esquire 1:23, 1:28, 1:33.
essentially 12:1.
establish 14:20, 20:9.
establishes 6:9.
et 2:4.
event 15:10.
Eventually 10:24.
everyone 9:5, 13:7, 13:11, 17:2, 17:14.
evidence 24:13.
exact 8:25, 9:2.
exactly 5:2, 16:6, 19:5.
examples 13:18.
except 11:25.
exclusively 2:20.
exhaust 15:25.
existing 4:13.
expending 12:20.
expert 5:6.

explained 17:11.
express 5:25.
expressly 2:19.
extent 3:11, 3:16.
.
.
< F >.
face 5:22.
fact 12:19, 14:20, 17:1, 20:25, 23:4.
facts 24:13.
Fair 3:9, 3:23.
fairness 10:5.
far 11:9, 22:4, 24:8.
favors 18:24.
FCRR 1:41, 25:16.
Federal 1:42, 9:17.
feeling 8:17.
few 4:2, 8:17, 13:18, 22:10.
fewer 13:4, 13:6, 16:22, 17:7, 17:9, 17:12.
figure 24:16.
find 20:14, 21:5, 21:6.
fine 9:15, 15:24, 24:3.
fined 7:19, 7:20, 7:22.

finish 10:25.
finished 12:10.
firm 2:20.
first 24:12, 24:14, 24:15, 24:17.
flexible 7:7.
focus 9:1.
force 22:13.
forced 14:24.
foregoing 25:17.
form 3:16.
forward 6:9, 19:23, 20:10.
four 20:21, 21:4.
front 7:23, 18:12.
fuel 10:15, 10:16, 12:4, 16:23.
future 14:19, 14:22, 14:23, 15:1, 19:8, 19:9, 22:4.
.
.
< G >.
garbage 7:20.
gates 11:12.
General 1:34.
generation 12:2.
gets 18:12, 19:14.
getting 9:25.
give 5:8, 12:21, 24:17,

24:21, 24:22, 25:2, 25:4, 25:6.
given 21:8.
Glinda 22:24.
goal 6:2.
government 9:17, 13:5, 17:22, 18:7, 18:8, 19:1, 19:20.
grant 21:8.
Great 24:4.
guess 16:4, 18:15, 22:24.
Guillermo 23:10, 23:12, 23:14.
gun 10:5.
guys 24:16, 24:22.
.
.
< H >.
happen 18:7, 19:8, 19:9.
happened 4:25, 22:13.
happy 14:12, 24:17.
hardest 23:17.
Harm 13:2, 13:3, 13:11, 13:12, 13:13, 13:20, 16:14, 16:24, 17:8.
harmed 3:6.
harms 16:16, 16:18, 16:20, 16:22.

head 14:11.
hear 8:17, 8:19, 9:19.
hearing 20:19.
Hello 2:8.
helpful 8:14, 11:19.
hereby 25:16.
history 6:7.
hit 16:17, 17:2.
Home 2:3, 18:8.
honestly 21:20.
Honor 2:25, 3:8, 5:1, 9:14, 10:7, 11:11, 11:18, 14:2, 15:12, 15:21, 16:6, 16:10, 17:17, 17:25, 25:10.
Honorable 1:18.
hopefully 25:5.
house 7:20, 7:24, 8:2.
Houston 1:26.
hurts 17:10.
hypothetical 18:4.
.
.
< I >.
idea 18:21.
III 21:23, 22:22, 23:4, 23:12.
imagine 20:18.
immense

13:11.
impact 22:3.
impeding 15:3.
impending 15:4, 15:7, 22:19.
implement 4:2, 4:3, 5:8.
implementation 6:7.
implemented 8:4, 11:3, 21:14.
implementing 7:6, 11:13.
improved 7:2.
improvements 4:12, 4:13.
incurring 3:16, 3:20, 9:21, 21:9.
indicia 6:6.
individuals 14:16, 14:24.
industry 13:4.
inflict 17:8.
information 24:5.
injury 14:20, 15:1, 15:3, 22:18, 22:19.
inquiry 13:20.
insane 7:22.
install 7:11, 7:12, 7:14, 8:2.
installed 6:22.
intended 5:4.

intent 6:2, 6:6.
interest 19:1.
International 3:20, 14:7.
interpret 11:6.
interpreted 9:1, 11:3.
issue 9:20, 11:13, 12:23, 13:10, 16:10, 17:22, 20:12, 20:20, 23:16, 24:1.
issues 5:21.
.
.
< J >.
J. 1:33.
January 29 1:12.
Jonathan 1:23.
Jr 1:28.
JSR 24:22, 25:3.
Judge 1:19, 18:16.
judgment 20:8, 24:2.
jumping 10:5.
jurisdiction 20:15.
jurisdictional 20:9.
Justice 14:8.
.
.
< K >.
kind 5:5, 10:5, 13:19,

13:20, 17:9, 23:8.
knows 17:2.
.
.
< L >.
Large 17:5.
last 2:19, 24:17.
later 17:18, 17:23, 19:12.
latest 13:8, 15:15.
least 7:25, 20:17.
left 5:17.
legal 18:14.
legislative 6:7.
less 16:22, 17:3, 17:4.
letter 8:25.
level 6:11.
life 5:8.
Light 13:16.
likelihood 14:21.
likely 17:3, 17:4.
litigation 19:21.
Little 1:23, 2:7, 2:8, 5:24, 21:22, 25:9.
LLP 1:24, 1:29.
logic 21:20.
long 4:8, 12:4, 19:22.
look 6:4, 12:3, 14:13, 22:6, 23:2.
looking 11:18.
lot 12:25,

21:9, 21:20.
Louisiana 1:25.
.
.
< M >.
M. 1:23.
machine 1:48.
magic 22:24, 22:25.
maintenance 17:13.
majority 6:22.
manufactured 6:21.
manufacturers 6:10, 6:12, 6:14.
Mark 2:7.
matter 9:16, 19:24, 24:10, 25:18.
mayor 11:13, 11:16, 11:20, 13:9.
mean 3:6, 7:19, 9:20, 11:6, 13:9, 15:6, 16:3, 17:15, 18:2, 18:21, 19:19, 21:6, 24:5, 24:6.
means 10:19.
members 24:13.
memory 2:21.
memos 2:17.
merit 17:24.
merits 5:10, 20:15, 20:16, 23:13.
mess 18:17.

method 16:23.
mind 24:24.
minutes 8:17.
mis-citing 6:25.
mischaracterization 9:4.
modification 12:13.
moment 8:1.
monetary 16:18, 16:20, 16:22, 16:24, 17:8.
money 9:24, 12:20.
month 15:22.
months 20:21, 21:4.
motion 20:8, 24:2.
move 17:4, 19:23, 20:10, 23:13, 23:21.
moves 18:7.
MR. LITTLE 2:7, 2:25, 3:5, 3:8, 8:20, 10:7, 10:14, 10:21, 11:11, 11:16, 12:11, 12:22, 13:13, 15:12, 15:14, 15:21, 16:5, 16:10, 16:12, 16:16, 16:20, 17:17,

25:10.
MR. NOVAK 2:9.
.
.
< N >.
name 6:19, 14:3, 14:11.
National 2:3.
NATIONAL ASSOCIATION OF HOME 1:5.
natural 7:9.
need 5:2, 6:12, 6:16, 24:5, 24:12, 25:6.
new 4:9, 4:10, 4:11, 4:12, 4:19, 4:20, 5:16, 7:1, 7:15, 9:2, 9:8, 9:12, 9:25, 11:6, 12:12.
next 13:9, 15:15, 15:19, 23:20.
NO. 1:5.
none 18:24.
nothing 11:25, 15:8, 22:11, 22:13.
notice 15:25, 16:13.
Novak 1:28, 2:9.
NW 1:30, 1:35, 1:43.
.
.
< O >.
objectively 14:21.
obtain 22:18.

Obviously 22:23.
Office 1:34.
Official 1:42, 25:22.
Okay 3:9, 3:23, 4:7, 4:15, 5:1, 5:14, 5:23, 7:19, 8:14, 9:12, 10:12, 11:10, 11:15, 13:24, 14:9, 14:15, 16:9, 16:15, 20:22, 22:8, 25:2, 25:8, 25:11.
on-site 7:5, 7:7, 10:16, 12:4.
once 13:7, 13:10, 14:12, 20:5.
One 5:12, 7:24, 10:14, 11:12, 12:5, 12:23, 13:2, 13:24, 14:2, 15:12, 15:22, 18:7, 18:19, 22:17, 22:25.
ones 4:9, 24:12.
ongoing 17:13.
operate 22:16.
operates 12:11.
operation 11:17.
opinion 23:19.
opp 20:18.
opposed

16:3.
order 21:14, 23:18.
ordered 22:11.
otherwise 9:24, 22:15.
outside 7:20.
overcautious 13:1.
overread- 21:25.
own 3:20, 18:17.
.
.
< P >.
p.m. 25:14.
paragraph 12:1.
parameters 5:5.
part 10:18, 20:17.
particular 23:5.
particularly 4:2.
parts 13:2.
passed 10:2, 19:4.
pending 21:7, 21:15.
people 7:23, 13:4, 17:3, 17:14, 18:10, 19:7, 20:4, 20:5, 20:6, 22:3.
percent 12:14.
perhaps 13:1, 16:12.
period 5:3, 15:23.
permit 11:21, 12:8, 12:9,

12:12.
permits 8:5.
permitted 10:16.
perspective 17:22.
phase 16:1.
phases 17:5.
phone 24:24.
place 8:10.
Plaintiff 1:8, 1:23, 2:5.
plaintiffs 2:7, 2:9, 3:14, 3:16, 4:5, 6:19, 20:8, 23:5, 23:7.
plan 9:23, 17:6.
planning 17:5.
plans 3:4, 8:8.
play 6:4.
please 2:5.
point 9:21, 13:18, 14:22, 14:23, 15:11, 22:4.
pool 17:13.
position 8:22, 8:23.
potentially 12:24, 15:8.
power 12:2.
practice 22:12.
pre-empted 2:19, 21:5, 21:6.
pre-emption 2:21, 5:10, 5:24, 6:1, 6:4, 9:16, 18:14, 18:22,

20:12, 20:24, 21:1, 21:2, 21:3, 25:3.
pre-empts 6:11.
pre-motion 2:16, 16:13.
Pre-motion Conference 1:17.
pre-permit 17:5.
precedent 24:11.
precisely 10:3.
prefer 13:15.
preferable 24:1.
preferred 16:23.
premature 22:15.
prematurely 22:10.
presented 16:13.
presumably 3:7.
pretend 4:7.
pretty 6:8, 12:18.
preventive 22:18.
prices 13:6.
primary 14:10.
principally 16:20, 16:21.
principle 4:3, 7:7, 11:3, 11:6.
principles 4:2, 5:6, 5:11.
probably

18:15, 21:3.
problem 4:24, 10:24.
proceed 19:11, 19:19, 23:25.
Proceedings 1:48, 25:14, 25:18.
produced 1:48.
products 6:11.
prohibit 7:5, 10:15, 12:1.
prohibits 7:1.
promulgate 4:23.
promulgated 10:15.
prosecution 7:18.
prove 22:14.
provide 14:12.
provision 7:8, 10:17.
pull 12:12, 24:24.
purpose 6:6.
purposes 18:3.
pursue 20:7.
pushing 18:17.
put 3:4, 7:25, 12:16, 19:21, 20:23.
.
.
< Q >.
quantum 17:9.
question 8:15, 20:1.
questions

10:8, 10:11.
quick 14:14, 20:17, 23:15, 25:5.
quickly 18:7, 23:18.
quite 3:17.
.
.
< R >.
R. 1:28.
raise 5:21, 21:22.
rates 17:14.
rather 17:23, 19:12, 23:11.
read 10:9, 10:12, 11:1, 22:1.
reading 23:10.
ready 18:11.
real 14:13.
really 9:16, 10:13, 13:2, 16:14, 21:10.
reasonable 14:21.
recent 11:24.
record 2:2, 2:6, 25:18.
recorded 1:48.
refrigerator 6:13.
regs 13:10.
regulation 2:18, 18:18.
regulations 5:18, 8:13, 10:2, 11:13, 15:9, 15:14, 16:2, 16:3,

16:5, 18:9.
regulatory 16:1.
relatively 25:5.
relief 22:18.
remember 14:11.
renovations 12:14.
reply 20:19.
Reported 1:41.
Reporter 1:42, 25:22.
represent 4:25.
required 10:1, 10:3, 10:4, 10:5.
requirement 3:14, 15:2.
reread 22:1.
residential 7:3.
respectively 3:10.
respondent 14:19, 15:1.
respondents 14:19, 14:23.
response 21:10.
restaurant 13:14.
restaurants 13:15.
revenue 16:22.
review 8:12.
reviews 8:11.
revisions 4:1.
Reyes 21:11.

rid 9:5, 9:25.
rip 12:15.
ripeness 2:22, 13:20.
rise 13:6.
risk 13:21.
role 6:4.
RPR 1:41, 25:16.
rule 4:4, 4:23, 5:12.
rule-making 4:25, 5:1, 5:20, 15:25.
rules 5:7, 7:6, 8:9, 15:20.
.
.
< S >.
S. 22:7.
satisfy 15:2, 15:7.
saying 12:5.
says 2:18, 3:25, 6:24, 6:25, 7:5, 9:15, 11:21, 12:3, 14:18, 22:14, 25:3.
schedule 23:16, 25:4, 25:6.
scheme 6:3.
scientists 5:8.
Scott 1:28, 2:9.
second 13:24, 14:2, 24:9.
seem 9:4.
seems 7:24, 10:5, 14:15, 22:2.
self-incurred

3:18.
self-select 4:18.
sense 21:16, 23:21, 24:10, 25:9.
set 23:15.
settle 19:2.
shall 10:16, 11:22, 12:1.
shooting 7:23.
shootings 7:25.
shorthand 1:48.
show 24:7.
sides 2:24.
sign 5:16.
sit 17:15.
site 10:15.
situations 23:7.
SJ 20:18.
sliver 7:10, 9:10.
slowly 10:13, 13:19.
small 9:10.
smaller 17:13.
smart 21:11, 22:5.
sold 6:21.
someone 17:18.
sometime 17:2.
somewhat 7:22.
sooner 17:18, 17:23, 19:12.
sorry 3:11, 4:12, 10:15, 11:18, 14:3, 15:18, 15:21.

sort 19:1, 21:17, 23:2.
specific 7:9.
speculation 4:24.
speculative 14:16, 15:2.
speed 19:15.
spending 9:24.
spread 17:12.
stage 4:6.
standalone 20:14.
standard 11:25, 22:20.
standards 6:9, 6:12, 10:14.
standing 2:22, 3:22, 5:21, 9:20, 12:21, 15:8, 17:19, 18:2, 18:4, 19:10, 19:24, 20:7, 20:9, 20:13, 20:17, 20:20, 21:1, 21:22, 22:22, 22:23, 23:5, 23:12, 23:16, 24:1, 24:6, 25:5, 25:6.
start 4:15, 6:5, 9:20.
started 4:5, 15:20.
starting 2:5.
State 2:5, 6:11, 22:7.

States 1:1, 1:6, 1:19, 2:4, 8:25, 22:17.
statute 9:2, 10:9, 11:1, 11:2, 11:19, 16:3, 16:4, 16:7, 18:19.
statutory 6:3.
stay 21:7.
stayed 21:14.
stenographic 25:17.
step 23:20.
steps 21:19.
stories 7:3.
stove 7:14, 8:2.
straight 6:8, 20:12, 23:13.
strand 16:25.
Street 1:25, 1:30, 1:35, 7:21, 7:25.
stuck 21:2.
subject 4:6.
submit 8:7.
submitted 11:22.
substantial 4:12, 4:13, 12:13.
substantially 7:2.
suffer 13:11.
suggest 20:1, 20:2, 20:3, 21:25.
suggestion 20:4, 24:9.
suggestions

23:23.
suggests 22:6.
Suite 1:36.
Suits 22:9, 22:10, 22:14.
summary 20:8, 24:2.
supervisors 19:24.
supposed 7:21.
Supreme 3:19, 12:18, 13:25, 14:6, 22:14, 23:10.
surreply 24:18.
surveillance 14:25.
surveyed 14:17.
.
.
< T >.
T. 1:41, 25:21.
talked 20:5.
talks 13:15.
tasks 3:25.
term 12:14.
terms 21:21.
tested 22:12.
Texas 1:26.
text 6:5.
THE CLERK 2:2.
themselves 16:2.
theory 14:19, 15:1, 16:24.
thermal 7:8, 10:17.
they've 19:9.
though 3:2,

6:5.
threatened 15:3, 22:18.
three 7:3, 8:9, 20:20, 24:22.
today 2:13, 4:16, 5:1, 5:16, 5:21, 24:23.
ton 9:24.
top 14:11.
toss 18:22.
totally 16:21, 22:4.
Transcript 1:17, 1:48, 25:17.
transcription 1:49.
transition 5:3, 5:18, 5:21.
try 19:21, 23:17.
trying 6:3, 8:16, 8:18, 8:21, 21:16.
TUETKEN 1:33, 2:11, 2:13, 2:17, 25:8.
turn 7:15.
turnaround 20:17.
turns 11:20, 13:19.
Two 11:12, 13:2, 13:24, 16:14, 20:4, 23:2, 23:22, 24:20.
type 5:3, 13:14, 17:8.
types 9:13.
.
.

< U >.
uncertainty 12:25.
understand 2:22, 8:18, 8:21, 9:22, 15:11, 19:3.
unfortunately 21:22.
United 1:1, 1:6, 1:19, 2:3.
unless 11:23, 19:19.
until 15:9, 18:4, 18:18, 21:2.
utter 18:11.
.
.
< V >.
v. 14:18, 15:4, 22:1.
vague 2:21.
value 12:15.
various 18:10.
vast 6:22.
version 11:24, 23:12, 23:14.
versus 2:4, 3:19, 5:2, 13:22, 14:7, 22:7.
via 12:11.
view 12:17, 18:16.
views 21:12.
violating 8:3.
Virginia 22:7.
vs 1:9.
.
.
< W >.
waiting 13:22,

15:23.
waive 23:6.
wall 7:21.
wants 13:16.
Washington 1:13, 1:31, 1:37, 1:44, 13:16.
wasted 21:4.
week 13:9, 15:15, 15:20.
weeks 23:2, 24:22, 24:23.
well-establish ed 15:2.
whatever 8:12, 10:14, 11:7, 19:13, 21:5, 23:4.
whenever 18:5.
whether 5:1, 8:12, 14:16, 20:6, 21:21, 22:9.
Whitmer 14:18, 15:4.
Whitmore 22:1.
Will 3:16, 3:21, 4:8, 5:21, 7:9, 7:11, 7:17, 8:12, 13:6, 13:22, 14:16, 14:22, 17:8, 19:9, 19:16, 23:15, 23:17.
within 20:19.
without 8:2, 23:19.
words 9:2.
work 5:4, 18:9, 18:13.

worked 2:20, 4:4.
working 13:19.
works 6:8, 11:2.
worries 15:24.
worry 18:25.
worth 12:14, 20:11.
.
.
< Y >.
years 2:19, 8:9.
.
.
< Z >.
zero 18:23.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | No. 1:24-cv-02942-ACR |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Civil Rule 7(h), Plaintiffs respectfully submit the following Statement of Material Facts Not in Dispute.

| Plaintiffs | Defendants |
|---|---|
| 1. D.C. Law 24-177 became effective on September 21, 2022. Compl., ECF No. 4-1, ¶¶ 31-32; Answer, ECF No. 18, ¶¶ 31-32. | |
| 2. D.C. Law 24-177 prohibits the use of gas appliances in newly constructed covered buildings and substantial modifications to existing covered buildings after December 31, 2026, at latest. Ex. 3, Perry McGuire Decl., at ¶ 4; Ex. 4, Angelo Amador Decl., at ¶ 6; Ex. 5, Nicole Upano Decl., at ¶ 4; Ex. 6 Lori Graf Decl., at ¶ 4; Ex. 7, Donald "Blue" Jenkins Decl., at ¶ 5; Ex. 8, Ryan Boyer Decl., ¶ 5; Ex. 9, Wilder Reed Decl., at ¶ 5. | |
| 3. The District of Columbia has not applied for a waiver from preemption under the Energy Policy and Conservation Act ("EPCA"). Compl., ECF No. 4-1, ¶ 74; Answer, ECF No. 18, ¶ 74. | |

1

| | |
|---|---|
| 4. One of the National Association of Home Builders of the United States' members, Rinnai America Corporation, is an appliance manufacturer that manufactures and sells gas appliances. Ex. 3, Perry McGuire Decl., at ¶ 2. | |
| 5. Rinnai America Corporation will lose sales if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances the company manufactures and sells due to D.C. Law 24-177. Ex. 3, Perry McGuire Decl., at ¶ 5. | |
| 6. The Restaurant Law Center has members who rely on gas for cooking and space and water heating, and D.C. Law 24-177 will prohibit them from using gas for those purposes in new and substantially modified commercial buildings. Ex. 4, Angelo Amador Decl., at ¶ 7. | |
| 7. The Restaurant Law Center has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. Ex. 4, Angelo Amador Decl., at ¶ 7. | |
| 8. The National Apartment Association has members who will be prohibited from using gas in new buildings as a result of D.C. Law 24-177. Ex. 5, Nicole Upano Decl., at ¶ 6. | |
| 9. The National Apartment Association has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. Ex. 5, Nicole Upano Decl., at ¶ 6. | |
| 10. The Maryland Building Industry Association has members who, as a result of D.C. Law 24-177, will be prohibited from installing gas in new buildings they construct. Ex. 6, Lori Graf Decl., at ¶ 6. | |

2

| | |
|---|---|
| 11. The Maryland Building Industry Association has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. Ex. 6, Lori Graf Decl., at ¶ 6. | |
| 12. D.C. Law 24-177 has caused and will continue to cause reduced growth of Washington Gas Light Company's customer base. Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-7. | |
| 13. By limiting the pool of gas customers, D.C. Law 24-177 will result in rates for gas service that are higher than they would be without D.C. Law 24-177.  Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-8. | |
| 14. The D.C. Public Service Commission relied on D.C. Law 24-177 to deny Washington Gas Light Company's PIPES 3 Plan.  Ex. 7, Donald "Blue" Jenkins Decl., at ¶ 10. | |
| 15. D.C. Law 24-177 will reduce the amount of work performed by members of the Philadelphia-Baltimore-Washington Laborers' District Council and result in the loss of employment of some of its members.  Ex. 8, Ryan Boyer Decl., ¶ 6. | |
| 16. D.C. Law 24-177 will result in a decline of work performed by members of Teamsters Local 96. Ex. 9, Wilder Reed Decl., at ¶ 6. | |

3

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. MARK LITTLE [admitted pro hac vice]
910 Louisiana Street
Houston, TX 77002
Phone: (713) 229-1489
Email: mark.little@bakerbotts.com

SCOTT NOVAK [1736274]
700 K St NW
Washington, D.C. 20001
Phone: (202) 639-1316
Email: scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders
of the United States, Restaurant Law Center,
National Apartment Association, Maryland Building
Industry Association, and Washington Gas Light
Company*

RESTAURANT LAW CENTER

/s/ *Angelo Amador*
ANGELO AMADOR [480031]
2055 L St NW
Washington, D.C. 20036
Phone: (202) 331-5913
Email: AAmador@restaurant.org

*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

/s/ *Brian Petruska*
BRIAN PETRUSKA [498321]
1875 Explorer Dr, Ste. 920
Reston, VA 20190
Phone: (703) 860-4194
Email: bpetruska@maliuna.org

*Counsel for Philadelphia-Baltimore-Washington
Laborers' District Council*

4

JA159

5

MOONEY, GREEN, SAIDON, MURPHY &
WELCH, P.C.


/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
Phone: (202) 783-0010
Email: lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*,<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>        **Defendant.** | **No. 1:24-cv-02942-ACR** |

## EXHIBIT INDEX

| Ex. No. | Description |
|---|---|
| Ex. 1 | D.C. Law 24-177 |
| Ex. 2 | Complaint for Declaratory and Injunctive Relief (Originally filed at ECF No. 1) |
| Ex. 3 | Declaration of Perry McGuire (Originally filed at ECF No. 1-1) |
| Ex. 4 | Declaration of Angelo Amador (Originally filed at ECF No. 1-2) |
| Ex. 5 | Declaration of Nicole Upano (Originally filed at ECF No. 1-3) |
| Ex. 6 | Declaration of Lori Graf (Originally filed at ECF No. 1-4) |
| Ex. 7 | Declaration of Donald "Blue" Jenkins (Originally filed at ECF No. 1-5) |
| Ex. 8 | Declaration of Ryan Boyer (Originally filed at ECF No. 1-6) |
| Ex. 9 | Declaration of Wilder Reed (Originally filed at ECF No. 1-7) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,**<br><br>　　　**Plaintiffs,**<br><br>　　　**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>　　　**Defendant.** | **No. 1:24-cv-02942-ACR** |

### DEFENDANT'S COUNTER-STATEMENT OF DISPUTED FACTS

Pursuant to Local Civil Rule 7(h)(1) and this Court's Standing Order [15], Defendant

District of Columbia (the District) submits this Counter-Statement of Disputed Facts.

| PLAINTIFFS' FACTS | DEFENDANT'S RESPONSE |
|---|---|
| 1. D.C. Law 24-177 became effective on September 21, 2022.  Compl., ECF No. 4-1, ¶¶ 31-32; Answer, ECF No. 18, ¶¶ 31-32. | Undisputed. |
| 2. D.C. Law 24-177 prohibits the use of gas appliances in newly constructed covered buildings and substantial modifications to existing covered buildings after December 31, 2026, at latest.  Ex. 3, Perry McGuire Decl., at ¶ 4; Ex. 4, Angelo Amador Decl., at ¶ 6; Ex. 5, Nicole Upano Decl., at ¶ 4; Ex. 6 Lori Graf Decl., at ¶ 4; Ex. 7, Donald "Blue" Jenkins Decl., at ¶ 5; Ex. 8, Ryan Boyer Decl., ¶ 5; Ex. 9, Wilder Reed Decl., at ¶ 5. | This is a legal conclusion, not a statement of fact, so no response is required.  Regardless, the statement is disputed because it is not quite accurate.  The Clean Energy DC Building Code Amendment Act (Clean Buildings Act) itself imposes no prohibitions but leaves implementation to the Mayor or provides a default if she does not act by December 31, 2026.  *See* D.C. Code § 6-1453.01. |
| 3. The District of Columbia has not applied for a waiver from preemption under the Energy Policy and Conservation Act ("EPCA").  Compl., ECF No. 4-1, ¶ 74; Answer, ECF No. 18, ¶ 74. | Undisputed. |
| 4. One of the National Association of Home Builders of the United States' members, | Undisputed. |

| | |
|---|---|
| Rinnai America Corporation, is an appliance manufacturer that manufactures and sells gas appliances. Ex. 3, Perry McGuire Decl., at ¶ 2. | |
| 5. Rinnai America Corporation will lose sales if new commercial buildings and substantially modified commercial buildings in the District of Columbia can no longer use the gas appliances the company manufactures and sells due to D.C. Law 24-177. Ex. 3, Perry McGuire Decl., at ¶ 5. | Disputed. Whether Rinnai will face sales losses—especially significant ones—is highly speculative. The fossil fuel prohibition will need to be implemented, which could occur as late as December 31, 2026. Then, there must be building projects that are covered by the Act. Whether there are a significant number of such projects that result in a noticeable decline in demand for gas appliances from Rinnai specifically is speculative. Moreover, there is no way to predict whether any fluctuations in future demand are due to the Clean Buildings Act versus other factors, like consumer choice. Indeed, the federal government is also phasing in a fossil fuel prohibition for federal buildings. 42 U.S.C. § 6834(a)(3)(D)(i)(I); *see also* 89 Fed. Reg. 35,384, 35,394 (May 1, 2024). As a result, any drop in demand for gas appliances in the District cannot be attributed to the Clean Buildings Act alone when the federal government owns so much property in the District. Accordingly, because the declarant's testimony (1) is too conclusory, (2) relies on highly generalized statements with no supporting facts, and (3) is supported only by unsubstantiated speculation, it cannot establish the facts. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *United States v. Dynamic Visions Inc.*, 971 F.3d 330, 337 (D.C. Cir. 2020); *Lexington Ins. Co. v. Paddock Swimming Pool Co.*, 532 F. Supp. 3d 1, 8 (D.D.C. 2021). <br><br> The statement is also immaterial because predictions of future harms do not qualify for either Article III standing or injunctive relief. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (to seek prospective relief, harm must be "certainly impending"); *Whitmore v. Arkansas*, 495 U.S. 149, 158 |

2

| | |
|---|---|
| | (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III."); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (irreparable harm must be "both certain and great," "actual and not theoretical"). |
| 6. The Restaurant Law Center has members who rely on gas for cooking and space and water heating, and D.C. Law 24-177 will prohibit them from using gas for those purposes in new and substantially modified commercial buildings.  Ex. 4, Angelo Amador Decl., at ¶ 7. | Disputed.  The only evidence cited in support of the statement is hearsay, and hearsay "counts for nothing" on summary judgment. *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Setting that aside, the members' complaints are too conclusory, generalized, and speculative.  *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8.  And the statement is immaterial.  *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674.  At a minimum, the statement is immaterial because there are no energy conservation standards for commercial cooking appliances, *see* U.S. Dep't of Energy, *Standards and Test Procedures*, https://tinyurl.com/x4stj5tf, and commercial space and water heaters only have energy conservation standards for energy *efficiency*, not energy *use*, 10 C.F.R. §§ 431.77(a), 431.110.  Accordingly, as explained further in the District's brief, the Clean Building Act's application to commercial cooking appliances and space and water heaters does not conflict with the Energy Conservation and Policy Act (EPCA)'s preemptive scope as interpreted by Plaintiffs. |
| 7. The Restaurant Law Center has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service.  Ex. 4, Angelo Amador Decl., at ¶ 7. | Disputed and immaterial.  Def.'s Resp. ¶ 6.  Further, the Committee on Transportation and the Environment made uncontroverted findings that the costs of compliance with a net-zero-energy standard would be minimal and offset by energy savings.  Def.'s Ex. 2, Clean Energy DC Building Code Amendment Act of 2022 Comm. Rep. (Comm. Rep.) at 7–8. |
| 8. The National Apartment Association has members who will be prohibited from using | Disputed.  The only evidence cited in support of the statement is hearsay.  *See Gleklen*, 199 F.3d at 1369.  Setting that aside, the |

JA164

| | |
|---|---|
| gas in new buildings as a result of D.C. Law 24-177. Ex. 5, Nicole Upano Decl., at ¶ 6. | members' complaints are too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8. And the statement is immaterial. *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
| 9. The National Apartment Association has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. Ex. 5, Nicole Upano Decl., at ¶ 6. | Disputed. The only evidence cited in support of the statement is hearsay. *See Gleklen*, 199 F.3d at 1369. Setting that aside, the members' complaints are too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *United States v. Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8. Further, the Committee on Transportation and the Environment made uncontroverted findings that the costs of compliance with a net-zero-energy standard would be minimal and offset by energy savings. Comm. Rep. at 7–8. And the statement is immaterial. *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
| 10. The Maryland Building Industry Association has members who, as a result of D.C. Law 24-177, will be prohibited from installing gas in new buildings they construct. Ex. 6, Lori Graf Decl., at ¶ 6. | Disputed. The only evidence cited in support of the statement is hearsay. *See Gleklen*, 199 F.3d at 1369. Setting that aside, the members' complaints are too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8. And the statement is immaterial. *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
| 11. The Maryland Building Industry Association has members who, as a result of D.C. Law 24-177, will have to conduct expensive electric retrofits in existing buildings they make substantial modifications to that currently have gas service. Ex. 6, Lori Graf Decl., at ¶ 6. | Disputed. The only evidence cited in support of the statement is hearsay. *See Gleklen*, 199 F.3d at 1369. Setting that aside, the members' complaints are too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8. Further, the Committee on Transportation and the Environment made uncontroverted findings that the costs of compliance with a net-zero-energy standard would be minimal and offset by energy savings. Comm. Rep. at 7–8. And the statement is immaterial. *See* |

| | *Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
|---|---|
| 12. D.C. Law 24-177 has caused and will continue to cause reduced growth of Washington Gas Light Company's customer base. Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-7. | Disputed.  The Clean Buildings Act has not been implemented, and there is no evidence in the record to suggest otherwise.  As a result, there is no way that the Act "has caused" reduced growth of Washington Gas's customer base.  As to the declarant's claims about future reduced growth, such testimony is purely speculative.  In all, the testimony is too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8.  Further, Washington Gas's customer base is likely to be more affected by the federal government's fossil fuel prohibition.  *See* Def.'s Resp. ¶ 5.  Indeed, Washington Gas represented in a rulemaking regarding that prohibition that "gas delivery to buildings that house various Federal operations account for a material volume of the natural gas delivered by Washington Gas." Def.'s Ex. 14, Wash. Gas Comments at 1.  Accordingly, there is no way to reliably attribute future hypothetical reduced growth to the Clean Buildings Act when federal law provides a concurrent or superseding cause.<br><br>The statement is also immaterial.  *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
| 13. By limiting the pool of gas customers, D.C. Law 24-177 will result in rates for gas service that are higher than they would be without D.C. Law 24-177.  Ex. 7, Donald "Blue" Jenkins Decl., at ¶¶ 6-8. | Disputed and immaterial.  *See* Def.'s Resp. ¶ 12.  Whether the Clean Buildings Act will have such an effect on the customer pool that it affects rates is entirely speculative.  Further, the declarant cannot foresee whether other factors may raise rates and complicate his causal conclusions.  *See id.* |
| 14. The D.C. Public Service Commission relied on D.C. Law 24-177 to deny Washington Gas Light Company's PIPES 3 Plan.  Ex. 7, Donald "Blue" Jenkins Decl., at ¶ 10. | Disputed.  Although the Commission cited the Clean Buildings Act, it relied on a host of other District and federal laws.  Pub. Serv. Comm'n Order No. 22003 ¶¶ 9–13.  The District law that the Commission primarily relied on was a different law requiring the District to "achiev[e] carbon neutrality by 2045."  *Id.* ¶ 45.  Moreover, the Commission |

5

| | denied Washington Gas's application largely because of Washington Gas's own failures, including that "the Application is thin on any actual evidence or data," and Washington Gas had fallen behind on timelines. *Id.* ¶ 44. Further, in order to obtain approval for an acquisition by a foreign energy company (AltaGas), Washington Gas and AltaGas promised regulators and the public to respect the District's climate goals and work to achieve them. Def.'s Ex. 13, Pub. Serv. Comm'n Order No. 19396 ¶¶ 76–77, 79. So the Clean Buildings Act did not cause the denial of Washington Gas's PIPES 3 Plan when Washington Gas had previously voluntarily agreed to abide by the District's climate laws and goals. *See Clapper*, 568 U.S. at 416 (self-inflicted harm is not cognizable). The statement is also immaterial because past harms are not cognizable in a case seeking prospective relief. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). |
|---|---|
| 15. D.C. Law 24-177 will reduce the amount of work performed by members of the Philadelphia-Baltimore-Washington Laborers' District Council and result in the loss of employment of some of its members. Ex. 8, Ryan Boyer Decl., ¶ 6. | Disputed. Whether the Clean Buildings Act will have such an effect on the gas customer pool that it substantially affects labor associated with gas is entirely speculative. Further, the declarant cannot foresee whether other factors may affect labor demands and complicate his causal conclusions, including a similar fossil fuel prohibition imposed by federal law. *See* Def.'s Resp. ¶¶ 5, 12. In all, the testimony is too conclusory, generalized, and speculative. *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8. And the statement is immaterial. *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |
| 16. D.C. Law 24-177 will result in a decline of work performed by members of Teamsters Local 96. Ex. 9, Wilder Reed Decl., at ¶ 6. | Disputed. Whether the Clean Buildings Act will have such an effect on the gas customer pool that it substantially affects labor associated with gas is entirely speculative. Further, the declarant cannot foresee whether other factors may affect labor demands and complicate his causal conclusions, including a similar fossil fuel prohibition imposed by |

6

|  | federal law.  *See* Def.'s Resp.¶¶ 5, 12.  In all, the testimony is too conclusory, generalized, and speculative.  *See Greene*, 164 F.3d at 675; *Dynamic Visions*, 971 F.3d at 337; *Lexington*, 532 F. Supp. 3d at 8.  And the statement is immaterial.  *See Clapper*, 568 U.S. at 416; *Whitmore*, 495 U.S. at 158; *Wis. Gas*, 758 F.2d at 674. |

Date: May 28, 2025.                                    Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendant*

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>     **Defendant.** | **No. 1:24-cv-02942-ACR** |

## DEFENDANT'S EXHIBIT LIST

1. D.C. Council, Certification Record: B23-0420

2. Clean Energy DC Building Code Amendment Act of 2022 Committee Report

3. Climate Commitment Amendment Act of 2022 Committee Report

4. Construction Codes Coordinating Board Minutes (Sept. 21, 2023)

5. Appendix Z to the Energy Conservation Code (2017)

6. Appendix Z to the Energy Conservation Code (2023)

7. National Research Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report* (2009)

8. David Santana Ortiz & Mark Allen Bernstein, RAND, *Measures of Residential Energy Consumption and Their Relationships to DOE Policy* (1999)

9. American Public Gas Association, Comments (Apr. 30, 2014)

10. National Association of Home Builders, Comments (Oct. 19, 2010)

11. American Gas Association, Comments (Oct. 19, 2010)

12. U.S. Department of Energy, *A Common Definition for Zero Energy Buildings* (Sept. 2015)

13.	Public Service Commission Order No. 19396

14.	Washington Gas Light Company, Comments (Feb. 21, 2023)

Date: May 28, 2025.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ Matthew R. Blecher
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

/s/ Honey Morton
HONEY MORTON [1019878]
Assistant Chief, Equity Section

/s/ Adam J. Tuetken
ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendant*

# EXHIBIT 1

AN ACT

## D.C. ACT 24-528

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

### JULY 27, 2022

To require the Mayor to issue final regulations, by December 31, 2026, requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard, to provide that, if the Mayor does not adopt such regulations, no new building permit applications shall be approved unless the building design complies with Appendix Z of the District of Columbia Energy Conservation Code, to provide that on-site combustion of fossil fuels for backup power generation shall not be prohibited for facilities that are essential to protecting public health and safety, and to require the Department of Buildings to arrange for an independent audit every 3 years on compliance with the requirements of this act; and to amend the Green Building Act of 2006 to expand the permissible uses of money in the Green Building Fund.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Clean Energy DC Building Code Amendment Act of 2022".

Sec. 2. Net-zero-energy building code requirements.

(a) For the purposes of this section, the term:

(1) "Appendix Z" means Appendix Z of the District of Columbia Energy Conservation Code – Commercial Provisions (12-I [CE] DCMR § Z1 *et seq.*).

(2) "Covered buildings" means all buildings that are subject to the District of Columbia Energy Conservation Code – Commercial Provisions (12-I [CE] DCMR § 1 *et seq.*).

(3) "Net-zero-energy standard" means a standard under which:

(A) A building conserves an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z; and

(B) A building obtains energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z; provided, that the following restrictions shall apply:

(i) Renewable energy shall be generated at the building site wherever feasible;

1

(ii) To the extent a building owner procures renewable energy through offsite sources, the building owner may not rely on unbundled renewable energy credits to satisfy the renewable energy requirement; and

(iii) On-site fuel combustion shall not be permitted for the provision of thermal energy to the building.

(4) "New construction" shall have the same meaning as provided in section 2(33) of the Green Building Act of 2006, effective March 8, 2007 (D.C. Law 16-234; D.C. Official Code § 6-1451.01(33)).

(5) "Substantial improvement" shall have the same meaning as provided in section 2(40) of the Green Building Act of 2006, effective March 8, 2007 (D.C. Law 16-234; D.C. Official Code § 6-1451.01(40)).

(b)(1) By December 31, 2026, the Mayor, pursuant to Title I of the District of Columbia Administrative Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 et seq.), shall issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard.

(2) If the Mayor does not comply with paragraph (1) of this subsection, no building permit application submitted after December 31, 2026, shall be approved unless the building design complies with the most recent version of Appendix Z; except, that nothing in this paragraph shall be construed to prohibit the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety.

(c)(1) Beginning in 2029, and every 3 years thereafter, the Department of Buildings shall arrange for an independent audit that assesses a representative sample of newly constructed or substantially improved covered buildings that received certificates of occupancy in the District in the preceding 3 years and quantifies the percentage of those covered buildings that comply with the requirements of subsection (b) of this section. The audit shall detail the replicable method used to select a representative sample of covered buildings for the audit.

(2) The Department of Buildings shall submit a complete copy of the audit findings to the Council and the Mayor no later than March 31 of the year following the initiation of the audit.

Sec. 3. Section 8(c) of the Green Building Act of 2006, effective March 8, 2007 (D.C. Law 16-234; D.C. Official Code § 6-1451.07(c)), is amended as follows:

(a) Paragraph (6) is amended by striking the phrase "; and" and inserting a semicolon in its place.

(b) Paragraph (7) is amended by striking the period and inserting the phrase "; and" in its place.

(c) A new paragraph (8) is added to read as follows:

"(8) Costs to obtain the audit required by section 2(c) of the Clean Energy DC Building Code Amendment Act of 2022, passed on 2nd reading on July 12, 2022 (Enrolled version of Bill 24-420).".

2

Sec. 4. Applicability.
This act shall apply as of October 1, 2023.

Sec. 5. Fiscal impact statement.
The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 4a of the General Legislative Procedures Act of 1975, approved October 16, 2006 (120 Stat. 2038; D.C. Official Code § 1-301.47a).

Sec. 6. Effective date.
This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of congressional review as provided in section 602(c)(l) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(l)), and publication in the District of Columbia Register.

_____
Chairman
Council of the District of Columbia

_____
Mayor
District of Columbia

APPROVED
July 27, 2022

3



## COUNCIL OF THE DISTRICT OF COLUMBIA

## WASHINGTON, DC, 20004

Docket No. **B24-0420**

[ X ] ITEM ON CONSENT CALENDAR

[ X ] ACTION      **First Reading, CC**

[ X ] VOTE DATE      **June 28, 2022**

[ ] VOICE VOTE

     RECORDED VOTE ON REQUEST

ABSENT

[ X ] ROLL CALL VOTE – Result      **Approved**

| Council Member | Aye | Nay | NV | AB | Rec | Council Member | Aye | Nay | NV | AB | Rec | Council Member | Aye | Nay | NV | AB | Rec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chairman Mendelson | X | | | | | Henderson | X | | | | | R. White | X | | | | |
| Allen | X | | | | | Lewis George | X | | | | | Silverman | X | | | | |
| Bonds | X | | | | | McDuffie | X | | | | | T. White | X | | | | |
| Cheh | X | | | | | Nadeau | X | | | | | | | | | | |
| Gray | X | | | | | Pinto | X | | | | | | | | | | |

| X - Indicate Vote | AB – Absent | NV - Present, Not Voting | Rec - Recused |
|---|---|---|---|

CERTIFICATION RECORD

_____
Secretary to the Council

7-19-22
_____
Date

Docket No. **B24-0420**

[ ] ITEM ON CONSENT CALENDAR

[ X ] ACTION      **Final Reading**

[ X ] VOTE DATE      **July 12, 2022**

[ ] VOICE VOTE

     RECORDED VOTE ON REQUEST

ABSENT

[ X ] ROLL CALL VOTE – Result      **Approved**

| Council Member | Aye | Nay | NV | AB | Rec | Council Member | Aye | Nay | NV | AB | Rec | Council Member | Aye | Nay | NV | AB | Rec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chairman Mendelson | X | | | | | Henderson | X | | | | | R. White | X | | | | |
| Allen | X | | | | | Lewis George | X | | | | | Silverman | X | | | | |
| Bonds | X | | | | | McDuffie | X | | | | | T. White | X | | | | |
| Cheh | X | | | | | Nadeau | X | | | | | | | | | | |
| Gray | X | | | | | Pinto | X | | | | | | | | | | |

| X - Indicate Vote | AB – Absent | NV - Present, Not Voting | Rec - Recused |
|---|---|---|---|

CERTIFICATION RECORD

_____
Secretary to the Council

7-19-22
_____
Date

JA175

# EXHIBIT 4



**GOVERNMENT OF THE DISTRICT OF COLUMBIA
CONSTRUCTION CODES COORDINATING BOARD**

**REGULAR MEETING**

**Thursday, September 21, 2023
Video Conference Call
10:30 am-12:30 pm**

Recording of this Board meeting can be found here.

**MEETING MINUTES**

| Board Members Present | Board Members Not Present | DOB Staff Present | Other Persons Present |
|---|---|---|---|
| Marc Fetterman, Vice Chair | | Ali Alaswadi | Amy Boyce, *IMT* |
| Chris Bailey | | Helen Hooks Scott | Kenneth Bland, *AWA* |
| Matt Borger | | | Rob Hawkins, *Berlin Rosen* |
| Michael Brown | | | Portia Hurtt, *Washington Gas* |
| Joel Causey | | | Eric J. Jones, *AOBA* |
| Anthony Dale | | | Eric Lacey, *Responsible Energy Codes Alliance* |
| Mitchell Kannry | | | Michael Pautisan, *DC Resident* |
| Gus Mehrdad | | | Katalin Peter, *AOBA* |
| Harrison Miller | | | Brandon Todd, *Washington Gas* |
| Casey Studhalter | | | |
| Jeff Viano | | | |
| Garret Whitescarver | | | |
| Jason Wright | | | |

1.  **Preliminary Matters**

    i.      **Call to Order and Roll Call**
    The meeting was called to order by Marc Fetterman, Board Vice Chair, at 10:33am. Roll call of Board members and other persons present was initiated by Board Vice Chair Marc Fetterman. All members and other persons present participated via WebEx video conference.

    ii.     **Adoption of Meeting Agenda**
    Prior to the adoption of the meeting minutes, Marc Fetterman presented an amendment to add Election of the Vice Chair to Item 5 of the September meeting agenda. Anthony Dale motioned to approve the amendment, seconded by Joel Causey. The agenda was amended without any objections. A motion to adopt the meeting agenda as amended was made by Casey Studhalter and seconded by Harrison Miller. Without any objections, the agenda was adopted as amended.

1



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**CONSTRUCTION CODES COORDINATING BOARD**

| Casey Studhalter | Yes |
|---|---|
| Jeff Viano | Yes |
| Garret Whitescarver | Abstain |
| Jason Wright | No |

## 3. Code Change Proposals for Consideration

### i.    Property Maintenance Code Changes

| Amendment No | Code/Section | CCCB Presentation | Procedural History | CCCB Action & Date |
|---|---|---|---|---|
| PMC-CCCB-1-1-23 | Chapter 1 | 8/17/23 | | 9/21/23 – Approved |
| PMC-CCCB-4-1-23 | 401.3 – 404.7.1 | 8/17/23 | | 9/21/23 – Approved |
| PMC-CCCB-5-1-23 | 505.4.1 | 8/17/23 | | 9/21/23 – Approved |
| PMC-CCCB-6-1-23 | 602 | 8/17/23 | | 9/21/23 – Approved |
| PMC-CCCB-7-1-23 | 702 | 8/17/23 | | 9/21/23 – Approved |
| PMC-CCCB-8-1-23 | Chapter 8 | 8/17/23 | | 9/21/23 – Approved |

**PMC-CCCB-1-1-23, PMC-CCCB-4-1-23, PMC-CCCB-5-1-23, PMC-CCCB-6-1-23, PMC-CCCB-7-1-23, PMC-CCCB-8-1-23**
Motion to approve the proposals as a package vote by Marc Fetterman, seconded by Matt Borger. The proposals were unanimously approved.

### ii.    Green Construction & Energy-Commercial Code Change

| Amendment No | Code/Section | CCCB Presentation | Procedural History | CCCB Action & Date |
|---|---|---|---|---|
| ECC-En-Appendix Z-1-23 | Appendix Z | 8/17/23 | | 9/21/23 – Approved, as amended |

**ECC-En-Appendix Z-1-23**
In section Z4.2, the reference to Section 4.1.1.1. in the Energy-Commercial Code was removed.  Motion to approve by Casey Studhalter, seconded by Jason Wright. The proposal was unanimously approved.

## 4. Code Change Proposals for Introduction

### i.    Building Code Changes

| Amendment No | Code/Section | CCCB Presentation | Procedural History | CCCB Action & Date |
|---|---|---|---|---|
| BC-En-1-2-23 | 110 | 9/21/23 | | |

4

# EXHIBIT 5



**2017**

District of Columbia
**Energy Conservation Code
Appendix Z**

GOVERNMENT OF THE
DISTRICT OF COLUMBIA
MURIEL BOWSER, MAYOR

dcra

ICC
INTERNATIONAL
CODE COUNCIL

2017 District of Columbia Energy Conservation Code

First Printing: September 2020

COPYRIGHT © 2014
International Code Council, Inc. (for 2015 International Energy Conservation Code®)
COPYRIGHT © 2020
Government of the District of Columbia (for new text)

ALL RIGHTS RESERVED. This 2017 *District of Columbia Energy Conservation Code* contains substantial copyrighted materials from the 2015 *International Energy Conservation Code*®, third printing, which is a copyrighted work owned by the International Code Council, Inc. ("ICC"). Without advance written permission from the ICC, no part of this book may be reproduced, distributed or transmitted in any form or by any means, including, without limitation, electronic, optical or mechanical means (by way of example, and not limitation, photocopying, or recording by or in an information storage retrieval system). For information on use rights and permissions, please contact: ICC Publications, 4051 Flossmoor Road, Country Club Hills, IL 60478. Phone 1-888-ICC-SAFE (422-7233).

The 2017 *District of Columbia Energy Conservation Code* contains substantial copyrighted material from the *ANSI/ASHRAE/IES Standard 90.1*—2013, which is a copyrighted work owned by ASHRAE. Without advance written permission from the copyright owner, no part of this book may be reproduced, distributed or transmitted in any form or by any means, including, without limitation, electronic, optical or mechanical means (by way of example, and not limitation, photocopying, or recording by or in an information storage retrieval system). For information on permission to copy material exceeding fair use, please contact: ASHRAE Publications, 1791 Tullie NE, Atlanta, GA 30329.

ASHRAE has not investigated nor participated in the creation of this 2017 *District of Columbia Energy Conservation Code*, which contains substantial material from *ANSI/ASHRAE/IES Standard 90.1*—2013 and ASHRAE expressly disclaims any duty to investigate any product, service, process, procedure, design, or the like that may be described herein. The appearance of any technical data or editorial material in this publication does not constitute endorsement, warranty, or guaranty by ASHRAE of any product, service, process, procedure, design, or the like. ASHRAE does not warrant that the information in this publication is free of errors, and ASHRAE does not necessarily agree with any statement or opinion in this publication. The entire risk of the use of any information in this publication is assumed by the user.

Trademarks: "International Code Council," the "International Code Council" logo, "ICC," the "ICC" logo, "*International Energy Conservation Code*," "IECC" and other names and trademarks appearing in this book are registered trademarks of the International Code Council, Inc., and/or its licensors (as applicable), and may not be used without permission.

PRINTED IN THE USA

**APPENDIX Z**
**NET-ZERO ENERGY COMPLIANCE PATH**

**Z1. GENERAL.** Appendix Z is intended to be an optional alternative compliance path for projects to comply with the energy conservation code-commercial provisions.

The design of a *net-zero energy building* shall be achieved through the use of three complementary approaches, to be employed to the maximum extent feasible, in the following order:

1. Reducing building energy demand for heating, cooling, lighting and ventilation through the use of passive design and improved envelope performance techniques.

2. Reducing total building energy demand through the installation of high-efficiency mechanical systems, hot water systems, power systems, lighting, and process equipment.

3. Supplying remaining building energy needs from renewable sources of energy.

Appendix Z draws on existing requirements outlined in the *Energy Conservation Code—Commercial Provisions.* Additional minimum performance requirements for building thermal energy performance and airtightness testing have been set to ensure new construction achieves a high degree of energy conservation.

**Z1.1 Definitions.** In addition to definitions contained in Chapter 2 of the *Building Code* and in Section 3.2 of the *Energy Conservation Code—Commercial Provisions*, the following definitions shall apply to projects opting to use Appendix Z:

**Airtightness.** The rate of air leakage through the building envelope, measured in cubic feet per minute per square foot of building envelope ($cfm/ft^2_{env}$), at 0.0109 psig (75 Pa) of pressure differential.

**Annual cooling demand.** The total amount of thermal energy required to cool a building over the course of a year, measured in thousands of British thermal units per square foot of interior conditioned floor area, per year ($kBtu/ft^2_{iCFA}/yr$).

**Annual heating demand.** The total amount of thermal energy required to heat a building over the course of a year, measured in thousands of British thermal units per square foot of interior conditioned floor area, per year ($kBtu/sf_{iCFA}/yr$).

**Energy Use Intensity (EUI).** The annual energy use of the building expressed in kBtu divided by square feet ($kBtu/ft^2$).

**Low-carbon neighborhood thermal energy system.** A district-scale energy system that uses acceptable sources of renewable energy per Section Z3.2 to produce steam, hot water, or chilled water for the purposes of providing for building heating, cooling, and/or domestic hot water needs.

**Net-zero energy building.** A highly energy-efficient building that produces on-site, or procures through the construction of new renewable energy generation, enough energy to meet or exceed the annual energy consumption of its operations.

**Renewable energy microgrid.** (As defined by the U.S. Department of Energy) A group of interconnected loads and distributed renewable energy resources within clearly defined electrical boundaries that act as a single controllable entity with respect to the grid.

**Zero Energy Performance Index (zEPI).** A scale representing the ratio of the energy performance of a proposed design or an existing building compared to the mean energy performance of the building stock from the benchmark year of 2000 (Commercial Buildings Energy Consumption Survey, US Department of Energy, 2003 Average).

**Z1.2 Scope and Intent.** The provisions of Appendix Z regulate the design, construction, commissioning and operation of buildings and their associated building sites for compliance with the *Energy Conservation Code—Commercial Provisions*. The intent of this Appendix is the reduction of energy use to achieve net-zero performance.

**Z1.3 Administration and Enforcement.** Administration and enforcement of Appendix Z shall be governed by Chapter 1 of the *Building Code*, 12-A DCMR.

**Z1.4 Application.** The provisions of Appendix Z shall apply to each project that is new construction, or classified as a Level 3 alteration under the *Existing Building Code*, and for which this compliance path option has been chosen.

**Z1.5 Compliance.** Compliance with Appendix Z requires that the building and its site comply with the provisions of Sections Z2, Z3, Z4, and Z5.

**Z2. MINIMUM PERFORMANCE REQUIREMENTS.** Minimum performance requirements for building energy use intensity have been set to ensure maximum energy efficiency prior to adding renewable energy generation. The building and its site shall be designed and constructed to meet the mandatory prescriptive requirements in Sections Z2.1, Z.2, Z.3, Z.4, and Z.5.

**Z2.1 Building Energy Use Intensity.** Applicant shall submit, with the building permit application, *permit documents* with data and calculations sufficient to ascertain compliance with the net-zero energy performance target for buildings and their sites, using predictive modeling. Predictive modeling shall use a source energy unit of measurement, expressed in $kBtu/ft^2/yr$, based on the use of the *Zero Energy Performance Index (zEPI)* as outlined in section Z2.1.1. In a mixed-use building, all uses shall be included in demonstrating compli-

ance, and an area-weighted calculation method shall be used to account for each use.

**Z2.1.1 Zero Energy Performance Index, zEPI.** Building design shall demonstrate a zEPI of 30 or lower as determined in accordance with Equation 1.

$$zEPI = 50.4 \times (EUIp/EUI) \qquad \text{(Equation 1)}$$

Where:

EUIp = The annual energy use of the building in source kBtu/ft$^2$, for the proposed design of the building and its site, calculated in accordance with Section Z2.1.2, not taking into account any on-site or off-site renewable energy.

EUI = The annual energy use of the building in source kBtu/ft$^2$ for a baseline building and its site, calculated in accordance with Section Z2.1.2, not taking into account any on-site or off-site renewable energy.

**Z2.1.2 Annual Energy Use Indices.** The EUIp of the building and building site, and the EUI, shall be calculated in accordance with Appendix G to ASHRAE 90.1-2016, as modified by Sections Z2.1.2.1 and Z2.1.2.2, and *approved* modeling guidelines published by the *Department* in *administrative bulletins*. The annual energy use shall include all energy used for the building systems and its anticipated occupancies.

**Z2.1.2.1 Additional Modeling Rules and Procedures.** Modeling inputs shall be in accordance with the *COMNet Rules and Procedures Manual*.

**Z2.1.2.2 Electricity.** In calculating the annual energy use indices, consistent units shall be used for electric energy use, converting the electric energy use, measured at the utility meter or metered point of delivery from kWh to kBtu. KWh shall be converted to kBtu by multiplying the annual electric energy use, in kWh, by 3.412 kBtu/kWh. and multiplying the result by the dimensionless conversion factor found in Table Z2.1.2.2.

**TABLE Z2.1.2.2 ELECTRICITY GENERATION ENERGY CONVERSION FACTOR BASED ON EPA eGRID SUB-REGION**

| eGRID 2010 SUB-REGION ACRONYM | eGRID 2010 SUB-REGION NAME | CONVERSION FACTOR |
|---|---|---|
| RFCE | RFC East | 3.28 |

**Z2.2 Building Thermal Energy Performance.** Building thermal energy performance shall comply with Sections Z2.2.1 through Z2.2.2.

**Z2.2.1 Annual Heating Demand.** Building design shall demonstrate a maximum *annual heating demand* of 4.2 kBtu/ft$^2$ $_{iCFA}$/yr (4.8 $\times$ 10$^4$ kJ/m$^2$$_{iCFA}$/yr).

**Z2.2.2 Annual Cooling Demand.** Building design shall demonstrate a maximum *annual cooling demand* of 6.4 kBtu/ft$^2$ $_{iCFA}$/yr (7.3 $\times$ 10$^4$ kJ/m$^2$$_{iCFA}$/yr).

**Z2.3 Multiple Buildings on a Site.** Where there is more than one building on a site, each building shall comply with Sections Z2.2.1 and Z2.2.2 or the combined demands of all the buildings on the site shall comply with Sections Z2.2.1 and Z2.2.2.

**Z2.3.1 Assignment of Energy to Multiple Buildings on a Site.** For building sites employing district energy systems and with multiple buildings, the energy use associated with the building site shall be assigned to each building proportionally to the gross floor area of each building as a fraction of the total gross floor area of all buildings on the building site. Where energy is derived from either renewable or waste energy, or both sources, either located on the building site, within individual buildings, or on individual buildings and delivered to multiple buildings, the energy so derived shall be assigned on a proportional basis to the buildings served, based on each served building gross floor area. Energy delivered from renewable or waste energy sources located on or within a building shall be assigned to that building.

> **Exception:** Where it can be shown that energy to be used at the building site is associated with a specific building, that energy use shall be assigned to that specific building.

**Z2.4 Registered Design Professional in Responsible Charge of Building Energy Simulation.** Where the *applicant* chooses to utilize Appendix Z as the path of compliance with the *Energy Conservation Code—Commercial Provisions*, the owner shall engage the services of, and designate on the building permit application, a registered design professional who shall act as the registered design professional in responsible charge of building energy simulation. Building energy simulation services engaged by the registered design professional shall be certified by an *approved* accrediting entity as determined by the *code official*. As authorized by the *code official*, the owner is allowed to designate a substitute registered design professional who shall perform the duties required of the original registered design professional in responsible charge of building energy simulation. The owner shall notify the *code official*, in writing, whenever the registered design professional in responsible charge of building energy simulation is changed or is unable to continue to perform his or her duties.

**Z2.5 Building Commissioning.** All systems shall be commissioned in accordance with this section and the *Energy Conservation Code—Commercial Provisions*. Energy systems commissioning and completion shall be performed for the following systems and their associated controls:

- Building envelope;

- HVAC (both mechanical and passive systems as well as HVAC controls);

- Lighting, daylighting, and lighting control systems;

- Domestic hot water systems; and
- Renewable energy systems.

**Z2.6  Airtightness Testing.** A whole building pressurization testing shall be conducted in accordance with Section 11.3.1.2.4(a) of the *Energy Conservation Code – Commercial Provisions* to measure the airtightness of the building envelope. The owner shall verify that the airtightness specified in the final approved predictive energy model is achieved in the field by providing the *code official* with a copy of the test results before the final *Certificate of Occupancy* is issued.

**Z3.  RENEWABLE ENERGY.** The building and building site shall be provided with renewable energy equal to the $EUI_P$ on an annual basis and calculated in accordance with Section Z2.1.1. Sources of renewable energy shall comply with Sections Z3.1 through Z3.3.

**Z3.1   On-site Combustion.** On-site combustion of fossil fuels shall not be permitted for the provision of thermal energy to the building except as specified by the *code official.*

**Z3.2  Acceptable Sources of Renewable Energy.** Acceptable sources of on-site renewable energy to be used on the building site include:

- Photovoltaic panels.
- Solar thermal systems.
- Wind turbines.
- Biogas.

No other source of on-site renewable energy is acceptable for building design, unless the rationale for its selection is approved by the *code official*.

**Z3.3  On-site Renewable Energy.** Renewable energy shall be generated on-site wherever feasible. Before procuring off-site renewable energy, a project must demonstrate one of the following:

1. A minimum of 5% of the total building energy consumption shall first be met by an acceptable source of renewable energy installed on the building roof or site.

2. For projects generating onsite renewable energy through solar photovoltaic systems, a minimum of 25% of total site area, including building footprint, shall be allocated for photovoltaic array and energy production.

**Exception:** Where there is not adequate solar access as determined by Chapter 13 of the *Energy Conservation Code—Commercial Provisions.*

**Z3.4  Procurement of Off-site Renewable Energy.** The procurement of off-site renewable energy is acceptable only where the energy is procured from a qualified electricity supplier providing energy from Tier 1 renewable sources meeting the minimum percentages of the District of Columbia Renewable Portfolio Standard. Acceptable methods for the procurement of off-site renewable energy include any of the following or as approved by the *code official*:

- Owner shall provide the *code official* with documentation of a signed, legally-binding contract to procure off-site renewable energy through a power purchase agreement for a minimum period of 5 years for electricity generation from, solar or wind-generation facilities that are located within the District of Columbia, Maryland, or Virginia. The owner remains subject to, and must comply with, the District of Columbia's Renewable Portfolio Standard.
- Connection to a *renewable energy microgrid.*
- Connection to a *low-carbon neighborhood thermal energy system.*

**Z4.  ENERGY  METERING,  MONITORING  AND REPORTING.**

**Z4.1  Scope.** The provisions of this Section Z4 shall apply to all projects that opted for Appendix Z as a path of code compliance.

**Z4.2  Purpose.** The purpose of Section Z4 is to provide requirements that will ensure that buildings are constructed or altered in a way that will provide the capability for their energy use, production and reclamation to be measured, monitored and reported. This includes the design of energy distribution systems so as to isolate load types, the installation of meters, devices and a data acquisition system, and the installation of energy displays and other appropriate reporting mechanisms.

**Z4.3  Energy Metering.** All forms of energy delivered to the building and building site or produced on the building site or in the building, shall be metered and all energy load types measured.

**Z4.4  Ventilation Flow Rate.** In addition to requirements outlined in the *Energy Conservation Code—Commercial Provisions*, all centrally ventilated building systems shall be designed to enable the collection of real-time and historical ventilation flow rate data.

**Z4.5  Grid Integration.** In places where equipment constraints in the distribution network render net metering impossible, onsite storage options shall be considered.

**Z5.  ENERGY  REPORTING.** Owners of buildings that used Appendix Z as a path for code compliance shall comply with this section.

**Z5.1  Post Occupancy Measurement and Reporting.**

**Z5.1.1** Owners of buildings that use Appendix Z as a path for code compliance shall annually benchmark and report their energy and water performance using the Energy Star® Portfolio Manager tool, including renewable energy generation and green power usage, pursuant to rules in *20 DCMR 3513,* regardless of square footage.

**Z5.1.2  Energy Star Portfolio Manager Account.** The *owner* of a *building* that used Appendix Z as a path for compliance with the *Energy Conservation Code—Commercial*

*Provisions* shall create an Energy Star® Portfolio Manager account and property record on the U.S. Environmental Protection Agency's benchmarking website, and share the property with the District of Columbia's Department of Energy and Environment. The *code official* is authorized to require proof of compliance with Section Z5.3.1 and proof that all utilities have been linked to the account.

**Z5.2 Performance Verification.** Within 24 months of occupancy, the owner or owner's representative shall submit documentation to the *code official* demonstrating 12 continuous months of operation with no less than 90% occupancy where the energy consumed by the building and building site as measured in accordance with Section Z4 are equal to or less than the renewable energy associated with the building and building site in accordance with Section Z3. Documentation shall be in a form acceptable to the *code official.*

**Z5.2.1 Normalization for abnormal conditions.** At the discretion of the *code official*, the owner or owner's representative may submit documentation demonstrating that abnormal weather or occupancy conditions during the compliance period are responsible for the variance between the energy consumed by the energy and energy site and the renewable energy associated with the building and building site and that the building would comply with Z5.2 under normal conditions.

## Z6.  NORMATIVE REFERENCES

Section numbers indicate where the reference occurs in Appendix Z.

| Standard Reference number | Title | Referenced in code section number |
|---|---|---|
| **U.S. Army Corps of Engineers** **441 G Street NW, Washington, DC 20314-1000** | | |
| Version 3: 2012-05-11 | Air Leakage Test Protocol for Building Envelopes | Appendix Z, Z2.6 |
| **Passive House Institute US (PHIUS)** **116 W Illinois Street, #5e, Chicago, IL 60654** | | |
| Version 1.03 July 27 2016 | Passive Building Standard for North America | Appendix Z, Z.1 |
| **RESNET** **P.O Box 4561, Oceanside, CA 92052** www.resnet.us | | |
| August 16, 2010 | *COMNET Rules and Procedures Manual* | Appendix Z, Z2.1.2.1 |

# EXHIBIT 6



# CODE CHANGE PROPOSAL FORM
### [Top section is for administrative use only; please leave blank]

**PAGE** 1 **OF**

**CODE:  ECC-C**          **SECTION NO.**  Appendix Z          **SUBCOMMITTEE AMENDMENT NO.  1**

**PROPOSING SUBCOMMITTEE:**          Commercial Energy TAG    **CHAIR:**    Casey Studhalter

**DATES OF PROPOSAL**:          **CCCB PRESENTATION:  9/21/23**          **CCCB APPROVAL:**
**9/21/2023 w/ amendments**

**SUBMITTER NAME:   Mark Lyles, NBI**                    **PHONE NUMBER: 503-317-5320**

**ADDRESS:**                    **EMAIL: markl@newbuildings.org**

**CODE CHANGE:  <mark>Please enter code change proposal on the following page using these formatting rules</mark>**

TYPE ALL TEXT IN 12- POINT TIMES NEW ROMAN FONT
~~LINE THROUGH TEXT TO BE DELETED~~
<u>UNDERLINE TEXT TO BE ADDED</u>

CHECK ONE    ☐ Revise section to read as follows:          ☐ Delete section and substitute the following:
             ☐ Add new section to read as follows:          ☐ Delete section without substitution**.**

**ESTIMATED IMPACT OF CODE CHANGE ON COST OF CONSTRUCTION**

CHECK ONE    ☐ Increase          ☐ Decrease          ☐ Negligible          ☐ Unknown
             Per 1,000 SF single-family dwelling          to
             Per 1,000SF of commercial building          to

**JUSTIFICATION OF CODE CHANGE:  Please enter justification in box below.  Continue justification on following page, if necessary.**

Please reference one or more of the following criteria
☐ To address a critical life/safety, health, general welfare need.          ☐ Address a unique character issue in the District
of Columbia
☐ To address a specific District of Columbia policy or statute          ☐ Correction of errors and omissions
☐ For consistency with federal, or with MD, VA codes          ☐ Other (explain in justification text, below)

## Justification of Code Change:

Appendix Z was introduced in the 2017 DC Energy Conservation Code and offers projects an alternative code compliance path that strives to achieve zero energy levels for performance. This proposal keeps a majority of the previous requirements associated with Appendix Z and seeks to simplify the performance requirements by more closely aligning it with the base DC Energy Code's Commercial Provisions. The proposal includes several updates, including an updated structure to better match ASHRAE and the base energy code, shifting from the zEPI score as the energy metric to using the Site Energy Index detailed in the updated based code

Rights to Text of Proposed Code Change Become Property of the District of Columbia



Appendix G modeling pathway with Building Performance Factors that are incrementally more stringent than the base DC Energy Conservation Code's, on-site and off-site renewable energy requirements that align with the base DC Energy Code, and a small number of requirements from the base Energy Code that are carried forward and required for Appendix Z compliance as well.

Insert a new Appendix Z in the Energy Conservation Code-Commercial Provisions to read as follows:

## APPENDIX Z NET-ZERO ENERGY COMPLIANCE PATH

### Z1 GENERAL

### Z2 COMPLIANCE

### Z3 SIMPLIFIED BUILDING COMPLIANCE PATH (Not used)

### Z4 MANDATORY PROVISIONS

### Z5 PRESCRIPTIVE COMPLIANCE PATH (Not used)

### Z6 ALTERNATIVE COMPLIANCE PATH (Not used)

**Z1 GENERAL.** Appendix Z is intended to be an optional alternative compliance path for projects to comply with the *Energy Conservation Code-Commercial Provisions*.

The design of a *net-zero energy building* shall be achieved through the use of three complementary approaches, to be employed to the maximum extent feasible, in the following order:

1. Reducing building energy demand for heating, cooling, lighting and ventilation through the use of passive design and improved envelope performance techniques.
2. Reducing total building energy demand through the installation of high-efficiency mechanical systems, hot water systems, and power systems, lighting, and process equipment.
3. Supplying remaining building energy needs from renewable sources of energy.

Appendix Z draws on existing requirements outlined in the *Energy Conservation Code-Commercial Provisions*. Additional whole-building energy performance and renewable energy requirements have been set to ensure new construction achieves a high degree of energy conservation with consumption offset by impactful renewable energy sources.

Rights to Text of Proposed Code Change Become Property of the District of Columbia



**Z1.1. Definitions.** In addition to definitions contained in Chapter 2 of the *Building Code* and in Section 3.2 of the *Energy Conservation Code-Commercial Provisions*, the following definitions shall apply to projects opting to use Appendix Z:

**Airtightness.** The rate of air leakage through the building envelope, measured in cubic feet per minute per square foot of building envelope ($cfm/ft_{2env}$), at 0.3 in. of water (75 Pa) of pressure differential.

**Energy Use Intensity (EUI).** The annual energy use of the building expressed in kBtu divided by gross square feet ($kbtu/ft_2$).

**Low-carbon neighborhood thermal energy system.** A district-scale energy system that uses acceptable sources of renewable energy per section 10.5.1 to produce steam, hot water, or chilled water for the purposes of providing for building heating, cooling, and/or domestic hot water needs.

**Net-zero energy building.** An all-electric, highly energy-efficient building that produces on-site, or procures off-site through approved sources, enough renewable energy to meet or exceed the annual energy consumption of its operations.

**Renewable energy microgrid.** (As defined by the U.S. Department of Energy) A group of interconnected loads and distributed renewable energy resources within clearly defined electrical boundaries that acts as a single controllable entity with respect to the grid.

**Z1.2. Scope and intent.** The provisions of Appendix Z regulate the design, construction, commissioning and operation of buildings and their associated building sites for compliance with the *Energy Conservation Code-Commercial Provisions*. The intent of this Appendix is the reduction of energy use and generation or procurement of renewable energy to achieve net-zero energy performance.

**Z1.3. Administration and enforcement.** Administration and enforcement of Appendix Z shall be governed by Chapter 1 of the *Building Code*, 12-A DCMR.

**Z1.4. Application.** The provisions of Appendix Z shall apply to each project that is new construction, or classified as a Level 3 alteration under the *Existing Building Code*, and for which this compliance path option has been chosen.

**Z1.5. Multiple buildings on a site.** Where there is more than one building on a site, each building shall comply individually with Appendix Z or the combined demands of all the buildings on the site shall comply with Appendix Z.

 **Z1.5.1. Assignment of energy to multiple buildings on a site.** For building sites employing district energy systems and with multiple buildings the energy use associated with the building site shall be assigned to each building proportionally

Rights to Text of Proposed Code Change Become Property of the District of Columbia



to the gross floor area of each building as a fraction of the total gross floor area of all buildings on the building site. Where energy is derived from either renewable or waste energy, or both sources, either located on the building site, within individual buildings, or on individual buildings and delivered to multiple buildings, the energy so derived shall be assigned on a proportional basis to the buildings served, based on each served building gross floor area. Energy delivered from renewable or waste energy sources located on or within a building shall be assigned to that building.

**Exception:** Where it can be shown that energy to be used at the building site is associated with a specific building, that energy use shall be assigned to that specific building.

**Z2 COMPLIANCE.** The building and its site shall comply with all of the following:

a.   Sections Z1, Z2, and Z4.
b.   Building energy use minimum performance targets as specified in Section Z4.2.
c.   All-electric building requirements as specified in Section Z4
d.   Verification, testing and commissioning requirements of 4.2.5 shall be met.  See Informative Appendix H for additional commissioning guidance.
e.   Whole building pressurization testing shall be conducted in accordance with Section 5.4.3.1.1to measure the airtightness of the building envelope. The owner shall verify that the airtightness specified in the final approved predictive energy model is achieved in the field by providing the *code official* with a copy of the test results before the respective the final *Certificate of Occupancy* is issued.
f.   The *continuous air barrier* shall be designed and installed in accordance with Section 5.4.3.1.2.
g.   Continuous insulation shall comply with Section 5.5.3.7
h.   Thermal bridging shall comply with Section 5.5.5.
i.   Electric vehicle charging infrastructure shall comply with Section 10.4.8.
j.   Electrical infrastructure for energy storage shall comply with Section 10.4.9.
k.   Electrical receptacles shall comply with Section 8.4.2.
l.   Thermostatic controls shall comply with demand response requirements in Section 6.4.3.1.3
m.   Building lighting controls shall comply with demand response requirements in Section 9.4.1.5

**Z3. SIMPLIFIED BUILDING COMPLIANCE PATH (Not used)**

**Z4. MANDATORY PROVISIONS.**

Rights to Text of Proposed Code Change Become Property of the District of Columbia



**Z4.1 Building energy use.** Minimum performance targets for building energy use ~~intensity~~ have been set to ensure maximum energy efficiency prior to adding renewable energy generation. Applicant shall submit, with the building permit application, *permit documents* with data and calculations sufficient to ascertain compliance with the net-zero energy performance target for buildings and their sites, using predictive modeling.

Predictive modeling shall be conducted in accordance with Normative Appendix G, "Performance Rating Method" as adopted in DC Energy Conservation Code. The Performance Site *Energy* Index (PSEI) of new *buildings*, *additions* to *existing buildings*, and/or *alterations* to *existing buildings* shall be less than or equal to the Performance Site *Energy* Index Target (PSEI$_t$) when calculated in accordance with section 4.2.1.1. Appendix Z compliance, however, shall be based on the Building Performance Factors (BPF) listed in Table Z4.1. In a mixed-use building, all uses shall be included in demonstrating compliance, and an area weighted calculation method shall be used to account for each use.

**Table Z4.1 Building Performance Factors (BPF), Site *Energy***

| Building Area Type | Climate Zone 4A |
|---|---|
| Multifamily | 0.55 |
| Healthcare/hospital [a] | 0.62 |
| Hotel/motel | 0.59 |
| Office[b] | 0.45 |
| Restaurant | 0.59 |
| Retail | 0.45 |
| School | 0.40 |
| Warehouse | 0.38 |
| All others | 0.50 |

[a] "Healthcare/hospital" includes buildings within the scope of ASHRAE Standard 170 ventilation requirements that are dedicated to patient care, including hospitals, nursing facilities, outpatient facilities, and surgery centers.
[b] "Office" includes offices or clinics where medical, dental, psychotherapy, physical therapy or other services are provided that are not within the scope of ASHRAE Standard 170 ventilation requirements.

**Z4.2 All Electric Buildings** All *buildings* shall be *all-electric buildings*.

Exception to Z4.2

The following occupancies and equipment uses are permitted to use

Rights to Text of Proposed Code Change Become Property of the District of Columbia

combustion equipment as approved by the code official:

    a. *Commercial cooking appliances.*
    b. Group B, Laboratories: teaching, testing, and research equipment.
    c. Group I-2.
    d. Group I-3.
    e. Decorative appliances found in community spaces to include gas fireplace inserts, fireplaces, and fire pits excluding residential units.
    f. Natural gas fired grills associated with amenity spaces in Group R-2 occupancies.
    g. Equipment used for generation of utilities for existing district heating and cooling systems.
    h. *Standby power systems.*

**Z4.3 Renewable Energy** The building and building site shall be provided with renewable energy equal to the Proposed Building Performance without any credit for reduced annual energy from on-site renewable energy generation systems. $(PBP_{nre})$ on an annual basis and calculated in accordance with Section Z4.1. Sources of renewable energy shall comply with Section 10.5.1.

**Z4.3.1 On-site renewable energy.** Renewable energy shall be generated on-site wherever feasible. Before procuring off-site renewable energy, a project must demonstrate the following:

1. The building site shall have equipment for on-site renewable energy with a rated capacity of not less than 0.75 W/ft² or 2.55 Btu/ft2 (8.1W/m2) multiplied by the sum of the gross conditioned floor area for all floors up to the three (3) largest floors. Renewable Energy Certificates (RECs) associated with the on-site renewable energy shall be retired to the building address or may be sold to the local utility for the express purpose of meeting the DC Renewable Energy Portfolio Standard. The authority having jurisdiction may request documentation of REC sale or retirement.

Exceptions to Z4.3.1:

1.     Any building where more than 50% of the roof area is shaded that complies with section Z4.3.2 . Shaded areas are defined as roof area where direct-beam sunlight is blocked by structures or natural objects for more than 2,500 annual hours between 8am and 4pm.

Rights to Text of Proposed Code Change Become Property of the District of Columbia



2.        Any building where more than 80% of the roof area is covered by any combination of equipment other than for on-site renewable energy systems, or skylights that complies with section Z4.3.2.

**Z4.3.2. Procurement of off-site renewable energy.** Qualifying off-site renewable energy shall meet the following requirements:

1.        Documentation of off-site renewable energy procurement shall be submitted to the authority having jurisdiction.

2.        The purchase contract shall provide the equivalent of not less than 15 years of Green-e certified RECs. The contract shall be structured to survive a partial or full transfer of ownership of the building property.

3.        RECs associated with the purchase contract from an off-site renewable energy system shall be assigned exclusively to the building for a period of not less than 15 years.

4.        The energy source shall produce electricity from solar, wind, hydropower or geothermal.

**Z4.4 Energy metering.** All forms of energy delivered to the building and building site, or produced on the building site or in the building, shall be metered and all energy load types measured.

**Z4.5. Ventilation flow rate.** In addition to requirements outlined in the *Energy Conservation Code-Commercial Provisions*, all centrally ventilated building systems shall be designed to enable the monitoring of ventilation flow rate data.

**Z4.6. Post Occupancy Measurement and Reporting.**

**Z4.6.1.** Owners of buildings that use Appendix Z as a path for code compliance shall annually benchmark and report their energy and water performance using the Energy Star® Portfolio Manager tool, including renewable energy generation and green power usage, pursuant to rules in *20 DCMR 3513,* regardless of square footage.

**Z4.6.2. Energy Star Portfolio Manager account.** The *owner* of a *building* that used Appendix Z as a path for compliance with the *Energy Conservation Code-Commercial Provisions* shall create an Energy Star® Portfolio Manager account and property record on the U.S. Environmental Protection Agency's benchmarking website, and share the property with the District of Columbia's Department of Energy and Environment. The *code official* is authorized to require proof of compliance with this Section and proof that all utilities have been linked to the account.

Rights to Text of Proposed Code Change Become Property of the District of Columbia



**Z5. PRESCRIPTIVE PATH (Not used)**

**Z6. ALTERNATIVE COMPLIANCE PATH (Not used)**

Rights to Text of Proposed Code Change Become Property of the District of Columbia

# EXHIBIT 7

**NATIONAL ACADEMIES** *Sciences*
*Engineering*
*Medicine*

NATIONAL
ACADEMIES
PRESS
Washington, DC

This PDF is available at http://nap.nationalacademies.org/12670

  



# Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report (2009)

### DETAILS

40 pages | 8.5 x 11 | PAPERBACK
ISBN 978-0-309-13909-0 | DOI 10.17226/12670

**BUY THIS BOOK**

**FIND RELATED TITLES**

### CONTRIBUTORS

Committee on Point-of-Use and Full-Fuel-Cycle Measurement Approaches to Energy Efficiency Standards; Board on Energy and Environmental Systems; Division on Engineering and Physical Sciences; National Research Council

### SUGGESTED CITATION

National Research Council. 2009. *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report.* Washington, DC: The National Academies Press. https://doi.org/10.17226/12670.

Visit the National Academies Press at nap.edu and login or register to get:

– Access to free PDF downloads of thousands of publications
– 10% off the price of print publications
– Email or social media notifications of new titles related to your interests
– Special offers and discounts



All downloadable National Academies titles are free to be used for personal and/or non-commercial academic use. Users may also freely post links to our titles on this website; non-commercial academic users are encouraged to link to the version on this website rather than distribute a downloaded PDF to ensure that all users are accessing the latest authoritative version of the work. All other uses require written permission. (Request Permission)

This PDF is protected by copyright and owned by the National Academy of Sciences; unless otherwise indicated, the National Academy of Sciences retains copyright to all materials in this PDF with all rights reserved.

JA196

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR     Document 29-9     Filed 05/28/25     Page 3 of 42

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*
**Board on Energy and Environmental Systems**

May 15, 2009

Dr. John Mizroch
Acting Assistant Secretary
U.S. Department of Energy
Office of Energy Efficiency and Renewable Energy
1000 Independence Avenue SW
Washington, DC 20585

Dear Dr. Mizroch:

In response to a request from the Department of Energy (DOE), Office of Energy Efficiency and Renewable Energy (EERE), the National Research Council (NRC) appointed the Committee on Point-of-Use and Full-Fuel-Cycle Measurement Approaches to Energy Efficiency Standards to conduct a study called for in Section 1802 of the Energy Policy Act of 2005 (Public Law 109-58).

As specified in Attachment A of this letter report, the fundamental task before the committee was to evaluate the methodology used for setting energy efficiency standards and to comment on whether site (point-of-use) or source (full-fuel-cycle) measures of energy efficiency better support rulemaking to achieve energy conservation goals. As suggested by Senator Gordon H. Smith (see Attachment B), the committee adopted a broad view of its mandate, taking into account concerns about energy consumption's impact on national security, the environment, and climate change. Currently DOE rulemaking for appliance energy efficiency is based on site measurement of energy consumption to set efficiency standards and extended site measures of energy consumption to assess national energy consumption and environmental impact. However, full-fuel-cycle measurement of energy consumption is not employed in DOE analyses.

The committee met three times and heard presentations from representatives of the electric and natural gas utilities, appliance manufacturers, and the government agencies participating in the various aspects of the appliance standards program. In addition, the committee examined the data and analysis presented in various technical support documents and studies of energy efficiency and measurement of energy use.

The committee's primary general recommendation is that DOE/EERE consider moving over time to the use of a full-fuel-cycle measure of energy consumption for assessment of national and environmental impacts. Using that metric would provide the public with more comprehensive information about the impacts of energy consumption on the environment, the economy, and other national concerns, through the use of labels and other means such as an enhanced website. The current use by DOE/EERE of site energy consumption is effective for setting standards for the operational efficiency of single-fueled appliances within the same class and should be continued without change. However, DOE/EERE's current use of site energy consumption does not account for the total consumption of energy when more than one fuel is used in an appliance or when more than one fuel can be used for the same application. For these appliances, measuring full-fuel-cycle energy consumption would provide a more complete picture of energy used, allowing comparison across many different appliances as well as an improved assessment of impacts such as effects on energy security and the environment. The

1

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR     Document 29-9     Filed 05/28/25     Page 4 of 42

attached letter report discusses these matters and offers several related findings and recommendations together with supporting information.

Despite its best efforts to come to a full consensus, the committee was unable to achieve unanimous agreement on some of its majority views. The perspectives of committee members David H. Archer and Ellen Berman are presented in Attachments H and I and are referred to at points in the text of the committee's report.

The National Research Council was pleased to have this opportunity to serve DOE/EERE. If you have questions, please contact James Zucchetto, director of the Board on Energy and Environmental Systems, at (202) 334-3222 or Duncan Brown, senior program officer, at (202) 334-1202.

Sincerely,

James W. Dally, *Chair*
Committee on Point-of-Use and Full-Fuel-Cycle
Measurement Approaches to Energy Efficiency
Standards

2

Copyright National Academy of Sciences. All rights reserved.

# Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards

## COMMITTEE TASK AND APPROACH

In response to a request from the Department of Energy (DOE), Office of Energy Efficiency and Renewable Energy (EERE), the National Research Council's (NRC's) Committee on Point-of-Use and Full-Fuel-Cycle Measurement Approaches to Energy Efficiency Standards examined the DOE's appliance standards program to assess whether the goals of energy efficiency standards are better served by measurements of energy consumed, and improvements in energy efficiency, at the actual site (point of use) of energy consumption or throughout the full fuel cycle, beginning at the source of energy production. The full statement of task is given in Attachment A, and a related request encouraging a broad approach to consideration of these issues is reproduced in Attachment B.

The committee gathered information during presentations at its three meetings (see Attachment C) and from a variety of published documents. These included a report by the Rand Corporation that investigated, at the request of the Office of Science and Technology Policy and EERE, the impacts of measuring energy consumption at the site of use versus the source (Ortiz and Bernstein, 1999) and a report by GARD Analytics (2005) commissioned by the American Gas Foundation. The key points of these two studies are summarized in Attachment D. The committee also considered DOE test procedures codified in the Code of Federal Regulations at 10 CFR Part 430; technical support documents developed for recent rulemakings for such products as distribution transformers and residential furnaces and boilers; and written material provided directly to the committee (see Attachment E).

## DISCUSSION AND ANALYSIS

### DOE/EERE Standards Setting for Appliances

The DOE/EERE appliance standards program is intended to reduce energy consumption in U.S. residential and commercial buildings (which account for 40 percent of the nation's primary energy use and 70 percent of its electric power use [DOE/EIA, 2008, Table 2-1a]). It does so by setting efficiency standards for appliances that perform specific functions (such as space cooling, water heating, or dishwashing), dividing the appliances into classes differentiated by their energy source (natural gas, oil, or electric power), technology, and capacity. Most of the energy consumed in a building passes through these appliances, and their efficiency is therefore highly important. Even seemingly small differences in energy efficiency can become significant when considered on a national scale.

Since Congress passed the Energy Policy Conservation Act of 1975, DOE has established several standards that have led to improved energy efficiency for light bulbs; appliances such as refrigerators, washing machines, air conditioners, storage water heaters, and furnaces; and motors and other devices. As a result, consumption of electricity, natural gas, heating oil, and other forms of energy has been reduced for each unit of service an appliance provides (NRC,

3

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 6 of 42

2001; Meyers et al., 2003).  For example, according to the Association of Home Appliance Manufacturers, large reductions in energy consumption (47 to 69 percent) have been realized since 1980 for clothes washers, refrigerator-freezers, and dishwashers (see Attachment E).  The appliance standards program has thus achieved significant benefits in reducing the energy required by appliances in U.S. buildings (NRC, 2001).

The appliance standards program is not meant to favor one energy source or technology over another (and the committee saw no evidence that it has done so) but instead to leave decisions about such matters to government policy and/or the market.  For that reason, and for the benefit of the consumer purchasing an appliance, the results of the DOE/EERE'S appliance testing and standards setting are expressed in terms of estimated annual operating costs, annual energy usage, and the cost range of similar models.

Current DOE standards for the energy consumed by operating individual appliances call for measurement at the site (point of use) of the appliance.  For example, the energy efficiency of a storage water heater is defined as a measure of the energy contained in a specified amount of hot water produced per unit of energy consumed at the site of the water heater over a typical day.  Some analysts, however, question whether site measurements of energy consumption give a complete picture of overall energy use (see, for example, GARD Analytics, 2005).

Using appliance-testing procedures prescribed by DOE with input from the National Institute of Standards and Technology, appliance manufacturers measure site energy consumption.  The accuracy of the data on site energy consumption is dependent on whether laboratory-defined operating conditions sufficiently reflect actual energy consumption by a particular appliance in a home or commercial building.  Actual energy use differs from the standard according to differences in operating conditions.  For a standard to be robust, it should reflect relative energy use.  While it is plausible to believe that this is the case for many appliances, confirming empirical studies are lacking.  Nevertheless, site energy consumption is the best constrained of the different measures of energy use that are considered in the rulemaking process.  Site energy use is also the most appropriate measure for setting operational efficiency requirements for single-fueled appliances within the same class, because it can be controlled by the manufacturer in designing and constructing the appliance.

DOE/EERE also estimates extended site energy consumption, which is then used in preparing national impact and environmental impact analyses (Meyers et al., 2003).  As a measure of energy consumption, extended site energy endeavors to capture energy losses that occur in the supply chains (generation, transmission, and distribution) for generated electricity and fuels such as natural gas.

DOE/EERE also defines for energy sources heat rates that do not involve conversion of heat to work such that hydro, wind, and solar power are made equal to the fossil heat rate.  Instead, the heat rates of fossil, nuclear, hydro, wind, and solar energy are weighted according to their generation share, as supplied to the electrical grid.[1]  In 2005, estimating losses of 9.5 percent due to transmission and distribution, the net conversion factor for site electricity to extended site energy was 3.75, a conversion factor determined from data supplied by the Energy

---

[1] The electricity grid is modeled as a national aggregate.  The aggregation of electricity supply into a national grid is an essential element in estimates of extended site energy consumed.  There is a concern that the regional variation in electricity grids implies that extended site energy does not accurately reflect energy losses when an appliance is connected to the electricity grid in a specific locale.  However, one can also argue that electricity is fungible and that a kilowatt-hour of supply saved by a more efficient appliance could travel well beyond local consumers.

4

Copyright National Academy of Sciences. All rights reserved.

Information Administration.  The committee did not explore in depth the methodology employed by EERE for the determination of this conversion factor.

In examining the DOE/EERE approach to setting standards, the committee found that the agency uses several different models developed by the Energy Information Administration, such as the National Energy Modeling System (NEMS), and conducts several analyses.  Each standard is justified by DOE/EERE in terms of technical feasibility, reduction of energy use by the subject appliance, and reduced capital and operating costs for consumers.  The agency estimates the effects on appliance manufacturers and calculates the net present value of the energy savings.  Although the committee was briefed on the NEMS model, time was not sufficient to examine the capability of such models in depth.

In exploring measures of energy consumption and how they serve the goals of energy conservation standards central to DOE/EERE's appliance standards program, the committee examined all the criteria DOE/EERE considers in setting energy-efficiency standards.  These criteria, together with the analyses conducted by DOE/EERE in the rulemaking process and the measure of energy consumption used, are listed in Table 1 and are described in some detail in Attachment F.

The committee believes that the seven criteria listed in Table 1 are appropriate and serve the well-being of the U.S. public, consumers, appliance manufactures, and the electric and gas utilities.  In addition, it is the opinion of the committee that making the environmental impact of energy consumption an explicit factor in DOE/EERE rulemaking on standards for appliance efficiency, and not merely a consideration added at the discretion of the DOE secretary under the seventh criterion, would acknowledge the public's strong interest in environmental quality (Leiserowitz, 2006) and would help support related decision making.

TABLE 1  Criteria Examined and Analyses Conducted by DOE/EERE in Its Standards-Setting and Rulemaking Process

| Criteria Set by the Energy Policy and Conservation Act | DOE/EERE Analysis | Measure of Energy Efficiency Used |
|---|---|---|
| 1. Economic impact on consumers and manufacturers | Life-cycle cost analysis<br>Manufacturer impact analysis | Site<br>Not applicable |
| 2. Lifetime operating cost savings compared to increased cost of the product | Life-cycle cost analysis | Site |
| 3. Total projected energy savings | National impact analysis | Extended site |
| 4. Impact on utility or performance | Engineering analysis<br>Screening analysis | Site<br>Not applicable |
| 5. Impact of any lessening of competition | Manufacturer impact analysis | Not applicable |
| 6. Need for national energy conservation | National impact analysis | Extended site |
| 7. Other factors the DOE secretary considers relevant | Environmental assessment<br>Utility impact assessment<br>Employment impact assessment | Extended site<br>Not applicable<br>Mixed |

5

Copyright National Academy of Sciences. All rights reserved.

### Defining and Evaluating Measures of Energy Consumption

The committee began by defining site and full-fuel-cycle measures of energy consumption as follows:

- *Site (point-of-use) measure of energy consumption* reflects the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site where the appliance is operated, based on specified test procedures.
- *Full-fuel-cycle measure of energy consumption* includes, in addition to site energy use, the energy consumed in the extraction, processing, and transport of primary fuels such as coal, oil, and natural gas; energy losses in thermal combustion in power-generation plants; and energy losses in transmission and distribution to homes and commercial buildings.[2]

The committee also noted that extended site energy consumption—which is used by DOE/EERE for assessing the impact of energy use on the economy, energy security, and environmental quality—includes the energy used in generating and distributing electricity, natural gas, or oil in addition to the energy used by the appliance at the site. But unlike the full-fuel-cycle measure, the extended site measure of energy consumption does not include the energy consumed in extracting, processing, and transporting primary fuels.

Although the site measure of energy consumption allows easy comparison of the operating efficiency of one appliance over another in isolation, it gives only a partial picture of total energy use because it omits the energy needed to mine, process, and transport the primary fuel to a generating plant; the energy used at the generating plant; and the energy used in delivering electricity or fuel to the site of operation of an appliance. For example, based on their site energy consumption, an electric storage water heater might operate with 90 percent efficiency and a natural gas water heater with 70 percent efficiency. But for the electric storage water heater, energy losses of about 70 to 75 percent occur in acquiring the primary fuel and in the generation, transmission, and distribution of the electricity, yielding an overall energy efficiency for the electric storage water heater of about 0.30 X 0.90, or 27 percent. This figure is much lower than the gas-fired storage water heater's overall energy efficiency of about 0.91 X 0.70, or 64 percent, when full-fuel-cycle energy consumption is the measure employed (Jaramillo et al., 2007, 2008).[3] In general, energy losses in heating applications with electric resistance heaters are greater than in heating applications with natural gas when the measure is full-fuel-cycle energy use.

---

[2] For an appliance powered by electricity, for example, full-fuel-cycle energy consumption includes all the energy consumed from the coal mine to the coal-fired power plant to the appliance at its site of operation. For a power plant fueled with natural gas or oil, full-fuel-cycle energy consumption includes all the energy used from the wellhead to the generating plant to the appliance, including transportation. For an appliance that directly uses natural gas (e.g., a storage water heater or stove), full-fuel-cycle energy consumption includes the energy consumed in extracting, processing, and transporting the natural gas, in addition to that used in distributing and ultimately using the gas.

[3] Jaramillo et al. (2007, 2008) estimated the efficiency for delivery of natural gas to the appliance site as 91.2 percent. For electricity generated from coal-fired power plants, full-fuel-cycle efficiency varied from 26.8 to 38.7 percent. For electricity generated from natural-gas-fired power plants the full-fuel-cycle efficiency ranged from 27.9 to 50.7 percent.

6

Copyright National Academy of Sciences. All rights reserved.

JA202

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 23 of 42

# Attachment E
# Written Material Provided Directly to the Committee

**EDISON ELECTRIC INSTITUTE RESPONSE TO COMMITTEE QUERIES**

**April 9, 2008**

EDISON ELECTRIC INSTITUTE
701 Pennsylvania Avenue, N.W
Washington D.C. 20004-2119
202-508-5010

Mr. Duncan Brown
Senior Program Officer
Board on Energy and Environmental Systems
National Academies of Sciences
500 Fifth Street NW
Room Keck 908
Washington, DC 20001

RE: Query from Committee on Point of Use and Full Fuel Cycle Measurement

Dear Mr. Brown:

The Edison Electric Institute (EEI), as an interested participant in the setting of standards and in this case appliance efficiency standards, appreciates the opportunity to submit answers to your questions that were sent via e-mail on March 28, 2008.

> *1) (a) If source energy as opposed to site energy was used by DOE when efficiency standards were set for appliances, might the efficiency standard set for electric and gas water heaters - assuming as now the standards are set separately - change and be higher? (b) If yes, why might the standard change? (c) If it does change, what might the change be in the appliance that was manufactured (e.g., more insulation or what?)*

The efficiency standards set for the separate classes of electric and gas water heaters would be no different under a source-based metric than it is under the current site based metric. DOE currently uses a mix of site and source energy metrics when setting appliance energy efficiency standards. If source energy as opposed to site energy was used when setting efficiency standards for electric and gas water heaters, the standards values derived from the rigorous DOE process would not change based on the use of site or source energy. They could change only if DOE abandoned its required use of economic analysis (consumer cost effectiveness) in the process.

The current procedure sets standards based on (1) the level of efficiency that is technically achievable, and (2) the level of efficiency that is cost effective from the manufacturers' and consumers' point of view. When performing its economic analysis, DOE uses the cost impacts of efficiency measures at the retail price (or "site" price, as it were), rather than the wholesale manufacturing cost (a "source" cost, in a way). The efficiency levels set are not based on the metric used or the perception that it is too high or too low. They are set based on the level that is most cost-effective for consumers based on life-cycle costs.

For instance, the efficiency of an electric resistance water heater is 90+ percent today, and there is very little opportunity for improvement in this class of water heater. If the metric used today for electric resistance units assigned a value of "1" to the efficiency of an electric water heater, are manufacturers going to suddenly discover a way to improve the efficiency of their products in

21

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 24 of 42

order to raise the rating? Will they find a way to achieve efficiency levels greater than 100 percent in resistance water heaters? Of course not. Whether the value of the metric is 1 or 99, the ability of resistance water heater manufacturers to improve their efficiency does not change. Therefore changing the measurement metric of a standard by itself will make no difference in the efficiency of the water heater.

Similarly, changing the efficiency metric with gas (or oil-fired) water heaters will make no difference in the manufactured efficiency levels. With gas equipment, the efficiency ceiling for non-condensing units has been the cost effectiveness of the units. While improvements are technically achievable, it has not been deemed cost effective to do so. Changing the metric assigned to the efficiency rating does not change that fact. Gas water heater manufacturers are still faced with the same economic hurdles.

DOE has enough information available now to require higher levels of efficiency where possible and cost effective. Manufacturers are continually looking to improve their product, and with the higher energy costs higher efficiency becomes a greater competitive advantage. Changing the efficiency metric does not change any of that ability or incentive.

If the standard were to change, the other required decision factors would still have to be considered, regardless of using site or source energy. In the case of water heaters, there are significant additional costs for raising the standard higher, such as difficulty fitting water heaters through doorways and other clearances due to increased insulation levels. Insulation materials are also more costly, because of the elimination of low cost, high performance materials that contained ozone- depleting chemicals. If the standard did change slightly, electric water heaters could potentially use better, more costly insulation materials, while gas water heaters could do the same.

However, if the standard changed significantly, such that there would be elimination of entire classes of products (e.g., non-condensing gas water heaters). It is likely that the DOE manufacturer impact analysis would detail the negative effects on manufacturers, and the US Justice Department would be obligated to detail the negative impact on competition, such that the standard would likely not be implemented.

> *2) (a) If no change in the efficiency standard would be made by changing from site to source energy when standards are established, what are the two most important results of the change from the perspective of the consumer? What would the consumer see that is different? (Different labels?) (b) From society's perspective, how would things be different if no change would be made in the efficiency standard using source instead of site energy?*

It is difficult to provide a succinct answer without seeing a final version of the following: the source energy metric; the label provided by the appliance manufacturer; and the FTC Energy Guide label.

The most important result of the change from the consumer's perspective would be the difficulty in comparing the efficiency of the current water heater using site energy to a new water heater based on source energy. At present, when consumers shop for water heaters, they can compare various models using metrics that they are familiar with, such as kWh's of electricity used per year, therms or cubic feet of gas used per year, gallons of oil consumed per year, and annual operating costs. Consumers are familiar with these terms because these terms are the basis of consumer utility bills as well as other guides that consumers use. Changing the label to a metric based on a new unfamiliar term and concept will not result in increased energy efficiency, but rather in consumer confusion. The result will be a loss in consumer credibility in the standards process and a loss in the "societal" investment made by the Department of Energy and the Federal Trade Commission over the last 20 years in educating consumers about smart energy choices.

22

Copyright National Academy of Sciences. All rights reserved.

Changing from "all-site" efficiency measures to "all-source" efficiency measures on consumer labeling such as the FTC Appliance Guide would mean that all information would be communicated based on societal impacts, without easy linkage to consumer behavior, local energy use, or local energy costs. If the perceived performance doesn't match the perception of what the label tells the consumer, the credibility of the label will rapidly decline, making the label less valuable and moving the consumer to some other source that they trust. This would result in (1) less useful information for comparing their actual energy usage to the information on the label, and (2) a focus on societal benefits rather than individual consumer benefits which are typically the key driver of choice in buying the new appliance.

From a societal perspective, it would reduce the usefulness of the label, by rendering the information in a form less usable to consumers. It could also lead to increased overall energy usage if the result was for more consumers to delay purchases, make the less efficient selection based on confusion over source estimates or retain equipment by repairing rather than replacing older and less efficient appliances.

EEI sincerely appreciates the opportunity to submit these comments. It remains our recommendation that DOE retain the current system to set appliance energy efficiency standards which uses a mix of site measurements and source estimates.

Respectfully submitted,

Steve Rosenstock, P.E.
Manager, Energy Solutions Edison Electric Institute
701 Pennsylvania Avenue N.W. Washington, D.C. 20004-2696

cc:     Rick Tempchin, EE1
        Donald Brundage, Southern Company Services
        Steve Kennedy, Georgia Power Company
        Charles Foster, Esq.


### AMERICAN GAS ASSOCIATION RESPONSE TO COMMITTEE QUESTIONS

AGA responses to questions from the National Academies Committee on Point of Use and Full Fuel Cycle Measurement sent on March 28th, 2008:

1) (a) If source energy as opposed to site energy was used by DOE when efficiency standards were set for appliances, might the efficiency standard set for electric and gas water heaters - assuming as now the standards are set separately - change and be higher? (b) If yes, why might the standard change? (c) If it does change, what might the change be in the appliance that was manufactured (e.g. more insulation or what? )

AGA Response:

If source energy as opposed to site energy was used by DOE when efficiency standards are set for appliances, the measurements of energy efficiency would change but the actual energy efficiency of those appliances would most likely not change.  DOE's test procedures and energy descriptors would remain the same, but a new descriptor would be added to allow source calculation methods. Additions of source energy descriptors to current descriptors and DOE test methods will not alter the standards.  However, with a clearer understanding of full fuel cycle efficiency opportunities provided by this additional information, together with energy savings remaining the primary

23

Copyright National Academy of Sciences. All rights reserved.

consideration of the standards process, these additions are likely to change and improve energy efficiency outcomes within the DOE appliance program.

Consumer education would be enhanced if source procedures were employed. This new calculation method would more accurately reflect the amount of overall energy consumed by the appliance and thus allows consumers to compare appliances on a common basis. In addition, source methodology provides information that can be used to identify the carbon footprint and other environmental impacts associated with each appliance.

2) (a) If no change in the efficiency standard would be made by changing from site to source energy when standards are established, what are the two most important results of the change from the perspective of the consumer? What would the consumer see that is different? (different labels?) (b) From society's perspective, how would things be different if no change would be made in the efficiency standard using source instead of site energy?

AGA Response

Changing from site to source energy methodologies when standards are established can yield important benefits to consumers. These include:

1. Providing a more accurate determination of overall energy use by appliances that will allow true comparisons between fuels and equipment types. If the DOE results are made available to the public (e.g., appliance labels), consumers will be able to make an "apples to apples" comparison when a common energy unit measurement (Btu) is used, as opposed to the confusing fuel-specific measurements (cubic feet, kilowatts, etc.) now in use. Thus the consumer will be better able to choose an appliance if overall energy efficiency is important to them. It should be noted that changes to the Federal Trade Commission (FTC) Energy Guide Labeling program were proposed by AGA. FTC in its final rulemaking called for under EPACT 2005 admitted that it currently had the authority to implement consumer information on source energy and emission but pointed to the lack of DOE calculation methodologies as the basis for making this change to the Energy Guide labels.[1] DOE can provide an immediate remedy to this lack of calculation methodologies by either documenting and recommending procedures it currently uses within the Energy Information Administration for source energy calculations, coupled with existing DOE test procedures, or recommending to FTC use of the EPA ENERGY STAR Portfolio Manager calculations for source energy and carbon dioxide emissions:

   http://www.energystar.gov/index.cfm?c=evaluate_performance.pt_neprs_learn

2. Making DOE test results available, which could aid consumers to make a "green" choice when purchasing appliances. Using DOE results that employ source methods, organizations and individuals will be better able to determine the environmental impacts of their purchase options. Having DOE test results in used to determine a typical carbon footprint that appears on the appliance label will aid the consumer in making an informed choice, particularly if carbon reduction goals become law. DOE test procedures represent the only reliable and consistent means of comparing appliances and energy efficiency. While questions about specific test procedures persist, the current DOE rulemaking

---

[1] Office of the Federal Register, National Archives and Records Administration, "Federal Trade Commission: Rule Concerning Disclosures Regarding Energy Consumption and Water Use of Certain Home Appliances and other Products Required Under the Energy Policy and Conservation Act ("Appliance Labeling Rule")," Federal Register, Volume 72, Issue 167, August 29, 2007, pp. 49948-49997.

24

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 27 of 42

process for addressing test procedures represents a reasonable opportunity to make changes where needed.

From society's perspective, changing from site to source calculations, even with no change in the efficiency standards, would provide much needed guidance for other groups to employ this measurement technique. The use of source methodology by DOE would set a precedent that should encourage other organizations (International Code Council, the American Society of Heating, Refrigeration, and Air Conditioning Engineers, Federal Trade Commission, etc.) to incorporate source methodologies into their codes, standards, and consumer education activities.

If current voluntary efforts to reduce carbon become mandatory through future government actions, source methodologies will be the only way to accurately depict environmental impacts of energy use. Even if appliance efficiency standards do not change, the use by DOE of source methods will allow consumers to make a more educated decision when purchasing appliances and will also pave the way for other organizations to employ source methods in their energy/environmental activities.


## LETTER FROM THE ASSOCIATION OF HOME APPLIANCE MANUFACTURERS

Dr. James W. Dally, Chair and Council Members
Committee on Point-of-Use and Full-Fuel-Cycle Measurement Approaches to Energy Efficiency
    Standards
National Academy of Sciences
500 5th Street NW
Washington, DC 20001

RE: AHAM Comments on National Academy of Sciences Project on Energy Efficiency Standards: Alternative Approaches to Measurement

Dear Dr. Dally and NAS Council Members:

On behalf of the Association of Home Appliance Manufacturers (AHAM), I would like to provide written comments on the National Academy of Sciences project titled "Energy Efficiency Standards: Alternative Approaches to Measurement". AHAM is a not-for-profit trade association representing manufacturers of major, portable and floor care home appliances, and suppliers to the industry.

In 1975, the Energy Policy and Conservation Act (EPCA) established test procedures, targets and labeling requirements for household appliances. This was followed by the National Energy Conservation and Policy Act (NECPA) in 1978, which provided DOE with authorization to set standards for 13 of these household appliances. Standards were set using point-of-use energy measurement, or the energy used by the appliance at the electrical outlet. Over the past 30 years, the household appliance industry has risen to the challenge of producing products that consume less energy and provide equal or better performance for the consumer. For example, since 1980 when these regulations became effective:

- Clothes washer energy use per cycle has decreased 69%, while tub capacity has increased 20%;
- Refrigerator-freezer energy use per year has decreased 61%, although volumes have increased nearly 12%;
- Dishwasher energy use per cycle has decreased 47%.

These significant improvements in energy use by appliances are achievable because household appliance manufacturers have a clearly defined energy goal for product design and a representative

25

Copyright National Academy of Sciences. All rights reserved.

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 28 of 42

test procedure for product evaluation. Designing to a point-of-use energy requirement allows the manufacturer to wholly manage the energy use of their product and provides incentive for research and development that go above and beyond current regulations.

Furthermore, appliance energy information has become an important factor in purchasing decisions for consumers in the past five years. Through a combination of appliance efficiency standards, Energy Guide labels, Energy Star and other market awareness efforts, including tax incentives to manufacturers to deliver energy savings beyond that required by regulation, consumers are taking steps to further reduce energy consumption of appliances. The product specific information addressed by the abovementioned information programs is critical to this progress and should be maintained.

AHAM requests that the Committee maintain the current DOE procedure for defining appliance energy standards using point-of-use energy as the basis. As noted above, this approach has incentivized manufacturers and results in substantial improvements in product energy efficiency. As mentioned earlier, AHAM believes that consumers are also motivated by point-of-use energy values, as these are values they can control.

AHAM acknowledges that addressing inefficiencies in the fuel cycle, for all fuels, is paramount to further reducing energy inefficiencies and greenhouse gas emissions; however, home appliance manufacturers are not responsible for fuel cycle efficiencies and therefore cannot directly address energy use at this level. Only the utilities can be held accountable for the fuel source in their generating plants. Again, DOE's current approach, where point-of-use energy values are used to set regulations and full fuel cycle energy use is estimated through impact analysis, provides a realistic foundation for addressing both concerns.

We thank you for the opportunity to provide these comments. Please feel free to contact me with any comments or questions that you may have.

> Sincerely,
> Debra K. Brunk, Ph.D.
> Director, Technical Services
> Cc: Joe McGuire, AHAM President
> David Calabrese, AHAM Vice President, Government
>      Relations
> Charles Samuels, AHAM Legal Counsel

Copyright National Academy of Sciences. All rights reserved.

JA208

# Attachment G
## Biographical Sketches of Committee Members

**James W. Dally (Chair), University of Maryland, College Park.** James W. Dally (NAE) is professor emeritus, University of Maryland, College Park. Dr. Dally has had a distinguished career in industry, government, and academia and is the former dean of the College of Engineering at the University of Rhode Island. Dr. Dally is Glenn L. Martin Institute Professor of Engineering (emeritus) at the University of Maryland at College Park. His former positions include senior research engineer, Armour Research Foundation; assistant director research, Illinois Institute of Technology Research Institute; and senior engineer, International Business Machines Corporation. Currently, he is also an independent consultant. Dr. Dally is a mechanical engineer and the author or co-author of six books, including engineering textbooks on experimental stress analysis, engineering design, instrumentation, and the packaging of electronic systems, and has published approximately 200 research papers. He has served on a number of National Research Council (NRC) committees such as the Committee on Alternatives for Controlling the Release of Solid Materials from Nuclear Regulatory Commission-Licensed Facilities, the Panel on Prospective Benefits of DOE/EERE's Distributed Energy Resources R&D Program, and the Panel on Air and Ground Vehicle Technology for the Army Research Laboratory Technical Assessment Board. He has a B.S. and an M.S. from the Carnegie Institute of Technology and a Ph.D. from the Illinois Institute of Technology.

**David H. Archer, Westinghouse Electric Corporation [retired].** David H. Archer (NAE) is an adjunct professor, Carnegie Mellon University. He has earned a B.S. in chemical engineering and mathematics from Carnegie Mellon University and a Ph.D. from the University of Delaware. He is a consulting engineer from the Westinghouse Corporation. He has extensive experience in the development, design, and evaluation of innovative fossil and nuclear-fueled power generation systems. His work has included basic studies of flame behavior and process equipment dynamics as well as the applications of high-temperature solid oxide fuels, coal gasifiers and fluidized bed combustors, hot gas cleaning units, and combustion turbines. He is currently involved at Carnegie Mellon in the development of advanced energy supply Committee for the Disposal of the Chemical Weapons Stock Pile, the Committee on R&D Opportunities for Advanced Fossil Fueled Energy Complexes, and the Committee Investigating Methods for the Evaluation of DOE/EERE Programs. He joined Westinghouse in 1960, retired, and joined Carnegie Mellon in 1990.

**Ellen Berman, Consumer Energy Council of America.** Ellen Berman has a 40-year career that spans the intersection of science and technology. She served as president of the Consumer Energy Council of America from its founding in 1973 until her retirement and the organization's closing in 2006. Under Ms. Berman's leadership, CECA was one of the leading public interest organizations in the United States focusing on the energy, telecommunications, and other industries providing essential services for consumers. Throughout her tenure as leader of CECA, Ms. Berman sought to advance the public's understanding of the interrelationship of energy policy and the environment, transportation, telecommunications, and other disciplines. She directed the publication and dissemination of nearly 500 reports; technical, economic, and policy analyses; public testimony; and brochures, pamphlets, articles, official documents, consumer

33

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 36 of 42

guides, and op-ed pieces. Ms. Berman has served on numerous national energy policy committees. She continues to be an active member of the Aspen Institute Energy Policy Forum. She served on the Council on Competitiveness National Innovation Initiative. She serves on the Advisory Council of the Women's Council on Energy and the Environment. In 2004, Ms. Berman was awarded a Key Women in Energy in the Americas Pathfinder and Trailblazer Award. In the past she served on the Committee on Energy and Economic Development of the NAACP; the Magnetic Fusion Research and Development Advisory Committee and the Residential Energy Conservation Advisory Committee of the Office of Technology Assessment of the U.S. Congress; the American Council for an Energy Efficient Economy's Building Efficiency Program; and the Secretary of Energy's Fuel Oil Marketing Advisory Committee. She was invited by the White House and the Japanese Ministry of International Trade and Industry to participate in a month-long executive business study program in Japan. Ms. Berman served as 2008 chair and 2007 co-chair of the 2007 Sarasota International Design Summit, a sustainable design initiative sponsored by the Ringling College of Art and Design in Sarasota, Florida. Ms. Berman holds a B.A. in Russian language and literature from Barnard College of Columbia University.

**Ramon L. Espino, University of Virginia.** Ramon L. Espino is currently research professor, University of Virginia, Charlottesville; he has been on the faculty since 1999. Prior to joining the Department of Chemical Engineering, he was with ExxonMobil for 26 years. He held a number of research management positions in petroleum exploration and production, petroleum process and products, alternative fuels and petrochemicals. He has published about 20 technical articles and holds 9 patents. Dr. Espino's research interests focus on fuel cell technology, specifically in the development of processors that convert clean fuels into hydrogen and of fuel cell anodes that are resistant to carbon monoxide poisoning. Another area of interest is the conversion of methane to clean liquid fuels and specifically the development of catalysts for the selective partial oxidation of methane to synthesis gas. He served on the NRC Committee on R&D Opportunities for Advanced Fossil-Fueled Energy Complexes, the NRC Committee on Review of DOE/EERE's Vision 21 R&D Program, and the NRC Committee on Prospective Evaluation of Applied Energy Research and Development at DOE/EERE (Phase One and Two). He received a B.S. degree in chemical engineering from Louisiana State University, and an M.S. and a doctor of science in chemical engineering from the Massachusetts Institute of Technology.

**David Hungerford, California Energy Commission.** David Hungerford is the special advisor to Commissioner Arthur Rosenfeld at the California Energy Commission.  He most recently served as the Energy Commission's lead staff on demand response policy development. He was the facilitator of a committee formed to oversee measurement and evaluation of Demand Response programs and rate designs approved by the California Public Utilities Commission, as well as the facilitator of a working group set up by the California Public Utilities Commission to develop programs and tariffs for large commercial and industrial customers.  Dr. Hungerford's professional career has focused on conducting and overseeing evaluation research of energy efficiency and demand response programs and using those results to analyze the impacts of policy change for the purpose of developing and guiding policy initiatives.  He has also served on numerous technical advisory committees for investor-owned utility programs and public interest energy research (PIER) projects.  Since 2003, He has served on the advisory group overseeing PIER demand response research at the Demand Response Research Center at

Copyright National Academy of Sciences. All rights reserved.

Lawrence Berkeley National Laboratory and as a member of the technical advisory panel for the San Diego Gas & Electric Advanced Metering Infrastructure project.  His professional focus is in energy policy analysis and his research interests are in technology/society issues, technology adoption, consumer behavior, and social change applied to the problem of energy consumption. He received his Ph.D. in human ecology from the University of California, Davis and holds a B.A. in English and in environmental studies from Baylor University.

**Steven Nadel, American Council for an Energy-Efficient Economy.** Steven Nadel is executive director of the American Council for an Energy-Efficient Economy (ACEEE), Washington, D.C., where he has worked since 1989. He is responsible for overall management of the organization including supervising program directors, fund-raising, overseeing administrative systems, and working with the board of directors. Prior to becoming the executive director, Mr. Nadel served at deputy director and also led ACEEE's Buildings and Equipment Program and Utilities Program for many years. With the ACEEE Buildings Program he has worked on appliance and equipment efficiency standards, building codes, and market transformation programs. He led successful efforts to incorporate lamp, motor and HVAC standards and luminaire and office equipment labeling in the federal Energy Policy Act of 1992 and to include standards on 15 new products in the Energy Policy Act of 2005. Both are now law. He continues to play a major role on U.S. efficiency standards and market transformation programs. With the ACEEE Utilities Program he helped plan, profile, and evaluate energy efficiency programs for many years, and remains active in the development of public benefit programs and policies in several states and in the development of programs to reduce peak electric demand in response to recent electric reliability problems. Mr. Nadel has led or assisted on numerous research projects, leading to over 100 published papers. In early 2006 he authored a report on energy efficiency resource standards (energy-savings targets for utilities) and since that time has provided assistance to several states and members of Congress working on legislative and regulatory proposals. He has an M.S. in energy management from the New York Institute of Technology and a B.A. in government and an M.A. in environmental studies from Wesleyan University in Connecticut.

**Richard K. Newell, Duke University.** Richard G. Newell is the Gendell Associate Professor of Energy and Environmental Economics at the Nicholas School of the Environment and Earth Sciences, Duke University. He is a University Fellow at Resources for the Future, Washington, D.C. He recently served as the senior economist for energy and environment on the President's Council of Economic Advisers, where he advised on policy issues ranging from automobile fuel economy and renewable fuels to management of the Strategic Petroleum Reserve. He is a member of the National Academy of Sciences (NAS) Committee on National Science Foundation Innovation Inducement Prizes, the NAS Committee on Energy R&D, the National Petroleum Council Global Oil and Gas Study Committee, the Advisory Board of the Automotive X-Prize, and the Editorial Board of the journal *Energy Economics*. He has served as an independent expert reviewer and advisor for governmental, non-governmental, international, and private institutions including the National Commission on Energy Policy, the U.S. Environmental Protection Agency, the U.S. Department of Energy, the U.S. Energy Information Administration, the U.S. National Science Foundation, the Intergovernmental Panel on Climate Change, the Pew Center on Global Climate Change, and others. He holds a Ph.D. from Harvard

35

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 38 of 42

University, a master in public affairs (M.P.A.) from Princeton University's Woodrow Wilson School of Public and International Affairs, and a B.S. and a B.A. from Rutgers University.

**Reinhard Radermacher, University of Maryland, College Park.** Reinhard Radermacher is a professor in the Department of Mechanical Engineering at the University of Maryland. He has 30 years of experience in research and development of energy conversion systems in general and CHP (Cooling Heating and Power) Systems and air-conditioning/heat pumping devices in particular. He is an internationally recognized expert in the use of working fluid mixtures. Dr. Radermacher founded the Energy Laboratory in 1983 and is the director and co-founder of the Center for Environmental Energy Engineering (CEEE) at the University of Maryland. The center is taking the lead in developing energy conversion systems that meet environmental and economic concerns. Dr. Radermacher's service includes international activities such as being the U.S. representative of the International Energy Agency Annexes 13 and 34, past vice president of Commission B1, and president of Commission B2 of the International Institute of Refrigeration (IIR). He is an honorary member of the IIR and has been invited for lecture tours to Europe, China, Japan, Korea, and South America. He also serves as the coordinator of the Student Exchange Program for the University of Maryland, College of Engineering. Nationally, he is an active fellow of the American Society of Heating Refrigeration and Air-conditioning Engineers (ASHRAE) and a member of the American Society of Mechanical Engineers (ASME). His work has resulted in more than 150 publications, as well as numerous invention records and 10 patents, and he co-authored three books. He serves as the editor ASHRAE's *HVAC&R Research* journal starting in July 2002. He holds an M.S. and a Ph.D. in physics from the Munich Institute of Technology and was a visiting scientist and NATO scholar at the National Institute of Standards and Technology.

**Phyllis Reha, Minnesota Public Utilities Commission.** Phyllis A. Reha was appointed to the Minnesota Public Utilities Commission (PUC) by Governor Jesse Ventura on May 16, 2001, and reappointed by Governor Tim Pawlenty on June 26, 2007, and serves as its vice chair. Commissioner Reha has been active in a number of utility and energy organizations during her tenure as a PUC commissioner. She is a member of the National Association of Regulatory Utility Commissioners (NARUC) and currently serves as the chair of the Committee on Energy Resources and the Environment. She is also a member of and past president of the Mid-America Regulatory Conference. Commissioner Reha also serves on the advisory councils of the Electric Power Research Institute; the New Mexico State University Center for Public Utilities; and the National Council on Electricity Policy. Recently she was selected as one of seven commissioners nationally to participate on a leadership group, sponsored by the U.S. Environmental Protection Agency and the U.S. Department of Energy, whose charge was to develop a National Energy Efficiency Action Plan. She is also co-chair of the Federal Energy Regulatory Commission/NARUC Demand Response Collaborative, which will explore how to coordinate federal and state approaches to electricity demand response policies and practices. Commissioner Reha has a B.A. degree from the University of Minnesota and a J.D. from the University of Minnesota Law School.

**Eric Williams, Arizona State University.** Eric Williams is assistant professor in civil and environmental engineering and in the School of Sustainability. As part of his responsibilities, he is also developing a program in Earth Systems Engineering and Management. Before joining

36

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 39 of 42

Arizona State University, he spent a year as visiting faculty at civil and environmental engineering at Carnegie Mellon University, preceded by eight years in Tokyo at United Nations University where he conducted research related to information technology and the environment. His research interests include industrial ecology, life cycle assessment, information technology (IT), and energy systems, with a focus on the environmental assessment and management of IT hardware. In addition to IT-related issues, Dr. Williams is also working on the effects of development and urbanization on energy demand in industrializing nations, including analysis of relationships between infrastructure provision and transport-related carbon dioxide emissions in Asia and projections of future energy demand of the Chinese iron/steel sector, hybrid life cycle assessment (which combines process and economic input-output techniques), uncertainty analysis in industrial ecology, and sector-level forecasting of technological change/growth. Dr. Williams earned degrees in physics at Macalester College, in St. Paul (B.A.) and the State University of New York, Stony Brook (Ph.D.).

**James L. Wolf, Independent Consultant.** James Wolf is an independent consultant working with private companies, governments, and foundations on energy and climate change issues. He was formerly vice president of energy and environmental markets for Honeywell, Inc. where he focused on business development opportunities to develop new products and services and market existing services to energy and environmental concerns. Previously, he was executive director at the Alliance to Save Energy, a nonprofit coalition whose board of directors is composed of U.S. senators, chief executive officers of major corporations, and environmental leaders. He also served as acting deputy assistant administrator for policy and planning with the U.S. Department of Commerce's National Oceanic and Atmospheric Administration, where he helped design and supervise policies and programs addressing marine pollution, global climate change, alternative energy resources, and international scientific research protocols. Mr. Wolf has a J.D. degree from Harvard Law School.

Copyright National Academy of Sciences. All rights reserved.

## Attachment H
## Minority Opinion of David H. Archer, Committee Member

I regret that I cannot concur with the draft transmittal letter and the final report of the committee.

First, they do not include [what I view as] the most important finding and recommendations that should result from the information presented to the committee:

- [Archer] Finding:  The U. S. DOE/EERE Energy Conservation Program that establishes energy performance standards for residential and commercial building appliances is significant and effective in reducing the energy demand of the nation.  It is well conceived and structured.   It properly uses site energy to set the standards and source energy to estimate their energy, economic, and environmental cost/benefits to the nation.  The Program is appreciated by appliance manufacturers and their customers, the public.

- [Archer] Recommendation 1:  The scope of the program should be broadened to include a wider variety of residential and commercial building appliances and systems.  These should be identified by DOE/EERE to cover a broader range of the energy consuming appliances in these buildings.  (An illustrative, but not prescriptive, list of such appliances and systems is attached as . . . [Table H.1].)

- [Archer] Recommendation 2:  The pace of the program should be accelerated to establish and also to revise appliance standards more rapidly.

Second, the report overemphasizes the concept of full fuel cycle energy to the point that it diverts attention from the purpose of the DOE/EERE program: to assure that the available building appliances for all the various functions, energy sources, and building applications are efficient; not to compare the energy use of appliances using different energy sources on the basis of full fuel cycle energy consumption.

Third, I am concerned that the length and complexity of the committee's "letter" report detracts from its impact.

TABLE H-1  Additions to the Department of Energy/Office of Energy Efficiency and Renewable Energy Appliance Energy Conservation Standards Program

| |
|---|
| Residential television sets |
| Lap and desk top computers |
| Solar photovoltaic power or solar thermal heating units |
| Commercial air circulation fans for variable and constant air flow |
| Cooling/heating and ventilation systems |
| Commercial ventilation air enthalpy recovery units. |
| Commercial desiccant based air dehumidification units |
| Commercial absorption chillers |
| Advanced thermostats, smart meters, and other instrumentation and control hardware to achieve energy reductions in the operation of appliances |

38

Copyright National Academy of Sciences. All rights reserved.

Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Report

Case 1:24-cv-02942-ACR    Document 29-9    Filed 05/28/25    Page 41 of 42

## Attachment I
## Minority Opinion of Ellen Berman, Committee Member

The committee's primary recommendation (Recommendation 1) is that:

DOE/EERE should consider moving over time to use of the full- fuel-cycle measure of energy consumption for assessment of national and environmental impacts, especially levels of greenhouse gas emissions, and to providing more comprehensive information to the public through labels and other means including an enhanced website. DOE/EERE efforts should address the data collection and analysis needed to accurately estimate full-fuel-cycle energy consumption as well as to assess and improve consumer understanding and use of information on full-fuel-cycle energy consumption.

As an advocate for energy policy in the best interest of the nation's consumers, I believe that consumers may unintentionally be adversely affected by the primary conclusion and related recommendations. In order to ensure that consumers are best served by the Appliance Efficiency Program, I present this dissent. My dissent addresses three key issues which could impact the usefulness of the program for consumers:

**1. The problem with the appropriateness and validity of a full-fuel-cycle energy measure.** The Committee's recommendation that DOE/EERE transition to a full-fuel-cycle energy measure is intended to provide a more complete picture of the energy consumed by an appliance. The full-fuel-cycle measurement would expand the energy calculations beyond the direct consumption of energy by the consumer's appliance and would include those upstream costs incurred from the point of extraction of the fuel to the point the energy made from that fuel enters the home. As laudable as this intent is meant to be, this approach would not benefit consumers. Developing a full-fuel-cycle cost methodology is fraught with complexity and controversy. A simple conversion factor from site energy to full fuel cycle is not adequate. There are myriad criteria for determining full-fuel-cycle analysis and reaching agreement on a satisfactory procedure would likely be beyond DOE/EERE's time and resources at a time when such resources are already strained. Some reputable economic models include not just costs of fuels but benefits as well, while others include societal costs and benefits, such as health impacts, environmental impacts, global warming, accidents, energy security, employment impacts, and depletion of non-renewable resources. In addition, both supply and demand of fuels should be considered. The impact of new technologies for carbon sequestration and clean coal, new generation of nuclear power, greater use of renewables, gas technologies should be factored into the model. Given the complexity of a proper full-fuel-cycle-cost model, the ability of the public to respond meaningfully in the rulemaking process would be limited and the Appliance Efficiency Program would not benefit. The current measurements best serve the goals of the Program.

**2. The problem with using full-fuel-cycle in setting a standard when a choice of fuels can be used.** Assuming an appropriate full-fuel-cycle methodology could be determined, using this measure when a choice of fuels can be used could have unintended consequences and harm consumers. As explained in this report, "the appliance standards program is not meant to identify or establish favored energy sources or technologies for building appliances. That is a matter of government policy and/or the free market." Notwithstanding this caveat, direct comparisons among fuels will inevitably favor one fuel over another in terms of the measures

39

Copyright National Academy of Sciences. All rights reserved.

used in the analysis—one fuel will be more environmentally sound, one will be more affordable, another might be more reliable or secure, yet another might be more available, and another might be determined to be safer.  These preferences are beyond the intention of the Program and are a matter of national energy policy. Of particular significance is the fact that the consumer has no control over upstream costs of producing energy or the physical characteristics of fuels. They cannot control the transmission and distribution losses incurred in bringing electricity to the home.  They cannot control the energy required to bring LNG into the country or pressurize it into the pipeline system. They cannot account for the cost of oil drilling or storing nuclear waste. They can only control the amount of energy used within their home—site energy. Factoring in the upstream costs would create a disservice to consumers and could thwart the intent of the Program. Were consumers to switch fuels based on incomplete analysis, costs of conversion could be very great and energy savings might not occur at all. In addition, supplies of the preferred fuel could become constrained, prices could soar, and industries could relocate abroad in order to stay competitive.  The nation saw such an example of unintended consequences—constrained supply, sharply increased prices, chemical industries moving abroad—when natural gas, a clean-burning fuel, was popularly used in turbines to generate electricity. DOE/EERE should continue using site measurements to set appliance efficiency standards.

**3.  The problem with using the label as a vehicle for societal goals as measured by full-fuel-cycle energy analysis.**  Informing the public of environmental consequences of energy use is an important goal.  The government has an obligation to conduct such educational campaigns.  As worthy as this goal is, the appliance labeling program is not the appropriate vehicle. Over the past 30 years, energy efficiency standards have helped consumers in very important ways which can be negatively impacted by the recommendations. Adding information on environmental impacts would confuse the decision process.  The existing site-based labels provide clear and understandable cost and consumption information that is relevant to consumers' purchases.  Consumers can easily compare the annual operating costs of different appliances while they compare the purchase prices of the appliances.  The cost and energy consumption information on the label equips the consumer to make an informed economic decision—a decision which is fully within the consumer's control. Importantly, a unit of energy saved by the purchase of an efficient appliance—regardless of the fuel used—means one less unit of energy that we need to produce from domestic sources or import from unstable foreign countries. That helps the environment through reduced air emissions and has important national security implications.

In 2006, the Consumer Energy Council of America convened leading energy experts to examine the costs and benefits of each fuel used for stationary energy needs. The consensus forum examined the characteristics of each fuel through the prism of national consumer priorities, including cost, environmental impacts, availability, national security, public health, safety, and other factors. The report of the forum, *Fueling the Future: Better Ways to Use America's Fuel Options,* determined that over the next 20 years we need to use every fuel in the nation's portfolio—but we need national policy and new technology to improve the characteristics of each fuel.  The Appliance Efficiency Program is not the proper vehicle for setting national fuels policy—and fuels policy would be the unintended consequence. Site based standards are uncomplicated, non-political, provide valuable cost and consumption information for consumers, result in significant national energy and environmental savings, and best serve the goals of the Program.

Copyright National Academy of Sciences. All rights reserved.

JA216

# EXHIBIT 8

# RAND

# Measures of residential energy consumption and their relationships to DOE policy



David Santana Ortiz and
Mark Allen Bernstein

**DISTRIBUTION STATEMENT A**
Approved for Public Release
Distribution Unlimited

*MR-1105.0-DOE*

*November 1999*

*Prepared for the*
*U.S. Department of Energy*
*Office of Energy Efficiency and Renewable Energy*
*and the*
*Office of Science and Technology Policy*

**20000223 183**

This is the final report of a project. It has been formally reviewed but has not been formally edited.

Science and Technology Policy Institute

RAND is a nonprofit institution that helps improve policy and decisionmaking through research and analysis.
RAND's publications do not necessarily reflect the opinions or policies of its research sponsors.

DTIC QUALITY INSPECTED 4

# Preface

The U.S. Department of Energy compiles, analyzes and disseminates data and information on energy use. Their purpose is to answer questions that range from the straightforward in concept – how much foreign oil does the U.S. consume annually? – to the complex – what is the interplay between the energy consumed during mechanical removal of moisture in a washing machine versus its thermal removal in a clothes dryer? Each calculation depends upon a measurement of energy, be it barrels of oil, kilowatt hours of electricity or cubic feet of natural gas.

Every measurement carries with it a degree of uncertainty and possibility for bias. The natural gas and electricity industries claim that the measurement of energy has the potential to influence the market for their products. The question for this report is whether the measurement of energy consumption at the point of use, or at the point of generation or extraction carries with it a bias toward one fuel or another.

This report investigates the impact of measuring energy use either at the point of use or the point of generation on energy use in the residential sector. The issue of whether the measurement basis has an impact on energy use patterns has simmered since the passage of the first national energy legislation in the 1970s and continues today.

This report has been prepared at the request of the DOE's Office of Energy Efficiency and Renewable Energy. The results should be of interest to policymakers and energy suppliers who have been concerned about any possible biases related to energy use, as well as to manufacturers, builders, and homeowners who must comply with appliance standards and home energy codes.

The authors would like to thank those individuals and organizations who helped in the researching and preparation of the report. A partial listing includes the many of the staff of the U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy; Arthur D. Little, Inc.; Dr. James McMahon and his staff at the Lawrence Berkeley National Laboratory; the stakeholders who provided comments on the issue including Mark Krebs of the LaClede Gas Company and Steve Rosenstock of the Edison Electric Institute, representatives of the American Gas Association, the American Gas Cooling Center, the Edison Electric Institute, the American Refrigeration Institute,

iii

MR-1105.0-DOE                                                              **RAND**

Virginia Power, and the Southern Company; Susan Freedman of the Building Codes Assistance Project; Hewan Tomlinson of D&R International; William Prindle of the Alliance to Save Energy; G. William Pennington of the California Energy Commission; Christine Egan of the American Council for an Energy-Efficient Economy; and RAND's internal and external reviewers of the report.

This research was undertaken as a project of RAND's Science and Technology Policy Institute. Originally created by Congress in 1991 as the Critical Technologies Institute and renamed in 1998, the Science and Technology Policy Institute is a federally-funded research and development center sponsored by the National Science Foundation and managed by RAND. The Institute's mission is to help improve public policy by conducting objective, independent research and analysis on policy issues that involve science and technology. To this end, the Institute:

- Supports the Office of Science and Technology Policy and other Executive Branch agencies, offices, and councils
- Helps science and technology decisionmakers understand the likely consequences of their decisions and choose among alternative policies
- Helps improve understanding in both the public and private sectors of the ways in which science and technology can better serve national objectives.

Science and Technology Policy Institute research focuses on problems of science and technology policy that involve multiple agencies. In carrying out its mission the Institute consults broadly with representatives from private industry, institutions of higher education, and other nonprofit institutions.

iv

RAND                                                                          MR-1105.0-DOE

# Summary

Measurements tend to be viewed as absolutes. The distance from Los Angeles to Washington, DC via major roads and interstate highways is 2674.6 miles according to a popular internet mapping service. But an airline credits 2288 miles to its travelers for the same journey - 14.5 percent fewer miles. The distance measurement is a function of the mode of transportation: the airplane can fly a straight line whereas the interstate highway system constrains the car's motion. Also, embedded in the measurement are assumptions regarding the route and altitude. In short, measurements and their meanings depend on context and purpose.

Another measure of the same journey is the fuel use per passenger. For the automobile, the total gallons of gasoline or the total gallons of gasoline per passenger would be convenient measures. Were consumer cost or convenience a primary concern, the cost per person or the elapsed time of the trip may be more important. Similar metrics could be applied to air travel so that the appropriate comparison could be made. Even with accurate data regarding the metrics above, no two trips would require the same amount of fuel, cost the same amount of money or take, the same amount of time. There are too many exogenous inputs: the traffic, the speed, the choice of roads, the wind, etc. Travelers have grown accustomed to these uncertainties.

The U.S. Department of Energy (DOE) faces similar problems with respect to the measurement of energy. The same household appliance can use significantly different amounts of energy depending on the user, the geographic location in which it is installed, and the level of maintenance that the owner provides. Despite these differences, the DOE develops test procedures to measure the energy consumption of the appliance and support the promulgation of minimum efficiency standards for appliances. The DOE and the Federal Trade Commission (FTC) label appliances with the information from the test procedure, the energy use, and the estimated costs of operation.

There are those who argue that the DOE test procedures are flawed in concept: the DOE test procedures for appliances measure the energy consumed at the point of use. However, there are significant losses of energy due to the extraction, generation,

transmission and distribution of the energy from the source to the end user; the losses can add to 70 percent of the energy.

Point of use energy measurement is often called the *site energy*; energy measurement that accounts for the extraction, generation, transmission and distribution of the energy is often called *source energy*. These are the terms that we will use throughout the report. Incorporation of extraction, generation, transmission and distribution losses into DOE and FTC policy, it is claimed, would give consumers a clearer picture of their energy use. Since the losses are markedly different for different energy types – natural gas and electricity for example – the effects of maintaining or changing policy could be significant for appliances in which there is a choice of energy sources. The problem of energy measurement is more complicated for homes since homes often use both electricity and another fuel.

This study addresses the question of whether the measurement of energy, for the purpose of setting or promulgating codes or standards, promotes the use of one fuel over another. If consumers only have the knowledge of the site energy consumption of an appliance or if standards and codes consider only site or source energy, does one fuel benefit over another? The results of RAND's analysis are straightforward though the DOE faces broader issues:

- Analysis does not support the claim that the site-based measurement used to promulgate minimum efficiency standards for water heaters favors electric units over natural gas units.
- There is no statistical difference in the market share of electricity between states with source-based residential energy codes or codes that are fuel-specific as a group and states with site-based residential energy codes as a group. The claim that the measurement of energy used to comply with residential energy codes adversely influences the broader market for natural gas and electricity is unsupported.
- There is preliminary evidence that states that use source-based energy codes or codes that are fuel-specific, as a group, are more efficient with respect to energy use per capita than other states.

*DOE goals and policy*

The DOE has a variety of goals with respect to energy use and the appropriate measure of energy consumption is closely related to each goal: energy costs and life-cycle costs quantify expenditure goals; pollution levels and distribution quantify environmental damage; fraction of energy derived from domestic sources is a measure of energy

xiv

security; productivity of energy use indicates efficiency; and the market penetration of renewable resources marks their acceptance into the market. Since the DOE does not dictate the actions of consumers, builders, manufacturers and energy suppliers, its policies strive to target the motivating factors for each of these groups.

If the information that the DOE provides to consumers, builders, manufacturers and energy suppliers is to influence their energy-related decisions, it must be well considered in relation to the DOE's energy efficiency goals. The same comments apply to the process of setting codes and standards. Proponents of site energy accounting claim that since consumers only pay for the energy that enters their homes rather than the energy that is lost in generation, transmission and distribution, that site energy is the most appropriate measure of energy consumption at the consumer level; note, however, that retail electricity pricing often includes charges for maintenance of transmission and distribution resources in addition to charges for end-use electricity consumption. Its opponents argue that since site energy ignores up to 70 percent of the energy required to deliver electricity to a home, site energy causes consumers to make poor societal decisions with respect to energy use. Advocates of either measurement claim that since consumers receive incomplete information, their decisions with respect to energy use may favor one energy source over another (that energy source with the highest efficiency with respect to the measurement of choice.) A key result of this study is that neither the use of site or source energy use seems to have adversely affected the broader market for fuels.

MR-1105.0-DOE                                                                    RAND



**Figure 1. Geographical distribution of three groups of states.**

We investigate if the choice of a particular measure of energy, either site or source energy, has had an impact on the fuel-use mixture in the residential market. On the national scale, we study the relationship between the EnergyGuide label for water heaters, which displays either the site-based efficiency rating or the site-based energy consumption, and historical shipments of natural gas and electric units. At the state level, through 1995, two thirds of states had implemented residential energy codes. A group of states had codes that were based on site energy and largely used revisions of the Model Energy Code (we label this group *group 1*.) California had a source-based code and several others had codes that required increased efficiency for homes heated with electricity (we label this group *group 2*.) A third group did not have energy codes or failed to enforce their codes (*no code*; see Figure 1.) We study the differences in the use of natural gas and electricity across these three groups of states. In addition, we study the impact of the residential energy codes on per capita residential energy consumption. Taken together, the set of results gives the DOE a picture of its options for meeting its energy efficiency goals in the residential sector.

*Water heaters*

The initial installation of a water heater is usually the responsibility of the builder, who may not consider the efficiency or cost of operation of the unit at the time of installation. Furthermore, since hot water is an essential service, when a water heater fails, speedy

xvi

# I. The context of energy measurement

## 1. Scope

The Energy Policy Conservation Act (EPCA) of 1975 specified that the Federal Energy Administration, later the U.S. Department of Energy (DOE), develop test procedures, labeling policy and voluntary standards for various appliances. Since passage of EPCA, the natural gas and electricity industries have disagreed on the basis for the measurement of energy consumption. It is the belief of each group that quantifying gains in energy efficiency in terms of a particular measurement has adverse effects on the energy market, on consumer well-being, and on the environment, and, furthermore, is the basis for suboptimal DOE policy. In this report, we address the issue of energy measurement and how measures of energy consumption and efficiency are related to DOE policy. The DOE has a number of goals: among them are increasing energy efficiency, reducing costs to consumers and federal agencies, and minimizing effects on the environment. Each of these goals may be quantified in terms of a set of measurements that may affect the natural gas and electricity industries.

We organize our analysis and results to set the issue in a proper context, to address the concerns of the primary stakeholders, and to recommend a course of action that best promotes the multiple goals of the DOE. We begin by stating the several goals of the DOE and the measures that it may choose to quantify and mark its performance. The natural gas and electricity industries have reduced the debated energy measurements to the two that they feel best represent their interests: source energy and site energy. We perform a quantitative analysis of the national water heater market and of residential energy use at the state level to directly address the concerns of the natural gas and electricity industries because these are two markets in which the competition between electricity and gas is direct. We hope that the quantitative analysis will demonstrate to both natural gas and electricity stakeholders that energy measurements have not yielded anti-competitive effects to date. We close by revisiting the goals of the DOE in light of the analytical results and recommending actions that address the DOE's goals and current trends in the energy industry and in information technology.

1

## 2. DOE goals and objectives

The 1997 Strategic Plan of the DOE outlines the DOE's objectives. An objective of the DOE with respect to energy resources is to ensure the viability of a competitive electric generation industry that delivers "adequate and affordable supplies with reduced environmental impact (DOE 1997, 13)." A strategy associated with this objective is the development of "renewable energy technologies and supporting policies capable of doubling non-hydroelectric renewable energy generating capacity by 2010 (DOE 1997, 13)." Another objective with respect to energy resources is to "increase the efficiency and productivity of energy use, while limiting environmental impacts (DOE 1997, 15)." The Office of Energy Efficiency and Renewable Energy (DOE-EERE) implements many of the higher-level objectives of the DOE with the aggregate goal of developing "cost-effective energy efficiency and renewable energy technologies that protect the environment and support the nation's economic competitiveness (DOE-EERE 1999A)." DOE-EERE's Federal Energy Management Program (FEMP) oversees the energy use of the U.S. Government. A 3 June 1999 Executive Order entitled "Greening the Government" restated the goals of FEMP consistent with the Strategic Plan and the goals of the DOE-EERE (U.S. President 1999).

Each of the strategic or energy management goals has a corresponding figure of merit against which its performance is measured. The benchmarks for the monetary goals are reduced energy costs and reduced life-cycle costs of energy-consuming equipment relative to current and historic costs. Reduced total emissions of carbon dioxide, other gases and precursors to local pollution are measures of environmental progress. The percentage of the nation's electricity produced by renewable resources at some future time is an indicator of the success of renewable energy promotion programs. The energy use per square foot of a building is a measure of general energy efficiency.

If the DOE is to achieve these goals outside of federal energy management, it must influence the energy-use choices of consumers, builders, building managers, manufacturers and energy suppliers. Each group has a particular set of motivating factors. Consumers desire convenience, safety, reliability and service at minimal cost. Builders attempt to reduce production costs while satisfying the real and perceived needs of the consumers. Manufacturers create products for a market that includes consumers,

2

contractors, retailers and builders. Energy suppliers need to deliver a product of uniform and consistent performance and value to their customers.

The DOE attempts to achieve some of the goals stated above through its programs targeted at energy producers and consumers. With the Federal Trade Commission (FTC) and the Environmental Protection Agency (EPA), the DOE labels appliances with energy efficiency information, including expected annual energy use and annual operating cost. Minimum efficiency standards for appliances eliminate the least efficient models from the market. State building energy codes prescribe insulation levels and the efficiency of major energy consuming systems and in some cases set performance standards. Government and utility sponsored rebate programs encourage consumers and builders to install efficient equipment. Government and industry sponsored research and development enables technological leaps in energy efficiency.

The policies, like the goals themselves, rely upon measurements of energy consumption for evaluation. In addition to characterizing the performance of energy management programs, the particular measurement of energy also describes a market in which there is a complex interaction among consumers, contractors, builders, manufacturers, retailers and energy suppliers. We investigate the historical role that energy measurement has played in the DOE minimum efficiency standards for residential appliances and in state energy codes, and how the choice of measurement has affected the marketplace for natural gas and electricity, two energy sources that are often in competition to provide services to consumers.

## 3. Energy measures and applications

On every new automobile sold in the U.S., there is a label from the Environmental Protection Agency (EPA) that gives an estimated miles per gallon for the automobile. The goal of the label is to give the consumer information regarding the fuel use of the vehicle so that it may be compared against the fuel use of other vehicles. Miles per gallon is a useful, easily recognizable and reasonable measure, though driving habits vary from person to person as do the definitions of "city" and "highway" traffic, and the achieved mileage is rarely what the EPA predicts. Because consumers pay for gasoline continually, they are very aware of the relationship between the fuel use of the car and

3

the cost of operation. Miles per gallon is also only one measurement. Consumers may also be interested in fuel cost per mile, miles per dollar, or the total estimated cost of ownership for three or five years; the EPA may be interested in the weighted average fuel economy of all cars of a particular manufacturer.

Appliances and homes may be thought of as systems that consume energy and provide services in return. As with automobiles, there exist standard methods to measure energy consumption and energy efficiency. For water heaters, the figure of merit for energy consumed at the site is the energy factor (EF). A home is a system of energy consuming machines and people; the figures of merit for energy efficiency most often cited – if given at all – for homes are total energy use per year by fuel or total energy cost per year.

The EF for water heaters has a formal, engineering definition: the EF is the fraction of heat energy input as fuel or electricity that is converted to hot water. The energy required to raise the temperature of the water depends upon the amount of water used and its input and output temperatures, all of which are specified by a DOE test procedure. Like the EPA's miles per gallon rating, the EF and the consumption estimates derived from it may not reflect an individual's actual energy use. But unlike the MPG rating, which consumers can conceptualize, there seems to be a lack of understanding regarding interpretation of the esoteric EF. Likewise, to estimate energy use in the home, the average use of the collection of appliances in the home must be estimated against the home's insulation levels, environmental exposure and the expected weather. It is, at best, an imprecise process.

The EF is a measure of the efficiency of the water heater at the point of use. However, there are alternative ways to interpret efficiency. According to the National Appliance Energy Conservation Act (NAECA) and the accompanying U.S. Code, the term energy use refers to "the quantity of energy directly consumed by a consumer product at point of use (42 U.S. Code 6291)." The "point of use" language directs the DOE to develop and implement test procedures that depend upon the energy consumed at the site of operation of the appliance. The language makes for repeatable test procedures, but omits the amount of energy consumed to generate and deliver the usable energy to the appliance (from the energy source.) It is also possible to account for the energy required

4

to generate, to transmit and to distribute the electricity to the consumer, and to incorporate this energy use into the efficiency rating. Were one concerned about reducing overall energy use, such energy consumption information might be useful to consider, especially if the consumer is comparing appliances that can use different fuel sources, such as water heaters. According to the *Annual Energy Review 1997*, 90 percent of the natural gas extracted was delivered to consumers – residential, commercial, industrial, transportation or electric utilities – while 29 percent of the energy consumed to generate electricity by electric utilities was sold as electricity (DOE-EIA 1998a). Most of the losses occur at electric generating stations, where most of the chemical energy in the fuel is converted to heat. Given the threefold difference in overall efficiency of natural gas versus electricity in energy production and delivery, there is a large disparity between the efficiency rating reported by test procedures, known as site measurements, and those that attempt to account for the extraction, processing, transportation, generation and transmission losses of the fuels, known as source measurements.

For homes, the problem is subtle. The average home uses electricity and natural gas or oil, though some are all electric, and the collection of appliances and end uses reflects in part the preferences of the builder, the homeowner (current and previous), the effect of national regulation on the appliances, and state or local regulation on home insulation and construction as well as the availability of natural gas. The tactic of labeling homes with respect to energy efficiency is new, but state energy codes are not. California bases its residential energy code on the total energy consumed by the home when compared to a model home. Other states, such as New York and Wisconsin, have different requirements for homes that are heated with electricity versus fossil fuels or wood. Many states have prescriptive codes, which dictate minimum levels of insulation and the efficiency of the appliances. And finally there are several states with no residential energy codes.

As in the case of automobiles, the EF of an appliance or the total energy used by a home – accounted at the point of use or the energy used in generation, transmission and distribution – is only a single measurement of the energy consumption of an appliance or building. There are additional measurements that could be useful to consumers, such as

5

estimates of the environmental damage associated with the use of an appliance or home, the annual operating cost and the life-cycle cost.

## 4. Site vs. source

Though there are many ways to calculate energy consumption for the use of either consumers or policymakers, two have maintained the interest of energy industry stakeholders for the past 25 years: site and source. Site energy is the energy consumed at a location to perform a particular function, such as water heating or lighting. Source energy, as defined by the California residential energy code – and adopted for our analysis – is "the energy that is used at a site and consumed in producing and in delivering energy to a site, including, but not limited to, power generation, transmission, and distribution losses, and that is used to perform a specific function, such as space conditioning, lighting or water heating (CEC 1995b)." Source energy refers to the energy consumed in generation, transmission and distribution for electricity and to the energy consumed in extracting, transporting and removing the impurities from natural gas.[1]

In legislation and DOE policy the concept of site energy, which is relatively easily measured, has been dominant. The first mention of site energy occurred in the Energy Policy and Conservation Act (EPCA) in 1975 and it is the "point of use" language of the U.S. Code. In each subsequent piece of legislation, the "point of use" language has been reaffirmed. In June 1998, the Senate committee on appropriations issued a report in which it noted the current policy and directed a change.

> The Committee understands that the appliance efficiency standards promulgated by the codes and standards programs at the Department of Energy presently reflect only the energy consumed at the point-of-use. The Department also funds activities and makes purchases based on point-of-use energy consumption. This method ignores the total energy consumed over the full fuel cycle and costs, and may result in misleading conclusions about the success of certain departmental programs. With regard to energy measurement or efficiency standards, Federal facilities and buildings, energy purchases, participation in or funding of standard setting organizations, the Committee expects the Department to increase greatly its efforts to consider the total energy consumed over the fuel cycle as well as emissions and energy costs (U.S. Senate 1998).

---

[1] A weakness of source energy analysis, its opponents note, is that there is no common definition of it. See page 8 for alternative definitions of source energy.

6

The House echoed the sentiments of the Senate: "In measuring energy for efficiency standards, for Federal facilities and buildings and for dealings with standard setting organizations, the Department [of Energy] should consider the total energy consumed over the full fuel cycle, emissions and energy costs. This applies to all programs funded under the energy conservation appropriation (U.S. House 1998)." The directive from the committees is straightforward: the Department of Energy (DOE) should consider the total amount of fuel used to deliver energy to an appliance – be it a refrigerator, water heater or clothes dryer – or to a building, in addition to the energy consumed at the point of use, when making policy.

There remained Senators who objected to any change in policy. Senator Frank H. Murkowski inserted into the Congressional Record a letter on behalf of Senator Tom Harkin, Senator Chuck Grassley, Senator Craig Thomas, Senator Michael Enzi, Senator Larry Craig, Senator John Glenn and Senator Jan Kyl opposing the report's language on historical and scientific grounds. "Congress and the President wisely rejected such an approach [gross energy use] in 1975 and in succeeding debates in recognition that determining the energy use of an appliance at its point-of-use is a measurement, while attempting to factor in various exogenous factors is an attempt to estimate that which cannot be measured, projected, quantified or extrapolated with any real accuracy. It is a case of comparing hard, objective measurements with soft, subjective estimates (Murkowski et al. 1998)." Though this action by Congress encourages the DOE to address source energy, the Energy Policy and Conservation Act (EPCA) of 1975 still directs the DOE to measure energy consumption at the point-of-use (42 U.S. Code 6291).

The Clinton Administration has vocalized its support for source energy measurement and analysis. The language has appeared in an Executive Order with the title "Greening the Government through Efficient Energy Management." It directs: "The Federal government shall strive to reduce total energy use as measured at the source and associated carbon emissions. To that end, agencies shall undertake cost effective projects where source energy decreases, even if site energy use increases. In such cases, agencies will receive additional credit, through guidelines developed by the Department of Energy, toward energy reduction goals (U.S. President 1999)." Vice President Al Gore and Energy Secretary Bill Richardson have commented recently on the issue. "I don't have

7

to tell you that the 'site versus source' issue is a long-standing one, and that the statutes and Executive Orders that have governed the accounting of efficiency benefits, using both of these methods, have not been consistent," said Gore. "The Administration wants the best possible information to reach those making decisions about efficiency in buildings, equipment, appliances and the like (Gore 1999)." The Secretary displayed a broad perspective on the issue: "There are appropriate uses for both site-based and total energy accounting (Richardson 1999)." The DOE does consider source energy consumption as part of procedure for setting appliance efficiency standards (see Section I.5 of this report.)

The language used to characterize either site or source energy measurement is so strong because both the natural gas and electricity industries believe it is the key to increased market share. The natural gas industry believes that policies based on site energy give an unfair advantage to electricity; the electricity industry believes that a change to source energy would unfairly benefit the natural gas industry. Citing the Edison Electric Institute's (EEI) *Washington Letter* of 23 October 1998, Mark Krebs of LaClede Gas Company reinterprets the EEI language: "…electric utilities are receiving 'billions of dollars' of government subsidies by maintaining site-based energy efficiency standards (Krebs 1999)." Those in favor of site energy simply reverse the allegation: "One of these special interests [the AGA] has gone on record in their own publications as promoting the use of source energy analysis in order to gain competitive advantage (Bernadowski 1999)."

One goal of this report is to determine if any competitive advantage exists with respect to policies based on site or source energy. While markets and sales are primary motivating factors in the site vs. source debate, there are subtleties and legitimate arguments supporting either side. We summarize the arguments of the primary stakeholders in six categories: definitions, estimation, environment, energy industry deregulation, fuel preference, and relevance with respect to DOE policy and enabling legislation. Later, we explicitly address the issue of fuel preference in the quantitative analysis of the national water heater market and the analysis of residential energy codes.

The definition of source energy from the California residential energy code is one of few published definitions. It may be inferred from the natural gas industry literature that

8

source energy is an energy accounting method that accounts for the "energy consumed in the production, generation and transmission" of either natural gas or electricity (Fritts 1999). However, critics of source energy are quick to point out details that complicate the issue. First, in any particular region, the mixture of energy sources that contribute to the delivered electricity is unique and varies over time. Second, for renewable resources, there does not exist an accepted conversion factor that facilitates comparison among hydroelectric, biomass, wind or solar power, or between renewable technologies and fossil fuel systems since renewable systems do possess embodied energy (Heiss 1999; Bernadowski 1999). Critics of source energy finally note that it is protean and may include the embodied energy of the steel and concrete that comprises a dam or power station. "Where do you draw the box?" asks one critic rhetorically (Brundage 1999).

California calculates source energy for electricity through a conversion factor of 10,239 Btu/kWh[2]. This is a statewide average of the electricity mix over a year; the California Energy Commission (CEC) considers changes to the various conversion factors with each code revision. But even in California, the conversion factor represents only a statewide average. Source energy analysis relies on estimates "of factors that are virtually impossible to measure, predict, quantify or extrapolate (CPAES 1998)." Virginia Power notes: "Typical source energy analyses do not recognize time-of-use, regional, local, application or availability specific impacts on data or inputs (Bernadowski 1999)." Source energy opponents uniformly echo the sentiments of Virginia Power. Electricity deregulation is likely to alter the source mix attributable to each customer. Source energy advocates admit the significant regional variation and the complicating penetration of renewable resources; however, in electric utilities 57 percent of electrical generation is powered by coal, 9 percent by natural gas, 20 percent by nuclear, 11 percent by hydroelectric and 3 percent by additional sources (DOE-EIA 1998a). The "additional sources" includes renewable resources. By some estimates, this mixture is not expected to change appreciably in any given year (DOE-EIA 1998d). However, if DOE programs promoting research, development and implementation of

---

[2] A direct conversion between the two units is 3412 kWh per Btu. The conversion and delivery efficiency of the electricity in California, according to the CEC, is 33 percent, 3 percent greater than the national average.

9

renewable energy and clean fossil fuel technologies are successful, then the overall mix of electricity generation could be cleaner in the future; according to these estimates, renewable energy has the potential to generate 350 billion-kilowatt hours displacing 45.3 million metric tons of carbon per year by 2020 (Arthur D. Little 1999a; NREL 1999).[3] Source energy proponents note that although it is difficult to structure source energy estimates to account for renewable resources, site measures of energy ignore the differences in generation altogether. Advances in information technology and real-time access to information regarding generating resources have reduced the impediments to maintaining accurate source energy estimates.

Both sides of the site vs. source debate lay claim to the environmentally friendly position. Source energy, its detractors complain, does not consider the "scarcity of resources, local environmental issues or global environmental issues…it does not consider the environmental consequences of the energy use choice (Brundage 1999)." California and the DOE use a fixed conversion rate to calculate source energy consumption. Site energy proponents suggest that since the fixed conversion rate is incapable of accommodating local variations in energy production and delivery, it is also unable to quantify the benefits of local renewable generation. Such comments by site energy proponents irk source energy advocates, who count among themselves the Alliance to Save Energy – an energy-efficiency and environmental advocacy group. Quite simply, source energy proponents argue that site energy ignores differences in the energy sources used to provide electricity to a home and ignores the environmental consequences of electricity. While source energy does not yield measures of pollutants, it is much more closely related to them than its counterpart (Krebs 1999).

Both sides claim that they provide consumers in deregulated energy markets the most comprehensive information regarding energy use. "[Source energy] is meaningless and confusing to consumers, who need information on the amount of energy they will be expected to buy and the cost of that energy. This need will become even more critical for

---

[3] Given current estimates for growth in electricity demand, an additional 350 billion-kilowatt hours of renewable generating capacity would result in a market share of 15 percent for renewables, including hydroelectric generating units. Likewise, the 45.3 million tons of saved carbon is approximately 6 percent of the projected carbon emissions due to electricity generation and approximately 2 percent of total carbon emissions, in the absence of new measures to control emissions (DOE-EIA 1998d).

10

consumers as they gain the ability to shop for their energy," notes Virginia Power (Bernadowski 1999). In its most simple terms, "consumers pay only for energy they consume at the site, any attempt to interject source energy into their decision-making process will be confusing at best – misleading at worst (EEI 1998)." Consumers will demand more accuracy in the information they receive. "In the restructured future…the heating values (Btu per kWh, Btu per therm, or Btu per gallon) may change on a daily or hourly basis (Kuhn 1998)." The logical consequence of this position is that the volatility in the energy marketplace will make source energy obsolete. Source energy may lead to only perceived energy improvements. An energy manager may change to more efficient suppliers and claim a savings in energy without performing any action at the building site (EEI 1998).

Source energy advocates note that "deregulation and restructuring places increased emphasis on comparisons across fuel types that are equitable and consistent with economics (Pennington 1999)." Economic factors include the costs (environmental and financial) to produce and deliver that energy; in California, for example, electric utilities "want greater differentiation of the 'value' of energy by time-of-use and season that give signals that are consistent with the economics of delivering energy services – site energy is an obsolete concept and completely inadequate for meeting this need (Pennington 1999)." As discussed later, neither measure seems to provide information that influences consumer decisions.

Both sides reserve their most intense and contentious language for energy efficiency codes and standards. Fortunately, the positions are the simplest to state. "The use of source energy analysis in these types of applications [energy efficiency standards] always produces anti-competitive and discriminatory results. An example of this result is the current situation in California where it is extremely difficult for electricity to compete with fossil fuels for certain uses such as space heating and water heating due to source-based state energy efficiency regulations (Bernadowski 1999)." Source energy advocates state that the use of site energy in standards and rating results in a *de facto* discrimination against fuels other than electricity (Pennington 1999). By discrimination, the stakeholders mean that the site-based or source-based policies involuntarily force consumers into purchases of appliances that use the opposing fuel – electricity for source

11

energy and natural gas for site energy. It is this topic that we address in the following chapters; neither point of view is supported.

The final battleground that we discuss is legal. As before, it is straightforward to state the opposing viewpoints. The EPCA instructs the DOE to develop efficiency standards based on the energy measured at the point of use for a set of appliances. It also directs the DOE to label the appliances with the energy efficiency information (42 U.S. Code 6294). While the law directs the DOE to consider net energy use when evaluating consumer appliances and setting standards, it also allows the DOE to provide the consumer with "additional information [that] would assist [him] in making purchasing decisions (42 U.S. Code 6294(c)(5))." Source energy advocates claim that the omission of the gross energy consumption information results in inconsistent ratings across consumer goods for which there is a fuel choice – water heaters or homes, for example (AGA 1999). Representatives of the natural gas industry state that because of the relative inefficiency of delivering energy in the form of electricity to consumers, the DOE policies result in a *de facto* preference for electric power at a hefty environmental cost (Kalisch 1998). Since the publication of the supportive language in the Senate and House reports, both the AGA and the EEI have been thorough with their praise or criticism (Krebs 1999; Wethje 1999; CPAES 1998).

## 5. Implementation of current policy

This section is a summary of DOE policy with respect to appliance standards, home energy rating systems (HERS), and the site vs. source issue. The DOE itself describes the legislative history. We quote from it at length:

> The Department of Energy's appliance standards program is conducted pursuant to Title III, Part B of the Energy Policy and Conservation Act (EPCA). 42 U.S.C. 6291-6309. In 1987, EPCA was amended to establish by law national efficiency standards for certain appliances and a schedule for DOE to conduct rulemakings to periodically review and update these standards. National Appliance Energy Conservation Act, Pub. L. 100-12 (1987). The products covered by these standards included refrigerators…In conducting the rulemakings to update the standards, the Secretary of Energy is to set standards at levels that achieve the maximum improvement in energy efficiency that is technologically feasible and economically justified…

12

EPCA also provides for DOE to establish test procedures to be used in evaluating compliance with efficiency standards. These test procedures are revised periodically to reflect new product designs or technologies.

As prescribed by EPCA, energy efficiency standards are established by a three-phase public process: Advance Notice of Proposed Rulemaking (ANOPR); Notice of Proposed Rulemaking (NOPR); and Final Rule. The process to develop test procedures is similar, except that an Advance Notice is not required (DOE-EERE 1996).

The origin of energy policy legislation in the U.S. is the energy crisis of the early 1970s. The EPCA passed in 1975. It successors are the National Energy Conservation Policy Act (NECPA) (1978), the National Appliance Energy Conservation Act (NAECA) (1987) and the Energy Policy Act (EPACT) of 1992. The EPACT outlines the environmental motivation of current energy policy; it contains sections on renewable resources, alternatively-fueled vehicles and the like. For example, the EPACT's "Least Cost Energy Strategy" outlines several measures that "shall be designed to achieve to the maximum extent practicable and at the least cost to the Nation:

> The stabilization and eventual reduction in the generation of greenhouse gases;
>
> An increase in the efficiency of the Nation's total energy use by 30 percent over 1988 levels by the year 2010;
>
> An increase in the percentage of energy derived from renewable resources by 75 percent over 1988 levels by the year 2005…(EPACT, sec. 1502)."

Although standards are promulgated through a site energy measurement of energy use, the DOE bases the standard on several factors. Indeed, the test procedures measure the energy consumed by an appliance at the site but it is only one aspect of the standard setting process. Each standard must satisfy the "technologically feasible and economically justified" provisions of the legislation. Technological feasibility is determined through a series of notices of rulemakings and comments in which manufacturers and retailers comment on various design options for the product. To satisfy the "economically justified" provision of the legislation, the DOE must "determine that the benefits of the standard exceed its burdens, based, to the greatest extent practicable, on a weighing of seven factors (DOE-EERE 1994)." These seven factors are the economic impact on manufacturers and consumers, the life-cycle cost savings of the product, the total energy savings due to the standard, a possible reduction of the performance of the product due to the standard, the possible lessening of

13

competition in the industry, "the need for national energy conservation", and any other factor that the Secretary of Energy determines is relevant (DOE-EERE 1994). Standards are specified in terms of site energy, after weighing a set of factors that includes the source energy consumption of the appliance. The stakeholders – manufacturers, retailers, contractors, builders and consumers – comment on all aspects of the standard setting process, including the unit lifetime, the manufacturing and retail costs, the fuel price scenarios, the range of discount rates, and the test procedures.

The EPCA also instructs the DOE, along with the FTC, to label appliances with information on their energy consumption; the program manifests itself as the conspicuous yellow EnergyGuide stickers that adorn appliances. According to the statute, labels may be developed for any product covered by a standard if the FTC or the DOE "has made a determination with respect to such type [of product] that labeling…will assist purchasers in making purchasing decisions (EPCA Sec. 324)." For water heaters, the format of the label changed in the 1980s, but the information contained on the label remained the same. The EnergyGuide label for water heaters contains information on the annual operating cost and the annual energy consumption (at the point-of-use). There is a hierarchy to the information: the energy consumption information (on the latest version of the label) is prominent and the operating cost information is subordinate. The label provides a range of values (in terms of operating cost in the previous format and energy consumption in the current format) for similar models so that the consumer may compare units against one another. The comparison is for models of the same fuel and similar size and performance.

The available studies of the influence of the EnergyGuide program, and the related EPA Energy Star® program, on consumer behavior is inconclusive. Du Pont and Lord report that "a large percentage of consumers either ignore or misinterpret the labels (du Pont and Lord 1996)." The EPA and DOE Energy Star® logo adorns appliances such as clothes washers, refrigerators, dishwashers, and room air conditioners. According to the EPA, "an appliance receives the Energy Star® rating if it is significantly more energy efficient than the minimum government standards, as determined by standard testing procedures (EPA 1999)." The Energy Star® program encourages consumers to purchase appliances that exceed the DOE minimum efficiency standard. Analyses of the Energy

14

Star® program indicate that while consumers do use this additional piece of information, it does not necessarily give consumers the essential information regarding energy efficiency to influence purchasing decisions.

> Asked if they had seen the Energy Star® logo before, 42 percent of participants registered awareness of it. A few more, 68 percent, had seen the EnergyGuide label and knew what information was on it. Although almost two-thirds claimed the label was considered in their purchasing decision, it was considered only moderately to somewhat useful.
> When presented with choices of ways in which they would like to see energy efficiency information stated, respondents chose "Dollars Saved," closely followed by "Dollars of Operating Costs." (Brown & Whiting 1997).

The labeling programs have not made the transition to the internet: though Sears sells appliances via the world wide web, as of this report its "side-by-side" comparisons of appliances do not include energy efficiency information (Sears 1999).

Residential energy codes are state-level mechanisms for regulating the energy efficiency of homes. The EPACT directs each state to revise its energy codes (both residential and commercial) such that the building code provisions "meet or exceed CABO Model Energy Code, 1992 (EPACT 1992, 304(a)(1))." While states are free to develop and implement building energy codes, the codes are benchmarked against a national standard. The EPACT also directs the DOE to develop a home energy rating system (HERS): "voluntary guidelines that may be used by state and local governments, utilities, builders, real estate agents, lenders, agencies in mortgage markets, and others, to enable and encourage the assignment of energy efficiency ratings to residential buildings (DOE-EERE 1995)." Like the EnergyGuide label, a HERS is supposed to make a connection with the consumer regarding the energy consumption of the purchase and HERS programs already exist in many states. A HERS calculates the energy performance of a home with respect to a standard. According to the DOE: "An accurate home energy rating system will give the lending industry the confidence it needs to underwrite energy efficiency mortgages, offer financing mechanisms, and provide the real estate and appraisal industries with a basis for valuing energy efficiency in the home sale and resale markets (DOE-EERE 1995)." The proposed federal HERS program was site-based and references the MEC as its standard. Regardless of site or source energy, the goal of the HERS rating is to establish a measure for energy efficient mortgages and

15

induce competition for energy efficiency, it is a market-based approach to energy efficiency (Verdict et al. 1998).

The site vs. source issue superceded the market-based goals of the national HERS program. Despite objections to the site-based methodology of the ratings, the AGA and other source energy proponents approved the initial national HERS technical committee guidelines. In response to the notice of public rulemaking, several stakeholders commented on the inadequacy of the site-based ratings. The California Energy Commission (CEC) provided the most succinct explanation: "Under the proposed regulations two homes with identical energy features, except that one has an electric resistance water heater and the other a gas water heater, will receive exactly the same rating. However, the energy bills for these two homes could be widely different with identical patterns of energy consuming behavior. This situation discriminates against natural gas, and creates conflicting signals to consumers and lenders that will reduce the credibility of HERS and reduce investment in energy efficiency (Deter 1995)." In late 1995, the Florida Solar Energy Center, in a test calculation, showed that two similar homes, one with electric appliances and one with natural gas, would receive different ratings: the electric home would be rated higher. During the spring of 1996, a "fuel adjustment factor" became the source of debate (Fairey 1996). When the "adjustment factor" failed to satisfy the AGA that the national HERS had addressed the site vs. source issue, the AGA withdrew from the negotiations. The site vs. source issue killed the national HERS program.

It is not clear that a national HERS program, being voluntary, would actually promote residential energy efficiency. The goal was to institute market-based incentives for energy efficiency as regulatory programs, such as residential energy codes, fell from favor. Jeff Ross Stein and his colleagues at the Lawrence Berkeley National Laboratory have questioned the accuracy of state HERS programs. Stein compared the energy usage of rated homes as predicted by the HERS rating with the actual energy usage in California, Colorado, Kansas, and Ohio. "None of the HERS we examined showed any clear relationship between rating score and total energy use or energy cost (Stein 1997)." The precision of the rating, he concludes, is essential to the widespread acceptance of

16

such a system.  It is questionable that a national program could have achieved higher precision.

## 6.  Two case studies: the national market for electric and natural gas water heaters and state residential energy standards

The site vs. source battle has continued over programs whose effects on the market are unclear: the EnergyGuide label and HERS programs.  Both are the consumer-based components of larger programs in which the measurement of energy is contentious: minimum efficiency standards for appliances and residential energy codes.  Since appliance standards and building codes actively regulate the market, we investigate if these programs have shifted the market for natural gas and electricity due to the use of site or source energy measurement.  Since both sides of the site vs. source debate contend that policies have adversely influenced consumer choices, we focus upon the residential market.

The water heater is an appliance that delivers an essential service to the home and bears a significant load of the household energy use (DOE-EIA 1995).  An installed water heater guarantees consistent energy sales for years or decades.  If DOE policy were to shift the market toward either electricity or natural gas, there would be a corresponding gain and loss of billions of dollars of energy sales.  We investigate the effect of the site-based rating on the national market for water heaters.

Many states responded to the energy crisis through the implementation of building efficiency programs, including residential energy codes.  Though the codes vary considerably among the states, they may be categorized as based upon site or source energy consumption.  Accordingly, we investigate the effect of the code on the sales of electricity and natural gas within the states.  We also assess the performance of the states in reducing per capita energy consumption.

17



**Figure 7. Average site-based share of natural gas and electricity in the *no code*, *group 1*, and *group 2* states from 1970 to 1995.**

## 3.  A preliminary look at the effectiveness of residential energy codes

The purpose of a residential energy code is not to equalize the market for either natural gas or electricity; it is to cost-effectively reduce energy consumption. Therefore, it is important to consider the performance of the codes as measured by the decline in per capita energy consumption and percent change in per capita energy consumption. Figure 8 is a plot of the average per capita energy consumption in the *group 1*, *group 2*, and *no code* states. The energy consumption refers to the total of all fuels used in the residential sector excluding transportation. The average level of annual per capita energy consumption among the three groups of states was within 3 million Btu per capita until 1985, after which the per capita energy consumption in the *group 1* and *no code* states rose and the per capita energy consumption in the *group 2* states remained roughly constant. In 1995, the average per capita energy consumption in the *group 2* states was 64 million Btu per capita, while the average per capita energy consumption in the *no code* and *group 1* states was 75 and 74 million Btu per capita respectively.

**RAND**                                                                    MR-1105.0-DOE



**Figure 8. Average annual residential per capita energy consumption in the three sets of states. The energy includes all fuels consumed in the residential sector excluding transportation.**

The analysis in Appendix A.3 supports the visual observation that the *group 2* states, as a group, maintained residential per capita energy consumption whereas the *no code* and *group 1* states, as groups, did not, with some caveats. First, the results are state-specific: for instance, there are *group 1* states that have energy efficiency performance equivalent to the performance of the *group 2* states - states that have stabilized or reduced residential per capita energy consumption from the level of the mid-1970s. Second, the analysis uses fuel-weighted prices of all energy consumed in the residential sector. A complete analysis, which is beyond the scope of this report, would be fuel-specific and would account for national and state legislation, utility-sponsored efficiency programs, equipment efficiency, building techniques, types, sizes and location among other factors. With those concerns noted, the analysis indicates that there exist substantive differences in the change in per capita energy consumption and that these differences are distributed roughly by the state grouping. The analysis is not causal and additional research is necessary to determine the instigators of change of energy efficiency in the residential sector.

We identify those states that outperform their peers in gains in residential energy efficiency. The figures of merit are the percent decline in per capita energy consumption from the average per capita energy consumption of the mid-1970s (the years preceding

33

MR-1105.0-DOE                                                    RAND

the implementation of most of the energy codes) and the annual rate of decline of per capita energy consumption in the residential sector since energy code implementation. A list of these states appears in Table 2.

| State | Year of residential energy code implementation | Average annual rate of change of per capita source energy consumption calculated from the year of energy code implementation to 1995, $10^6$ Btu per capita per year. | Percent change in per capita source energy consumption from 1970-1978 average to 1988 to 1995 average. |
| --- | --- | --- | --- |
| CA | 1978 | -0.49 | -19.2 |
| UT | 1986 | -0.87 | -13.2 |
| NV | 1975 | -0.32 | -9.9 |
| MA | 1978 | -0.16 | -12.8 |
| OR | 1978 | -0.09 | -6.2 |
| WA | 1975 | -0.27 | -5.4 |

Table 2. States with declines in residential per capita energy consumption from levels in the 1970s and negative rates of change of residential per capita energy consumption.

## 4. Formulating effective residential energy efficiency policy at the state level

> Not later than two years after the date of the enactment of the Energy Policy Act of 1992, each State shall certify to the Secretary that it has reviewed the provisions of its residential building code regarding energy efficiency and made a determination as to whether it is appropriate for such State to revise such residential building code provisions to meet or exceed CABO Model Energy Code, 1992 (EPACT 1992, 304(a)(1)).

The EPACT is very clear with respect to the minimal state efforts for building energy efficiency. To aid in the adoption of this provision, the Alliance to Save Energy, the American Council for an Energy Efficient Economy and the Natural Resources Defense Council established the Building Codes Assistance Project (BCAP) to monitor the progress of the states' efforts in the adoption and enforcement of energy codes. The progress of the states is measured against adoption of the 1992 and 1995 revisions of the Model Energy Code. The 1998 revision of the Model Energy Code is the International Energy Conservation Code, which promises to offer an "international forum for energy professionals to discuss performance and prescriptive code requirements (ICC 1998)." Table 3 contains data on the current status of energy codes as benchmarked against the Model Energy Code, its successor, or equivalent.

34

# EXHIBIT 9

 **AMERICAN PUBLIC GAS ASSOCIATION**

April 30, 2014

Abigail Daken, Product Manager
ENERGY STAR HVAC Program
US Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

RE: Draft 1 Version 3.0 ENERGY STAR® Water Heater specification

Dear Ms. Daken,

The American Public Gas Association (APGA) is pleased to submit comments in response to the US Environmental Protection Agency's (EPA) proposal to revise ENERGY STAR® Water Heater specifications.

APGA is the national association for publicly-owned natural gas distribution systems. There are approximately 1,000 public gas systems in 37 states and over 700 of these systems are APGA members. Publicly-owned gas systems are not-for-profit, retail distribution entities owned by, and accountable to, the citizens they serve. They include municipal gas distribution systems, public utility districts, county districts, and other public agencies that have natural gas distribution facilities.

The recently proposed revisions to the ENERGY STAR® criteria for residential water heaters will introduce product classes for the first time in the water heater market. The market will now be differentiated based on size of less than or equal to 55 gallons and greater than 55 gallons. APGA would like to applaud EPA for recognizing the need for distinct product classes under the ENERGY STAR® program based on technology and size.

APGA agrees there is no need to artificially manipulate the market for gas storage and electric storage water heaters less than or equal to 55 gallons.

However, APGA has serious concerns over the EPA proposal to raise the ENERGY STAR® levels for gas storage greater than 55 gallons and for gas instantaneous water heaters.

The ENERGY STAR® certification program is designed so appliances meet strict performance criteria that are technology and fuel neutral, providing a level playing field for current and future technologies while ensuring a positive consumer experience. However the current proposal is

201 Massachusetts Avenue, NE
Suite C-4
Washington, DC 20002

202.464.2742 (tel)
202.464.0246 (fax)
www.apga.org

ignoring this guiding principle. The notes associated with the proposal clearly illustrate this fact by noting for the electric storage water heaters market:

> *"Most of the units currently available in the market would meet the proposed requirement. However, with the federal standards raising the baseline efficiency level to nearly 2.0 EF, EPA anticipates an increase in the number of units offered at 2.0 EF or higher thus creating product differentiation in the market and also leading to reduction in the price premium of energy efficient products."*

Whereas the notes supporting the proposed increase to the over 55 gallon natural gas water heater market demonstrate there are no products that would meet the new standard:

> *"Currently there are no gas water heaters greater than 55 gallon available in the market that would meet the proposed requirement. However, EPA anticipates that as manufacturers prepare products for the market that meet the forthcoming federal standard, market availability for products that meet the proposed level will grow. An ENERGY STAR level of 0.80 EF will provide sufficient product differentiation between the standard and efficient products."*

The current proposal would eliminate any current over 55 gallons natural gas water heaters from the ENERGY STAR® program and tilt the market 100% towards the electric water heater appliances. By proposing these standards, the ENERGY STAR® certification program is clearly ignoring one of its primary criteria. Furthermore, this change is completely counter to the program objectives. More electric water heaters would equal more energy consumption and more pollution. Below is an example that further illustrates this point. This information was taken from an EPA Presentation to National Academy of Sciences in February 2008.



## Example:  Electric and Gas Water Heaters
### Site vs. Source Energy Comparison

**Comparison of Site Energy, Source Energy, and CO2 Emissions for Comparable Electric and Gas Water Heaters Operating at Minimum Federal Efficiency Levels**

Legend:
- Site Energy
- Source Energy
- CO2 Emissions (assuming national average electricity generation mix)

Electric: 4,936 lbs $CO_2$; 41,323 kBtu; 12,372 kBtu
Gas: 2,278 lbs $CO_2$; 20,490 kBtu; 19,570 kBtu

Left axis: kBtu per year (0–45,000)
Right axis: Pounds of $CO_2$ per year (0–6,000)

**Type of Water Heater (both producing output of 31,025 Btu/day)**

2

The current site-based measurement methods only calculate the energy consumed at the end-use point and hence do not properly account for the total energy consumed. A source or full-fuel-cycle (FFC) analysis examines all impacts associated with energy use, including those from extraction/production, conversion/generation, transmission, distribution, and ultimate energy consumption. The current practice of using site (or point-of-use) measurement fails to account for the impacts between the processes of energy extraction through delivery to the point of final consumption, when comparing energy use intensity of optional fuels.

APGA understands that, under EPCA, DOE is authorized to set energy conservation standards for covered products based on point-of-use. However, there is nothing preventing the EPA under the ENERGY STAR® Program from adopting a superior, more comprehensive methodology which considers FFC. DOE itself has recognized the shortcoming of site-based analysis and the need "to use FFC measures of energy use and GHG and other emissions in the national impact analyses and environmental assessments included in future energy conservation standards rulemakings."[1] DOE has also recognized the importance of making "readily available to consumers and other users of regulated products information on the FFC energy use and emissions associated with specific products, whether or not these other products use the same type of energy."[2] The use of FFC analysis is endorsed by the National Academy of Sciences in a 2009 report.[3] In addition to both the DOE and the Academies recognizing the use of FFC, the ENERGY STAR® Portfolio Manger program is already utilizing and promoting the use source based energy analysis. APGA strongly encourages the EPA to begin to utilize the FFC analysis when establishing standards for ENERGY STAR® certified appliances.

An additional advantage to providing source based energy efficiency data under the Energy Star® Program is that it will help customers to make intelligent purchasing decisions based on an appliance's true potential energy savings and emissions impact.

The final concern APGA has with the proposed standard is the failure to not only recognize the potential environmental harm but also the potential to steer consumers unknowingly towards costlier-to-operate electric appliances. The current proposal fails to recognize the average natural gas water heater is nearly 50% cheaper to operate on a yearly basis when compared to a similar electric water heater.

The Energy Star® Program must continue to recognize the benefits of energy efficient products on the environment. The average electric water heater will emit three tons of $CO_2$ per year compared to the average natural gas water heater that only emits 1.3 tons of $CO_2$ per year. However, the proposed standards will only increase GHG by eliminating the entire market of clean burning natural gas water heaters and advising consumers to purchase the more polluting and expensive-to-operate electric appliances.

---

[1] DOE Statement of Policy, 76 Fed. Reg. 51281, 51282 (2011).
[2] Id.
[3] Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy Efficiency Standards, available at http://www.nap.edu/catalog.php?record_id=12670.

APGA- 3

As the public becomes more aware of their environmental footprint and its impact, the source based or FFC energy efficiency metrics will give consumers the necessary information to aid in decisions that will help them reduce their potential carbon footprint. The use of FFC is already being done within the ENERGY STAR®. Allowing customers to shift to cleaner energy sources will not only have an environmental benefit but it will also have positive health impacts.

APGA thanks the EPA for its consideration of these comments. Please do not hesitate to contact APGA if you would like to further discuss our comments and recommendations.

Respectfully submitted,

Bert Kalisch
President and CEO, American Public Gas Association
202-464-2742
bkalisch@apga.org

APGA- 4

JA249

# EXHIBIT 10

National Association of Home Builders                                    Environmental, Labor, Safety & Health

1201 15th Street NW
Washington, DC  20005

T 800 368 5242 x8538
F 202 266 8056
sasmus@nahb.org

www.nahb.org



October 19, 2010

Ms. Brenda Edwards
U.S. Department of Energy
Building Technologies Program
Mailstop EE-2J
1000 Independence Avenue, SW
Washington, DC 20585-0121

RE:     Notice of Proposed Policy for Full Fuel Cycle Analysis,
        Docket No.  EERE-2010-BT-NOA-0028; RIN 1094-AC24

Dear Ms. Edwards:

On behalf of the 175,000 members of the National Association of Home Builders
(NAHB), I respectfully submit these comments in response to the U.S.
Department of Energy's (DOE) Proposed Policy for Adopting Full-Fuel-Cycle (FFC)
Analyses Into Energy Conservation Standards Program (RIN 1904-AC78), as
published in the Federal Register on August 20, 2010 (75 Fed. Reg. No. 161).

NAHB's membership consists of individuals and firms who develop land and
construct homes and apartments, as well as light commercial and industrial
projects.  NAHB's builder members will construct about 80 percent of the new
housing units projected for 2010, making housing one of the largest engines of
economic growth in the country.  As a leader in promoting energy efficiency and
green practices in our industry, NAHB believes that energy efficiency standards
for residential appliances, particularly water heaters, boilers and furnaces, and
heat pumps, can be a benefit to homeowners.  In fact, the majority of warm air
furnaces installed by NAHB members are 90% efficient or greater.  However,
NAHB is concerned about measuring energy efficiency using an FFC (source)
method instead of the current point-of-use (site) method because "the appliance
standards program is not meant to identify or establish favored energy sources or
technologies for building appliances," which in this case FFC favors natural gas
products over electric products.[1]  We are also troubled over DOE's hasty change

---

[1] The National Academies of Science, *Review of Site (Point-of-Use) and Full-Fuel-Cycle
Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards*, (2009)

Ms. Brenda Edwards
February 23, 2007
Page 2 of 3

of course and in particular the proposed policy to use the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation (GREET) model for determining FFC.

NAHB's initial concerns about the GREET model is the proposal lack of a Technical Support Document to qualify the data provided in the proposal.  NAHB believes increases in energy efficiency must be based on methods and data that are reliable and verifiable.  Nowhere in the proposal or the rulemaking's docket is the GREET model verified.  While NAHB applauds the National Academy of Sciences' (NAS) recommendation that DOE consider moving to FFC, its recommendation was to do so over time.  In fact, NAS cites the GREET model and still states "[T]he committee's acknowledgment of the **additional effort required to develop a full-fuel-cycle measure** of energy consumption is reflected in its recommendation for a **gradual transition** to use of that measure for assessment of national and environmental impacts of energy consumption."[2] (emphasis added)  It appears NAS endorses FFC, but not the GREET model.  Furthermore, the NAS committee recognizes the current uncertainties in the data involved with FFC, which also influenced its recommendation of a gradual transition.  Considering the NAS review was published in 2009, DOE's push for FFC in 2010 appears premature.

With regard to the proposed changes to the federally mandated EnergyGuide labels on all appliances to reflect predicted greenhouse gas (GHG) emissions based on fuel source of the appliance, NAHB concurs with DOE's own negative assessment in the preamble on the utility of such information to consumers.  (*see* 75 Fed. Reg. 51428)  Namely,  to change the current EnergyGuide labels to include the expected GHG emissions of an appliance would require a complex analysis of similar types of appliances using different types of fuel sources (electricity, gas, and propane), and such an analysis does not seem compatible with the current succinct EnergyGuide labels.  Conversely, simplified GHG emissions predictions for appliances is unlikely to reflect the actual GHG emissions consumers would likely see because it fails to consider the actual usage rate of the appliance by the consumer.  Finally, NAHB shares the concerns raised by other stakeholders who question the utility of FFC analysis on EnergyGuide labels for appliances when neither the consumer, nor the homebuilder controls either how energy is generated, or how energy is transmitted into the home.  The usefulness of EnergyGuide labels has stemmed from providing the consumer with an analysis of a given appliance's point-of-use energy efficiency levels, which the consumer can reasonably control by his/her overall use of that product.  NAHB therefore agrees with DOE's own assessment within the preamble that inclusion of FFC analysis on EnergyGuide labels is not warranted at this time.

NAHB welcomes verifiable and reliable policies and practices for setting energy efficiency standards and sees them as a benefit to consumers. However, we cannot

---

[2] *Id.*

Ms. Brenda Edwards
February 23, 2007
Page 3 of 3

endorse the proposed policy specifically because the GREET model lacks technical support data as well as any tacit or actual endorsement by NAS.  Moreover, NAHB agrees that for the purposes of clarity and consistency, the EnergyGuide label should remain in its current format.  Thank you for your consideration of our comments. Please feel free to contact me or Matthew Watkins (202) 266-8327, mwatkins@nahb.org if you have any questions or if you would like to discuss our comments further.

Sincerely,

Susan Asmus
Senior Vice President

JA253

JA254

# EXHIBIT 11

**BEFORE THE**
**OFFICE OF ENERGY EFFICIENCY AND RENEWABLE ENERGY**
**UNITED STATES DEPARTMENT OF ENERGY**
**WASHINGTON, DC**

Statement of Policy for Adopting Full-Fuel-Cycle   EERE-2010-BT-NOA-0028
Analyses Into Energy Conservation Standards Program  RIN 1904-AC24

**COMMENTS OF THE**
**AMERICAN GAS ASSOCATION**

## Introduction

  Pursuant to the Notice of Proposed Policy ("Notice") issued August 20, 2010,[1] the American Gas Association ("AGA") is pleased to submit comments in response to the proposed policy of the U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy ("Department" or "DOE") to adopt full-fuel-cycle analyses into its energy conservation standards program. AGA supports the proposal and encourages the Department to take additional steps to implement the recommendations of the National Academy of Sciences regarding the use of full-fuel cycle measures into the establishment of energy conservation standards.

  AGA, founded in 1918, represents 195 local energy companies that deliver clean natural gas throughout the United States. There are more than 70 million residential, commercial and industrial natural gas customers in the U.S., of which 91 percent — more than 64 million customers — receive their gas from AGA members. AGA is an advocate for local natural gas utility companies and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international gas companies and industry associates. Today, natural gas meets almost one-fourth of the United States' energy needs.[2] AGA members are directly affected by the manner in which the Department develops energy conservation standards, including standards applicable to natural gas appliances as well as standards applicable to appliances where there is a choice of fuel, such as furnaces and water heaters.

## Background

  In the Notice, the Department proposed to incorporate full-fuel cycle analyses into the methods it uses to estimate the likely impacts of energy conservation standards on energy use and greenhouse gas emissions. The Notice stated that the Department is proposing this policy change to implement the recommendation of the National Academy of Sciences that the Department consider moving over time to the use of a full-fuel-cycle measure of energy consumption for assessment of national energy and environmental impacts, especially levels of

---

[1] *Energy Conservation Program for Consumer Products and Certain Commercial and Industrial Equipment; Public Meeting and Availability of Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program*, 75 Fed. Reg. 51,423 (Aug. 20, 2010) ("Notice").
[2] For more information, please visit www.aga.org.

1

greenhouse gas emissions, and providing more comprehensive information on fuel-cycle energy use and emissions to the public through labels and other means, such as an enhanced website. The Notice further stated that the Greenhouse Gases, Regulations Emissions, and Energy Use in Transportation (GREET) model developed by Argonne National Laboratory is a model of full-fuel-cycle energy use and emissions that would be appropriate to use for estimating full-fuel-cycle energy use and emissions associated with proposed energy efficiency standards.

In the Notice, the Department proposed to work with the Federal Trade Commission ("FTC") to make full-fuel-cycle energy and emissions data available to the public to enable consumers to make cross-class comparisons. In particular, the Notice proposed to significantly improve upon the FTC's existing on-line databases by making full-fuel-cycle energy use and greenhouse gas emissions data available to the public. The Notice also sought comment on whether the Department should work with the FTC to provide emissions information on appliance labels.

**Comments**

**I.      AGA Supports DOE's Proposal To Incorporate Full-Fuel-Cycle Analyses Into Its Assessments Of The Energy Consumption And Emissions Impacts Of Energy Conservation Standards.**

AGA believes that customers should have access to useful information regarding the energy consumption and environmental impacts associated with their appliance choices. The Department, working together with the FTC, should provide customers with the information they need to make well-informed decisions about the appliances they purchase. Accordingly, AGA supports the Department's proposals to incorporate full-fuel-cycle analyses into its assessments of the energy consumption and greenhouse gas emissions impacts of appliance energy efficiency standards and to work with the FTC to make such information available to consumers.

Full-fuel-cycle metrics would enable a more comprehensive analysis of the total energy usage and environmental impacts of appliance energy efficiency standards. Full-fuel-cycle metrics are also useful for more accurately calculating the energy consumption and emissions of hybrid or multi-fuel appliances. Full-fuel-cycle metrics would level the playing field for appliances that can use different fuels by providing a proper basis for comparison of energy usage and efficiency. As such, full-fuel-cycle analyses would help move the Department's appliance standards along a path to becoming more fuel-neutral. The Department's proposal is consistent with the National Academy of Sciences' recommendation that the Department consider moving over time to the use of a full-fuel-cycle measure of energy consumption for assessment of national energy and environmental impacts.

As the Department has noted, existing law requires it to develop efficiency standards based on the energy consumed by the appliance at its point of use (site energy).[3] Site energy analysis omits all upstream energy consumption and associated emissions required to deliver the fuel to its point of use. As a result, site energy metrics do not provide an adequate basis for comparing the energy usage or efficiencies of appliances consuming different fuels. More importantly, under site energy not all energy forms are equivalent, creating advantages and disadvantages for certain kinds of energy sources.

---

[3] *See* Notice, 75 Fed. Reg. at p. 51,423.

For example, for appliances that use natural gas most of the energy losses and emissions occur at the point of use. The overall natural gas delivery system, from extraction and production, through processing, transportation, and delivery to end use is relatively efficient – approximately 92 percent of the energy produced reaches the consumer as usable energy. Natural gas appliances appear less efficient on a site energy basis than on a full-fuel-cycle basis, and are thus at a disadvantage since the efficiency of the production and delivery system upstream of the site is ignored.

The Department has previously recognized this inaccuracy in other contexts. In 2000, the Department revised its regulations to provide procedures for calculating the petroleum-equivalent fuel economy of electric vehicles.[4] In that proceeding, the Department concluded as follows:

> When comparing gasoline vehicles with electric vehicles, it is essential to consider the efficiency of the respective "upstream" processes in the two fuel cycles. A full description of the differences in the processes is beyond the scope of this rulemaking, but the critical difference is that a gasoline vehicle burns its fuel on-board the vehicle, and an electric vehicle burns its fuel (the majority of electricity in the U.S. is generated at fossil fuel burning powerplants) off-board the vehicle. In both cases, the burning of fuels to produce work is the least efficient step of the respective energy cycles.[5]

The Department, therefore, developed a method for expressing the relative energy efficiency of the full energy cycles of gasoline and electricity to allow for comparisons across fuel types.[6]

In order to provide a fair basis for comparison of appliances that can use different fuels, the Department should analyze efficiency standards on a full-fuel-cycle basis. AGA therefore supports the Department's proposal to incorporate full-fuel-cycle analyses into its assessments of the energy consumption and greenhouse gas emissions impacts of appliance energy efficiency standards.

II.   **AGA Supports DOE's Proposed Use Of The GREET Model To Derive Full-Fuel-Cycle Conversion Factors.**

AGA supports the Department's intent to supplement its current use of the National Energy Modeling System with its proposed use of the GREET model to perform the national impact analyses and environmental assessments included in the review of proposed energy conservation standards. There has been some debate in years past over how best to derive the factors for converting site energy consumption to full-fuel-cycle energy consumption. AGA believes that the GREET model provides an adequate modeling platform for the calculation of energy consumption and greenhouse gas emissions data as part of the Department's energy conservation standards program. The gas industry is united on this point. On September 30, 2010, AGA, along with several other gas industry associations and organizations, sent a letter to

---

[4] *See Electric and Hybrid Vehicle Research, Development, and Demonstration Program; Petroleum-Equivalent Fuel Economy Calculation*, 65 Fed. Reg. 36,986 (June 12, 2000).
[5] *Id.* at p. 36,987.
[6] *Id.*

3

# EXHIBIT 12

**U.S. DEPARTMENT OF ENERGY** | Energy Efficiency & Renewable Energy

# A Common Definition for Zero Energy Buildings

September 2015

Prepared for the U.S. Department of Energy by
The National Institute of Building Sciences



*NREL Research Support Facility, photo credit: Bill Gillies, NREL*

The *site boundary* for a Zero Energy Building (ZEB) could be around the *building* footprint if the *on-site renewable energy* is located within the *building* footprint, or around the *building site* if some of the *on-site renewable energy* is on-site but not within the *building* footprint. *Delivered energy* and e*xported energy* are measured at the *site boundary*.

The *site boundary* for a *Zero Energy Campus* allows for the *building sites* on a *campus* to be aggregated so that the combined *on-site renewable energy* could offset the *combined building energy* from the buildings on the *campus*. The *site boundary* for a *Zero Energy Community* or *Zero Energy Portfolio* would allow a group of project sites at different locations to be aggregated so that the combined *on-site renewable energy* could offset the combined *building energy* from the aggregated project sites. *Zero Energy Communities* can share the benefit of *renewable energy* projects in the *community* that pool investments from multiple *building* owners and provide power benefits in return.

## Energy Accounting and Measurements

A ZEB is typically a grid-connected *building* that is very *energy* efficient. The premise is that ZEBs use the electric grid or other *energy* networks to transfer any surplus of *on-site renewable energy* to other users.

ZEB *energy* accounting would include *energy* used for heating, cooling, ventilation, domestic hot water (DHW), indoor and outdoor lighting, plug loads, process *energy* and transportation within the *building*. Vehicle charging *energy* for transportation inside the *building* would be included in the *energy* accounting. *On-site renewable energy* may be exported through transmission means other than the electricity grid such as charging of electric vehicles used outside the building.

*Delivered energy* to the *building* includes grid electricity, district heat and cooling, renewable and non-renewable fuels. A ZEB balances its *energy* use so that the *exported energy* to the grid or other energy network (i.e., *campus* or *facility*) is equal to or greater than the *delivered energy* to the *building* on an *annual* basis.

A ZEB may only use *on-site renewable energy* in offsetting the *delivered energy*. *On-site renewable energy* is *energy* produced from *renewable energy* sources within the *site boundary*. Renewable fuels delivered to the *site boundary* are not included in this term, because they are treated as *delivered energy* to the *building*, i.e. off-site renewables. For example, wood chips or biofuel harvested on-site would be considered on-site renewable energy, while wood or biofuel/biomass delivered to the site would not be considered *on-site renewable energy*. The ZEB *energy* accounting does not allow non-renewable *energy* that is exported from the *site boundary* to offset *delivered energy*.

*On-site renewable energy* production systems may supply *building energy*, thus reducing the need for the *delivered energy* to the *building*, and/or may be directly exported to *energy* networks. This is taken into account in the net *delivered energy* balance. *Zero Energy Campuses*, *Portfolios* and *Communities* can combine the *on-site renewable energy* among different sites under an aggregated *site boundary* to balance the *delivered energy*.

## Source Energy Calculations

Most *building managers* are familiar with *site energy*, the amount of *energy* consumed by a *building* as measured by utility meters. *Site energy* consumption can be useful for understanding the performance of the *building* and the *building* systems, but it does not tell the whole story of impacts from resource consumption and emissions associated with the *energy* use. In addition, *site energy* is not a good comparison metric for *buildings* that have different mixes of *energy* types, *buildings* with on-site *energy* generation, such as photovoltaics, or *buildings* with cogeneration units. Therefore, to assess the relative efficiencies of *buildings* with varying fuel types, it is necessary to convert these types of *energy* into equivalent units of raw fuel consumed in generating one unit of *energy* consumed on-site. To achieve this equivalency, the convention of *source energy* is utilized.

When *energy* is consumed on-site, the conversion to source energy must account for the energy consumed in the extraction, processing and transport of primary fuels such as coal, oil and natural gas; energy losses in thermal combustion in power generation plants; and energy losses in transmission and distribution to the building site. The Zero Energy Building definition uses national average ratios to accomplish the conversion to source energy because

7

JA260

the use of national average source-site ratios ensures that no specific building will be credited (or penalized) for the relative efficiency of its energy provider(s).

*Source energy* is calculated from *delivered energy* and *exported energy* for each *energy* type using source *energy conversion* factors. *Source energy* conversion factors are applied to convert *energy* delivered and exported on-site into the total equivalent *source energy*. The *source energy* conversion factors utilized are from ASHRAE Standard 105 . While *on-site renewable energy* is a carbon-free, zero-energy-loss resource, when it is exported to the grid as electricity, it displaces electricity that would be required from the grid.  In ZEB accounting, the *exported energy* is given the same *source energy* conversion factor as the *delivered energy* to appropriately credit its displacement of delivered electricity. Table 1 summarizes the national average *source energy* conversion factors for various energy types.

### Table 1 – National Average Source Energy Conversion Factors

| Energy Form | Source Energy Conversion Factor (r) |
|---|---|
| Imported Electricity | 3.15 |
| Exported Renewable Electricity | 3.15 |
| Natural Gas | 1.09 |
| Fuel Oil (1,2,4,5,6,Diesel, Kerosene) | 1.19 |
| Propane & Liquid Propane | 1.15 |
| Steam | 1.45 |
| Hot Water | 1.35 |
| Chilled Water | 1.04 |
| Coal or Other | 1.05 |

*Source energy* would be calculated using the following formula:

$$E_{source} = \sum_i (E_{del,i} r_{del,i}) - \sum_i (E_{exp,i} r_{exp,i})$$

Where

$E_{del,i}$ is the delivered energy for energy type $i$;

$E_{exp,i}$ is the exported on-site renewable energy for energy type $i$;

$r_{del,i}$ is the source energy conversion factor for the delivered energy type $i$;

$r_{exp,i}$ is the source energy conversion factor for the exported energy type $i$;

### Example Calculation for All Electric ZEB

A *building* has the following actual *annual delivered energy* of 300,000 kBtu electricity. The on-site renewable *exported energy* is 320,000 kBtu electricity from photovoltaics. (Note: The equation is using *energy* transferred across the *site boundary* and does not include *on-site renewable energy* consumed by the building.)

Using the formula above, the *annual* source energy balance would be:

$$E_{source} = (300,000 kBtu \times 3.15) - (320,000 kBtu \times 3.15)$$

$$= 945,000 kBtu - 1,008,000 kBtu$$

$$= -63,000 kBtu$$

Since $E_{source} \leq 0$, the building would be a *Zero Energy Building*.

### Example Calculation for ZEB with Multiple Delivered Energy Types

A *building* has the following actual *annual delivered energy* types: 200,000 kBtu electricity, 60,000 kBtu natural gas and 100,000 kBtu chilled water. The on-site renewable *exported energy* is 260,000 kBtu electricity from photovoltaics.

Using the formula above, the *annual source energy* balance would be:

$$E_{source} = [(200,000 kBtu \times 3.15) + (60,000 kBtu \times 1.09) + (100,000 kBtu \times 1.04)] - (260,000 kBtu \times 3.15)$$

$$= 799,400 \ kBtu - 819,000 kBtu$$

$$= -19,600 kBtu$$

Since $E_{source} \leq 0$, the building would be a *Zero Energy Building*.

### Example Calculation for ZEB with Combined Heat and Power (CHP)

A *building* with CHP has the following actual *annual delivered energy* types: 120,000 kBtu electricity and 260,000 kBtu natural gas. The on-site renewable *exported energy* is 210,000 kBtu electricity from photovoltaics.

Using the formula above, the *annual source energy* balance would be:

$$E_{source} = [(120,000 \ kBtu \times 3.15) + (260,000 \ kBtu \times 1.09)] - (210,000 \ kBtu \times 3.15)$$

$$= 661,400 \ kBtu - 661,500 \ kBtu$$

$$= -100 \ kBtu$$

Since $E_{source} \leq 0$, the building would be a *Zero Energy Building*.

9

# EXHIBIT 13

**FC1142 - 2018 - G - 428**
**RECEIVED 2018 JUN 29 3:06 PM (E)**

**PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA**
**1325 G STREET, N.W., SUITE 800**
**WASHINGTON, D.C. 20005**

**ORDER**

**June 29, 2018**

**FORMAL CASE NO. 1142, IN THE MATTER OF THE MERGER OF ALTAGAS LTD.**
**AND WGL HOLDINGS, INC., Order No. 19396**

## I.    INTRODUCTION

1.      By this Order, the Public Service Commission of the District of Columbia
("Commission") approves the Unanimous Agreement of Stipulation and Full Settlement
("Settlement Agreement")[1] filed by AltaGas Ltd. ("AltaGas" or "Company"), WGL Holdings, Inc.
("WGL Holdings"), and Washington Gas Light Company ("WGL") (collectively, "Joint
Applicants"); the Office of the People's Counsel for the District of Columbia ("OPC"); the
Apartment and Office Building Association of Metropolitan Washington ("AOBA"); the District
of Columbia Government ("DCG"); the Department of Defense/Other Federal Executive Agencies
("DoD/FEA"); the National Consumer Law Center/National Housing Trust/National Housing
Trust-Enterprise Preservation Corporation ("NCLC"); the Baltimore Washington Construction &
Public Employees Laborers' District Council ("LiUNA"); and the Office and Professional
Employees International Union Local 2, AFL-CIO ("OPEIU") (collectively, "the Settling
Parties").  This Order also gives final approval to the Merger Application[2] ("Joint Application")
filed by AltaGas, WGL Holdings, and WGL pursuant to D.C. Code §§ 34-504 and 34-1001,
subject to the conditions in this Order and Appendix A.[3]   The Settling Parties shall have five (5)
days to indicate to the Commission whether they accept the conditions outlined in this Order and
in Appendix A.

## II.    BACKGROUND

2.      On April 25, 2017, the Commission opened this proceeding to review the merger
Application filed by the Joint Applicants pursuant to D.C. Code § 34-504 and § 34-1001 on April
24, 2017.[4]   The Joint Applicants proposed to merge WGL Holdings, the parent of WGL, and
Wrangler Inc. ("Merger Sub"), a wholly-owned indirect subsidiary of AltaGas (the "Proposed

---

[1]      *Formal Case No. 1142, In the Matter of the Merger of AltaGas Ltd. and WGL Holdings, Inc.,* **("***Formal Case No. 1142")*****,** Consent Motion to Reopen the Record in Formal Case No. 1142 to Allow for Consideration of Unanimous Full Settlement Agreement and Stipulation, and to Waive Hearing on Proposed Settlement ("Consent Motion"), filed May 8, 2018.

[2]      *Formal Case No. 1142,* Application of AltaGas Ltd., WGL Holdings, Inc. and Washington Gas Light Company ("Joint Application"), filed April 24, 2017.

[3]      D.C. Code §§ 34-504 and 34-1001 (2001 Ed.).

[4]      *Formal Case No. 1142,* Public Notice, rel. April 25, 2017.

<u>Order No. 19396, Appendix A</u>                                                    **Page 1**

**<u>UNANIMOUS AGREEMENT OF STIPULATION</u>**
**<u>AND FULL SETTLEMENT</u>**

**<u>DEFINED TERMS</u>**

"<u>AltaGas</u>" means AltaGas Ltd.

"<u>Applicants</u>" means AltGas Ltd., WGL Holdings, Inc., and Washington Gas Light Company.

"<u>ASUS</u>" means AltaGas Services (U.S.) Inc.

"<u>AUHUS</u>" means AltaGas Utility Holdings (U.S.) Inc.

"<u>Commission</u>" means the Public Service Commission of the District of Columbia.

"<u>Greater Washington, D.C. metropolitan area</u>" includes each county, city or township in which Washington Gas is authorized to provide natural gas distribution service.

"<u>Independent Director</u>" means an individual who satisfies the New York Stock Exchange's ("NYSE") definition of "independent" and does not have any other relationship with AltaGas or any of its affiliates that a majority of either the Washington Gas board or the AltaGas board determines would impact the independence of the individual from the management of AltaGas and its affiliates.

"<u>Low-income customers</u>" are those customers whose gross annual household income is at or below 200 percent of the federal poverty level.

"<u>Material Adverse Effect</u>" means any event, circumstance, occurrence, or change which materially impairs or has a material adverse effect on, or would reasonably be expected to materially impair or have a material adverse effect on: a) either the overall financial condition of AltaGas and its consolidated affiliates and subsidiaries, or b) the ability of AtlaGas and AltaGas Services (U.S.) Inc (the borrowers), to repay the borrowings under the $3 billion term credit facility (the acquisition bridge loan) with JP Morgan Chase Bank, NA (the agent) and other financial institutions.  Such Material Adverse Effects would include, but not be limited to, an event of default and/or a breach of a covenant, under the terms of the above $3 billion term credit facility.

"<u>Merger</u>" means the merger among AltaGas, Wrangler, Inc. (an indirect, wholly-owned subsidiary of AltaGas), and WGL, which shall have the effect of WGL becoming an indirect subsidiary of AltaGas.

"<u>Merger Close</u>" or "<u>Merger Closing</u>" means the date the Merger is consummated.

Page **1** of **30**

JA265

war or terrorism, other utility company work and/or construction or District initiatives, changes in regulatory requirements, or other force majeure circumstances. Washington Gas shall meet the above hazardous leak reduction targets via multiple methods of their choice.

74.     AltaGas and Washington Gas shall, within twelve (12) months after Merger Close, develop a proposal to accelerate PROJECTpipes to a 30-year program rather than a 40-year program.

75.     <u>Customer Service Root Cause Analysis:</u> Consistent with American Society for Quality (ASQ) principles, Washington Gas shall be required to have a root cause analysis (RCA) conducted of performance categories not meeting established service levels, and develop an action plan to improve Washington Gas' overall customer satisfaction scores in the deficient categories. The RCA shall investigate service level deficiencies that may include billing, SAP and eService system reliability and customer service. The analysis also must provide a solution or action plan to improve service levels by linking appropriate performance metrics/initiatives to the primary cause identified in the RCA. An independent ASQ-certified professional with expertise in root-cause analyses will perform the RCA. Washington Gas will file this analysis and action plan with the District of Columbia Public Service Commission no later than twelve (12) months after Merger Close and provide interested parties with the opportunity to comment on the RCA. Washington Gas shall apply the documented and recommended solution(s) after a review period, not to exceed six months. The costs incurred by Washington Gas in preparing and filing the RCA will not be recovered from District of Columbia Customers in Washington Gas' rates.

76.     AltaGas recognizes the scientific consensus that human activity – primarily GHG emissions and the conversion of land for agriculture and development – is contributing to changes in the global climate including changing weather patterns, rising sea levels and more extreme weather events. AltaGas believes that actions must be taken now to stabilize and reduce emissions in line with the international goal of preventing temperatures from rising more than two degrees Celsius by the end of this century. Climate change presents risks to AltaGas and its operations, but also provides it with an opportunity to be part of the solution. These factors underlie AltaGas's commitment to continued change and improvement in its operations, and provide an evolving portfolio of clean and renewable products and services to communities AltaGas serves.

77.     The Applicants recognize that the District of Columbia and the Government of the United States retain the full right to enact bona fide laws and regulations in relation to the production and distribution of natural gas and other carbon-based energy sources.  Nothing in this Settlement Agreement or the Commission's orders restrict or alter these rights, or creates or implies any limitation on the District of Columbia or its agencies, or on the Government of the United States and its agencies, with respect to future measures in this regard.    This includes measures

to address climate change and other public interest issues such as air quality, and including the District's Sustainable DC Plan and Clean Energy Plan.

78.    The Applicants expressly acknowledge that the Commission, by approving the Merger and adopting the terms of this Settlement Agreement, is not creating any special expectations to induce AltaGas, as an entity covered by North American Free Trade Agreement ("NAFTA"), to close the Merger.

79.    By January 1, 2020, AltaGas will file with the Commission a long-term business plan on how it can evolve its business model to support and serve the District's 2050 climate goals (e.g., providing innovative and new services and products instead of relying only on selling natural gas).  After the business plan is filed, AltaGas will hold bi-annual public meetings to report on and discuss its progress on the business plan.

80.    Washington Gas shall provide and maintain a performance guarantee of $20 million for the benefit of the District of Columbia to meet current and future environmental study and clean-up obligations under CERCLA or other Federal or District law(s) regarding sites or substances in the District relating to the Anacostia River or any other site.  The performance guarantee shall be in a form substantially similar to that for the 2012 Consent Decree for East Station.  The instant paragraph neither admits nor limits responsibility or liability.  The performance guarantee shall be issued no later than 28 days from merger close.  The costs associated with providing and maintaining this performance guarantee shall not be recovered in rates.  Should a Material Adverse Effect occur, the Commission may require an additional performance guarantee, such as a surety bond, irrevocable letter of credit, trust fund, or insurance policy.

81.    Washington Gas will file its next base rate case no earlier than 34 months from the date of the Commission's most recent base rate order (i.e., no earlier than January 3, 2020).

82.    AltaGas and Washington Gas shall actively assist in promoting the number of income-eligible District residents who become aware of and apply for the Earned Income Tax Credit.  To do so, the Applicants will utilize their ability to communicate with customers and the public through various means such as: bill stuffers and bill messages, interactions between customers and the company's customer service representatives on the phone and walk-in visits, newsletters, e-mails, advertising, and displaying information in their physical office locations. AltaGas and WGL also commit to making a financial contribution to the D.C. EITC Campaign of $250,000 to offset the cost of critical outreach activities, including, but not limited to, paid media and access to free tax preparation services.  No portion of the funding will be recovered in utility rates.  They shall coordinate their efforts with existing groups promoting awareness of the Earned Income Tax Credit, including Capital Area Asset Builders and the D.C. EITC Campaign, a partnership of D.C. government, business, and nonprofit organizations to promote the EITC and other tax benefits for low-income workers.  The Applicants shall coordinate

their efforts to focus their outreach and communications efforts on customers on the RES discount and who receive fuel assistance payments on their accounts. They will consider making in-kind contributions to other groups working on EITC outreach.

83.      AltaGas, Washington Gas, and WGL agree that each of them are subject to D.C. Code § 34-706, in addition to any other penalties provided by law, to enforce the provisions of any order approving this Settlement Agreement. Payment of any penalties will be made by the entity, or entities, upon which compliance responsibility falls under this Settlement Agreement. No payments under this paragraph shall be recovered in rates.

84.      Commencing in the first quarter after Merger Close, and quarterly thereafter, the Applicants will file with the Commission updates on the Applicants' post-closing acquisition financing plan, including updates on how the Applicants are paying down the bridge loan. These reports may be filed confidentially. This reporting requirement shall terminate when the bridge loan is paid in full. The Applicants acknowledge that the Commission has the right to open an investigation and take actions that are necessary to protect Washington Gas should a Material Adverse Effect occur.

85.      The Applicants agree to work with Commission staff to implement a mutually agreeable method to provide construction notices, consistent with the provisions of Virginia safety Commitment No. 15, through an online database or another efficient method. The Applicants agree to expand the currently available reporting data provided to Commission staff, to also encompass appropriate detailed reporting elements outlined in Virginia safety Commitment No. 17 (a-i), with respect to construction project reporting. Such reporting will be implemented within six months of Merger Close.

# EXHIBIT 14

UNITED STATES OF AMERICA
BEFORE THE
DEPARTMENT OF ENERGY

| | | |
|---|---|---|
| Department of Energy's Supplemental Notice | ) | EERE–2010–BT–STD–0031 |
| of Proposed Rulemaking on Clean Energy | ) | RIN 1904-AB96 |
| for New Federal Buildings and Major | ) | 87 Fed. Reg. 78,382 |
| Renovations of Federal Buildings | ) | |
| | ) | |

## <u>COMMENTS OF</u>

## <u>WASHINGTON GAS LIGHT COMPANY</u>

February 21, 2023

JA270

## I.      Introduction

Washington Gas Light Company ("Washington Gas" or "Company") is pleased to submit these comments on the U.S. Department of Energy's (DOE) Supplemental Notice of Proposed Rulemaking ("SNOPR") -- *Clean Energy for New Federal Buildings and Major Renovations of Federal buildings* – to "establish revised energy performance standards for the construction of new Federal buildings and major renovation of existing Federal buildings".[1] This DOE proposal would limit on-site fossil fuel use in newly built federally-owned or leased buildings, and buildings that undergo renovations (at a cost of at $3.375 million and above for public Federal buildings and $2.5 million and above for private Federal buildings). The Company's comments focus on timing, cost, and the beneficial role of energy efficiency and lower and zero-carbon fuels, including geologic and renewable gases, in meeting Federal building greenhouse gas emissions reduction goals while maintaining safety, security, reliability, resiliency and affordability. The company also raises the importance of affordability and equity that have been excluded from consideration in this SNOPR.

Washington Gas was formed to serve the needs of the Federal Government. The company was founded in 1848, through a Congressional charter signed into law by President James K. Polk to light the Capitol and surrounding area. As the 20th Century dawned, Washington Gas expanded into Virginia and Maryland. Today, Washington Gas is marking its 175th year of natural gas service to more than 1.2 million residential, commercial, and industrial customers in the District of Columbia, Maryland, and Virginia. Washington Gas operates approximately $5 billion in natural gas system assets, delivering safe, affordable, and reliable energy to its customers across its service territory.

Of relevance to this SNOPR, Washington Gas delivers reliable energy to federal government buildings providing national security, cultural, medical, and other services. These buildings include the White House, the Architect of the Capitol, Department of State, the National Institutes of Health, multiple military bases, the Smithsonian Institution, the General Services Administration (GSA), Food and Drug Administration (FDA), U.S. Postal Service, and DOE. Natural gas delivery to buildings that house various Federal operations account for a material volume of the natural gas delivered by Washington Gas.

## II.     Washington Gas is committed to working with our government partners to reduce greenhouse gas emissions

The Company is committed to continued collaboration with DOE and other Federal agency partners, state energy agencies, public utility commissions in its service territory, and its customers to help achieve greenhouse gas reduction goals, while maintaining safety, security, reliability, resiliency, and affordability.[2]

The Company provides the region with a vast energy delivery and storage system that instantaneously meets customer demand 24/7 with 99% reliability. The Company is also focused on promoting the efficient use of energy that, in turn, reduces greenhouse gas emissions.

---

[1] Federal Register: Clean Energy for New Federal Buildings and Major Renovations of Federal Buildings

[2] Washington Gas Climate Business Plan

RESPONSE TO DOE SNOPR PROPOSAL                                                                 2

The Company supports an array of energy efficiency programs and incentives and believes that the efficient use of energy, on a site-to-source basis, should precede efforts to mandate broad scale electrification. The Company further believes that the current and future carbon intensity of the supporting grid should be fully assessed before pathways toward increased electrification are pursued.

As Washington Gas pursues initiatives that reduce customer usage and associated emissions, it is simultaneously reducing emissions on its distribution system through enhanced operations, including advanced leak detection and mitigation measures, as well as overall system modernization.

Finally, the Company is helping to reduce emissions from upstream production by purchasing geologic gas from producers that have been third-party certified for lower emissions intensity. Washington Gas intends to leverage its existing system to further reduce GHG emissions by decarbonizing its gas supply through hydrogen blending and the introduction of lower carbon biogenic and synthetic renewable gases. A description of these and other emissions reduction pathways are articulated in the Company's Climate Business Plan and the 5- and 30-year Climate Actions Plans, all of which have been filed in the public record with the DC Public Service Commission.[3]

The Company's vision for the energy future[4] includes highly efficient gas appliances and applications, as well as hybrid gas/electric thermal offerings with increasing levels of renewable energy. Leveraging the existing natural gas system ensures that peak winter demand is reliably met during a period of increased demand from vehicle and building electrification and general economic growth. Grid capacity during peak demand periods has been further challenged by the introduction of intermittent renewable generation that lacks viable, at-scale storage capacity. Washington Gas sees an opportunity to address this storage challenge by capturing excess, otherwise curtailed, renewable electricity to produce hydrogen that can be stored for thermal applications or dispatchable electric generation. The Company strongly believes there is no single-source solution to reach carbon neutrality while adequately meeting customers' growing energy needs while also remaining affordable.

The Company is also pursuing Investment Infrastructure & Jobs Act (IIJA) investments to accelerate the adoption of lower carbon fuels (e.g., hydrogen and renewable fuels) in support of DOE's decarbonization efforts as well as the development of a strong national hydrogen economy. Washington Gas recognizes that a reliable delivery infrastructure will be needed to fully bring this to fruition, and the Company is poised to provide that vital infrastructure. To achieve carbon neutrality goals, the federal government must direct investment into research and development, deployment, and commercialization of advanced gas technologies for distributed generation, renewable natural gas production, renewably sourced hydrogen as well as carbon capture utilization and sequestration, and other technologies that promote a diversified, reliable, carbon neutral energy future.

---

[3] https://washingtongasdcclimatebusinessplan.com/

[4] Washington Gas 5-year and 30-year Climate Action Program and Roadmap

JA272

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>    **Defendant.** | **No. 1:24-cv-02942-ACR** |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h)(1) and this Court's Standing Order [15], Defendant

District of Columbia (the District) submits this Statement of Undisputed Material Facts in

support of its Motion for Summary Judgment.

| DEFENDANT'S FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 1. The Clean Energy DC Building Code Amendment Act of 2022 (the Clean Buildings Act) was unanimously passed by the D.C. Council.  Def.'s Ex. 1, D.C. Council, Certification Record: B23-0420 (July 19, 2022). | |
| 2. The Mayor approved the Clean Buildings Act.  69 D.C. Reg. 11,947 (Oct. 7, 2022). | |
| 3. The Clean Buildings Act cleared congressional review.  *Id.* | |
| 4. In considering the Clean Buildings Act, the Committee on Transportation and the Environment found that "energy production for buildings is by far the largest source of greenhouse gas emissions in the District." Def.'s Ex. 2, Clean Energy DC Building Code Amendment Act of 2022 Comm. Rep. (Comm. Rep.) at 5. | |
| 5. The Committee found that "reducing buildings' energy burden and reliance on | |

| | |
|---|---|
| fossil fuels for energy is critical to [the District's] emissions reduction goals." *Id.* | |
| 6. In considering other climate legislation, the Committee found that achieving emissions goals "is necessary to avoid or mitigate the most catastrophic possible effects of climate change." Def.'s Ex. 3, Climate Commitment Amendment Act of 2022 Comm. Rep. at 2. | |
| 7. The Committee found that the Clean Buildings Act would not only cut emissions but also reduce "exposure to the harmful pollutants that natural gas combustion releases into the air" and "offer owners and tenants significant savings on energy bills." Comm. Rep. at 6. | |
| 8. The Construction Codes Coordinating Board has approved a new version of Appendix Z. Def.'s Ex. 4, Constr. Codes Coordinating Bd. Minutes at 4. | |

Date: May 28, 2025.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

2

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*,<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>     **Defendant.** | **No. 1:24-cv-02942-ACR** |

## PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 7(h) and this Court's standing order (ECF 15), Plaintiffs

respectfully submit this Counter-Statement of Undisputed Facts.

| Defendant | Plaintiffs |
|---|---|
| 1. The Clean Energy DC Building Code Amendment Act of 2022 (the Clean Buildings Act) was unanimously passed by the D.C. Council. Def.'s Ex. 1, D.C. Council, Certification Record: B23-0420 (July 19, 2022). | Undisputed. |
| 2. The Mayor approved the Clean Buildings Act. 69 D.C. Reg. 11,947 (Oct. 7, 2022). | Undisputed. |
| 3. The Clean Buildings Act cleared congressional review. *Id.* | Undisputed. |
| 4. In considering the Clean Buildings Act, the Committee on Transportation and the Environment found that "energy production for buildings is by far the largest source of greenhouse gas emissions in the District." Def.'s Ex. 2, Clean Energy DC Building Code Amendment Act of 2022 Comm. Rep. (Comm. | Undisputed. |

| | |
|---|---|
| Rep.) at 5. | |
| 5. The Committee found that "reducing buildings' energy burden and reliance on fossil fuels for energy is critical to [the District's] emissions reduction goals." *Id.* | Undisputed. |
| 6. In considering other climate legislation, the Committee found that achieving emissions goals "is necessary to avoid or mitigate the most catastrophic possible effects of climate change." Def.'s Ex. 3, Climate Commitment Amendment Act of 2022 Comm. Rep. at 2. | Undisputed. |
| 7. The Committee found that the Clean Buildings Act would not only cut emissions but also reduce "exposure to the harmful pollutants that natural gas combustion releases into the air" and "offer owners and tenants significant savings on energy bills." Comm. Rep. at 6. | Undisputed. |
| 8. The Construction Codes Coordinating Board has approved a new version of Appendix Z. Def.'s Ex. 4, Constr. Codes Coordinating Bd. Minutes at 4. | Undisputed. |

2

Respectfully submitted,


BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. MARK LITTLE [admitted pro hac vice]
910 Louisiana Street
Houston, TX 77002
Phone: (713) 229-1489
Email: mark.little@bakerbotts.com

SCOTT NOVAK [1736274]
700 K St NW
Washington, D.C. 20001
Phone: (202) 639-1316
Email: scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders*
*of the United States, Restaurant Law Center,*
*National Apartment Association, Maryland Building*
*Industry Association, and Washington Gas Light*
*Company*


RESTAURANT LAW CENTER

/s/ *Angelo Amador*
ANGELO AMADOR [480031]
2055 L St NW
Washington, D.C. 20036
Phone: (202) 331-5913
Email: AAmador@restaurant.org

*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

/s/ *Brian Petruska*
BRIAN PETRUSKA [498321]
1875 Explorer Dr, Ste. 920
Reston, VA 20190
Phone: (703) 860-4194
Email: bpetruska@maliuna.org

*Counsel for Philadelphia-Baltimore-Washington*
*Laborers' District Council*

3

MOONEY, GREEN, SAIDON, MURPHY &
WELCH, P.C.


/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
Phone: (202) 783-0010
Email: lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

# EXHIBIT 15

FC1167 - 2025 - M - 307
RECEIVED 2025 JUN 9 4:30 PM



1000 Maine Avenue, SW
Suite 700
Washington, DC 20024
**www.washingtongas.com**

jdodge@washgas.com

June 9, 2025

**VIA ELECTRONIC FILING**

Brinda Westbrook-Sedgwick
Commission Secretary
Public Service Commission of the District of Columbia
1325 "G" Street, N.W., 8th Floor
Washington, D.C. 20005

**Re: FC 1167 [Washington Gas's 15-Year Plan]**

Dear Ms. Westbrook-Sedgwick:

Pursuant to Order Nos. 22313 and 22339 in the above-referenced proceeding Washington Gas Light Company hereby submits its 15-Year Plan.

Please direct questions regarding the Proposal to the undersigned.

Sincerely,

John C. Dodge
Associate General Counsel and Director,
Regulatory Matters

cc: Per Certificate of Service

JA281

**BEFORE THE**
**PUBLIC SERVICE COMMISSION**
**OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| THE IMPLEMENTATION OF ELECTRIC | ) |
| AND NATURAL GAS CLIMATE CHANGE | ) |
| PROPOSALS | )          Formal Case No. 1167 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**WASHINGTON GAS LIGHT COMPANY'S 15-YEAR PLAN SUBMISSION**

Washington Gas Light Company ("Washington Gas" or the "Company") submits the following 15-Year Plan in response to Order Nos. 22313 and 22339 of the Public Service Commission of the District of Columbia ("Commission").[1] In particular, Order No. 22313 instructed Washington Gas and Potomac Electric Power Company ("Pepco") to file 15-Year Plans that include an "analysis of changes to consumption in the residential and commercial markets" and "expected GHG emissions reductions as a result of the . . . new 15-Year Plans, including detailed explanation of the proposed methodologies for calculating reductions and evaluating progress toward the District's climate goals."[2] Importantly, this order also emphasized that the 15-Year Plans should "ensure that they effectively serve the public interest by advancing the District's climate policy commitments while ensuring safe, reliable, and reasonable rates for District consumers."[3]

---

[1] *Formal Case No. 1167, In the Matter of the Implementation of Electric and Natural Gas Climate Change Proposals* ("*Formal Case No. 1167*"), Order No. 22339 (Dec. 10, 2024); *Formal Case No. 1167*, Order No. 22313 (Oct. 10, 2024).

[2] Order No. 22313, at 12.

[3] *Id.* at 11.

1

As such, Washington Gas's 15-Year Plan first presents a Base Forecast that includes the Company's anticipated customer counts, demand, and greenhouse gas emissions over the next 15 years, assuming existing rules and regulations remain in place, including the Clean Energy DC Building Code Amendment Act of 2022.[4] Importantly, this Base Forecast *does not* include future emission reduction options the Company may pursue after presenting those detailed plans to the Commission and obtaining the necessary Commission approval to move forward with them.  In order to evaluate such future emission reduction options, the 15-Year Plan undertakes an initial presentation and assessment of a variety of potential emission reduction options the Company could pursue with Commission approval that are available now and could be deployed right away. To facilitate Commission evaluation and consistent with Order Nos. 22313 and 22339, the Company's analysis of these potential options includes estimates of the emission reductions and the associated customer bill impacts such options may have. The Company anticipates that for the specific emission reduction options that are most cost-effective and/or beneficial to customers, Washington Gas will submit more detailed, individual filings that will include program design and costs, cost-effectiveness assessments based on the Benefit Cost Analysis ("BCA") currently being developed by the Commission, anticipated participation levels, near-term anticipated emissions reductions based on the program design, and cost recovery to obtain necessary Commission approval for implementation of each of the specific programs.

---

[4] As the Commission is aware, there are potentially substantial changes to a number of relevant laws and regulations currently under consideration (e.g., federal legislation impacting the Inflation Reduction Act, Infrastructure Investment and Jobs Act, and the Mayor's budget proposal impacting the timing of the Clean Energy DC Building Code Amendment Act of 2022). This 15-Year Plan is based on the laws and regulations currently in effect as of the date of this filing.

Before turning to the 15-Year Plan itself, Washington Gas will provide a brief overview of (1) the procedural background of this proceeding; and (2) legal considerations to account for as the Commission and other parties analyze the Company's filing.

## I.    PROCEDURAL BACKGROUND

The Commission opened *Formal Case No. 1167* to "commence a climate policy proceeding to consider whether and to what extent utility or energy companies . . . are meeting and advancing the District's energy and climate goals."[5] On March 16, 2020, Washington Gas filed its forward-looking Climate Business Plan pursuant to Term No. 79 of the AltaGas Ltd. Merger Settlement Agreement.[6] Then, pursuant to Order No. 20754, Washington Gas submitted its September 1, 2021, compliance filing, which contained the Company's further explanation and modeling regarding the Climate Business Plan's Fuel Neutral Decarbonization Scenario.[7] Subsequently, on December 15, 2021, Washington Gas filed its 5-year plan, Climate Change Action Program, Part 1, and on January 18, 2022, the Company filed its 30-year plan, Climate Change Action Roadmap, Part 2.[8] The Company filed an amendment to its Climate Change Action Program, Part 1, on October 26, 2022. [9] Multiple parties proceeded to comment on Washington Gas's climate filings throughout 2022.[10] More recently, on August 5, 2024, Washington Gas filed its Proposal to Implement the District of Columbia's Climate Goals, which the Commission

---

[5] Order No. 22313, at 2.

[6] *Id.* at 3.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* at 4.

JA284

# 15-Year Plan

**Formal Case 1167**

**Submitted June 9, 2025**



# I.   EXECUTIVE SUMMARY

## A.  BACKGROUND FOR THE 15-YEAR PLAN

Washington Gas Light Company (Washington Gas or the Company) is committed to meeting the needs of its customers and exploring ways to lower greenhouse gas (GHG) emissions in the District of Columbia (District) in collaboration with the Public Service Commission of the District of Columbia (Commission) and other stakeholders.[1] This 15-Year Plan is being provided in accordance with the Commission's orders from October 10, 2024 and December 10, 2024, in Formal Case (FC) 1167. The Commission's orders require the Company to show in the 15-Year Plan how it can help the District achieve its goal of carbon neutrality by 2045 and how the 15-Year Plan will effectively serve the public interest by helping to advance the District's climate policy commitments, while the Company continues to operate the system in a safe and reliable manner at reasonable rates for consumers.[2]

## B.  CORE OBJECTIVES FOR THE 15-YEAR PLAN

Affordability is a key concern for Washington Gas as it considers actions the Company could take to reduce GHG emissions. As discussed herein, the Company's 15-Year Plan includes the proposal of various emission reduction options for consideration by the Commission and stakeholders. Washington Gas also continues to prioritize the safety and reliability of the gas system. The Company must balance these and other objectives as it develops the 15-Year Plan. Washington Gas's core objectives for the 15-Year Plan are provided in Figure I-1.

**FIGURE I-1**

**WASHINGTON GAS'S 15-YEAR PLAN OBJECTIVES**

- Conduct planning that is consistent with the Climate Commitment Act of 2022 (CCA) to the extent possible under existing law, recognizing the role of customer behavior and the importance of affordability.

- Ensure a safe, reliable and resilient gas system for Washington Gas's customers and communities.

- Provide affordable energy to customers.

- Preserve the gas infrastructure's ability to enable cost-effective emissions reductions while continuing to contribute to the District's economy.

---

[1]   In the 15-Year Plan, stakeholders are defined as customers, the Commission, other District agencies, environmental and other advocacy groups, and elected official.

[2]   FC 1167, Order No. 22313, at 11.

⇨ Consider the energy system holistically by recognizing the interconnectedness of the gas and electric systems.

⇨ Partner with community and stakeholders to provide customer education, which promotes effective behavior, reduces confusion, and avoids inequities.

## C. WASHINGTON GAS'S APPROACH FOR THE 15-YEAR PLAN

The District has set ambitious climate goals. The CCA requires the Mayor to adopt policies to achieve a 60% reduction in economy-wide GHG emissions by 2030 relative to 2006 levels and achieve carbon neutrality in the District by 2045. In addition, the Clean Energy DC Omnibus Amendment Act of 2018 mandates that the Commission consider the climate impacts of utility service, in addition to the Commission's obligation to consider public safety and the economy of the District.[3] The Company has developed this 15-Year Plan to provide information to help the Commission address climate considerations. Washington Gas's 15-Year Plan presents its anticipated customer counts, demand, and GHG emissions over the next 15 years (Base Forecast) divided into three five-year horizons, assuming existing rules and regulations remain in place.

Separately, Washington Gas also identifies several potential emission reduction options that it could implement to further reduce GHG emissions, and provides costs, GHG emissions reductions, and residential bill impacts for each. The impacts of these emission reduction options are not included in the Base Forecast because the Company does not currently have approvals for these programs and because the Commission has not provided policy guidance regarding which options the Company should pursue. This 15-Year Plan provides forecasts of potential costs and GHG emissions reductions associated with each of the emission reduction options based on specific assumptions and information available today. Specific emission reduction options will be the subject of future, more detailed filings to obtain approval for the implementation of specific programs and provide for associated cost recovery. The costs and emission reductions associated with each emission reduction option will change as policies and technologies evolve over time. The emission reduction options discussed throughout this report will be updated in the three-year informational reports required by the Commission in Order No. 22313[4] and will reflect more and better information as it becomes available. The Company will provide detailed proposals, including specific program costs and associated cost recovery, action plans, milestones and forecasted emissions reductions in future filings for each emission reduction option that is approved by the Commission.

---

[3]    D.C. Law 22-257. CleanEnergy DC Omnibus Amendment Act of 2018.
[4]    FC 1167, Order No. 22313, at 11.

## D. 15-YEAR BASE FORECAST

Washington Gas's 15-Year Plan represents its anticipated customer counts, demand, and GHG emissions over the next 15 years (2026-2040) based on information currently available (Base Forecast). The Base Forecast assumes that all existing programs, regulations, and laws remain in place. Any potential future changes to legislation or Commission rulings that would directly or indirectly impact the Company's operations in the District have not been incorporated into the Base Forecast. Specifically, the Base Forecast does not include impacts associated with programs that have not been approved by the Commission (e.g., the Base Forecast does not include impacts associated with the Company's proposed energy efficiency (EE) program).

The Base Forecast projects that demand for the Residential, Commercial, and Other segments will remain flat during the 15-Year Plan, while demand for the group metered accounts (GMA) segment will grow at a rate of 0.66% per year. Total Base Forecast demand is projected to increase at a rate of 0.09% per year, as presented below.

**FIGURE I-2**

**WASHINGTON GAS BASE FORECAST ANNUAL DEMAND (THERMS)**

GHG emissions associated with the Company's Base Forecast are representative of the entire natural gas lifecycle and are presented in metric tons of carbon dioxide equivalents (MT CO2e). The Base Forecast includes emissions associated with production, transmission, distribution, and final customer use of gas. Washington Gas's Base Forecast GHG emissions are anticipated to change minimally over the 15-Year analysis period. Emissions are also computed for the 2006 District-wide emissions reference point.[5] Figure I-3 below illustrates the Company's Base Forecast emissions. As shown, 2040 (Year 15) Base Forecast emissions represent a 17% reduction in GHG emissions from the 2006 reference point. The

---

[5]   D.C. Law 24-176. Climate Commitment Amendment Act of 2022.

## II.  INTRODUCTION

### A.  CONTEXT FOR THE 15-YEAR PLAN

This 15-Year Plan presents Washington Gas's anticipated customer counts, demand, and GHG emissions over the next 15 years (Base Forecast), assuming existing rules and regulations remain in place. This 15-Year Plan also presents several potential emission reduction options the Company could pursue with Commission approval to help advance the District's climate policy commitments while providing safe, reliable, and affordable energy service to its approximately 163,000[6] District customers.

### B.  HISTORY OF PROCEEDINGS AND POLICY GUIDANCE

In July 2022, the District's climate commitments and priorities that were established over the prior decade coalesced into the passing of the CCA. The CCA codifies the City's commitment to reducing GHG emissions to achieve carbon neutrality by 2045 (expediting a former goal of 2050) and aims for the District's government operations to be carbon neutral by 2040. To help achieve the CCA and other recent climate laws, the Commission recently issued two orders establishing requirements for District utilities to file 15-Year Plans.[7]

#### 1.  FC1167 Order Nos. 22313 and 22339

FC1167 Order Nos. 22313 and 22339 require that the Company develop a 15-Year Plan to inform the Commission and stakeholders about how the Company will effectively serve the public interest by advancing the District's climate policy commitments while ensuring safe and reliable service, and reasonable rates for District consumers. The Company believes that the emission reduction options described in this 15-Year Plan will help inform the Commission about possible strategies that could contribute to the goals of the CCA and the other legislation and regulations.

Order No. 22313 establishes that the 15-Year Plan will be updated every three years and should demonstrate how the Company will endeavor to meet the District's climate goals over the next 15 years. Order No. 22339 set new deadlines for the 15-Year Plans[8] and stated that the new 15-Year Plans will provide valuable insights into how new federal and District climate legislation impacts the utilities and how the utilities plan to help the District achieve these new climate goals. As stated in Order No. 22313, Washington Gas will not need to submit its own Benefit Cost Analysis (BCA) as part of the 15-Year Plans.[9]

---

[6]   2024 average customer count.

[7]   FC1167, Order Nos. 22313 and 22339.

[8]   FC1167, Order No. 22339.

[9]   FC1167, paragraph 19.

July. Winters are much colder, with an average daily high of 41 degrees in January, with temperatures falling below freezing overnight. The region can experience snowfall, typically during December through March.[13] As discussed above, winter is the highest-demand period for the District, due to winter heating load.

## C. ECONOMIC CONDITIONS IN THE DISTRICT

The District has a diverse economy with major economic sectors that include the U.S. government, tourism, information technology, research, hospitality, and news media. Higher education, healthcare, retail, charitable organizations, and professional services (for example, law and consulting) are other large employers in the area.[14] In January 2023, the Deputy Mayor for Planning and Economic Development issued an Economic Plan for the District that included several goals for economic growth, population growth and other measures relating to services for residents. One goal involved developing specific "Opportunity Rich Neighborhoods" for low-income residents.[15] There is also a focus in the District to increase the share of minority-owned businesses from 27% to 33% of all businesses,[16] and to increase the median household income of Black residents by $25,000.[17]

About one-third of Washington Gas's residential customers in the District are classified as low-income, further highlighting the importance of maintaining energy affordability.[18] Figure III-4 below depicts the distribution of Washington Gas's low-income customers in the District.

---

[13] Yearly & Monthly weather - Washington, DC.

[14] https://does.dc.gov/publication/top-200-employers-2022, "Top 200 Employers 2024"

[15] DC's Comeback Plan Presentation, January 9, 2023, slide 5, https://static1.squarespace.com/static/59cebe6ff09ca495d3b4a940/t/63bebd74784c9e53ea4ed1f7/1673444725030/DCs+Comeback+Plan+Presentation+FINAL.pdf

[16] *Id*, slide 7.

[17] *Id*, slide 13. The report further states that the median Black household income in Washington, D.C. is $52,000.

[18] Low-income is defined at below 80% of average median income for the District. See AEG 2022 Washington Gas Light Company EEDR Potential Study- Final Report Washington D.C. Service Area ("EEDR Study"), October 31, 2022, p. 19.

**FIGURE III-4**

**WASHINGTON GAS RESIDENTIAL INCOME DISTRIBUTION[19]**



Washington Gas is involved in several efforts to assist low- and moderate-income customers. For example, all Washington Gas customers in the District pay a per-therm surcharge on their gas bill that contributes to the Energy Assistance Trust Fund, which is used to fund low-income programs that are managed by the District Department of Energy and Environment (DOEE), including some of the programs described below.

The Residential Essential Service (RES) discount is available to certain residential customers who use gas as their principal source of space heating. Eligible customers are qualified by the DOEE and can receive a discount that eliminates both the customer charge and gas distribution service charge during the heating season of November through April and provides a 50% discount to the customer charge during May through October.[20] The RES program also includes an Arrearage Management Program for residential customers where the utility will forgive 1/12 of the pre-program arrears each month that customers pay their new bill in-full and on-time. After 12 months of in-full, on-time bill payments, the original arrearage will be forgiven. To participate, customers must be eligible for the RES program, enroll in budget billing, and must be at least 60 days past due with a maximum arrearage of $3,000.

In addition, Washington Gas administers several programs to address affordability concerns for low and moderate-income customers. The following programs help with utility costs and home energy efficiency programs.[21]

- Low Income Home Energy Assistance Program (LIHEAP) is a federally funded program aimed at helping low-income customers pay their utility bills. Eligible

---

[19]    EEDR Study, p. 20.

[20]    Washington Gas Tariff Rate, Schedule No. 1, Sheet No. 4.

[21]    Get Help: Your Washington D.C. Gas Bill

14 | P a g e

JA291

households may receive energy bill assistance between $250 and $1,800 as a one-time energy assistance benefit under the current program; however, the future of this federal program is uncertain.[22]

- The Washington Area Fuel Fund, a joint effort between Washington Gas and the Salvation Army, provides heating bill assistance to income-qualified customers. These customers do not have to qualify for LIHEAP or RES programs to be eligible.[23]

Additionally, Washington Gas has two residential low-income specific programs aimed at enhancing home energy efficiency to save on energy use and costs. The Weatherization Assistance Program, administered through the DOEE, provides residents with financial assistance to help reduce their energy bills by making their homes more energy efficient.[24] The Emergency Mechanical Assistance Program provides for emergency replacement of household appliances (hot water heater, furnace, boiler or air conditioner) with new, high-efficiency appliances. The program is meant for customers whose appliances have already failed or will fail soon.

Washington Gas continues to prioritize energy affordability within the District and will continue to support efforts that address affordability concerns, especially for low-income customers, in accordance with Commission guidance and directives.

## D. SUPPLY PORTFOLIO

As discussed above, Washington Gas operates its system in the District on an integrated basis with its systems in Maryland and Virginia. Therefore, the Company's gas supply and capacity portfolio is planned and designed as an integrated system with gas purchases flowing throughout the Company's three jurisdictions. Costs for gas purchases are allocated to each jurisdiction based on total annual gas consumption by gas delivery customers by jurisdiction.

Washington Gas's supply and capacity portfolio is comprised of firm transportation contracts, firm storage contracts, on-system peaking, off-system commodity peaking contracts, and off-system peaking contracts. Washington Gas holds firm transportation capacity from the Marcellus natural gas production basin on the Columbia Gas Transmission (Columbia) and Eastern Gas Transmission and Storage (EGTS) gas pipelines, and from gas production in the Gulf of Mexico on the Transcontinental Gas Pipeline (Transco). Geographic diversification of gas supply can provide reliability and cost benefits, as issues specific to one location, such as inclement weather or production/pipeline constraints, can be mitigated. In recent years an average of 59% of the total annual gas supply was sourced from the

---

[22]  Receive Assistance With Your Utility Bills (e) | doee
[23]  Washington Area Fuel Fund – A Washington Gas and Salvation Army Partnership
[24]  Weatherization Assistance Program (WAP) | doee

# IV.  BASE FORECAST

## A. INTRODUCTION

Washington Gas's 15-Year Plan represents its anticipated customer counts, demand, and GHG emissions over the next 15-years (2026-2040) based on information currently available (Base Forecast). The Base Forecast assumes that all existing programs, regulations, and laws remain in place. Any potential future changes to legislation or Commission rulings that would directly or indirectly impact the Company's operations in the District have not been incorporated into the Base Forecast. Specifically, the Base Forecast does not include impacts associated with programs that have not been approved by the Commission (e.g., the Base Forecast does not include impacts associated with the Company's proposed energy efficiency program).

The Base Forecast includes forecasts for the Company's distribution system demand, customer count, miles of pipe by material, and GHG emissions in the District. Customer counts and demand are forecasted in four customer segments (i.e., Residential, Commercial, GMA, and Other). The Base Forecast includes both retail sales customers and transportation customers since the Company's distribution system is used to deliver gas to both retail sales and transportation customers. Additional details about the Base Forecast methodology and results are presented in Appendix A**.**

## B. CUSTOMER FORECAST

Base Forecast customer counts are necessary to forecast Base Forecast demand and Base Forecast GHG emissions. The Company examined historical customer count data and identified that historical customer counts for each customer segment did not exhibit significant trends in recent years (i.e., any customer attrition was offset by customers joining the gas system). Therefore, Base Forecast customer counts for each customer segment are projected to remain flat over the 15-Year Plan, consistent with recent history, as the Base Forecast does not assume any major customer declines due to potential future large-scale electrification programs or other potential future decarbonization approaches as there is no meaningful operating data at this time. The Base Forecast customer count for each segment was derived by calculating the average historical customer counts during the 12 months of 2024,[40] which produces a Base Forecast of approximately 163,000 customers for the duration of the 15-Year Plan, as shown below.

---

[40] Calendar 2024 average is used for the Base Forecast customer counts as it was the most recent 12 months of data available at the time the forecast was developed.

JA293

**TABLE IV-1**

**WASHINGTON GAS BASE FORECAST ANNUAL CUSTOMER COUNT**

| Reference Case - Annual Customer Count by Customer Segment | | | | | |
|---|---|---|---|---|---|
| Year | Residential | Commercial | GMA | Other | Total |
| 2026 | 149,544 | 9,836 | 3,193 | 106 | 162,679 |
| 2030 (Yr 5) | 149,544 | 9,836 | 3,193 | 106 | 162,679 |
| 2035 (Yr 10) | 149,544 | 9,836 | 3,193 | 106 | 162,679 |
| 2040 (Yr 15) | 149,544 | 9,836 | 3,193 | 106 | 162,679 |
| 2026 – 2040 CAGR | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**FIGURE IV-1**

**WASHINGTON GAS BASE FORECAST ANNUAL CUSTOMER COUNT**



## C. DEMAND FORECAST

Base Forecast demand is necessary to calculate Base Forecast GHG emissions, as well as to evaluate the potential effectiveness of different emissions reduction options. The Base Forecast demand is based on recent historical trends and does not reflect the potential impacts of future emissions reduction options that may become available to customers. The Base Forecast demand for each customer segment is derived from multiplying monthly Base Forecast customer counts (described above) by monthly Base Forecast use per customer. The Base Forecast use per customer is developed using regression models based on historical use per customer for customer segment from January 2022 through December 2024.[41] Weather is statistically significant in each of the segment use per customer models

---

[41] Data from 2020 and 2021 was omitted from the analyses, as customer behavior during this period was impacted by the COVID-19 pandemic.

and the Base Forecast assumes normal weather (defined as a 30-year historical average of weather) during the forecast period.  While use per customer has followed the recent warming weather patterns observed over the last few years, no separate statistically significant trend is evident based on the results of the segment use per customer regression analyses, except for GMA. Consequently, the Base Forecast projects that demand for the Residential, Commercial, and Other segments will remain flat during the 15-Year Plan, while GMA will grow at a rate of 0.66% per year. Total Base Forecast demand is projected to increase at a rate of 0.09% per year, as shown below.

**TABLE IV-2**

**WASHINGTON GAS BASE FORECAST ANNUAL DEMAND (THERMS)**

| Reference Case - Annual Demand by Customer Segment (Therms) | | | | | |
|---|---|---|---|---|---|
| Year | Residential | Commercial | GMA | Other | Total |
| 2026 | 88,145,511 | 80,652,460 | 35,685,502 | 78,289,444 | 282,772,918 |
| 2030 (Yr 5) | 88,145,511 | 80,652,460 | 36,664,530 | 78,289,444 | 283,751,946 |
| 2035 (Yr 10) | 88,145,511 | 80,652,460 | 37,888,314 | 78,289,444 | 284,975,730 |
| 2040 (Yr 15) | 88,145,511 | 80,652,460 | 39,112,099 | 78,289,444 | 286,199,515 |
| 2026 – 2040 CAGR | 0.00% | 0.00% | 0.66% | 0.00% | 0.09% |

**FIGURE IV-2**

**WASHINGTON GAS BASE FORECAST ANNUAL DEMAND (THERMS)**



## D.  PIPES BY MATERIAL FORECAST

Base Forecast pipe mileage by material is necessary to calculate Base Forecast GHG emissions. To enhance the safety and reliability of the gas system, Washington Gas proactively replaces leak prone pipe infrastructure through the Company's accelerated

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF HOME ) CIVIL NO.:
BUILDERS OF THE UNITED STATES, ) 24-2942-ACR
et al.,                         )
            Plaintiff,          )
        vs.                     )
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                ) September 25, 2025
            Defendant.          ) Washington, D.C.
_____ ) 2:47 p.m.

Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge

<u>APPEARANCES</u>:

For the Plaintiff:   Ronald Scott Novak, Jr., Esquire
                     Baker Botts, LLP
                     700 K St NW
                     Washington, DC 20001

                     Jonathan Mark Little
                     Baker Botts L.L.P.
                     910 Louisiana St.
                     Houston, TX 77002

                     Daniel B. Rankin, Esquire
                     Baker Botts, LLP
                     401 S. 1st Street
                     Suite 1300
                     Austin, TX 78704

For the Defendant:   Adam J. Tuetken
                     Office of Attorney General-DC
                     400 6th Street, NW
                     Suite 8100
                     Washington, DC 20001

Reported by:   Christine T. Asif, RPR, FCRR
               Federal Official Court Reporter
               333 Constitution Avenue, NW
               Washington, D.C. 20001
               (202) 354-3247

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

PROCEEDINGS

THE CLERK: This is civil action 24-2942, National Association of Homebuilders of the United States, et al., versus District of Columbia.

Would the parties please identify themselves for the record, beginning with plaintiff's counsel.

MR. LITTLE: Mark Little for plaintiffs.

THE COURT: Mr. Little, we've met before, yes?

MR. LITTLE: We have, Your Honor, at the pre-motion conference in this case.

THE COURT: Oh, yeah, okay. Welcome back.

MR. NOVAK: Scott Novak for plaintiffs.

THE COURT: All right.

MR. RANKIN: Daniel Rankin for plaintiffs.

MR. TUETKEN: Adam Tuetken on behalf of the District of Columbia.

THE COURT: You're flying solo?

MR. TUETKEN: Yes, you just have me today.

THE COURT: All right. So just to be perfectly frank with you all, this is our fourth hearing of the day. I had a substantive one this morning, the other two were not substantive, but it's been kind of a crazy week for a lot of reasons I won't bore you with. So I have read the materials and I do have a few questions. But this might actually be good news for you all, I'm not as alert as usual. So I

probably will need you all talking more than me asking questions. It's little bit unlike how I do things. But let me just ask, I guess, the defense first, if you could come up, please.

So can you explain to me and maybe the law isn't clear on this yet, I understood, I think it was the 9th Circuit case or the SDNY case or maybe both, where the prohibition was on a gas pipe and not on actual appliances.

MR. TUETKEN: That's the 9th Circuit case.

THE COURT: The 9th Circuit case. Okay. What is this law? Is this a ban on the gas pipes or is it a ban on appliances that use gas or both?

MR. TUETKEN: It's --

THE COURT: Or do we not know yet?

MR. TUETKEN: It's not a ban on gas pipes specifically. It is, if you want to call it a ban on gas appliances for the buildings covered by the Act. So the Act only applies to commercial and residential buildings over three stories. And then within that, it only applies to new construction or substantial improvements.

THE COURT: So if there's a new building, let's just say -- from now on let's just say a building is something covered by the Act, so you don't have to say that every time.

MR. TUETKEN: Okay.

THE COURT: So if there's a building, a new building, they can put in stoves with the heating things, but not a gas stove.

MR. TUETKEN: Correct.

THE COURT: Okay. All right. And that's what you guys are annoyed about and I guess particularly your restaurants; right?

MR. LITTLE: Yes, Your Honor.

THE COURT: Are a lot of restaurants covered by this?

MR. LITTLE: Well, so Your Honor, just to back up, we have a broad plaintiff --

THE COURT: No, no, I know. Fine. I'm getting off on a tangent. Okay. And as I understood your briefs and it sounds like basically how we're dealing with this is you all agree with the SDNY and you all agree with the 9th Circuit, right? And the reasoning is, as laid out in your briefs, more or less the reasoning in those two opinions, more or less; right?

MR. LITTLE: Your Honor, if I could just -- I'm not trying to take over my friend on the other side's time, but I think there were multiple paths to get to that result and the 9th Circuit laid out one of them.

THE COURT: Okay. All right. Fair enough.

So what's your main thing that I should be focused

on in terms of -- as I understand your arguments, the defense main point is that -- well, points-of-use, frankly, I don't really understand the point-of-use issue. But basically so far as I understand your argument, it's we're not telling people who make gas stoves how much gas they have to use, we're just saying you have to use nongas stoves. And so there's no patchwork of states doing different things with respect to the regulation of gas appliances, you're not regulating gas appliances at all. To the contrary, you're saying there can't be gas appliances, which is something totally different than a gas appliance only being able to use, I don't know, 10 grams of fuel or something.

MR. TUETKEN: That is a pretty succinct way of putting our position, yes. Maybe putting it in the statutory terms.

THE COURT: I mean, yeah, I get --

MR. TUETKEN: We are not regulating energy use as defined by ECPA.

THE COURT: But you're not -- I mean, but you're not -- right. Well, because the energy use goes to the actual covered product and a building is not a covered product. You're not addressing any covered products; right?

MR. TUETKEN: Yes, that's certainly an aspect of it. Our law does not even mention covered products.

THE COURT: Right. It just says if you're going to

build you have to use these other products that are not covered.

MR. TUETKEN: Well, it actually doesn't mention any products at all, because it's referring to the fuel source for the building in general.

THE COURT: Oh, I thought that that's what we talked about earlier.

MR. TUETKEN: So because the fuel source for the building cannot be fossil fuels, you can't use a gas appliance. But in terms of like how the Act is actually spelled out it says -- it doesn't actually regulate covered products or any products.

THE COURT: Right. Okay. Any products. Okay. So it's more like the 9th Circuit, maybe I missed that when we with were talking about it, I apologize. So you're basically saying, you can't have a gas pipe come into the building. If you want to have gas appliances, by all means, you can have whatever gas appliances that you want, they're just not going to get gas from the building.

MR. TUETKEN: Right. Because the building needs to be -- cannot be operating on fossil fuels.

THE COURT: Right. And so the gas appliances will just be useless, I guess, unless you have your own independent gas source.

MR. TUETKEN: Yes, more or less.

THE COURT: All right. Okay. Can I hear from the plaintiffs? So I have to say this doesn't really seem all that complicated to me, I mean, they're not -- they're not covering -- they're not regulating your product at all or products at all, they're just saying what kind of fuel can go into a building. And my concern with sort of your argument -- of course, when I say that I don't mean I've decided the issue --

MR. LITTLE: I understand.

THE COURT: And you're all just wasting my time, I'm just telling you what I'm thinking so you know how to address it. They're not regulating anything that -- they're not regulating a covered product. And in order to accept your interpretation, I think, you know, the SDNY said it would mean that the consumer would have the right to use a gas appliance, and the statute doesn't create a right. But I think it does -- I think your interpretation would do more than that, it would create a right or an obligation on those who build buildings for all cities, that they would have a right if they wanted to to use gas appliances. And I certainly don't think that that's in the statutory language. And it would seem to me quite, like, I guess in an Alanis Morrisette kind of way, ironic for an act that was designed to limit fossil fuels to give individuals an absolute right to use them if they wanted to. So that's what my thinking is. You have the floor.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

MR. LITTLE: Thank you, Your Honor. And let me back up and I think come at this in a different way that I think will be helpful, but if I'm not being helpful let me know.

THE COURT: Yeah, I'll let you know.

MR. LITTLE: I guess when you look at the briefing, there's a lot of kind of statutory jockeying about you know energy point of views concerning how broad all of this is. And, frankly, I don't think you have to reach almost any of those, because the district's conception of EPCA's preemption provision, let's just assume arguendo that this very narrow preemption provision just applies to energy conservation standards and things that essentially operate as energy conservation standards. Let's just grant them that for the sake of argument of course, I'm happy to --

THE COURT: You agree with them that the bill doesn't actually deal with appliances, it just deals with the energy source for the building.

MR. LITTLE: Well, it says on-sight fuel combustion shall not be permitted so I do think that means that appliances can't use fuel combustion on site, which is at the building.

THE COURT: Okay.

MR. LITTLE: But to that point if -- I think the district would agree with me it couldn't pass a law like this that applied to these same building that said, you know, only

gas appliances that have a energy use label of say 500 kBTU per year can be used.

THE COURT: Yeah, I mean, I think you would agree with that.

MR. LITTLE: Right. And so that's the same --

THE COURT: Well, actually, I'm not sure that you would agree with that, because -- well, do would you agree with that, disagree with that, or you need to think about it?

MR. TUETKEN: I don't think he's given enough facts so far with that hypothetical.

THE COURT: Okay. Fair enough. Good lawyerly answer.

MR. LITTLE: Well, if that's true, because I don't want to put words in my friend's mouth, you know, they also couldn't pass the law saying you can only use appliances less than 100 kBTU per year, or 10 or one or none, right, or zero kBTU per year, that's a energy conservation standard. That can be a label-based, you know, factory floor, this product uses zero kBTU a year.

Now, look it's an extreme standard. That is -- in fact, it's the most extreme type of standard. But if that's right, I mean, if we're going to just call a spade a spade and something that says I can't use any product that has a, you know, more than zero kBTU a year, that's what this is. And I think the District's main argument for this -- I think there

are two arguments, but I'll take each in turn. One is that bans are totally different. It would be one thing if we had a standard that said 10 KBTU per year, or I guess even 1 kBTU that's a standard theoretically could be met, I guess, but zero is somehow different. And I think my kind of first response is just there really isn't a difference there nor would it make any sense, right? I mean, why would --

THE COURT: That's not a product that exists. I mean, to me that's setting up a straw argument, right, though they couldn't regulate -- they couldn't say that something has to be zero amount. Well, yeah, of course, because that doesn't exist. So they're not saying you have to bring in a gas appliance and it has to be -- the energy has to be zero. They're saying you have to bring in an appliance, whatever you want, but there's not going to be fuel coming into the building.

MR. LITTLE: Well, Your Honor, I think it says -- I mean, at least the law, and this is on-site fuel combustion isn't allowed. I read that as saying you can't use gas in this building, that's what on-site fuel combustion is.

THE COURT: Okay. Fine. But I mean, the manufacture -- there's a zero manufacture of any gas appliance whose manufacturing is going to have to change in any way, shape, or form, in any iota because of this law, right? I mean none. They're not going to be required to rejigger their

appliances in any way.

And my understanding -- and granted, you know, I have not delved as deep into this as I will before I write the opinion, because a lot of things have been going on, but I do know enough to know that so far as I understand the history of the statute was we had a standard, all the manufacturers knew what the standard was, but instead of applying the standard, states got all these exemptions and so GE would have to have, you know, a gas stove with 50 whatever in Kentucky and a gas stove with 20 whatever in California and a gas stove with whatever, you know, thousand in New York. And so they had to make all these different gas stoves for different states and it just wasn't workable. And so we're just going to say, all right, everyone has to have the national standard. And the national standard is whatever it is.

MR. LITTLE: Yes --

THE COURT: But, again, that's going straight to appliances and manufacturers, not what a government can or should regulate with respect to what buildings are made or created.

MR. LITTLE: So I think two responses there. And let me address the last thing you said first. One is, we know and I think the -- agrees with me on this, but I'll of course let Mr. Tuetken speak for himself, that EPCA doesn't just apply to regulations that directly apply to manufacturers. We

know that it applies to some building codes.

THE COURT: Which ones?

MR. LITTLE: Well, why we know that, if I could do a small digression before I answer your question directly, is that it has an exemption for certain building codes. Now, that does not mean that every building code that doesn't meet the exemption applies. But I think what that does tell us at the very least is that this argument that it, you know, doesn't apply directly to the manufacturer so it can't be pre-empted, that can't be enough. Because you could easily have something like an energy conservation standard and just put it in a building code like the example I had earlier if the District had passed this law and said, you know, you can only have gas appliances that have a, you know, 500 kBTU or less energy use rating.

So I think the fact that the level of regulation is at the building level rather than at the appliance level really doesn't matter and really doesn't advance the analysis, frankly, either way because we know rather the key question isn't at what level it's regulated, it's what is the -- what is the effect of the regulation? Does it concern the energy use? Does it concern the energy efficiency? And saying you can't use any gas at all it does concern it. And then going back to your earlier point about the kind of patchwork bulkanization regulation concern.

So I agree with much and maybe all of what Your Honor said about the statutory history and about Congress's motivations for the law. What I think I would go a little bit further on is that a straight prohibition on gas appliances does impact those things, so --

THE COURT: He's not prohibiting gas appliances. You can have all the gas appliances you want, there's just no gas that's going to be coming into the building.

MR. LITTLE: I suppose I could --

THE COURT: I mean, certainly a regulation -- a national regulation that says if you're going to have a TV, it has to be a Sony TV and states can't say you can have an RCA TV. You wouldn't take that to then mean that buildings are required to have TVs. You wouldn't even take that to mean that buildings are required to have outlets or cable outlets for TVs; right? And it seems like that's exactly what we have here.

I mean, you're inferring an affirmative right from a pre-emption provision. And I've just never seen that. And I don't understand how you get to this affirmative right.

MR. LITTLE: Sure. So, Your Honor, I don't think or at least I don't view us as claiming some right to use gas appliances. That's --

THE COURT: Well, yeah you do, because you say they can't have a code that says you can't use gas -- or you can't

use gas in a building.

MR. LITTLE: Right.

THE COURT: So what are you arguing?

MR. LITTLE: They can't have a code that sets an effective energy conservation standard that is, you know, be it 10, 100, 1,000, or none, that's I think our --

THE COURT: They have to be allowed to use gas.

MR. LITTLE: Yes.

THE COURT: The energy conservation standard isn't, so far as I understand it, you can have gas stoves, it just has to be zero gas used. Their thing is, we're just not putting gas into a building. Put in whatever stove you want, we're not allowing gas into the building. So you can have a gas stove that meets all of the pre-emption -- or that meets all the requirements of the federal standard, but gas isn't going into the building. And you're saying no, no, gas has to come into the building, because we have a right to have our gas stoves there, and that is an affirmative right that you're trying to read into the pre-emption statute.

MR. LITTLE: So, Your Honor, I guess one small point, I'm not trying to fight over something that might not matter, but this isn't a prohibition on gas house piping like in *Burke*, I mean, it literally says you can't combust fuel onsite. So even if I could somehow get gas in, not through house piping, I still couldn't use that appliance.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT: All right. Well, that's fine. I mean, fair. That's a fair point. But I don't think -- I still -- you're still saying that the Court has to read into this pre-emption provision an affirmative right to use the gas appliances. And not just gas stoves, presumably, I mean gas -- I don't know what else --

MR. LITTLE: It would be all covered appliances, which are a broad swath of appliances.

THE COURT: What are the other ones, just out of curiosity.

MR. LITTLE: Water heaters, ranges, air heaters, go on.

I think where we might be talking past each other, and perhaps I'm not tracking you and I obviously want to, is it's not so much we're saying this or that consumer has a right to do this or a right to do that, our point is that if Congress said, look, federal government is going to say what kind of gas appliances can be used in buildings, that a locality can't go and say, no, no, no we're going to talk about a different energy use or energy efficiency standard for those appliances. And there simply is no functional difference other than perhaps the theoretical possibility to meet it of a 1 kBTU --

THE COURT: There's a massive difference --

MR. LITTLE: -- and zero.

THE COURT: There's a massive difference between Congress saying if you're going to have gas appliances they have to meet X standards versus -- because the obvious point there is the if, right? You're saying -- you're just trying to read that if out of the argument. And you're saying what Congress said is buildings have gas stoves and those gas stoves have to meet a certain standard.

And what he's saying is, Congress isn't saying that we have to allow gas stoves. Congress is saying if we allow gas stoves, then they have to meet certain standards. And you're saying, Congress is saying they have to allow gas stoves. And that's an affirmative right that you're reading into the statute.

MR. LITTLE: Right. So I do read EPCA's pre-emption provision as saying that as far as gas stove energy use regulation goes, the energy conservation standard set by the DOE is the standard. And so --

THE COURT: Yeah. I mean, what -- yeah.

MR. LITTLE: And so I think where I'm -- I want to be helpful, but I don't understand the kind of functional difference between, frankly, what would be a less violent attack on the EPCA standard, say going from 700 to 650, and a more disruptive attack going from 700 to zero. I mean, not --

THE COURT: But zero is not an attack, zero is like we're just not going to use your product. Versus Congress

saying if you're going to use -- if a state allows the product to come in, it has to meet certain standards. I mean, or let me maybe put -- where do you find in the language of the actual pre-emption statute this argument that the building has to allow a fuel standard.

MR. LITTLE: Well, it says you can't have a strict regulation concerning energy use in a ban on gas energy use.

THE COURT: Well, take me to the actual language.

MR. LITTLE: Oh, sure. Give me one moment, Your Honor and I'll actually pull it up. So looking at 62 -- I'm sorry, 42 U.S.C. 6297(c) that's the preemption provision that is, frankly, scattered across both sides' brief.

THE COURT: This is the standard on page 5, the bottom of page 5 of your brief.

MR. LITTLE: I don't have my brief, but I bet it is.

THE COURT: 42:6316.

MR. LITTLE: Oh, no. Well, it's a -- I think 42 6297, but it's probably a parallel site to 6316(2), that's a similar provision.

THE COURT: Oh, wait. Hold on. Yes. Okay. On page 4, effective on the effective date of energy conservation standard established or prescribed for any covered product, no state regulation concerning energy efficiency, energy use, or water use of such covered product shall be effective with

respect to such product. And what I found interesting in the 9th Circuit and the SDNY decisions is that there was a lot of discussion about what energy use and energy efficiency mean.

MR. LITTLE: Yes.

THE COURT: And a lot of discussion about at the point of use, which I still don't understand, but whatever, we can get to that in a moment. I think I understand parts of it. But to me the key language seems to be "of such covered product." Because what it's saying is there can't be regulations with respect to the product, not with respect to whatever is going in or out of a building. I mean, my -- the way that I -- the way that I think I would have to read this in order to agree with you is to reach, to say that such covered product basically is the building.

And my clerk yesterday didn't agree with me on this, so I might just be reading it wrong. But that to me seems like the obvious solution here. But we have the 9th Circuit saying one thing, the SDNY saying something else, and they both sort of don't reach that straight forward point. So I feel like I must be missing something, because to me it seems obvious that when it's saying for any covered product no state regulation concerning blah, blah, blah, blah, blah of such covered product has to include something that you're regulating with respect to the product.

MR. LITTLE: Yes, Your Honor. So I think a few

points here, but interrupt me when you wish.  One I'll just harken back to my earlier point about I think we know that EPCA applies to some type of building codes, building codes regulate buildings, at least most directly.  And I think that --

THE COURT:  Well, why don't you take me to those -- can you take me -- I read that in your brief, but can you just take me back to the examples you use, because they obviously use a lot of examples of codes that do regulate energy use that -- including a lot of fire codes that, you know, presumably under your argument would also be null.  But can you just take me back to the actual examples that you gave.

MR. LITTLE:  Sure.  Do you mind if I grab the brief.

THE COURT:  Of course.  Whatever you need.

MR. LITTLE:  Sorry, Your Honor, I didn't take all my materials to the podium.  Rookie mistake.

THE COURT:  Totally fine.

MR. LITTLE:  As I'm paging through, one of the things I will just kind of hopefully give Your Honor some comfort on, on this floodgates pre-emption argument, I want to be very candid with the Court and, look, I think there will be hard lines to draw on where EPCA pre-emption ends.  I just think this case, if EPCA pre-emption is going to mean much at all, at least in the kind of pure gas ban context, I think

this is the tiniest little baby step out.

And at some point, you know, maybe there will be more aggressive lawsuits brought about things that have a more tenuous connection to energy use. And I think the Courts will look at that and, you know, use the touchstone that we always have of what was Congress's intent, judging by the text, judging by the history, judging by all those tools. And at some point, sure, we don't think that EPCA's pre-emption provision is going to invalidate all state laws or anything like that. But it at least has to extend to things that are energy conservation provisions, you know, done with, I think, the least bit of creativity to not use the word "energy conservation provision." Because it is --

THE COURT: So I guess under your argument then a state does not have the right to pass a regulation that says our buildings have to use all solar power. They don't -- this preempts that.

MR. LITTLE: The state couldn't, if by that you mean they could not use gas appliances?

THE COURT: No, what I mean is the regulation says, all energy from a building has to come from solar panels.

MR. LITTLE: Yes, I think we're saying the same thing, I just want to be clear because --

THE COURT: No, no.

MR. LITTLE: -- I don't want to --

THE COURT: Because that's what the regulation says, the words of the regulation say -- I understand the import is that you can't use gas stoves. You also can't use stoves that plug into an energy source that comes from coal, or whatever energy comes from, I never know exactly. It can only come from the sun. Clearly, this would not pre-empt that. But your argument is exactly the same in that situation as in this situation. I take it your argument would be, yeah, they can't do that.

MR. LITTLE: So I think I won't go so far as to say they can't do that, because I haven't fully thought through all this, what I can say is I think that would be at least a somewhat harder case. And let me explain why, which is, I mean, here we have a regulation that is targeted directly at what EPCA protects, gas appliances, their energy use. That is at least a more broad based, at least a more broadly applicable regulation. And there's --

THE COURT: It's just saying we don't want energy that doesn't come from the sun. And what they're saying right now is we don't want energy that doesn't come wherever it comes from, I don't know, the socket. It's the exact same situation. They want their buildings to be fueled by a particular type of energy.

MR. LITTLE: I agree with you that both of those would reduce to a ban on gas appliances. I guess the point

I'm making is the fact that the broader based solar power only rule is at least somewhat more broadly applicable, and at least less obviously targeted towards the gas appliance, I think gives it a better chance of surviving pre-emption, whether it does or not.

THE COURT: I mean, the way that you're reading the statute, and it might be the way that it's intended, is that they're attacking gas -- they're attacking the ability of gas products to be put in the building; right? I mean, that's really the heart of your complaint. That's what you're saying. Fine.

But the language of the statute, so far as I understand it, is -- or the import of the statute is not that you can't use gas, but you have to use X-type of energy source. And I don't see how it statute that's aimed at ensuring national standards for gas appliances preempts that. And you were going to take me, I know that you're --

MR. LITTLE: I'm sorry, Your Honor, I'm trying to do double duty and I'm failing horribly at it. Sorry, Your Honor, I'm just looking for the cite for the exception so when I talk I can actually point to something rather than have you just trust me.

THE COURT: Take your time. I'm sorry. I took you away from that.

MR. LITTLE: No worries.

THE COURT: It's on page 12 of your brief, "As for exceptions the statute contains an entire subsection dealing with, quote, 'exception for certain building code requirements.'"

MR. LITTLE: There we go, yes.

THE COURT: "It specifies the circumstances in which a regulation or other requirement contained in a state or local building code for new construction concerning energy efficiency or energy use of a covered product can avoid pre-emption." But we got -- we just keep coming back to the issue of covered product.

MR. LITTLE: Absolutely, yes. So I view -- so let me change the facts here slightly, and then I think it's going to be easier to see where we might diverge.

THE COURT: Sure.

MR. LITTLE: This is a building code, I think we all agree on that. And it -- let's say that instead of saying no onsite fuel combustion it said only gas appliances that have X energy use rating. I think that would be a building code that specifies an energy use standard, frankly, pretty clearly for a covered product.

THE COURT: All right.

MR. LITTLE: So what I'm saying here, and I think the jump that we're having some friction on is that an energy use standard that allows a gas appliance to use some energy,

isn't fundamentally different from one that allows it to use none. It certainly --

THE COURT: But it is in the effect; right? I mean, it certainly is, because if there's a building code that says you have to -- if D.C. has a building code that says if you have an energy use product that has to be at 50 whatever, and New York has one that says if you use an energy thing, it has to be in a building code, it has to be at a hundred whatever, we're back to the exact same problem that Congress was dealing with. But if there's a building code that says, you have to use X type of fuel, which isn't fossil fuel, we're way beyond the problem that Congress was trying to deal with.

MR. LITTLE: So I don't think we are. And because if you look at it from that point of view of the statute when it's in the waiver provision, which I can probably find if I pull through my brief long enough, it talks about the -- and I'm not saying there's a waiver issue here, I'm using the waiver issue whereby DOE can grant a waiver to show the kind of things Congress was worried about, but it says, look, let's see if this would impact the marketing, servicing of the product. Let's look at if this type of law proliferated what would be the cumulative affect.

And because they're worried about this bulkanization that makes it harder for manufacturers to make one product,

but also for manufacturers to kind of service their product nationally. And if you think about a gas ban, a zero kBTU a year energy use standard, you know, let's say that the district passes this one, Maryland passes one, Virginia passes one, you know, pretty quickly we're in an area where there are legacy gas appliances kind of stranded out here. And people might have a really hard time finding people to service those products.

THE COURT: Well, I mean, you know, such is life. I don't -- I mean, take it up with Adam Smith, I don't know what to tell you on that.

MR. LITTLE: Well, if this were a pure unregulated free market, that would be one thing, but it's not. Congress spoke very significantly in the pre-emption context, the District is passing a law that I think clashes with it, or at least clashes with the kinds of things Congress was worried about. And if we're talking about redesigning and kind of --

THE COURT: Congress was worried -- I mean, let's just all be frank here, Congress was worried about fossil fuels. So Congress certainly wasn't intending to pass a law that the effect of which would be states would be required to allow fossil fuel burning appliances in their buildings, because that would be the exact opposite of what Congress wanted.

MR. LITTLE: So I don't think the only aim of EPCA

was to reduce fossil fuel use. I think a very clear aim of EPCA, both in the history and frankly in the text, like I just talked about with the waiver, was ensuring this uniform national appliance regulation for the independent aims of just making it easier on the appliance industry having enough --

THE COURT: But that all stemmed from the original desire, which as I understand it was during the energy crisis or what not --

MR. LITTLE: Yes.

THE COURT: -- to limit the amount of fossil fuels used. And the problem wasn't -- the problem as I understood it that Congress was facing, was that the states were doing their own things. So more fossil fuel is being used than was intended by the Act, in some ways it was a bulkanization and people were doing different standards. So yes, they wanted a consistent standard. Yes, you're exactly right. But the reason they wanted any standards at all was to limit the amount of fossil fuels used.

So it clearly cannot be that the way to interpret a statute that was -- and if the statutory language is ambiguous, I don't think it is, or that I don't see that it is yet, and of course you have the right to convince me otherwise, it would just be very odd to me to say Congress passed a law to limit fossil fuel use that preempts the states, not only from limiting fossil fuel use, but requires

the states to allow it in all of their buildings.

Because let's say, you know, D.C. said we don't want fossil fuels -- I think this was in your brief actually, and there was a code or something that said you can't use fossil fuel, whatever, stoves, you know, if the building is 50 feet from a fire hydrant or a gas pump or something; right? And they made the good argument that under your view, yeah, they can't do that, which would make no sense whatsoever.

MR. LITTLE: So if Congress' aim in EPCA was to do everything it could to reduce fossil fuel use, I don't think the EPCA preemption provision would have been written how it is. I think I would have allowed downward departures on --

THE COURT: No, it wouldn't have, because then it undoes the point about bulkanization, you still would have the bulkanization problem is you allowed downward use. You don't have the bulkanization problem if there's no use. There's no bulkanization problem, right? Appliances can be whatever they are with respect to the national standard, but you can have buildings that just don't have the appliances.

MR. LITTLE: I still think that creates a bulkanization problem. If there's a bulkanization problem you have large swaths of the country where you cannot have a certain type of appliance, gas appliances.

THE COURT: Okay.

MR. LITTLE: And, again, it's not that I care about

this, I mean, it's that, again, when you look at the waiver provision it talks about, you know, you can grant this waiver, but when you think about it what would, you know, think about its effects on types of products and whether the public would still have access to them, which I think does signal some type of concern with the public access to these products in a uniform regulation --

THE COURT: There's nothing in the congressional -- There's just nothing in the congressional language, I mean, if what you're implying is that there's something in the congressional language or in the congressional background that consumers have a right to use fossil fuel products that's clearly not --

MR. LITTLE: If Your Honor --

THE COURT: But that's -- I mean, again, I just go back to this, so my main concern with your argument is that to accept it, I have to accept that Congress created a national requirement that buildings be allowed -- that buildings be allowed to use fossil fuels, I imagine that creates a whole host of constitutional issues about whether or not that would overreach Congress's national power.

But I guess my main question, and maybe there's just no good answer, maybe you and I are just continuing to miss each other -- and, you know, the people figuratively and literally above me are a lot smarter, so maybe they'll get

it -- but what I keep coming back to is the very simple proposition that to accept that the state cannot have a building code that says a building can't use fossil fuels is a requirement that states allow all buildings to use fossil fuels.

MR. LITTLE: So, I think one point just on that and then my second point that I will follow up, which is one I agree that as I read EPCA's pre-emption provision even under what I think is kind of bending over backwards to read it as a district judge really focusing on energy use -- energy conservation standards, rather, that yes, you could not have a statewide building code that says you can't use gas in buildings, at least as it relates to EPCA covered appliances, I suppose you could do that as long as it doesn't touch the EPCA covered appliances.

What I will say as far as how far this case takes us and what could come after, again, I see this as like the tiniest baby step down this pre-emption scale, there are other ways states could try to limit fossil fuel use in buildings --

THE COURT: Okay. Well, how would -- what would be a way that D.C. could do that, that under your view would pass muster under the EPCA.

MR. LITTLE: Sure, so I -- my view is broader than the Court needs to adopt here. So if I could tweak that slightly, because I don't think I have an answer to that

question.

THE COURT: Okay.

MR. LITTLE: But I will say that the Berkeley case talked a lot about, you know, states have a lot of traditional powers over gas utilities and about, you know, where they send gas, who their customers are, and all of that. And while that isn't in front of us here, I think that would at least be a different pre-emption question and one that has to take into account, you know, very strong tradition of state regulation of gas utilities and all of that.

THE COURT: So D.C. could pass a building code that says, by all means the building can allow for gas, you know, do what you will, but we're just not going to give you any gas?

MR. LITTLE: So, I don't think they could do that, Your Honor. What I'm trying to do, to be clear, is to chart this kind of spectrum of, I think, laws that could potentially be preempted under EPCA, but where argument for pre-emption might be harder. And, again, I see this as kind of the first step --

THE COURT: The reason I'm asking you what's the law that they could pass is because my guess is there is no law that your clients would believe that they could pass that wouldn't be preempted, which takes me back to my point that the impact of your argument is that they have to require

buildings to be able to -- or they have to -- that the buildings have to be able to use fossil fuel if they want, which creates a positive right on the behalf of building constructors or, you know, whoever does the building.

MR. LITTLE: So I agree they can't give you a particular law that they could pass right now. I will fall back on my earlier answer that I'm not trying to repeat myself, but forgive me, that there are other potential laws out there that I think would be closer pre-emption questions, sure. I think all of them would still be preempted.

THE COURT: All right. Because at the end of the day, and I'm not faulting you, I mean, I'm not, you know, obviously, some people agree with you, so clearly, you know, it's not like you're obviously wrong. But to me, I just this feels like what you're saying is states cannot pass building codes that -- let me do it this way. Any -- basically the import of your statement is any building code that a state passes must allow for the use of fossil fuel appliances. Because you're saying they can't ban them, which means they have to allow them.

MR. LITTLE: Yes, but can I qualify this slightly, which is it's not even a qualification, I just want to explain how I get there.

THE COURT: Sure.

MR. LITTLE: The tech says a pre-emption provision

right says no state regulation concerning energy use of such covered product. And that I think when it comes to building codes in particular, because again that's pretty close to the heart of EPCA, that the federal government simply has made the choice, we're regulating this area. We're going to regulate the energy use of covered products, at least as it concerns building codes, maybe more broadly, we'll see in the next case.

And so, you know, to the extent that takes some power away from the states, that's true, right, pre-emption always kind of alters the federal state balance. I just think this case is really at the core and not a giant leap away from exactly what the tech says a regulation concerning energy use of the product, use energy know, that seems like a regulation concerning energy use.

THE COURT: But wouldn't -- like, if Congress wanted to say buildings have to allow the use of fossil fuels, wouldn't Congress say that? I mean, why would they make this weird end run around if that's what they want. Congress could have said states must allow the use of fossil fuels and states have to defer to the national government standard on those fossil fuels.

MR. LITTLE: They could have said that, I agree. I just think it's functionally equivalent to say what I think the "in effect" said, which is you can't set a zero kBTU a

year rate.

THE COURT: No, no, no, I mean, that -- as I understand it that goes to whether or not someone's actually using the product, which I think is maybe your argument versus the testing of it, which is their argument --

MR. LITTLE: No. I don't mean to interrupt, but if I could have one comment.

THE COURT: Yeah, sure.

MR. LITTLE: When I say this I'm actually trying to bend over backwards to accept the kind of labels based pure this product uses X --

THE COURT: Okay. All right.

MR. LITTLE: And why I say zero kBTU is only a product that wouldn't use any gas would have that rating. It isn't -- it is impossible, I agree, for a gas appliance to have zero kBTU a year rating on it. But that doesn't change kind of the fact that it's -- it is a energy conservation standard. It's just an impossible one.

THE COURT: Well, I mean, I have a electric car. It's a pure electric car. It's a really great car. I love it. I don't call that a gas -- a car that gets zero miles per hour on gas. I say that that's an electric car. And certainly a regulation that says all cars that use gas have to get at least 20 miles to the gallon cannot be read to say a state has to permit all dealers to sell gas cars if they want.

Like, let's say that there was a statute that said to avoid balkanization, blah, blah, blah, every gas car has to get 20 miles of gas to the gallon, end stop, every gas car. And that's what it says. And we're going to preempt any state law that tries to do anything with respect to gas cars. Right. And the state says, all right, we are banning gas cars and we're only allowing dealers -- or maybe it doesn't even say banning gas cars -- we're only allowing dialers, new dealers who pop up to sell electric cars. No one would say that Congress is forcing the states to permit dealers to sell gas cars. That's not the statute.

MR. LITTLE: So I think I agree with Your Honor. And I only qualify because, you know, doing this live I don't have this written down, but I think I agree with Your Honor. If I could point out what I think is also the difference between that hypo and this case.

THE COURT: Sure.

MR. LITTLE: Which is if instead --

THE COURT: Do you have a gas car, by the way.

MR. LITTLE: I do. Well, I have a hybrid car, so it's both. If instead of phrasing the law as you did it, if instead Congress had said the federal government is regulating the energy use of cars and states can't set, you know, energy -- in case states can't depart from the federal government's energy use regulations and if the federal

government says, you know, all cars that get 20 miles per gallon of gas or higher are allowed, then I think the states couldn't ban cars that get less than that.

THE COURT: Well, yeah, but you add the very important provision at the end that says the states have to allow gas cars, I mean, that's -- at the end of the day that's the heart of the discussion that you and I are having. And I'm not seeing that in the language.

MR. LITTLE: Sure, Your Honor. And I think that was actually just my loose language, because I don't think that would have to be -- I don't think that would have to be explicit. If it says federal government is setting the energy use limits for cars and it sets 20 miles a gallon or higher are fine. And a state comes out and obviously does something like, you know -- sorry, 20 miles a gallon -- and if a state says no we want 25, obviously, that's going to be a problem. And now as I'm talking I don't actually know you can talk about miles per gallon in terms of an electric car --

THE COURT: Bingo. Because a statute that said you have to have -- cars have to have 20 miles to the gallon would not, therefore, prohibit people from selling electric cars. There's no issue with respect to gas mileage with respect to electric cars. You wouldn't say, yes, we're regulating those too, because those get zero miles to the gallon.

MR. LITTLE: Right.

THE COURT: Because there's no gallon.

MR. LITTLE: So I do agree with Your Honor's hypothetical, the gas and electric and how it works and the language makes it harder to kind of talk this out. I wish I had a better hypo that I could throw out there, but if I could try one more time to go back to this case.

THE COURT: Yeah. Sure. Go ahead. I mean, yeah, go back to this case.

MR. LITTLE: The -- I simply don't think we have the same kind of problem here, because it -- it is -- at least I think we're all on the same page with any positive value of energy use standard for gas appliances that that wouldn't be allowed.

THE COURT: Uh-huh.

MR. LITTLE: And even if it's a very low value, even if it's a value that maybe couldn't be met, like 10 KBTU a year or 1 kBTU a year, and if we're just going to say that bans are okay and bans are different, it seems that it quickly devolves into letting states effectively set any conservation standard they want if they're a little creative. You know, they can look at all the gas appliance models and then just ban those with energy use labels higher than they like.

THE COURT: But that's exactly what would be covered by pre-emption.

MR. LITTLE: Well, I think that, Your Honor, but

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

this as I understood and I'm obviously not understanding --

THE COURT: Maybe I didn't understand your hypo.

MR. LITTLE: Sure, if bans are something fundamentally different that states can do, I think states could just use bans not just to set a true zero energy use standard, but any energy use standard they want by just being a little thoughtful what they ban and what they don't.

THE COURT: Well, no, they can't say you can't use appliances that get 15 whatever. They can't do that. That's clearly what Congress is getting at. If there are going to be appliances there has to be a national standard for what those appliances get with respect to the fossil fuel. They're saying you just can't use a product -- or the product you use isn't going to hook up to fossil fuels.

I mean, maybe if -- maybe just it would be helpful if you took me through sort of -- and I understood the 9th Circuit was focused on the energy use. And I don't think I'd let you do that yet. Can you just like focus me on the argument --

MR. LITTLE: Of course.

THE COURT: -- with respect to how the 9th Circuit and how you understand that energy use covers all energy use as opposed to whatever we've been talking about.

MR. LITTLE: Sure. I think the difference on energy use really isn't as to what kind of energy it covers. I see

the difference between my view of it and the District's position as the District sees it as the kind of energy use, meaning the label static value that is placed on gas appliance when it leaves the factory. That this gas appliance uses 200 kBTU per year under normal use and conditions.

THE COURT: Right.

MR. LITTLE: How the 9th Circuit viewed energy use and how we view energy use is energy use means the use of the appliance in the actual home.

Now, I'll just pause here for a second, and I'm happy to talk about energy use for as long as Your Honor wants, but candidly, I don't think the case turns on energy use, because either way you still have the same kind of fundamental issue of they're either setting a energy use standard of zero or they're just saying you can't use energy. And those, at least in my mind, collapse to the same thing, which is those are both regulations concerning energy use.

THE COURT: So let me ask you this, is your argument that energy use doesn't just cover fossil fuel energy use, it covers any energy use. And a stove has a certain energy use and so by saying you have to have -- stove top is I guess what I'll call it, a stovetop uses a certain amount of energy and so therefore it's violating the national standard.

MR. LITTLE: Sure. So energy is defined in the statute to say things like fossil fuels, gas --

THE COURT: Okay. So that's not the argument.

MR. LITTLE: Yeah, so I think -- again, yes, I think everyone agrees on kind of what energy means and what energy use covers.

THE COURT: So a stove -- so let's just say we were talking about a fossil fuel stove and a stove top stove, the D.C. could do whatever it wanted with stove top stoves, it could say you have to have five stove top things or it has to have X amount of energy, and that wouldn't be covered because that's not energy with respect to how it's used in the statute?

MR. LITTLE: No and let me just clarify. So EPCA, we're obviously focusing on gas appliances, because it's a gas ban here, but EPCA covers a wide variety of electric appliances too. So I think any type of energy use regulation that concerns any appliance gas or electric you're going to start asking pre-emption questions, you know, whether it crosses the line or not, you have to look at the individual case.

THE COURT: So, I'm confused. So if they have a stovetop stove, right, and it has five little things on it. I'm not a cook. I don't actually know how to boil an egg. Is there a national standard that governs stovetops or can they do whatever they want with respect to stovetops?

MR. LITTLE: No, there is a energy conservation

standard for electric stovetops for gas stovetops and those are specified in the --

THE COURT: No, but that's gas. I'm just talking about the purely electric --

MR. LITTLE: For electric too, there is a --

THE COURT: Okay. So is your argument that by saying that you can't use the gas but you can use the stove saying you are therefore creating an energy use standard.

MR. LITTLE: So I think my argument is broader than that, but I don't think it has to be. So the most narrow version of my argument is, by saying you can't use any gas appliance at all, if you are that's an energy conservation standard, it's just none, you know, it's less than one. You can't even use a gas stove that uses 1 kBTU a year of gas energy. It has to be absolutely none, zero. And so on this chart of the EPCA?

THE COURT: It's kind of like a very big existential question, like what does nothing mean.

MR. LITTLE: But on this, if you look at the EPCA regulations, and I don't think you really have to for this case, but it's a chart and kind of lists the type of product and then it lists the energy conservation standard, right. And these are different things like 100 kBTU a year, 850, you know based on all sorts of things. And I guess the sort of narrowest version of my argument is if that said zero kBTU a

year, thousand british thermal units a year, that is the same as saying you just can't combust gas. It's the same thing. It's functionally equivalent.

THE COURT: It's not function -- Okay. All right. I mean, I guess here's where I don't understand how these are functionally equivalent. If you say to a manufacturer, you can't have a gas appliance, any gas appliance in our city has to have zero use of energy. That clearly would violate the standard because the standard is you have to allow gas appliances if they have 50 whatever of energy, right. We all agree that that would violate the statute.

And because the manufacturers would have to change their gas appliances, they would somehow have to come up with a gas appliance that worked without using any energy. Presumably not possible, but it would be forcing the manufacturers to decide whether or not to create a gas appliance. And if so, that they had to create a gas appliance that had zero amount of energy.

That's totally different from saying our buildings require stovetop energy because -- and it poses no obligation on the manufacturer whatsoever, none. The manufacturer keeps manufacturing their gas stove at the 50 whatever. It's just they're going to have less people to sell it to. But Congress certainly wasn't, I don't think, insisting that there be a marketplace that states open up a marketplace for fossil fuel

appliances.

MR. LITTLE: So if I understand, Your Honor, and I just want to make sure I got this right.

THE COURT: Yeah. Sure.

MR. LITTLE: Is I think we agree at least that if this law wasn't a building code aimed at some buildings, but was a regulation aimed at the actual product manufacturers and said your gas appliances can't use gas energy, and I don't mean to question the Court, forgive me, but do we agree that would be preempted under EPCA, at least tentatively and not obviously holding you to anything because you're --

THE COURT: I'm sorry, so say the hypothetical again.

MR. LITTLE: Sure. It's a law that looks a lot like this but it isn't a building code, but instead it tells gas appliance manufacturers you can't use gas energy or you can't make gas appliances that use gas energy. You have to make gas appliances so now it doesn't use gas, that would be preempted under EPCA?

THE COURT: I mean, I would think so. I haven't thought about it, you might have a good point, but I would think so.

MR. LITTLE: Believe me, I'm not trying to boss Your Honor. I'm trying to --

THE COURT: Yeah, no. I hear you. Go ahead.

MR. LITTLE: I think if we agree there, then it's a very small step to us agreeing in this case. Because I think the only jump that we're doing is that would be an energy conservation standard applied to the appliance manufacturer. And this would be an energy conservation standard applied to a building.

THE COURT: I think it's a big -- but to me that's a big distinction, in part because even the exception you pointed me to refers to a covered product.

MR. LITTLE: Sure, but I guess my point here is in the absence of say the exception for the building code for the products, I think that would perhaps be a larger leap. But since we know with some certainty that Congress intended things like energy conservation standards that happen to apply at the building level to also be preempted, then I think there's very little daylight between the regulation that just tells the appliance manufacturer your gas appliances can't use gas energy and a regulation that says, hey, in this building your gas appliances can't use gas energy. I think at least under EPCA pre-emption, because we know it covers both those fields, those should both be preempted if either one is.

THE COURT: But I don't think they're saying your appliances can't use gas energy in our building. I think what they're saying is our building doesn't have gas energy, so presumably people aren't going to put your appliances in the

building.

MR. LITTLE: So Your Honor --

THE COURT: But it's not saying, you, manufacturer, have to do anything different.

MR. LITTLE: So, Your Honor is correct that they aren't allowing gas energy for any purposes in the building. I agree with that.

THE COURT: Uh-huh.

MR. LITTLE: But I think that necessarily means that any gas appliances in this building can't use gas energy.

THE COURT: No -- well, yeah, but also it means -- but there's a distinction right, yeah, if you have a gas energy product in there it can't use gas. But because there's no gas coming in, not because you're telling the manufacturer they have to do anything differently with respect to their gas appliances.

MR. LITTLE: Well, sure. But I think that that's a function of these -- of the EPCA preempting certain building codes, right. Building codes are always going to tell the builder how it can build its buildings, or the occupants what they can do in their buildings. The building codes don't apply to the manufacturers directly. And while I think that there are these effects on the manufacturers, really I think it's more of a contextual point, which is that we -- that it's a regulation concerning energy use, I think we agree that if

it were applied at the manufacturer level it's preempted.

And at least as I read EPCA, some types of regulations concerning energy use in building codes applied at the building level have to be preempted so --

THE COURT: But if the regulation covers -- if the regulation requires a different energy use of a covered product, and we would go back to my gas and electric car example, and I think you and I just have a fundamental disagreement as to what "nothing" means, because I don't think that anyone would say an electric car you would describe it as a car that gets zero miles to the gas gallon. You would just say it's an electric car and it gets however many -- like my electric car it gets, I don't know, 210 miles to my battery being filled up.

MR. LITTLE: Sure, Your Honor.

THE COURT: But you wouldn't say that a code that regulates how much gas to the gallon a gas car gets has impact on a battery powered car.

MR. LITTLE: But I'm also not saying -- and forgive me if I'm not following Your Honor's hypothetical, but I'm not saying here that the gas ban is somehow problematic for how it impacts electric appliances or something like that. I'm saying the gas ban is problematic for how it impacts gas appliances.

THE COURT: Yeah, but that's my point. Yes,

exactly. Yes. That is what you're saying. And my point is is that you're reading the pre-emption to say a state can't say that new dealerships can only sell battery powered cars because there's this national regulation that says all gas cars have to get 20 miles to the gallon. Right?

MR. LITTLE: I think I agree with Your Honor's hypothetical. But I just think it's fundamentally different and forgive me.

THE COURT: Okay.

MR. LITTLE: I thought we agreed this is somewhat different, but I could be wrong. If we could go back, and I don't mean to retread ground here, but to the -- to the law focused on the manufacturer saying you can make whatever gas appliance you want you just can't use gas power, that seems like a gas ban and that seems --

THE COURT: It is a gas ban.

MR. LITTLE: Right. And it seems like --

THE COURT: It's not telling manufacturers what kind of energy use their appliances can make.

MR. LITTLE: Well, sure it is, right, if you're saying you can't use gas energy in your gas appliance, that seems to be telling them what kind of energy use they can make or they can use in the appliance.

THE COURT: It's not telling them how much energy the appliance has to get with respect to how much gas comes in

or out. Because I thought that you and I had agreed that the regulation -- or the statute concerns how much gas -- how much energy use a gas covered product can use; right?

MR. LITTLE: Yes.

THE COURT: 50 to whatever.

MR. LITTLE: Sure.

THE COURT: Which is different than saying that stoves -- stovetop things can have four tops; right?

MR. LITTLE: Yes, I don't think of -- and I don't mean to be pedantic, but I don't think a regulation kind of concerning how many tops or whatever on a stove would run afoul of EPCA, because it really doesn't --

THE COURT: Okay. Well, I mean, I don't know how you measure energy that comes out of --

MR. LITTLE: Oh --

THE COURT: A non gas stove, I'm just making that --

MR. LITTLE: Sure. It's a, you know, kilowatts per year or something like that.

THE COURT: All right. So the statute says if you're using a gas stove it has to get 50 whatever. If you're using a stovetop stove it has to get 50 whatever whatever. They're different whatevers; right?

MR. LITTLE: Yes.

THE COURT: So then a regulation that says the buildings have to use stovetops has no impact on regulating

what kind of gas the gas stoves can use.

MR. LITTLE: And -- but I do think it does impact, if we could go at a very broad level here it impacts what kind of gas appliances in terms of their energy use profile I can use in that building. In just the same way that if this law were aimed at the manufacturer itself, it would impact what kind of gas appliances it could manufacturer, whether it could only manufacturer ones that use zero gas, which again --

THE COURT: No, that manufacturer could manufacture as many things as it wants. D.C. is not doing anything to a manufacturer. D.C. is saying, our buildings are going to use X type of appliances, but it's not telling any manufacture -- I mean, it's not telling any manufacturer they have to do something different with their existing product lines. You still are just following the national standard.

MR. LITTLE: Sure. So no, I think, no state local regulation at the building level is going to contain an actual order at a manufacturer. Once it gets to enough, and there are so many states here practically I think that could happen. But I think the point, and what EPCA seems to be concerned about, is these building code regulations are -- do impact the appliance marketplace. And while their impacts on the manufacturer itself may not be as extreme as a regulation just telling a manufacturer what they can and cannot make, it's still having some impact. It's --

THE COURT: It's having impact on that manufacturer's bottom line maybe.

MR. LITTLE: So --

THE COURT: But then we get back to the argument that you're reading the statute to create an affirmative basically market right. Basically, you're saying the government has to allow open markets with respect to new buildings to gas appliances.

MR. LITTLE: I mean, I think a necessary consequence of the pre-emption provision is that there will be more buildings that permit gas appliances that comply with the federal standards.

THE COURT: I'm sorry, say that again.

MR. LITTLE: I think a necessary consequence of EPCA pre-emption is that there will be more buildings that permit gas appliances that comply with the federal standards. I agree with that.

THE COURT: Right.

MR. LITTLE: Whether it's a right or not, I'm less certain. But I guess my focus when I think about this is if you couldn't do this at the manufacturer level, why could you do it at the building level, because again we --

THE COURT: Because the purpose of the statute is A, to reduce fossil fuels, and to not have balkanization with respect to the different kinds of appliances that

manufacturers have to manufacture. You don't want GE to have to manufacture a D.C. stovetop and a New York stovetop and a California stovetop. You just want GE to be able to manufacture a good old US of A stovetop. And what he's saying is, yes, under our regulation GE can still manufacture its U.S. of A good old stovetop. We're not saying you have to have a D.C. Stovetop. We're leaving you totally alone. What we're saying is we're not creating a market for you. We're not forced to create a market for you. We're not -- the thing that trying to ban balkanization isn't requiring us, a state, to allow stovetops.

MR. LITTLE: So if -- imagine, and I don't have an example here, so bear with me here, but I'm imagining an appliance manufacturer that just makes gas stovetops.

THE COURT: Uh-huh.

MR. LITTLE: And let's say that they just sell in D.C. or let's say, you know, Maryland and Virginia.

THE COURT: Uh-huh.

MR. LITTLE: So let's say a little broader. If you have a gas ban, that manufacturer is going to have to redesign, retool, still making stovetops but making them completely differently, somehow making gas stovetop doesn't make gas.

THE COURT: No, that manufacturer is going to have to go into a different line of manufacturing, but that's just

competition. And that's just, you know, what not, I mean, yeah, okay.

MR. LITTLE: So with that, I think that's -- that's at least a very close to the types of impacts on manufacturers having to retool, having to change their production lines in response to state and local regulations. Now, I grant it's not the same thing as having, you know, 30 different types of energy use standards across the country, of course it's not. But I don't think it's a million miles away either. And again, given the pre-emption provision's seemingly broad language concerning energy use of such product, and I think everyone's agreement that a gas ban at least has the effect of concerning the energy use of gas appliances for --

THE COURT: No, it has the effect of saying whether or not you can use that appliance. I think you and I -- I think you and I just have a fundamental disagreement on this. It seems like we're going back and forth on the same thing. But can you give me one minute because I just want to look --

MR. LITTLE: Of course.

THE COURT: Stay up for a moment because I just want to check something in the 9th Circuit case.

MR. LITTLE: Of course.

THE COURT: I just want to make sure I covered it.

(Pause in the proceedings.)

THE COURT: Okay. I think one of your friends sent

you a note, were you able to address that.

MR. LITTLE: Yes, Your Honor.

THE COURT: Okay. Anything else that you want to note?

MR. LITTLE: Not unless Your Honor has some more questions.

THE COURT: Okay.

MR. LITTLE: Thank you.

THE COURT: Is there anything you would like to say?

MR. TUETKEN: I'm happy to answer questions if you have them, but --

THE COURT: I mean, I guess -- I mean, at the end of the day it seems like we just -- there's actually a book called zero that I've been meaning to read for a long time, and it's about the number zero and how ancient people actually didn't have a concept of the number zero. It's really fascinating. I just haven't been able to read the book yet. I haven't had the time. But I think at the end of the day where counsel and I disagree is whether -- what the meaning of zero is. Whether zero means we are regulating the product or not regulating the product. And I think I understand his arguments.

Do you want to say anything about that particular issue, because I think that's really at the heart of where probably my opinion is going to come down.

MR. TUETKEN: Yes.

THE COURT: Okay. Why don't we do this, why don't we take an 18-minute break and come back at 4:15. That will give me a chance to look over my notes and It will give you a chance to look over your notes. And I'll let you have the final word. All right.

(A recess was taken from 3:57 p.m. to 4:15 p.m.)

THE COURT: All right. I have a couple questions for you, before you get started. First -- maybe I should have asked your colleague this too, but do we have a ripeness issue? I mean, the law hasn't passed yet, right, I mean, as I understand in its final form.

MR. TUETKEN: So the law is passed, the legislation has passed. But Your Honor's correct, the standard that it announces is not implemented because the way the law works it says here's a broad directive of what we want buildings to be designed to. Here's the standard we call that our net zero energy standard. And the Construction Codes Coordinating Board is in charge of implementing that, so coming up with regulations that are, you know, positive law that implement that standard. And that process is -- yeah, has not occurred. The latest -- the deadline is the end of 2026.

THE COURT: All right. And is there room in that for restaurants to be able to use -- I mean, would it be possible to have a regulation that allowed restaurants to use

gas stoves.

MR. TUETKEN: Not under this. But an important point about the restaurants and the stoves is that ECPA doesn't actually provide pre-emption protection for commercial cooking appliances.

THE COURT: Okay.

MR. TUETKEN: So the way the pre-emption provision works is it's only triggered if an energy conservation standard is set for a covered product. And then as Your Honor was saying it only preempts regulations concerning the energy use of that product. But no energy conservation standard has been set for commercial cooking appliances. So the restaurants are kind of in this lawsuit more mistaken reasons, because they think ECPA gives them the right to use commercial gas powered commercial cooking appliances.

THE COURT: I thought there was both a commercial and industrial pre-emption, it's not this?

MR. TUETKEN: So, yes, you're right. So there are consumer products --

THE COURT: Consumer, right.

MR. TUETKEN: And industrial products. The commercial cooking appliances are in the industrial products section. And they don't have a energy conservation standard.

THE COURT: All right. Well, I don't know. As a

citizen whoa doesn't know how to cook and likes restaurants, I mean it does seem at least they have a maybe not legal gripe but a legitimate gripe that being forced to use stovetop versus gas top might be difficult. But, you know, do with that what you will.

And then what about this issue with respect to will the code -- does the code or do you not know yet, prevent people to bring in their own generators, their own foss- -- like I don't know if that exists. But let's say I had a fossil fuel generator, and even though I can't hook up my stove to the building I can hook up my stove to my self-generator, would that be permitted or not permitted? And if you don't know, that's totally fine.

MR. TUETKEN: I think -- I'm sorry, I don't know and that's because, you know, this hasn't been implemented yet.

THE COURT: Right. So that might be part of what we're dealing with.

Okay. My clerk looked up the book, it's -- the name is "Zero, the biography of a dangerous idea," which I now will be reading, now I have a reason to read. It's been on my bookshelf for a while. But go ahead.

MR. TUETKEN: Yes. So a few points on zero, since it now seems to be their main argument. And I think Your Honor seems to be thinking about zero correctly. And there's, you know, I see three big problems with the zero argument for

them, is that first energy use is a fixed, premarket characteristic of the product's design. And so energy use does not change or depend on anything that happens within the market. So if a product enters a market or a jurisdiction where gas appliances are banned, its energy use doesn't suddenly become zero when it crosses the border. So to say that we have imposed a zero energy standard is incompatible with understanding how energy use is a premarket figure. The second problem --

THE COURT: So the stove can use whatever energy it wants or Congress demands, it's just you can't use the stove.

MR. TUETKEN: Right. The energy use figure, which is specific to ECPA doesn't change.

THE COURT: Okay.

MR. TUETKEN: The second problem with the zero argument, and Your Honor was touching on this, is that they are saying we are requiring zero energy gas stoves. There's no such thing, like both just as a general common sense matter, but especially under the language of ECPA. Because ECPA defines energy use as the quantity of energy consumed by a product during a representative use cycle. So we -- for manufactures to measure energy use and get a energy use figure, you have to run the product. And obviously the product needs energy to run. So there's just no such thing as

a zero energy product as defined by ECPA. So for them to say, well, the District's law is effectively telling gas appliances we'll only let you in if you're a zero energy gas appliance, but that's just not possible for the District to discriminate on that basis, because that's not a real thing.

And then the third problem, and Your Honor was touching on this with the -- like, with the electric cars example, is that a product can only have one energy use, that follows from the text of the statute, which energy use is the quantity of energy a product is designed to use. And so for plaintiffs to say that by requiring electric stoves we are requiring zero gas energy products, and electric stoves or zero gas energy products, that's just not possible because electric stoves are whatever their energy use is expressed in electricity. Like when --

THE COURT: That's what I was looking for, electricity. Thank you.

MR. TUETKEN: And so, and it's clear that ECPA does not contemplate multiple energy uses because you have to label the products. The yellow label you might have all seen if you've ever had the joy of shopping for appliances at Lowe's, like there's one number there. So if it's an electric, like, washing machine, it doesn't say 20 kilowatt hours, oh, and also zero BTU gas. And so the zero argument doesn't work because it presupposes that products can have -- that electric

products can with have a zero energy use, which just isn't right. And I would last note about this zero argument is that no one who correctly understands ECPA has accepted it, the New York --

THE COURT: So the 9th Circuit just didn't understand.

MR. TUETKEN: Yeah, the New York courts have rejected it. Judge Friedland's dissent rejected it. And while Judge Bumatay's opinion for the panel entertained and seemed to accept a zero energy argument, they misunderstood what energy use was. They cut off half of the definition. And so I don't think plaintiffs can like reasonably say that the 9th Circuit accepted this argument, because the 9th Circuit accepted this argument based on a misunderstanding of energy use. The 9th Circuit --

THE COURT: No, go ahead.

MR. TUETKEN: Oh, I was just going to finish. The 9th Circuit's opinion is like if someone wrote a Second Amendment opinion and the entire time thought that bear arms meant to go sleeveless, like it's that level of misunderstanding here. So I don't think plaintiffs can really rely --

THE COURT: That's a great example.

MR. TUETKEN: -- can really rely on the Ninth Circuit, say, look they accepted all of our arguments, because

the 9th Circuit made a big mistake up front and then it infected it. And, I mean, there where are a lot of other mistakes too, if that opinion was submitted as a final paper in textualism 101 it would get a F. Like, it's just elementary mistake after elementary mistake.

THE COURT: I'm sure the 9th Circuit judges will be happy to hear you say that.

MR. TUETKEN: Well, funny enough, they did hear something like that from Judge Friedland and no one had a response. No one can muster up a concurrence and like Judge --

THE COURT: For some reason it didn't go en banc; right?

MR. TUETKEN: Right. But it takes a lot of votes on the 9th Circuit. It's 28 actives. But what's interesting about that, so as Your Honor probably knows, especially like there are a lot of considerations for en banc review, beyond just whether a decision is wrong --

THE COURT: I get it. We don't have to -- they're going to do what they're going to do.

MR. TUETKEN: So but I think it' remarkable that off the bat eight judges didn't need to see percolation, they didn't need to see how other circuits treated this. They said this panel opinion is wrong and we got to stop it now.

THE COURT: Got it. Okay. All right. Anything

else?

MR. TUETKEN: No.

THE COURT: All right. Thank you. Do you want to respond anything he said and then I have a question for you, or say anything else.

MR. LITTLE: Yes, Your Honor. Could I respond to two things.

THE COURT: You can respond to as much as much as you want. You've got me until 6:00 p.m.

MR. LITTLE: Well, I will try not to take quite that long.

First, just to Your Honor's point about ripeness, I want to point out that how the law is written, at the end of 2026, there will be a ban onsite --

THE COURT: Okay.

MR. LITTLE: -- combustion, no matter how this shakes out. I won't belabor that point, I just want to make that clear.

THE COURT: Sure.

MR. LITTLE: One more minor point or I guess targeted point, it's not minor. On the one type of energy use and all of that, EPCA proscribes standards for gas ranges then electric ranges. And then it specifies at least at times between gas and electric. So our point is for those, you know, gas ranges, it has an energy use standard. And I

understand that we may not see zero as the same way there, but I just do want to be clear that it would kind of impede the operation of that standard in some sense.

I do have one point that is not responsive.

THE COURT: Sure. Go ahead.

MR. LITTLE: Going back to our conversation from earlier, one additional I think consequence that I wanted to point out, and Your Honor may be aware of this already, is that if the District can ban gas appliances in these buildings, I think under the way that Your Honor's thinking about it at least in this hearing, you could also just ban gas appliances across the entire District.

THE COURT: Sure.

MR. LITTLE: And if it can do that, then I see very little daylight between that and telling an appliance manufacturer that it can't market gas appliances in the District, or that it can't -- I misspoke there, sorry, that it can't manufacture any gas appliances that use gas energy. And again this kind of gets to what I've been kind of circling around and trying to connect up, that really these regulations on buildings, especially say all buildings, have the same effect as the appliance-focused regulations of, you know, energy use. Now, we have a separate, I think, point about whether zero is an energy conservation standard or not, or whether zero effects energy use or not. But I do want to be

clear that I think Your Honor's conception of if it impacts buildings might be somewhat different, that gets pretty broad pretty quickly. And with that I'm happy to answer any questions.

THE COURT: Okay. All right. I hear you.

First, a clarification, I overstated something with respect to an affirmative right, and Katherine pointed out this is where we might have been missing each other at least on this small point. I shouldn't have said that reading the pre-emption to require -- to prevent the bans requires D.C. to have buildings that have fossil fuels, because as Katherine pointed out, the buildings in themselves could agree not to have it or to have it. So the better thing to have said is it would create sort of an obligation on D.C. to allow fossil fuels if the buildings wanted them. So just a very slight tweak.

MR. LITTLE: I understand.

THE COURT: Since I overstated it I wanted to correct it.

My second question is from Katherine so you can blame her. But I did mention this, that D.C. does currently ban kerosene powered heaters, right. And I don't think you would have an argument that D.C. can't ban kerosene powered heaters. Although, per your logic that would mean that we were bringing the energy use of kerosene heaters down to zero

and that that would be preempted.

MR. LITTLE: So I don't know as I stand here today, and I'm happy to look this up afterwards, whether kerosene powered heaters fall within the energy conservation standards.

THE COURT: Well, just let's just assume they are.

MR. LITTLE: If they are then yes, I think D.C. couldn't just also ban kerosene powered heaters, because that would be setting a zero energy conservation standard for them.

THE COURT: Okay. And what would create -- the thing where I said, yeah, just assume they are, what was it that you didn't know?

MR. LITTLE: Oh, whether DOE has promulgated a energy conservation standard for kerosene heaters.

THE COURT: All right. Got it. Anything else?

MR. LITTLE: No, Your Honor.

THE COURT: Okay. Anything from you?

MR. TUETKEN: No.

THE COURT: All right. You can be seated.

So, as you know, well, I assume you know, I've only been on the bench for a couple years. And a question I get asked often is what's something you realize now that you didn't realize when you were litigating. And one of the things that struck me the most is that when I was litigating

if I lost a case I would just kick myself over and over again if I lost an argument trying to figure out what I could have done better. And what I realized is that people can have excellent arguments and be excellent orators and be very well prepared and just not convince me. And that has nothing to do with anyone's preparation or skill.

So whatever happens with respect to the opinion, both sides have done a terrific job. Obviously, I kept plaintiffs up here a lot longer than I did the defense. But very well done. Both of you were very prepared. I know how crazy busy D.C. lawyers are these days, not surprised maybe that you're the only one here, but everyone was exceptionally well prepared, which makes my job a lot easier, so thank you.

I don't know when we're going get out a decision. Hopefully before the end of the year. I can't promise that. But, you know, that's what I hope. If anything happens in the meantime, or you need my attention or you guys are talking or something happens, don't like write each other a bunch of letters, just email chambers and we can get on a very quick phone call if we need to figure something out. And if I need briefing on something, I'll let you guys know, okay? Anything else?

All right. Have a good weekend, everyone.

(The proceedings were concluded at 4:30 p.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif
Official Court Reporter

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< 0 >.
00 60:9.
000 14:6.
.
.
< 1 >.
1 10:3, 14:6,
  15:23, 36:17,
  40:14.
10 5:12, 9:16,
  10:3, 14:6,
  36:16.
100 9:16, 14:6,
  40:23.
101 59:4.
12 23:1.
1300 1:34.
15 37:9, 53:3,
  53:7.
18-minute
  53:3.
1st 1:33.
.
.
< 2 >.
20 11:10,
  33:24, 34:3,
  35:1, 35:13,
  35:15, 35:20,
  46:5,
  57:23.
200 38:4.
20001 1:24,
  1:41, 1:46.
202 1:47.
2025 1:11.
2026 53:22,
  60:14.
210 45:13.
24-2942 2:2.
24-2942-ACR
  1:5.
25 35:16.
28 59:15.
2:47 p.m.
  1:13.
.
.
< 3 >.
3 53:7.

30 51:7,
  64:24.
333 1:45.
354-3247
  1:47.
.
.
< 4 >.
4 17:22, 53:3,
  53:7,
  64:24.
400 1:39.
401 1:33.
42 17:11,
  17:17,
  17:18.
.
.
< 5 >.
5 17:13,
  17:14.
50 11:9, 24:6,
  27:5, 41:10,
  41:22, 47:5,
  47:20,
  47:21.
500 9:1,
  12:14.
57 53:7.
.
.
< 6 >.
6 60:9.
62 17:10.
6297 17:19.
6297(c 17:11.
6316 17:17.
6316(2 17:19.
650 16:22.
6th 1:39.
.
.
< 7 >.
700 1:23,
  16:22,
  16:23.
77002 1:29.
78704 1:35.
.
.

< 8 >.
8100 1:40.
850 40:23.
.
.
< 9 >.
910 1:28.
9th 3:6, 3:9,
  3:10, 4:16,
  4:23, 6:14,
  18:2, 18:17,
  37:16, 37:21,
  38:7, 51:21,
  58:5, 58:13,
  58:15, 58:18,
  59:1, 59:6,
  59:15.

_____/s/___
_____

  65:5.

.
.
< A >.
ability 22:8.
able 5:11,
  31:1, 31:2,
  50:3, 52:1,
  52:17,
  53:24.
above 28:25.
above-entitled
  65:3.
absence
  43:11.
absolute
  7:24.
Absolutely
  23:12,
  40:15.
accept 7:13,
  28:17, 29:2,
  33:10,
  58:10.
accepted 58:3,
  58:13, 58:14,
  58:25.
access 28:5,
  28:6.
account 30:9.
across 17:12,

51:8,
  61:12.
Act 3:17, 3:23,
  6:10, 7:23,
  26:14.
action 2:2.
actives
  59:15.
actual 3:8,
  5:20, 17:4,
  17:8, 19:12,
  38:9, 42:7,
  48:17.
actually 2:24,
  6:3, 6:10,
  6:11, 8:16,
  9:6, 17:10,
  22:21, 27:3,
  33:3, 33:9,
  35:10, 35:17,
  39:22, 52:13,
  52:15,
  54:4.
Adam 1:37,
  2:15,
  25:10.
add 35:4.
additional
  61:7.
address 7:11,
  11:22,
  52:1.
addressing
  5:22.
adopt 29:24.
advance
  12:18.
affect 24:23.
affirmative
  13:18, 13:20,
  14:18, 15:4,
  16:12, 49:5,
  62:7.
afoul 47:12.
afterwards
  63:3.
aggressive
  20:3.
agree 4:16,
  8:15, 8:24,

9:3, 9:7, 13:1, 18:13, 18:15, 21:24, 23:17, 29:8, 31:5, 31:13, 32:23, 33:15, 34:12, 34:14, 36:2, 41:11, 42:5, 42:9, 43:1, 44:7, 44:25, 46:6, 49:17, 62:12.
agreed 46:10, 47:1.
agreeing 43:2.
agreement 51:12.
agrees 11:23, 39:3.
ahead 36:7, 42:25, 55:21, 58:16, 61:5.
aim 25:25, 26:1, 27:9.
aimed 22:15, 42:6, 42:7, 48:6.
aims 26:4.
air 15:11.
al 1:6, 1:10, 2:3.
Alanis 7:22.
alert 2:25.
allow 16:9, 16:11, 17:5, 25:22, 27:1, 29:4, 30:12, 31:18, 31:20, 32:17, 32:20, 35:6, 41:9, 49:7, 50:11, 62:14.
allowed 10:19, 14:7, 27:12, 27:15, 28:18, 28:19, 35:2, 36:13,

53:25.
allowing 14:13, 34:7, 34:8, 44:6.
allows 17:1, 23:25, 24:1.
almost 8:8.
alone 50:7.
already 61:8.
alters 32:11.
Although 62:24.
ambiguous 26:21.
Amendment 58:19.
amount 10:11, 26:10, 26:18, 38:22, 39:9, 41:18.
Ana C. Reyes 1:16.
analysis 12:18.
ancient 52:15.
announces 53:15.
annoyed 4:6.
answer 9:12, 12:4, 28:23, 29:25, 31:7, 52:10, 62:3.
apologize 6:15.
APPEARANCES 1:19.
appliance-focus ed 61:22.
applicable 21:17, 22:2.
applied 8:25, 43:4, 43:5, 45:1, 45:3.
applies 3:18, 3:19, 8:11, 12:1, 12:7,

19:3.
apply 11:25, 12:9, 43:14, 44:22.
applying 11:7.
area 25:5, 32:5.
arguendo 8:10.
arguing 14:3.
arguments 5:1, 10:1, 52:22, 58:25, 64:4.
arms 58:19.
around 32:19, 61:20.
As if 1:43, 65:1, 65:6.
aspect 5:23.
Association 2:3.
assume 8:10, 63:6, 63:12, 63:21.
attack 16:22, 16:23, 16:24.
attacking 22:8.
attention 64:17.
Attorney 1:38.
Austin 1:35.
Avenue 1:45.
avoid 23:9, 34:2.
aware 61:8.
away 22:24, 32:10, 32:12, 51:9.
.
.
< B >.
B. 1:31.
baby 20:1, 29:18.
back 2:11,

4:11, 8:1, 12:24, 19:2, 19:8, 19:12, 23:10, 24:9, 28:16, 29:1, 30:24, 31:7, 36:6, 36:8, 45:7, 46:11, 49:4, 51:17, 53:3, 61:6.
background 28:11.
backwards 29:9, 33:10.
Baker 1:22, 1:27, 1:32.
balance 32:11.
balkanization 34:2, 49:24, 50:10.
ban 3:11, 3:15, 3:16, 17:7, 19:25, 21:25, 25:2, 31:19, 35:3, 36:22, 37:7, 39:14, 45:21, 45:23, 46:15, 46:16, 50:10, 50:20, 51:12, 60:14, 61:9, 61:11, 62:22, 62:23, 63:8.
banc 59:12, 59:17.
banned 56:5.
banning 34:6, 34:8.
bans 10:2, 36:18, 37:3, 37:5, 62:10.
based 21:16, 22:1, 33:10, 40:24, 58:14.
Basically 4:15, 5:3, 6:15, 18:14, 31:16,

49:6.
basis 57:5.
bat 59:22.
battery 45:13,
45:18,
46:3.
bear 50:13,
58:19.
become 56:6.
beginning
2:6.
behalf 2:15,
31:3.
belabor
60:17.
Believe 30:23,
42:23.
bench 63:22.
bend 33:10.
bending 29:9.
Berkeley
30:3.
bet 17:15.
better 22:4,
36:5, 62:13,
64:3.
beyond 24:12,
59:17.
big 40:17,
43:7, 43:8,
55:25,
59:1.
bill 8:15.
Bingo 35:19.
biography
55:19.
bit 3:2, 13:3,
20:12.
blah 18:22,
34:2.
blame 62:21.
Board 53:19.
boil 39:22.
book 52:13,
52:17,
55:18.
bookshelf
55:21.
border 56:6.
bore 2:23.

boss 42:23.
bottom 17:14,
49:2.
Botts 1:22,
1:27, 1:32.
break 53:3.
brief 17:12,
17:14, 17:15,
19:7, 19:14,
23:1, 24:17,
27:3.
briefing 8:5,
64:21.
briefs 4:14,
4:17.
bring 10:12,
10:14,
55:8.
bringing
62:25.
british 41:1.
broad 4:12,
8:7, 15:8,
21:16, 48:3,
51:10, 53:16,
62:2.
broader 22:1,
29:23, 40:9,
50:19.
broadly 21:16,
22:2, 32:7.
brought 20:3.
BTU 57:24.
build 6:1,
7:18,
44:20.
builder
44:20.
BUILDERS 1:5.
bulkanization
12:25, 24:24,
26:14, 27:14,
27:15, 27:16,
27:17,
27:21.
Bumatay 58:9.
bunch 64:18.
Burke 14:23.
burning
25:22.

busy 64:11.
.
.
< C >.
C. 1:12, 1:46,
17:11, 24:5,
27:2, 29:21,
30:11, 39:7,
48:10, 48:11,
50:2, 50:7,
50:17, 62:10,
62:14, 62:21,
62:23, 63:7,
64:11.
cable 13:15.
California
11:10,
50:3.
call 3:16,
9:22, 33:21,
38:22, 53:17,
64:20.
called 52:14.
candid 19:22.
candidly
38:12.
car 33:19,
33:20, 33:21,
33:22, 34:2,
34:3, 34:19,
34:20, 35:18,
45:7, 45:10,
45:11, 45:12,
45:13, 45:17,
45:18.
care 27:25.
cars 33:23,
33:25, 34:5,
34:6, 34:8,
34:9, 34:11,
34:23, 35:1,
35:3, 35:6,
35:13, 35:20,
35:21, 35:23,
46:3, 46:5,
57:7.
case 2:10, 3:7,
3:9, 3:10,
19:24, 21:13,
29:16, 30:3,

32:8, 32:12,
34:16, 34:24,
36:6, 36:8,
38:12, 39:19,
40:21, 43:2,
51:21,
64:1.
certain 12:5,
16:7, 16:10,
17:2, 23:3,
27:23, 38:20,
38:22, 44:18,
49:20.
certainly 5:23,
7:20, 13:10,
24:2, 24:4,
25:20, 33:23,
41:24.
certainty
43:13.
certify 65:1.
chambers
64:19.
chance 22:4,
53:4, 53:5.
change 10:23,
23:13, 33:16,
41:12, 51:5,
56:3,
56:14.
characteristic
56:2.
charge 53:19.
chart 30:16,
40:16,
40:21.
check 51:21.
choice 32:5.
Christine 1:43,
65:1, 65:6.
circling
61:19.
Circuit 3:7,
3:9, 3:10,
4:16, 4:23,
6:14, 18:2,
18:17, 37:17,
37:21, 38:7,
51:21, 58:5,
58:13, 58:14,

58:15, 58:18, 58:25, 59:1, 59:6, 59:15.

circuits 59:23.

circumstances 23:6.

cite 22:20.

cities 7:19.

citizen 55:1.

city 41:7.

CIVIL 1:4, 2:2.

claiming 13:22.

clarification 62:6.

clarify 39:12.

clashes 25:15, 25:16.

clear 3:6, 20:23, 26:1, 30:16, 57:18, 60:18, 61:2, 62:1.

Clearly 21:6, 23:20, 26:19, 28:13, 31:13, 37:10, 41:8.

CLERK 2:2, 18:15, 55:18.

clients 30:23.

close 32:3, 51:4.

closer 31:9.

coal 21:4.

code 12:6, 12:12, 13:25, 14:4, 23:3, 23:8, 23:16, 23:19, 24:4, 24:5, 24:8, 24:10, 27:4, 29:3, 29:12, 30:11, 31:17,

42:6, 42:15, 43:11, 45:16, 48:21, 55:7.

Codes 12:1, 12:5, 19:3, 19:9, 19:10, 31:16, 32:3, 32:7, 44:19, 44:21, 45:3, 53:18.

collapse 38:16.

colleague 53:10.

Columbia 1:2, 2:4, 2:16.

combust 14:23, 41:2.

combustion 8:18, 8:20, 10:18, 10:20, 23:18, 60:16.

comes 21:4, 21:5, 21:21, 32:2, 35:14, 46:25, 47:14.

comfort 19:21.

coming 10:15, 13:8, 23:10, 29:1, 44:14, 53:19.

comment 33:7.

commercial 3:18, 54:4, 54:12, 54:14, 54:15, 54:16, 54:22.

common 56:19.

competition 51:1.

complaint 22:10.

completely 50:22.

complicated 7:3.

comply 49:11, 49:16.

computer-aided 1:50.

concept 52:16.

conception 8:9, 62:1.

concern 7:6, 12:21, 12:22, 12:23, 12:25, 28:6, 28:16.

concerned 48:20.

concerning 8:7, 17:7, 17:24, 18:22, 23:8, 32:1, 32:13, 32:15, 38:17, 44:25, 45:3, 47:11, 51:11, 51:13, 54:10.

concerns 32:6, 39:16, 47:2.

concluded 64:24.

concurrence 59:10.

conditions 38:5.

conference 2:10.

confused 39:20.

congressional 28:8, 28:9, 28:11.

connect 61:20.

connection 20:4.

consequence 49:9, 49:14, 61:7.

conservation 8:11, 8:13, 9:17, 12:11,

14:5, 14:9, 16:16, 17:22, 20:11, 20:13, 29:11, 33:17, 36:19, 39:25, 40:12, 40:22, 43:4, 43:5, 43:14, 54:8, 54:11, 54:23, 61:24, 63:4, 63:9, 63:15.

considerations 59:17.

consistent 26:16.

Constitution 1:45.

constitutional 28:20.

Construction 3:20, 23:8, 53:18.

constructors 31:4.

consumed 56:21.

Consumer 7:15, 15:15, 54:19, 54:20.

consumers 28:12.

contain 48:17.

contained 23:7.

contains 23:2.

contemplate 57:19.

context 19:25, 25:14.

contextual 44:24.

continuing 28:23.

contrary 5:9.

conversation 61:6.

convince 26:22,

64:5.
cook 39:22, 55:1.
cooking 54:5, 54:12, 54:15, 54:22.
Coordinating 53:18.
core 32:12.
Correct 4:4, 44:5, 53:14, 62:19, 65:2.
correctly 55:24, 58:3.
counsel 2:6, 52:19.
country 27:22, 51:8.
couple 53:8, 63:22.
course 7:7, 8:14, 10:11, 11:23, 19:15, 26:22, 37:20, 51:8, 51:19, 51:22.
Courts 20:4, 58:7.
cover 38:19.
covering 7:4.
covers 37:22, 37:25, 38:20, 39:4, 39:14, 43:20, 45:5.
crazy 2:22, 64:11.
create 7:16, 7:18, 41:16, 41:17, 49:5, 50:9, 62:14, 63:11.
created 11:20, 28:17.
creates 27:20, 28:19, 31:3.
creating 40:8,

50:8.
creative 36:20.
creativity 20:12.
crisis 26:7.
crosses 39:18, 56:6.
cumulative 24:23.
curiosity 15:10.
currently 62:21.
customers 30:6.
cut 58:11.
cycle 56:22.
.
.
< D >.
dangerous 55:19.
Daniel 1:31, 2:14.
date 17:22.
day 2:20, 31:12, 35:6, 52:13, 52:18.
daylight 43:16, 61:15.
days 64:11.
DC 1:24, 1:41.
deadline 53:22.
deal 8:16, 24:12.
dealers 33:25, 34:7, 34:9, 34:10.
dealerships 46:3.
dealing 4:15, 23:2, 24:10, 55:17.
deals 8:16.
decide 41:16.
decided 7:7.

decision 59:18, 64:14.
decisions 18:2.
deep 11:3.
Defendant 1:12, 1:37.
defense 3:3, 5:1, 64:9.
defer 32:21.
defined 5:18, 38:24, 57:1.
defines 56:21.
definition 58:11.
delved 11:3.
demands 56:11.
depart 34:24.
departures 27:12.
depend 56:3.
describe 45:10.
design 56:2.
designed 7:23, 53:17, 57:10.
desire 26:7.
devolves 36:19.
dialers 34:8.
difference 10:6, 15:22, 15:24, 16:1, 16:21, 34:15, 37:24, 38:1.
different 5:7, 5:11, 8:2, 10:2, 10:5, 11:12, 15:20, 24:1, 26:15, 30:8, 36:18, 37:4, 40:23, 41:19, 44:4, 45:6, 46:7, 46:11, 47:7,

47:22, 48:14, 49:25, 50:25, 51:7, 62:2.
differently 44:15, 50:22.
difficult 55:4.
digression 12:4.
directive 53:16.
directly 11:25, 12:4, 12:9, 19:4, 21:14, 44:22.
disagree 9:8, 52:19.
disagreement 45:9, 51:16.
discriminate 57:4.
discussion 18:3, 18:5, 35:7.
disruptive 16:23.
dissent 58:8.
distinction 43:8, 44:12.
District 1:1, 1:2, 1:17, 2:4, 2:15, 8:9, 8:24, 9:25, 12:13, 25:4, 25:15, 29:10, 38:1, 38:2, 57:2, 57:4, 61:9, 61:12, 61:17.
DISTRICT OF COLUMBIA 1:10.
diverge 23:14.
DOE 16:17, 24:19,

63:14.
doing 5:7,
26:12, 26:15,
34:13, 43:3,
48:10.
done 20:11,
64:3, 64:8,
64:10.
double 22:19.
down 29:18,
34:14, 52:25,
62:25.
downward 27:12,
27:15.
draw 19:23.
during 26:7,
56:22.
duty 22:19.
.
.
< E >.
earlier 6:7,
12:12, 12:24,
19:2, 31:7,
61:7.
easier 23:14,
26:5,
64:13.
easily 12:10.
ECPA 5:18,
54:3, 54:14,
56:14, 56:20,
56:21, 57:1,
57:18,
58:3.
effect 12:21,
24:3, 25:21,
32:25, 51:12,
51:14,
61:22.
effective 14:5,
17:22,
17:25.
effectively
36:19,
57:2.
effects 28:4,
44:23,
61:25.
efficiency

12:22, 15:20,
17:24, 18:3,
23:9.
egg 39:22.
eight 59:22.
either 12:19,
38:13, 38:14,
43:21,
51:9.
electric 33:19,
33:20, 33:22,
34:9, 35:18,
35:21, 35:23,
36:3, 39:14,
39:16, 40:1,
40:4, 40:5,
45:7, 45:10,
45:12, 45:13,
45:22, 57:7,
57:11, 57:12,
57:14, 57:22,
57:25, 60:23,
60:24.
electricity
57:15,
57:17.
elementary
59:5.
email 64:19.
en 59:12,
59:17.
end 31:11,
32:19, 34:3,
35:5, 35:6,
52:12, 52:18,
53:22, 60:13,
64:15.
ends 19:23.
enough 4:24,
9:9, 9:11,
11:5, 12:10,
24:17, 26:5,
48:18,
59:8.
ensuring 22:16,
26:3.
enters 56:4.
entertained
58:9.
entire 23:2,

58:19,
61:12.
equivalent
32:24, 41:3,
41:6.
especially
56:20, 59:16,
61:21.
Esquire 1:21,
1:31.
essentially
8:12.
established
17:23.
et 1:6, 1:10,
2:3.
everyone 11:14,
39:3, 51:12,
64:12,
64:23.
everything
27:10.
exact 21:21,
24:9,
25:23.
exactly 13:16,
21:5, 21:7,
26:16, 32:13,
36:23,
46:1.
example 12:12,
45:8, 50:13,
57:8,
58:23.
examples 19:8,
19:9,
19:12.
excellent
64:4.
exception
22:20, 23:3,
43:8,
43:11.
exceptionally
64:12.
exceptions
23:2.
exemption 12:5,
12:7.
exemptions

11:8.
exist 10:12.
existential
40:17.
existing
48:14.
exists 10:8,
55:9.
explain 3:5,
21:13,
31:22.
explicit
35:12.
expressed
57:14.
extend 20:10.
extent 32:9.
extreme 9:20,
9:21,
48:23.
.
.
< F >.
F. 59:4.
facing 26:12.
fact 9:21,
12:16, 22:1,
33:17.
factory 9:18,
38:4.
facts 9:9,
23:13.
failing
22:19.
Fair 4:24,
9:11, 15:2.
fall 31:6,
63:4.
far 5:4, 9:10,
11:5, 14:10,
16:15, 21:10,
22:12,
29:16.
fascinating
52:17.
faulting
31:12.
FCRR 1:43,
65:1.
Federal 1:44,

14:15, 15:17,
32:4, 32:11,
34:22, 34:24,
34:25, 35:12,
49:12,
49:16.
feel 18:20.
feels 31:15.
feet 27:5.
few 2:24,
18:25,
55:22.
fields 43:21.
fight 14:21.
figuratively
28:24.
figure 56:8,
56:13, 56:24,
64:2,
64:20.
filled 45:14.
final 53:6,
53:12,
59:3.
find 17:3,
24:16.
finding 25:7.
Fine 4:13,
10:21, 15:1,
19:18, 22:11,
35:14,
55:13.
finish 58:17.
fire 19:10,
27:6.
First 3:3,
10:5, 11:22,
30:19, 53:9,
56:1, 60:12,
62:6.
five 39:8,
39:21.
fixed 56:1.
floodgates
19:21.
floor 7:25,
9:18.
flying 2:17.
focus 37:18,
49:20.

focused 4:25,
37:17,
46:13.
focusing 29:10,
39:13.
follow 29:7.
following
45:20,
48:15.
follows 57:9.
forced 50:9,
55:3.
forcing 34:10,
41:15.
foregoing
65:2.
forgive 31:8,
42:9, 45:19,
46:8.
form 10:24,
53:12.
forth 51:17.
forward
18:19.
foss- 55:8.
found 18:1.
four 47:8.
fourth 2:20.
frank 2:20,
25:19.
frankly 5:2,
8:8, 12:19,
16:21, 17:12,
23:20,
26:2.
free 25:13.
friction
23:24.
Friedland 58:8,
59:9.
friend 4:21,
9:14.
friends
51:25.
front 30:7,
59:1.
fueled 21:22.
fuels 6:9,
6:21, 7:23,
25:20, 26:10,

26:18, 27:3,
28:19, 29:3,
29:5, 32:17,
32:20, 32:22,
37:14, 38:25,
49:24, 62:11,
62:15.
fully 21:11.
function 41:4,
44:18.
functional
15:21,
16:20.
functionally
32:24, 41:3,
41:6.
fundamental
38:14, 45:8,
51:16.
fundamentally
24:1, 37:4,
46:7.
funny 59:8.
.
.
< G >.
gallon 33:24,
34:3, 35:2,
35:13, 35:15,
35:18, 35:20,
35:24, 36:1,
45:11, 45:17,
46:5.
gave 19:12.
GE 11:8, 50:1,
50:3, 50:5.
general 6:5,
56:19.
General-dc
1:38.
generator
55:10.
generators
55:8.
gets 33:21,
45:11, 45:12,
45:13, 45:17,
48:18, 61:19,
62:2.
getting 4:13,

37:10.
giant 32:12.
Give 7:24,
17:9, 19:20,
30:13, 31:5,
51:18,
53:4.
given 9:9,
51:10.
gives 22:4,
54:14.
government
11:18, 15:17,
32:4, 32:21,
34:22, 34:25,
35:1, 35:12,
49:7.
governs
39:23.
grab 19:13.
grams 5:12.
grant 8:13,
24:19, 28:2,
51:6.
granted 11:2.
great 33:20,
58:23.
gripe 55:2,
55:3.
ground 46:12.
guess 3:3, 4:6,
6:23, 7:22,
8:5, 10:3,
10:4, 14:20,
20:14, 21:25,
28:22, 30:22,
38:21, 40:24,
41:5, 43:10,
49:20, 52:12,
60:20.
guys 4:6,
64:17,
64:21.
.
.
< H >.
half 58:11.
happen 43:14,
48:19.
happens 56:3,

64:7, 64:16, 64:18.

happy 8:14, 38:11, 52:10, 59:7, 62:3, 63:3.

hard 19:23, 25:7.

harder 21:13, 24:25, 30:19, 36:4.

harken 19:2.

hear 7:1, 42:25, 59:7, 59:8, 62:5.

hearing 2:20, 61:11.

heart 22:10, 32:4, 35:7, 52:24.

heaters 15:11, 62:22, 62:24, 62:25, 63:4, 63:8, 63:15.

heating 4:2.

helpful 8:3, 16:20, 37:15.

hereby 65:1.

higher 35:2, 35:13, 36:22.

history 11:5, 13:2, 20:7, 26:2.

Hold 17:21.

holding 42:11.

HOME 1:4, 38:9.

Homebuilders 2:3.

Honorable 1:16.

hook 37:14, 55:10, 55:11.

hope 64:16.

Hopefully

19:20, 64:15.

horribly 22:19.

host 28:20.

hour 33:22.

hours 57:23.

house 14:22, 14:25.

Houston 1:29.

hundred 24:8.

hybrid 34:20.

hydrant 27:6.

hypo 34:16, 36:5, 37:2.

hypothetical 9:10, 36:3, 42:12, 45:20, 46:7.

.

.

< I >.

idea 55:19.

identify 2:5.

imagine 28:19, 50:12.

imagining 50:13.

impact 13:5, 24:21, 30:25, 45:17, 47:25, 48:2, 48:6, 48:21, 48:25, 49:1.

impacts 45:22, 45:23, 48:3, 48:22, 51:4, 62:1.

impede 61:2.

implement 53:20.

implemented 53:15, 55:15.

implementing 53:19.

implying 28:10.

import 21:2, 22:13,

31:17.

important 35:5, 54:2.

imposed 56:7.

impossible 33:15, 33:18.

improvements 3:20.

include 18:23.

including 19:10.

incompatible 56:7.

independent 6:23, 26:4.

individual 39:18.

individuals 7:24.

industrial 54:17, 54:21, 54:22.

industry 26:5.

infected 59:2.

inferring 13:18.

insisting 41:24.

instead 11:7, 23:17, 34:18, 34:21, 34:22, 42:15.

intended 22:7, 26:14, 43:13.

intending 25:20.

intent 20:6.

interesting 18:1, 59:15.

interpret 26:19.

interpretation 7:14, 7:17.

interrupt 19:1,

33:6.

invalidate 20:9.

iota 10:24.

ironic 7:23.

issue 5:3, 7:8, 23:11, 24:18, 24:19, 35:22, 38:14, 52:24, 53:11, 55:6.

issues 28:20.

itself 48:6, 48:23.

.

.

< J >.

J. 1:37.

job 64:8, 64:13.

jockeying 8:6.

Jonathan 1:26.

joy 57:21.

Jr 1:21.

Judge 1:17, 29:10, 58:8, 58:9, 59:9, 59:11.

judges 59:6, 59:22.

judging 20:6, 20:7.

jump 23:24, 43:3.

jurisdiction 56:4.

.

.

< K >.

Katherine 62:7, 62:11, 62:20.

KBTU 9:1, 9:16, 9:17, 9:19, 9:24, 10:3, 12:14, 15:23, 25:2, 32:25, 33:13, 33:16,

36:16, 36:17, 38:5, 40:14, 40:23, 40:25.

keep 23:10, 29:1.

keeps 41:21.

Kentucky 11:9.

kept 64:8.

kerosene 62:22, 62:23, 62:25, 63:3, 63:8, 63:15.

key 12:19, 18:8.

kick 64:1.

kilowatt 57:23.

kilowatts 47:17.

kinds 25:16, 49:25.

knows 59:16.

.

.

< L >.

label 9:1, 38:3, 57:19, 57:20.

label-based 9:18.

labels 33:10, 36:22.

laid 4:17, 4:23.

language 7:21, 17:3, 17:8, 18:8, 22:12, 26:20, 28:9, 28:11, 35:8, 35:10, 36:4, 51:11, 56:20.

large 27:22.

larger 43:12.

last 11:22, 58:2.

latest 53:22.

laws 20:9,

30:17, 31:8.

lawsuit 54:13.

lawsuits 20:3.

lawyerly 9:11.

lawyers 64:11.

leap 32:12, 43:12.

leaves 38:4.

leaving 50:7.

legacy 25:6.

legal 55:2.

legislation 53:13.

legitimate 55:3.

less 4:18, 6:25, 9:15, 12:15, 16:21, 22:3, 35:3, 40:13, 41:23, 49:19.

letters 64:19.

letting 36:19.

level 12:16, 12:17, 12:20, 43:15, 45:1, 45:4, 48:3, 48:17, 49:21, 49:22, 58:20.

life 25:9.

likes 55:1.

limit 7:23, 26:10, 26:17, 26:24, 29:19.

limiting 26:25.

limits 35:13.

line 39:18, 49:2, 50:25.

lines 19:23,

48:14, 51:5.

lists 40:21, 40:22.

literally 14:23, 28:25.

litigating 63:24, 63:25.

LITTLE 1:26, 2:7, 2:8, 2:9, 3:2, 8:23, 13:3, 15:25, 20:1, 36:20, 37:7, 39:12, 39:21, 40:9, 43:16, 50:19, 51:19, 61:15.

live 34:13.

LLP 1:22, 1:32.

local 23:8, 48:16, 51:6.

locality 15:19.

logic 62:24.

long 24:17, 29:14, 38:11, 52:14, 60:11.

longer 64:9.

look 8:5, 9:20, 15:17, 19:22, 20:5, 24:15, 24:20, 24:22, 28:1, 36:21, 39:18, 40:19, 51:18, 53:4, 53:5, 58:25, 63:3.

looked 55:18.

looking 17:10, 22:20, 57:16.

looks 42:14.

loose 35:10.

lost 64:1,

64:2.

lot 2:22, 4:9, 8:6, 11:4, 18:2, 18:5, 19:9, 19:10, 28:25, 30:4, 42:14, 59:2, 59:14, 59:17, 64:9, 64:13.

Louisiana 1:28.

love 33:20.

low 36:15.

Lowe 57:21.

.

.

< M >.

machine 1:49, 57:23.

main 4:25, 5:2, 9:25, 28:16, 28:22, 55:23.

manufacture 10:22, 48:9, 48:12, 50:1, 50:2, 50:4, 50:5, 61:18.

manufacturer 12:9, 41:6, 41:21, 43:4, 43:17, 44:3, 44:14, 45:1, 46:13, 48:6, 48:7, 48:8, 48:9, 48:11, 48:13, 48:18, 48:23, 48:24, 49:2, 49:21, 50:14, 50:20, 50:24, 61:16.

manufacturers 11:6, 11:18, 11:25, 24:25, 25:1, 41:12, 41:16, 42:7, 42:16, 44:22,

44:23, 46:18, 50:1, 51:4.
manufactures 56:23.
manufacturing 10:23, 41:22, 50:25.
Mark 1:26, 2:7.
market 25:13, 49:6, 50:8, 50:9, 56:4, 61:16.
marketing 24:21.
marketplace 41:25, 48:22.
markets 49:7.
Maryland 25:4, 50:17.
massive 15:24, 16:1.
materials 2:23, 19:17.
matter 12:18, 14:22, 56:20, 60:16, 65:3.
meaning 38:3, 52:14, 52:19.
means 6:17, 8:19, 30:12, 31:19, 38:8, 39:3, 44:9, 44:11, 45:9, 52:20.
meant 58:20.
meantime 64:17.
measure 47:14, 56:23.
meet 12:6, 15:23, 16:3, 16:7, 16:10, 17:2.
meets 14:14.
mention 5:24, 6:3, 62:21.

met 2:8, 10:4, 36:16.
mileage 35:22.
miles 33:21, 33:24, 34:3, 35:1, 35:13, 35:15, 35:18, 35:20, 35:24, 45:11, 45:13, 46:5, 51:9.
million 51:9.
mind 19:13, 38:16.
minor 60:20, 60:21.
minute 51:18.
missed 6:14.
missing 18:20, 62:8.
misspoke 61:17.
mistake 19:17, 59:1, 59:5.
mistaken 54:13.
mistakes 59:3.
misunderstanding 58:14, 58:21.
misunderstood 58:10.
models 36:21.
moment 17:9, 18:7, 51:20.
morning 2:21.
Morrisette 7:22.
Motions Hearing 1:15.
motivations 13:3.
mouth 9:14.
MR. NOVAK 2:12.
multiple 4:22, 57:19.
muster 29:22,

59:10.
myself 31:8, 64:1.
.
.
< N >.
name 55:18.
narrow 8:10, 40:10.
narrowest 40:25.
National 2:2, 11:14, 11:15, 13:11, 22:16, 26:4, 27:18, 28:17, 28:21, 32:21, 37:11, 38:23, 39:23, 46:4, 48:15.
NATIONAL ASSOCIATION OF 1:4.
nationally 25:2.
necessarily 44:9.
necessary 49:9, 49:14.
need 3:1, 9:8, 19:15, 59:22, 59:23, 64:17, 64:20.
needs 6:20, 29:24, 56:25.
net 53:17.
New 3:19, 3:21, 4:1, 11:11, 23:8, 24:7, 34:8, 46:3, 49:7, 50:2, 58:3, 58:7.
news 2:25.
next 32:7.
Ninth 58:24.
No. 1:4, 17:18, 33:6, 42:25.
non 47:16.

none 9:16, 10:25, 14:6, 24:2, 40:13, 40:15, 41:21.
nongas 5:6.
nor 10:6.
normal 38:5.
note 52:1, 52:4, 58:2.
notes 53:4, 53:5.
nothing 28:8, 28:9, 40:18, 45:9, 64:5.
Novak 1:21, 2:12.
null 19:11.
number 52:15, 52:16, 57:22.
NW 1:23, 1:39, 1:45.
.
.
< O >.
obligation 7:18, 41:20, 62:14.
obvious 16:3, 18:17, 18:21.
Obviously 15:14, 19:8, 22:3, 31:13, 31:14, 35:14, 35:16, 37:1, 39:13, 42:11, 56:24, 64:8.
occupants 44:20.
occurred 53:21.
odd 26:23.
Office 1:38.
Official 1:44, 65:7.
often 63:23.
old 50:4,

50:6.
on-sight
  8:18.
on-site 10:18,
  10:20.
Once 48:18.
ones 12:2,
  15:9, 48:8.
onsite 14:24,
  23:18,
  60:14.
open 41:25,
  49:7.
operate 8:12.
operating
  6:21.
operation
  61:3.
opinion 11:4,
  52:25, 58:9,
  58:18, 58:19,
  59:3, 59:24,
  64:7.
opinions
  4:18.
opposed
  37:23.
opposite
  25:23.
orators 64:4.
order 7:13,
  18:13,
  48:18.
original
  26:6.
otherwise
  26:23.
outlets
  13:15.
overreach
  28:21.
overstated
  62:6,
  62:18.
own 6:23,
  26:13,
  55:8.
.
.
< P >.

P. 1:27.
p.m. 53:7,
  60:9,
  64:24.
page 17:13,
  17:14, 17:22,
  23:1,
  36:11.
paging 19:19.
panel 58:9,
  59:24.
panels 20:21.
paper 59:3.
parallel
  17:19.
part 43:8,
  55:16.
particular
  21:23, 31:6,
  32:3,
  52:23.
particularly
  4:6.
parties 2:5.
parts 18:7.
pass 8:24,
  9:15, 20:15,
  25:20, 29:21,
  30:11, 30:22,
  30:23, 31:6,
  31:15.
passed 12:13,
  26:24, 53:11,
  53:13,
  53:14.
passes 25:4,
  31:18.
passing
  25:15.
past 15:13.
patchwork 5:7,
  12:24.
paths 4:22.
Pause 38:10,
  51:24.
pedantic
  47:10.
people 5:5,
  25:6, 25:7,
  26:15, 28:24,

31:13, 35:21,
  41:23, 43:25,
  52:15, 55:8,
  64:3.
per 9:2, 9:16,
  9:17, 10:3,
  33:21, 35:1,
  35:18, 38:5,
  47:17,
  62:24.
percolation
  59:22.
perfectly
  2:19.
perhaps 15:14,
  15:22,
  43:12.
permit 33:25,
  34:10, 49:11,
  49:15.
permitted 8:19,
  55:12.
phone 64:20.
phrasing
  34:21.
pipe 3:8,
  6:16.
pipes 3:11,
  3:15.
piping 14:22,
  14:25.
placed 38:3.
Plaintiff 1:7,
  1:21, 2:6,
  4:12.
plaintiffs 2:7,
  2:12, 2:14,
  7:2, 57:11,
  58:12, 58:21,
  64:9.
please 2:5,
  3:4.
plug 21:4.
podium 19:17.
point-of-use
  5:3.
pointed 43:9,
  62:7,
  62:12.
points 19:1,

55:22.
points-of-use
  5:2.
pop 34:9.
poses 41:20.
position 5:14,
  38:2.
positive 31:3,
  36:11,
  53:20.
possibility
  15:22.
possible 41:15,
  53:25, 57:4,
  57:13.
potential
  31:8.
potentially
  30:17.
power 20:16,
  22:1, 28:21,
  32:10,
  46:14.
powered 45:18,
  46:3, 54:15,
  62:22, 62:23,
  63:4, 63:8.
powers 30:5.
practically
  48:19.
pre-empt
  21:6.
pre-empted
  12:10.
pre-emption.
  23:10.
pre-motion
  2:9.
preempt 34:4.
preempted
  30:18, 30:24,
  31:10, 42:10,
  42:18, 43:15,
  43:21, 45:1,
  45:4, 63:1.
preempting
  44:18.
preemption 8:9,
  8:11, 17:11,
  27:11.

preempts 20:17, 22:16, 26:24, 54:10.
premarket 56:1, 56:8.
preparation 64:6.
prepared 64:5, 64:10, 64:13.
prescribed 17:23.
Presumably 15:5, 19:11, 41:15, 43:25.
presupposes 57:25.
pretty 5:13, 23:20, 25:5, 32:3, 62:2, 62:3.
prevent 55:7, 62:10.
probably 3:1, 17:19, 24:16, 52:25, 59:16.
problem 24:9, 24:12, 26:11, 27:15, 27:16, 27:17, 27:21, 35:16, 36:10, 56:9, 56:16, 57:6.
problematic 45:21, 45:23.
problems 55:25.
Proceedings 1:49, 64:24, 65:3.
proceedings. 51:24.
process 53:21.
produced 1:49.
product.

18:9.
production 51:5.
products 5:22, 5:24, 6:1, 6:4, 6:12, 6:13, 7:5, 22:9, 25:8, 28:4, 28:6, 28:12, 32:6, 43:12, 54:19, 54:21, 54:22, 57:12, 57:13, 57:20, 57:25, 58:1.
profile 48:4.
prohibit 35:21.
prohibiting 13:6.
prohibition 3:8, 13:4, 14:22.
proliferated 24:22.
promise 64:15.
promulgated 63:14.
proposition 29:2.
proscribes 60:22.
protection 54:4.
protects 21:15.
provide 54:4.
provision 8:10, 8:11, 13:19, 15:4, 16:15, 17:11, 17:20, 20:9, 24:16, 27:11, 28:2, 29:8, 31:25, 35:5, 49:10, 51:10, 54:7.
provision. 20:13.

provisions 20:11.
public 28:4, 28:6.
pull 17:10, 24:17.
pump 27:6.
pure 19:25, 25:12, 33:10, 33:20.
purely 40:4.
purpose 49:23.
purposes 44:6.
Put 4:2, 9:14, 12:12, 14:12, 17:3, 22:9, 43:25.
putting 5:14, 14:12.
.
.
< Q >.
qualification 31:22.
qualify 31:21, 34:13.
quantity 56:21, 57:10.
question 12:4, 12:19, 28:22, 30:1, 30:8, 40:18, 42:9, 60:4, 62:20, 63:22.
questions 2:24, 3:2, 31:9, 39:17, 52:6, 52:10, 53:8, 62:4.
quick 64:19.
quickly 25:5, 36:18, 62:3.
quite 7:22, 60:10.
quote 23:3.
.
.

< R >.
ranges 15:11, 60:22, 60:23, 60:25.
Rankin 1:31, 2:14.
rate 33:1.
rather 12:17, 12:19, 22:21, 29:11.
rating 12:15, 23:19, 33:14, 33:16.
RCA 13:12.
reach 8:8, 18:13, 18:19.
read 2:23, 10:19, 14:19, 15:3, 16:5, 16:14, 18:12, 19:7, 29:8, 29:9, 33:24, 45:2, 52:14, 52:17, 55:20.
reading 16:12, 18:16, 22:6, 46:2, 49:5, 55:20, 62:9.
real 57:5.
realize 63:23, 63:24.
realized 64:3.
really 5:3, 7:2, 10:6, 12:18, 22:10, 25:7, 29:10, 32:12, 33:20, 37:25, 40:20, 44:23, 47:12, 52:16, 52:24, 58:21, 58:24, 61:20.
reason 26:17, 30:21, 55:20, 59:12.
reasonably

58:12.
reasoning 4:17, 4:18.
reasons 2:23, 54:13.
recess 53:7.
record 2:6, 65:3.
recorded 1:49.
redesign 50:21.
redesigning 25:17.
reduce 21:25, 26:1, 27:10, 49:24.
referring 6:4.
refers 43:9.
regulate 6:11, 10:10, 11:19, 19:4, 19:9, 32:5.
regulated 12:20.
regulates 45:17.
regulating 5:9, 5:17, 7:4, 7:12, 7:13, 18:24, 32:5, 34:22, 35:23, 47:25, 52:20, 52:21.
regulations 11:25, 18:10, 34:25, 38:17, 40:20, 45:3, 48:21, 51:6, 53:20, 54:10, 61:20, 61:22.
rejected 58:8.
rejigger 10:25.
relates 29:13.
rely 58:22,

58:24.
remarkable 59:21.
repeat 31:7.
Reported 1:43.
Reporter 1:44, 65:7.
representative 56:22.
require 30:25, 41:20, 62:10.
required 10:25, 13:14, 13:15, 25:21.
requirement 23:7, 28:18, 29:4.
requirements 14:15.
requirements.' 23:4.
requires 26:25, 45:6, 62:10.
requiring 50:10, 56:18, 57:11, 57:12.
residential 3:18.
respect 5:8, 11:19, 18:1, 18:10, 18:24, 27:18, 34:5, 35:22, 37:12, 37:21, 39:10, 39:24, 44:15, 46:25, 49:7, 49:25, 55:6, 62:7, 64:7.
respond 60:4, 60:6, 60:8.
response 10:6, 51:6, 59:10.
responses 11:21.
responsive

61:4.
restaurants 4:7, 4:9, 53:24, 53:25, 54:3, 54:13, 55:1.
result 4:22.
retool 50:21, 51:5.
retread 46:12.
review 59:17.
ripeness 53:10, 60:12.
Ronald 1:21.
Rookie 19:17.
room 53:23.
RPR 1:43, 65:1.
rule 22:2.
run 32:19, 47:11, 56:24, 56:25.
.
.
< S >.
S. 1:33, 50:6.
sake 8:14.
scale 29:18.
scattered 17:12.
Scott 1:21, 2:12.
SDNY 3:7, 4:16, 7:14, 18:2, 18:18.
seated 63:20.
Second 29:7, 38:10, 56:9, 56:16, 58:18, 62:20.
section 54:23.
seeing 35:8.
seem 7:2, 7:21, 55:2.
seemed 58:10.
seemingly 51:10.

seems 13:16, 18:8, 18:16, 18:20, 32:14, 36:18, 46:14, 46:15, 46:17, 46:22, 48:20, 51:17, 52:13, 55:23, 55:24.
seen 13:19, 57:20.
sees 38:2.
self-generator 55:12.
sell 33:25, 34:9, 34:10, 41:23, 46:3, 50:16.
selling 35:21.
send 30:5.
sense 10:7, 27:8, 56:19, 61:3.
sent 51:25.
separate 61:23.
September 25 1:11.
service 25:1, 25:7.
servicing 24:21.
set 16:16, 32:25, 34:23, 36:19, 37:5, 54:9, 54:12.
sets 14:4, 35:13.
setting 10:9, 35:12, 38:14, 63:9.
shakes 60:17.
shall 8:19, 17:25.
shape 10:24.
shopping 57:21.
shorthand

1:49.
shouldn't 62:9.
show 24:19.
side 4:21.
sides 17:12, 64:8.
signal 28:5.
significantly 25:14.
similar 17:20.
simple 29:1.
simply 15:21, 32:4, 36:9.
site 8:20, 17:19.
situation 21:7, 21:8, 21:22.
skill 64:6.
sleeveless 58:20.
slight 62:15.
slightly 23:13, 29:25, 31:21.
small 12:4, 14:20, 43:2, 62:9.
smarter 28:25.
Smith 25:10.
socket 21:21.
solar 20:16, 20:21, 22:1.
solo 2:17.
solution 18:17.
somehow 10:5, 14:24, 41:13, 45:21, 50:22.
someone 33:3, 58:18.
somewhat 21:13, 22:2, 46:10, 62:2.
Sony 13:12.

Sorry 17:11, 19:16, 22:18, 22:19, 22:23, 35:15, 42:12, 49:13, 55:14, 61:17.
sort 7:6, 18:19, 37:16, 40:24, 62:14.
sorts 40:24.
sounds 4:15.
source 6:4, 6:8, 6:24, 8:17, 21:4, 22:15.
spade 9:22.
specific 56:14.
specifically 3:16.
specified 40:2.
specifies 23:6, 23:20, 60:23.
spectrum 30:17.
spelled 6:11.
spoke 25:14.
St 1:23.
St. 1:28.
stand 63:2.
standards 8:12, 8:13, 16:3, 16:10, 17:2, 22:16, 26:15, 26:17, 29:11, 43:14, 49:12, 49:16, 51:8, 60:22, 63:5.
start 39:17.
started 53:9.
state 17:1, 17:24, 18:21, 20:9, 20:15, 20:18, 23:7, 29:2, 30:9, 31:17, 32:1,

32:11, 33:25, 34:4, 34:6, 35:14, 35:15, 46:2, 48:16, 50:10, 51:6.
statement 31:17.
States 1:1, 1:5, 1:17, 2:3, 5:7, 11:8, 11:12, 13:12, 25:21, 26:12, 26:25, 27:1, 29:4, 29:19, 30:4, 31:15, 32:10, 32:20, 34:10, 34:23, 34:24, 35:2, 35:5, 36:19, 37:4, 41:25, 48:19.
statewide 29:12.
static 38:3.
statute 7:16, 11:6, 14:19, 16:13, 17:4, 22:7, 22:12, 22:13, 22:15, 23:2, 24:15, 26:20, 34:1, 34:11, 35:19, 38:25, 39:11, 41:11, 47:2, 47:19, 49:5, 49:23, 57:9.
statutory 5:14, 7:21, 8:6, 13:2, 26:20.
Stay 51:20.
stemmed 26:6.
stenographic 65:2.
step 20:1, 29:18, 30:20, 43:2.

stop 34:3, 59:24.
stories 3:19.
stove 4:3, 11:9, 11:10, 14:12, 14:14, 16:15, 38:20, 38:21, 39:5, 39:6, 39:7, 39:8, 39:21, 40:7, 40:14, 41:22, 47:11, 47:16, 47:20, 47:21, 55:11, 56:10, 56:12.
stoves 4:2, 5:5, 5:6, 11:12, 14:10, 14:18, 15:5, 16:6, 16:7, 16:9, 16:10, 16:12, 21:3, 27:5, 39:7, 47:8, 48:1, 54:1, 54:3, 56:18, 57:11, 57:12, 57:14.
Stovetop 38:22, 39:21, 41:20, 47:8, 47:21, 50:2, 50:3, 50:4, 50:6, 50:7, 50:22, 55:3.
stovetops 39:23, 39:24, 40:1, 47:25, 50:11, 50:14, 50:21.
straight 11:17, 13:4, 18:19.
stranded 25:6.
straw 10:9.
Street 1:33, 1:39.
strict 17:6.

strong 30:9.
struck 63:25.
submitted 59:3.
subsection 23:2.
substantial 3:20.
substantive 2:21, 2:22.
succinct 5:13.
suddenly 56:6.
Suite 1:34, 1:40.
sun. 21:6, 21:19.
suppose 13:9, 29:14.
surprised 64:11.
surviving 22:4.
swath 15:8.
swaths 27:22.
.
.
< T >.
T. 1:43, 65:6.
talked 6:6, 26:3, 30:4.
talks 24:17, 28:2.
tangent 4:14.
targeted 21:14, 22:3, 60:21.
tech 31:25, 32:13.
tells 42:15, 43:17.
tentatively 42:10.
tenuous 20:4.
terms 5:1, 5:15, 6:10, 35:18, 48:4.

terrific 64:8.
testing 33:5.
text 20:6, 26:2, 57:9.
textualism 59:4.
themselves 2:5, 62:12.
theoretical 15:22.
theoretically 10:4.
thermal 41:1.
they'll 28:25.
thinking 7:11, 7:25, 55:24, 61:10.
third 57:6.
though 10:9, 55:10.
thoughtful 37:7.
thousand 11:11, 41:1.
three 3:19, 55:25.
throw 36:5.
tiniest 20:1, 29:18.
today 2:18, 63:2.
took 22:23, 37:16.
tools 20:7.
top 38:21, 39:6, 39:7, 39:8, 55:4.
tops 47:8, 47:11.
Totally 5:11, 10:2, 19:18, 41:19, 50:7, 55:13.
touch 29:14.
touching 56:17, 57:7.
touchstone 20:5.

towards 22:3.
tracking 15:14.
tradition 30:9.
traditional 30:4.
Transcript 1:15, 1:49, 65:2.
transcription 1:50.
treated 59:23.
tries 34:5.
triggered 54:8.
true 9:13, 32:10, 37:5.
trust 22:22.
try 29:19, 36:6, 60:10.
trying 4:21, 14:19, 14:21, 16:4, 22:18, 24:12, 30:16, 31:7, 33:9, 42:23, 42:24, 50:10, 61:20, 64:2.
Tuetken 1:37, 2:15, 11:24.
turn 10:1.
turns 38:12.
TV 13:11, 13:12, 13:13.
Tvs 13:14, 13:16.
tweak 29:24, 62:16.
two 2:21, 4:18, 10:1, 11:21, 60:7.
TX 1:29, 1:35.
type 9:21,

19:3, 21:23, 24:11, 24:22, 27:23, 28:5, 39:15, 40:21, 48:12, 60:21.
types 28:4, 45:2, 51:4, 51:7.
.
.
< U >.
understand 5:1, 5:3, 5:4, 7:9, 11:5, 13:20, 14:10, 16:20, 18:6, 18:7, 21:2, 22:13, 26:7, 33:3, 37:2, 37:22, 41:5, 42:2, 52:21, 53:12, 58:6, 61:1, 62:17.
understanding 11:2, 37:1, 56:8.
understands 58:3.
understood 3:6, 4:14, 26:11, 37:1, 37:16.
undoes 27:14.
uniform 26:3, 28:7.
United 1:1, 1:5, 1:17, 2:3.
units 41:1.
unless 6:23, 52:5.
unlike 3:2.
unregulated 25:12.
until 60:9.
useless 6:23.
uses 9:19, 33:11, 38:4,

38:22, 40:14, 57:19.
using 24:18, 33:4, 41:14, 47:20, 47:21.
usual 2:25.
utilities 30:5, 30:10.
.
.
< V >.
value 36:11, 36:15, 36:16, 38:3.
variety 39:14.
version 40:11, 40:25.
Versus 2:4, 16:3, 16:25, 33:4, 55:4.
view 13:22, 23:12, 24:15, 27:7, 29:21, 29:23, 38:1, 38:8.
viewed 38:7.
views 8:7.
violate 41:8, 41:11.
violating 38:23.
violent 16:21.
Virginia 25:4, 50:17.
votes 59:14.
vs 1:8.
.
.
< W >.
wait 17:21.
waiver 24:16, 24:18, 24:19, 26:3, 28:1, 28:2.
wanted 7:20, 7:24, 25:24, 26:15, 26:17,

32:16, 39:7, 61:7, 62:15, 62:18.
wants 38:12, 48:10, 56:11.
washing 57:23.
Washington 1:12, 1:24, 1:41, 1:46.
wasting 7:10.
Water 15:11, 17:25.
ways 26:14, 29:19.
week 2:22.
weekend 64:23.
weird 32:19.
Welcome 2:11.
whatevers 47:22.
whatsoever 27:8, 41:21.
whereby 24:19.
wherever 21:20.
Whether 22:5, 28:4, 28:20, 33:3, 39:17, 41:16, 48:7, 49:19, 51:14, 52:19, 52:20, 59:18, 61:24, 61:25, 63:3, 63:14.
whoa 55:1.
whoever 31:4.
whole 28:19.
wide 39:14.
will 3:1, 6:22, 8:3, 11:3, 19:20, 19:22, 20:2, 20:4, 29:7, 29:16, 30:3, 30:13, 31:6, 49:10,

49:15, 53:3, 53:4, 55:5, 55:6, 55:19, 59:6, 60:10, 60:14.
wish 19:1, 36:4.
within 3:19, 56:3, 63:4.
without 41:14.
word 20:12, 53:6.
words 9:14, 21:2.
work 57:24.
workable 11:13.
worked 41:14.
works 36:3, 53:15, 54:8.
worried 24:20, 24:24, 25:16, 25:18, 25:19.
worries 22:25.
write 11:3, 64:18.
written 27:11, 34:14, 60:13.
wrote 58:18.
.
.
< X >.
X-type 22:14.
.
.
< Y >.
year 9:2, 9:16, 9:17, 9:19, 9:24, 10:3, 25:3, 33:1, 33:16, 36:17, 38:5, 40:14, 40:23, 41:1, 47:18, 64:15.

years 63:22.
yellow 57:20.
yesterday 18:15.
York 11:11, 24:7, 50:2, 58:4, 58:7.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>    *Defendant*. | Case No. 24-cv-02942 (ACR) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Energy Policy and Conservation Act of 1975 (EPCA) prohibits state and local regulations "concerning the energy efficiency [or] energy use" of certain products, including gas appliances. *See* 42 U.S.C. § 6297(c). The Clean Energy D.C. Building Code Amendment Act of 2022 (Clean Buildings Act) requires that by 2027, certain newly constructed or improved buildings in Washington, D.C., operate as zero-energy—essentially, they must produce as much energy as they consume. To achieve this, it bans the use of gas appliances in those buildings.

The question: does the former preempt the latter? Plaintiffs—an assortment of trade associations, companies, and unions—say yes. The ban, they argue, de facto sets gas appliances' energy efficiency or use standard to zero, which conflicts with EPCA's preemption provision. The District of Columbia responds that the ban does not address such standards at all. Yes, it mandates that gas appliances cannot be used in certain buildings. But it says nothing about the performance standards the appliances must meet when used elsewhere.

The District has the better interpretation.  The Court therefore GRANTS the District's Cross-Motion for Summary Judgment, Dkt. 30, and DENIES Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26.

## I.     BACKGROUND

### A.  The Oil Embargo of 1973[1]

While it is difficult to pinpoint the origin story of any litigation, we might as well start ours on October 17, 1973.  That day, President Richard M. Nixon expressed concern that the Arab–Israeli War might cause gas prices to rise.  Given our country's dependence on foreign oil then, he feared this would cause economic upheaval at home.[2]  And he was right to worry.  On that same day, halfway across the world, Arab oil ministers decided to impose a total oil embargo on the United States and other countries aiding Israel.[3]  As intended, this ban "sent shock radiating through the social fabric of . . . industrial nations."[4]  In the United States, gas prices skyrocketed, supplies plummeted, unemployment increased, and the economy teetered.[5]

Oil was not the President's only problem.  Throughout 1973, the Watergate scandal was splashed daily in newspaper headlines across the Nation.[6]  And it seemed that "the President was

---

[1] For those interested in a "panoramic history of the world's most important resource: oil," including the 1973 oil crisis, the Court commends Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* (1990).

[2] *Id.* at 588–91.

[3] *Id.*

[4] *Id*. at 597.  Coincidentally, as the Court publishes this Memorandum Opinion, the world economy is facing potentially its largest oil shock.  Due to a conflict in the Middle East.  *See* Emmett Lindner, *Echoes of the '70s in What's Now the Largest Oil Shock Ever*, N.Y. Times (Mar. 13, 2026).

[5] H.R. Rep. No. 94-340, at 20–22 (1975).

[6] Yergin at 601.  For more on that scandal and recommended readings, see *Storch v. Hegseth*, 804 F. Supp. 3d 216, 219–21 & n.1 (D.D.C. 2025).

always searching for some political 'spectacular' involving oil and the Middle East to try to divert the country from its obsession with Watergate."[7]  Because of the embargo, Watergate, or both, on November 7, 1973, President Nixon announced Project Independence: "in the spirit of Apollo, with the determination of the Manhattan Project, . . . by the end of this decade we will have developed the potential to meet our own energy needs without depending on any foreign energy source."[8]  And afterward, his administration continued to announce various energy actions.

But neither the announcements nor the energy actions succeeded.  President Nixon was forced to resign in August 1974.  And our dependence on products that used petroleum *increased* from 33 percent in September 1973 to 36 percent in December 1974.[9]

### B.  The Energy Policy and Conservation Act of 1975

The oil embargo ended on March 18, 1974.  But the crisis had awakened the United States to the "serious long-term economic and national security problems" of continued dependence on foreign oil.  *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985).  So in January 1975, President Gerald R. Ford called for "the strongest and most far-reaching energy conservation program we have ever had."  *Id*.  Congress answered him by passing EPCA that same year.  *See* EPCA, Pub. L. No. 94-163, 89 Stat. 871 (1975).  Relevant here, EPCA aimed to "reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  *Herrington*, 768 F.2d at 1364 (citing S. Rep. No. 94–516, at 116–17 (1975)).

---

[7] Yergin at 601.

[8] *Id*. at 599.

[9] H.R. Rep. No. 94-340, at 20.

At enactment, EPCA required the Department of Energy "to mandate energy efficiency labeling of major residential appliances and to prescribe voluntary industry appliance efficiency improvements." S. Rep. No. 100-6, at 3 (1987); *see* EPCA §§ 324–326. It also "authorized, but did not require, DOE to establish mandatory efficiency standards if necessary." S. Rep. No. 100-6, at 3.

But DOE was slow on the uptake. It did not set standards expeditiously or, in some cases, at all. *See* H.R. Rep. No. 95-496, at 43–46 (1977). So three years later, Congress amended EPCA to mandate minimum energy efficiency standards for appliances that consume substantial energy, such as kitchen ranges, ovens, refrigerators, and dishwashers. *See* National Energy Conservation Policy Act (NECPA), Pub. L. No. 95-619, § 422, 92 Stat. 3206, 3259–62 (1978); *Herrington*, 768 F.2d at 1362 & n.1. Congress sought product designs that "achieve the maximum improvement in energy efficiency which the [DOE] Secretary determines is technologically feasible and economically justified." S. Rep. No. 100-6, at 3. It added, however, a waiver provision that DOE began granting as a matter of course. *See infra* pp. 9–10.

In 1987, again attempting to ensure uniformity, Congress amended EPCA to clamp down on the waivers and bolster EPCA's preemption provision. S. Rep. No. 100-6, at 4–5; National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. No. 100-12 § 5, 101 Stat. 103, 107–17 (codified as amended at 42 U.S.C. § 6295). If an energy conservation standard exists for a covered product,[10] EPCA preemption now provides that "no State regulation concerning the

---

[10] The statute identifies specific covered products and provides that the Secretary "may classify" certain other consumer products as covered products if the Secretary makes certain findings. *See* 42 U.S.C. § 6292(a), (b)(1).

4

energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product."  42 U.S.C. § 6297(c).[11]

In the decades since, DOE has promulgated energy conservation standards for various gas appliances, including stoves,[12] ovens, water heaters, and dryers.  *See* 42 U.S.C. § 6295(a); 10 C.F.R. § 430.32.

### C.  The Clean Energy D.C. Building Code Amendment Act of 2022

Fast-forward about half a century.  In 2021, six D.C. Councilmembers introduced the Clean Buildings Act "to arrest climate change" in response to "record-breaking extreme weather, higher tides caused by rising sea levels, heavy rains and flooding, and a sharp increase in the number of dangerously hot days."[13]  The Clean Buildings Act codifies a component of the 2018 Clean Energy D.C. Plan, the District's strategy to achieving carbon neutrality by 2050.[14]

In 2022, the D.C. Council passed the Clean Buildings Act.  *See* D.C. Act 24-528 (July 27, 2022).  The Act requires that by 2027 certain newly constructed or improved buildings operate as zero-energy.  That is, they must produce as much energy as they consume.  An arguably laudable goal, though one that imposes numerous conditions on commercial buildings and residential buildings over three stories.  D.C. Code § 6-1453.01(a)(2); 12A D.C. Mun. Regs. § 101.10.5; D.C. Energy Conservation Code R202.

---

[11] This preemption provision is subject to several exception and waiver provisions, *id.* § 6297(c)–(f), which the Court discusses *infra* pp. 15–19.

[12] *Stove*, coincidentally, is the title of Lana Del Rey's forthcoming album.  *See* Lindsay Zoladz, *6 (More) Albums I'm Looking Forward to in 2026*, N.Y. Times (Feb. 24, 2026).  Alas, though, it is unlikely to address EPCA or preemption.

[13] Letter from Mary M. Cheh, Councilmember, Ward 3, Council of the District of Columbia, to Nyasha Smith, Secretary, Council of the District of Columbia, at 1 (Oct. 1, 2021).

[14] *Id.*

JA381

The Act directs the D.C. Mayor, by December 31, 2026, to "issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1).[15]  To meet a "[n]et-zero-energy standard," a building must (1) "conserve[] an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z"; and (2) "obtain[] energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z" and meet additional "restrictions." *Id*. § 6-1453.01(a)(3)(A)–(B).  If the Mayor does not timely issue the required regulations, however, a fallback provision kicks in: "no building permit application submitted after" 2026 "shall be approved unless the building design complies with the most recent version of Appendix Z." *Id*. § 6-1453.01(b)(2).[16]

Appendix Z of the D.C. Energy Conservation Code provides for "the design of a net-zero energy building" through, among other criteria, prohibition of "[o]n-site combustion of fossil fuels . . . for the provision of thermal energy to the building." Dkt. 29-7 at 4, 6.[17]  In lay terms, it

---

[15] The Net Zero Modification and Preservation Emergency Amendment Act of 2026, D.C. Act 26-275 (Mar. 6, 2026), temporarily alters the text of the statute until June 4, 2026.  The amendment replaces "substantial improvements" with "Level 3 alterations," for example, and clarifies the definition of "[n]et-zero-energy standard." *Id*. § 3(a)(3), (b).  These temporary changes do not affect the Court's analysis.

[16] The Act excepts from this provision "the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety." D.C. Code § 6-1453.01(b)(2).

[17] The D.C. Construction Codes Coordinating Board approved a new version of Appendix Z in 2023, which provides that "[a]ll buildings shall be all-electric buildings." Dkt. 29-8 at 6; Dkt. 29-6; Dkt. 38-1 ¶ 8.  As of the filing of this Memorandum Opinion, that version has not yet gone into effect, because it has not yet undergone notice-and-comment rulemaking and gained the approval of the D.C. Council.  D.C. Mun. Regs. tit. I, §§ 600–603; D.C. Code § 6-1409; *see* Dkt. 29 at 6–7.  The Court's analysis does not depend on which version of Appendix Z is in effect, because both effectively prohibit the use of natural-gas appliances in covered buildings.

6

bans the use of natural-gas appliances in applicable buildings.  So, for example, rather than installing gas stoves in apartments, builders must install electric stoves.

### D.  Procedural Background

Plaintiffs, "a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems," here sued the District to enjoin the Clean Buildings Act.  Dkt. 1 ¶ 6.  They assert that if allowed to go into effect, the Act "will inflict serious harm on Plaintiffs in the form of lost customers, sales, and revenue; loss of employment; increased expenses, including as a result of higher gas prices; and the inability of restaurants to cook with their preferred form of energy."  Dkt. 26 at 15–16.

Plaintiff National Association of Home Builders of the United States is an organization that represents approximately 140,000 U.S. residential building construction industry members.  Dkt. 1 ¶ 11.  Plaintiff Restaurant Law Center is a public-policy organization whose membership includes all members in good standing with the National Restaurant Association and State Restaurant Associations.  *Id*. ¶ 12.  Plaintiff National Apartment Association is a federation of 141 affiliated apartment associations.  *Id*. ¶ 13.  Plaintiff Maryland Building Industry Association represents home builders, remodelers, developers, and affiliate professional and service providers in D.C. and Maryland.  *Id*. ¶ 14.  Plaintiff Washington Gas Light Company is a regulated public utility that provides natural gas services to 1.2 million customers in D.C., Maryland, and Virginia.  *Id*. ¶ 15.  Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council is an affiliate of the Laborers International Union of North America, AFL-CIO.  *Id*. ¶ 16.  Finally, Plaintiff Teamster Local 96 is a union whose members work for Plaintiff Washington Gas Light Company.  *Id*. ¶ 17.

Collectively, Plaintiffs contend that EPCA preempts the Clean Buildings Act.  They moved for summary judgment and requested a declaration and a permanent injunction.  Dkt. 26 at 35.  The District disagrees that the Act is unlawful and therefore cross-moved for summary judgment.  Dkt. 29.  The Court heard argument on these Motions on September 25, 2025.[18]

## II.    LEGAL STANDARD

Because the parties present a purely legal question of statutory interpretation and "there is no genuine dispute as to any material fact," summary judgment is appropriate.  Fed. R. Civ. P. 56(a).  And because Plaintiffs challenge the Clean Buildings Act facially, *see* Dkt. 1 ¶ 20, the Court may award summary judgment in their favor only if "no set of circumstances exists under which the [District's regulation] would be valid."  *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 213 (D.C. Cir. 2010).

## III.    ANALYSIS

The Constitution's Supremacy Clause makes federal law "supreme."  U.S. Const. art. VI, cl. 2.  And so Congress may decide that federal law should "preempt," rather than "operate alongside state law."  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018).  The question here is whether EPCA "announces its displacement" of the Clean Buildings Act "through [its] express preemption provision."  *Id*. (cleaned up).

---

[18] Application of EPCA's preemption provision to regulations like the Clean Buildings Act has generated a split among federal courts.  *Compare Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (local regulation preempted), *with Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (local regulation not preempted), *and Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (same), *and Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) (same).  The Southern District of New York and Northern District of New York decisions are on appeal before the Second Circuit.  *See* Dkt. 85, *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 25-977 (2d Cir. Jan. 30, 2026); Dkt. 71, *Mulhern Gas Co. v. Mosley*, No. 25-2041 (2d Cir. Jan. 30, 2026).

The traditional tools of statutory interpretation, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024), favor the District.  Plaintiffs' preferred reading strains the statutory text, context, and history beyond what they can bear.  The District's reading, on the other hand, fits comfortably within EPCA's statutory history, plain language, and structure.  Energy efficiency or use in EPCA refers to a fixed measure of an appliance's performance capacity.[19]  It does not concern whether the appliance can be used in a particular context.  The Clean Buildings Act only regulates the latter.

### A.  EPCA's Statutory History

Congress amended and refined EPCA over time to increase federal control over product design and strengthen its preemption provision.  This statutory history, which "form[s] part of the context of the statute," Antonin Scalia & Bryan A. Garner, *Reading Law* 256 (2012) (Scalia & Garner), informs the Court's central task of interpreting the text of the preemption provision.[20] So the Court backs up to explain EPCA's evolution.

The federal government did not act alone in addressing the energy crisis.  Throughout the 1970s, "some States began enacting appliance efficiency standards on their own."  S. Rep. No. 100-6, at 4.  And, while NECPA contained a limited preemption provision, it allowed a state to petition DOE for a waiver.  *Id*.  Moreover, the agency adopted "a general policy" of granting

---

[19] The Court will follow the parties' lead in discussing EPCA's provisions concerning consumer products.  However, its analysis applies equally to industrial equipment for which parallel language applies.  *See* 42 U.S.C. § 6316(a) (incorporating by reference 42 U.S.C. § 6297 for certain industrial equipment); *id*. ch. 77, subch. III, pt. A-1.

[20] Statutory history includes "the statutes repealed or amended by the statute under consideration."  Scalia & Garner at 256.  It "(unlike with legislative history) can properly be presumed to have been before all the members of the legislature when they voted."  *Id.*  "So a change in the language of a prior statute presumably connotes a change in meaning."  *Id*.  For a critique of this approach, however, see Anita S. Krishnakumar, *Statutory History*, 108 Va. L. Rev. 263 (2022).

them. *Id*. The exception became the rule, and, predictably, a "growing patchwork of differing State regulations" emerged. *Id*. Equally predictably, this created conflicting standards to which manufacturers had to cater. *Id.* One state could require that a gas stove not consume greater than 1,200 kBtu per year, while another could up the limit to 1,770 kBtu per year. Soon, manufacturers confronted the Hobbesian choice of designing appliances to meet the strictest state standard or designing appliances differently for different states.

To address this performance standard free-for-all and promote uniformity, Congress amended EPCA in 1987 to tighten the waiver provision and include a new preemption provision. S. Rep. No. 100-6 at 2, 9; NAECA § 7. The main goal was to allow "industry [to] avoid the burdens of a patchwork of conflicting and unpredictable State regulations." S. Rep. No. 100-6 at 12–13. This goal is key. It was not to ensure the use of all covered appliances in all buildings. *Cf*. Dkt. 26 at 25–28; Dkt. 38 at 13–15. And so the preemption provision's language focuses laser-like on "energy efficiency [or] energy use" of "covered product[s]." 42 U.S.C. § 6297(c).

The Court considers this text in depth next.

### B. Statutory Definitions of "Energy Efficiency" and "Energy Use"

#### 1. "Energy Efficiency" and "Energy Use" Standards Govern Product Design

The text of EPCA's preemption provision reads:

> [E]ffective on the effective date of an energy conservation standard [that DOE] established . . . for any covered product, no State regulation concerning the energy efficiency [or] energy use . . . of such covered product shall be effective with respect to such product.

42 U.S.C. § 6297(c). To interpret this language, the Court looks first to the relevant statutory definitions. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021).

To start, EPCA preempts regulations only where there is a DOE-established "energy conservation standard" for a covered product. 42 U.S.C. § 6297(c). It defines "energy

10

JA386

conservation standard" as a "performance standard" that measures either the "minimum level of *energy efficiency* or a maximum quantity of *energy use*" of an appliance.  *Id*. § 6291(6)(A) (emphases added).[21]  And so, by design, "energy conservation standard" is synonymous with "energy efficiency" and "energy use."  *Id*.; *see Rawat v. Comm'r of Internal Revenue*, 108 F.4th 891, 896 (D.C. Cir. 2024).

EPCA defines "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of such product."  42 U.S.C. § 6291(5).  "Energy use" in turn is "the quantity of energy directly consumed by a consumer product at point of use."  *Id*. § 6291(4).  So energy efficiency is a ratio of an appliance's useful output to its energy use, while energy use is total consumption.  As defined, each term—energy conservation standard, energy efficiency, and energy use—refers to and protects federal primacy over product design.  And each metric is determined in accordance with test procedures performed under 42 U.S.C. § 6293.  *See id*. § 6291(4)–(6).

Let's consider gas cooking tops, *i.e.,* gas stoves, to show how these performance standards work in practice.  Gas cooking tops manufactured after April 9, 2012, cannot come equipped with a constant burning pilot light.  *See* 10 C.F.R. § 430.32(j)(1)(i).  For those manufactured on or after January 31, 2028, their "[m]aximum integrated annual energy consumption" must be 1,770 kBtu/year.  *Id*. § 430.32(j)(1)(iii)(C).  And to ensure a gas cooking top meets these requirements, a manufacturer must test it under specified "[t]esting [c]onditions."  *See generally* 10 C.F.R. ch. II subch. D, pt. 430, subpt. B.  DOE instructs, for example, that the test gas cooking top must meet certain installation, gas supply, and instrument-configuration

---

[21] That the statute itself establishes this equivalency punctures Plaintiffs' assertion that the Court should resist "conflat[ing] the terms 'regulation[s] concerning . . . energy use' and 'energy conservation standard.'"  Dkt. 38 at 18.

requirements, among other specifications. *See id*. ch. II, subch. D, pt. 430, subpt. B, app. I1 § 2. The test aims to "simulat[e] actual use." *Herrington*, 768 F.2d at 1404.

Putting all the pieces together, and widening our lens again, EPCA preempts regulations that govern the design, manufacture, and production of an appliance—*i.e.*, colloquially, how it "perform[s]." *See* 42 U.S.C. § 6291(6)(A). And a state or local regulation only conflicts with a federal energy efficiency or use standard where it affects the appliance's performance under "simulat[ed]" test conditions, not in other settings. *Herrington*, 768 F.2d at 1404.

This all matters because Plaintiffs' interpretation of EPCA is instead based on a hypothetical measurement of the appliance's energy consumption *not* under testing conditions, but at the "point of use"—a phrase they take from the statutory definition of "energy use" and define in a particular way. Which takes us next to answering, what is a point of use?

### 2. That "Energy Use" Is Measured at an Appliance's "Point of Use" Does Not Alter the Analysis

Avoiding that the text refers to product design and testing conditions, Plaintiffs instead latch on to a different aspect of EPCA's definition of "energy use." The statute provides that "energy use" means the "quantity of energy" a product consumes at its "point of use." 42 U.S.C. § 6291(4). And the dictionary definition of "point of use," Plaintiffs note, is "the place where or time when a product or service is used." Dkt. 26 at 18 (quoting *Point of Use*, Cambridge English Dictionary Online (2025)). So, they say, the statute preempts any regulation of the "quantity of energy" that a gas appliance consumes where it is used. *Id*. at 17–18. And if a regulation entirely precludes the use of gas appliances, then their "energy use" at the "point of use" is zero—which is a standard different from the federal energy conservation standard and thus preempted. *Id*.

In making this argument, Plaintiffs rely on *California Restaurant Association*, a Ninth Circuit opinion holding that EPCA preempts a similar regulation enacted by the City of Berkeley. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  And the Court considers this decision in detail, as it is currently the lone circuit decision on point.  *See supra* note 18. The panel began by referencing the Oxford English Dictionary to define "point of use" (similarly to Plaintiffs) as the "place where something is used."  *Id.* at 1101 (quoting *Point of Use*, Oxford English Dictionary Online (2022)).  It used this definition to rewrite EPCA to "preempt[] regulations, including 'building code requirements,' § 6287(f), that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used."  *Id*.

"Right off the bat," the panel next stated, "we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants."  *Id*. at 1101–02.  And the Berkeley building code in question "necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'"  *Id*. at 1102.  "So, by its plain language, EPCA preempts Berkeley's regulation . . . because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used."  *Id*.

The Court does not dismiss the panel's reasoning, which three circuit court judges signed and which the Ninth Circuit voted not to take up en banc.  That said, in the Court's view, if this was the at-bat, the batter struck out.  To start, EPCA addresses *technical* subjects.  And so, naturally, "point of use" in EPCA "has a well-established technical meaning."  *Cal. Rest. Ass'n*, 89 F.4th at 1123 (on denial of rehearing en banc) (Friedland, J., dissenting).  The Ninth Circuit majority ignored that when a statute "'address[es] a technical subject, a specialized meaning

is expected'" to work better than a phrase's ordinary meaning.  *Van Buren*, 593 U.S. at 388 n.7 (cleaned up) (quoting Scalia & Garner at 73).  The Oxford English Dictionary definition the panel consulted thus sheds no light.

Rather than refer to a lay-use dictionary, the dissent from the denial of rehearing en banc exhaustively canvassed a range of industry, regulatory, and legislative sources.  *See Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting).  That survey shows that Congress included the phrase "point of use" to "convey that the 'energy use' of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain," such as "energy consumed in extracting that natural gas, removing its impurities, and transporting it to the location of the stove."  *Id*. at 1123 (Friedland, J., dissenting).  So "point of use," properly defined in the EPCA context, has nothing to do with an appliance's use at the place it is used.

Second, the panel's analysis contends that banning the use of appliances effectively sets the appliance's consumption to zero.  *Id*. at 1102.  But recall that DOE assesses energy efficiency and use according to *simulated-use test procedures*.  If a test had shown our hypothetical gas stove's energy use to be 1,770 kBtu (according to the maximum integrated annual energy consumption metric the DOE prescribes), its energy use would be 1,770 kBtu wherever used.  And even if not used at all.  "[A] gas stove of a particular model that sits uninstalled and unused has the same 'energy use' under EPCA as one that is installed and running."  *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting).

Third, even accepting the lay-use dictionary definition for "point of use" does not require accepting the inference that EPCA demands that the appliance must be permitted in *all* places. Consider a hypothetical federal law that defines the point of use as restaurants, sets a national tortilla chips-to-salsa ratio of 2 grams for every 3 grams, and preempts states from regulating that

ratio.  No one would say that because Congress set a chips-to-salsa ratio, it intended to ensure that every restaurant has a right to sell chips and salsa.  And a state regulation prohibiting French restaurants from serving chips and salsa would not be preempted because it would operate in an entirely different regulatory space, preserving French cuisine—one that happens also to affect chips and salsa availability.  But replace "chips and salsa" with "covered products" and "ratio" with "energy efficiency," and the situation is the same this litigation presents.

The District has the better reading of "point of use."

## C. Statutory Context

### 1. The Court's Interpretation Creates a Coherent Statutory Scheme

The statutory definitions do not end the Court's analysis.  It must also interpret EPCA with an eye toward "harmony among [its] provisions."  Scalia & Garner at 180.

Here, the statutory scheme confirms that Congress intended the preemption provision to cover only state and local regulations that alter a product's design.  Consider that the statute contemplates that the Secretary may require "each manufacturer of a covered product to submit information or reports to the Secretary with respect to energy efficiency [or] energy use."  42 U.S.C. § 6296(d)(1).  That is, manufacturers report a static energy efficiency or use figure as a property of a particular product.  This data does not vacillate depending on where a product is used.  EPCA also contains labeling requirements pertaining to "energy use" of certain products.  *Id*. § 6294(a)(2)(I), (a)(3).  Those labels, too, must necessarily report a static figure.  And manufacturers and distributors may not "make any representation . . . with respect to the energy use or efficiency . . . of a covered product to which a test procedure is applicable . . . unless such product has been tested in accordance with [the relevant] test procedure and such representation

fairly discloses the results of such testing." *Id*. § 6293(c)(1). Again, these representations concern a static figure.

In addition, DOE may in some cases waive preemption for states. *See id*. § 6297(d). This waiver provision, too, reflects congressional concern for how a state or local law might affect an appliance's design and production.[22] For example, DOE must consider "the extent to which the State regulation would cause a burden to manufacturers to *redesign and produce* the covered product type (or class)." *Id*. § 6297(d)(3)(C) (emphasis added). The DOE cannot grant a waiver if a state or local regulation would remove certain "*performance characteristics* (including reliability), features, sizes, capacities, and volumes" from the market. *Id*. § 6297(d)(4) (emphasis added). And if DOE waives federal preemption of a state regulation governing a covered product's energy efficiency or use, DOE may still delay the state regulation's effective date if it finds such delay "necessary due to the substantial burdens of *retooling, redesign, or distribution need* to comply with the State regulation." *Id*. § 6297(d)(5) (emphasis added).

### 2.  Plaintiffs' Contrary Interpretation Disrupts the Statutory Scheme

Plaintiffs take a different view. They assert that (1) the word "concerning" in the preemption provision, 42 U.S.C. § 6297(c); (2) the explicit exclusion of certain building codes from preemption, *id*. § 6297(f); (3) the statute's waiver provision, *id*. § 6297(d); and (4) the appearance of "energy use" in other portions of EPCA enlarge EPCA's preemptive scope. They do not.

---

[22] As the Court discusses *infra* pp. 18–19, a waiver provision attached to a more general provision (here, the preemption provision) cannot, by itself, control the interpretation of the more general provision. Here, however, the Court uses the language of the waiver provision alongside other contextual cues to confirm a reading of the statutory definitions of "energy efficiency" and "energy use" it has already established.

First, "concerning." True, that term "generally has a broadening effect." *Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 716–17 (2018). But that does not tell the Court *how* broadly to read the preemption provision. "[A]s many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring). And words like "concerning" are especially sensitive to surrounding context. *See United States v. Miller*, 604 U.S. 518, 533 (2025). Courts must therefore take "particular" care, when "construing [words and] phrases that govern conceptual relationships," to read these terms "in their context and with a view to their place in the overall statutory scheme." *Id*.

The District contends that "concerning" limits preemption to building codes that smuggle in design-related restrictions. *See* Dkt. 29 at 47–49. For example, a building code could provide that all gas appliances consume only a certain amount of energy while switched on in certain buildings. The inclusion of the term "concerning" likely closes such a loophole.[23] On the other hand, stretching "concerning" to cover *any* state or local prohibition of appliance use would preclude a host of critical regulations—such as fire codes that prevent placement of gas appliances where they could increase the risk of poisoning from harmful pollutants or more easily ignite. *See Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at \*6 (S.D.N.Y. Mar. 18, 2025). Plaintiffs read "concerning" with "uncritical literalism" that risks "mak[ing] pre-emption turn on infinite connections." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (cleaned up).

---

[23] The legislative history confirms this view. Congress added § 6297(f) to "prevent[] State building codes from being used as a means of setting mandatory State appliance standards in excess of the Federal standards." H.R. Rep. No. 100-11, at 26 (1987).

Second, the exception for certain building codes.  EPCA excludes from federal preemption "State or local building code[s]" that meet certain criteria.  42 U.S.C. § 6297(f).  The parties agree that § 6297(f) is inapplicable here because the Clean Buildings Act does not meet those criteria.  *See* Dkt. 26 at 28–31; Dkt. 29 at 50–51.  But § 6297(f) remains relevant, Plaintiffs assert, because it allows the Court to infer that by exempting certain building codes, Congress meant to apply the preemption provision to all other building codes.  *See* Dkt. 26 at 19–20.

That argument is a too-long stretch.  "[E]xceptions to preemption," like § 6297(f), "while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the [preemptive] rule."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013); *see also Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 127 (2016) (explaining the no-elephants-in-mouseholes interpretive canon).  That is because statutes often provide multiple routes for escaping a particular proscription.  *See Dan's City Used Cars*, 569 U.S. at 264.  Here, the Clean Buildings Act is not preempted because that Act does not "concern[] . . . energy efficiency [or] energy use" under the main preemption provision.  42 U.S.C. § 6297(c).  But even building codes that *do* concern energy efficiency or use could still be excepted from preemption if they meet one of the tests that § 6297(f) prescribes.

Third, the waiver provision.  DOE may grant state and local governments waivers that permit their regulations of a product's energy efficiency or use to go into effect under certain conditions.  *See id*. § 6297(d).  But EPCA prohibits waiver if the "state regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  *Id*. § 6297(d)(3).  Plaintiffs claim that if DOE cannot waive preemption of laws that affect an appliance's "sale" or "servicing," *id*. § 6297(d)(3), the

18

preemption provision must cover all laws affecting an appliance's post-manufacturing life cycle. Dkt. 26 at 20–21 (quoting 42 U.S.C. § 6297(d)(3)) (citing *Cal. Rest. Ass'n*, 89 F.4th at 1104).

But like an exception provision, a waiver provision cannot by itself establish the scope of a preemption provision. *See Dan's City Used Cars*, 569 U.S. at 264. And Plaintiffs' read too much into the words "sale" and "servicing." That "the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition," *California Rest. Ass'n*, 89 F.4th at 1104, does not mean that the corresponding preemption provision covers *all* laws governing an appliance's entire life cycle in all contexts.

Fourth, "energy use" in other portions of EPCA. Notwithstanding the definition of "energy use" that the statute explicitly supplies, *see supra* pp. 10–15, Plaintiffs assert that other sections of EPCA refer to "energy use" as the quantity of energy a household consumes. *See* Dkt. 26 at 23. But those other sections do not refer to the "performance standard," 42 U.S.C. § 6291(6)(A), associated with "a covered product," *id*. § 6297(c), as the preemption provision and its associated statutory definitions do. Instead, they reference "*average annual per-household* energy use," *id*. § 6292(b)(1) (emphasis added), and similarly "*average per household* energy use," *id*. § 6295(*l*)(1) (emphasis added), of products. Different sections of EPCA, different types of energy use referenced.

If anything, the different usages support the District's take: the preemption provision's omission of any reference to total household consumption suggests that it covers regulations of product design, *not* actual energy consumption in a particular location. Between § 6297(c) on the one hand and § 6292(b)(1) and § 6295(*l*)(1) on the other, the phrase "energy use" "take[s] on distinct characters from association with distinct statutory objects." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (cleaned up).

In sum, EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones.  This is the only reading that preserves "a symmetrical and coherent regulatory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).[24]

### D. Federalism

Finally, the Court addresses federalism concerns.  The Supreme Court has "long recognized the role of the States as laboratories for devising solutions to difficult legal problems."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015).  Lead Plaintiff National Association of Home Builders agrees.  It has endorsed this principle before the D.C. Circuit—as to building codes, no less.  In 2020, it explained that "[s]tate and local governments, which are closer to the needs and realities of their economies and constituents, have primary authority to adopt and enforce building energy codes."  *See* Br. Amicus Curiae Nat'l Ass'n of Home Builders in Supp. of Resp'ts at 18, *Am. Lung Ass'n v. EPA*, No. 19-1173 (D.C. Cir. June 23, 2020).  Well said.

Still, here, the parties present dueling theories regarding the applicability of a presumption against preemption in areas that states and municipalities traditionally regulate.  *See* Dkt. 26 at 17; Dkt. 29 at 25–27.  The Court does not fault them for raising this issue, as the relevant Supreme Court jurisprudence is evolving.  The Supreme Court has previously instructed

---

[24] On summary judgment, Plaintiffs for the first time raise the question of whether EPCA also preempts certain provisions of Appendix Z.  *Compare* Dkt. 26 at 24–26, *with* Dkt. 1 at 22–23. The Court agrees with the District that Plaintiffs have forfeited this challenge.  *See Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019); Dkt. 29 at 59.  Even if they have not, and assuming without deciding that they have standing on a ripe claim, *cf.* Dkt. 29 at 59–60, Plaintiffs' argument is unpersuasive.  Appendix Z (in either its current or proposed form, *see supra* note 17) provides for reduced energy consumption in certain buildings without setting any product-design standard.  So EPCA does not preempt Appendix Z for the same reasons it does not preempt the Clean Buildings Act.

that "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (cleaned up). More recently, however, the Supreme Court refused to "invoke any presumption against pre-emption" where (as here) the "statute contains an express pre-emption clause." *Franklin Cal. Tax-free Tr.*, 579 U.S. at 125 (cleaned up). Some judges have noted difficulty in reconciling these approaches, because *Franklin California Tax-free Trust* did not "mention—much less expressly overrule—the decades of cases where the presumption had . . . been applied." *See Cal. Rest. Ass'n*, 89 F.4th at 1107–08 (O'Scannlain, J., concurring); *see Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (discussing a circuit split).

Fortunately, the presumption, applicable or not, is a wash here. Whatever else the Supreme Court cases state, both emphasize that the text of the statute must bear the weight of the chosen interpretation. *See Medtronic,* 518 U.S. at 485; *Franklin California Tax-free Tr.*, 579 U.S. at 125. Here, the text is clear. EPCA establishes certain national programs for conservation. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986). Plaintiffs provide no persuasive evidence that Congress meant, through the same statute, to trample on the District's ability to pursue its own environmental goals where they do not contradict federal standards. With or without federalism principles to aid its analysis, the Court's conclusions remain the same.

21

JA397

## IV.    CONCLUSION AND ORDER

In sum, the Clean Buildings Act is not facially invalid under EPCA.  Accordingly, the Court:

**GRANTS** Defendant's Cross-Motion for Summary Judgment, Dkt. 30;

**DENIES** Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Permanent Injunction, Dkt. 26; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).

Date: March 26, 2026

_____
ANA C. REYES
United States District Judge

22

JA398

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,** *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>    **Defendant.** | **No. 1:24-cv-02942-ACR** |

## NOTICE OF APPEAL

Pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, notice is hereby given that Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 appeal to the United States Court of Appeals for the District of Columbia Circuit from the order entered in this action on March 26, 2026 (Dkt. 48), in accordance with the accompanying Memorandum Opinion of this Court entered on March 26, 2026 (Dkt. 48).

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *J. Mark Little*
J. MARK LITTLE [admitted pro hac vice]
910 Louisiana Street
Houston, TX 77002
Phone: (713) 229-1489
Email: mark.little@bakerbotts.com

JA399

SCOTT NOVAK [1736274]
700 K St NW
Washington, D.C. 20001
Phone: (202) 639-1316
Email: scott.novak@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, and Washington Gas Light Company*


BREDHOFF & KAISER, P.L.L.C

/s/ *Abigail V. Carter*
Abigail V. Carter [474454]
805 15th St. NW, Ste. 1000
Washington, D.C. 20005
Phone: (202) 842-2600
Email: acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*


MOONEY, GREEN, SAIDON, MURPHY, & WELCH, P.C.

/s/ *Lauren McDermott*
LAUREN MCDERMOTT [1008301]
1920 L St NW
Washington, D.C. 20036
Phone: (202) 783-0010
Email: lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

**CERTIFICATE OF SERVICE**

On April 14, 2026, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, District of Columbia, using the electronic case filing system of the court. Service was accomplished through the CM/ECF system.

*/s/ J. Mark Little*
J. Mark Little