**[NOT SCHEDULED FOR ORAL ARGUMENT]**

No. 26-7050

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, Teamsters Local 96,

Plaintiffs-Appellants,

v.

District of Columbia,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the District of Columbia

---

BRIEF FOR THE UNITED STATES
AS *AMICUS CURIAE* SUPPORTING APPELLANTS AND REVERSAL

---

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM
CHARLES E.T. ROBERTS
  Attorneys
  *Civil Division, Room 3617*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1141*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

The appellants in this Court and the plaintiffs in the district court are National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96.

The appellee in this Court and defendant in the district court is the District of Columbia.

*Amicus* in this Court is the United States.

### B.    Rulings Under Review

The rulings under review are identified in Appellants' Certificate as to Parties, Rulings, and Related Cases.

### C.    Related Cases

This case has not previously been before this Court, and undersigned counsel is aware of no other related cases currently pending in this court or in any other court, except as described in Appellants' Certificate as to Parties, Rulings, and Related Cases.

*/s/ Charles E.T. Roberts*
Charles E.T. Roberts

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION AND STATEMENT OF INTEREST ...................................1

STATEMENT OF THE CASE.................................................................................3

    A.    Statutory Background..........................................................................3

    B.    Prior Proceedings ................................................................................7

ARGUMENT............................................................................................................8

    I.    EPCA Preempts D.C.'s Ban on Energy Use by Products
        Subject to a Federal Standard ............................................................8

    A.    EPCA's Text Preempts Act 42-177 ...............................................10

    B.    EPCA's Statutory Context Confirms It Preempts
        Act 42-177 .........................................................................................19

    C.    EPCA's Statutory History Confirms It Preempts
        Act 42-177 .........................................................................................25

    D.    Adopting D.C.'s Interpretation Would Disrupt the
        Federal Administration of EPCA......................................................30

CONCLUSION ......................................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,*
410 F.3d 492 (9th Cir. 2005) .............................................. 3, 4, 25, 29

*American Trucking Ass'ns v. City of Los Angeles,*
569 U.S. 641 (2013) ...................................................................13

*California Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024),
*amended on denial of reh'g en banc* ................................. 2, 8, 9, 11, 14, 15, 16,
17-18, 18, 20, 22, 23, 27, 32

*Champion v. Ames,*
188 U.S. 321 (1903) ...................................................................17

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) .....................................................................8

*Dan's City Used Cars, Inc. v. Pelkey,*
569 U.S. 251 (2013) .....................................................................8

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018) ......................................................................11

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.,*
541 U.S. 246 (2004) ................................................................ 13, 14

*Henson v. Santander Consumer USA Inc.,*
582 U.S. 79 (2017) ......................................................................16

*Kansas v. Garcia,*
589 U.S. 191 (2020) ......................................................................8

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018) .....................................................................12

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ................................................................ 9, 19

*Morales v. Trans World Airlines, Inc.*,
504 U.S 374 (1992) ...................................................................16

*National Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ...................................................................13

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .....................................................................9

*Rowe v. New Hampshire Motor Transp. Ass'n*,
552 U.S. 364 (2008) ...................................................................13

*Rudisill v. McDonough*,
601 U.S. 294 (2024) ............................................................. 15-16

*Wyeth v. Levine*,
555 U.S. 555 (2009) ...................................................................30

**U.S. Constitution:**

Art. VI, cl. 2...............................................................................8

**Statutes:**

Energy Policy and Conservation Act (EPCA):
Pub. L. No. 94-163, 89 Stat. 871 (1975) ............................... 25, 26, 29
42 U.S.C. § 6202(4) ...............................................................10
42 U.S.C. §§ 6291-6309 .............................................................4
42 U.S.C. § 6291(1) ................................................................10
42 U.S.C. § 6291(3) ............................................................ 4, 10
42 U.S.C. § 6291(4) ........................................................... 10, 15
42 U.S.C. § 6291(6) ........................................................... 15, 16
42 U.S.C. § 6292...................................................................10

42 U.S.C. §§ 6292-6293 ...................................................................................4
42 U.S.C. § 6295 ...............................................................................................4
42 U.S.C. § 6295(o)(4) .....................................................................................21
42 U.S.C. § 6295(h) ..........................................................................................12
42 U.S.C. § 6297(c) ..................................... 1, 2, 4, 10, 16, 18, 27, 32
42 U.S.C. § 6297(c)(2) .......................................................................................5
42 U.S.C. § 6297(c)(3) ................................................................................. 5, 19
42 U.S.C. § 6297(d) ..................................................................................... 5, 32
42 U.S.C. § 6297(d)(3) ................................................................................ 5, 22
42 U.S.C. § 6297(d)(1)(A) ..............................................................................26
42 U.S.C. § 6297(d)(4) ................................................................................ 5, 21
42 U.S.C. § 6297(f)(3) ................................................................................. 5, 19
42 U.S.C. § 6302(a)(5) .......................................................................................4
42 U.S.C. §§ 6311-6317 ....................................................................................4
42 U.S.C. § 6314 .................................................................................................4

Pub. L. No. 95-619, 92 Stat. 3206 (1978) .................................... 26, 28, 29

Pub. L. No. 100-12, 101 Stat. 103 (1987) .................................... 26, 27, 29

15 U.S.C. § 1203(a) .........................................................................................15

15 U.S.C. § 1476(a) .........................................................................................15

21 U.S.C. § 360ss .............................................................................................15

21 U.S.C. § 387p(a)(2)(A) ..............................................................................15

42 U.S.C. § 5403(d) .........................................................................................15

42 U.S.C. § 7543(c) ..........................................................................................15

D.C. Act 42-177:
   D.C. Code § 6-1453.01(a)(2) ......................................................................6
   D.C. Code § 6-1453.01(b)(1) ......................................................................6
   D.C. Code § 6-1453.01(b)(2) ......................................................................6
   D.C. Code § 6-1453.01(a)(3)(B)(iii) ........................................................5, 6

**Regulation:**

10 C.F.R. § 430.32(d) ...................................................................12

**Legislative Material:**

S. Rep. No. 100-6 (1987) .............................................................30

**Other Authorities:**

*Final Rule for Clothes Dryers and Kitchens Ranges and Ovens*,
  47 Fed. Reg. 57,198 (Dec. 22, 1982) ...................................... 27-28, 28

*Procedures, Interpretations, and Policies for Consideration of
  New or Revised Energy Conservation Standards and Test
  Procedures for Consumer Products and Certain Commercial/
  Industrial Equipment*,
  90 Fed. Reg. 16,093 (Apr. 17, 2025) ...............................................30

*Proposed Rulemaking and Public Hearings Regarding Energy
  Efficiency Standards for Refrigerators and Refrigerator-Freezers,
  Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners,
  Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*,
  47 Fed. Reg. 14,424 (Apr. 2, 1982) ...............................................28

*Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into
  Energy Conservation Standards Program*,
  76 Fed. Reg. 51,281 (Aug. 18, 2011) ........................................ 11, 18

U.S. Dep't of Energy, *Secretarial Order: Unleashing the Golden
  Era of American Energy Dominance* (Feb. 5, 2025),
  https://perma.cc/8GHX-PRA5....................................................30

## GLOSSARY

| | |
|---|---|
| Department | U.S. Department of Energy |
| D.C. | District of Columbia |
| EPCA | Energy Policy and Conservation Act |
| JA | Joint Appendix |

**INTRODUCTION AND STATEMENT OF INTEREST**

The question in this appeal is whether a local law prohibiting "[o]n-site fuel combustion … for the provision of thermal energy" to appliances in certain buildings is a "regulation concerning the … *energy use*" of appliances that provide that thermal energy.  The answer is yes.

The Energy Policy and Conservation Act (EPCA) directs the U.S. Department of Energy (Department) to establish energy conservation standards for certain consumer products and industrial equipment—such as appliances—and then expressly preempts state and local "regulation[s] concerning the … energy use" of those products that the Federal Government has authorized to be sold.  42 U.S.C. § 6297(c).  This broad preemption provision enables appliance manufacturers to design, produce, and market appliances across the country in accordance with a single set of nationally applicable regulations.  But the District of Columbia (D.C.) bans the use of certain products that meet federal standards, making them effectively unmarketable by manufacturers and unavailable to consumers.  Regulating—indeed, prohibiting—the "energy use" of federally authorized appliances in this manner is preempted, a conclusion mandated by EPCA's plain text, consideration of the statutory context and history, and the

1

Department's implementation of the statutory regime. *Id.* As the only other court of appeals to have addressed this question recognized when invalidating a local measure prohibiting natural gas infrastructure in new buildings, "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024), *amended on denial of reh'g en banc*. This Court should hold likewise and reverse the district court's judgment.

The United States submits this brief as *amicus curiae* to advance its interests in the administration of EPCA by the Department, including by ensuring the utility of nationally applicable standards adopted by the Department and preempting any state regulations that would undermine those standards.[1]

---

[1] The United States previously addressed the scope of EPCA preemption in a challenge to a City of Berkeley, California, ordinance that banned natural gas hookups in new construction. *See* Brief for the United States, *California Rest. Ass'n*, No. 21-16278 (9th Cir. Feb. 8, 2022) (Panel *Amicus* Br.); Brief for the United States, *California Rest. Ass'n*, No. 21-16278 (June 12, 2023) (*En Banc Amicus* Br.). In that case the government argued that the ordinance was not preempted because it did not "concern[] … energy use." On further reflection and in light of the Ninth Circuit's

*Continued on next page.*

**STATEMENT OF THE CASE**

**A.     Statutory Background**

**1.** Congress passed EPCA to establish a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources" laid bare by the 1970s oil crisis. *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,* 410 F.3d 492, 498 (9th Cir. 2005). In service of its goals to promote both domestic energy supply and energy conservation, Congress began regulating many appliances' energy efficiency and energy use. *See id.*

Originally, EPCA permitted more substantial state and local involvement in appliance regulation. *Id.* at 499. But Congress narrowed that authority as it directed increasingly greater federal involvement. Amendments in the 1970s and 1980s eventually mandated federal standards for many appliances and authorized the Department to issue

persuasive opinion holding the contrary, the United States has reconsidered its position on the scope of EPCA preemption.

new or revised standards. *See id.* at 499–500.[2] Products covered by EPCA

now may only be "distribute[d] in commerce" if they conform with the

applicable federal standard, which requires rigorous testing among other

things. § 6302(a)(5); *see* §§ 6292–6293, 6295, 6314.

To give effect to federal standards and ensure that manufacturers can

market and sell products that conform with them, Congress broadened

EPCA's preemption clause. As amended, EPCA preempts not only state

and local regulations that are stricter than (and therefore would effectively

supersede) a federal standard, but more broadly any regulation "concerning

the energy efficiency, energy use, or water use of" products subject to a

federal standard. § 6297(c). EPCA defines "energy use" as "the quantity of

energy directly consumed by a consumer product at point of use."

§ 6291(4). And it defines "energy" as "electricity, or fossil fuels." § 6291(3).

---

[2] Unless otherwise indicated, all section (§) citations refer to Title 42 of the U.S. Code.

EPCA addresses consumer products and industrial equipment separately. *See* §§ 6291–6309 (consumer); §§ 6311–6317 (industrial). The provisions are substantially similar, and nothing at issue turns on the specific type of product involved. For convenience, this brief cites the consumer product provisions. *Cf. Air Conditioning & Refrigeration Inst.*, 410 F.3d at 496 n.2 (taking a similar approach).

Congress also specified that "regulation[s] or other requirement[s] contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" are preempted *unless* they satisfy specific conditions. § 6297(f)(3); *see* § 6297(c)(3).

States and localities may ask the Department to waive this preemption, but Congress strictly cabined waiver authority both procedurally and substantively. *See* § 6297(c)(2), (d). For example, EPCA prohibits waiving preemption of measures that are "likely to result in the unavailability … of performance characteristics [or] features" in covered products within the jurisdiction. § 6297(d)(4). So too if the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." § 6297(d)(3).

**2.** The District of Columbia enacted Act 42-177 in August 2022 to prohibit most new construction and substantial improvements to covered buildings from using "[o]n-site fuel combustion … for the provision of thermal energy to the building." D.C. Code § 6-1453.01(a)(3)(B)(iii).[3] The

---

[3] As the district court explained, the District has temporarily amended the Act to "replace[] 'substantial improvements' with 'Level 3

*Continued on next page.*

5

measure requires the Mayor to "issue final regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard" by December 31, 2026. *Id.* § 6-1453.01(b)(1). The definition of "net-zero-energy standard" includes the prohibition of "[o]n-site fuel combustion … for the provision of thermal energy to the building." *Id.* § 6-1453.01(a)(3)(B)(iii).[4] Because gas-, propane-, and oil-fueled appliances combust fuel to provide thermal energy, these required regulations would ban these appliances in covered buildings come January 1, 2027.

If the Mayor does not timely issue the required regulations, however, a fallback provision kicks in: "no building permit application submitted after" 2026 "shall be approved unless the building design complies with the most recent version of Appendix Z" of the D.C. Energy Conservation Code—Commercial Provisions. *Id*. § 6-1453.01(b)(2). As the district court

---

alterations,'" among other changes, but "[t]hese temporary changes [set to expire January 1, 2027] do not affect the [preemption] analysis." JA382.

[4] The Act covers commercial buildings and residential buildings over three stories, but exempts "the on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety." D.C. Code § 6-1453.01(a)(2), (b)(2).

recognized, mandating compliance with Appendix Z also "bans the use of natural-gas appliances in applicable buildings." JA383.[5]

The District has not sought a preemption waiver from the Department.

**B.    Prior Proceedings**

After plaintiffs — trade associations, a utility company, and two unions — sued in October 2024, the parties cross-moved for summary judgment, *see* Dkt. 26, 30, and the district court granted the District's motion, JA377–98. The court concluded that the Act is not preempted because it is not an "energy conservation standard," which the court viewed to be "synonymous" with "regulation concerning … energy use." JA387; *see* JA396 (EPCA preempts "only laws that impose additional performance standards for appliances on top of federally established ones."). The court also reasoned that the "Act is not facially invalid under

---

[5] In 2023, D.C. advanced a proposal to amend Appendix Z, which has not yet taken effect; but both that proposal and the current version "effectively prohibit the use of natural-gas appliances in covered buildings." JA382 n.17. As the district court observed, the preemption "analysis does not depend on which version of Appendix Z is in effect, because both effectively prohibit the use of natural-gas appliances in covered buildings." JA382 n.17

EPCA" because it determined that the Act does not regulate "energy use" at the "point of use" as defined in EPCA.  JA389–91, JA398.  The court interpreted those terms to exclude "'indirect energy consumption upstream in the supply chain.'"  JA390 (quoting *California Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting from the denial of reh'g en banc)).  And the court further cited EPCA's "statutory scheme," focusing on how it understood the Department's implementation thereof.  JA391–96.

## ARGUMENT

### I. EPCA Preempts D.C.'s Ban on Energy Use by Products Subject to a Federal Standard.

Pursuant to the Constitution's Supremacy Clause, "Congress has the power to preempt state law."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").  Congress may do so in express terms.  *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).  When a statute preempts state law expressly, a court's only "task is to identify the domain expressly pre-empted."  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quotation marks omitted).  To do that,

courts use the typical tools of statutory interpretation, starting with "the language of the statute itself" and ending there if "the statute's language is plain." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quotation marks omitted). The surrounding "statutory framework" may also help inform a preemption provision's meaning. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). Courts "do not invoke any presumption against pre-emption" when the statute "contains an express preemption clause." *Franklin*, 579 U.S. at 125 (quotation marks omitted).

EPCA's broad preemption provision bars state measures, like D.C.'s, that prohibit products subject to a federal energy conservation standard from using a type of energy. As the Ninth Circuit explained, "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *California Rest. Ass'n*, 89 F.4th at 1102 (alteration in original). Indeed, to conclude otherwise would require holding that a ban on using energy somehow does *not* "concern[] … energy use." EPCA requires no such linguistic strain. On the contrary, text, context, and history all confirm that Act 42-

177 is preempted.  And a contrary ruling would disrupt federal administration of the statute.

### A.  EPCA's Text Preempts Act 42-177.

**1.**  Section 6297(c) provides that, once the Department of Energy has approved a standard for a covered product, "no State regulation concerning the … energy use … of such covered product shall be effective." § 6297(c).  The domain expressly preempted is therefore "State regulation[s] concerning … energy use," § 6297(c), and the resolution of this case turns on whether that language covers Act 42-177.

To start, the term "State regulation" includes laws of the District of Columbia.  § 6202(4).  Next, the subject of preempted regulations is "energy use," a term defined in EPCA to mean "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title."  § 6291(4).  "Energy," in turn, "means electricity, or fossil fuels," which includes fuel gas and oil.  § 6291(3).  A "consumer product" is "any article" which "consumes, or is designed to consume" energy and is distributed in commerce for personal use, such as a kitchen stove.  § 6291(1); *see* § 6292 (identifying covered products).  "Point of use" is not defined in the statute,

10

but, giving the term its ordinary meaning, *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018), the phrase means the "place where something is used." *California Rest. Ass'n*, 89 F.4th at 1101 (quotation marks omitted); *see also Statement of Policy for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program*, 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) (explaining that the "point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site *where the appliance is operated*" (emphasis added)).

Putting all this together, then, EPCA preempts local regulations concerning the quantity of fossil fuels consumed by a covered product where that product is used, once the Department has set a standard to cover that specific type or class of product. *See California Rest. Ass'n*, 89 F.4th at 1101–02 (analyzing statutory terms and context).

This rule plainly covers Act 42-177. By banning the combustion of fuel for the provision of thermal energy to buildings, it "necessarily regulates" how much energy gas-, propane-, or oil-powered products consume when used, because the only permissible quantity of fossil fuel use is zero. *Id.* at 1102. Because federal standards exist for several types of

such products—*see, e.g.*, § 6295(h) (kitchen ranges and ovens); 10 C.F.R.
§ 430.32(d) (water heaters), (e) (furnaces), (h) (clothes dryers), (j) (cooking
products)—Act 42-177 is preempted as to those products.

But were there any doubt on this score, EPCA's preemption clause
sweeps even more broadly than facial regulations of a product's energy
use. Section 6297(c) displaces any regulation "concerning" energy use of a
covered product. "Concerning means relating to, and is the equivalent of
regarding, respecting, about." *Lamar, Archer & Cofrin, LLP v. Appling*, 584
U.S. 709, 717 (2018) (quotation marks omitted). The use of such words "in
a legal context generally has a broadening effect, ensuring that the scope of
a provision covers not only its subject but also matters relating to that
subject." *Id.* Congress intended § 6297(c) to reach broadly, a choice that
must be given meaningful effect. Thus, for example, measures that require
a particular design or feature that constitutes a proxy for energy use or
efficiency, and that drive non-compliant options out of the marketplace,
would be preempted even if the measures do not themselves impose
numerical targets or otherwise appear to directly "touch on" energy use or
efficiency. EPCA's preemptive reach is not unlimited, *see infra* Part I.D.,
but, at a bare minimum, a law that explicitly prohibits a particular type or

class of products from using a type of energy "relates to" their "energy use."

Further, the Supreme Court has repeatedly instructed that such a broadly worded preemption clause cannot be evaded by slightly "shifting [the] regulatory focus" to employ an "indirect but wholly effective means" of achieving a preempted objective. *American Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013); *see National Meat Ass'n v. Harris*, 565 U.S. 452, 458, 463–64 (2012) (holding that a state cannot evade a preemption clause aimed at requirements "with respect to" slaughterhouses by framing its regulation "as a ban on the sale of meat produced in whatever way the State disapproved"); *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (preempting "the very effect that the federal law sought to avoid" even if pursued "less direct[ly] than it might be" (quotation marks omitted)).

Especially instructive here is *Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, 541 U.S. 246 (2004). That case concerned a provision of the Clean Air Act that preempted any standard "relating to the control of emissions from new motor vehicles" and local rules that prohibited the purchase of vehicles that did not comply with certain

emission requirements.  *Id.* at 249, 252 (quotation marks omitted).  The Supreme Court rejected the district court's attempt "to draw a distinction between purchase restrictions (not pre-empted) and sale restrictions (pre-empted)."  *Id.* at 252.  The Court explained that "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."  *Id.* at 255.

Here, EPCA authorizes the sale only of covered products that conform with federal standards and preempts state and local attempts to restrict that authorization.  And here, as in *South Coast Air*, the right of manufacturers to sell conforming products is meaningless if consumers cannot buy (or can buy but cannot use) those products.  For that reason, as the Ninth Circuit recognized, "Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses.  So EPCA preemption extends to regulations that address the products themselves *and* building codes that concern their *use* of natural gas."  *California Rest. Ass'n*, 89 F.4th at 1103.  Accordingly, states and "localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*."  *Id.* at 1107.

**2.** The district court committed two fundamental errors in its textual analysis of § 6297.

*First*, the district court concluded that Act 42-177 should not be understood to concern "energy use" because the Act does not directly impose an "energy conservation standard," which the court viewed as "synonymous" with "regulation concerning … energy use." JA387; *see* JA396 ("EPCA preempts only laws that impose additional performance standards for appliances on top of federally established ones."). Congress's choice to define those terms differently precludes any such contention. § 6291(4), (6); *see California Rest. Ass'n*, 89 F.4th at 1105 ("Congress gave [the terms] related, but different, meanings." They are not "identical.").

Congress not only differentiated "energy use" from "energy conservation standard,"[6] but, as explained above, further broadened its preemptive sweep through the use of "concerning." These deliberate choices must be given effect. *See Rudisill v. McDonough*, 601 U.S. 294, 308

---

[6] Indeed, Congress routinely focuses preemption provisions specifically on product, manufacturing, or similar technical "standards." *E.g.*, 15 U.S.C. §§ 1203(a), 1476(a); 21 U.S.C. §§ 360ss, 387p(a)(2)(A); 42 U.S.C. §§ 5403(d), 7543(c).

(2024) (Courts "generally 'presume differences in language like this convey differences in meaning.'" (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017))); *Morales v. Trans World Airlines, Inc.*, 504 U.S 374, 386 (1992) (regulations need not "specifically address[]" preempted subject matter given "the sweep of the 'relating to' [or concerning] language"). As the Ninth Circuit observed, Congress also used those terms "*together*" elsewhere in EPCA, "which shows that they aren't simply interchangeable." *California Rest. Ass'n*, 89 F.4th at 1105 (citing § 6297(d)(1)(A)).

Even if "regulation concerning … energy use," § 6297(c), somehow were "synonymous" with "energy conservation standard," JA387, Act 42-177 would be preempted, because it "prescribes … a maximum quantity of energy use" for covered products that combust fuel to produce thermal energy, or at least functions as such a prescription, § 6291(6). By prohibiting fossil-fuel-powered products from combusting any fuel, the law sets the maximum amount of energy such an appliance can use at zero. *See California Rest. Ass'n*, 89 F.4th at 1102 (rejecting the argument that the Berkeley ordinance does not "prescribe[] an affirmative quantity of energy" because "it is well accepted in ordinary usage that zero is a quantity"

16

(quotation marks omitted)). It is undisputable that a state law prescribing the maximum quantity of energy use at some miniscule, unattainable value just greater than zero would be preempted by EPCA. There is no logical reason why lowering that quantity to zero should lead to a different result.

Indeed, Act 42-177 is the most burdensome form of energy conservation standard for these covered products one can imagine, prohibiting any energy use at all and requiring consumers to choose other, more favored products.[7]

*Second*, the district court declined to adopt the Ninth Circuit's interpretation of § 6297(c) because it viewed that interpretation as resting on the "ordinary meaning" of "point of use," as opposed to a more "*technical*" one. JA389–90. The court did not specify what "well-established technical meaning," JA389, it preferred but rather treated "point of use" as a specialized term meaning that a product's energy is measured without adjustment for any "energy losses that occur in the generation, transmission, and distribution of electricity," *California Rest.*

---

[7] The Supreme Court has established that a "regulation may … assume the form of [a] prohibition." *Champion v. Ames*, 188 U.S. 321, 328 (1903).

*Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting) (quotation marks omitted).  Although it is true that compliance testing for EPCA standards happens in a laboratory setting that is intended to eliminate real-world variables, the Department nonetheless considers "where the appliance is operated," 76 Fed. Reg. at 51,283, which is consistent with the Ninth Circuit's focus on the energy used by covered products "at their intended final destinations," *California Rest. Ass'n*, 89 F.4th at 1102.

More fundamentally, though, even accepting a more technical definition of "point of use" would not change the result.  Regardless of the precise time or means of measurement, Act 42-177 prohibits products that are compliant with EPCA standards *because* their energy (*i.e.*, fossil fuel) use is too high.  For a manufacturer to comply with D.C.'s standard, it would have to design and manufacture a product that uses zero energy from fossil fuels—regardless of whether that energy usage is measured in a home or in a laboratory setting.  And that is why Act 42-177 is preempted.  D.C. functionally is setting standards that Congress determined are preempted (absent a waiver).  § 6297(c).

**B. EPCA's Statutory Context Confirms It Preempts Act 42-177.**

Because the plain text of § 6297(c) displaces Act 42-177, the Court's inquiry could properly stop there. But if more were needed, related provisions of EPCA confirm that conclusion. The district court's different assessment is mistaken.

**1.** One relevant provision is EPCA's exception to preemption for certain building codes. § 6297(c)(3), (f)(3). The Supreme Court has observed that exceptions to a preemption clause are helpful in interpreting a preemption provision's scope. *See Medtronic*, 518 U.S. at 486. And here, EPCA's building code exception provides an especially important part of the "'statutory framework' surrounding" the preemption provision and, therefore, a significant source of evidence regarding § 6297(c)'s scope. *Id.* The statute provides that "a regulation … contained in a State or local building code for new construction concerning the … energy use of such covered product is not superseded" if it "complies with all" of the seven specified requirements. § 6297(f)(3).[8] By exempting only a narrow sliver of

---

[8] As the district court noted, "[t]he parties agree that § 6297(f) is inapplicable here because the … Act does not meet those criteria." JA394.

19

energy use regulations contained in building codes, and preempting all others, Congress underscored that "EPCA's preemptive scope extends beyond direct or facial regulations of covered products" and prevents states from evading preemption by regulating appliances indirectly through other types of measures. *California. Rest. Ass'n*, 89 F.4th at 1101.

The district court recognized that § 6297(c)'s use of "concerning," alongside the building code exception, means it covers "a building code … provid[ing] that all gas appliances consume only a certain amount of energy while switched on in certain buildings." JA393. But that is just what Act 42-177 does: It provides that all fossil fuel appliances consume zero energy (whether switched on or off) in certain buildings. The district court provided no basis for distinguishing the Act from its own hypothetical, preempted building code. *See* JA393.

**2.** Another relevant provision is § 6297(d), which permits the Department to waive preemption in certain circumstances. The waiver provides relief in appropriate circumstances from § 6297(c)'s general rule of preemption, but Congress strictly limited authority to grant waivers. § 6297(d). A form of regulation for which Congress precluded a waiver is especially likely to be one that Congress expected to be covered by the

20

preemption provision in the first place. Otherwise, there would be no need to limit waiving preemption of that form of regulation.

Act 42-177 falls within two separate categories of regulation for which waiver is unavailable, thereby demonstrating Congress's intent that such regulations should be (and remain) preempted. *First,* § 6297(d)(4), which the district court did not grapple with, prohibits waiving preemption of regulations that are "likely to result in the unavailability … of performance characteristics (including reliability), features, sizes, capacities, and volumes" in "any covered product type (or class)" "that are substantially the same as those generally available" in the regulating jurisdiction when the Secretary decides whether to waive preemption.[9] Thus, Congress intended to preempt regulations that eliminate currently authorized types or classes of products or products' performance characteristics or features from the market. But that is precisely what Act 42-177 seeks to do. It prohibits whole types or classes of appliances based

---

[9] Another provision, § 6295(o)(4), prohibits the Department from promulgating an energy conservation standard in the first place if similar unavailability would result.

on a characteristic or feature D.C. disfavors: the use of energy from combustible fuel to provide thermal energy.

*Second*, § 6297(d)(3) prohibits waiver if the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." A law preventing the use of gas, propane, and oil heating appliances in new construction and substantial building improvements will necessarily burden the *sale* (and manufacturing, marketing, distribution, and servicing) of those appliances. Several "relevant factors" the Secretary "shall evaluate" to determine the regulation's burdens prove the point. If Act 42-177 functions as intended, it

- "will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product[s] in the State";

- "would result in a reduction— (i) in the current models, or in the projected availability of models, that could be shipped … to the State" or "(ii) in the current or projected sales volume of the covered product type (or class) in the State"; and

- "is likely to contribute significantly to a proliferation of" similar requirements in other jurisdictions pursuing similar electrification agendas that would have a "cumulative impact" on the market for covered appliances.

§ 6297(d)(3). And if it is replicated, these effects will occur nationwide. *See California Rest. Ass'n*, 89 F.4th at 1104 ("[N]o doubt Berkeley's ban, if

adopted by States and localities throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'").[10]  Further, as the Ninth Circuit observed, this provision requires the Department to "consider the complete lifecycle of an appliance—from manufacturing to servicing"—which would make "little sense if the scope of EPCA's preemption ends with the design or manufacture of the product" by covering only direct energy conservation standards.  *Id.*

The district court's brief discussion of the waiver provisions attacks a strawman by suggesting that those provisions do "not mean that the corresponding preemption provision covers *all* laws governing an appliance's entire life cycle in all contexts."  JA395.  No one is arguing for such a sweeping rule here.  *See infra* Part I.D.  The court did not deny that this particular law would result in a significant reduction in availability of gas-, propane-, and oil-powered appliances in D.C. and contribute to a similar effect nationwide if replicated elsewhere.

---

[10] Congress's inclusion of not just a given "covered product" but also "product *type*" and "*class*" in both § 6297(d)(3) and (4) further underscores that bans targeting whole types or classes of covered products (products that consume combustible fuel) fall within EPCA's preemptive reach.

**3.**  The district court cited several EPCA provisions it believed show that preemption "cover[s] only state and local regulations that alter a product's design."  JA391; *see* JA392 ("concern for how a state or local law might affect an appliance's design and production").  For starters, that rule seems different and broader than the court's conclusion elsewhere that preemption is limited to "laws that impose additional performance standards for appliances on top of federally established one."  JA396.  But in any event, Act 42-177 fits this description too.  As discussed, there is no way for a covered product to both (i) comply with D.C.'s standard (zero energy from combustion for the provision of thermal energy) and (ii) perform according to its federal energy conservation standard (use some non-zero amount of energy from combustion for the provision of thermal energy).  To comply, the manufacturer would need to "alter [the] product's design" so that it would not use any energy from combustion. JA391.  This establishes preemption, even under this conception of § 6297(c).

And the district court's concerns regarding "labeling" and the need for a "static" energy use value for purposes of other EPCA provisions, JA391–92, suffer from the same flaws as its reliance on a hyper-technical

24

definition of "point of use," *see supra* Part I.A.2.  Interpreting EPCA to

preempt D.C.'s Act does not mean "energy use" labels must change

depending on how a consumer uses the product; the point merely is that a

law prohibiting a type or class of appliance from using the type of energy it

requires to reach that static value for labeling purposes is a regulation

*concerning* those appliances' "energy use."

### C. EPCA's Statutory History Confirms It Preempts Act 42-177.

EPCA's statutory history points in the same direction.  Both the

preemption and waiver provisions have evolved over time, further

restricting state and local interference with federally covered products.

*First*, from 1975 to the present version, Congress has extended the

preemption provision to cover more than just "energy conservation

standards" or their equivalents.  *See Air Conditioning & Refrigeration Inst.*,

410 F.3d at 500.  The three versions are reproduced in relevant part below:

> **1975:**  "This part supersedes any State regulation insofar as such State regulation may now or hereafter *provide for … any energy efficiency standard or similar requirement with respect to* energy efficiency or energy use of a covered product…."
> Pub. L. No. 94-163, § 327(a), 89 Stat. 871, 926–27 (1975) (emphasis added) ("Effect on Other Law").

**1978:** "If a State regulation is prescribed *which establishes an energy efficiency standard or other requirement respecting* energy use or energy efficiency of a type (or class) of covered products and which is not superseded by subsection (a)(2) or (b)(2), then" a regulated party may petition for preemption.
Pub. L. No. 95-619, sec. 424(a), § 327(b)(1), 92 Stat. 3206, 3263–64 (1978) (emphasis added) ("Effect of Standards on Other Laws").

**1987:** "[N]o State *regulation concerning* the energy efficiency or energy use of such covered product shall be effective with respect to such product." Pub. L. No. 100-12, sec. 7, § 327(c), 101 Stat. 103, 118 (1987) (emphasis added) ("Effect on Other Law").

The 1975 version is the narrowest substantively. Whatever regulations it covered beyond formal "energy efficiency standard[s]" had to provide for a "*similar* requirement with respect to … energy use." 89 Stat. at 927 (emphasis added). The 1978 version is broader substantively but narrower procedurally. It replaced "similar requirement," *id.*, with "*other* requirement respecting energy use;"[11] and it imposed a requirement to "petition" the Department for preemption to be effective, 92 Stat. at 3263–64 (emphasis added). Today's version, from 1987, is broader still. *See*

---

[11] The current waiver provision retains the 1978 "other requirement" language, but this holdover does not negate the 1987 change to the preemption provision's operative language. § 6297(d)(1)(A). And, in any event, Act 42-177 still would fit the bill, because it "require[s]" zero "energy use" by covered products. *Id.*

*California Rest. Ass'n*, 89 F.4th at 1104 n.6 (describing the 1978 version as "narrower than today"). No longer does the provision specify "energy efficiency standard[]" (or energy conservation standard) in a way that might suggest a regulation must at least be like an energy conservation standard to be preempted—let alone equivalent. *See id.* Nor must the state or local measure "establish[]" a "requirement." *See id.* It now covers any "regulation *concerning* … energy use." 101 Stat. at 118 (emphasis added). And it removes the petition requirement for preemption to be effective. *Id.*

This history puts to rest any contention that the operative language equates "regulation concerning … energy use" with "energy conservation standard." § 6297(c); *see* JA387, JA396 (interpreting them "synonymous[ly]" and limiting preemption to "only laws that impose additional performance standards for appliances on top of federally established ones"). And because more than just standards are preempted, a regulation like Act 42-177 that prescribes how much energy a type or class of appliances can use is also covered. *See supra* Part I.A.

Even under the narrower 1978 language, the Department interpreted EPCA to preempt indirect bans on products subject to a federal standard. *Final Rule for Clothes Dryers and Kitchens Ranges and Ovens*, 47 Fed. Reg.

57,198, 57,215 (Dec. 12, 1982).[12] In addition to the building codes discussed above, the Department advised that a "[p]rohibition of hook-ups for appliances with less than a certain efficiency" and "[p]rohibitions on standing pilot lights" in products subject to a federal standard would both "be subject to preemption." *Id.* & n.34. Neither hook-ups nor standing pilot lights were covered products subject to their own energy efficiency standards; nor did prohibiting them establish an energy efficiency standard in its own (technical) right. Yet such prohibitions are, if not functional "standards," at least "other requirement[s] respecting energy use." 92 Stat. at 3263–64. All the more so today for a provision like D.C.'s that prohibits whole types or classes of appliances based on what type of energy they use.

_____

[12] This interpretation followed a proposed rule that "[m]any commenters indicated [left] uncertainty" as to the scope of preempted State and local laws. 47 Fed. Reg. at 57,215; *see Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,455 (Apr. 2, 1982) (focusing on "energy efficiency standards" under the header "Preemption of State Regulations"). Yet even that proposed rule recognized that "effectively ban[ning] appliances using certain types of fuel" "should not be the consequence of standards" because EPCA's focus on "saving energy is relative, not absolute." 47 Fed. Reg. at 14,434.

*Second*, the waiver provision's history tells a similar story. Originally, waiver was impermissible unless, among other things, "such State regulation contains a more stringent energy efficiency standard than the corresponding Federal standard." 89 Stat. at 927 (Sec. 327(b)(2)(C)). Similarly, the 1978 version required that "such State regulation contains a more stringent energy efficiency standard than such Federal standard." 92 Stat. at 3264. But the 1987 amendments eliminated that stringency requirement, replacing it with a more reticulated set of requirements aimed at determining whether "such State regulation is needed to meet unusual and compelling State or local energy interests." 101 Stat. at 119; *see supra* p. 20. This makes sense not just because of Congress's goal to make waiver "more difficult for states to obtain," *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500, but also because Congress intended to preempt more than just explicit state and local energy efficiency standards and their equivalents, to instead encompass regulations "concerning" energy use and energy efficiency.

**D. Adopting D.C.'s Interpretation Would Disrupt the Federal Administration of EPCA.**

EPCA prevents states and localities from interfering with what the Department does at the federal level. If products authorized for sale pursuant to a federal energy conservation standard can be categorically outlawed by any state or locality, that would disrupt the Department's administration of EPCA's Energy Conservation Program and severely limit or even cut off consumers' options. *Cf. Wyeth v. Levine*, 555 U.S. 555, 576 (2009) ("[W]e have attended to an agency's explanation of how state law affects the regulatory scheme."). In particular, recognizing such authority to end-run EPCA would run directly counter to the Department's goals of reducing costs and increasing choice for consumers, alongside increasing domestic energy supply and energy conservation. *See* U.S. Dep't of Energy, *Secretarial Order: Unleashing the Golden Era of American Energy Dominance* (Feb. 5, 2025), https://perma.cc/8GHX-PRA5; *Procedures, Interpretations, and Policies for Consideration of New or Revised Energy Conservation Standards and Test Procedures for Consumer Products and Certain Commercial/Industrial Equipment*, 90 Fed. Reg. 16,093, 16,096–97 (Apr. 17, 2025); *see also* S. Rep. No. 100-6, at 2 (1987) (1987 amendment was intended

to "reduce the regulatory and economic burdens on the appliance manufacturing industry").

Permitting states to evade EPCA also would undermine federal neutrality between energy technologies and energy sources for covered products. EPCA's definitions are technology- and source-neutral: They apply equally to fossil fuel and electric products. The Department's regulations, in turn, are primarily performance-based and do not mandate or prefer one fuel source. Thus, § 6297(c) prevents jurisdictions from functionally banning a disfavored energy type.

EPCA's preemptive reach, of course, is not unlimited, but this is not an edge case. There is no need to decide the outer limits of that scope here, because a complete ban on a type of energy used by products subject to a federal standard comfortably falls within them—whereas measures concerning subjects other than energy use likely present different issues. Here, though, D.C. has banned federally authorized products from using specific types of energy. Applying EPCA's plain text to preempt such measures does not threaten states' ability to regulate dangerous or unsafe conditions. Nor would that application require that health and safety regulations' incidental impacts on covered products trigger preemption. It

31

merely would prevent products subject to a federal standard, after rigorous

testing, from being banned from using specific types of energy. *See*

*California Rest. Ass'n*, 89 F.4th at 1101 (emphasizing ruling's "limited"

reach). States would remain free to experiment with different approaches

to matters within their historical police powers. And Congress

contemplated that states would *collaborate* with the Federal Government on

such experimentation through the waiver provision. § 6297(d). Any

concern about fundamentally different safety regulations is misplaced. *See*

JA390, JA395. Indeed, there has been no flood of challenges to such safety

regulations in the Ninth Circuit despite the *California Restaurant Ass'n*

decision.[13]

Nor should there be concern over the Department's implementation

of the statutory waiver provision. The United States previously expressed

concern that interpreting EPCA's preemption provision to cover more than

---

[13] On the contrary, if preemption were to turn on the state or locality's "reasons" for enacting a provision, *see* 89 F.4th at 1126 (Friedland, J., dissenting), courts would become awash with litigation over the diverse intentions of officials, agencies, and elected bodies. D.C.'s intentions are plain, but the more appropriate focus is on a provision's effects. *See* § 6297(c) ("no State regulation concerning … energy use … shall be *effective*" (emphasis added)).

just energy conservation standards or their technical equivalents could "put enormous strain on the waiver process."  *En Banc Amicus* Br. 20; Panel *Amicus* Br. 25.  Yet in the more than three years since the *California Restaurant Ass'n* panel decision issued (and more two years since the denial of rehearing en banc there), the Department has not received *any* new waiver request under § 6297(d), let alone a flood thereof.

For decades, the Department has promulgated energy conservation standards without concern that states may end-run those standards by outright banning covered products from using a type of energy.  If the district court's misguided decision stands, that painstaking and vital work may be for naught.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

June 2026

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS PULHAM

*/s/ Charles E.T. Roberts*

CHARLES E.T. ROBERTS
  Attorneys
  *Civil Division, Room 3617*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1141*
  charles.roberts2@usdoj.gov

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 29(5) because it contains 6,481 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Charles E.T. Roberts*
Charles E.T. Roberts

# CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2026, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system.  Service will be

accomplished by the appellate CM/ECF system.

/s/ Charles E.T. Roberts

Charles E.T. Roberts

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 6291 (excerpts) ................................................................ A1

42 U.S.C. § 6292 ................................................................................ A2

42 U.S.C. § 6293 (excerpts) ................................................................ A4

42 U.S.C. § 6295 (excerpts) ................................................................ A4

42 U.S.C. § 6297 ................................................................................ A5

42 U.S.C. § 6302 (excerpts) .............................................................. A15

**42 U.S.C. § 6291 (excerpts)**

**§ 6291. Definitions**

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of Title 49) of a type—

(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the

case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

…

**42 U.S.C. § 6292**

**§ 6292. Coverage**

(a) In general

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding--

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

(b) Special classification of consumer product

(1) The Secretary may classify a type of consumer product as a covered product if he determines that--

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

**42 U.S.C. § 6293 (excerpts)**

**§ 6293. Test procedures**

…

(b) Amended and new procedures

    (1) Test procedures. —

      …

      (B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

      …

    …

    (3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

    …

…

**42 U.S.C. § 6295 (excerpts)**

**§ 6295. Energy conservation standards**

(a) Purposes. The purposes of this section are to —

    (1) provide Federal energy conservation standards applicable to covered products; and

    (2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

…

(o) Criteria for prescribing new or amended standards

…

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

**42 U.S.C. § 6297**

**§ 6297. Effect on other law**

(a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also

A5

mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product.

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

A6

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(iii) Repealed. Pub.L. 112-210, § 10(a)(9)(C), Dec. 18, 2012, 126 Stat. 1525

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product.

A7

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

A8

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

(i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

(ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

(d) Waiver of Federal preemption

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary

finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to

A12

section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

(e) Exception for certain State procurement standards

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

(f) Exception for certain building code requirements

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed —

   (A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

(g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

**42 U.S.C. § 6302 (excerpts)**

**§ 6302. Prohibited acts**

(a) In general

It shall be unlawful--

…

(5) for any manufacturer or private labeler to distribute in commerce any new covered product which is not in conformity with an applicable energy conservation standard established in or prescribed under this part, except to the extent that the new covered product is covered by a regional standard that is more stringent than the base national standard;

…

(b) "New covered product" defined

For purposes of this section, the term "new covered product" means a covered product the title of which has not passed to a purchaser who buys such product for purposes other than (1) reselling such product, or (2) leasing such product for a period in excess of one year.