ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 8, 2026

No. 26-7050

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE
UNITED STATES, *et al.*,
APPELLANTS,

V.

DISTRICT OF COLUMBIA,
APPELLEE.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEE THE DISTRICT OF COLUMBIA**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

BRYAN J. LEITCH
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524
bryan.leitch@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici*.—Plaintiffs-appellants are the National Association of Home Builders of the United States, Restaurant Law Center, National Apartment Association, Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96.  Defendant-appellee is the District of Columbia.  Several amici curiae appeared in the district court.  American Gas Association appeared as amicus curiae in support of plaintiffs.  Public Health Law Center, Sierra Club, and Chesapeake Climate Action Network appeared as amici curiae in support of defendant.  American Gas Association and the United States have appeared as amici curiae in support of appellants in this Court.

B.    *Ruling under review*.—The ruling of the district court under review is the March 26, 2026 Memorandum Opinion and Order (ECF No. 48), entered by U.S. District Judge Ana C. Reyes, granting defendant's cross-motion for summary judgment (ECF No. 30), and denying plaintiffs' motion for summary judgment, declaratory relief, and permanent injunction (ECF No. 26).  The decision is not reported but is available at 2026 WL 837674.

C.    *Related cases*.—This case has not previously been before this Court or any other.  Undersigned counsel is aware of several "related cases" involving some of "the same parties" and/or raising "similar issues" within the meaning of Circuit

Rule 28(a)(1)(C).  Two of those cases remain pending: *Maryland Building Industry Association, Inc. v. McIlwain*, No. 26-1552 (4th Cir.), and *National Association of Home Builders of the U.S. v. Montgomery County*, No. 26-1449 (4th Cir.).  Three other cases were recently decided by the Ninth and Second Circuits: *Rinnai Am. Corp. v. S. Coast Air Quality Mgt. Dist.*, ---F.4th---, No. 25-5129, 2026 WL 1912093 (9th Cir. July 2, 2026), and *Ass'n of Contracting Plumbers of the City of N.Y., Inc. v. City of N.Y.*, --- F.4th ---, Nos. 25-977 & 25-2041, 2026 WL 1871692 (2d Cir. June 30, 2026), affirming *Association of Contracting Plumbers of the City of New York v. City of New York*, No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), and *Mulhern Gas Co., Inc. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025).

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATEMENT OF THE ISSUE..................................................................................4

STATUTES AND REGULATIONS..........................................................................4

STATEMENT OF THE CASE...................................................................................4

    1.    Legal Background ........................................................................4

        A.    The Energy Policy And Conservation Act ...............................4

        B.    The Clean Buildings Act...........................................................8

    2.    Factual And Procedural Background .....................................11

STANDARD OF REVIEW .......................................................................................14

SUMMARY OF ARGUMENT .................................................................................14

ARGUMENT .............................................................................................................17

    I.    The District Court Correctly Concluded That EPCA Does Not Facially Preempt The Clean Buildings Act..........................................17

        A.    The Clean Buildings Act's fossil-fuel provision is not preempted as to EPCA-covered products or on its face ..........17

                1.    The fossil-fuel provision does not "concern[]" the "energy use" of a "covered product" under EPCA ........17

                2.    Plaintiffs effectively concede that the fossil-fuel provision is not facially preempted, thus independently defeating their claim ..............................25

        B.    Plaintiffs' arguments lack merit................................................27

                1    The Clean Buildings Act does not set an "energy use" standard of "zero" for gas appliances....................27

2.      Plaintiffs cannot salvage their claim by changing "concerning" to "relating to" ............................................. 32

3.      Plaintiffs' reliance on *Berkeley* is misplaced.................. 34

4.      EPCA's structure constrains its preemptive scope......... 37

5.      EPCA's history and purpose underscore the textual and structural limits of its preemption provision............ 42

C.      The district court correctly rejected plaintiffs' Appendix Z claim as forfeited and meritless ................................................ 47

II.      Plaintiffs' Overbroad Remedies Are Inequitable And Unsound ........ 52

CONCLUSION .............................................................................................. 54

STATUTORY AND REGULATION ADDENDUM............................................. 1

# TABLE OF AUTHORITIES*

## *Cases*

*Advoc. Health Care Network v. Stapleton*,
   581 U.S. 468 (2017)....................................................................................33

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) ...........................................................43

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)......................................................................................23

*Ardelyx, Inc. v. Kennedy*,
   ---F.4th---, 2026 WL 1839261 (D.C. Cir. June 26, 2026)..................................38

*Ass'n of Contracting Plumbers v. City of New York*,
   No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025).......................13

*Ass'n of Contracting Plumbers v. City of New York*, ---F.4th---, 2026 WL
   1871692 (2d Cir. June 30, 2026) ............................ 2, 3, 17, 19-22, 29-36, 39-44

*Baptist Mem'l Hosp. v. Sebelius*,
   566 F.3d 226 (D.C. Cir. 2009)......................................................................44

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005)....................................................................18, 23, 30, 46

*Cal. Coastal Comm'n v. Granite Rock Co.*,
   480 U.S. 572 (1987)....................................................................................25

*Cal. Rest. Ass'n v. Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ........................................ 12, 13, 24, 34, 35, 36, 37

*Cavel Int'l, Inc. v. Madigan*,
   500 F.3d 551 (7th Cir. 2007) ........................................................................31

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

v

*Corley v. DOJ*,
   998 F.3d 981 (D.C. Cir. 2021)......................................................21

*Council for Responsible Nutrition v. James*,
   159 F.4th 155 (2d Cir. 2025) .....................................................31

*CTS Corp. v. Waldburger*,
   573 U.S. 1 (2014)......................................................................17

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013).............................................................14, 38

*Dep't of Agric. v. Kirtz*,
   601 U.S. 42 (2024)...............................................................18, 27

*District of Columbia v. Dep't of Lab.*,
   819 F.3d 444 (D.C. Cir. 2016)..................................................35

*Dubin v. United States*,
   599 U.S. 110 (2023)..................................................................33

*Georgia v. U.S. DOJ*,
   148 F.4th 724 (D.C. Cir. 2025).................................................50

*GSS Grp. Ltd v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012)..................................................47

*Happel v. Guilford Bd. of Educ.*,
   913 S.E.2d 174 (N.C. 2025) .....................................................24

*Hemp Indus. Ass'n v. DEA*,
   36 F.4th 278 (D.C. Cir. 2022)...................................................47

*Humane Soc'y v. Perdue*,
   935 F.3d 598 (D.C. Cir. 2019)..................................................47

*In re Rail Fuel Antitrust Litig.*,
   34 F.4th 1 (D.C. Cir. 2022).......................................................21

*Iowaska Church v. Werfel*,
   105 F.4th 402 (D.C. Cir. 2024).................................................47

*Jackson v. Culinary Sch. of Wash., Ltd.*,
 59 F.3d 254 (D.C. Cir. 1995)................................................................14, 53

*Kansas v. Garcia*,
 589 U.S. 191 (2020)...........................................................................17, 30

*Kennedy v. Comm'r*,
 142 F.4th 769 (D.C. Cir. 2025)..................................................................33

*Leavitt v. Jane L.*,
 518 U.S. 137 (1996).................................................................................53

*Lomont v. O'Neill*,
 285 F.3d 9 (D.C. Cir. 2002).......................................................................26

*Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*,
 ---F. Supp. 3d---, 2026 WL 946235 (D. Md. Apr. 2, 2026) ........................13, 38

*Meijer, Inc. v. Biovail Corp.*,
 533 F.3d 857 (D.C. Cir. 2008)....................................................................26

*Mellouli v. Lynch*,
 575 U.S. 798 (2015).................................................................................33

*Moody v. NetChoice, LLC*,
 603 U.S. 707 (2024).................................................................................25

*Montgomery v. Caribe Transp. II, LLC*,
 146 S. Ct. 1199 (2026).............................................................................45

*Mozilla Corp. v. FCC*,
 940 F.3d 1 (D.C. Cir. 2019).......................................................................45

*Mulhern Gas Co. v. Mosley*,
 798 F. Supp. 3d 304 (N.D.N.Y. 2025).........................................................13

*Nat'l Ass'n of Broadcasters v. FCC*,
 147 F.4th 978 (D.C. Cir. 2025)..................................................................38

*Nat'l Ass'n of Home Builders v. Montgomery County*,
 No. 8:24-CV-03024, 2026 WL 817322 (D. Md. Mar. 25, 2026).......................13

*Newman v. Moore,
   151 F.4th 472 (D.C. Cir. 2025)......................................................26

NRDC v. Abraham,
   355 F.3d 179 (2d Cir. 2004) ......................................................6, 43

NRDC v. Herrington,
   768 F.2d 1355 (D.C. Cir. 1985).................................................6, 19

Puerto Rico v. Franklin Cal. Tax-Free Trust,
   579 U.S. 115 (2016)......................................................................24

Rawat v. Comm'r,
   108 F.4th 891 (D.C. Cir. 2024).....................................................20

Refugee & Immigrant Ctr. v. Mullin,
   174 F.4th 81 (D.C. Cir. 2026)......................................................46

R.J. Reynolds Tobacco Co. v. City of Edina,
   60 F.4th 1170 (8th Cir. 2023) ......................................................23

*Rinnai Am. Corp. v. S. Coast Air Quality Mgt. Dist.,
   ---F.4th---, 2026 WL 1912093 (9th Cir. July 2, 2026) ...............25, 26

Rutledge v. Pharm. Care Mgmt. Ass'n,
   592 U.S. 80 (2020)...................................................................17, 34

Save Jobs USA v. U.S. Dep't of Homeland Sec.,
   111 F.4th 76 (D.C. Cir. 2024).......................................................24

Shaw v. Delta Airlines, Inc.,
   463 U.S. 85 (1983)........................................................................32

Shuker v. Smith & Nephew, PLC,
   885 F.3d 760 (3d Cir. 2018) .........................................................23

Sickle v. Torres Advanced Enter. Sols., LLC,
   884 F.3d 338 (D.C. Cir. 2018)..................................................23, 24

Statewide Bonding, Inc. v. U.S. Dep't Homeland Sec.,
   980 F.3d 109 (D.C. Cir. 2020).......................................................49

*Talbott v. United States*,
  176 F.4th 720 (D.C. Cir. 2026)...................................................................52

*Triumph Foods, LLC v. Campbell*,
  156 F.4th 29 (1st Cir. 2025)......................................................................31

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)...................................................................................52

*Trudel v. SunTrust Bank*,
  924 F.3d 1281 (D.C. Cir. 2019)......................................................14, 48, 49

*UARG v. EPA*,
  573 U.S. 302 (2014)...................................................................................27

*Upside Foods Inc v. Fla. Dep't of Agric.*,
  171 F.4th 1239 (11th Cir. 2026) ................................................................31

*U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*,
  608 F.3d 871 (D.C. Cir. 2010)....................................................................14

*Van Buren v. United States*,
  593 U.S. 374 (2021)..............................................................................18, 36

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)...................................................................................31

## Statutes and Regulations

12A DCMR § 104.10 ....................................................................................47

21 U.S.C. § 467e .........................................................................................31

21 U.S.C. § 678 ...........................................................................................31

42 U.S.C. § 6201 ...........................................................................................1

42 U.S.C. § 6291 ........................................... 1, 3, 6, 18, 20, 28, 29, 35, 42

42 U.S.C. § 6292 ..............................................................................1, 25, 27, 28

42 U.S.C. § 6293 ......................................................................1, 3, 18, 19, 28, 35

42 U.S.C. § 6294 ..............................................................................19

42 U.S.C. § 6295 ........................................ 6, 23, 27, 28, 29, 39, 40

42 U.S.C. § 6297 ................................ 1, 2, 7, 8, 12, 14-23, 28, 32-35, 37-44, 46, 51

42 U.S.C. § 6316 .................................................................................8

D.C. Code § 6-1451.01 .........................................................................9

D.C. Code § 6-1453.01 ..........................................2, 9, 10, 22, 29, 53

D.C. Code § 45-201 ............................................................................52

D.C. Energy Conservation Code (2017) .......................................9, 10, 11

Energy Policy Act of 1992,
    Pub. L. No. 102-486, 106 Stat. 2776 .....................................................8

Energy Policy and Conservation Act of 1975,
    Pub. L. No. 94-163, 89 Stat. 871 .........................................................4

National Appliance Energy Conservation Act of 1987,
    Pub. L. No. 100-12, 101 Stat. 103 .......................................................6

National Energy Conservation and Policy Act of 1978,
    Pub. L. No. 95-619, 92 Stat. 3206 .......................................................6

The Clean Energy D.C. Building Code Amendment Act of 2022,
    D.C. Act 24-528 (July 27, 2022) ..........................................................2

The Fiscal Year 2027 Budget Support Act of 2026,
    D.C. Act 26-661 (July 7, 2026) ..........................................................10

## Other

42 Fed. Reg. 20012 (Apr. 15, 1977) ...................................................36

47 Fed. Reg. 14424 (Apr. 2, 1982) .....................................................45

47 Fed. Reg. 57198 (Dec. 22, 1982) ...................................................39

69 Fed. Reg. 45420 (July 29, 2004) ....................................................36

75 Fed. Reg. 51423 (Aug. 20, 2010) ...................................................36

75 Fed. Reg. 59470 (Sep. 27, 2010) ....................................................45

85 Fed. Reg. 30878 (May 21, 2020) ....................................................46

90 Fed. Reg. 19250 (May 7, 2025) ......................................................25

Clean Energy DC Building Code Amendment Act of 2022,
    D.C. Council Report on Bill No. 24-420 (June 13, 2022) ..............8, 9

D.C. Dep't of Buildings *DC Department of Buildings Advances
    Modernization of District Construction Codes* (June 8, 2026) ..........48

DOE, *Energy Intensity Indicators: Terminology and Definitions*..........38

H.R. Rep. 100-11 (1987)..............................................................6, 7, 43

S. Rep. 100-6 (1987) ..................................................................6, 7, 42

U.S. Reh'g Br., *Cal. Rest. Ass'n v. Berkeley*,
    No. 21-16278 (June 12, 2023) ..................................................35

U.S. Amicus Br., *Cal. Rest. Ass'n v. Berkeley*,
    No. 21-16278 (Feb. 2, 2022) ....................................................46

U.S. Statement of Interest, *Nat'l Ass'n of Home Builders v. Montgomery
    County*, No. 24-cv-3024, ECF No. 30 (D. Md. Jan. 17, 2025)..........46

*Webster's Ninth New Collegiate Dictionary* (1983)...............................28

*Webster's Third New Int'l Dictionary* (1986)........................................18

# GLOSSARY

| | |
|---|---|
| Act or Clean Buildings Act | Clean Energy D.C. Building Code Amendment Act of 2022, D.C. Act 24-528 (July 27, 2022) |
| DOE | Department of Energy |
| EPCA | Energy Policy and Conservation Act |
| EUI | Energy Use Intensity |
| EUIp | Energy Use Intensity (proposed) |
| JA | Joint Appendix |
| kBtu | Thousand British thermal units |
| NAECA | National Appliance Energy Conservation Act |
| Plaintiffs | National Association of Home Builders of the United States; Restaurant Law Center; National Apartment Association; Maryland Building Industry Association; Washington Gas Light Company; Philadelphia-Baltimore-Washington Laborers' District Council; and Teamsters Local 96 |
| zEPI | Zero Energy Performance Index |

**INTRODUCTION**

Plaintiffs' case rises and falls on a single proposition. They say that a federal law regulating the design and manufacture of certain appliances somehow preempts local construction codes that regulate where certain types of energy can be used. That cannot be right. And the relevant statutory text confirms that it is not.

The Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201 *et seq.*, preempts state and local laws that "concern[]" the "energy use" of various "covered products," such as dishwashers, microwaves, and furnaces. *Id.* §§ 6292, 6297(c). But "energy use" is a carefully limited and defined term. It refers to the quantity of energy a product is manufactured to consume based on its performance under testing conditions. *Id.* §§ 6291(4), 6293. A product's "energy use," in other words, is a static figure that does not vary based on actual usage. This means that the "energy use" of a residential room air conditioner remains the same under EPCA whether its owner runs it 24-hours a day, or whether she leaves it sitting in its box, unused.

The upshot is that state and local laws regulating the *type* of energy used in certain places do not concern the *amount* of energy that any product is manufactured to consume in the sense relevant to EPCA's preemption clause. A simple example illustrates the point. Banning kerosene in high-rise apartment buildings would impact the amount of energy kerosene heaters consume in those buildings (colloquially speaking), but it would not increase or decrease the amount of energy

any kerosene heater is engineered to consume under controlled testing conditions. And for that reason, such a law would not "concern[]" the "energy use" of any "covered product," and would not be expressly preempted by EPCA. *Id.* § 6297(c).

The same is true of the District's Clean Energy D.C. Building Code Amendment Act of 2022 (Clean Buildings Act), D.C. Act 24-528 (July 27, 2022). The Act provides in relevant part that builders cannot use a certain type of energy (i.e., fossil fuels) for certain purposes (i.e., on-site combustion) in certain buildings (i.e., commercial buildings, or residential buildings over three stories, that are newly constructed or substantially improved). *See* D.C. Code § 6-1453.01. But in regulating one type of energy and the location of its use, the Act has no bearing on the quantity of energy a product is designed or manufactured to consume under the controlled testing procedures that EPCA prescribes. The Clean Buildings Act accordingly does not "concern[]" the "energy use" of any "covered product" within the meaning of EPCA, and is not expressly preempted. 42 U.S.C. § 6297(c).

This conclusion is supported by nearly every judicial decision to address similar EPCA claims, including the Second Circuit's recent decision in *Association of Contracting Plumbers v. City of New York*, ---F.4th---, 2026 WL 1871692 (June 30, 2026). The court there held that EPCA does not preempt regulations that "effectively prohibit the use of fossil-fuel-powered appliances in new buildings,"

because such laws have "little to do with that appliance's 'energy use,'" as that term is defined in EPCA. *Id.* *1, *4. The same is true here.

Plaintiffs resist this straightforward conclusion by trying to rewrite EPCA's text, rearrange its structure, and revise its context, history, and purpose. Their primary theory is that, by purportedly "banning" all gas appliances, the Clean Buildings Act effectively sets an "energy use" standard for gas appliances at "zero." Br. 38-47. But the Second Circuit rejected that same theory in *Plumbers*, 2026 WL 1871692, *2-5, and this Court should too. For one, the argument ignores the statutory definition of "energy use," which measures the "quantity of energy" a product consumes under "test procedures" simulating "a representative average use cycle or period of use," not actual consumer use. 42 U.S.C. §§ 6291(4), 6293(b)(3). For another, the argument ignores the statutory reality of "energy conservation standards," which compel manufacturers to build products at or below "a maximum quantity of energy use," *id.* § 6291(6), and thus do not function like a law regulating where certain types of energy are used. And for yet another, the argument threatens to preempt "a whole slate of seemingly standard regulations" on the theory that, by allegedly barring "the use of certain covered products," the regulations "set their 'energy use' to zero." *Plumbers*, 2026 WL 1871692, *13.

Also flawed is plaintiffs' challenge to "Appendix Z" of the D.C. Energy Conservation Code, which the district court correctly rejected as forfeited and

meritless.  Plaintiffs not only failed to present evidence at summary judgment that they had Article III standing to challenge Appendix Z, but they also failed to plead or even mention that claim until summary judgment, at which point the district court had no obligation to consider it.  Plus, the claim fails on the merits because it just rehashes the same atextual interpretation of "energy use" that forecloses plaintiffs' primary theory.  This Could should reject plaintiffs' preemption claims.

## STATEMENT OF THE ISSUE

1.      Whether the district court correctly concluded that plaintiffs failed to show that EPCA facially preempts the Clean Buildings Act.

2.      Whether, if the Act is preempted, this Court should remand for the district court to decide remedies or, alternatively, reject plaintiffs' remedial claims.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations not included in plaintiffs' brief are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

1.    **Legal Background.**

A.      **The Energy Policy And Conservation Act.**

Enacted in response to the 1973 oil embargo, EPCA was designed in part "to reduce the demand for petroleum products and natural gas."  Pub. L. No. 94-163, § 2(6), 89 Stat. 871, 874 (1975).  To do so, EPCA authorized federal regulators to set "energy efficiency standards" for "covered products."  *Id.* § 325(a)(2), (b), 89

Stat. at 923-26. A "covered product" refers to a "consumer product" that "in operation consumes, or is designed to consume, energy." *Id.* § 321(a)(1)-(2), 89 Stat. at 917; *see id.* § 321(3), 89 Stat. at 917-18 (defining "energy" as "electricity, or fossil fuels"). An "energy efficiency standard" is "a performance standard" that "prescribes a minimum level of energy efficiency for a covered product, determined in accordance with test procedures." *Id.* § 321(6), 89 Stat. at 917. "[E]nergy efficiency" means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures," and "energy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures." *Id.* § 321(4)-(5), 89 Stat. at 917. The federally prescribed "test procedures" measure the "energy efficiency, energy use, or estimated annual operating cost of a covered product during a representative average use cycle[.]" *Id.* § 323(b)(1), 89 Stat. at 920.

EPCA also "supersede[d]" state laws that "provide[d] for" an "energy efficiency standard or similar requirement with respect to energy use or energy efficiency of a covered product." *Id.* § 327(a)(2)(A), 89 Stat. at 926-27. States could obtain waivers from preemption by showing, among other things, that their laws were justified by a sufficiently "substantial State or local need." *Id.* § 327(b)(2), 89 Stat. at 927. Congress subsequently amended EPCA's preemption provision by replacing the term "similar requirement" with "other requirement." National Energy

Conservation and Policy Act, Pub. L. No. 95-619, § 424(b), 92 Stat. 3206, 3264 (1978); *see NRDC v. Herrington*, 768 F.2d 1355, 1362-65 (D.C. Cir. 1985).

In the years that followed EPCA's enactment, the Department of Energy (DOE) issued few energy efficiency standards and regularly waived preemption. *See NRDC v. Abraham*, 355 F.3d 179, 186-87 & n.3 (2d Cir. 2004). This created a "patchwork of differing State regulations" that "complicate[d]" the "design, production and marketing" of appliances. S. Rep. 100-6, at 4 (1987).

Congress addressed that issue in the National Appliance Energy Conservation Act of 1987 (NAECA), Pub. L. No. 100-12, 101 Stat. 103. NAECA replaced "energy efficiency standards" with "energy conservation standards," which it defined as (1) "a performance standard" that "prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a covered product, determined in accordance with test procedures," and (2) "a design requirement" for certain products. *Id.* § 2(a), 101 Stat. at 103 (codified at 42 U.S.C. § 6291(6)). Congress itself prescribed "energy conservation standards" for certain products, and it authorized DOE to set standards for others based on certain policy considerations. *Id.* § 5, 101 Stat. at 114-15 (codified at 42 U.S.C. § 6295(o)(4)).

NAECA "follow[ed] substantially the preemption requirements in current EPCA." H.R. Rep. 100-11, at 23-24 (1987). Under the title "General Rule of Preemption for Energy Conservation Standards When Federal Standard Becomes

Effective for a Product," NAECA established that, once a federal "energy conservation standard" for a "covered product" takes effect, "no State regulation concerning the energy efficiency or energy use of such covered product shall be effective with respect to such product." NAECA § 7, 101 Stat. 118 (codified at 42 U.S.C. § 6297(c)). This provision "continue[d] the basic concept of preempting State energy efficiency standards." H.R. Rep. 100-11, at 23-24 (1987); *see* S. Rep. 100-6, at 9 (preempting state standards "as provided under current law").

NAECA changed EPCA's preemption regime by limiting DOE's waiver authority and creating a building-code exception. NAECA § 7, 101 Stat. at 118-19, 121. In particular, Congress provided that DOE could not grant waivers if a state "energy conservation standard or other requirement with respect to energy use" "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," or if "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes[.]" *Id.* § 7, 101 Stat. at 119-20 (codified at 42 U.S.C. § 6297(d)(1), (3)-(4)). Additionally, the building-code exception provided that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product" is not "superseded" "if the code complies with" seven requirements focused on the code's "energy consumption

7

or conservation objective." *Id.* § 7, 101 Stat. at 121 (codified at 42 U.S.C. § 6297(f)(3)). EPCA's framework remains essentially the same today.[1]

### B. The Clean Buildings Act.

The District of Columbia is a densely populated, urban locality in which almost 75% of greenhouse-gas emissions come from buildings. Clean Energy DC Building Code Amendment Act of 2022, D.C. Council Report on Bill No. 24-420, at 2, 5 (June 13, 2022) (Comm. Rep.), https://perma.cc/3MAN-Y7B9. The primary cause of those emissions is burning fossil fuels for thermal energy, which also produces carbon monoxide, nitrogen dioxide, formaldehyde, and harmful particulate matter. *Id.* at 2, 5-7 & n.17. Exposure to such substances is associated with higher risks of many serious illnesses, including childhood asthma. *Id.* at 6-7.

To address these concerns, the D.C. Council enacted the Clean Buildings Act in 2022. JA172-74. One of the Act's reforms involves "'net-zero-energy' buildings: buildings where the total amount of energy used annually is equal to the total amount of energy generated (ideally) on the site of the building using clean energy resources." Comm. Rep. 2. These and other features of the Act are expected to benefit District residents and the environment by, among other things, lowering

---

[1]    Congress subsequently created a program for certain industrial equipment similar to EPCA's consumer-product regime, with a similar preemption provision. *See* Energy Policy Act, Pub. L. No. 102-486, § 122(e)(2), 106 Stat. 2776, 2816 (1992) (codified at 42 U.S.C. § 6316(b)(2)(A)).

energy costs, reducing greenhouse-gas emissions, improving lighting and air quality in buildings, and minimizing the exposure of children and other vulnerable citizens to harmful gases and particulates. *Id.* at 6-8.

Though amendments have been approved by the Council, *see infra* note 2, the current permanent version of the Act provides as follows. By December 31, 2026, the Mayor must issue "regulations requiring all new construction or substantial improvements of covered buildings to be constructed to a net-zero-energy standard." D.C. Code § 6-1453.01(b)(1). "New construction" includes "new buildings and additions or enlargements of existing buildings," *id.* §§ 6-1451.01(33), 6-1453.01(a)(4); a "[s]ubstantial improvement" refers to a "repair, alteration, addition, or improvement" having a certain value, *id.* §§ 6-1451.01(40), 6-1453.01(a)(5); and "covered buildings" are commercial buildings and residential buildings over three stories, *id.* § 6-1453.01(a)(2). A "net-zero-energy standard" exists when a building (1) "conserves an amount of energy attributable to building operations that is equal to or greater than the amount that would be required by the most recent version of Appendix Z" in the D.C. Energy Conservation Code, *id.* § 6-1453.01(a)(3)(A); and (2) "obtains energy from renewable energy sources in the amount that would be required by the most recent version of Appendix Z," so long as, among other things, "[o]n-site fuel combustion

shall not be permitted for the provision of thermal energy to the building," *id.* § 6-1453.01(a)(3)(B)(iii).

The Act also provides a fallback. If the Mayor does not issue regulations by December 31, the District will approve building permits if the "design complies with the most recent version of Appendix Z." *Id.* § 6-1453.01(b)(2). Appendix Z provides in part that "[o]n-site combustion of fossil fuels shall not be permitted for the provision of thermal energy" in "a net-zero energy building" "except as specified by the code official." D.C. Energy Conservation Code §§ Z1, Z3.1, C-225, C-227 (2017) (italics omitted); JA182-84; *see* D.C. Code § 6-1453.01(b)(2) (allowing "on-site combustion of fossil fuels for backup power generation in buildings that are essential to protecting public health and safety"). Under either scenario, the Act applies only to new construction or substantial improvements of a commercial building or a residential building over three stories.[2]

---

[2] The Council recently approved amendments to the Clean Buildings Act. *See* The Fiscal Year 2027 Budget Support Act of 2026, D.C. Act 26-661, tit. II, sub. tit. L, §§ 2111-12, The Clean Energy DC Building Code Amendment Act of 2026 (July 7, 2026), https://tinyurl.com/jn86cakf. The amendments extend the Act's general implementation date to December 31, 2027, *id.* § 2112(b)(1)(A), while requiring the Mayor, by December 31, 2026, to promulgate "regulations prohibiting the use of on-site fuel combustion for the provision of thermal energy for all new construction of covered buildings and additions greater than 10,000 square feet to covered buildings," *id.* § 2112(b)(2). In addition, the amendments provide that, after December 31, 2026, "[n]o permit application for the new construction of a covered building or an addition greater than 10,000 square feet to a covered building" will

## 2. Factual And Procedural Background.

Plaintiffs filed this preenforcement suit in 2024 alleging that the Clean Buildings Act is "facial[ly]" preempted by EPCA under any "set of circumstances." JA21-22, 30.  According to plaintiffs, the Act is preempted because it "bans the use of gas appliances" in certain buildings and thus "effectively require[s] that the quantity of natural gas used by EPCA-covered products is zero."  JA22, 29-30. Plaintiffs requested an order declaring the Act "void" and a permanent injunction barring the District "from enforcing or attempting to enforce" it.  JA34.

The parties moved for summary judgment, and plaintiffs for the first time asserted two additional claims.  They first alleged that, regardless of any "prohibition on gas combustion," the Clean Buildings Act was preempted because Appendix Z "concern[s]" gas appliances by purportedly "cap[ping] the amount of non-renewable

---

"be approved if the building or addition design provides for the use of on-site fuel combustion for the provision of thermal energy for space heating and water heating." *Id.* § 2112(b)(3).  The amendments also replace "'new construction or substantial improvements'" with "'new construction of covered buildings or Level 3 alterations to covered buildings,'" *id.* § 2112(b)(1)(B), and replace "'newly constructed or substantially improved covered buildings'" with "'covered buildings that were newly constructed or underwent Level 3 alterations,'" *id.* § 2112(c); *see id.* § 2112(a) ("'Level 3 alteration' shall have the same meaning as provided in the Building Codes").  Relatedly, the amendments provide that, after December 31, 2026, "no building permit application for the new construction of a covered building, an addition greater than 10,000 square feet to a covered building, or a Level 3 alteration to a covered building" will "be approved unless the building design is such that the building conserves an amount of energy attributable to building operation that is equal to or greater than the amount that would be conserved if such building complied with the 2024 International Energy Conservation Code." *Id.* § 2112(b)(4).

11

energy a building can use" and by "penaliz[ing]" certain products.  Dkt. 26 at 17-18.

Next, in a footnote of their opposition, plaintiffs asserted that the Act's supposed

"Gas Ban" "also concerns" the "energy *efficiency*" of gas appliances.  Dkt. 38 at 15

n.4 (emphasis added).  The District noted that these new claims were not pleaded in

the complaint or otherwise preserved, and that they misconstrued EPCA in the same

manner as plaintiffs' pleaded claim.  Dkt. 38 at 30-32; Dkt. 45 at 29 n.8, 33-34.

After a hearing, the district court granted summary judgment to the District,

holding that EPCA did not "facially" preempt the Clean Buildings Act.  JA398.

Drawing on EPCA's text, structure, and history, the court found that Section 6297(c)

preempts state "laws that impose additional performance standards for appliances

on top of federally established ones," JA396, or that effectively force manufacturers

to "alter a product's design," JA391.  But EPCA did not preempt the Clean Buildings

Act, the court explained, which "only regulates" whether an "appliance can be used

in a particular context," not its "performance capacity."  JA385.

In reaching that conclusion, the court departed from the only appellate

decision on the issue at the time, which had found a local regulation of natural-gas

piping preempted by EPCA.  JA389-90; *see Cal. Rest. Ass'n v. Berkeley*, 89 F.4th

1094 (9th Cir. 2024).  After considering that "decision in detail," the district court

concluded that *Berkeley* "ignored" critical features of EPCA, including the statutory

definition of "energy use" and the technical term "point of use" in that definition.

JA389-90. Recognizing that every decision since *Berkeley* involving "regulations like the Clean Buildings Act" had found the "local regulation not preempted," JA384 n.18,[3] the district court followed Judge Friedland's dissent from the denial of rehearing en banc in *Berkeley*, 89 F.4th at 1119-26 (Friedland, J., dissenting). That opinion recognized—with the agreement of ten other Ninth Circuit judges—that laws regulating the type of energy used in a building do not "concern[]" the "energy use" of covered products, as EPCA defines those terms. *See* JA389-92.

The court thus declined plaintiffs' invitation to "enlarge EPCA's preemptive scope." JA392. Stretching the term "concerning" to "cover *any* state or local prohibition of appliance use would preclude a host of critical regulations," the court reasoned, including "fire codes that prevent placement of gas appliances where they could increase the risk of poisoning from harmful pollutants or more easily ignite." JA393. Nor did the Act "de facto set[] gas appliances' energy efficiency or use standard to zero," JA377, given that "DOE assesses energy efficiency and use

---

[3]    *See Nat'l Ass'n of Home Builders v. Montgomery County*, No. 8:24-CV-03024, 2026 WL 817322 (D. Md. Mar. 25, 2026), *appealed*, No. 26-1449 (4th Cir.); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025); *Ass'n of Contracting Plumbers v. City of New York*, No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025). Since the decision below, the Second Circuit has affirmed the *Mosley* and *Plumbers* decisions, *see Plumbers*, 2026 WL 1871692, and another court has rejected a similar EPCA preemption challenge, *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, ---F. Supp. 3d---, 2026 WL 946235 (D. Md. Apr. 2, 2026), *appealed*, No. 26-1552 (4th Cir.).

according to *simulated-use test procedures*" before sale, and so a product's energy efficiency and use remain the same "even if not used at all," JA390. Moreover, plaintiffs' reliance on EPCA's "building codes" exception and "waiver" provision was misplaced, the court concluded, because "[e]xceptions to preemption" typically "do not in themselves delineate the scope of the preemptive rule," and the Act here was "not preempted" in the first place under EPCA's "main preemption provision." JA394 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013)). Lastly, plaintiffs' belated challenge to Appendix Z was "forfeited" and "unpersuasive" because Appendix Z "provides for reduced energy consumption in certain buildings without setting any product-design standard." JA396 n.24.

## STANDARD OF REVIEW

Issues of preemption are reviewed de novo. *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 885 (D.C. Cir. 2010). Forfeiture rulings are reviewed for abuse of discretion. *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019). Remedial decisions are generally reviewed for abuse of discretion. *Jackson v. Culinary Sch. of Wash., Ltd.*, 59 F.3d 254, 256 (D.C. Cir. 1995).

## SUMMARY OF ARGUMENT

I.    The district court correctly construed EPCA's preemption provision in concluding that Section 6297(c) did not expressly preempt the Clean Buildings Act's fossil-fuel provision, on its face or otherwise.

14

A. The Act's fossil-fuel provision is not a regulation "concerning" the "energy use" of a "covered product" because it regulates only the *type* of energy used in certain buildings, not the *quantity* of energy any product is manufactured or designed to consume. Congress defined "energy efficiency" and "energy use" as fixed, standardized measurements of a product's performance under controlled laboratory conditions, while also distinguishing the concept of "energy use" from the "kind of energy" a product consumes. Properly construed, then, Section 6297(c) preempts state laws that concern the energy performance of covered products as they are designed and manufactured before reaching consumers. It follows that, because the Clean Buildings Act's fossil-fuel provision regulates based on the type of energy and location of use, it does not "concern[]" the "energy efficiency" or "energy use" of any covered product within the meaning of EPCA's preemption provision.

B. Plaintiffs' contentions fail. The Clean Buildings Act does not set an "energy use" standard of "zero" for gas appliances, and plaintiffs' contrary assertions flout EPCA's text, structure, and context. Also, plaintiffs' efforts to replace "concerning" with "relating to" are unsound, and they fail in any event. Even under a "relating to" test for preemption, the Act's fossil-fuel provision does not have the requisite connection or reference to EPCA's preemptive subject (i.e., "energy use" of a "covered product"). Additionally, plaintiffs' reliance on the Ninth Circuit's *Berkeley* opinion is misplaced because that decision ignored crucial text in

15

EPCA's definition of "energy use" and overlooked the technical meaning of the term "point of use." Nor can plaintiffs draw support from EPCA's structure: the building-code exception has no bearing on this case, and the provisions governing DOE's standards-setting and waiver authority reinforce the limits on Section 6297(c). The history and purpose of EPCA likewise undercut plaintiffs' claims because Congress pursued uniformity in the appliance industry by limiting DOE's waiver authority, not by expanding EPCA's preemptive reach.

C. The district court also properly rejected plaintiffs' challenge to Appendix Z. Plaintiffs lack standing to assert this claim because they have offered no evidence that Appendix Z injured them. Plaintiffs also forfeited this claim because it differs from the one in their complaint, and it was first raised at summary judgment. And the claim lacks merit anyway because it relies on the same flawed, atextual view of "energy use" that impairs plaintiffs' primary claim.

II. If the Court reverses on preemption, it should remand for on remedies. The district court has not yet decided those questions, many of which involve fact-intensive discretionary analyses. Alternatively, this Court can reject plaintiffs' remedial claims. They not only seek injunctive relief that would encompass nonparties, but they fail to show that the Act's fossil-fuel provision is inseverable.

I.  **The District Court Correctly Concluded That EPCA Does Not Facially Preempt The Clean Buildings Act.**

A.  **The Clean Buildings Act's fossil-fuel provision is not preempted as to EPCA-covered products or on its face.**

The Clean Buildings Act is not facially preempted by EPCA. Under EPCA, once a federal "energy conservation standard" takes effect for "any covered product, no State regulation concerning the energy efficiency" or "energy use" "of such covered product shall be effective with respect to such product[.]" 42 U.S.C. § 6297(c). Properly read, this provision "preempts energy conservation standards for covered appliances and a fairly limited realm of additional regulations which operate in a similar manner." *Plumbers*, 2026 WL 1871692, *1. But the Clean Buildings Act's fossil-fuel provision regulates only the *type* of energy used in certain locations—it does not operate as an "energy conservation standard" or otherwise concern a product's "energy use" under EPCA. *See* JA377-78, 388, 396-97. Section 6297(c) therefore does not preempt the Act, facially or otherwise.

1.  The fossil-fuel provision does not "concern[]" the "energy use" of a "covered product" under EPCA.

Like all statutes, preemption provisions are construed holistically in light of their text, structure, and history. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86-92 (2020); *Kansas v. Garcia*, 589 U.S. 191, 202, 203-07 & n.8 (2020). When Congress defines a term, courts follow that definition. *CTS Corp. v. Waldburger*,

573 U.S. 1, 10, 16-17 (2014); *see Dep't of Agric. v. Kirtz*, 601 U.S. 42, 59 (2024). Undefined terms and phrases receive their contextually appropriate meaning, with ordinary language receiving its ordinary meaning and specialized language receiving its specialized meaning. *Van Buren v. United States*, 593 U.S. 374, 388-89 (2021).

Here, Congress carefully crafted Section 6297(c)'s language using several statutorily defined terms. A "State regulation," for example, is "a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A); *see Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 446 (2005) (noting that "requirement" generally refers to "a rule of law that must be obeyed," not a mere incentive that "motivates an optional decision"). A "covered product" refers to a certain type of "consumer product" that "in operation consumes, or is designed to consume, energy." 42 U.S.C. § 6291(1)(A), (2); *see Webster's Third New Int'l Dictionary* 490 (1986) (defining "consume" as "use").

The "energy efficiency" or "energy use" of a product is a "static figure" measuring its performance under DOE "test procedures" before sale. JA391-92. "[E]nergy efficiency" is "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(5). And "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." *Id.* § 6291(4).

Section 6293, in turn, prescribes "test procedures" that "measure" product performance "during a representative average use cycle or period of use" under controlled conditions. *Id.* § 6293(b)(3); *see Herrington*, 768 F.2d at 1404. A product's "energy efficiency" or "energy use" thus can only refer to "a standardized, fixed measure assigned to it before it reaches consumers," as DOE's "test procedures are designed to *replicate* the appliance's average use" in "a controlled setting, not at the appliance's ultimate destination." *Plumbers*, 2026 WL 1871692, *4.

EPCA's structure confirms that "energy efficiency" and "energy use" are static figures. *Id.* *3. EPCA expressly distinguishes those terms from actual consumer usage, for example, by providing that a manufacturer's disclosures about a product's "energy use" or "energy efficiency" create no "warranty" about the product's performance "under conditions of *actual use*." 42 U.S.C. § 6297(g) (emphasis added); *see Plumbers*, 2026 WL 1871692, *4 ("[T]he warranty provision unmistakably suggests that an appliance's 'energy use' and the energy an appliance consumes 'under conditions of actual use,' are separate values."). Likewise, in requiring manufacturers to disclose a product's "operating cost" on its label (based on its "energy use"), 42 U.S.C. §§ 6293(b)(4), 6294(c)(1)(A), EPCA reaffirms that "energy use" is a "fixed" "metric determined before an appliance ever reaches consumers," *Plumbers*, 2026 WL 1871692, *5. For "if 'energy use' referred to the

19

fluctuating energy used by an appliance at its ultimate destination, it would hardly be possible for manufacturers to determine a fixed operating cost." *Id.* *4.

Underscoring this point is the "symmetry" EPCA creates between its "definition of an 'energy conservation standard' and the text it uses in its preemption provision." *Id.* *10. That is, by defining "energy conservation standard" as "a minimum level of *energy efficiency*" or "maximum quantity of *energy use*," 42 U.S.C. § 6291(6) (emphasis added), Congress created an interconnection among those terms, which it then carried over to Section 6297(c), *see Plumbers*, 2026 WL 1871692, *10 ("[T]he preemption provision's structure closely mirrors the statute's definition of 'energy conservation standard.'"). After all, "a definitional provision" "works both ways": it can "give meaning to a defined term" and "to the language of the definition." *Rawat v. Comm'r*, 108 F.4th 891, 895-96 (D.C. Cir. 2024) ("[I]f a statute defines 'house' as 'an enclosed structure used as a residence,' one would be hard-pressed to say that the statute's use elsewhere of the phrase 'an enclosed structure used as a residence' means anything but 'house.'"). So when Section 6297(c) speaks of an "energy conservation standard" it is speaking of a fixed "performance standard" for "the energy efficiency" or "energy use" of a covered product—and vice versa. JA387; *see Plumbers*, 2026 WL 1871692, *10.

Pulling this language together is the term "concerning." While dictionary definitions of that word vary, this Court has held that, when "concern" is used to

20

denote the relationship between two things (e.g., an agreement and a topic) the "most natural reading" is "about," such that an agreement "concern[s]" a topic when that topic is "the focus of" the agreement. *In re Rail Fuel Antitrust Litig.*, 34 F.4th 1, 9-10 (D.C. Cir. 2022); *see Corley v. DOJ*, 998 F.3d 981, 987 (D.C. Cir. 2021) ("[A] document concerns a given subject if it is about that subject."). The same logic should apply to Section 6297(c), which uses "concerning" to denote the relationship that must exist between a "State regulation" and the "energy use" of a "covered product," 42 U.S.C. § 6297(c)—i.e., the former must be *about* the latter in the sense that a state law *focuses on* the performance of a product as manufactured. *See, e.g.*, *Rail Fuel*, 34 F.4th at 9-10 (holding that discussions "concerned an interline movement" "only if" they were "about" interline movements).

Summing up, a "State regulation concern[s] the energy efficiency" or "energy use of" a "covered product" under Section 6297(c) when it imposes an "energy conservation standard" or equivalent performance requirement on a covered product. As its title makes clear, Section 6297(c) provides a "[g]eneral rule of preemption for *energy conservation standards*," 42 U.S.C. § 6297(c) (emphasis added), and Congress defined "energy conservation standard" as a static performance metric that products must satisfy before they are marketed or sold. JA391-92; *see Plumbers*, 2026 WL 1871692, at *10 (noting Section 6297(c)'s title showed that Congress "intended to preempt state and local energy conservation standards").

21

Section 6297(c) is thus best read to preempt state or local "energy conservation standards for covered appliances and a fairly limited realm of additional regulations which operate in a similar manner." *Id.* *1. A broader reading "strains the statutory text, context, and history beyond what they can bear." JA385.

The Clean Buildings Act's fossil-fuel provision is accordingly not preempted under a proper reading of Section 6297(c). The provision bars on-site fuel combustion for the provision of thermal energy in certain buildings. *See* D.C. Code § 6-1453.01. But it says nothing about the energy performance of EPCA-covered products, and it does not alter the design or manufacturing of EPCA-covered products. It regulates conduct involving a particular *type* of energy ("[o]n-site fuel combustion") in particular *locations* ("[c]overed buildings") for particular *purposes* ("the provision of thermal energy to the building"). *Id.* Nothing in that law "concern[s]" the "energy use" of a "covered product" under Section 6297(c), because even "a regulation that effectively bars the use of a covered appliance" "has little to do with that appliance's 'energy use,'" as EPCA defines that term. *Plumbers*, 2026 WL 1871692, *4. In short, EPCA does not preempt state and local laws that "govern via the type of energy an appliance consumes." *Id.* *8.

EPCA in fact recognizes this distinction between energy *type* and energy *use*. In a provision enacted alongside Section 6297(c), Congress required DOE to prescribe different "energy use" standards for otherwise-similar products that

22

"consume a different *kind* of energy" or have unique a "capacity or other *performance-related* feature." 42 U.S.C. § 6295(q)(1) (emphases added). This provision not only differentiates a product's "energy use" from the "*kind* of energy" it consumes, it also shows that EPCA views the "*kind* of energy" a product consumes as separate and distinct from the product's "*performance-related* feature[s]." *Id.* (emphases added). Laws like the Act's fossil-fuel provision, which regulate only the *type* of energy that may be used in certain buildings, therefore, do not regulate the performance-related features of any "covered product," let alone "concern[]" the "energy use" of such products under Section 6297(c).

Any lingering doubt is dispelled by the rule that "courts ordinarily 'accept the reading that disfavors pre-emption'" if "a pre-emption clause is susceptible of more than one plausible reading." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Bates*, 544 U.S. at 449). This principle actualizes the "starting assumption" in all preemption cases that "federal law does not override" state law unless that is Congress's "clear and manifest intent." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018) (quotations omitted); *see Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025); *R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176-77 (8th Cir. 2023); *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018). Here, the District offers the best reading of Section 6297(c), but even were plaintiffs' interpretation

plausible, the Court should resolve any ambiguities against extending EPCA's preemptive scope. *See Berkeley*, 89 F.4th at 1107-09 (O'Scannlain, J., concurring) (indicating that EPCA would not preempt a gas-infrastructure ban under the "presumption against preemption" (citation modified)).

Plaintiffs err in asserting (Br. 14-15) that this "presumption against preemption" was categorically "eliminate[d]" in "express-preemption cases" by *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115 (2016). *Franklin*'s "passing remark" about the presumption in a territorial bankruptcy case should not be read as "*sub silentio* overruling the decades of Supreme Court cases that held— indeed, mandated—that the presumption applies" to express-preemption provisions. *Berkeley*, 89 F.4th at 1111-12 (O'Scannlain, J., concurring); *see Happel v. Guilford Bd. of Educ.*, 913 S.E.2d 174, 189 n.8 (N.C. 2025). This Court in *Sickle*, moreover, followed that "starting assumption" in rejecting "[e]xpress preemption" claims even after *Franklin*. 884 F.3d at 346-48. Indeed, far from "merely recit[ing] the presumption" (Br. 15 n.5), *Sickle* made clear that it was "[a]pplying those preemption principles" in holding that a federal statute was "not broad enough to *expressly* foreclose" certain state-law claims. *Id.* at 347-48. At the very least, therefore, *Sickle* preserves the presumption in express-preemption cases that (like this one) implicate traditional state and local authority. *See Save Jobs USA v. U.S.*

24

*Dep't of Homeland Sec.*, 111 F.4th 76, 80 (D.C. Cir. 2024) (following panel ruling "decided after" purportedly abrogating Supreme Court decision).

> 2. Plaintiffs effectively concede that the fossil-fuel provision is not facially preempted, thus independently defeating their claim.

At the least, plaintiffs cannot show that EPCA facially preempts the Clean Buildings Act. The "cost" of bringing a facial claim is showing that "no set of circumstances exists under which the law would be valid." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citation modified). To defeat facial preemption claims, a state "need[s] merely to identify a possible set of" of circumstances in which its law is not "pre-empted." *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 589, 593 (1987). A state law is not facially preempted by EPCA, then, if it applies to products with no federal "energy conservation standard," or to items that are not "covered products" at all. *Rinnai Am. Corp. v. S. Coast Air Quality Mgt. Dist.*, ---F.4th---, 2026 WL 1912093, *12-14 (9th Cir. July 2, 2026) (holding that EPCA did not facially preempt local emissions rule that regulated "at least" one appliance (process heaters) that was not a "covered product").

So too here. The Clean Buildings Act validly applies to myriad items that are not "covered products" under EPCA, including (for example) coal-burning stoves, gas-fired kilns, and decorative gas fireplaces. *See* 42 U.S.C. § 6292; 90 Fed. Reg. 19250, 19253 (May 7, 2025). Plaintiffs in fact expressly "agree[d]" below that EPCA "does not prevent the District from enforcing [the Act] where it impacts only

non-covered products." Dkt. 38 at 34. That concession is fatal. Because plaintiffs'

facial claim encompasses covered and non-covered products alike, JA21-22, 34,

they cannot prevail by showing "only that some portion of the [Clean Buildings

Act's] applications are" preempted. *Newman v. Moore*, 151 F.4th 472, 483-85 (D.C.

Cir. 2025) (rejecting "facial challenge" given appellant's "own concessions" that

statute is valid "at least" sometimes). They must instead show that the Act is

preempted by EPCA "in every application," and plaintiffs admittedly cannot do so.

*Rinnai*, 2026 WL 1912093, *12-14 (rejecting facial claim that did not "distinguish[]

between appliances which are covered by EPCA and appliances which are not").

This point takes on added weight given that, on appeal, plaintiffs entirely

ignore the district court's ruling under the "no set of circumstances" test that the

"Act is not facially invalid under EPCA." JA384, 398 (quotations omitted). Failing

to challenge that ruling is a dispositive forfeiture. This Court "will not disturb the

ruling of a district court where, as here, an independent basis for that ruling is

uncontested." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 863 (D.C. Cir. 2008); *see*

*Lomont v. O'Neill*, 285 F.3d 9, 18 (D.C. Cir. 2002) (declining to consider "as-applied

challenge" on appeal as plaintiffs raised "only a facial challenge" below).

### B.     Plaintiffs' arguments lack merit.

1     The Clean Buildings Act does not set an "energy use" standard of "zero" for gas appliances.

Straining to find any textual foothold in EPCA, plaintiffs assert that the Clean Buildings Act's fossil-fuel provision concerns the "energy use" of covered products because its purported "ban" on gas appliances effectively sets an "energy use" standard of "zero" for such appliances.  Br. 38-43.  They base this theory on idiosyncratic readings of "energy use" and equally idiosyncratic understandings of "energy conservation standards."  But none of plaintiffs' arguments can be squared with EPCA's definition of "energy use" or its overall structure.

*First*, plaintiffs' main strategy is to rewrite EPCA's "technical definition for 'energy use'" to mean "actual, real-world energy usage."  Br. 41-43.  They argue that "plain meaning" can replace a "statutory definition" if a "term is used in multiple statutory provisions in multiple different senses."  Br. 42.  And here, plaintiffs assert, two provisions of EPCA that mention "energy use" in terms of "actual" energy consumption.  Br. 42-43 (citing 42 U.S.C. §§ 6292(b)(1)(B) and 6295(*l*)(1)(B)).

Not so.  Ignoring a statutory definition "is no small ask."  *Kirtz*, 601 U.S. at 59.  Plaintiffs must show that it is "beyond reasonable debate that" applying the definition "would be incompatible with" Congress's "regulatory scheme."  *UARG v. EPA*, 573 U.S. 302, 322 (2014) (quotations omitted); *see Kirtz*, 601 U.S. at 60-62 (applying statutory definition to sovereign-immunity provision even if it seemed

"absurd" elsewhere). Yet they have not come close to making that showing because their cited provisions are inapposite: both refer to products DOE has not *yet* regulated. The first tells DOE when it "may classify a type of product as a covered product," 42 U.S.C. § 6292(b)(1), and the second tells DOE when it "may prescribe" a "standard for" such "products," *id.* § 6295(*l*)(1). Before DOE takes either action, however, such products have no DOE "energy use" standard. But Section 6297(c) is entirely different. It *only* refers to "covered products" with an "energy conservation standard," *id.* § 6297(c), and so the *only* meaning "energy use" can have in that provision is the one Congress gave it in Section 6291(4).

Additionally, plaintiffs' revisionist definition of "energy use" renders EPCA's regulatory framework incoherent. As plaintiffs' counsel acknowledged below, a "zero" energy use standard is "impossible" under EPCA. JA328. A "covered product" is one that "in operation consumes, or is designed to consume, energy," 42 U.S.C. § 6291(1)-(2), and "energy use" is "determined" "during a representative average *use* cycle or period of *use*," which means the product must be *using* energy during DOE testing to determine "the quantity of energy directly *consumed*," *id.* §§ 6291(4) 6293(b)(3) (emphases added). But because no "covered product" can operate for a "cycle" or "period" on zero energy, the "energy use" of a "covered product" must refer to a positive, non-zero "quantity." *See Webster's Ninth New Collegiate Dictionary* 1370-71 (1983) (defining "zero" as "the absence of all

28

magnitude or quantity").  Plaintiffs' central theory is accordingly irreconcilable with the legal and practical realities of EPCA.  *See Plumbers*, 2026 WL 1871692, *3.

*Second*, plaintiffs assert that the Act's fossil-fuel provision is preempted even under Congress's definition of "energy use."  Br. 41.  They acknowledge that the "Act does not speak in the language of kilowatt-hours, Btus, or any other technical 'energy use' measurement."  Br. 38.  Yet plaintiffs and their amicus insist that the fossil-fuel provision "operate[s]" (Br. 38) or "functions" (U.S. Br. 16) like a "traditional energy conservation standard" because, by supposedly banning gas appliances, it sets an "energy use" standard of "zero."  Br. 38-39, 41.

This argument fails, too.  An energy conservation standard "operate[s]" and "functions" as a direct mandate, requiring appliance manufacturers to design and make their products to meet specified *performance* metrics before sale.  *See* 42 U.S.C. §§ 6291(6), 6295.  But the Clean Buildings Act "operate[s]" and "functions" as a construction code, specifying which *types* of energy can be used in which *types* of buildings.  It does not directly (or indirectly) require appliance manufacturers to do anything.  *See* D.C. Code § 6-1453.01.  Even after the Act is implemented, manufacturers can still market and sell the same gas appliances in the District that they do now, and consumers can still buy such appliances and use them in many buildings throughout the District.  *See id*.

In no meaningful sense, then, does the Act "operate" or "function[]" like an "energy conservation standard," let alone a standard of "zero." Despite plaintiffs' efforts to portray the Act as "an outright ban" on "gas appliances" (Br. 27, 37), the federal government at least concedes that the Act regulates only the "type of energy" used in "certain buildings." U.S. Br. 9, 20. And regulating a "type of energy" does not set a performance standard by "proxy," because a "'proxy' requires an 'equivalency,'" and "there is no 'equivalency' between the *type* of energy an appliance uses and that appliance's 'energy use'" under EPCA. *Plumbers*, 2026 WL 1871692, *9 (emphasis added). The Clean Buildings Act, therefore, is not "moving up or down" the "supply chain" for gas appliances to "evade preemption." Br. 39-40. It is regulating along an entirely different axis based on type of energy and type of location—and such regulations do not "set" any appliance's "energy use" to "zero." *See Plumbers*, 2026 WL 1871692, *5.

To make matters worse, plaintiffs' "zero" argument yields untenable results. *See Garcia*, 589 U.S. at 206 (rejecting express-preemption claim that produced "strange consequences"); *Bates*, 544 U.S. at 445-46 (similar). As the Second Circuit recently observed, interpreting EPCA's "preemption provision to preclude state and local prohibitions on covered products" could eviscerate longstanding "fire safety" regulations banning items such as "indoor kerosene heaters." *Plumbers*, 2026 WL 1871692, *13. It could also wipe away "[z]oning laws that bar the use of certain

30

appliances, like furnaces, in residential neighborhoods," or "[n]oise ordinances prohibiting the use of industrial fans" on the theory that those regulations, too, set covered products' "'energy use' to zero." *Id.* Any reading of EPCA's preemption provision that leads to those outcomes is "far-fetched" indeed. *Id.*

Plaintiffs' contrary argument appears to presume that if federal law allows the sale of products meeting certain criteria, then states and localities must allow those products to operate in every location without limit. *See* Br. 38-41. That premise is wrong: "federal regulation of certain activities does not mean that States must authorize activities antecedent to those federally regulated." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 793 (2019) (Ginsburg, J., concurring in the judgment); *see id.* at 777-78 (Gorsuch, J., lead op.) (concluding that federal regulation of "nuclear fuel cycle" did not preempt state law banning uranium mining).[4] It follows that EPCA's regulation of "the energy conservation standards of covered appliances" does not mean that its preemption provision must force states and localities to allow

---

[4] This principle runs through express-preemption doctrine. *See, e.g.*, *Upside Foods Inc v. Fla. Dep't of Agric.*, 171 F.4th 1239, 1254-57 (11th Cir. 2026) (state ban on lab-grown meat not preempted "requirement[]" "with respect to" meat "ingredient" or slaughterhouse "operations" under 21 U.S.C. § 467e); *Triumph Foods, LLC v. Campbell*, 156 F.4th 29, 37, 51-52 (1st Cir. 2025) (state ban on certain pork products not preempted "requirement[]" "with respect to" slaughterhouse "operations" under 21 U.S.C. § 678); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 553-54 (7th Cir. 2007) (state horsemeat ban not preempted "[r]equirement[]" "with respect to" slaughterhouse "operations" under 21 U.S.C. § 678).

"covered appliances, in the first place." *Plumbers*, 2026 WL 1871692, *8.  Holding otherwise would turn EPCA from an energy-conservation regime into an industry giveaway mandating limitless use of gas appliances and insulating manufacturers from changes in demand resulting from local health-and-safety regulations. *See id.* *7 & n.5, *8 n.8 (recognizing that EPCA does not "ensure access to all covered products" or guarantee "static markets" for manufacturers (quotations omitted)).

> 2.  Plaintiffs cannot salvage their claim by changing "concerning" to "relating to."

Despite claiming to put "special emphasis" on the word "concerning" in Section 6297(c), plaintiffs quickly jettison that term for a different one: "related to." Br. 12, 19-22.  Cobbling together snippets of cases involving different statutes (e.g., ERISA) and different contexts (e.g., bankruptcy), plaintiffs argue that EPCA preempts "any state law" that is "related to" gas appliance use, even if the "relation" is "indirect."  Br. 19-22 (quotations omitted).  Plaintiffs say this is necessary to give Section 6297(c) an "expansive sweep."  Br. 20 (quotations omitted).

That is not a sound approach to reading statutes or precedent, and it is particularly inapt here given that "the Supreme Court has already warned against over-reading" the very cases plaintiffs cite. *Plumbers*, 2026 WL 1871692, *5 & n.4. When EPCA's current preemption provision was enacted, the phrase "related to" had a settled meaning in the preemption context. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-100 (1983).  Yet Congress eschewed that language in

Section 6297(c), and instead chose "concerning"—a term with a narrower connotation that even plaintiffs recognize can be "equivalent" to "about," Br. 19 (quotations omitted). Congress's choice should be respected, and the term "concerning" should be given its most naturally reading to mean "about," *see supra* pp. 20-21. *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) ("When legislators did not adopt obvious alternative language, the natural implication is that they did not intend the alternative." (quotations omitted)).

But plaintiffs lose either way. Because "statutory language has meaning only in context," even "expansive" terms may require "a narrower" construction than they "might suggest when read with blinders on." *Kennedy v. Comm'r*, 142 F.4th 769, 778-79 (D.C. Cir. 2025) (citation modified). This is particularly true of "indeterminate" phrases like "relating to," which are routinely "narrowe[d]" by structure, context, and history. *Mellouli v. Lynch*, 575 U.S. 798, 808-13 & nn.9-11 (2015) (quotations omitted); *see Dubin v. United States*, 599 U.S. 110, 118-20 (2023) (giving "in relation to" a "narrower reading").

For purposes of preemption, state law "relates to" a subject of federal regulation only when it is "'connected' to the forbidden subject matter (here, a product's 'energy use')," or when it "'reference[s]' the preempted matter (again, a product's 'energy use')." *Plumbers*, 2026 WL 1871692, *6. The Clean Buildings Act, however, is not "'connected' to" a "product's 'energy use'" because it does "not

impose standards" on any product and thus does "not implicate" EPCA's "objectives." *Id.* *6, *8-9. Nor does the Act impermissibly "reference" EPCA since its "operation and terms" depend on "the *type* of energy consumed," not "an appliance's 'energy use,' as that term is used in the preemption provision." *Id.* *6, *9 (emphasis added). Accordingly, even if the Act more broadly limited the use of "covered appliances," and directly impacted "the market for, and availability of, certain covered products," it would still have no "impermissible connection" or "reference" to EPCA for "preemption purposes." *Id.* *8-9. A contrary conclusion would mean that nearly any state or local law affecting the market for an EPCA-covered product would be preempted under Section 6297(c). That cannot be right. *See Rutledge*, 592 U.S. at 91 (holding that, even in the context of ERISA, "creating inefficiencies alone is not enough to trigger" preemption).

3.      Plaintiffs' reliance on *Berkeley* is misplaced.

Yet another reason to reject plaintiffs' claim is that it hinges entirely upon the Ninth Circuit's flawed decision in *Berkeley*. In essence, *Berkeley* read "energy use" to protect "the end-user's ability to *use* installed covered products at their intended final destinations," and it interpreted "concerning the . . . energy use" in Section 6297(c) to cover regulations that "relate to 'the quantity of natural gas directly consumed by' certain consumer appliances at the place where those products are used." 89 F.4th at 1101-02 (citation modified). But as the United States itself

34

previously observed, *Berkeley*'s "overbroad interpretation" of Section 6297(c) was "erroneous" and contrary to "the long-settled understanding" of EPCA. U.S. Reh'g Br. 1, 20, 22, *Berkeley*, No. 21-16278 (June 12, 2023), Dkt. 94. That assessment was correct then, and it is correct now. This Court should not follow *Berkeley*.

*First*, *Berkeley* "went astray" from the start by ignoring "the second half of the statutory definition" of "energy use." *Plumbers*, 2026 WL 1871692, *14. In particular, the court essentially deleted the phrase: "*determined in accordance with test procedures under section 6293.*" *Id.* (quoting 42 U.S.C. § 6291(4)). That misstep by itself warrants a departure from *Berkeley*. *See District of Columbia v. Dep't of Lab.*, 819 F.3d 444, 449 (D.C. Cir. 2016) ("Courts are not at liberty to rewrite laws[.]"). The "test procedures" language is "crucial" to understanding EPCA's preemptive scope because it shows that the definition of "energy use" cannot "refer[] to the energy an appliance consumes at its 'intended final destination.'" *Plumbers*, 2026 WL 1871692, *14 (quoting *Berkeley*, 89 F.4th at 1102). The Ninth Circuit's failure to grapple with that language in *Berkeley* led to a cascade of interpretive errors that no court has since followed, *see supra* p. 13 n.3.

*Second*, *Berkeley* overlooked the technical meaning of "point of use" in EPCA's definition of "energy use." Without recognizing that "point of use" has functioned as a technical term in the definition of "energy use" since its enactment in 1975, *Berkeley* relied on a modern-day online dictionary to conclude that the

"ordinary meaning" of that term was the "place where something is used."  89 F.4th at 1101.  This, too, was erroneous.  *See Plumbers*, 2026 WL 1871692, *14-15; *see also Van Buren*, 593 U.S. at 388 n.7 (recognizing that "when a statute" addresses a "technical subject, a specialized meaning is to be expected" (quotations omitted)).

In EPCA's "specialized context," the term "point of use" does not colloquially refer to where a product operates; it conveys the technical method by which EPCA regulates energy consumption—namely, "*site* energy," not "*source* energy." *Plumbers*, 2026 WL 1871692, *14-15 (emphasis added).  "[S]ite energy" refers to "the amount of energy consumed at the point of sale (e.g., that enters the home, building, or establishment) without adjustment for any energy loss in the generation, transmission, and distribution of that energy."  DOE, *Energy Intensity Indicators: Terminology and Definitions*, https://perma.cc/LHZ4-6UXK.  "Source energy," by contrast, sweeps more broadly, encompassing both site energy "plus the energy losses associated with the production of electricity by the utility sector (i.e., losses that occur in the generation, transmission, and distribution)."  *Id.*; *see* 75 Fed. Reg. 51423, 51424 (Aug. 20, 2010) (discussing "point of use"); 69 Fed. Reg. 45420, 45426 (July 29, 2004); 42 Fed. Reg. 20012, 20013 (Apr. 15, 1977).  In overlooking this technical understanding of "point of use," *Berkeley* failed to recognize that EPCA preemption is not concerned with state and local regulations that affect where

or how end-users operate a product. *See* 89 F.4th at 1101-02. And this Court should decline plaintiffs' invitation (Br. 45) to repeat the same mistake here.

4. EPCA's structure constrains its preemptive scope.

EPCA's structure reinforces Section 6297(c)'s textual limits, and provides no sound basis to preempt a law like the Clean Buildings Act's fossil-fuel provision, which regulates only the type of energy used in certain locations, not the quantity of energy any product is engineered to consume. Struggling to avoid that conclusion, plaintiffs try to expand Section 6297(c)'s based on EPCA's provisions about building codes and DOE's authority to set standards and grant waivers. Br. 23-29. But those provisions, if anything, favor the District.

Start with the "building code exception" in Section 6297(f). Under that provision, an otherwise-preempted "regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product" will not be "superseded" if the code overall "complies with" seven requirements that generally involve the prescriptions and specifications for its energy objectives. 42 U.S.C. § 6297(f)(3). In plaintiffs' view, this provision covers only "benign" and "gentle" building codes, and so if those sorts of codes "would be preempted" by EPCA "but for the exception," then the Clean Buildings Act "must be preempted as well." Br. 24-27. Otherwise, plaintiffs' assert, Section 6297(f)'s exception would be "a nullity." Br. 23.

Plaintiffs' conclusion does not follow. "Exceptions to a general rule, while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City*, 569 U.S. at 264; *see Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 996 (D.C. Cir. 2025) (similar). So the "mere fact that a regulation does not satisfy the criteria for a preemption exception does not mean the regulation is preempted." *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, ---F. Supp. 3d---, 2026 WL 946235, *16 (D. Md. Apr. 2, 2026). Just so here. Section 6297(f) cannot bear the weight plaintiffs foist on it because its threshold inquiry mirrors Section 6297(c)'s general rule. Indeed, none of Section 6297(f)'s seven requirements comes into play unless a building code "contain[s]" an otherwise-preempted "regulation or other requirement" "concerning the energy efficiency or energy use of [a] covered product." 42 U.S.C. § 6297(f)(3). The purported overall "flexibility" of codes that satisfy Section 6297(f)'s requirements thus says little about what sorts of regulations "concern[]" the "energy use" of "a covered product" in the first place.

That Section 6297(f) lacks salience in this case however does not nullify it. *See Ardelyx, Inc. v. Kennedy*, ---F.4th---, 2026 WL 1839261, *10 (D.C. Cir. June 26, 2026) ("Language in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." (quotations omitted)). Section 6297(f) would very likely cover building-code requirements that "'reference' appliances' individual 'energy use'" or that "directly implicate Congress's objectives in

maintaining uniform energy conservation standards." *Plumbers*, 2026 WL 1871692, *10-11. So, for example, "[p]rohibitions against placing oversized furnaces and air conditioners in new buildings" would not be preempted while a "[p]rohibition of hook-ups for appliances with less than a certain efficiency would be." 47 Fed. Reg. 57198, 57215 (Dec. 22, 1982). The distinction between those examples is that the latter "directly references and operates upon the preempted subject matter, the appliances' 'energy use,'" while the former does not. *Plumbers*, 2026 WL 1871692, *11 n.12. Construed in this manner, Section 6297(f) still does meaningful work without "rul[ing] out a narrow conception of EPCA preemption," Br. 24.

Plaintiffs fare no better with EPCA's standards-setting and waiver provisions. Plaintiffs surmise (Br. 27-29) that EPCA must preempt state and local laws that could reduce product demand because DOE cannot adopt an "energy conservation standard" that is "likely to result in the unavailability in the United States" of a "covered product type (or class) of performance characteristics" or "features." 42 U.S.C. § 6295(o)(4). They leap to a similar conclusion based on DOE's inability to waive preemption for state laws that are "likely to result in the unavailability in the State" of certain "performance characteristics" and "features," *id.* § 6297(d)(4), or that "will significantly burden manufacturing," "sale," or "servicing" of a "product on a national basis,'" *id.* § 6297(d)(3). Br. 28-29, 32.

Those arguments scramble EPCA's structure. Congress designed EPCA so that DOE would make certain policy decisions at the front end in deciding whether to set a "new or amended" standard for a "covered product," including whether the standard "is technologically feasible and economically justified," which depends in part on its economic and competitive impacts. 42 U.S.C. § 6295(o)(2)(A), (o)(2)(B)(i)(I)-(V), (o)(4). And Congress tasked DOE with considering similar policy issues at the back end in deciding waiver petitions, including predictive judgments about a preempted regulation's impact "in the State," and qualitative judgments about its "burden" on "a national basis.'" *Id.* § 6297(d)(3)-(4). But Congress did not include such policy considerations in Section 6297(c), and for good reason. Unlike standards-setting or waiver provisions, preemption statutes are principally administered by *courts of law*—not agencies. It would accordingly make little sense to read Section 6279(c) as tacitly incorporating the litany of policy concerns that guide DOE's administrative determinations under EPCA.

Plaintiffs' view of the waiver provision is especially misguided. If anything, that provision indicates that the downstream effect of a state regulation on product availability or on manufacturing, sale, and servicing has little bearing on the threshold preemption inquiry, because Section 6297(c) necessarily contemplates that some state regulations will be preempted even if they are *not* "likely" to effect product availability, and even if they will *not* "significantly burden" manufacturing

40

"on a national basis." *See* 42 U.S.C. § 6297(d)(3)-(4). Otherwise, the waiver provision would have little or no work to do. This further confirms that the factors guiding DOE's waiver analysis for laws already preempted by Section 6297(c) "say nothing" about the scope of that threshold preemption provision. *Plumbers*, 2026 WL 1871692, *7 (finding it "hard to draw conclusions about Congress's objective" for "purposes of preemption" from the "waiver provision").

Worse yet, plaintiffs' melding of the preemption and waiver provisions creates a needless dilemma. DOE can waive preemption if an otherwise-preempted "State regulation is needed to meet unusual and compelling State or local energy or water interests," which depends in part on the "costs" and "benefits" of the regulation's "energy or water savings." 42 U.S.C. § 6297(d)(1)(B), (d)(1)(C)(ii). Yet state and local regulations addressing health-and-safety concerns (e.g., fire codes) will often yield few if any energy savings from a strict cost-benefit analysis. Preempting such regulations would thus create a counterintuitive asymmetry: state and local regulations that do *not* set an "energy conservation standard" would be preempted and ineligible for waiver, while state and local regulations that *expressly* set an "energy conservation standard" would be eligible for waiver. EPCA should not be read to impose such an anomalous regime.

Nor should EPCA be read to create the regulatory void that would result from plaintiffs' attempt to impute DOE's standards-setting analysis into the preemption

41

provision. Congress tied EPCA's preemptive reach to the scope of DOE's standard-setting authority only in the sense that DOE has authority to set "energy conservation standards" and EPCA has preemptive effect only after DOE does so. 42 U.S.C. §§ 6291(6)(A), 6297(c). But if anything, that suggests EPCA's preemption provision should be read to *exclude* state or local laws that DOE itself could not establish as energy conservation standards. Otherwise, the limits of DOE's authority would *expand* EPCA's preemptive scope, and correspondingly *limit* the sovereign authority of state and local governments over matters within their traditional bailiwick. That is a strained account of EPCA's structure.

 5. EPCA's history and purpose underscore the textual and structural limits of its preemption provision.

The history and purpose of EPCA bolster the textual and structural cues indicating that Section 6297(c) does not preempt the Clean Buildings Act. Plaintiffs, however, spin a different narrative. They insist that Congress "strengthened EPCA's preemptive effect" through a series of "broadening" amendments in 1978 and 1987 to end a "patchwork" of state regimes and to ensure "regulatory uniformity"—goals that the Clean Buildings Act would supposedly undo. Br. 27, 30-32, 35-36.

Plaintiffs' arguments distort the historical record. EPCA's current regime was indeed preceded by a "patchwork" of state regulations. S. Rep. 100-6, at 4. But it was "a patchwork of *conservation standards specifically*, not a patchwork of any kind of regulation." *Plumbers*, 2026 WL 1871692, *8 n.8. And this patchwork was

42

caused by DOE's failure to issue "national standards" and its lax "policy of granting" waivers. *Abraham*, 355 F.3d at 187 n.3. That is why Congress "continue[d] the basic concept of preempting State energy efficiency standards" in EPCA's 1987 amendments, H.R. Rep. 100-11, at 24, and solved the patchwork issue by imposing national "energy conservation standards" and by making "it more difficult for states to obtain waivers." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 499-500 (9th Cir. 2005).

Congress thus did not "broaden" Section 6297(c) to eliminate any and all "state regulatory departures," and nothing in the Clean Buildings Act would "usher" back in that pre-1987 "patchwork." Br. 13, 27, 30-32. Far from it. Choosing "between electric and fossil-fuel-powered appliances does not represent the same risk of complication of the market as the potential for fifty different energy conservation standards." *Plumbers*, 2026 WL 1871692, *8 n.8. Plaintiffs' counsel essentially admitted as much below, "grant[ing]" that "a gas ban" is "not the same thing" as "30 different types of energy use standards across the country." JA345-46. That concession was prudent. Congress's "patchwork" concerns under the pre-1987 EPCA regime cannot "be extrapolated to cover all regulations which might impact the choices of manufacturers." *Plumbers*, 2026 WL 1871692, *8 n.8.

Section 6297(c)'s evolution casts further doubt on plaintiffs' story of "a substantial expansion of EPCA's preemptive scope." Br. 36. The statute originally

covered any state "energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product." EPCA, § 327(a)(2)(A), 89 Stat. at 926-27. At that time, "energy efficiency standard" meant "a performance standard." *Id.* § 321(a)(4)-(6), 89 Stat. at 917. But after some minor alterations in 1978, Congress streamlined the preemption provision in 1987 to accommodate EPCA's new keynote term: "energy conservation standard," which encompassed both "performance standards" *and* certain "design requirement[s]," NAECA § 2(a), 101 Stat. at 103. Congress did not simply add "energy conservation standard" to the preemption provision, then, as doing so would have preempted state-law "design requirements." *Plumbers*, 2026 WL 1871692, *12. Congress instead listed the constituent elements of "energy conservation standard" (e.g.., energy efficiency and energy use) to avoid covering "design requirements"; it replaced "with respect to" with "concerning"; and it expressly retained Section 6297(c)'s existing scope by adding a new title: "General Rule of Preemption for Energy Conservation Standards[.]" NAECA § 7, 101 Stat. at 118.

Far from expanding the statute, these "revisions to [EPCA's] preemption provision were intended to reinforce the limits of its scope, not broaden them." *Plumbers*, 2026 WL 1871692, *13; *see Baptist Mem'l Hosp. v. Sebelius*, 566 F.3d 226, 229 (D.C. Cir. 2009) ("[Changes] in statutory language need not *ipso facto* constitute a change in meaning." (quotations omitted)). After all, swapping "with

respect to" for "concerning" hardly makes a provision "more expansive," Br. 36. *See Montgomery v. Caribe Transp. II, LLC*, 146 S. Ct. 1199, 1204-25 (2026) (equating "with respect to" and "concerns"). Plaintiffs' contrary view implausibly presumes that Congress dramatically expanded EPCA's preemptive scope—and limited state and local authority—through language that is, at best, equivocal. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 84-85 (D.C. Cir. 2019) (recognizing that Congress does not use "vague terms" to alter "the balance of power between the federal government and the States").

This statutory continuity is especially noteworthy given DOE's longstanding construction of EPCA's preemption provision. As early as 1982, DOE recognized that a state rule establishing "the energy efficiency of a particular appliance would be superseded," while a rule addressing other matters (e.g., fire safety) would not be preempted "even if it has a secondary and incidental effect of improving the efficiency of a covered product." 47 Fed. Reg. 14424, 14456 (Apr. 2, 1982) (indicating EPCA would not preempt state laws with "only a peripheral effect on the energy efficiency of a covered product"). DOE has reaffirmed that stance time and again, moreover, by "interpret[ing] 'regulation concerning energy use' to be equivalent to 'energy conservation standard,'" 75 Fed. Reg. 59470, 59530 (Sep. 27, 2010), and by reiterating that federal standards "generally supersede State laws and regulations concerning energy conservation testing, labeling, and *standards*," 85

Fed. Reg. 30878, 30879 (May 21, 2020) (emphasis added). The government also reiterated this position in arguing as amicus curiae that EPCA does not preempt local laws banning gas infrastructure or appliances. U.S. Amicus Br. 14-25, *Berkeley*, No. 21-16278 (Feb. 8, 2022), Dkt. 33; U.S. Statement of Interest 14-25, *Nat'l Ass'n of Home Builders v. Montgomery County*, No. 24-cv-3024 (D. Md. Jan. 17, 2025), Dkt. No. 30, *withdrawn*, Dkt. No. 39 (Mar. 19, 2025).

That the federal government has recently "reconsidered" DOE's position (U.S. Br. 2-3 n.1) does not change the analysis. *See Bates*, 544 U.S. at 449 (rejecting express-preemption claim as "particularly dubious" where "just five years ago the United States advocated" a contrary "interpretation"). The executive branch can shift its policy priorities, but it cannot change Congress's statute or rewrite its own regulatory history. *See, e.g.*, *Refugee & Immigrant Ctr. v. Mullin*, 174 F.4th 81, 110-11 (D.C. Cir. 2026) ("If the Government wishes to modify [Congress's] carefully structured and intricate system, it must present those arguments to the only branch of government able to amend the [statute]: Congress."). Besides, the government had it right the first time: it is indeed "straightforward" that Section 6297(c) preempts only state laws that "establish or approximate" performance standards for covered products—not laws regulating "where" a particular "*kind* of energy" may be used. U.S. Amicus Br. 1, 17, 19, *Berkeley*, No. 21-16278.

**C.    The district court correctly rejected plaintiffs' Appendix Z claim as forfeited and meritless.**

Plaintiffs' belated challenge to Appendix Z is "forfeited" and "unpersuasive," as the district court rightly concluded.  JA396 n.24; *see GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 813 (D.C. Cir. 2012) ("A district court does not open the door to further consideration of a forfeited claim by giving an alternative, merits-based reason for rejecting it.").

As a threshold matter, plaintiffs lack Article III standing to assert this claim because they presented no evidence at summary judgment of any injury caused by the features of Appendix Z that they now challenge.  *Humane Soc'y v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) ("[P]laintiffs must prove injury in fact with specific facts[.]" (quotations omitted)).  Their only alleged injuries involved the Clean Buildings Act's purported "Appliance Ban."  JA37-108.  But standing is never "dispensed in gross"—it must be shown for "each claim."  *Iowaska Church v. Werfel*, 105 F.4th 402, 412 (D.C. Cir. 2024) (citation modified).  So affidavits about the Act's supposed ban cannot give plaintiffs standing to assert a separate claim against separate aspects of Appendix Z, especially given the uncertainty about whether or how Appendix Z will apply going forward.  *See* 12A DCMR § 104.10 (allowing "modifications for specific cases"); *see also Hemp Indus. Ass'n v. DEA*,

47

36 F.4th 278, 290-93 (D.C. Cir. 2022) (holding plaintiffs lack preenforcement standing where they face no "imminent or substantial risk of enforcement").[5]

But even if they had standing, plaintiffs have not shown that the district court abused its discretion in deeming the Appendix Z claim "forfeited." JA396 n.24; *see Trudel*, 924 F.3d at 1286 ("[A] preservation ruling is subject to review only for abuse of discretion."). Plaintiffs acknowledge that their complaint "did not detail the specifics of" any challenge to Appendix Z, Br. 49-50—indeed, it mentioned Appendix Z only passingly in two paragraphs, JA23. The only claim in plaintiffs' one-count complaint was that EPCA preempts the Clean Buildings Act because it allegedly "prohibits the use of gas appliances." JA2; JA22; JA30. But the Appendix Z claim they raised at summary judgment asserted that EPCA preempted the Act *even without* a "prohibition on gas" based on previously unmentioned parts of Appendix Z. Dkt. 26 at 17-18. Those claims are not the same, and the former hardly "encompasses" the latter (Br. 49). Plaintiffs therefore were not entitled to challenge Appendix Z "for the first time" at summary judgment. JA396 n.24; *see*

---

[5] The Department of Buildings is currently updating the District's Construction Codes to "incorporate newer editions of the International Code Council (ICC) model codes," which do not include Appendix Z. D.C. Dep't of Buildings, *DC Department of Buildings Advances Modernization of District Construction Codes* (June 8, 2026), https://tinyurl.com/3s67dwmb.

*Trudel*, 924 F.3d at 1286 (affirming rejection of a "theory as forfeited" that was "never pleaded" and not raised "until summary-judgment briefing").

No sound reason exists to second-guess the district court's forfeiture ruling. Contrary to plaintiffs' assertions, the Appendix Z claim was forfeited not because their complaint omitted "legal theorizing" or because they made a new "argument" in support of a "pleaded claim" at summary judgment. Br. 49-50. The claim was forfeited because (in plaintiffs' words) it was "a second path" to preemption based on "technical minutiae" in Appendix Z that was not alleged in the complaint, and that was asserted with little elaboration over less than two pages of their summary judgment motion. Dkt. 26 at 17-18. Nothing required the district court to consider that cursory, late-breaking claim: "To hold otherwise would mean that a party could unilaterally amend a complaint at will." *Statewide Bonding, Inc. v. U.S. Dep't Homeland Sec.*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020).

The same goes for plaintiffs' unpreserved claim that the Clean Buildings Act and Appendix Z "concern[]" not only "the 'energy *use*' of gas appliances," but also "the 'energy *efficiency*'" of "gas appliances." Br. 19 n.7, 32-34 (emphases added). Plaintiffs forfeited that argument below by asserting it in a one-sentence footnote of their summary-judgment opposition with no developed analysis (Dkt. 38 at 15 n.4), and the district court did not pass on it. Compounding that initial forfeiture, plaintiffs on appeal assert this "energy efficiency" argument in a one-sentence footnote (Br. 19

49

n.7) and then fail to meaningfully develop it elsewhere (Br. 34).  This Court need not address such doubly forfeited assertions, especially when, as here, they appear to fail for the same reasons plaintiffs' "primary" claim involving "energy use" fails (Br. 47).  *See Georgia v. U.S. DOJ*, 148 F.4th 724, 739-40 (D.C. Cir. 2025) (rejecting "cursory arguments" raised in "three-sentence footnote" (quotations omitted)).

Regardless, plaintiffs' new claim is "unpersuasive" because neither aspect of Appendix Z that they challenge impacts the typical amount of energy that any covered product is designed or manufactured to consume under EPCA.  JA396 n.24.  The first portion of Appendix Z that they mention is known as the "Zero Energy Performance Index" (zEPI), which is a formula for reducing a building's energy needs.  JA182-83.[6]  The other part of Appendix Z that they challenge says that buildings "shall be provided with renewable energy equal to the EUIp on an annual basis and calculated in accordance with" the zEPI formula.  JA184.  The district court held that EPCA preempted none of this because Appendix Z, like the Clean

---

[6]     In the zEPI formula, a fixed number (50.4) is multiplied by a variable number representing "Energy Use Intensity" (EUIp/EUI).  JA183.  The numerator EUIp is the "proposed" building's "annual energy use" in kBtu/square feet, while the denominator EUI is a "baseline" building's "annual energy use" in kBtu/square feet. JA183.  A passing zEPI score is 30 or lower, so if the EUI for a baseline building is 100 kBtu/square feet, then a proposed building could pass zEPI with an EUIp of roughly 59 kBtu/square feet: 50.4 x 0.59 = 29.7.  *See* JA183.

Buildings Act, merely "provides for reduced energy consumption in certain buildings without setting any product-design standard." JA396 n.24.

The district court was right, and plaintiffs' cryptic assertions to the contrary fall back on their flawed view of "energy use." They argue, for example, that the zEPI formula "'concern[s] the energy use' of EPCA-covered gas appliances" because it purportedly "restrict[s] the 'quantity of energy directly consumed by [these appliances].'" Br. 33. And they argue that Appendix Z's "renewable energy" provision "penalizes" gas appliances, and thus "'concern[s]' the 'energy use'" of such products, because gas appliances will "increase" a building's total energy use and "therefore require more renewable energy." Br. 34.

Both contentions miss the mark. As explained, "energy use" is not some colloquial, all-encompassing concept. It is a specific term that EPCA defines as a fixed measurement of an appliance's typical performance under premarket testing conditions—not the "quantity of energy" it draws in the hands of consumers. *See supra* pp. 18-20. So even if Appendix Z "restrict[ed]" or "penalize[d]" the use of gas appliances, it would still not "concern[]" the "energy use" of any "covered product" in the sense relevant to Section 6297(c). This is because limiting or dissuading the use of a covered product in certain locations does not impact how efficiently that product is designed or manufactured to perform under premarket

testing conditions. Indeed, manufacturers would be subject to the same uniform energy conservation standards whether Appendix Z applies or not.

## II. Plaintiffs' Overbroad Remedies Are Inequitable And Unsound.

Even were plaintiffs right on the merits, they are wrong on the remedies. Plaintiffs seek a declaration that the Clean Buildings Act is "void" and "a permanent injunction enjoining" its enforcement. Br. 55-56; JA34. But if the Court reverses on the merits, it should remand for the district court to decide the remedial issues in the first instance, *see Jackson*, 59 F.3d at 255—especially given the recently approved amendments to the Clean Buildings Act, *supra* pp. 10-11 n.2.

Alternatively, the Court can reject plaintiffs' blunderbuss remedies. Litigants generally cannot obtain declaratory or injunctive relief that extends beyond the named plaintiffs. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851-54 (2025); *Talbott v. United States*, 176 F.4th 720, 750 (D.C. Cir. 2026). Yet in seeking to bar enforcement of the Act against anyone, plaintiffs pursue just the sort of overbroad decree that would inflict "irreparable harm" on the District by preventing it "from enforcing its policies against nonparties." *CASA*, 606 U.S. at 859-60. And tellingly, plaintiffs make no attempt to show that such an injunction is necessary to afford them complete relief. But either way, the District's statutory severability requirement prevents plaintiffs from using the fossil-fuel provision to take down the entire Clean Buildings Act. *See* D.C. Code § 45-201(a); *Leavitt v. Jane L.*, 518 U.S.

137, 139 (1996) ("Severability is of course a matter of state law.").  Indeed, even without the fossil-fuel provision, the Act would still advance its purposes through its other provisions, including the requirement to generate "[r]enewable energy" at a "building site wherever feasible," D.C. Code § 6-1453.01(a)(3)(B)(i).  In short, plaintiffs' all-or-nothing remedial claims lack merit.

# CONCLUSION

This Court should affirm the judgment below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

/s/ Bryan J. Leitch
BRYAN J. LEITCH
Assistant Attorney General
D.C. Bar Number 1016484
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524 (office)
(202) 741-0649 (fax)
bryan.leitch@dc.gov

July 2026

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12590 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Bryan J. Leitch
BRYAN J. LEITCH

# STATUTORY AND REGULATION ADDENDUM

12A DCMR § 104.10 ....................................................................Add. 1

42 U.S.C. § 6293 ........................................................................Add. 6

42 U.S.C. § 6294 ........................................................................Add. 8

D.C. Code § 45-201 ....................................................................Add. 14

West's District of Columbia Municipal Regulations
  Title 12. Construction Codes Supplement of 2017
    Subtitle A. Building Code Supplement of 2017 [1] (Refs & Annos)
      Chapter 1A. Administration and Enforcement (Refs & Annos)

12 DCMR § 104A
D.C. Mun. Regs. Tit. 12, § 104A

104A. DUTIES AND POWERS OF THE CODE OFFICIAL

Effective: July 17, 2021
Currentness

*<Strike Section 104 of the International Building Code in its entirety and substitute new Section 104 in the Building Code in its place to read as follows:>*

**104.1 General.** The *code official* is hereby authorized and directed to enforce the provisions of the *Construction Codes*. The *code official* shall have the authority to render interpretations of the *Construction Codes* and to adopt policies and procedures in order to clarify the application of its provisions. Such interpretations, policies and procedures shall be in compliance with the intent and purpose of the *Construction Codes*. Such policies and procedures shall not have the effect of waiving requirements specifically provided for in the *Construction Codes*.

**104.1.1 Administrative Bulletins.** The *code official* shall have the authority to promulgate from time to time *administrative bulletins* that shall be effective upon publication in the *D.C. Register*. *Administrative bulletins* shall be titled, numbered, and dated. *Administrative bulletins* shall be publically available at the *Department's* permit center and shall be posted on the *Department's* website.

**104.2 Applications and Permits.** The *code official* shall receive applications, review submittal documents, and issue permits and certificates authorized by the *Construction Codes*, and shall enforce compliance with the provisions of the *Construction Codes*.

**104.3 Notices and Orders.** The *code official* shall have authority to issue all necessary notices or orders to ensure compliance with the *Construction Codes*, and shall have authority to institute administrative and legal actions to correct violations or infractions, including actions pursuant to An Act To provide for the abatement of nuisances in the District of Columbia by the Commissioners of said District, and for other purposes, approved April 14, 1906 (34 Stat. 114; D.C. Official Code §§ 42-3131.01 *et seq.* (2012 Repl.)) (the "Nuisance Abatement Act"), and the Due Process Demolition Act of 2002, effective April 19, 2002 (D.C. Law 14-114; D.C. Official Code §§ 42-3171.01 *et seq.* (2012 Repl.)).

**104.4 Inspections.** The *code official* is authorized: (i) to make all inspections necessary to ensure compliance with the *Construction Codes* in accordance with Section 104.6, and (ii) to accept reports of inspection by *approved* agencies. The *code official* is authorized to engage such expert opinion as is deemed necessary to report upon unusual technical issues that arise.

**104.4.1 Post Disaster Event Inspections.** The *code official* is authorized to conduct inspections to determine emergency and disaster related damage to *premises* in the District of Columbia in accordance with the *District of Columbia Damage Assessment Emergency Operations Plan* (September 2015) and any subsequent amendments thereto.

**104.5 Identification.** The *code official*, and authorized representatives of the *code official*, shall carry proper credentials when inspecting *premises* in the performance of duties under the *Construction Codes*.

**104.6 Right of Entry.** Where it is necessary to make an inspection to enforce the provisions of the *Construction Codes*, the *code official* is authorized to enter the *premises*, or any part thereof, at reasonable times to inspect or to perform the duties imposed by the *Construction Codes* subject to applicable law. This authority includes, but is not limited to, situations where the *code official* has reasonable cause to believe that a condition exists in or upon a *premises* that is contrary to or in violation of the *Construction Codes*. Where attempting to gain entrance for inspection, the *code official* and authorized representatives thereof shall present official credentials.

**104.6.1 Occupied residential premises.** With respect to the inspection of an occupied residential portion of any *premises* under the exclusive control of a tenant, the *code official* shall not enter that portion of the *premises* without first having obtained permission from the tenant or other *person* of suitable age and discretion who resides there, unless the *code official* has:

a. A valid administrative search warrant which permits the inspection, pursuant to D.C. Official Code §§ 11-941 and 42-3509.08 (2012 Repl.), and/or D.C. Superior Court Civil Rule 204; or

b. A reasonable basis to believe that an imminent danger to the public health, safety or welfare exists requiring immediate entry into that portion of the *premises*.

**104.6.1.1 Contractors and other persons with common authority over the premises.** Where a residential tenant has given access or control to a contractor or other *person* to undertake work on the tenant's portion of the *premises* pursuant to a permit, the *code official* is authorized to obtain consent from the contractor or other *person* with common authority over the *premises* to enter the *premises* for the limited purpose of inspecting the work authorized by such permit.

**104.6.2 Interference with Inspection.** Any *person* who interferes with the *code official* in the performance of authorized duties, or prevents or refuses to allow the *code official* to enter a *premises* or any portion thereof for inspection in the performance of authorized duties, is in violation of the *Construction Codes*.

**104.6.3 Refusal of Entry.** If entry is refused, the *code official* shall have recourse to the remedies provided by law to secure entry, including, but not limited to, application to the Superior Court for an administrative search warrant pursuant to D.C. Official Code §§ 42-3131.02 and 42-3509.08 (2012 Repl.), and Sup. Ct. Civ. R. 204.

**104.7 Retention of Public Records.** The *code official* shall comply with the requirements of the District of Columbia Public Records Management Act of 1985, as amended, effective September 5, 1985 (D.C. Law 6-19; D.C. Official Code §§ 2-1701 *et seq.* (2018 Repl.)) (the "Public Records Act"). Public records of the *Department* (as defined in D.C. Official Code § 2-1701(13)) shall be maintained for the period of time required by law. Records of permit applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued, and *approved* submittal documents shall

Add. 2

be maintained so long as the *building* or other *structure* to which they relate remains in existence, unless otherwise provided for by statute, rule or regulation.

**104.7.1 Flood Hazard Areas**. Retention of records for *premises* located in *flood hazard areas* shall comply with Appendix G.

**104.8 Liability.** The *code official* or *Department* employee charged with the enforcement of the *Construction Codes,* the *Zoning Regulations* or other pertinent laws or regulations, while acting for the District of Columbia in good faith and without malice in the discharge of the duties required by the *Construction Codes,* the *Zoning Regulations* or other pertinent laws or regulations, shall not thereby be civilly or criminally rendered liable personally and are hereby relieved from personal liability for any damage accruing to persons or property as a result of any act or by reason of an act or omission in the discharge of official duties.

**104.8.1 Legal Defense.** Any suit or criminal complaint instituted against an officer or employee of the *Department* because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of the *Construction Codes,* the *Zoning Regulations* or other pertinent laws or regulations shall be defended by legal representatives of the District of Columbia until the final termination of the proceedings. The *code official* or any subordinate shall not be liable for cost in any action, suit or proceeding that is instituted in pursuance of the provisions of the *Construction Codes,* the *Zoning Regulations* or other pertinent laws or regulations enforced by the *Department.*

**104.9 Approved Materials, Equipment and Devices.** All materials, equipment and devices *approved* for use by the *code official* shall be constructed and installed in accordance with such approval.

**104.9.1 Used Materials, Equipment and Devices.** The use of used materials which meet the requirements of the *Construction Codes* for new materials is permitted. Used *equipment* and devices shall not be reused unless *approved* by the *code official*.

**104.9.2 Unlabeled Products.** Where materials, assemblies or products are required by the *Construction Codes* to be labeled, those materials, assemblies or products which are not labeled, listed or classified by an *approved* testing agency and which are proposed to be installed in the District of Columbia, shall be tested and labeled by an *approved* testing laboratory or shall be *approved* in accordance with Sections 1701 and 1703 of the *Building Code* at the expense of the applicant, before a permit can be granted for this installation.

**104.9.3 Assembled Components.** Any mechanical or electrical appliance which is not labeled, listed or classified by an *approved* testing agency, which is an assembly of individually labeled or listed subassemblies or components and which is proposed to be installed in the District of Columbia, shall be tested and *approved* in accordance with Section 104.9.2 of the *Building Code*, before a permit can be granted for its installation.

**104.9.4 Modular Structures.** Before erecting or installing in the District of Columbia any factory assembled *structure*, manufactured at a remote site and transported in one or more sections, a complete set of drawings shall be submitted for review prior to the issuance of a building permit. These drawings shall include a certificate of approval by a factory inspection agency that has been *approved* by the *code official*. The drawings shall be submitted to the *code official* for plan review and permitting and shall include a set of the manufacturer's installation specifications and designate the applicable portions of construction that are required to have field inspection by the *code official*, including all utility connections, the marriage line connections and the foundation plate nailing patterns. These drawings shall be stamped by a structural engineer or architect licensed in the District of Columbia, and include the site constructed or assembled foundation system details and specifications. Separate permits issued

by the *Department* for plumbing, mechanical, and electrical connections shall be required. Inspections of all work conducted on site shall be in accordance with Section 109. Prior to placement of the factory assembled *structure* on a footing and foundation, all required footing and foundation inspections shall require approval by the *code official.*

**104.10 Modifications.** Wherever there are practical difficulties involved in carrying out the provisions of the *Construction Codes*, the *code official* shall have the authority to grant modifications for individual cases upon application of the *owner* or *owner's* representative; provided, that the *code official* shall first find: (1) that special individual reasons make the strict letter of the *Construction Codes* impractical; (2) that the modification is in compliance with the intent and purpose of the *Construction Codes*,; and (3) that such modification does not lessen health, accessibility, life and fire safety, or structural requirements. The details of the action granting modification shall be recorded and entered in the appropriate files of the *Department*.

**104.10.1 Procedure for Modifications.** The application for modification shall be submitted on a form provided by the *Department* and sealed by the registered design professional if applicable. The final decision of the *code official* shall be in writing and shall be officially recorded with the application for permit in the permanent records of the *Department*.

**104.10.2 Flood Hazard Areas.** Modifications to any provision required in *flood hazard areas* are also subject to Section G105 of Appendix G.

**104.10.3 Projections.** Modifications to *projection* requirements set forth in Chapter 32 shall also comply with Section 3202.4.

**104.11 Alternative Materials, Equipment, Methods of Construction and Design.** The provisions of the *Construction Codes* are not intended to prevent the use of any material, equipment or method of construction not specifically prescribed by the *Construction Codes*, provided any such alternative has been *approved* by the *Department*. Alternative materials, equipment or methods of construction shall be *approved* when the *code official* finds that the proposed design is satisfactory and complies with the intent of the provisions of the *Construction Codes*, and that the material, equipment or method offered is, for the purpose intended, at least the equivalent of that prescribed in the *Construction Codes* in quality, strength, effectiveness, *fire-resistance*, durability and safety. Approvals shall conform to Sections 1701 and 1703 of the *Building Code*. Where the alternative material, design or method of construction is not *approved*, the *code official* shall respond in writing, stating the reasons why the alternative was not *approved*.

**104.11.1 Research Reports.** Supporting data, where necessary to assist in the approval of materials, equipment or methods of construction not specifically provided for in the *Construction Codes* shall consist of valid research reports from sources *approved* by the *code official.*

**104.11.2 Tests.** Whenever there is insufficient evidence of compliance with the provisions of the *Construction Codes,* or evidence that a material, equipment or method of construction does not conform to the requirements of the *Construction Codes*, or in order to substantiate claims for alternative materials or methods, the *code official* shall have the authority to require tests as evidence of compliance to be made at no expense to the government of the District of Columbia. Test methods shall be specified in the *Construction Codes* or by other recognized and accepted test standards in the industry. In the absence of recognized and accepted test methods, the *code official* is authorized to approve appropriate testing procedures. Tests shall be performed by an agency *approved* by the *code official*. Reports of such tests shall be retained by the *code official* for the period required for retention of public records.

**104.12 Reasonable Accommodation Under the Fair Housing Act.** Requests for reasonable accommodation under the Fair Housing Act, 42 USC § 3604(f)(3)(B), as amended, shall be made according to the procedures set forth in 14 DCMR § 111.

104.13 [Expired]

104.14 [Expired].

**Credits**
SOURCE: Amended Mar. 28, 2014; Dec. 23, 2016. Amended emergency effective March 20, 2020. Amended May 29, 2020. Amended emergency effective Sept. 16, 2020; emergency effective Mar. 19, 2021.

Current through District of Columbia Register, Volume 73, Number 27, dated July 3, 2026.

12 DCMR § 104A, 12 DC ADC § 104A

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

## § 6293. Test procedures

### (a) General rule

All test procedures and related determinations prescribed or made by the Secretary with respect to any covered product (or class thereof) which are in effect on March 17, 1987, shall remain in effect until the Secretary amends such test procedures and related determinations under subsection (b).

### (b) Amended and new procedures

(1) TEST PROCEDURES.—

(A) AMENDMENT.—At least once every 7 years, the Secretary shall review test procedures for all covered products and—

(i) amend test procedures with respect to any covered product, if the Secretary determines that amended test procedures would more accurately or fully comply with the requirements of paragraph (3); or

(ii) publish notice in the Federal Register of any determination not to amend a test procedure.

(B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

(C) The Secretary shall direct the National Institute of Standards and Technology to assist in developing new or amended test procedures.

(2) If the Secretary determines, on his own behalf or in response to a petition by any interested person, that a test procedure should be prescribed or amended, the Secretary shall promptly publish in the Federal Register proposed test procedures and afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such procedures. The comment period shall not be less than 60 days and may be extended for good cause shown to not more than 270 days. In prescribing or amending a test procedure, the Secretary shall take into account such information as the Secretary determines relevant to such procedure, including technological developments relating to energy use or energy efficiency of the type (or class) of covered products involved.

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

(4) If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use or, in the case of showerheads, faucets, water closets, or urinals, water use in a representative average use cycle or period of use, as determined by the Secretary, and from representative average unit costs of the energy needed to operate such product during such cycle, or in the case of showerheads, faucets, water closets, or urinals, representative average unit costs of water and wastewater treatment service resulting from the operation of such products during such cycle. The Secretary shall provide information to manufacturers with respect to representative average unit costs of energy, water, and wastewater treatment.

(5) With respect to fluorescent lamp ballasts manufactured on or after January 1, 1990, and to which standards are applicable under section 6295 of this title, the Secretary shall prescribe test procedures that are in accord with ANSI standard C82.2–1984 or other test procedures determined appropriate by the Secretary.

(6) With respect to fluorescent lamps and incandescent reflector lamps to which standards are applicable under subsection (i) of section 6295 of this title, the Secretary shall prescribe test procedures, to be carried out by accredited test laboratories, that take into consideration the applicable IES or ANSI standard.

(7)(A) Test procedures for showerheads and faucets to which standards are applicable under subsection (j) of section 6295 of this title shall be the test procedures specified in ASME A112.18.1M–1989 for such products.

(B) If the test procedure requirements of ASME A112.18.1M–1989 are revised at any time and approved by ANSI, the Secretary shall amend the test procedures established by subparagraph (A) to conform to such revised ASME/ANSI requirements unless the Secretary determines, by rule, that to do so would not meet the requirements of paragraph (3).

(8)(A) Test procedures for water closets and urinals to which standards are applicable under subsection (k) of section 6295 of this title shall be the test procedures specified in ASME A112.19.6–1990 for such products.

(B) If the test procedure requirements of ASME A112.19.6–1990 are revised at any time and approved by ANSI, the Secretary shall amend the test procedures established by subparagraph (A) to conform to such revised ASME/ANSI requirements unless the Secretary determines, by rule, that to do so would not meet the requirements of paragraph (3).

(9) Test procedures for illuminated exit signs shall be based on the test method used under version 2.0 of the Energy Star program of the Environmental Protection Agency for illuminated exit signs.

(10)(A) Test procedures for distribution transformers and low voltage dry-type distribution transformers shall be based on the "Standard Test Method for Measuring the Energy Consumption of Distribution Transformers" prescribed by the National Electrical Manufacturers Association (NEMA TP 2–1998).

(B) The Secretary may review and revise the test procedures established under subparagraph (A).

(C) For purposes of section 6317(a) of this title, the test procedures established under subparagraph (A) shall be considered to be the testing requirements prescribed by the Secretary under section 6317(a)(1) of this title for distribution transformers for which the Secretary makes a determination that energy conservation standards would—

(i) be technologically feasible and economically justified; and

(ii) result in significant energy savings.

(11) Test procedures for traffic signal modules and pedestrian modules shall be based on the test method used under the Energy Star program of the Environmental Protection Agency for traffic signal modules, as in effect on August 8, 2005.

(12)(A) Test procedures for medium base compact fluorescent lamps shall be based on the test methods for compact fluorescent lamps used under the August 9, 2001, version of the Energy Star program of the Environmental Protection Agency and the Department of Energy.

(B) Except as provided in subparagraph (C), medium base compact fluorescent lamps shall meet all test requirements for regulated parameters of section 6295(cc)[1] of this title.

(C) Notwithstanding subparagraph (B), if manufacturers document engineering predictions and analysis that support expected attainment of lumen maintenance at 40 percent rated life and lamp lifetime, medium base compact fluorescent lamps may be marketed before completion of the testing of lamp life and lumen maintenance at 40 percent of rated life.

(13) Test procedures for dehumidifiers shall be based on the test criteria used under the Energy Star Program Requirements for Dehumidifiers developed by the Environmental Protection Agency, as in effect on August 8, 2005, unless revised by the Secretary pursuant to this section.

(14) The test procedure for measuring flow rate for commercial prerinse spray valves shall be based on American Society for Testing and Materials Standard F2324, entitled "Standard Test Method for Pre-Rinse Spray Valves".

(15) The test procedure for refrigerated bottled or canned beverage vending machines shall be based on American National Standards Institute/American Society of Heating, Refrigerating and Air-Conditioning Engineers Standard 32.1-2004, entitled "Methods of Testing for Rating Vending Machines for Bottled, Canned or Other Sealed Beverages".

(16)(A)(i) Test procedures for ceiling fans shall be based on the "Energy Star Testing Facility Guidance Manual: Building a Testing Facility and Performing the Solid State Test Method for ENERGY STAR Qualified Ceiling Fans, Version 1.1" published by the Environmental Protection Agency.

(ii) Test procedures for ceiling fan light kits shall be based on the test procedures referenced in the Energy Star specifications for Residential Light Fixtures and Compact Fluorescent Light Bulbs, as in effect on August 8, 2005.

(B) The Secretary may review and revise the test procedures established under subparagraph (A).

(17) CLASS A EXTERNAL POWER SUPPLIES.—Test procedures for class A external power supplies shall be based on the "Test Method for Calculating the Energy Efficiency of Single-Voltage External AC–DC and AC–AC Power Supplies" published by the Environmental Protection Agency on August 11, 2004, except that the test voltage specified in section 4(d) of that test method shall be only 115 volts, 60 Hz.

(18) METAL HALIDE LAMP BALLASTS.—Test procedures for metal halide lamp ballasts shall be based on ANSI Standard C82.6–2005, entitled "Bal-

lasts for High Intensity Discharge Lamps—Method of Measurement".

(c) **Restriction on certain representations**

(1) No manufacturer, distributor, retailer, or private labeler may make any representation—

(A) in writing (including a representation on a label); or

(B) in any broadcast advertisement,

with respect to the energy use or efficiency or, in the case of showerheads, faucets, water closets, and urinals, water use of a covered product to which a test procedure is applicable under subsection (a) or the cost of energy consumed by such product, unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

(2) Effective 180 days after an amended or new test procedure applicable to a covered product is prescribed or established under subsection (b), no manufacturer, distributor, retailer, or private labeler may make any representation—

(A) in writing (including a representation on a label); or

(B) in any broadcast advertisement,

with respect to energy use or efficiency or, in the case of showerheads, faucets, water closets, and urinals, water use of such product or cost of energy consumed by such product, unless such product has been tested in accordance with such amended or new test procedures and such representation fairly discloses the results of such testing.

(3) On the petition of any manufacturer, distributor, retailer, or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (2) may be extended by the Secretary with respect to the petitioner (but in no event for more than an additional 180 days) if the Secretary determines that the requirements of paragraph (2) would impose an undue hardship on such petitioner.

(d) **Case in which test procedure is not required**

(1) The Secretary is not required to publish and prescribe test procedures for a covered product (or class thereof) if the Secretary determines, by rule, that test procedures cannot be developed which meet the requirements of subsection (b)(3) and publishes such determination in the Federal Register, together with the reasons therefor.

(2) For purposes of section 6297 of this title, a determination under paragraph (1) with respect to any covered product or class shall have the same effect as would a standard prescribed for a covered product (or class).

(e) **Amendment of standard**

(1) In the case of any amended test procedure which is prescribed pursuant to this section, the Secretary shall determine, in the rulemaking carried out with respect to prescribing such procedure, to what extent, if any, the proposed test procedure would alter the measured energy efficiency, measured energy use, or measured water use of any covered product as determined under the existing test procedure.

(2) If the Secretary determines that the amended test procedure will alter the measured efficiency or measured use, the Secretary shall amend

---

[1] So in original. Probably should be section "6295(bb)".

the applicable energy conservation standard during the rulemaking carried out with respect to such test procedure. In determining the amended energy conservation standard, the Secretary shall measure, pursuant to the amended test procedure, the energy efficiency, energy use, or water use of a representative sample of covered products that minimally comply with the existing standard. The average of such energy efficiency, energy use, or water use levels determined under the amended test procedure shall constitute the amended energy conservation standard for the applicable covered products.

(3) Models of covered products in use before the date on which the amended energy conservation standard becomes effective (or revisions of such models that come into use after such date and have the same energy efficiency, energy use, or water use characteristics) that comply with the energy conservation standard applicable to such covered products on the day before such date shall be deemed to comply with the amended energy conservation standard.

(4) The Secretary's authority to amend energy conservation standards under this subsection shall not affect the Secretary's obligation to issue final rules as described in section 6295 of this title.

**(f) Additional consumer and commercial products**

(1) Not later than 2 years after August 8, 2005, the Secretary shall prescribe testing requirements for refrigerated bottled or canned beverage vending machines.

(2) To the maximum extent practicable, the testing requirements prescribed under paragraph (1) shall be based on existing test procedures used in industry.

(Pub. L. 94–163, title III, § 323, Dec. 22, 1975, 89 Stat. 919; Pub. L. 95–619, title IV, §§ 421, 425(a), title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3257, 3265, 3288; Pub. L. 100–12, § 4, Mar. 17, 1987, 101 Stat. 105; Pub. L. 100–357, § 2(c), June 28, 1988, 102 Stat. 672; Pub. L. 100–418, title V, § 5115(c), Aug. 23, 1988, 102 Stat. 1433; Pub. L. 102–486, title I, § 123(d), Oct. 24, 1992, 106 Stat. 2821; Pub. L. 109–58, title I, § 135(b), Aug. 8, 2005, 119 Stat. 627; Pub. L. 110–140, title III, §§ 301(b), 302(a), 324(c), Dec. 19, 2007, 121 Stat. 1550, 1551, 1593.)

AMENDMENTS

2007—Subsec. (b)(1). Pub. L. 110–140, § 302(a), which directed amendment of subsec. (b)(1) by striking "(1)" and all that followed through the "end of the paragraph" and inserting a new par. (1) designation and heading and subpar. (A), was executed by substituting the new par. (1) designation and heading and subpar. (A) for "(1)(A) The Secretary may amend test procedures with respect to any covered product if the Secretary determines that amended test procedures would more accurately or fully comply with the requirements of paragraph (3)." to reflect the probable intent of Congress.

Subsec. (b)(17). Pub. L. 110–140, § 301(b), added par. (17).
Subsec. (b)(18). Pub. L. 110–140, § 324(c), added par. (18).
2005—Subsec. (b)(9) to (16). Pub. L. 109–58, § 135(b)(1), added pars. (9) to (16).
Subsec. (f). Pub. L. 109–58, § 135(b)(2), added subsec. (f).
1992—Subsec. (b)(3). Pub. L. 102–486, § 123(d)(1)(A), inserted "water use (in the case of showerheads, faucets, water closets and urinals)," after "energy use,".
Subsec. (b)(4). Pub. L. 102–486, § 123(d)(1)(B), in first sentence inserted "or, in the case of showerheads, faucets, water closets, or urinals, water use" after "energy use" and ", or in the case of showerheads, faucets, water

closets, or urinals, representative average unit costs of water and wastewater treatment service resulting from the operation of such products during such cycle" after "such cycle", and in second sentence inserted ", water, and wastewater treatment" before period at end.
Subsec. (b)(6) to (8). Pub. L. 102–486, § 123(d)(1)(C), added pars. (6) to (8).
Subsec. (c)(1). Pub. L. 102–486, § 123(d)(2), in closing provisions inserted "or, in the case of showerheads, faucets, water closets, and urinals, water use" after "efficiency".
Subsec. (c)(2). Pub. L. 102–486, § 123(d)(3), in introductory provisions substituted "prescribed or established" for "prescribed".
Pub. L. 102–486, § 123(d)(2), in closing provisions inserted "or, in the case of showerheads, faucets, water closets, and urinals, water use" after "efficiency".
Subsec. (e)(1) to (3). Pub. L. 102–486, § 123(d)(4), substituted ", measured energy use, or measured water use" for "or measured energy use" in par. (1) and "energy efficiency, energy use, or water use" for "energy efficiency or energy use" in two places in par. (2) and once in par. (3).
1988—Subsec. (b)(1)(C). Pub. L. 100–418 substituted "National Institute of Standards and Technology" for "National Bureau of Standards".
Subsec. (b)(5). Pub. L. 100–357 added par. (5).
1987—Pub. L. 100–12 amended section generally, revising and restating as subsecs. (a) to (e) provisions formerly contained in subsecs. (a) to (c).
1978—Subsec. (a)(1), (2). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator", meaning Administrator of the Federal Energy Administration, wherever appearing.
Subsec. (a)(3). Pub. L. 95–619, §§ 425(a), 691(b)(2), struck out "Except as provided in paragraph (6)," before "The Secretary", struck out provision requiring proposed test procedures to be published not later than June 30, 1976, with certain excepted cases not required to be published before Sept. 30, 1976 and June 30, 1977, and substituted "Secretary" for "Administrator".
Subsec. (a)(4). Pub. L. 95–619, §§ 421(a), 691(b)(2), redesignated provisions formerly classified to subpar. (A), as par. (4) and in par. (4), as so redesignated, struck out "Except as provided in paragraph (6)," before "The Secretary shall", substituted "Secretary" for "Administrator" in two places, inserted provision requiring the prescription of test procedures not later than Jan. 31, 1978, and struck out subpar. (B) requiring the prescription of test procedures not later than Sept. 30, 1976, with certain excepted cases required to be prescribed not later than Dec. 31, 1976 and Sept. 30 1977.
Subsec. (a)(5). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator" wherever appearing.
Subsec. (a)(6). Pub. L. 95–619, § 421(b), redesignated existing provisions as subpar. (A) and, in subpar. (A) as so redesignated, substituted "Secretary" for "Administrator", struck out provisions relating to the authority to delay publication of proposed test procedures, inserted requirement that a determination of a necessary prescription delay be submitted in a report to Congress, inserted specific ninety day time limitation for delayed prescriptions, and added subpar. (B).
Subsec. (a)(7). Pub. L. 95–619, § 421(c), added par. (7).
Subsec. (b). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator" wherever appearing.
Subsec. (c). Pub. L. 95–619, § 421(d), redesignated existing provisions as par. (1), substituted "180 days" for "90 days" and redesignated former pars. (1) and (2) as subpars. (A) and (B), respectively, and added par. (2).

EFFECTIVE DATE OF 2007 AMENDMENT

Amendment by Pub. L. 110–140 effective on the date that is 1 day after Dec. 19, 2007, see section 1601 of Pub. L. 110–140, set out as an Effective Date note under section 1824 of Title 2, The Congress.

**§ 6294. Labeling**

**(a) In general**

(1) The Commission shall prescribe labeling rules under this section applicable to all covered prod-

ucts of each of the types specified in paragraphs (1), (2), (4), (6), and (8) through (12) of section 6292(a) of this title, except to the extent that, with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with this section is not technologically or economically feasible.

(2)(A) The Commission shall prescribe labeling rules under this section applicable to all covered products of each of the types specified in paragraphs (3), (5), and (7) of section 6292(a) of this title, except to the extent that with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with this section is not technologically or economically feasible or is not likely to assist consumers in making purchasing decisions.

(B) The Commission shall prescribe labeling rules under this section applicable to the covered product specified in paragraph (13) of section 6292(a) of this title and to which standards are applicable under section 6295 of this title. Such rules shall provide that the labeling of any fluorescent lamp ballast manufactured on or after January 1, 1990, will indicate conspicuously, in a manner prescribed by the Commission under subsection (b) by July 1, 1989, a capital letter "E" printed within a circle on the ballast and on the packaging of the ballast or of the luminaire into which the ballast has been incorporated.

(C) METAL HALIDE LAMP FIXTURES.—

(i) IN GENERAL.—The Commission shall issue labeling rules under this section applicable to the covered product specified in section 6292(a)(19) of this title and to which standards are applicable under section 6295 of this title.

(ii) LABELING.—The rules shall provide that the labeling of any metal halide lamp fixture manufactured on or after the later of January 1, 2009, or the date that is 270 days after December 19, 2007, shall indicate conspicuously, in a manner prescribed by the Commission under subsection (b) by July 1, 2008, a capital letter "E" printed within a circle on the packaging of the fixture, and on the ballast contained in the fixture.

(D)(i) Not later than 18 months after October 24, 1992, the Commission shall prescribe labeling rules under this section applicable to general service fluorescent lamps, medium base compact fluorescent lamps, and general service incandescent lamps. Except as provided in clause (ii), such rules shall provide that the labeling of any general service fluorescent lamp, medium base compact fluorescent lamp, and general service incandescent lamp manufactured after the 12-month period beginning on the date of the publication of such rule shall indicate conspicuously on the packaging of the lamp, in a manner prescribed by the Commission under subsection (b), such information as the Commission deems necessary to enable consumers to select the most energy efficient lamps which meet their requirements. Labeling information for incandescent lamps shall be based on performance when operated at 120 volts input, regardless of the rated lamp voltage.

(ii) If the Secretary determines that compliance with the standards specified in section 6295(i)

of this title for any lamp will result in the discontinuance of the manufacture of such lamp, the Commission may exempt such lamp from the labeling rules prescribed under clause (i).

(iii) RULEMAKING TO CONSIDER EFFECTIVENESS OF LAMP LABELING.—

(I) IN GENERAL.—Not later than 1 year after December 19, 2007, the Commission shall initiate a rulemaking to consider—

(aa) the effectiveness of current lamp labeling for power levels or watts, light output or lumens, and lamp lifetime; and

(bb) alternative labeling approaches that will help consumers to understand new high-efficiency lamp products and to base the purchase decisions of the consumers on the most appropriate source that meets the requirements of the consumers for lighting level, light quality, lamp lifetime, and total lifecycle cost.

(II) COMPLETION.—The Commission shall—

(aa) complete the rulemaking not later than the date that is 30 months after December 19, 2007; and

(bb) consider reopening the rulemaking not later than 180 days before the effective dates of the standards for general service incandescent lamps established under section 6295(i)(1)(A) of this title, if the Commission determines that further labeling changes are needed to help consumers understand lamp alternatives.

(E)(i) Not later than one year after October 24, 1992, the Commission shall prescribe labeling rules under this section for showerheads and faucets to which standards are applicable under subsection (j) of section 6295 of this title. Such rules shall provide that the labeling of any showerhead or faucet manufactured after the 12-month period beginning on the date of the publication of such rule shall be consistent with the marking and labeling requirements of ASME A112.18.1M–1989, except that each showerhead and flow restricting or controlling spout-end device shall bear a permanent legible marking indicating the flow rate, expressed in gallons per minute (gpm) or gallons per cycle (gpc), and the flow rate value shall ·be the actual flow rate or the maximum flow rate specified by the standards established in subsection (j) of section 6295 of this title.

(ii) If the marking and labeling requirements of ASME A112.18.1M–1989 are revised at any time and approved by ANSI, the Commission shall amend the labeling rules established pursuant to clause (i) to be consistent with such revised ASME/ANSI requirements unless such requirements are inconsistent with the purposes of this chapter or the requirement specified in clause (i) requiring each showerhead and flow restricting or controlling spout-end device to bear a permanent legible marking indicating the flow rate of such product.

(F)(i) Not later than one year after October 24, 1992, the Commission shall prescribe labeling rules under this section for water closets and urinals to which standards are applicable under subsection (k) of section 6295 of this title. Such rules shall provide that the labeling of any water closet or urinal manufactured after the 12-month period beginning on the date of the publication of such rule shall be consistent with the marking and labeling requirements of ASME A112.19.2M–1990, except that each fixture (and flushometer valve as-

sociated with such fixture) shall bear a permanent legible marking indicating the water use, expressed in gallons per flush (gpf), and the water use value shall be the actual water use or the maximum water use specified by the standards established in subsection (k) of section 6295 of this title.

(ii) If the marking and labeling requirements of ASME A112.19.2M–1990 are revised at any time and approved by ANSI, the Commission shall amend the labeling rules established pursuant to clause (i) to be consistent with such revised ASME/ANSI requirements unless such requirements are inconsistent with the purposes of this chapter or the requirement specified in clause (i) requiring each fixture and flushometer valve to bear a permanent legible marking indicating the water use of such fixture or flushometer valve.

(iii) Any labeling rules prescribed under this subparagraph before January 1, 1997, shall provide that, with respect to any gravity tank-type white 2-piece toilet which has a water use greater than 1.6 gallons per flush (gpf), any printed matter distributed or displayed in connection with such product (including packaging and point of sale material, catalog material, and print advertising) shall include, in a conspicuous manner, the words "For Commercial Use Only".

(G)(i) Not later than 90 days after August 8, 2005, the Commission shall initiate a rulemaking to consider—

(I) the effectiveness of the consumer products labeling program in assisting consumers in making purchasing decisions and improving energy efficiency; and

(II) changes to the labeling rules (including categorical labeling) that would improve the effectiveness of consumer product labels.

(ii) Not later than 2 years after August 8, 2005, the Commission shall complete the rulemaking initiated under clause (i).

(H)(i) Not later than 18 months after August 8, 2005, the Commission shall issue by rule, in accordance with this section, labeling requirements for the electricity used by ceiling fans to circulate air in a room.

(ii) The rule issued under clause (i) shall apply to products manufactured after the later of—

(I) January 1, 2009; or

(II) the date that is 60 days after the final rule is issued.

(I) LABELING REQUIREMENTS.—

(i) IN GENERAL.—Subject to clauses (ii) through (iv), not later than 18 months after the date of issuance of applicable Department of Energy testing procedures, the Commission, in consultation with the Secretary and the Administrator of the Environmental Protection Agency (acting through the Energy Star program), shall, by regulation, prescribe labeling or other disclosure requirements for the energy use of—

(I) televisions;

(II) personal computers;

(III) cable or satellite set-top boxes;

(IV) stand-alone digital video recorder boxes; and

(V) personal computer monitors.

(ii) ALTERNATE TESTING PROCEDURES.—In the absence of applicable testing procedures described

in clause (i) for products described in subclauses (I) through (V) of that clause, the Commission may, by regulation, prescribe labeling or other disclosure requirements for a consumer product category described in clause (i) if the Commission—

(I) identifies adequate non-Department of Energy testing procedures for those products; and

(II) determines that labeling of, or other disclosures relating to, those products is likely to assist consumers in making purchasing decisions.

(iii) DEADLINE AND REQUIREMENTS FOR LABELING.—

(I) DEADLINE.—Not later than 18 months after the date of promulgation of any requirements under clause (i) or (ii), the Commission shall require labeling of, or other disclosure requirements for, electronic products described in clause (i).

(II) REQUIREMENTS.—The requirements prescribed under clause (i) or (ii) may include specific requirements for each electronic product to be labeled with respect to the placement, size, and content of Energy Guide labels.

(iv) DETERMINATION OF FEASIBILITY.—Clause (i) or (ii) shall not apply in any case in which the Commission determines that labeling in accordance with this subsection—

(I) is not technologically or economically feasible; or

(II) is not likely to assist consumers in making purchasing decisions.

(3) The Commission may prescribe a labeling rule under this section applicable to covered products of a type specified in paragraph (20) of section 6292(a) of this title (or a class thereof) if—

(A) the Commission or the Secretary has made a determination with respect to such type (or class thereof) that labeling in accordance with this section will assist purchasers in making purchasing decisions,

(B) the Secretary has prescribed test procedures under section 6293(b)(1)(B) of this title for such type (or class thereof), and

(C) the Commission determines with respect to such type (or class thereof) that application of labeling rules under this section to such type (or class thereof) is economically and technologically feasible.

(4) Any determination under this subsection shall be published in the Federal Register.

(5)(A) For covered products described in subsections (u) through (ff) of section 6295 of this title, after a test procedure has been prescribed under section 6293 of this title, the Secretary or the Commission, as appropriate, may prescribe, by rule, under this section labeling requirements for the products.

(B) In the case of products to which TP–1 standards under section 6295(y) of this title apply, labeling requirements shall be based on the "Standard for the Labeling of Distribution Transformer Efficiency" prescribed by the National Electrical Manufacturers Association (NEMA TP–3) as in effect on August 8, 2005.

(C) In the case of dehumidifiers covered under section 6295(dd) of this title, the Commission shall not require an "Energy Guide" label.

(6) AUTHORITY TO INCLUDE ADDITIONAL PRODUCT CATEGORIES.—The Commission may, by regulation, require labeling or other disclosures in accordance with this subsection for any consumer product not specified in this subsection or section 6292 of this title if the Commission determines that labeling for the product is likely to assist consumers in making purchasing decisions.

**(b) Rules in effect; new rules**

(1)(A) Any labeling rule in effect on March 17, 1987, shall remain in effect until amended, by rule, by the Commission.

(B) After March 17, 1987, and not later than 30 days after the date on which a proposed test procedure applicable to a covered product of any of the types specified in paragraphs (1) through (13), and paragraphs (15) through (20) of section 6292(a) of this title (or class thereof) is prescribed under section 6293(b) of this title, the Commission shall publish a proposed labeling rule applicable to such type (or class thereof).

(2) The Commission shall afford interested persons an opportunity to present written or oral data, views, and comments with respect to the proposed labeling rules published under paragraph (1). The period for such presentations shall not be less than 45 days.

(3) Not earlier than 45 days nor later than 60 days after the date on which test procedures are prescribed under section 6293(b) of this title with respect to covered products of any type (or class thereof) specified in paragraphs (1) through (12) of section 6292(a) of this title, the Commission shall prescribe labeling rules with respect to covered products of such type (or class thereof). Not earlier than 45 days after the date on which test procedures are prescribed under section 6293(b) of this title with respect to covered products of a type specified in paragraph (20) of section 6292(a) of this title, the Commission may prescribe labeling rules with respect to covered products of such type (or class thereof).

(4) A labeling rule prescribed under paragraph (3) shall take effect not later than 3 months after the date of prescription of such rule, except that such rules may take effect not later than 6 months after such date of prescription if the Commission determines that such extension is necessary to allow persons subject to such rules adequate time to come into compliance with such rules.

(5) The Commission may delay the publication of a proposed labeling rule, or the prescription of a labeling rule, beyond the dates specified in paragraph (1) or (3), if it determines that it cannot publish proposed labeling rules or prescribe labeling rules which meet the requirements of this section on or prior to the date specified in the applicable paragraph and publishes such determination in the Federal Register, together with the reasons therefor. In any such case, it shall publish proposed labeling rules or prescribe labeling rules for covered products of such type (or class thereof) as soon as practicable unless it determines (A) that labeling in accordance with this section is not economically or technically feasible, or (B) in the case of a type specified in paragraphs (3), (5), and (7) of section 6292(a) of this title, that labeling in accordance with this section is not likely to assist consumers in purchasing decisions. Any such determination shall be published in the Federal Register, together with the reasons therefor. This paragraph shall not apply to the prescription of a labeling rule with respect to covered products of a type specified in paragraph (20) of section 6292(a) of this title.

**(c) Content of label**

(1) Subject to paragraph (6), a rule prescribed under this section shall require that each covered product in the type or class of covered products to which the rule applies bear a label which discloses—

(A) the estimated annual operating cost of such product (determined in accordance with test procedures prescribed under section 6293 of this title), except that if—

(i) the Secretary determines that disclosure of estimated annual operating cost is not technologically feasible, or

(ii) the Commission determines that such disclosure is not likely to assist consumers in making purchasing decisions or is not economically feasible,

the Commission shall require disclosure of a different useful measure of energy consumption (determined in accordance with test procedures prescribed under section 6293 of this title); and

(B) information respecting the range of estimated annual operating costs for covered products to which the rule applies; except that if the Commission requires disclosure under subparagraph (A) of a measure of energy consumption different from estimated annual operating cost, then the label shall disclose the range of such measure of energy consumption of covered products to which such rule applies.

(2) A rule under this section shall include the following:

(A) A description of the type or class of covered products to which such rule applies.

(B) Subject to paragraph (6), information respecting the range of estimated annual operating costs or other useful measure of energy consumption (determined in such manner as the rule may prescribe) for such type or class of covered products.

(C) A description of the test procedures under section 6293 of this title used in determining the estimated annual operating costs or other measure of energy consumption of the type or class of covered products.

(D) A prototype label and directions for displaying such label.

(3) A rule under this section shall require that the label be displayed in a manner that the Commission determines is likely to assist consumers in making purchasing decisions and is appropriate to carry out this part. The Commission may permit a tag to be used in lieu of a label in any case in which the Commission finds that a tag will carry out the purposes for which the label was intended.

(4) A rule under this section applicable to a covered product may require disclosure, in any printed matter displayed or distributed at the point of sale of such product, of any information which may be required under this section to be disclosed on the label of such product. Requirements under this paragraph shall not apply to any broadcast

advertisement or any advertisement in any newspaper, magazine, or other periodical.

(5) The Commission may require that a manufacturer of a covered product to which a rule under this section applies—

(A) include on the label,

(B) separately attach to the product, or

(C) ship with the product,

additional information relating to energy consumption, including instructions for the maintenance, use, or repair of the covered product, if the Commission determines that such additional information would assist consumers in making purchasing decisions or in using such product, and that such requirement would not be unduly burdensome to manufacturers.

(6) The Commission may delay the effective date of the requirement specified in paragraph (1)(B) of this subsection applicable to a type or class of covered product, insofar as it requires the disclosure on the label of information respecting range of a measure of energy consumption, for not more than 12 months after the date on which the rule under this section is first applicable to such type or class, if the Commission determines that such information will not be available within an adequate period of time before such date.

(7) Paragraphs (1), (2), (3), (5), and (6) of this subsection shall not apply to the covered product specified in paragraphs (13), (14), (15), (16), (17), and (18) of section 6292(a) of this title.

(8) If a manufacturer of a covered product specified in paragraph (15) or (17) of section 6292(a) of this title elects to provide a label for such covered product conveying the estimated annual operating cost of such product or the range of estimated annual operating costs for the type or class of such product—

(A) such estimated cost or range of costs shall be determined in accordance with test procedures prescribed under section 6293 of this title;

(B) the format of such label shall be in accordance with a format prescribed by the Commission; and

(C) such label shall be displayed in a manner, prescribed by the Commission, to be likely to assist consumers in making purchasing decisions and appropriate to carry out the purposes of this chapter.

(9) DISCRETIONARY APPLICATION.—The Commission may apply paragraphs (1), (2), (3), (5), and (6) of this subsection to the labeling of any product covered by paragraph (2)(I) or (6) of subsection (a).

### (d) Effective date

A rule under this section (or an amendment thereto) shall not apply to any covered product the manufacture of which was completed prior to the effective date of such rule or amendment, as the case may be.

### (e) Study of certain products

The Secretary, in consultation with the Commission, shall study consumer products for which labeling rules under this section have not been proposed, in order to determine (1) the aggregate energy consumption of such products, and (2) whether the imposition of labeling requirements under this section would be feasible and useful to consumers in making purchasing decisions. The Secretary shall include the results of such study in the annual report under section 6308 of this title.

### (f) Consultation

The Secretary and the Commission shall consult with each other on a continuing basis as may be necessary or appropriate to carry out their respective responsibilities under this part. Before the Commission makes any determination under subsection (a)(1), it shall obtain the views of the Secretary and shall take such views into account in making such determination.

### (g) Other authority of the Commission

Until such time as labeling rules under this section take effect with respect to a type or class of covered product, this section shall not affect any authority of the Commission under the Federal Trade Commission Act [15 U.S.C. 41 et seq.] to require labeling with respect to energy consumption of such type or class of covered product.

(Pub. L. 94–163, title III, § 324, Dec. 22, 1975, 89 Stat. 920; Pub. L. 95–619, title IV, § 425(b), (c), title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3265, 3288; Pub. L. 100–12, § 11(a)(1), (b)(2), Mar. 17, 1987, 101 Stat. 124, 125; Pub. L. 100–357, § 2(d), June 28, 1988, 102 Stat. 672; Pub. L. 102–486, title I, § 123(e), Oct. 24, 1992, 106 Stat. 2822; Pub. L. 105–388, § 5(a)(4), Nov. 13, 1998, 112 Stat. 3478; Pub. L. 109–58, title I, § 137, Aug. 8, 2005, 119 Stat. 645; Pub. L. 110–140, title III, §§ 321(b), 324(d), 325, Dec. 19, 2007, 121 Stat. 1584, 1593, 1595; Pub. L. 112–210, § 10(a)(12), Dec. 18, 2012, 126 Stat. 1525; Pub. L. 115–115, § 2(c)(2), Jan. 12, 2018, 131 Stat. 2281.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a)(2)(E)(ii), (F)(ii) and (c)(8)(C), was in the original "this Act", meaning Pub. L. 94–163, Dec. 22, 1975, 89 Stat. 871, as amended, known as the Energy Policy and Conservation Act. For complete classification of this Act to the Code, see Short Title note set out under section 6201 of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (g), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, as amended, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

AMENDMENTS

2018—Pub. L. 115–115 substituted "(20) of section 6292(a)" for "(19) of section 6292(a)" wherever appearing.

2012—Subsec. (c)(9). Pub. L. 112–210, § 10(a)(12), made technical amendment to directory language of Pub. L. 110–140, § 325(b). See 2007 Amendment note below.

2007—Subsec. (a)(2)(C). Pub. L. 110–140, § 324(d)(2), added subpar. (C). Former subpar. (C) redesignated (D).

Subsec. (a)(2)(C)(iii). Pub. L. 110–140, § 321(b), added cl. (iii).

Subsec. (a)(2)(D) to (H). Pub. L. 110–140, § 324(d)(1), redesignated subpars. (C) to (G) as (D) to (H), respectively.

Subsec. (a)(2)(I). Pub. L. 110–140, § 325(a)(1), added subpar. (I).

Subsec. (a)(6). Pub. L. 110–140, § 325(a)(2), added par. (6).

Subsec. (c)(9). Pub. L. 110–140, § 325(b), as amended by Pub. L. 112–210, § 10(a)(12), added par. (9).

2005—Subsec. (a)(2)(F), (G). Pub. L. 109–58, § 137(a), added subpars. (F) and (G).

Subsec. (a)(5). Pub. L. 109–58, § 137(b), added par. (5).

1998—Subsec. (a)(2)(C)(ii). Pub. L. 105–388 substituted "section 6295(i)" for "section 6295(j)".

1992—Subsec. (a)(2)(C) to (E). Pub. L. 102–486, § 123(e)(1), added subpars. (C) to (E).

Subsec. (a)(3). Pub. L. 102–486, § 123(e)(2), substituted "(19)" for "(14)".

Subsec. (b)(1)(B). Pub. L. 102–486, § 123(e)(3), substituted "(13), and paragraphs (15) through (19)" for "(14)".

Subsec. (b)(3), (5). Pub. L. 102–486, § 123(e)(4), substituted "(19)" for "(14)".

Subsec. (c)(7). Pub. L. 102–486, § 123(e)(5)(A), substituted "paragraphs (13), (14), (15), (16), (17), and (18) of section 6292(a)" for "paragraph (13) of section 6292".

Subsec. (c)(8). Pub. L. 102–486, § 123(e)(5)(B), added par. (8).

1988—Subsec. (a)(2). Pub. L. 100–357, § 2(d)(1), designated existing provision as subpar. (A) and added subpar. (B).

Subsecs. (a)(3), (b)(1)(B), (3), (5). Pub. L. 100–357, § 2(d)(2), substituted "(14)" for "(13)".

Subsec. (c)(7). Pub. L. 100–357, § 2(d)(3), added par. (7).

1987—Subsec. (a). Pub. L. 100–12, § 11(b)(2)(A), inserted heading.

Subsec. (a)(1). Pub. L. 100–12, § 11(a)(1)(A), substituted "paragraphs (1), (2), (4), (6), and (8) through (12)" for "paragraphs (1) through (9)".

Subsec. (a)(2). Pub. L. 100–12, § 11(a)(1)(B), substituted "paragraphs (3), (5), and (7)" for "paragraphs (10) through (13)".

Subsec. (a)(3). Pub. L. 100–12, § 11(a)(1)(C)(i), substituted "paragraph (13)" for "paragraph (14)".

Subsec. (a)(3)(A). Pub. L. 100–12, § 11(a)(1)(C)(ii), added subpar. (A) and struck out former subpar. (A) which read as follows: "the Commission or the Secretary has made a determination with respect to such type (or class thereof) under section 6293(a)(5)(B) of this title,".

Subsec. (a)(3)(B). Pub. L. 100–12, § 11(a)(1)(C)(iii), substituted "section 6293(b)(1)(B)" for "section 6293(a)(5)".

Subsec. (b). Pub. L. 100–12, § 11(a)(1)(D), inserted heading.

Subsec. (b)(1). Pub. L. 100–12, § 11(a)(1)(D), added par. (1) and struck out former par. (1) which read as follows: "Not later than 30 days after the date on which a proposed test procedure applicable to a covered product or any of the types specified in paragraphs (1) through (14) of section 6292(a) of this title (or class thereof) is published under section 6293(a) of this title, the Commission shall publish a proposed labeling rule applicable to such type (or class thereof)."

Subsec. (b)(3). Pub. L. 100–12, § 11(a)(1)(E), substituted "section 6293(b)" for "section 6293" in two places, "(12)" for "(13)", and "(13)" for "(14)".

Subsec. (b)(5). Pub. L. 100–12, § 11(a)(1)(F), substituted "(3), (5), and (7)" for "(10) through (13)" and "(13)" for "(14)".

Subsec. (c). Pub. L. 100–12, § 11(b)(2)(B), inserted heading.

Subsec. (d). Pub. L. 100–12, § 11(b)(2)(C), inserted heading.

Subsec. (e). Pub. L. 100–12, § 11(b)(2)(D), inserted heading.

Subsec. (f). Pub. L. 100–12, § 11(b)(2)(E), inserted heading.

Pub. L. 100–12, § 11(a)(1)(G), struck out "or (2)" after "subsection (a)(1)".

Subsec. (g). Pub. L. 100–12, § 11(b)(2)(F), inserted heading.

1978—Subsec. (a)(1), (2). Pub. L. 95–619, § 425(b), struck out labeling rule exception where Administrator had determined under section 6293(a)(6) of this title that test procedures could not be developed pursuant to section 6293(b) of this title.

Subsec. (a)(3). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator", meaning Administrator of the Federal Energy Administration, in cls. (A) and (B).

Subsec. (c)(1)(A)(i). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator".

Subsec. (c)(5). Pub. L. 95–619, § 425(c), inserted "including instructions for the maintenance, use, or repair of the covered product," after "energy consumption".

Subsecs. (e), (f). Pub. L. 95–619, § 691(b)(2), substituted "Secretary" for "Administrator" wherever appearing.

EFFECTIVE DATE OF 2012 AMENDMENT

Amendment by Pub. L. 112–210 effective as if included in the Energy Independence and Security Act of 2007, Pub. L. 110–140, see section 10(a)(13) of Pub. L. 112–210, set out as a note under section 6291 of this title.

EFFECTIVE DATE OF 2007 AMENDMENT

Amendment by Pub. L. 110–140 effective on the date that is 1 day after Dec. 19, 2007, see section 1601 of Pub.

L. 110–140, set out as an Effective Date note under section 1824 of Title 2, The Congress.

MARKET ASSESSMENTS AND CONSUMER AWARENESS
PROGRAM

Pub. L. 110–140, title III, § 321(c), Dec. 19, 2007, 121 Stat. 1584, provided that:

"(1) IN GENERAL.—In cooperation with the Administrator of the Environmental Protection Agency, the Secretary of Commerce, the Federal Trade Commission, lighting and retail industry associations, energy efficiency organizations, and any other entities that the Secretary of Energy determines to be appropriate, the Secretary of Energy shall—

"(A) conduct an annual assessment of the market for general service lamps and compact fluorescent lamps—

"(i) to identify trends in the market shares of lamp types, efficiencies, and light output levels purchased by residential and nonresidential consumers; and

"(ii) to better understand the degree to which consumer decisionmaking is based on lamp power levels or watts, light output or lumens, lamp lifetime, and other factors, including information required on labels mandated by the Federal Trade Commission;

"(B) provide the results of the market assessment to the Federal Trade Commission for consideration in the rulemaking described in section 324(a)(2)(C)(iii) of the Energy Policy and Conservation Act (42 U.S.C. 6294(a)(2)(C)(iii)); and

"(C) in cooperation with industry trade associations, lighting industry members, utilities, and other interested parties, carry out a proactive national program of consumer awareness, information, and education that broadly uses the media and other effective communication techniques over an extended period of time to help consumers understand the lamp labels and make energy-efficient lighting choices that meet the needs of consumers.

"(2) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to carry out this subsection $10,000,000 for each of fiscal years 2009 through 2012."

## § 6294a. Energy Star program

### (a) In general

There is established within the Department of Energy and the Environmental Protection Agency a voluntary program to identify and promote energy-efficient products and buildings in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards.

### (b) Division of responsibilities

Responsibilities under the program shall be divided between the Department of Energy and the Environmental Protection Agency in accordance with the terms of applicable agreements between those agencies.

### (c) Duties

The Administrator and the Secretary shall—

(1) promote Energy Star compliant technologies as the preferred technologies in the marketplace for—

(A) achieving energy efficiency; and

(B) reducing pollution;

(2) work to enhance public awareness of the Energy Star label, including by providing special outreach to small businesses;

(3) preserve the integrity of the Energy Star label;

(4) regularly update Energy Star product criteria for product categories;

Add. 13

West's District of Columbia Code Annotated 2001 Edition
  Division VIII. General Laws.
    Title 45. Compilation and Construction of Code. (Refs & Annos)
      Chapter 2. General Rule of Severability.

DC ST § 45-201
Formerly cited as DC ST 1981 § 49-601

§ 45-201. Established; exceptions.

Currentness

(a) Except as provided in subsection (b) of this section, if any provision of any act of the Council of the District of Columbia or the application thereof to any person or circumstance is held to be unconstitutional or beyond the statutory authority of the Council of the District of Columbia, or otherwise invalid, the declaration of invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of each act of the Council of the District of Columbia are deemed severable.

(b) The Council of the District of Columbia may provide, within the provisions of a specific act, that the provisions of a specific act are non severable or that certain specified provisions are deemed inoperative if certain other provisions of the act are declared invalid. If the Council of the District of Columbia provides for a special nonseverability clause as provided in this subsection, the long title of the act shall reflect the inclusion of a special nonseverability clause.

**Credits**
(Mar. 14, 1984, D.C. Law 5-56, § 2, 30 DCR 6286.)

Notes of Decisions (3)

DC CODE § 45-201
Current through April 29, 2026. Some sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 14