Case No. 26-7050

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,

*Appellants,*

v.

DISTRICT OF COLUMBIA,

*Appellee.*

———————————

On Appeal from the United States District Court
for the District of Columbia, No. 1:24-cv-02942-ACR

———————————

## BRIEF OF *AMICI CURIAE* ENERGY AND ENVIRONMENTAL LAW PROFESSORS IN SUPPORT OF APPELLEE

———————————

DENISE GRAB (NO. 55763)
ELIAS VAN EMMERICK*
JULIA E. STEIN (NO. 65402)
Frank G. Wells Environmental Law
Clinic
UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
grab.elc@law.ucla.edu

*Counsel for* Amici Curiae

*\*Admitted only in California;
practicing under the supervision of
D.C. Circuit Bar members*

July 24, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.    Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing before this Court are listed or referenced in the Brief for the Appellee the District of Columbia (filed July 17, 2026): *Amici* William Boyd, Lincoln Davies, Daniel A. Farber, Sharon Jacobs, Alexandra Klass, Joshua C. Macey, Heather Payne, Melissa Powers, Jim Rossi, David B. Spence, and Shelley H. Welton.

## II.    Ruling Under Review

The ruling under review is the Memorandum Opinion and Order dated March 26, 2026, entered by Judge Ana C. Reyes below. *National Association of Home Builders of the United States, et al. v. District of Columbia*, No. 24-cv-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026).

## III.    Related Cases

Amici are not aware of any related cases in this Court. There are two cases pending in other Courts of Appeals that raise similar issues: *Maryland Building Industry Association, Inc. v. McIlwain*, No. 26-1552 (4th Cir.) and *National Association of Home Builders of the U.S. v. Montgomery County*, No. 26-1449 (4th Cir.)

# RULE 29 STATEMENTS

*Amici* certify that all parties in this proceeding have consented to the filing of this amicus brief.

Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel for *Amici* states that no party or party's counsel authored this brief in whole or in part, and no other person besides *Amici* or their counsel contributed money intended to fund preparing or submitting the brief.

Pursuant to D.C. Cir. R. 29(d), undersigned counsel for *Amici* state that a separate brief is necessary due to *Amici*'s distinct expertise and interests. *Amici* are expert professors engaged in the study and teaching of energy and environmental law and policy. No other *amici curiae* appearing in this case share these perspectives or expertise, as far as *Amici* are aware. Accordingly, *Amici*, through counsel, certify that filing a joint brief would not be practicable.

*/s/ Denise Grab*
DENISE GRAB
July 24, 2026

ii

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

    I.   Parties and *Amici* ........................................................ i

    II.  Ruling Under Review .................................................. i

    III. Related Cases ............................................................ i

RULE 29 STATEMENTS ................................................................ ii

TABLE OF AUTHORITIES ........................................................... iv

GLOSSARY OF ABBREVIATIONS ............................................. vii

*AMICI CURIAE*'S STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE .................................................1

SUMMARY OF ARGUMENT ..........................................................6

ARGUMENT ....................................................................................8

    I.   Congress Has Firmly and Repeatedly Affirmed State and Local Governments as the Regulators Responsible for Local Distribution Infrastructure .......................................8

        A.   State and Local Governments Have Regulated Local Distribution Since the Inception of Utility Regulation .........................8

        B.   Congress Has Explicitly Delegated Police Powers Analogous to Those of a State to the Local District of Columbia Government, Including Control over Gas Distribution and Building Codes ............12

    II.  Appellants' Reading of EPCA Would Upend Congress's Federalist System of Utility Regulation ...................................15

    III. Appellants' Reading of EPCA Would Create a Regulatory Void in Contradiction of Congress's Intent ................................18

CONCLUSION .............................................................................21

# TABLE OF AUTHORITIES

**CASES**

*Ass'n of Contracting Plumbers v. City of New York*, No. 25-977, 2026 WL 1871692 (2nd Cir., June 30, 2026) ................................................................22

*E. Ohio Gas Co. v. Tax Comm'n of Ohio*, 283 U.S. 465 (1931) ..............................9

*Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) ...... 11, 19

*Fed. Power Comm'n v. E. Ohio. Gas Co.*, 338 U.S. 464 (1950)............................11

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1 (1961)……...12, 19

*Firemen's Ins. Co. of Washington, D.C. v. Washington*, 483 F.2d 1323 (D.C. Cir. 1973) ..................................................................................................................6

*Gen Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ..................................... 11, 12, 16

*Missouri v. Kan. Nat. Gas Co.*, 265 U.S. 298 (1924) ..........................................9

*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-cv-03024, 2026 WL 817322 (D. Md. Mar. 25, 2026) ..........................................22

*ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) ..........................................11

*Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329 (1951)… ............................................................................................................. 12, 20

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507 (1947)… ........................................................................................................................12

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ..........................................9

*Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927).....9

*Rinnai America Corp. v. South Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093 (9th Cir., July 2, 2026) ................................................................22

*S. Coast Air Quality Mgmt. Dist. v. Fed. Energy Regul. Comm'n*, 621 F.3d 1085 (9th Cir. 2010) ................................................................................................12

**STATUTES**

15 U.S.C. § 717(b) ..................................................................................... 10, 12

15 U.S.C. § 717(c) ..........................................................................................11

16 U.S.C. § 824(b) ..........................................................................................10

42 U.S.C. § 6295(a) ........................................................................................18

42 U.S.C. § 6297(c) ..................................................................................... 7, 16

42 U.S.C. § 6313 ............................................................................................18

D.C. Code § 34-1101(b)..................................................................................14

## REGULATIONS

15 D.C. Municipal Regs. § 2302.1 ................................................... 14, 17

2017 D.C. Fuel Gas Code § 303.3 ...............................................................17

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I, § 8 ...............................................................................12

## LEGISLATIVE HISTORY

133 Cong. Rec. 3070 (1987) .....................................................................21

Act of Mar. 27, 1954, ch. 115, 68 Stat. 36 (codified at 15 U.S.C. § 717(c)) ..........11

An Act to Incorporate the Washington Gas Light Company, 9 Stat. 722 (1848)… ................................................................................................13

An Act to Regulate Height of Buildings in the District of Columbia, Pub. L. No. 55-322 (1899) ....................................................................................15

District of Columbia Pub. L. 93-198, 87 Stat. 774 (1973) .............................. 14, 15

Federal Power Act of 1935, ch. 687, pt. II § 201(a), 49 Stat. 847 ...........................7

H.R. Rep. No. 100-11 (1987) (Conf. Rep.) .................................................21

H.R. Rep. No. 95-1751 (1978) (Conf. Rep.) ...............................................21

Law Creating the Public Utilities Commission of the District of Columbia, Pub. L. No. 62-451, 37 Stat. 974 (1913) ..........................................................13

National Appliance Energy Conservation Act of 1987, Pub. L. 100-12, 101 Stat. 103 .............................................................................................20

National Energy Conservation Policy Act of 1978, Pub. L. 95-619, 92 Stat. 3206 ................................................................................................20

Natural Gas Act of 1938, ch. 556 § 1(b), 52 Stat. 821 .............................................7

S. Rep. No. 83-817 (1953) .......................................................................11

S. Rep. No. 95-409 (1977) .......................................................................21

## OTHER AUTHORITIES

Jim Rossi, *The Brave New Path of Energy Federalism*, 95 TEX. L. REV. 399 (2016) ................................................................................................9

Matthew R. Christiansen & Joshua C. Macey, *Long Live the Federal Power Act's Bright Line*, 134 HARVARD L. REV. 1360 (2021) ...................................9

Werner Troesken, *Regime Change and Corruption. A History of Public Utility Regulation*, *in* CORRUPTION AND REFORM: LESSONS FROM AMERICA'S ECONOMIC HISTORY (2006, Edward L. Glaeser and Claudia Goldin, eds.) ...........................8

William Boyd & Ann E. Carlson, *Accidents of Federalism: Ratemaking and Innovation in Public Utility Law*, 63 UCLA L. REV. 810 (2016) .................... 8, 10

William Howard Taft, Fourth Annual Message, State of the Union Written Message (Dec. 3, 1912) ................................................................................13

# GLOSSARY OF ABBREVIATIONS

**EPCA**        Energy Policy and Conservation Act

**FERC**        Federal Energy Regulatory Commission

**NAECA**        National Appliance Energy Conservation Act of 1987

**NECPA**        National Energy Conservation Policy Act of 1978

**PUC**        Public Utilities Commission

## AMICI CURIAE'S STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

*Amici Curiae* ("*Amici*") are among the nation's preeminent professors engaged in the study and teaching of energy and environmental law and policy. They are leading experts in fields including energy regulation; federalism and its application to energy and environmental law; and federal, state, and local utility regulation. *Amici* have produced a large body of award-winning scholarly work on these subjects, including leading casebooks on energy, environmental, and constitutional law. They have an interest in ensuring that cases like this are decided based on a full understanding of the implications for the balance of federal, state, and local power in utility regulation, and this brief helps clarify these issues for the Court.

*Amici* are identified below. Their affiliations are provided to demonstrate their expertise and interest; this brief contains *Amici*'s own analysis, not that of their institutions.

**William Boyd** is the Michael J. Klein Chair and Professor of Law and Faculty Co-Director of the Emmett Institute on Climate Change and the Environment at the University of California, Los Angeles (UCLA) School of Law, and a Professor at the UCLA Institute of the Environment and Sustainability. Dr. Boyd has served as a consultant to the U.S. Department of Energy, the National Renewable Energy Laboratory, the Joint Institute for Strategic Energy Analysis,

the California Independent System Operator, and the Center for the New Energy Economy. He holds a Ph.D. in Energy & Resources from the University of California, Berkeley and a J.D. from Stanford Law School.

**Lincoln Davies** is a Professor of Law and the Co-Director of the Wallace Stegner Center for Land, Resources & The Environment at the University of Utah S.J. Quinney College of Law. Davies previously served as Dean of The Ohio State University Michael E. Moritz College of Law. He holds a J.D. from Stanford Law School.

**Daniel A. Farber** is the Sho Sato Professor of Law and the Faculty Director of the Berkeley Center for Law, Energy & the Environment at the University of California, Berkeley School of Law. He has published over 200 scholarly articles, essays, and books, primarily on energy, the environment, and the U.S. Constitution. Prof. Farber holds a J.D. from the University of Illinois College of Law.

**Sharon Jacobs** is a Professor of Law at the University of California, Berkeley School of Law. Prof. Jacobs' award-winning research focuses on the structure of energy regulation at the federal and state level, and she was a practicing energy regulatory attorney before joining the academy. She holds a J.D. from Harvard Law School.

**Alexandra Klass** is the James G. Degnan Professor of Law at the University of Michigan Law School. Professor Klass previously served as deputy general counsel for energy efficiency and clean energy demonstrations at the U.S. Department of Energy and as a member of the Minnesota Governor's Advisory Council on Climate Change. She holds a J.D. from the University of Wisconsin Law School.

**Joshua C. Macey** is a professor of law at Yale Law School. Prior to his appointment at Yale Law School, Macey served as an Assistant Professor of Law at the University of Chicago Law School. Macey has also won the Morrison Prize — awarded to the "most impactful sustainability-related legal academic paper published in North America during the previous year" — for three consecutive years. Professor Macey holds a J.D. from Yale Law School and an M.Sc. from the London School of Economics.

**Heather Payne** is the Carter C. Kissell Professor in Law at The Ohio State University Moritz College of Law. Professor Payne's scholarship focuses on regulatory frameworks and governance. She has also won the Morrison Prize. Professor Payne earned a J.D. from the University of North Carolina School of Law.

**Melissa Powers** is a Jeffrey Bain Faculty Scholar and Professor of Law at Lewis & Clark Law School. Melissa is also the founder of the Green Energy

Institute at Lewis & Clark Law School, an organization that designs policies to transition to a zero-carbon energy system. Melissa received her JD, magna cum laude, from Lewis & Clark Law School.

**Jim Rossi** is the Judge D.L. Lansden Chair in Law at Vanderbilt University Law School. He has served as a consultant or expert witness for the Federal Energy Regulatory Commission, the Administrative Conference of the United States, and various state regulatory commissions. Prof. Rossi holds an LL.M. from Yale Law School and a J.D. from the University of Iowa College of Law.

**David B. Spence** is the Rex G. Baker Centennial Chair in Natural Resources Law at the University of Texas at Austin School of Law, and Professor of Law & Regulation and Professor of Energy Law at the University of Texas at Austin McCombs School of Business. Dr. Spence works on long-term research projects with the University of Texas's Energy Institute, Harvard Law School, Duke University, and other institutions. He holds a Ph.D. in Political Science from Duke University and a J.D. from the University of North Carolina School of Law.

**Shelley H. Welton** is a Presidential Distinguished Professor of Law and Energy Policy at the University of Pennsylvania Carey Law School and the University of Pennsylvania Kleinman Center for Energy Policy. Dr. Welton's research focuses on energy governance, including state and local energy regulation and energy federalism. She holds a Ph.D. in law from Yale Law School, a J.D.

from New York University School of Law, and an M.P.A. in environmental

science and policy from the School for International and Public Affairs at

Columbia University.

## SUMMARY OF ARGUMENT

Appellants' reading of Energy Policy and Conservation Act ("EPCA") preemption conflicts with Congress's historical commitment to local control of utility distribution. The Clean Buildings Act is a building code that regulates on-site fuel combustion, something that falls well within the District's police power to protect public health. *See, e.g.*, *Firemen's Ins. Co. of Washington, D.C. v. Washington*, 483 F.2d 1323, 1327-28 (D.C. Cir. 1973) (discussing the delegation by Congress to the District of police powers necessary "for the protection of lives, limbs, health, comfort and quiet of all persons" residing in the District). Appellants' proposed reading of EPCA would not only interfere with local governments' traditionally held police powers, though that alone is a drastic enough impact to reject this reading. Appellants' argument would also upend a century of federalist utility regulation in the United States. It is this consequence that we focus on in this brief.

Authority over utility regulation has been shared between federal, state, and local regulators for nearly a century. Since the inception of federal utility regulation, Congress has adhered to the same fundamental organizing principle: The federal government regulates wholesale sales of energy in interstate commerce, while state and local governments regulate retail sales and local distribution infrastructure (among other things). These jurisdictional lines were

first established in the Federal Power Act of 1935, ch. 687, pt. II § 201(a), 49 Stat. 847, 847 (codified at 16 U.S.C. § 824) and the Natural Gas Act of 1938, ch. 556 § 1(b), 52 Stat. 821, 821 (codified at 15 U.S.C. § 717(b)), and have not been altered since. The distinctive federalist system created by these statutes—which allocates control over local distribution to the states—lies at the heart of utility regulation in the United States.

Appellants' proposed reading of EPCA's preemption clause, 42 U.S.C. § 6297(c), would fundamentally alter this structure. It would strip state and local governments of the ability to make decisions about local gas distribution and use that they have been making since energy utilities first arose. As EPCA does not grant the federal government the authority to regulate utility infrastructure, Appellants' interpretation of the preemption clause would simultaneously create a regulatory gap that no government would be able to fill without congressional intervention. In order to avert these dire effects, this Court should reject Appellants' interpretation and affirm the district court's decision.

**ARGUMENT**

**I.     Congress Has Firmly and Repeatedly Affirmed State and Local Governments as the Regulators Responsible for Local Distribution Infrastructure**

### A.     *State and Local Governments Have Regulated Local Distribution Since the Inception of Utility Regulation*

State and local governments have had authority over local utilities for as long as energy infrastructure has existed. Regulation of the gas and electric industries originated at the municipal level in the nineteenth century. Utilities were granted municipal franchises, which gave them the right to build infrastructure and operate within particular cities. *See, e.g.*, Werner Troesken, *Regime Change and Corruption. A History of Public Utility Regulation* 260-61, *in* CORRUPTION AND REFORM: LESSONS FROM AMERICA'S ECONOMIC HISTORY (2006, Edward L. Glaeser and Claudia Goldin, eds.). In the early twentieth century, states began creating public utility commissions ("PUCs") tasked with setting appropriate rates for retail utility sales. By 1930, every state but Delaware had adopted the PUC model. *See* William Boyd & Ann E. Carlson, *Accidents of Federalism: Ratemaking and Innovation in Public Utility Law*, 63 UCLA L. REV. 810, 823 (2016). These state PUCs initially regulated all utility activities within their state. Yet as utilities grew and became increasingly interconnected, the Supreme Court found that the dormant Commerce Clause barred state regulation of some utility activities affecting interstate commerce, such as interstate energy transmission and sales of

energy at wholesale. *See Pennsylvania v. West Virginia*, 262 U.S. 553, 596 (1923); *Missouri v. Kan. Nat. Gas Co.*, 265 U.S. 298, 307 (1924); *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927); *E. Ohio Gas Co. v. Tax Comm'n of Ohio*, 283 U.S. 465, 470–71 (1931).

In identifying states' lack of authority to regulate interstate transactions, these decisions affirmed state control over retail sales and the local distribution system that delivers energy to retail consumers. *See, e.g.*, *E. Ohio Gas,* 283 U.S. at 471 ("[T]he furnishing of gas to consumers…by means of distribution plants…is not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the state."). For wholesale energy sales and transmission in interstate commerce, however, these decisions created a regulatory void, termed the "*Attleboro* gap." *See, e.g.*, Jim Rossi, *The Brave New Path of Energy Federalism*, 95 TEX. L. REV. 399, 409-10 (2016); Matthew R. Christiansen & Joshua C. Macey, *Long Live the Federal Power Act's Bright Line*, 134 HARVARD L. REV. 1360, 1371-72 (2021).

Congress closed that gap by enacting the Federal Power Act of 1935 and the Natural Gas Act of 1938. These twin statutes tasked the Federal Power Commission (today's Federal Energy Regulatory Commission, or "FERC") with regulating wholesale sales and transportation of electricity and natural gas in interstate commerce. At the same time, both statutes explicitly recognized and left

alone pre-existing state authority to regulate retail sales and local distribution. What resulted was a distinctive dual structure of regulation with a clear division of labor between the federal government and the states. *See* 16 U.S.C. § 824(b) (giving the Federal Power Commission authority to regulate "the transmission of electric energy in interstate commerce and [] the sale of electric energy at wholesale in interstate commerce," but leaving "any other sale of electric energy" or "facilities used in local distribution" to the states); 15 U.S.C. § 717(b) (regulating "the transportation of natural gas in interstate commerce, [and] the sale in interstate commerce of natural gas for resale," but not "any other transportation or sale of natural gas or [] the local distribution of natural gas"); *see also* Boyd & Carlson, *Accidents of Federalism*, 63 UCLA L. Rev. at 822-30 (reviewing the history of congressional action in power regulation and noting Congress's continued respect for the jurisdictional split between federal and state spheres). In effect, these statutes were adopted to address the gaps in regulation created by the increasingly interstate aspects of electricity and natural gas. But in both statutes, Congress left untouched the longstanding authority of states and local governments to regulate local distribution.

In the more than eighty years since the passage of the Natural Gas Act and Federal Power Act, Congress has faithfully maintained this federalist system. In fact, Congress has affirmatively acted to safeguard state and local control over

distribution infrastructure. When a Supreme Court decision placed certain intrastate natural gas pipelines under federal jurisdiction, in *Fed. Power Comm'n v. E. Ohio. Gas Co.*, 338 U.S. 464 (1950), Congress responded by amending the Natural Gas Act to ensure that jurisdiction over those lines remained "exclusively in the States, *as always has been intended*." S. Rep. No. 83-817 at 2 (1953) (emphasis added); *see also* Act of Mar. 27, 1954, ch. 115, 68 Stat. 36 (codified at 15 U.S.C. § 717(c)) (overturning *East Ohio Gas* and declaring the affected pipelines to be "matters primarily of local concern and subject to regulation by the several States"). Even as Congress changed other areas of utility regulation, it never departed from its "unbroken recognition" of state and local authority over distribution. *Gen Motors Corp. v. Tracy*, 519 U.S. 278, 304 (1997).

The federal judiciary's interpretation of the Federal Power Act and the Natural Gas Act comports with Congress's intent to leave utility distribution in the hands of state and local governments. *See, e.g.*, *Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266-67 (2016) ("[T]he [Federal Power] Act…maintains a zone of exclusive state jurisdiction…[for] retail sales of electricity (*i.e.*, sales directly to users)."); *ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 384-85 (2015) ("As we have repeatedly stressed, the Natural Gas Act 'was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.'" (quoting *Panhandle E. Pipe Line Co. v. Pub.*

*Serv. Comm'n of Ind.*, 332 U.S. 507, 517-18 (1947))); *Gen. Motors Corp.*, 519 U.S. at 292 ("Congress's purpose in enacting the [Natural Gas Act] was to fill the regulatory void created by the Court's earlier decisions…, while at the same time leaving undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers."); *Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329, 334 (1951) ("Direct sales for consumptive use were designedly left to state regulation [by the Natural Gas Act]."); *S. Coast Air Quality Mgmt. Dist. v. Fed. Energy Regul. Comm'n*, 621 F.3d 1085, 1091 (9th Cir. 2010) ("[T]he Natural Gas Act specifically exempted from federal regulation the 'local distribution of natural gas.'" (quoting 15 U.S.C. § 717(b))).

### B. Congress Has Explicitly Delegated Police Powers Analogous to Those of a State to the Local District of Columbia Government, Including Control over Gas Distribution and Building Codes

The system of utility regulation that has been in place for nearly a century grants state governments authority over all aspects of distribution. That includes the retail rates utilities are allowed to charge customers, the siting and management of distribution infrastructure, and the safe operation thereof.

Although the District of Columbia ("the District") is not a state, Congress took affirmative steps to ensure that utility regulation in the District would operate similarly to the approach in states. Congress has original legislative authority over the District of Columbia, *see* U.S. Const. Art. I, § 8, and initially Congress bore the

responsibility of regulating distribution within the District. The first natural gas utility to serve the District, the Washington Gas & Light Company, was granted a franchise pursuant to federal legislation in 1848. *See* An Act to Incorporate the Washington Gas Light Company, 9 Stat. 722, 723 (1848) (Congress gave Washington Gas "full power and authority to manufacture, make, and sell gas . . . to be used for the purpose of lighting the city of Washington…."). Congress soon found itself unprepared to address local utility questions, and upon a request by President Taft passed a bill to create a public utilities commission for the District. Law Creating the Public Utilities Commission of the District of Columbia, Pub. L. No. 62-451, 37 Stat. 974 (1913); William Howard Taft, President of the United States, Fourth Annual Message, State of the Union Written Message (Dec. 3, 1912) ("One of the most crying needs in the government of the District is a tribunal or public authority for the purpose of supervising the corporations engaged in the operation of public utilities"), *available at* https://www.presidency.ucsb.edu/documents/fourth-annual-message-16. That Commission, today's Public Service Commission, fulfilled the role that state public utility commissions were playing in states throughout the country. The Commission was empowered to oversee utility rates, and order the "improvements and extensions of the works, wires, poles, lines, conduits, ducts, and other reasonable devices, apparatus, and property of gas corporations and electrical corporations." 37 Stat. 974 at 986. Congress thus

harmonized the District's method of utility regulation with that seen throughout the country by assigning control to a local commission.

While that Commission was originally created and overseen by Congress, it would not remain so. In 1973, the Home Rule Act delegated authority over utility regulation to the Council of the District of Columbia. District of Columbia Pub. L. 93-198, 87 Stat. 774 (1973). In doing so, Congress reaffirmed its commitment to a federalist system of utility regulation. The District of Columbia exemplifies this commitment perhaps more so than any other jurisdiction, precisely because Congress affirmatively chose to delegate authority over distribution that it originally held.

The authority delegated to the Public Service Commission was not limited to merely overseeing rates or infrastructure construction. The Commission is empowered to impose such additional conditions on service as it deems in the public interest. *See* D.C. Code § 34-1101(b) ("The Commission may prescribe terms and conditions upon a grant of an application for a certificate of present and future public convenience and necessity as the Commission, in its discretion, decides are necessary to further the present and future public convenience and necessity."). For example, the Commission, under authorization of the Council of the District of Columbia, may order the removal of infrastructure it deems hazardous to life or property. *See* 15 D.C. Municipal Regs. § 2302.1 ("Whenever

14

the Commission finds a particular facility to be hazardous to life or property, it shall require the person, firm, or corporation operating the facility to take all measures necessary to remove the hazards.").

Congress's decision to delegate this authority reflects its unwillingness to exercise the police powers that have traditionally been reserved to local governments. This extends to the authority to set building codes, which have long been viewed as an exercise of states' police powers. As with utility regulation, Congress was initially tasked with setting these standards for the District of Columbia in the absence of a state government. *See, e.g.*, An Act to Regulate Height of Buildings in the District of Columbia, Pub. L. No. 55-322 (1899). Here too, however, Congress delegated that authority to the Council of the District of Columbia in the Home Rule Act of 1973. *See* Pub. L. No. 93-198 § 302, 87 Stat. 774 (1973). Congress, even when given the chance, did not seek to exercise power over local matters such as distribution networks or building codes. EPCA should not be read to implicitly repeal the authority over utility and building regulation that Congress deliberately and explicitly chose to delegate to the District.

## II. Appellants' Reading of EPCA Would Upend Congress's Federalist System of Utility Regulation

Appellants' reading of EPCA's preemption provisions would eliminate much of the traditional role of state and local governments in regulating local utility distribution, in direct opposition to the "unbroken recognition of [] state

15

regulatory authority" over local distribution that has existed since before the Natural Gas Act of 1938 and that was expressly preserved in that statute. *Gen. Motors Corp.,* 519 U.S. at 304-05.

Appellants' proposed reading prohibits any state or local action that would affect the type of energy available to a building. Appellants rely on the provision that "no State regulation concerning the energy efficiency, energy use, or water use of [a] covered product shall be effective with respect to that product." Opening Brief of Appellants 16 (hereinafter "Appellants' Br.") (quoting 42 U.S.C. § 6297(c)). Appellants argue that, since the Clean Buildings Act seeks to "ban any appliances that use more than zero gas energy," this act clearly concerns the "energy use" of EPCA-covered appliances. Appellants' Br. at 21. As such, Appellants argue that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at 22. To make this argument, Appellants claim that the Act's prohibition of on-site fuel combustion is functionally equivalent to setting the maximum energy use of EPCA-covered gas appliances at zero, "as it prohibits any appliance that is designed to use more than zero gas energy." *Id.* at 18.

Taking Appellants' argument to its logical conclusion, this reading of EPCA would preempt any local government action that would affect the amount or type of energy appliances can use. That includes local governments' traditional

authority to safely manage local distribution infrastructure. If the District's Public Service Commission orders a gas line shut off because it is "hazardous to life or property," *see* 15 D.C. Mun. Regs. § 2302.1, that would similarly concern the "energy use" of EPCA-covered appliances. Appellants' Br. at 21. Health regulations designed to prevent carbon monoxide poisoning by prohibiting the installation of unvented room heaters into bedrooms, could similarly be preempted as concerning "energy use." *See* 2017 D.C. Fuel Gas Code § 303.3. This reading of EPCA, then, would remove local governments' long-held authority to regulate utility distribution infrastructure altogether.

This outcome would turn the federalist system of utility regulation Congress has sought to maintain for nearly a century squarely on its head. Under Appellants' reading, state and local governments would lose the authority to order the removal of hazardous or malfunctioning utility equipment, if doing so would change the type of energy available to customers. They would lose the power to engage in routine safety shut-offs in order to complete maintenance or repairs. State and local governments would be deprived of the responsibilities over energy distribution they have held since public utility service began in the United States, in direct contradiction of Congress's chosen federalist system of regulation.

### III. Appellants' Reading of EPCA Would Create a Regulatory Void in Contradiction of Congress's Intent

Appellants' argument implies that in passing EPCA Congress chose to do away with the basic structure of federalism that has animated natural gas regulation for almost a century, while failing to provide a substitute regulator for the authority it is taking from state and local governments. This not only disrupts the basic scheme of utility regulation that Congress created, but also creates a new regulatory gap—the opposite of what Congress has said it intended.

The regulatory authority created by the section of EPCA at issue in this case is limited to setting appliance-specific energy conservation standards. *See* 42 U.S.C. § 6295(a) (creating "[f]ederal energy conservation standards applicable to covered products" and authorizing "amended or new energy conservation standards" only); 42 U.S.C. § 6313 (creating appliance standards and authorizing new standards for covered products, but authorizing no additional regulatory action). If Appellants' reading is correct, EPCA eliminates the ability of local governments to manage local gas distribution, but neglects to grant that authority to anyone else. The Department of Energy is not equipped to act as the nation's gas line repairman. As a result, EPCA would eliminate *all* regulation of gas distribution.

If Appellants have their way, no government could regulate the types of energy a home or business could use. No government could require the removal of

hazardous or malfunctioning infrastructure from distribution networks. No government could order the shut-offs necessary to complete routine repairs. Under this reading of EPCA, such decisions could only be made if Congress created a new set of federal authorities that would oversee the distribution infrastructure connected to each building, on each street of each city in the country. As the history of utility regulation in the District of Columbia shows, this is the opposite of what Congress intended. Congress was tasked with doing this on the scale of just one city prior to 1913, yet it chose to delegate that authority to the District's Public Service Commission, and in 1973, to the Council of the District of Columbia. There is no reason to believe Congress, in passing EPCA, developed an appetite to control these decisions not just for the District, but for every locality in the nation.

The creation of such a regulatory gap would directly contradict Congress's intent to "impose a comprehensive regulatory system on the transportation, production, and sale" of natural gas to prevent the existence of any regulatory "no-man's land." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 28, 19 (1961). It has consistently been Congress's intent that any shortfall in federal power be made up by state jurisdiction and vice versa. *See, e.g.*, *Elec. Power Supply Ass'n*, 577 U.S. at 289 ("Some entity must have jurisdiction to regulate each and every practice that takes place in the electricity markets….");

*Mich. Pub. Serv. Comm'n*, 341 U.S. at 333 ("In the absence of federal regulation [of the sale and distribution of natural gas], state regulation is required in the public interest."). Thus, the gap that results from Appellants' reading, in which the state is preempted from regulating while no federal agency has authority to regulate, fundamentally contradicts Congress's intended regulatory scheme.

The history of EPCA's amendments confirms that Congress never intended the scope of EPCA's preemption provision to reach beyond appliance efficiency standards. Two EPCA amendments provide the core language relevant to this case: the National Energy Conservation Policy Act of 1978 ("NECPA"), which preempted "requirement[s] respecting energy use or energy efficiency of a type (or class) of covered products," Pub. L. 95-619, § 424(a)(2), 92 Stat. 3206, 3264, and the National Appliance Energy Conservation Act of 1987 ("NAECA"), which tweaked this language to its current form, preempting "regulation[s] concerning the energy efficiency or energy use of [a] covered product." Pub. L. 100-12, § 7, 101 Stat. 103, 118.

The legislative record indicates that Congress had no intention to expand EPCA preemption beyond appliance conservation standards in either law—and certainly not far enough to reach core areas of local decision-making over gas distribution and use. The justification behind NECPA's preemption was that "compliance with all state *standards* would be very costly." S. Rep. No. 95-409, at

39 (1977) (emphasis added); *see also* H.R. Rep. No. 95-1751, at 117 (1978) (Conf. Rep.) ("Both the House and Senate [versions of NECPA] modified EPCA to establish a period of automatic preemption of State standards prior to the establishment of a Federal standard."). NAECA's amendments, meanwhile, were intended to "follow[] substantially the preemption requirements in [NECPA]." H.R. Rep. No. 100-11, at 23 (1987) (Conf. Rep.); *see also* 133 Cong. Rec. 3070 (1987) (statement of Sen. Johnston) (sponsor's description of NAECA as having "two basic principles": "to establish efficiency standards" and "to preempt State efficiency standards"). Thus, the language changes in both amendments were meant to continue the preemption of state appliance standards, not to fundamentally alter the scope of EPCA preemption.

Congress gave no indication that its amendments to NECPA and NAECA were intended to expand the scope of EPCA preemption beyond energy efficiency standards. There is certainly no sign that it expected the amendments to remove a large swathe of state and local authority over natural gas distribution.

## CONCLUSION

Appellant's interpretation would radically expand EPCA preemption, creating a regulatory void in a system Congress meant to be seamless and threatening core areas of state and local power, including basic health and safety regulations. This Court should join the growing group of courts holding that EPCA

preemption does not extend beyond appliance conservation standards to threaten the ability of localities to protect their residents. *See Ass'n of Contracting Plumbers v. City of New York*, No. 25-977, 2026 WL 1871692 (2nd Cir., June 30, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-cv-03024, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026); *Rinnai America Corp. v. South Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093 (9th Cir., July 2, 2026) (holding that the *CRA v. Berkeley* decision does not extend to air quality regulations that could prevent the sale of covered appliances). *Amici* therefore urge the Court to reject Appellant's interpretation and uphold the district court's decision.

Respectfully submitted,

<u>/s/ Denise Grab</u>
DENISE GRAB (No. 55763)
ELIAS VAN EMMERICK*
JULIA E. STEIN (No. 65402)
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
(310) 206-4033
grab.elc@law.ucla.edu

July 24, 2026

*Counsel for* Amici Curiae

*\*Admitted only in California; practicing under the supervision of D.C. Circuit Bar members*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in D.C. Cir. R. 32(e)(3) and Fed. R. App. P. 29(a)(5) because this brief contains 4774 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1). The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Denise Grab*
DENISE GRAB
July 24, 2026

# CERTIFICATE OF SERVICE

I hereby certify that, on this 24th day of July, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system, which constitutes service on all parties and parties' counsel who are registered ECF filers.

*/s/ Denise Grab*
DENISE GRAB

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717

## § 717. Regulation of natural gas companies

Effective: August 8, 2005
Currentness

**(a) Necessity of regulation in public interest**

As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

**(b) Transactions to which provisions of chapter applicable**

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**(c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence**

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

**(d) Vehicular natural gas jurisdiction**

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is--

Add-1

**(1)** not otherwise a natural-gas company; or

**(2)** subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

## CREDIT(S)

(June 21, 1938, c. 556, § 1, 52 Stat. 821; Mar. 27, 1954, c. 115, 68 Stat. 36; Pub.L. 102-486, Title IV, § 404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub.L. 109-58, Title III, § 311(a), Aug. 8, 2005, 119 Stat. 685.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

## PROCLAMATIONS

### PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

### PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

Notes of Decisions (324)

15 U.S.C.A. § 717, 15 USCA § 717
Current through P.L. 119-100. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
   Title 16. Conservation
      Chapter 12. Federal Regulation and Development of Power (Refs & Annos)
         Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce

16 U.S.C.A. § 824

## § 824. Declaration of policy; application of subchapter

Effective: December 4, 2015
Currentness

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

**(1)** The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

**(2)** Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

Add-3

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f)[1], 824i, 824j, 824j-1, 824k, 824*o*, 824*o*-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

**(1)** Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

  **(A)** an electric utility company subject to its regulatory authority under State law,

  **(B)** any exempt wholesale generator selling energy at wholesale to such electric utility, and

  **(C)** any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

Add-4

**(2)** Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

**(3)** Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

**(4)** Nothing in this section shall--

    **(A)** preempt applicable State law concerning the provision of records and other information; or

    **(B)** in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

**(5)** As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005.

### CREDIT(S)

(June 10, 1920, c. 285, pt. II, § 201, as added Aug. 26, 1935, c. 687, Title II, § 213, 49 Stat. 847; amended Pub.L. 95-617, Title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub.L. 102-486, Title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub.L. 109-58, Title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub.L. 114-94, Div. F, § 61003(b), Dec. 4, 2015, 129 Stat. 1778.)

Notes of Decisions (227)

Footnotes

1      So in original. Section 824e of this title does not contain a subsec. (f).

16 U.S.C.A. § 824, 16 USCA § 824
Current through P.L. 119-100. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6295

## § 6295. Energy conservation standards

Effective: December 27, 2020
Currentness

**(a) Purposes**

The purposes of this section are to--

**(1)** provide Federal energy conservation standards applicable to covered products; and

**(2)** authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

**(b) Standards for refrigerators, refrigerator-freezers, and freezers**

**(1)** The following is the maximum energy use allowed in kilowatt hours per year for the following products (other than those described in paragraph (2)) manufactured on or after January 1, 1990:

|  | **Energy Standards Equations** |
| --- | --- |
| Refrigerators and Refrigerator-Freezers with manual defrost............................................. | $16.3\ AV + 316$ |
| Refrigerator-Freezers--partial automatic defrost................................................... | $21.8\ AV + 429$ |
| Refrigerator-Freezers--automatic defrost with: |  |
| Top mounted freezer without ice........................................................ | $23.5\ AV + 471$ |
| Side mounted freezer without ice......................................................... | $27.7\ AV + 488$ |

Add-6

 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6297

## § 6297. Effect on other law

Currentness

**(a) Preemption of testing and labeling requirements**

**(1)** Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if--

**(A)** such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

**(B)** such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

**(2)** For purposes of this section, the following definitions apply:

**(A)** The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

**(B)** The term "river basin commission" means--

**(i)** a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

**(ii)** a commission established under section 1962b(a) of this title.

Add-7

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision--

**(1)(A)** was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

**(B)** in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that--

**(i)** the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

**(ii)** the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

**(2)** is a State procurement regulation described in subsection (e);

**(3)** is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

**(4)** is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

**(5)** is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

Add-8

**(6)** is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

**(7)** is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation--

**(1)** is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

**(2)** is a regulation which has been granted a waiver under subsection (d);

**(3)** is in a building code for new construction described in subsection (f)(3);

**(4)** is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

**(5)** is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

**(6)** is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

**(7)(A)** is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

**(B)** is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

Add-9

**(8)(A)** is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

**(B)** is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

**(9)** is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that--

**(A)** if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission--

**(i)** on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

**(ii)** on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

**(d) Waiver of Federal preemption**

**(1)(A)** Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

**(B)** Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

**(C)** For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which--

**(i)** are substantially different in nature or magnitude than those prevailing in the United States generally; and

**(ii)** are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of

Add-10

alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

**(2)** The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

**(3)** The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including--

**(A)** the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

**(B)** the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

**(C)** the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction--

**(i)** in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

**(ii)** in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

**(D)** the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

**(4)** The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in

Add-11

the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

**(5)** No final rule prescribed by the Secretary under this subsection may--

**(A)** permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

**(B)** become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that--

**(i)** there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which--

**(I)** imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

**(II)** cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

**(ii)** the State regulation is necessary to alleviate substantially such condition.

**(6)** In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

**(e) Exception for certain State procurement standards**

Add-12

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

**(f) Exception for certain building code requirements**

**(1)** A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

**(2)** A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed--

   **(A)** the applicable minimum efficiency requirement in a national voluntary consensus standard; or

   **(B)** the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

**(3)** Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

   **(A)** The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

   **(B)** The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

   **(C)** The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

Add-13

**(D)** If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

**(E)** If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

**(F)** The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

**(G)** The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

**(4)(A)** Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

**(B)** If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

**(g) No warranty**

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

Add-14

**CREDIT(S)**

(Pub.L. 94-163, Title III, § 327, Dec. 22, 1975, 89 Stat. 926; Pub.L. 95-619, Title IV, § 424, Nov. 9, 1978, 92 Stat. 3263; Pub.L. 100-12, § 7, Mar. 17, 1987, 101 Stat. 117; Pub.L. 100-357, § 2(f), June 28, 1988, 102 Stat. 674; Pub.L. 102-486, Title I, § 123(h), Oct. 24, 1992, 106 Stat. 2829; Pub.L. 109-58, Title I, § 135(d), Aug. 8, 2005, 119 Stat. 634; Pub.L. 110-140, Title III, §§ 321(d), 324(f), Dec. 19, 2007, 121 Stat. 1585, 1594; Pub.L. 112-210, § 10(a)(9), Dec. 18, 2012, 126 Stat. 1524.)

Notes of Decisions (6)

42 U.S.C.A. § 6297, 42 USCA § 6297
Current through P.L. 119-100. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-15

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A-1. Certain Industrial Equipment (Refs & Annos)

42 U.S.C.A. § 6313

§ 6313. Standards

Effective: January 12, 2018
Currentness

**(a) Small, large, and very large commercial package air conditioning and heating equipment, packaged terminal air conditioners and heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks**

**(1)** Each small commercial package air conditioning and heating equipment (including single package vertical air conditioners and single package vertical heat pumps) manufactured on or after January 1, 1994, shall meet the following standard levels:

**(A)** The minimum seasonal energy efficiency ratio of air-cooled three-phase electric central air conditioners and central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), split systems, shall be 10.0.

**(B)** The minimum seasonal energy efficiency ratio of air-cooled three-phase electric central air conditioners and central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), single package, shall be 9.7.

**(C)** The minimum energy efficiency ratio of air-cooled central air conditioners and central air conditioning heat pumps at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be 8.9 (at a standard rating of 95 degrees F db).

**(D)** The minimum heating seasonal performance factor of air-cooled three-phase electric central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), split systems, shall be 6.8.

**(E)** The minimum heating seasonal performance factor of air-cooled three-phase electric central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), single package, shall be 6.6.

**(F)** The minimum coefficient of performance in the heating mode of air-cooled central air conditioning heat pumps at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be 3.0 (at a high temperature rating of 47 degrees F db).

Add-16

**(G)** The minimum energy efficiency ratio of water-cooled, evaporatively-cooled and water-source central air conditioners and central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity) shall be 9.3 (at a standard rating of 95 degrees F db, outdoor temperature for evaporatively cooled equipment, and 85 degrees Fahrenheit entering water temperature for water-source and water-cooled equipment).

**(H)** The minimum energy efficiency ratio of water-cooled, evaporatively-cooled and water-source central air conditioners and central air conditioning heat pumps at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be 10.5 (at a standard rating of 95 degrees F db, outdoor temperature for evaporatively cooled equipment, and 85 degrees Fahrenheit entering water temperature for water source and water-cooled equipment).

**(I)** The minimum coefficient of performance in the heating mode of water-source heat pumps less than 135,000 Btu per hour (cooling capacity) shall be 3.8 (at a standard rating of 70 degrees Fahrenheit entering water).

**(2)** Each large commercial package air conditioning and heating equipment (including single package vertical air conditioners and single package vertical heat pumps) manufactured on or after January 1, 1995, but before January 1, 2010, shall meet the following standard levels:

**(A)** The minimum energy efficiency ratio of air-cooled central air conditioners and central air conditioning heat pumps at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be 8.5 (at a standard rating of 95 degrees F db).

**(B)** The minimum coefficient of performance in the heating mode of air-cooled central air conditioning heat pumps at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be 2.9.

**(C)** The minimum energy efficiency ratio of water- and evaporatively-cooled central air conditioners and central air conditioning heat pumps at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be 9.6 (according to ARI Standard 360-86).

**(3)** Each packaged terminal air conditioner and packaged terminal heat pump manufactured on or after January 1, 1994, shall meet the following standard levels:

**(A)** The minimum energy efficiency ratio (EER) of packaged terminal air conditioners and packaged terminal heat pumps in the cooling mode shall be 10.0--(0.16 x Capacity [in thousands of Btu per hour at a standard rating of 95 degrees F db, outdoor temperature]). If a unit has a capacity of less than 7,000 Btu per hour, then 7,000 Btu per hour shall be used in the calculation. If a unit has a capacity of greater than 15,000 Btu per hour, then 15,000 Btu per hour shall be used in the calculation.

**(B)** The minimum coefficient of performance (COP) of packaged terminal heat pumps in the heating mode shall be 1.3 + (0.16 x the minimum cooling EER as specified in subparagraph (A)) (at a standard rating of 47 degrees F db).

Add-17

**(4)** Each warm air furnace and packaged boiler manufactured on or after January 1, 1994, shall meet the following standard levels:

**(A)** The minimum thermal efficiency at the maximum rated capacity of gas-fired warm-air furnaces with capacity of 225,000 Btu per hour or more shall be 80 percent.

**(B)** The minimum thermal efficiency at the maximum rated capacity of oil-fired warm-air furnaces with capacity of 225,000 Btu per hour or more shall be 81 percent.

**(C)** The minimum combustion efficiency at the maximum rated capacity of gas-fired packaged boilers with capacity of 300,000 Btu per hour or more shall be 80 percent.

**(D)** The minimum combustion efficiency at the maximum rated capacity of oil-fired packaged boilers with capacity of 300,000 Btu per hour or more shall be 83 percent.

**(5)** Each storage water heater, instantaneous water heater, and unfired water storage tank manufactured on or after January 1, 1994, shall meet the following standard levels:

**(A)** Except as provided in subparagraph (G), the maximum standby loss, in percent per hour, of electric storage water heaters shall be 0.30 + (27/Measured Storage Volume [in gallons]).

**(B)** Except as provided in subparagraph (G), the maximum standby loss, in percent per hour, of gas- and oil-fired storage water heaters with input ratings of 155,000 Btu per hour or less shall be 1.30 + (114/Measured Storage Volume [in gallons]). The minimum thermal efficiency of such units shall be 78 percent.

**(C)** Except as provided in subparagraph (G), the maximum standby loss, in percent per hour, of gas- and oil-fired storage water heaters with input ratings of more than 155,000 Btu per hour shall be 1.30 + (95/Measured Storage Volume [in gallons]). The minimum thermal efficiency of such units shall be 78 percent.

**(D)** The minimum thermal efficiency of instantaneous water heaters with a storage volume of less than 10 gallons shall be 80 percent.

**(E)** Except as provided in subparagraph (G), the minimum thermal efficiency of instantaneous water heaters with a storage volume of 10 gallons or more shall be 77 percent. The maximum standby loss, in percent/hour, of such units shall be 2.30 + (67/Measured Storage Volume [in gallons]).

Add-18

**(F)** Except as provided in subparagraph (G), the maximum heat loss of unfired hot water storage tanks shall be 6.5 Btu per hour per square foot of tank surface area.

**(G)** Storage water heaters and hot water storage tanks having more than 140 gallons of storage capacity need not meet the standby loss or heat loss requirements specified in subparagraphs (A) through (C) and subparagraphs (E) and (F) if the tank surface area is thermally insulated to R-12.5 and if a standing pilot light is not used.

**(6) Amended energy efficiency standards**

**(A) In general**

**(i) Analysis of potential energy savings**

If ASHRAE/IES Standard 90.1 is amended with respect to the standard levels or design requirements applicable under that standard to any small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, or unfired hot water storage tanks, not later than 180 days after the amendment of the standard, the Secretary shall publish in the Federal Register for public comment an analysis of the energy savings potential of amended energy efficiency standards.

**(ii) Amended uniform national standard for products**

**(I) In general**

Except as provided in subclause (II), not later than 18 months after the date of publication of the amendment to the ASHRAE/IES Standard 90.1 for a product described in clause (i), the Secretary shall establish an amended uniform national standard for the product at the minimum level specified in the amended ASHRAE/IES Standard 90.1.

**(II) More stringent standard**

Subclause (I) shall not apply if the Secretary determines, by rule published in the Federal Register, and supported by clear and convincing evidence, that adoption of a uniform national standard more stringent than the amended ASHRAE/IES Standard 90.1 for the product would result in significant additional conservation of energy and is technologically feasible and economically justified.

**(B) Rule**

**(i) In general**

Add-19

If the Secretary makes a determination described in subparagraph (A)(ii)(II) for a product described in subparagraph (A)(i), not later than 30 months after the date of publication of the amendment to the ASHRAE/IES Standard 90.1 for the product, the Secretary shall issue the rule establishing the amended standard.

**(ii) Factors**

In determining whether a standard is economically justified for the purposes of subparagraph (A)(ii)(II), the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed the burden of the proposed standard by, to the maximum extent practicable, considering--

**(I)** the economic impact of the standard on the manufacturers and on the consumers of the products subject to the standard;

**(II)** the savings in operating costs throughout the estimated average life of the product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the products that are likely to result from the imposition of the standard;

**(III)** the total projected quantity of energy savings likely to result directly from the imposition of the standard;

**(IV)** any lessening of the utility or the performance of the products likely to result from the imposition of the standard;

**(V)** the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

**(VI)** the need for national energy conservation; and

**(VII)** other factors the Secretary considers relevant.

**(iii) Administration**

**(I) Energy use and efficiency**

The Secretary may not prescribe any amended standard under this paragraph that increases the maximum allowable energy use, or decreases the minimum required energy efficiency, of a covered product.

**(II) Unavailability**

Add-20

**(aa) In general**

The Secretary may not prescribe an amended standard under this subparagraph if the Secretary finds (and publishes the finding) that interested persons have established by a preponderance of the evidence that a standard is likely to result in the unavailability in the United States in any product type (or class) of performance characteristics (including reliability, features, sizes, capacities, and volumes) that are substantially the same as those generally available in the United States at the time of the finding of the Secretary.

**(bb) Other types or classes**

The failure of some types (or classes) to meet the criterion established under this subclause shall not affect the determination of the Secretary on whether to prescribe a standard for the other types or classes.

**(C) Amendment of standard**

**(i) In general**

Every 6 years, the Secretary shall conduct an evaluation of each class of covered equipment and shall publish--

**(I)** a notice of the determination of the Secretary that standards for the product do not need to be amended, based on the criteria established under subparagraph (A); or

**(II)** a notice of proposed rulemaking including new proposed standards based on the criteria and procedures established under subparagraph (B).

**(ii) Notice**

If the Secretary publishes a notice under clause (i), the Secretary shall--

**(I)** publish a notice stating that the analysis of the Department is publicly available; and

**(II)** provide an opportunity for written comment.

**(iii) Amendment of standard; new determination**

**(I) Amendment of standard**

Not later than 2 years after a notice is issued under clause (i)(II), the Secretary shall publish a final rule amending the standard for the product.

Add-21

**(II) New determination**

Not later than 3 years after a determination under clause (i)(I), the Secretary shall make a new determination and publication under subclause (I) or (II) of clause (i).

**(iv) Application to products**

Notwithstanding subparagraph (D), an amendment prescribed under this subparagraph shall apply to products manufactured after a date that is the later of--

**(I)** the date that is 3 years after publication of the final rule establishing a new standard; or

**(II)** the date that is 6 years after the effective date of the current standard for a covered product.

**(v) Consideration of prices and operating patterns**

If the Secretary is considering revised standards for air-cooled 3-phase central air conditioners and central air conditioning heat pumps with less[1] 65,000 Btu per hour (cooling capacity), the Secretary shall use commercial energy prices and operating patterns in all analyses conducted by the Secretary.

**(vi)** For any covered equipment as to which more than 6 years has elapsed since the issuance of the most recent final rule establishing or amending a standard for the product as of December 18, 2012, the first notice required under clause (i) shall be published by December 31, 2013.

**(D)** A standard amended by the Secretary under this paragraph shall become effective for products manufactured--

**(i)** with respect to small commercial package air conditioning and heating equipment, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks, on or after a date which is two years after the effective date of the applicable minimum energy efficiency requirement in the amended ASHRAE/IES standard referred to in subparagraph (A); and

**(ii)** with respect to large commercial package air conditioning and heating equipment and very large commercial package air conditioning and heating equipment, on or after a date which is three years after the effective date of the applicable minimum energy efficiency requirement in the amended ASHRAE/IES standard referred to in subparagraph (A);

except that an energy conservation standard amended by the Secretary pursuant to a rule under subparagraph (B) shall become effective for products manufactured on or after a date which is four years after the date such rule is published in the Federal Register.

Add-22

**(7)** Small commercial package air conditioning and heating equipment (other than single package vertical air conditioners and single package vertical heat pumps) shall meet the following standards:

**(A)** For equipment manufactured on or after January 1, 2010, the minimum energy efficiency ratio of air-cooled central air conditioners at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be--

**(i)** 11.2 for equipment with no heating or electric resistance heating; and

**(ii)** 11.0 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

**(B)** For equipment manufactured on or after January 1, 2010, the minimum energy efficiency ratio of air-cooled central air conditioner heat pumps at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be--

**(i)** 11.0 for equipment with no heating or electric resistance heating; and

**(ii)** 10.8 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

**(C)** For equipment manufactured on or after January 1, 2010, the minimum coefficient of performance in the heating mode of air-cooled central air conditioning heat pumps at or above 65,000 Btu per hour (cooling capacity) and less than 135,000 Btu per hour (cooling capacity) shall be 3.3 (at a high temperature rating of 47 degrees F db).

**(D)** For equipment manufactured on or after the later of January 1, 2008, or the date that is 180 days after December 19, 2007--

**(i)** the minimum seasonal energy efficiency ratio of air-cooled 3-phase electric central air conditioners and central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), split systems, shall be 13.0;

**(ii)** the minimum seasonal energy efficiency ratio of air-cooled 3-phase electric central air conditioners and central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), single package, shall be 13.0;

**(iii)** the minimum heating seasonal performance factor of air-cooled 3-phase electric central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), split systems, shall be 7.7; and

Add-23

**(iv)** the minimum heating seasonal performance factor of air-cooled 3-phase electric central air conditioning heat pumps less than 65,000 Btu per hour (cooling capacity), single package, shall be 7.7.

**(8)** Large commercial package air conditioning and heating equipment (other than single package vertical air conditioners and single package vertical heat pumps) manufactured on or after January 1, 2010, shall meet the following standards:

**(A)** The minimum energy efficiency ratio of air-cooled central air conditioners at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be--

**(i)** 11.0 for equipment with no heating or electric resistance heating; and

**(ii)** 10.8 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

**(B)** The minimum energy efficiency ratio of air-cooled central air conditioner heat pumps at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be--

**(i)** 10.6 for equipment with no heating or electric resistance heating; and

**(ii)** 10.4 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

**(C)** The minimum coefficient of performance in the heating mode of air-cooled central air conditioning heat pumps at or above 135,000 Btu per hour (cooling capacity) and less than 240,000 Btu per hour (cooling capacity) shall be 3.2 (at a high temperature rating of 47 degrees F db).

**(9)** Very large commercial package air conditioning and heating equipment (other than single package vertical air conditioners and single package vertical heat pumps) manufactured on or after January 1, 2010, shall meet the following standards:

**(A)** The minimum energy efficiency ratio of air-cooled central air conditioners at or above 240,000 Btu per hour (cooling capacity) and less than 760,000 Btu per hour (cooling capacity) shall be--

**(i)** 10.0 for equipment with no heating or electric resistance heating; and

**(ii)** 9.8 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

Add-24

**(B)** The minimum energy efficiency ratio of air-cooled central air conditioner heat pumps at or above 240,000 Btu per hour (cooling capacity) and less than 760,000 Btu per hour (cooling capacity) shall be--

**(i)** 9.5 for equipment with no heating or electric resistance heating; and

**(ii)** 9.3 for equipment with all other heating system types that are integrated into the equipment (at a standard rating of 95 degrees F db).

**(C)** The minimum coefficient of performance in the heating mode of air-cooled central air conditioning heat pumps at or above 240,000 Btu per hour (cooling capacity) and less than 760,000 Btu per hour (cooling capacity) shall be 3.2 (at a high temperature rating of 47 degrees F db).

**(10) Single package vertical air conditioners and single package vertical heat pumps**

**(A) In general**

Single package vertical air conditioners and single package vertical heat pumps manufactured on or after January 1, 2010, shall meet the following standards:

**(i)** The minimum energy efficiency ratio of single package vertical air conditioners less than 65,000 Btu per hour (cooling capacity), single-phase, shall be 9.0.

**(ii)** The minimum energy efficiency ratio of single package vertical air conditioners less than 65,000 Btu per hour (cooling capacity), 3-phase, shall be 9.0.

**(iii)** The minimum energy efficiency ratio of single package vertical air conditioners at or above 65,000 Btu per hour (cooling capacity) but less than 135,000 Btu per hour (cooling capacity), shall be 8.9.

**(iv)** The minimum energy efficiency ratio of single package vertical air conditioners at or above 135,000 Btu per hour (cooling capacity) but less than 240,000 Btu per hour (cooling capacity), shall be 8.6.

**(v)** The minimum energy efficiency ratio of single package vertical heat pumps less than 65,000 Btu per hour (cooling capacity), single-phase, shall be 9.0 and the minimum coefficient of performance in the heating mode shall be 3.0.

**(vi)** The minimum energy efficiency ratio of single package vertical heat pumps less than 65,000 Btu per hour (cooling capacity), 3-phase, shall be 9.0 and the minimum coefficient of performance in the heating mode shall be 3.0.

Add-25

**(vii)** The minimum energy efficiency ratio of single package vertical heat pumps at or above 65,000 Btu per hour (cooling capacity) but less than 135,000 Btu per hour (cooling capacity), shall be 8.9 and the minimum coefficient of performance in the heating mode shall be 3.0.

**(viii)** The minimum energy efficiency ratio of single package vertical heat pumps at or above 135,000 Btu per hour (cooling capacity) but less than 240,000 Btu per hour (cooling capacity), shall be 8.6 and the minimum coefficient of performance in the heating mode shall be 2.9.

**(B) Review**

Not later than 3 years after December 19, 2007, the Secretary shall review the most recently published ASHRAE/IES Standard 90.1 with respect to single package vertical air conditioners and single package vertical heat pumps in accordance with the procedures established under paragraph (6).

**(b) Electric motors**

**(1)** Except for definite purpose motors, special purpose motors, and those motors exempted by the Secretary under paragraph (2), each electric motor manufactured (alone or as a component of another piece of equipment) after the 60-month period beginning on October 24, 1992, or in the case of an electric motor which requires listing or certification by a nationally recognized safety testing laboratory, after the 84-month period beginning on October 24, 1992, shall have a nominal full load efficiency of not less than the following:

| | **Nominal Full-Load Efficiency** | | | | | |
|---|---|---|---|---|---|---|
| **Number of poles** | **Open Motors** | | | **Closed Motors** | | |
| | 6 | 4 | 2 | 6 | 4 | 2 |
| Motor Horsepower | | | | | | |
| 1............................................................................................... | 80.0 | 82.5 | | 80.0 | 82.5 | 75.5 |
| 1.5............................................................................................ | 84.0 | 84.0 | 82.5 | 85.5 | 84.0 | 82.5 |
| 2............................................................................................... | 85.5 | 84.0 | 84.0 | 86.5 | 84.0 | 84.0 |
| 3............................................................................................... | 86.5 | 86.5 | 84.0 | 87.5 | 87.5 | 85.5 |
| 5............................................................................................... | 87.5 | 87.5 | 85.5 | 87.5 | 87.5 | 87.5 |
| 7.5............................................................................................ | 88.5 | 88.5 | 87.5 | 89.5 | 89.5 | 88.5 |
| 10............................................................................................. | 90.2 | 89.5 | 88.5 | 89.5 | 89.5 | 89.5 |
| 15............................................................................................. | 90.2 | 91.0 | 89.5 | 90.2 | 91.0 | 90.2 |

Add-26

| | | | | | | |
|---|---|---|---|---|---|---|
| 20 | 91.0 | 91.0 | 90.2 | 90.2 | 91.0 | 90.2 |
| 25 | 91.7 | 91.7 | 91.0 | 91.7 | 92.4 | 91.0 |
| 30 | 92.4 | 92.4 | 91.0 | 91.7 | 92.4 | 91.0 |
| 40 | 93.0 | 93.0 | 91.7 | 93.0 | 93.0 | 91.7 |
| 50 | 93.0 | 93.0 | 92.4 | 93.0 | 93.0 | 92.4 |
| 60 | 93.6 | 93.6 | 93.0 | 93.6 | 93.6 | 93.0 |
| 75 | 93.6 | 94.1 | 93.0 | 93.6 | 94.1 | 93.0 |
| 100 | 94.1 | 94.1 | 93.0 | 94.1 | 94.5 | 93.6 |
| 125 | 94.1 | 94.5 | 93.6 | 94.1 | 94.5 | 94.5 |
| 150 | 94.5 | 95.0 | 93.6 | 95.0 | 95.0 | 94.5 |
| 200 | 94.5 | 95.0 | 94.5 | 95.0 | 95.0 | 95.0 |

**(2) Electric motors**

**(A) General purpose electric motors (subtype I)**

Except as provided in subparagraph (B), each general purpose electric motor (subtype I) with a power rating of 1 horsepower or greater, but not greater than 200 horsepower, manufactured (alone or as a component of another piece of equipment) after the 3-year period beginning on December 19, 2007, shall have a nominal full load efficiency that is not less than as defined in NEMA MG-1 (2006) Table 12-12.

**(B) Fire pump motors**

Each fire pump motor manufactured (alone or as a component of another piece of equipment) after the 3-year period beginning on December 19, 2007, shall have nominal full load efficiency that is not less than as defined in NEMA MG-1 (2006) Table 12-11.

**(C) General purpose electric motors (subtype II)**

Each general purpose electric motor (subtype II) with a power rating of 1 horsepower or greater, but not greater than 200 horsepower, manufactured (alone or as a component of another piece of equipment) after the 3-year period beginning on December 19, 2007, shall have a nominal full load efficiency that is not less than as defined in NEMA MG-1 (2006) Table 12-11.

**(D) NEMA Design B, general purpose electric motors**

Add-27

Each NEMA Design B, general purpose electric motor with a power rating of more than 200 horsepower, but not greater than 500 horsepower, manufactured (alone or as a component of another piece of equipment) after the 3-year period beginning on December 19, 2007, shall have a nominal full load efficiency that is not less than as defined in NEMA MG-1 (2006) Table 12-11.

**(3)(A)** The Secretary may, by rule, provide that the standards specified in paragraph (1) shall not apply to certain types or classes of electric motors if--

**(i)** compliance with such standards would not result in significant energy savings because such motors cannot be used in most general purpose applications or are very unlikely to be used in most general purpose applications; and

**(ii)** standards for such motors would not be technologically feasible or economically justified.

**(B)** Not later than one year after October 24, 1992, a manufacturer seeking an exemption under this paragraph with respect to a type or class of electric motor developed on or before October 24, 1992, shall submit a petition to the Secretary requesting such exemption. Such petition shall include evidence that the type or class of motor meets the criteria for exemption specified in subparagraph (A).

**(C)** Not later than two years after October 24, 1992, the Secretary shall rule on each petition for exemption submitted pursuant to subparagraph (B). In making such ruling, the Secretary shall afford an opportunity for public comment.

**(D)** Manufacturers of types or classes of motors developed after October 24, 1992, to which standards under paragraph (1) would be applicable may petition the Secretary for exemptions from compliance with such standards based on the criteria specified in subparagraph (A).

**(4)(A)** The Secretary shall publish a final rule no later than the end of the 24-month period beginning on the effective date of the standards established under paragraph (1) to determine if such standards should be amended. Such rule shall provide that any amendment shall apply to electric motors manufactured on or after a date which is five years after the effective date of the standards established under paragraph (1).

**(B)** The Secretary shall publish a final rule no later than 24 months after the effective date of the previous final rule to determine whether to amend the standards in effect for such product. Any such amendment shall apply to electric motors manufactured after a date which is five years after--

**(i)** the effective date of the previous amendment; or

**(ii)** if the previous final rule did not amend the standards, the earliest date by which a previous amendment could have been effective.

Add-28

**(c) Commercial refrigerators, freezers, and refrigerator-freezers**

**(1)** In this subsection:

**(A)** The term "AV" means the adjusted volume ($ft^3$) (defined as 1.63 x frozen temperature compartment volume ($ft^3$) + chilled temperature compartment volume ($ft^3$)) with compartment volumes measured in accordance with the Association of Home Appliance Manufacturers Standard HRF1-1979.

**(B)** The term "V" means the chilled or frozen compartment volume ($ft^3$) (as defined in the Association of Home Appliance Manufacturers Standard HRF1-1979).

**(C)** The term "service over the counter, self-contained, medium temperature commercial refrigerator" or "(SOC-SC-M)" means a medium temperature commercial refrigerator--

**(i)** with a self-contained condensing unit and equipped with sliding or hinged doors in the back intended for use by sales personnel, and with glass or other transparent material in the front for displaying merchandise; and

**(ii)** that has a height not greater than 66 inches and is intended to serve as a counter for transactions between sales personnel and customers.

**(D)** The term "TDA" means the total display area ($ft^2$) of the refrigerated case, as defined in AHRI Standard 1200.

**(E)** Other terms have such meanings as may be established by the Secretary, based on industry-accepted definitions and practice.

**(2)** Each commercial refrigerator, freezer, and refrigerator-freezer with a self-contained condensing unit designed for holding temperature applications manufactured on or after January 1, 2010, shall have a daily energy consumption (in kilowatt hours per day) that does not exceed the following:

Refrigerators with solid doors..................................................................................... 0.10 V + 2.04

Refrigerators with transparent doors........................................................................... 0.12 V + 3.34

Freezers with solid doors.............................................................................................. 0.40 V + 1.38

Freezers with transparent doors................................................................................... 0.75 V + 4.10

Refrigerators/freezers with solid doors the greater of............................................... 0.27 AV - 0.71 or 0.70.

Add-29

**(3)** Each commercial refrigerator with a self-contained condensing unit designed for pull-down temperature applications and transparent doors manufactured on or after January 1, 2010, shall have a daily energy consumption (in kilowatt hours per day) of not more than 0.126 V + 3.51.

**(4)(A)** Each SOC-SC-M manufactured on or after January 1, 2012, shall have a total daily energy consumption (in kilowatt hours per day) of not more than 0.6 x TDA + 1.0.

**(B)** Not later than 3 years after December 18, 2012, the Secretary shall--

    **(i)** determine whether the standard established under subparagraph (A) should be amended; and

    **(ii)** if the Secretary determines that such standard should be amended, issue a final rule establishing an amended standard.

**(C)** If the Secretary issues a final rule pursuant to subparagraph (B) establishing an amended standard, the final rule shall provide that the amended standard shall apply to products manufactured on or after the date that is--

    **(i)** 3 years after the date on which the final amended standard is published; or

    **(ii)** if the Secretary determines, by rule, that 3 years is inadequate, not later than 5 years after the date on which the final rule is published.

**(5)(A)** Not later than January 1, 2009, the Secretary shall issue, by rule, standard levels for ice-cream freezers, self-contained commercial refrigerators, freezers, and refrigerator-freezers without doors, and remote condensing commercial refrigerators, freezers, and refrigerator-freezers, with the standard levels effective for equipment manufactured on or after January 1, 2012.

**(B)** The Secretary may issue, by rule, standard levels for other types of commercial refrigerators, freezers, and refrigerator-freezers not covered by paragraph (2)(A) with the standard levels effective for equipment manufactured 3 or more years after the date on which the final rule is published.

**(6)(A)** Not later than January 1, 2013, the Secretary shall issue a final rule to determine whether the standards established under this subsection should be amended.

**(B)** Not later than 3 years after the effective date of any amended standards under subparagraph (A) or the publication of a final rule determining that the standards should not be amended, the Secretary shall issue a final rule to determine whether the standards established under this subsection or the amended standards, as applicable, should be amended.

Add-30

**(C)** If the Secretary issues a final rule under subparagraph (A) or (B) establishing amended standards, the final rule shall provide that the amended standards apply to products manufactured on or after the date that is--

**(i)** 3 years after the date on which the final amended standard is published; or

**(ii)** if the Secretary determines, by rule, that 3 years is inadequate, not later than 5 years after the date on which the final rule is published.

**(d) Automatic commercial ice makers**

**(1)** Each automatic commercial ice maker that produces cube type ice with capacities between 50 and 2500 pounds per 24-hour period when tested according to the test standard established in section 6314(a)(7) of this title and is manufactured on or after January 1, 2010, shall meet the following standard levels:

| Equipment Type | Type of Cooling | Harvest Rate (lbs ice/24 hours) | Maximum Energy Use (kWh/100 lbs Ice) | Maximum Condenser Water Use (gal/100 lbs Ice) |
| --- | --- | --- | --- | --- |
| Ice Making Head | Water | <500 | 7.80-0.0055H | 200-0.022H |
| | | ≥500 and <1436 | 5.58-0.0011H | 200-0.022H |
| | | ≥1436 | 4.0 | 200-0.022H |
| Ice Making Head | Air | <450 | 10.26-0.0086H | Not Applicable |
| | | ≥450 | 6.89-0.0011H | Not Applicable |
| Remote Condensing (but not remote compressor) | Air | <1000 | 8.85-0.0038H | Not Applicable |
| | | ≥1000 | 5.10 | Not Applicable |
| Remote Condensing and Remote Compressor | Air | <934 | 8.85-0.0038H | Not Applicable |
| | | ≥934 | 5.3 | Not Applicable |
| Self Contained | Water | <200 | 11.40-0.019H | 191-0.0315H |
| | | ≥200 | 7.60 | 191-0.0315H |
| Self Contained | Air | <175 | 18.0-0.0469H | Not Applicable |
| | | ≥175 | 9.80 | Not Applicable |

Add-31

H=Harvest rate in pounds per 24 hours.

Water use is for the condenser only and does not include potable water used to make ice.

**(2)(A)** The Secretary may issue, by rule, standard levels for types of automatic commercial ice makers that are not covered by paragraph (1).

**(B)** The standards established under subparagraph (A) shall apply to products manufactured on or after the date that is--

  **(i)** 3 years after the date on which the rule is published under subparagraph (A); or

  **(ii)** if the Secretary determines, by rule, that 3 years is inadequate, not later than 5 years after the date on which the final rule is published.

**(3)(A)** Not later than January 1, 2015, with respect to the standards established under paragraph (1), and, with respect to the standards established under paragraph (2), not later than 5 years after the date on which the standards take effect, the Secretary shall issue a final rule to determine whether amending the applicable standards is technologically feasible and economically justified.

**(B)** Not later than 5 years after the effective date of any amended standards under subparagraph (A) or the publication of a final rule determining that amending the standards is not technologically feasible or economically justified, the Secretary shall issue a final rule to determine whether amending the standards established under paragraph (1) or the amended standards, as applicable, is technologically feasible or economically justified.

**(C)** If the Secretary issues a final rule under subparagraph (A) or (B) establishing amended standards, the final rule shall provide that the amended standards apply to products manufactured on or after the date that is--

  **(i)** 3 years after the date on which the final amended standard is published; or

  **(ii)** if the Secretary determines, by rule, that 3 years is inadequate, not later than 5 years after the date on which the final amended standard is published.

**(4)** A final rule issued under paragraph (2) or (3) shall establish standards at the maximum level that is technically feasible and economically justified, as provided in subsections (o) and (p) of section 6295 of this title.

**(e) Commercial clothes washers**

**(1)** Each commercial clothes washer manufactured on or after January 1, 2007, shall have--

Add-32

**(A)** a Modified Energy Factor of at least 1.26; and

**(B)** a Water Factor of not more than 9.5.

**(2)(A)(i)** Not later than January 1, 2010, the Secretary shall publish a final rule to determine whether the standards established under paragraph (1) should be amended.

**(ii)** The rule published under clause (i) shall provide that any amended standard shall apply to products manufactured 3 years after the date on which the final amended standard is published.

**(B)(i)** Not later than January 1, 2015, the Secretary shall publish a final rule to determine whether the standards established under paragraph (1) should be amended.

**(ii)** The rule published under clause (i) shall provide that any amended standard shall apply to products manufactured 3 years after the date on which the final amended standard is published.

**(f) Walk-in coolers and walk-in freezers**

**(1) In general**

Subject to paragraphs (2) through (6), each walk-in cooler or walk-in freezer manufactured on or after January 1, 2009, shall--

**(A)** have automatic door closers that firmly close all walk-in doors that have been closed to within 1 inch of full closure, except that this subparagraph shall not apply to doors wider than 3 feet 9 inches or taller than 7 feet;

**(B)** have strip doors, spring hinged doors, or other method of minimizing infiltration when doors are open;

**(C)** contain wall, ceiling, and door insulation of at least R-25 for coolers and R-32 for freezers, except that this subparagraph shall not apply to glazed portions of doors nor to structural members;

**(D)** contain floor insulation of at least R-28 for freezers;

**(E)** for evaporator fan motors of under 1 horsepower and less than 460 volts, use--

**(i)** electronically commutated motors (brushless direct current motors); or

Add-33

**(ii)** 3-phase motors;

**(F)** for condenser fan motors of under 1 horsepower, use--

**(i)** electronically commutated motors;

**(ii)** permanent split capacitor-type motors; or

**(iii)** 3-phase motors; and

**(G)** for all interior lights, use light sources with an efficacy of 40 lumens per watt or more, including ballast losses (if any), except that light sources with an efficacy of 40 lumens per watt or less, including ballast losses (if any), may be used in conjunction with a timer or device that turns off the lights within 15 minutes of when the walk-in cooler or walk-in freezer is not occupied by people.

**(2) Electronically commutated motors**

**(A) In general**

The requirements of paragraph (1)(E)(i) for electronically commutated motors shall take effect January 1, 2009, unless, prior to that date, the Secretary determines that such motors are only available from 1 manufacturer.

**(B) Other types of motors**

In carrying out paragraph (1)(E)(i) and subparagraph (A), the Secretary may allow other types of motors if the Secretary determines that, on average, those other motors use no more energy in evaporator fan applications than electronically commutated motors.

**(C) Maximum energy consumption level**

The Secretary shall establish the maximum energy consumption level under subparagraph (B) not later than January 1, 2010.

**(3) Additional specifications**

Each walk-in cooler or walk-in freezer with transparent reach-in doors manufactured on or after January 1, 2009, shall also meet the following specifications:

Add-34

**(A)** Transparent reach-in doors for walk-in freezers and windows in walk-in freezer doors shall be of triple-pane glass with either heat-reflective treated glass or gas fill.

**(B)** Transparent reach-in doors for walk-in coolers and windows in walk-in cooler doors shall be--

**(i)** double-pane glass with heat-reflective treated glass and gas fill; or

**(ii)** triple-pane glass with either heat-reflective treated glass or gas fill.

**(C)** If the appliance has an antisweat heater without antisweat heat controls, the appliance shall have a total door rail, glass, and frame heater power draw of not more than 7.1 watts per square foot of door opening (for freezers) and 3.0 watts per square foot of door opening (for coolers).

**(D)** If the appliance has an antisweat heater with antisweat heat controls, and the total door rail, glass, and frame heater power draw is more than 7.1 watts per square foot of door opening (for freezers) and 3.0 watts per square foot of door opening (for coolers), the antisweat heat controls shall reduce the energy use of the antisweat heater in a quantity corresponding to the relative humidity in the air outside the door or to the condensation on the inner glass pane.

**(4) Performance-based standards**

**(A) In general**

Not later than January 1, 2012, the Secretary shall publish performance-based standards for walk-in coolers and walk-in freezers that achieve the maximum improvement in energy that the Secretary determines is technologically feasible and economically justified.

**(B) Application**

**(i) In general**

Except as provided in clause (ii), the standards shall apply to products described in subparagraph (A) that are manufactured beginning on the date that is 3 years after the final rule is published.

**(ii) Delayed effective date**

If the Secretary determines, by rule, that a 3-year period is inadequate, the Secretary may establish an effective date for products manufactured beginning on the date that is not more than 5 years after the date of publication of a final rule for the products.

Add-35

**(5) Amendment of standards**

**(A) In general**

Not later than January 1, 2020, the Secretary shall publish a final rule to determine if the standards established under paragraph (4) should be amended.

**(B) Application**

**(i) In general**

Except as provided in clause (ii), the rule shall provide that the standards shall apply to products manufactured beginning on the date that is 3 years after the final rule is published.

**(ii) Delayed effective date**

If the Secretary determines, by rule, that a 3-year period is inadequate, the Secretary may establish an effective date for products manufactured beginning on the date that is not more than 5 years after the date of publication of a final rule for the products.

**(6) Innovative component technologies**

Subparagraph (C) of paragraph (1) shall not apply to a walk-in cooler or walk-in freezer component if the component manufacturer has demonstrated to the satisfaction of the Secretary that the component reduces energy consumption at least as much as if such subparagraph were to apply. In support of any demonstration under this paragraph, a manufacturer shall provide to the Secretary all data and technical information necessary to fully evaluate its application.

**(g) Lighting power supply circuits**

If the Secretary, acting pursuant to section 6312(b) of this title, includes as covered equipment solid state lighting power supply circuits, drivers, or devices described in section 6291(36)(A)(ii) of this title, the Secretary may prescribe under this part, not earlier than 1 year after the date on which a test procedure has been prescribed, an energy conservation standard for such equipment.

**CREDIT(S)**

(Pub.L. 94-163, Title III, § 342, as added Pub.L. 95-619, Title IV, § 441(a), Nov. 9, 1978, 92 Stat. 3269; amended Pub.L. 102-486, Title I, § 122(d), Oct. 24, 1992, 106 Stat. 2810; Pub.L. 109-58, Title I, § 136(b) to (e), Aug. 8, 2005, 119 Stat. 636 to 641; Pub.L. 110-140, Title III, §§ 305(b), 306(c), 312(b), 313(b)(1), 314(b), Dec. 19, 2007, 121 Stat. 1554, 1559, 1564, 1568, 1570; Pub.L. 112-210, §§ 2, 4, 5(b), 10(a)(3), (4), Dec. 18, 2012, 126 Stat. 1514, 1516, 1518, 1522, 1524; Pub.L. 113-188, Title VI, § 601(c), Nov. 26, 2014, 128 Stat. 2019; Pub.L. 115-115, § 2(b)(2), Jan. 12, 2018, 131 Stat. 2280.)

Add-36

 KeyCite Yellow Flag
Proposed Legislation

West's District of Columbia Code Annotated 2001 Edition
  Division V. Local Business Affairs.
    Title 34. Public Utilities. (Refs & Annos)
      Subtitle I. Applicable Provisions Generally.
        Chapter 11. Service, Valuation, Accounts. (Refs & Annos)

DC ST § 34-1101
Formerly cited as DC ST 1981 § 43-501

# § 34-1101. Utility service and charges to be just and reasonable; certification required.

Currentness

(a) Every public utility doing business within the District of Columbia is required to furnish service and facilities reasonably safe and adequate and in all respects just and reasonable. The charge made by any public utility for a facility or service furnished, rendered, or to be furnished or rendered, shall be reasonable, just, and nondiscriminatory. Every unjust, unreasonable, or discriminatory charge for the facility or service is prohibited and unlawful. Every public utility is required to obey the lawful orders of the Commission created by this subtitle.

(b) No public utility shall furnish a service or facility, directly or indirectly, without first proceeding and proving to the satisfaction of the Public Service Commission ("Commission") that the present and future public convenience and necessity requires that the service be provided or the facility be offered. Upon application of a public utility for a certificate of present and future public convenience and necessity pursuant to this subsection, the Commission, upon a hearing and notice to the public, shall issue an order granting or denying the application, in whole or in part, stating the reasons for the action. The Commission may prescribe terms and conditions upon a grant of an application for a certificate of present and future public convenience and necessity as the Commission, in its discretion, decides are necessary to further the present and future public convenience and necessity. The Commission is authorized to promulgate any rules necessary to implement this subsection.

(c) Every public utility that was regulated by the Commission and that furnished a service or facility within the District of Columbia as of June 27, 1989 is deemed to have been granted a certificate of public convenience and necessity.

(d) The Commission is authorized to promulgate any rules necessary to implement this section.

**Credits**
(Mar. 4, 1913, 37 Stat. 977, ch. 150, § 8, par. 2; Sept. 20, 1989, D.C. Law 8-29, § 2, 36 DCR 4742; Oct. 19, 1989, D.C. Law 8-47, § 2, 36 DCR 5786.)

Notes of Decisions (66)

Add-37

West's District of Columbia Municipal **Regulations**
    Title **15**. Public Utilities and Cable Television
        Chapter 23. Natural Gas

**15** DCMR § 2302
**D.C**. **Mun**. **Regs**. Tit. **15**, § 2302

## 2302. ENFORCEMENT

Currentness

**2302**.**1** Whenever the Commission finds a particular facility to be hazardous to life or property, it shall require the person, firm, or corporation operating the facility to take all measures necessary to remove the hazards.

2302.2 The Office of Engineering of the Commission shall have responsibility for the enforcement of the provisions of this chapter.

2302.3 The Office of Engineering shall investigate and report to the Commission, in writing, instances in which it appears that this chapter has not been complied with, and shall make recommendations for achieving prompt compliance.

2302.4 The plant, property, facilities, and records of gas corporations under the Commission's jurisdiction shall be made readily accessible to the Commission, its staff, or its authorized representatives in the administration and enforcement of this chapter, or in the investigation of violations or alleged violations of any of its provisions.

**Credits**
SOURCE: Adopted at 33 DCR 6625 Oct. 24, 1986. Amended Jan. 4, 2013.

Current through District of Columbia Register, Volume 73, Number 27, dated July 3, 2026.

**15** DCMR § 2302, **15 DC** ADC § 2302

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add-38

---



## 303.3 Prohibited locations.

Appliances shall not be located in sleeping rooms, bathrooms, toilet rooms, storage closets or surgical rooms, or in a space that opens only into such rooms or spaces, except where the installation complies with one of the following:

1. The *appliance* is a direct-vent *appliance* installed in accordance with the conditions of the listing and the manufacturer's instructions.
2. Vented room heaters, wall furnaces, vented decorative appliances, vented gas fireplaces, vented gas fireplace heaters and decorative appliances for installation in vented solid fuel-burning fireplaces are installed in rooms that meet the required volume criteria of Section 304.5.
3. A single wall-mounted unvented room heater is installed in a bathroom and such unvented room heater is equipped as specified in Section 621.6 and has an input rating not greater than 6,000 Btu/h (1.76 kW). The bathroom shall meet the required volume criteria of Section 304.5.
4. A single wall-mounted unvented room heater is installed in a bedroom and such unvented room heater is equipped as specified in Section 621.6 and has an input rating not greater than 10,000 Btu/h (2.93 kW). The bedroom shall meet the required volume criteria of Section 304.5.
5. The *appliance* is installed in a room or space that opens only into a bedroom or bathroom, and such room or space is used for no other purpose and is provided with a solid weather-stripped door equipped with an *approved* self-closing device. All *combustion air* shall be taken directly from the outdoors in accordance with Section 304.6.

## 303.4 Protection from vehicle impact damage.

Appliances shall not be installed in a location subject to vehicle impact damage except where protected by an *approved* means.

Add-39

West's District of Columbia Municipal Regulations
  Title 12. Construction Codes Supplement of 2017
    Subtitle D. Fuel Gas Code Supplement of 2017[1]

12 DCMR § T. 12, Subt. D, Refs & Annos
D.C. Mun. Regs. Tit. 12, § T. 12, Subt. D, Refs & Annos
Currentness

**Editors' Notes**

The District of Columbia adopts the 2015 edition of the *International Fuel Gas Code* (IFGC), as amended by this Supplement.

[1] The *District of Columbia Fuel Gas Code (2017)*, referred to as the "*Fuel Gas Code*," consists of the 2015 edition of the *International Fuel Gas Code (International Fuel Gas Code)*, published by the International Code Council (ICC), as amended by the *Fuel Gas Code Supplement of 2017* (12-D DCMR). The International Fuel Gas Code is copyrighted by the ICC and therefore is not republished here. However, a copy of the text may be obtained at: https://codes.iccsafe.org/public/document/toc/547/.

Current through District of Columbia Register, Volume 73, Number 27, dated July 3, 2026.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.