**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

**Office of the Solicitor General**

August 19, 2026

Clifton Cislak
Clerk of the Court
U.S. Court of Appeals for the D.C. Circuit
333 Constitution Ave., NW
Washington, D.C. 20001

Re: No. 26-7050, *National Association of Home Builders v. District of Columbia*
Oral argument to be held September 8, 2026

Dear Mr. Cislak:

Under Fed. R. App. P. 28(j), the District of Columbia cites the attached decision in *Restaurant Law Center v. Denver*, No. 24-cv-1862 (D. Colo. Aug. 7, 2026) (Brimmer, J.), to support the argument that the Clean Energy D.C. Building Code Amendment Act of 2022 (Clean Buildings Act), D.C. Code § 6-1453.01, is not preempted by the Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201, *et seq*. *See* District Br. 17-25, 27-46.

In *Restaurant Law Center*, the court determined that a local building code did not "concern[]" the "energy use" of "covered product[s]" under "EPCA's preemption provision" simply because it "restricts or bans the use of certain natural gas appliances." Attach. 2, 15-22 (quoting 42 U.S.C. § 6297(c)). Adopting "the Second Circuit's interpretation of 'energy use' and 'concerning,'" the court reasoned that EPCA preempts "state energy efficiency regulations"—not building codes that "only regulate appliances purchased by consumers and which do not impose requirements on manufacturers." Add. 16-18. As the court explained, "EPCA's preemption provision guarantees uniform appliance efficiency standards. It does not create a consumer right to use any covered appliance." Add. 19 (internal quotation marks omitted). The court thus concluded that the building code was "not preempted

by the EPCA" as it did not "establish a maximum quantity of energy use" for any product "by restricting or banning the use of gas appliances." Add. 15, 22.

So too here. District Br. 17-25, 27-46. The Clean Buildings Act regulates the type of energy used in certain buildings by prohibiting fuel combustion in certain newly constructed or substantially improved buildings. D.C. Code § 6-1453.01. But it does not establish a maximum quantity of energy use for any covered product or otherwise affect the amount of energy that any product is manufactured to consume, and thus does not "concern[]" the "energy use" of "covered product[s]" under EPCA, 42 U.S.C. § 6297(c).

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General

By: /s/ Bryan J. Leitch
BRYAN J. LEITCH
Assistant Attorney General

cc: All counsel of record via ECF

## CERTIFICATE OF COMPLIANCE

I certify that this letter complies with the type-volume limitation in Federal Rule of Appellate Procedure 28(j) because it contains 316 words, excluding exempted parts. This letter complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Bryan J. Leitch
BRYAN J. LEITCH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 24-cv-01862-PAB-KAS

RESTAURANT LAW CENTER,
NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,
COLORADO RESTAURANT ASSOCIATION,
HOME BUILDERS ASSOCIATION OF METROPOLITAN DENVER,
AMERICAN HOTEL & LODGING ASSOCIATION,
NATIONAL APARTMENT ASSOCIATION, and
NATIONAL PROPANE GAS ASSOCIATION,

Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

Defendant,

and

SIERRA CLUB,

Defendant-Intervenor.

---

**ORDER**

---

This matter comes before the Court on Defendant the City and County of Denver's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [Docket No. 57] and Defendant-Intervenor Sierra Club's Motion to Dismiss First Amended Complaint [Docket No. 58]. Plaintiffs filed responses. Docket Nos. 59, 60. Defendants filed replies. Docket Nos. 62, 63. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

Plaintiffs are associations representing various businesses who believe they are negatively impacted by laws and regulations enacted by the City and County of Denver ("Denver") regarding natural gas appliances. Docket No. 52 at 5-12, ¶¶ 12-19. Plaintiffs claim that Denver's natural gas appliances laws are preempted by federal law. *Id.* at 1-2, ¶ 1.

On January 9, 2023, the Denver City Council passed Denver Ordinance No. 22-1653, amending Section 10-16 of the Denver Revised Municipal Code to adopt the 2022 Denver Building Code, including the 2022 Denver Energy Code.[2] *Id.* at 13, ¶ 28. The Energy Code now includes Sections C403.2.4 and C404.10, each of which restricts or bans the use of certain natural gas appliances. *Id.* at 14, ¶¶ 29-32. The purpose of Ordinance No. 22-1653's passage was "to advance the health and safety and long-term viability of the city." Denver, Colo., *Legislation Text,* Ordinance No. 22-1653 (2022).[3] Ordinance No. 22-1653 was adopted to "ensure[] Denver . . . meet[s] our Comprehensive Plan 2040 and climate action goals in addition to ensuring that the most current nationally vetted regulations are incorporated and applied locally to the benefit

---

[1] The well-pled facts below are taken from plaintiffs' amended complaint, Docket No. 52, and are presumed to be true, unless otherwise noted, for purposes of ruling on Denver's and Sierra Club's motions to dismiss.

[2] The complaint and the briefing use the terms "Energy Code" and "Building and Fire Code" somewhat interchangeably. The Energy Code is a component of the Building and Fire Code. *See* City and County of Denver, *2025 Denver Building Code* at 8 (available at https://www.denvergov.org/Government/Agencies-Departments-Offices/Agencies-Departments-Offices-Directory/Community-Planning-and-Development/Building-Codes-Policies-and-Guides#section-1). The Court will use the term "Energy Code" in the rest of the order.

[3] Federal courts can "take judicial notice of adjudicative facts, including provisions in municipal ordinances, at any stage of the proceedings." *Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1196 n.9 (10th Cir. 2018).

of the citizens." *Id.* Denver's Comprehensive Plan 2040 recognizes that "the energy used in existing commercial and multifamily buildings constitutes the largest source of greenhouse gas emissions in the City and County of Denver." Denver, Colo., Council Bill No. 21-1310 (2021). Denver's 2040 Plan finds that the electrification of commercial and multifamily buildings "protects Denver from climate change by reducing greenhouse gas emissions through renewably powered electric heat." *Id.*

Section C403.2.4 states that, for applicants seeking permits from the Building and Permitting Inspections Agency after January 1, 2024, "[f]ossil-fuel warm air furnaces and electric resistance space heating equipment shall not be permitted for space heating." Docket No. 52 at 14, ¶ 31; Energy Code, § C403.2.4. Section C404.10 states that, for applicants after January 1, 2024, "[f]ossil fuel and electric resistance water heaters shall not be permitted to provide potable hot water." Docket No. 52 at 14, ¶ 31; Energy Code, § C404.10. In sum, beginning on January 1, 2024, "commercial building permit applications must comply with Sections C403.2.4 and C404.10 of the 2022 Denver Energy Code, which restrict the new use of natural gas appliances." Docket No. 52 at 14, ¶ 30.

On November 24, 2021, Denver enacted Denver Ordinance No. 21-1310, which amended Chapter 10 of the Revised Municipal Code to require the Energy Code to restrict uses of gas appliances in certain commercial and multifamily buildings. *Id.* at 12, ¶ 20.[4] The Revised Municipal Code directs that electrification-related amendments

[4] The complaint does not list the exact date of enactment, but the Court includes the date here for the sake of clarity. *See* Denver, Colo., Ordinance No. 21-1310 (2021).

be made to the Energy Code by 2023, with additional amendments required by January 1, 2025, and January 1, 2027. *Id.*, ¶ 22.

Plaintiffs allege that Denver's gas appliance ordinances regulate industrial and consumer appliances and are preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422. *Id.* at 1-2, 23-27, ¶¶ 1, 67-82. Plaintiffs' amended complaint brings a single claim, entitled "Federal Preemption by the Energy Policy and Conservation Act," in which plaintiffs challenge Sections 10-16 and 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the Energy Code. *Id.* at 27-28, ¶¶ 83-91. Plaintiffs ask the Court to permanently enjoin Denver from enforcing or attempting to enforce Sections 10-16 and 10-20 of the Revised Municipal Code and Sections C403.2.4 and C404.10 of the Energy Code and to prohibit Denver from maintaining these provisions as part of the Revised Municipal Code and the Energy Code. *Id.* at 29, ¶ 93. Plaintiffs also ask the Court to issue a declaratory judgment stating that the challenged provisions are preempted by federal law and are therefore void and unenforceable. *Id.*, ¶ 94.

## II. LEGAL STANDARD

### A. <u>Rule 12(b)(1)</u>

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074

(10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). Ultimately, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because he is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

**B. Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to

dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

"To obtain dismissal at the Rule 12(b)(6) stage based on the statute of limitations, the allegations on the face of the complaint surrounding the date of accrual must 'make clear that the right sued upon has been extinguished.'" *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citation omitted).

## III. ANALYSIS

Plaintiffs' original complaint challenged three sets of legal provisions that are part of Denver's natural gas appliance laws. Docket No. 1 at 28, ¶¶ 87-88. The first set of standards (the "2023 standards") were added to the Energy Code, Sections C403.2.4 and C404.10, on January 9, 2023. *Id.* at 13 ¶ 30. The second set of standards ("the 2025 standards") is contained in Denver's Revised Municipal Code, Section 10.20(d), enacted on November 24, 2021. *See* Denver, Colo., Ordinance No. 21-1310 (2021) (enacting Revised Muni. Code 10.20(d)). Section 10.20(d) directs that the Energy Code be amended to include the 2025 standards by January 1, 2025. Revised Muni. Code § 10.20(d). At the time, the Energy Code had not yet been amended to include these standards. The third set of standards ("the 2027 standards") is contained in Denver's Revised Municipal Code, Section 10.20(e), enacted on November 24, 2021. *See* Denver, Colo., Ordinance No. 21-1310 (2021) (enacting Revised Muni. Code 10.20(e)).

Section 10.20(e) directs that the Energy Code be amended to include these standards by January 1, 2027. Revised Muni. Code § 10.20(e). The Energy Code has not been amended to include these standards.

On September 16, 2025, the Court granted in part and denied in part Sierra Club's motion to dismiss. Docket No. 43 at 24. The Court found that plaintiffs' challenges to the 2025 and 2027 standards are not ripe and dismissed those portions of the complaint, but found that the challenge to the 2023 standards is timely. *Id.* at 6. Accordingly, the Court will consider plaintiffs' claim that the 2023 standards are preempted by the EPCA.

### A. Article III Standing

To establish Article III standing, a plaintiff must allege "that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)). In order to demonstrate the first element of standing, a plaintiff must show that she has "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("Injury in fact is a constitutional requirement."). An injury is particularized if it affects the plaintiff in "a personal and individual way." *Spokeo,* 578 U.S. at 339 (citation omitted). "A 'concrete' injury must be 'de facto'; that is, it must actually exist;" it must be "real," not "abstract." *Id*. at 340. Furthermore, "[a] federal court's jurisdiction . . . can be invoked only when the plaintiff himself has

suffered 'some threatened or actual injury.'" *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).

Denver focuses on whether plaintiffs have suffered an injury in fact that is actual or imminent. *See* Docket No. 57 at 6-8.[5] Denver argues that plaintiffs lack Article III standing because they fail to provide factual detail for each organizational plaintiff to support an actual or imminent injury. *See id.* at 6-7. Furthermore, Denver argues that the 2023 standards do not "mandate the installation of a space heating or hot water heaters which run on a specific type of fuel source" and that there are a "number of exceptions" that would permit the installation of appliances fueled by natural gas. *See id.* at 7. Denver attaches to its motion the declaration of Charles Bartel, Denver's Commercial Building Plan Review Manager in the Department of Community Planning and Development. Docket No. 57-3 at 1, ¶¶ 1-2. Mr. Bartel states that, from May 1, 2025 through July 31, 2025, Denver approved 52% of permits subject to Section C403.2.4 that allow the use of electric appliances and approved 48% of permits that allow the use of natural gas or mixed fuel. *Id.*, at 2-3, ¶ 7. For this same time period, Mr. Bartel states that Denver approved 49% of permits subject to Section C404.10 that allow the use of electric-powered water heaters and approved 51% of permits that allow the use of natural gas. *Id.* at 3, ¶ 8. Because, "[i]n practice, approximately 50% of

[5] "[T]here is longstanding Supreme Court authority supporting standing for organizations whose injured members are not named." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024) (collecting cases). The Tenth Circuit has "previously held that organizational standing is proper even when the qualifying member of the plaintiff organization is anonymous." *Id.* at 951 (collecting cases). Therefore, the Court rejects Denver's argument that, "[w]hen organizational plaintiffs fail to explicitly identify the individuals who have been, or imminently will be, harmed, they have no standing." *See* Docket No. 57 at 6.

permit applicants were able to qualify for one of these exceptions which allowed them to install Covered Products that utilizes natural gas," Denver contends that "Plaintiffs cannot support their assertions that the Denver Energy Codes are written as or operate as a ban." *See* Docket No. 57 at 7-8.

"In a suit premised on the mere risk of future harm – that is, where the alleged injury-in-fact is imminent rather than actual – we must also consider the type of relief sought." *Owen-Brooks v. DISH Network Corp.*, 23-cv-01168-RMR-SBP, 2024 WL 4338133, at *5 (D. Colo. Aug. 23, 2024), *report and recommendation adopted,* 2024 WL 4333660 (D. Colo. Sept. 27, 2024) (citation omitted). In a suit for damages, a risk of future harm alone does not confer standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021) (finding "persuasive" TransUnion's argument that, "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm – at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm"); *Owen-Brooks*, 2024 WL 4338133, at *5 ("for *damages* based only on a risk of future harm, the plaintiff must allege some additional, currently felt concrete harms for standing") (internal quotation omitted). On the other hand, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *See TransUnion LLC*, 594 U.S. at 435. Because plaintiffs seek only injunctive relief, *see* Docket No. 52 at 29, ¶¶ 93-94, the Court will determine whether the complaint's allegations establish a risk of harm that is sufficiently imminent and substantial.

Plaintiffs' amended complaint alleges that the Restaurant Law Center ("RLC") membership includes more than "500,000 restaurant businesses located across the United States, including Denver" that will be harmed by the 2023 standards "by making the rates they pay for gas service higher than they would otherwise due to limiting the County's gas customer base." *Id.* at 5-6, ¶ 12. The complaint alleges that RLC members will be harmed by being unable to install natural gas appliances in newly constructed restaurants or when replacing existing heating equipment. *Id.* As an example, the RLC alleges that one of its members has been reliant on natural gas appliances for the past 15 years and that being forced to switch to electric appliances would "push the restaurant's electric panel past their limit" and "make it impossible" to continue serving the members' most popular item in a timely manner." *Id.*[6]

Regarding the National Association of Homebuilders ("NAHB"), the amended complaint alleges that the NAHB's "manufacturer members produce and sell gas appliances in the Denver area that building owners can no longer install and use" under the 2023 standards. *Id.* at 6-8, ¶ 13. For NAHB's builder members, the amended complaint alleges that they will suffer harm to their business operations and revenue because electric heating systems "require higher initial installation costs and often lead to increased operational expenses for homeowners due to higher electricity prices." *Id.* The amended complaint alleges that NAHB's builder members "must now hire experts, including electricians, to determine the increased costs involved in constructing buildings that use electric space and water heating." *Id.* Furthermore, NAHB has

[6] The amended complaint alleges that the Colorado Restaurant Association is a member of the RLC and, therefore, shares the same harms as the RLC. *See* Docket No. 52 at 8, ¶ 14.

members who sell natural gas appliances, such as tankless water heaters, boilers, and direct-vent heaters. *Id.* As a result of the Energy Codes, these manufacturers "are suffering or will imminently suffer harm to their revenues and business operations." *Id.*

The amended complaint alleges that the Home Builders Association of Metropolitan Denver includes members of the "residential home building industry." *Id.* at 8-9, ¶ 15. The complaint alleges that at least one of its members owns a building that is installed with gas water heaters and ranges and that, when it is time to replace these appliances, the member will have to pay "significant costs to retrofit the building with electric water heaters" and transitioning to electric appliances "poses substantial challenges for the member's construction projects," such as higher initial installation costs and delays in project timelines. *Id.* Like the RLC, the amended complaint alleges that the Home Builder Association of Metropolitan Denver would have increased gas energy bills due to the 2023 standards decreasing the pool of customers using natural gas appliances. *Id.* Furthermore, the Home Builders Association of Metropolitan Denver has at least one member who uses gas water heaters and ranges in a building that it owns. *Id.* Due to the Energy Codes, this member will "have to pay significant costs to retrofit the building with electric water heaters when the time comes to replace them" and pay "higher installations costs." *Id.* Because "the current supply chain for electric-only appliances is not as robust as for gas appliances," this member anticipates "delay[ed] project timelines and increase[d] overall costs." *Id.*

The amended complaint alleges that the National Apartment Association ("NAA") is a federation of apartment associations that are harmed by the 2023 standards that "restrict[] energy choice and increas[e] the costs of building and maintaining apartment

buildings." *Id.* at 9-10, ¶ 16. Specifically, the complaint alleges that the 2023 standards "will force NAA members to make costly electric retrofits for apartment buildings already developed using gas space and water heating" and deprive NAA members of the ability to "benefit from the reliability and cost advantages of gas." *Id.*

The amended complaint alleges that the American Hotel & Lodging Association ("AHLA") represents "all sectors and stakeholders in the U.S. lodging industry" that "often have large central plants for heating and cooling for domestic hot water." *Id.* at 10-11, ¶ 17. The complaint alleges that "[e]lectrifying central heating plant systems and kitchens can be extremely complex and would inflict significant capital and operations costs." *Id.* One of AHLA's members completed an "electrification study" which resulted in a cost estimate above $1 million, "without providing acceptable financial returns." *Id.* Like the RLC and the Home Builders Association of Metropolitan Denver, the complaint alleges that AHLA would experience increased gas energy bills due to the 2023 standards decreasing the pool of customers using natural gas appliances. *Id.*

The amended complaint alleges that the National Propane Gas Association ("NPGA") members include "retail marketers of propane gas who deliver the fuel to the end user, propane producers, transporters and wholesalers, and manufacturers and distributors of equipment, containers, and appliances." *Id.* at 11-12, ¶ 18. The amended complaint alleges that the 2023 standards will "decrease NPGA members' sales to less than they would be otherwise." *Id.*

The Court finds that the amended complaint's allegations establish a risk of future harm that is imminent and substantial. For each organizational plaintiff, as described above, the complaint alleges that the 2023 standards will increase plaintiffs'

members' operational costs and decrease revenue. Defendants' facial attack that relies on Mr. Bartel's declaration does not alter the Court's conclusion. Even if the Court were to accept Mr. Bartel's representation that approximately 50% of permits seeking exceptions to the 2023 standards are approved, that does not undermine the complaint's allegations of harm. The complaint alleges that the 2023 standards will decrease the number of customers seeking gas appliances, harming NAHB and NPGA's members' revenue from these sales. With fewer customers seeking gas appliances, the amended complaint alleges that gas costs, for those remaining customers using gas appliances, would increase. *See Foremaster v. City of St. George*, 882 F.2d 1485, 1487 (10th Cir. 1989) (holding that plaintiff had standing to challenge a subsidy awarded by the City of St. George, Utah to a Mormon temple because, "[t]o the extent that this subsidy diminished total revenues for the City's Utility Department, the Utility Department and the purchasers of municipal electricity are less well off and those purchasers may very well pay higher rates"). These harms exist even if a significant number of exceptions are granted to the 2023 standards. Accordingly, the Court finds that plaintiffs plausibly allege an injury in fact that confers Article III standing. *See Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 113-14 (2025) ("As for injury in fact, the fuel producers make money by selling fuel. Therefore, the decrease in purchases of gasoline and other liquid fuels resulting from the California regulations hurts their bottom line. Those monetary costs are of course an injury.") (internal quotation and citation omitted); *Nat'l Ass'n of Home Builders of United States v. Montgomery Cnty., Maryland*, 2026 WL 817322, at *3 (D. Md. Mar. 25, 2026) ("The gravamen of the alleged injury is that Bill 13-22 effectively bans gas

appliances in any new construction. From this, Plaintiff Washington Gas Light Company ("WGL") has alleged a sufficiently concrete and particularized injury to confer jurisdiction.").

### B. Preemption

Article VI, cl. 2 of the Constitution – known as the Supremacy Clause – provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress can demonstrate its intent to preempt expressly, through enacting a statute containing a preemption provision. *Id*. Preemption can also by implied through a statute's "structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

The EPCA contains an express preemption provision that reads:

> Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product.

42 U.S.C. 6297(c). Denver argues that the EPCA's preemption provision "is limited in scope to energy conservation standards" that govern how manufacturers design appliances. Docket No. 57 at 11-12. Denver contends that the preemption provision does not cover the 2023 standards. *See id.* at 14-15. Sierra Club argues that the 2023 standards are not preempted because they do not "restrict the amount of energy a covered appliance may consume or seek to produce any energy conservation savings." Docket No. 58 at 11. Rather than promulgate energy conservation standards, Sierra

Club states that Denver "enacted these Standards to protect residents from air pollution and safety threats." *Id.*

Plaintiffs respond that the 2023 standards fall within the scope of the EPCA's preemption provision, relying on the Ninth Circuit's holding in *Cal. Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094, 1099 (9th Cir. 2024). *See* Docket No. 59 at 13-15; Docket No. 60 at 4-12. Plaintiffs also argue that, even if defendants' "narrow interpretation" is correct, preemption would still apply because the 2023 standards, by "prohibiting gas use entirely," establish a maximum quantity of energy use. Docket No. 60 at 12-13. Thus, the dispute focuses on whether the 2023 standards regulate "energy use," as defined by the EPCA, by restricting or banning the use of gas appliances.

In *Berkeley*, the Ninth Circuit addressed whether the City of Berkeley's ordinance prohibiting natural gas infrastructure in newly constructed homes was preempted by the EPCA. *See Berkeley,* 89 F.4th at 1099. *Berkeley* concluded that, "[b]ased on its text, structure, and context, . . . EPCA preempts building codes like Berkeley's Ordinance that ban natural gas piping within new buildings." *Id.* at 1011. In reaching this conclusion, *Berkeley* relied on its interpretation of the term "energy use." *See id.* at 1101-1102. The EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). *Berkeley* held that, "as a matter of ordinary meaning, 'point of use' means the 'place where something is used.'" *Berkeley*, 89 F.4th at 1101 (citing Oxford English Dictionary Online (2022)). Putting these interpretations together, *Berkeley* concluded that:

> EPCA preempts regulations, including "building code requirements," § 6297(f), that relate to "the quantity of [natural gas] directly consumed by" certain

> consumer appliances at the place where those products are used. Right off the bat, we know that EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations, like restaurants. After all, a building code that prohibits consumers from using natural gas–powered appliances in newly constructed buildings necessarily regulates the "quantity of energy directly consumed by [the appliances] at point of use." So, by its plain language, EPCA preempts Berkeley's regulation here because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used.

*Id.* at 1101-02. Thus, *Berkeley* held that "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Id.* at 1102.

The Second Circuit in *Ass'n of Contracting Plumbers of City of N.Y., Inc.* v. *City of N.Y,* 180 F.4th 434, 451 (2d Cir. June 30, 2026), disagreed with the Ninth Circuit, finding that "Judge Friedland, dissenting from denial of rehearing en banc, has the better interpretation" of the EPCA preemption provision. *Ass'n of Contracting Plumbers* concerned a New York City law that "prohibits the use of appliances that run on natural gas, heating fuel, and other fossil fuels." *Id.* at 437. The Second Circuit held that the EPCA defines "energy use" to be "a standardized, fixed measure assigned to a product before it reaches consumers." *Id.* at 439. Accordingly, the Second Circuit concluded that "a regulation that effectively bars the use of a covered appliance by certain consumers . . . has little to do with that appliance's 'energy use'" and that "[t]he statutory definition all but confirms that the preemption provision does not directly implicate the energy an appliance consumes in the hands of consumers." *Id.* at 439-40.

The Court agrees with the Second Circuit's interpretation of "energy use" and "concerning" and with its reasoning for determining that the 2023 standards are not preempted by the EPCA. "If the statute contains an express pre-emption clause, the

task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). As stated above, "energy use" is defined in the EPCA as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). The test procedures under § 6293 are to be "reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Thus, these procedures for testing energy use are "designed to *replicate* the appliance's average use, meaning the tests are performed in a controlled setting, not at the appliance's ultimate destination in the hands of consumers." *Ass'n of Contracting Plumbers*, 180 F.4th at 439. "[O]nce an appliance has been sold, nothing a consumer does with the appliance changes that appliance's 'energy use.'" *Id.* Therefore, the 2023 standards – which only regulate appliances purchased by consumers and which do not impose requirements on manufacturers – do not regulate energy use as contemplated by the EPCA's preemption provision.

Plaintiffs contend that the EPCA must be "construed holistically, accounting for its structure and context." Docket No. 60 at 5. Plaintiffs focus on 42 U.S.C. §§ 6292(b)(1)(B) and 6295(l)(1)(B) for the proposition that "other parts of EPCA expressly contemplate that the term 'energy use' includes real-world use of the appliances." *Id.* As Sierra Club notes, these provisions treat "energy use" as a

measure of an appliance's average energy use, not as a measure of actual use on the consumer end. *See* Docket No. 62 at 4-5. Section 6292(b)(1)(B) states that a product may be classified as a covered product under the EPCA based on the "average annual per-household energy use by products of such type," which "means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type." 42 U.S.C. 6292(b)(2)(A). Similarly, § 6295(l)(1)(B) focuses on "the aggregate household energy use within the United States by products of such type (or class)." 42 U.S.C. § 6295(l)(1)(B). In short, the EPCA considers energy use to be a measure that is controlled by manufacturers, not by consumers' use of a covered product.

While plaintiffs assert that the EPCA's "structure and context" support plaintiffs' interpretation of the preemption provision, *see* Docket No. 60 at 5, the EPCA's structure and context support the opposite conclusion. The history of the EPCA and the preemption provision affirms that the preemption provision applies to state energy efficiency regulations. *See Ass'n of Contracting Plumbers*, 180 F.4th at 449. The EPCA established "a nationwide conservation program for appliances and required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). As the Department of Energy granted waivers to states to set their own standards, the result was "a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans." *Id.* at 500 (citing S. Rep. No. 100–6, at 4). In response,

Congress added the preemption provision to the EPCA "to counteract the systems of separate state appliance standards that had emerged." *Id.* "As one would expect from that history, the text of EPCA's preemption provision guarantees uniform appliance efficiency standards. It does not create a consumer right to use any covered appliance." *Berkeley*, 89 F.4th at 1121 (Friedland, J., dissenting).

Other provisions of the EPCA confirm that the scope of the preemption provision is limited to state regulations that impose energy use requirements on manufacturers before the appliances ever reach consumers. *See Ass'n of Contracting Plumbers*, 180 F.4th at 440-41. Pursuant to §§ 6294(c)(1)(A) and 6293(b)(4), the EPCA requires manufacturers to disclose a product's "annual operating cost" on the label that is calculated from "measurements of energy use." *See* 42 U.S.C. §§ 6294(c)(1)(A), 6293(b)(4). In these provisions, "if 'energy use' referred to the fluctuating energy used by an appliance at its ultimate destination, it would hardly be possible for manufacturers to determine a fixed operating cost." *Ass'n of Contracting Plumbers*, 180 F.4th at 440-41. The EPCA requires manufacturers to submit reports regarding "energy use," 42 U.S.C. § 6296(d)(1), which means that "'energy use' must be a pre-determined, fixed measurement that does not rely upon a product's real-world use" as "manufacturers can hardly be expected to track and report on the performance of their products after they leave their control and are placed in the hands of consumers." *Ass'n of Contracting Plumbers*, 180 F.4th at 440. Section § 6293(c)(1), which governs the marketing of products, "expressly ties a product's 'energy use' to the results of test procedures conducted in the pre-marketing (and by extension, pre-consumer) context." *Id*. The EPCA's warranty provision, 42 U.S.C. § 6297(g), is consistent with Congress's focus on

manufactures, not consumer use. The warranty provision provides that "[a]ny disclosure with respect to energy use . . . shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use." For the EPCA's warranty provision "to make any sense, a covered product's 'energy use' must be fixed and determined by the manufacturer, as no express or implied warranty could attach to a shifting value arising from a product's use by consumers." *Ass'n of Contracting Plumbers*, 180 F.4th at 440. Furthermore, the warranty provision confirms that the EPCA distinguishes between measures of energy use from measures of a product's actual use by consumers. *See id.*

Plaintiffs rely on *Berkeley*'s interpretation of the term "point of use," arguing that the term makes the preemption provision applicable to state regulations that govern consumer usage of EPCA-covered products. *See* Docket No. 60 at 6-7. However, the Second Circuit concluded that *Berkeley* "ignored the second half of the statutory definition" of "energy use" when focusing on the term "point of use." *Ass'n of Contracting Plumbers*, 180 F.4th at 451. Energy use is defined as "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures under section 6293 of this title*." 42 U.S.C. § 6291(4) (emphasis added). The Court agrees with *Ass'n of Contracting Plumbers* that, in considering the full definition – particularly the fact that energy use is measured by test procedures that must necessarily occur before the product reaches the consumer – the term "point of use" does not alter the scope of the preemption provision.

The Court also agrees with *Ass'n of Contracting Plumbers* that *Berkeley* did not apply the technical definition of "point of use." *Ass'n of Contracting Plumbers*, 180 F.4th at 452-53. "When interpreting statutes, courts take note of terms that carry technical meanings." *Van Buren v. United States*, 593 U.S. 374, 388 (2021) (alteration, internal quotation, and citation omitted). "'Point of use' has a well-established technical meaning that must be applied here: To measure energy at the 'point of use,' one measures only 'site energy,' the energy that is directly consumed by the appliance from the pipe or outlet." *Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting) (citing David Santana Ortiz & Mark Allen Bernstein, RAND, *Measures of residential energy consumption and their relationships to DOE policy* xiii–xiv, 6–7 (1999)). "[T]echnical sources demonstrate that 'point of use' does not refer to the place where an appliance is used; it refers to a technical way of measuring energy consumption." *Id.* at 1125. "Point of use" only relies on measures of "site energy," as opposed to considering "source energy," which is a measure of the energy consumed in the process of extracting the energy, removing its impurities, and transporting it to the location of the appliance's use. *See id.* at 1123.

Plaintiffs contends that the preemption clause is broad enough to cover the 2023 standards, specifically arguing that "Congress's use of the word 'concerning' indicates an intent to preempt not only regulations that look like the Department of Energy's ("DOE") energy conservation standards, but also regulations that merely 'concern' covered appliances' energy use and efficiency." *See* Docket No. 59 at 8-9. The use of "concerning" in statutory text is synonymous with "related to." *See Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 717 (2018); *Berkeley*, 89 F.4th at 1125 ("The

Supreme Court has said that 'concerning' means the same thing as 'relating to,' and it has recently counseled against reading such words too broadly.") (citing *Lamar*, 584 U.S. at 717; *Dubin v. United States*, 599 U.S. 110, 119 (2023)). "Congress' use of the word 'concerning' does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the 'energy use' of a covered product for preemption to apply." *Montgomery Cnty,* 2026 WL 817322, at *7 (citation omitted). Because the Court has concluded that the 2023 standards do not govern "energy use" as defined by the EPCA, the use of the word "concerning" does not extend the reach of the preemption provision to the 2023 standards. *See id.*; *Berkeley*, 89 F.4th at 1125-26 (Friedland, J., dissenting) ("Here, 'concerning' cannot transform the meaning of 'energy use.' Berkeley's ordinance obviously concerns natural gas, and natural gas is a type of energy. But to say that the ordinance therefore concerns 'energy use,' as defined by EPCA, is to engage in 'uncritical literalism.'"); *Ass'n of Contracting Plumbers*, 2026 WL 1871692, at *5 (rejecting plaintiffs' argument that use of the term "concerning" expanded the EPCA's preemption provision).

Plaintiff's sole remaining claim in this case is that the 2023 standards are preempted by the EPCA and therefore unenforceable. *See* Docket No. 52 at 27-28, ¶¶ 83-91. Because the 2023 standards are not preempted by the EPCA, the Court will dismiss with prejudice plaintiff's complaint.[7]

[7] When a claim fails as a matter of law, dismissal should be with prejudice. *Miller v. Asset Living, LLC*, No. 24-cv-02687-NYW-TPO, 2026 WL 705005, at *4 (D. Colo. Feb. 17, 2026), *report and recommendation adopted*, 2026 WL 701083 (D. Colo. Mar. 12, 2026) ("Because this claim fails as a matter of law, dismissal should be with prejudice because amendment would be futile.") (citing *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)).

## IV. CONCLUSION

It is therefore,

**ORDERED** that Defendant the City and County of Denver's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [Docket No. 57] is **GRANTED**. It is further

**ORDERED** that Defendant-Intervenor Sierra Club's Motion to Dismiss First Amended Complaint [Docket No. 58] is **GRANTED**. It is further

**ORDERED** that plaintiffs' complaint is **DISMISSED with prejudice**. It is further

**ORDERED** that this case is closed.

DATED August 7, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge